## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION

**J.O.P.** (**by and through Next Friend G.C.P.**), **M.A.L.C.**, **M.E.R.E.**, and **K.A.R.C.**, on behalf of themselves as individuals and on behalf of others similarly situated,

        Plaintiffs,

v.

**U.S. DEPARTMENT OF HOMELAND SECURITY**, **KEVIN MCALEENAN** (in his official capacity as Acting Secretary of Homeland Security), **U.S. CITIZENSHIP & IMMIGRATION SERVICES**, and **KENNETH CUCCINELLI** (in his official capacity as Acting Director of U.S. Citizenship & Immigration Services)

        Defendants.

Civil Action No.  8:19-CV-01944

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## COMPLAINT

Plaintiffs J.O.P., M.A.L.C., M.E.R.E., and K.A.R.C., on behalf of themselves and other similarly situated children seeking asylum, bring this class action complaint against Defendants U.S. Department of Homeland Security ("DHS"); Kevin McAleenan, in his official capacity as Acting Secretary of DHS; U.S. Citizenship and Immigration Services ("USCIS"); and Kenneth Cuccinelli, in his official capacity as Acting Director of USCIS.  Plaintiffs allege as follows.

## INTRODUCTION

1.    Plaintiffs are among thousands of unaccompanied immigrant children who have made the long and perilous journey to the United States to seek protection, fleeing violence and

1

persecution in their countries of origin.  This class action challenges a federal agency's sudden shift in policy that retroactively strips Plaintiffs of critical, statutory asylum protections.

2.      Recognizing the vulnerability and special needs of unaccompanied immigrant children, Congress has enacted laws specifically designed to protect them.  In 2008, Congress enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA").  The TVPRA provides multiple protections to unaccompanied immigrant children, who are often vulnerable to trafficking, persecution, trauma, and other harms en route to or while in the United States.

3.      The TVPRA draws on a prior statutory definition according to which an "unaccompanied alien child" ("UAC") is one whom the federal government determines to be without lawful immigration status, under the age of 18, and without a parent or legal guardian in the United States available to provide care and physical custody.  6 U.S.C. § 279(g)(2). Plaintiffs were each apprehended by Defendant DHS upon entering the United States and determined by a DHS agent to satisfy this definition.

4.      The TVPRA relieves unaccompanied immigrant children of two procedural hurdles to accessing the asylum system, providing a more child-appropriate way for the government to process their claims to protection under U.S. and international law fairly.

5.      First, the TVPRA creates an exception to the general requirement that applicants facing removal proceedings present their asylum claims in an adversarial setting before the immigration court.  Instead, the TVPRA allows unaccompanied immigrant children to pursue asylum in the first instance through a non-adversarial administrative interview with a trained asylum officer within USCIS, a process more appropriate for traumatized young applicants.

6.      Second, the TVPRA exempts unaccompanied immigrant children from a one-year filing deadline that otherwise applies to asylum applicants.  Without that TVPRA exemption, applicants filing later than one year after entering the United States must establish that they merit an exception to the one-year filing deadline.

7.      Under a policy USCIS adopted effective June 2013 to implement these TVPRA asylum protections, Plaintiffs, and all other unaccompanied children seeking asylum in the United States, were entitled to access the TVPRA asylum process once they had been determined to be a UAC upon their initial apprehension by DHS, and that determination remained in place. Under the 2013 policy, USCIS exercised initial jurisdiction over an unaccompanied child's asylum claim regardless of whether the applicant had turned 18 or been appointed a legal guardian before applying for asylum.

8.      The permanent protections enacted by Congress in the TVPRA are unlawfully curtailed by Defendants' recent actions.  On June 14, 2019, Defendant USCIS posted a memorandum dated May 31, 2019 (the "2019 Redetermination Memo") to its website announcing significant changes to how USCIS will implement the TVPRA, effective on June 30, 2019.[1]  USCIS did not publish the 2019 Redetermination Memo in the Federal Register, and the agency did not invite public comment on any of the new directives set forth in the memorandum.

9.      The 2019 Redetermination Memo now mandates that, beginning on June 30, 2019, an asylum officer must make an independent factual inquiry to redetermine whether an applicant met the statutory definition of a UAC on their filing date—even if that filing date was years ago, when the prior policy was in effect.  If USCIS determines that the individual no longer

---

[1] Ex. 1, U.S. Citizenship and Immigration Services, Updated Procedures for Asylum Applications Filed by Unaccompanied Alien Children (May 31, 2019), https://www.uscis.gov/humanitarian/refugees-asylum/asylum/minor-children-applying-asylum-themselves.

satisfied the definition on the date the individual applied for asylum, USCIS will decline

jurisdiction over the asylum application.  Moreover, based on the same determination, USCIS

must also conclude that an applicant is not entitled to the related protection that exempts UACs

from the one-year deadline for filing asylum applications.

10.     The 2019 Redetermination Memo applies to any USCIS decision issued on or

after its effective date of June 30, 2019.  Thus, the policy will be implemented retroactively—

applying to individuals who already had asylum applications pending before USCIS, even those

whom USCIS already interviewed, as of June 30, 2019, as well as to others who have relied upon

USCIS's 2013 policy.

11.     The 2019 Redetermination Memo marks a drastic change in USCIS policy and a

departure from the protections in the TVPRA that profoundly undermines Plaintiffs' rights, and

the rights of other unaccompanied children who have filed for or plan to file for asylum in the

United States.  Under the policy in place since 2013, Plaintiffs were entitled to seek asylum

before USCIS and were relieved from the requirement to show that they either had filed within

one year or qualified for an exception to that general deadline.  Under the new policy, they will

be deprived of their right to seek asylum before USCIS, and will face an adversarial process in

which a DHS prosecutor subjects them to cross examination and advocates for their deportation.

Further, Plaintiffs may lose their eligibility to seek asylum entirely by retroactive imposition of a

filing deadline that was inapplicable to their applications at the time they were filed.  The policy

thus undermines the core purpose of the TVPRA to provide procedural protections to vulnerable

children seeking asylum.

12.     The 2019 Redetermination Memo is the latest in a long line of recent policies

adopted in an effort to curtail the rights of unaccompanied children and others seeking asylum

and other protections in the United States, as revealed by a leaked DHS memorandum, titled

"Policy Options to Respond to Border Surge of Illegal Immigration" (herein, the "Policy Options

List") (Ex. 2).[2]  Among the listed "options" for responding to a "border surge" is a summary of

the policies announced in the 2019 Redetermination Memo, appearing alongside the Trump

Administration's policy to separate children from their families after entry as a means of

deterrence.  Ex. 2 at 1-2.  Despite acknowledging that the 2013 USCIS asylum policy "affords

the minors the protections under the Trafficking in Victims Protection Reauthorization Act

(TVPRA)," the author proposed to rescind that policy, which is referred to in a margin

annotation as "misguided."  *Id.* at 2.

13.     In making these significant and harmful policy changes that undermine the

purpose of and are inconsistent with the TVPRA, without providing notice or opportunity to

comment, and by announcing their intent to apply the new policy retroactively, Defendants have

violated the TVPRA itself, the Administrative Procedures Act ("APA"), and the constitutional

due process rights of children who seek to access the statutory asylum system in the United

States.

14.     Plaintiffs seek the Court's immediate intervention so that they and others

similarly situated may exercise their right to seek asylum before USCIS and maintain their

statutory exemption from the general one-year filing deadline.  Defendants' actions have caused

and, unless enjoined, will continue to cause serious and irreparable harm to Plaintiffs and to the

proposed class.  Plaintiffs therefore seek declaratory and injunctive relief from this Court to end

these violations and harms.

---

[2] Available at https://www.documentcloud.org/documents/5688664-Merkleydocs2.html.  On
information and belief, the leaked memorandum was provided to NBC News by the office of
Sen. Jeff Merkley, which obtained the memorandum from a government whistleblower.

**PLAINTIFFS**

15.     Plaintiff J.O.P. is a 17-year-old from Guatemala, who currently resides with his

mother at ▮▮▮▮▮▮▮▮▮▮ College Park, Maryland (located in Prince George's County).

He brings suit through his mother and next friend, G.C.P.

16.     J.O.P. fled Guatemala and came to the United States after witnessing a murder

and receiving violent threats.

17.     J.O.P. is currently in removal proceedings under 8 U.S.C. § 1229a, INA § 240.

18.     On or about November 25, 2015, agents for defendant Department of Homeland

Security determined that J.O.P. is a UAC.

19.     J.O.P. subsequently was reunified with his mother.

20.     On February 20, 2018, J.O.P. filed his asylum application with USCIS, exercising

his right to seek asylum before USCIS based on the policy that has been in place since 2013.  He

has yet to obtain an interview from USCIS for his asylum application.

21.     Plaintiff M.A.L.C. is a 20-year-old from Guatemala, who currently resides at

▮▮▮▮▮▮▮▮▮▮ Los Angeles, California.

22.     M.A.L.C.'s parents were murdered in Guatemala, and thereafter, he continued to

experience repeated threats of violence and extortion in Guatemala.  M.A.L.C. fled to the United

States in August 2016.

23.     M.A.L.C. is currently in removal proceedings under 8 U.S.C. § 1229a, INA § 240.

24.     In August 2016, agents for defendant Department of Homeland Security

determined that M.A.L.C. is a UAC.

25.     On February 14, 2018, when he was 19 years old, M.A.L.C. filed his asylum application with USCIS, exercising his right to seek asylum before USCIS based on the policy in place since June 2013.  M.A.L.C. has yet to be interviewed by USCIS on his asylum application.

26.     Plaintiff M.E.R.E. is a 20-year-old from El Salvador, who currently resides at ███████████████ Temple Hills, Maryland (located in Prince George's County).

27.     M.E.R.E. fled El Salvador because of abuse, discrimination, and persecution that he experienced based on his sexual orientation.

28.     M.E.R.E. is currently in removal proceedings under 8 U.S.C. § 1229a, INA § 240.

29.     On or about November 15, 2014, agents for defendant Department of Homeland Security determined that M.E.R.E. is a UAC.

30.     M.E.R.E. subsequently was reunified with his mother.

31.     On March 30, 2018, when he was 18 years old, M.E.R.E. filed his asylum application with USCIS, exercising his right to seek asylum before USCIS based on the policy that has been in place since 2013.  USCIS has not yet scheduled M.E.R.E. for an asylum interview.

32.     Plaintiff K.A.R.C. is a 20-year-old from El Salvador, who currently resides at ██ ███████████ Gaithersburg, Maryland (located in Montgomery County).

33.     K.A.R.C. fled El Salvador because of abuse, discrimination, and persecution that he experienced based on his perceived sexual orientation.

34.     K.A.R.C. is currently in removal proceedings under 8 U.S.C. § 1229a, INA § 240.

35.     Around May 2016, agents for Defendant Department of Homeland Security determined that K.A.R.C. is a UAC.

36.     In the fall of 2017, when K.A.R.C. was 18 years old, he filed his asylum application with USCIS, exercising his right to seek asylum before USCIS based on the policy in place since June 2013.  In November 2017, USCIS conducted the asylum interview with K.A.R.C.

## DEFENDANTS

37.     Defendant U.S. Department of Homeland Security ("DHS") is a federal cabinet department responsible for implementing and enforcing the Immigration and Nationality Act ("INA") (*see* 8 U.S.C. § 1103) and an "agency" within the meaning of the APA (5 U.S.C. § 551(1)).

38.     Defendant Kevin McAleenan is the Acting Secretary of Homeland Security and therefore the "head" of the Department of Homeland Security.  6 U.S.C. § 112(a)(2).  He is charged with administering and enforcing the federal immigration and nationality laws.  8 U.S.C. § 1103(a)(1), (3).  He is sued in his official capacity.

39.     Defendant U.S. Citizenship and Immigration Services ("USCIS") is a bureau within DHS (6 U.S.C. § 271) and an "agency" within the meaning of the APA (5 U.S.C. § 551(1)).  USCIS is the "agency" that issued the 2019 Redetermination Memorandum.

40.     Defendant Kenneth T. Cuccinelli is the Acting Director of U.S. Citizenship and Immigration Services and therefore the "head" of that agency (6 U.S.C. § 271(a)(2)).  He is sued in his official capacity.

## JURISDICTION AND VENUE

41.     This Court has federal question jurisdiction over Plaintiffs' complaint under 28 U.S.C. § 1331.  It has the authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202; 5 U.S.C. §§ 705, 706(1), 706(2)(A)-(D); and its general equitable powers.

42.     The APA provides a cause of action for parties adversely affected by final agency action when "there is no other adequate remedy in a court."  5 U.S.C. § 704.  That condition is met in this case because the 2019 Redetermination Memo is a "final agency action" within the meaning of the statute and there is no other adequate remedy available in any other court.

43.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants are officers or agencies of the United States and one or more Plaintiffs reside in the district within the meaning of 28 U.S.C. § 1391(d).

44.     This case is properly assigned to the Southern Division of the District of Maryland because the majority of Plaintiffs reside in that Division.  *See* Local Rule 501.

## FACTUAL BACKGROUND

### Passage of the TVPRA in 2008

45.     Before 2002, the care and placement of unaccompanied children in the United States was the responsibility of the Office of Juvenile Affairs in the former Immigration and Naturalization Service ("INS").  In 2002, Congress enacted the Homeland Security Act ("HSA"). Pub. L. No. 107-296, 116 Stat. 2153.  The HSA created DHS and transferred most immigration functions formerly performed by INS to the newly formed DHS and its components, including USCIS, Custom Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE").

46.     The HSA defined an "unaccompanied alien child" as a child who: "(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody."  HSA 462(g)(2); 6 U.S.C. § 279(g)(2).  Congress transferred to the Office for Refugee Resettlement ("ORR"), within the Department of Health and Human Services ("HHS"), the responsibility for

the care of UACs "who are in Federal custody by reason of their immigration status."  HSA 462(a), (b)(1)(A); 6 U.S.C. § 279(a), (b)(1)(A).

47.      Six years later, Congress passed the TVPRA, which was signed into law on December 23, 2008 and took effect in March 2009.  In addition to measures to combat international and domestic human trafficking, including trafficking of children, the TVPRA recognized the vulnerability of children fleeing their countries of origin to seek protection in the United States, and responded with multiple provisions addressing safe custody and child-appropriate procedures for unaccompanied children.

48.      In structuring the TVPRA, Congress placed legal protections for UACs, including provisions on asylum, in a section of the statute titled "Permanent protection for certain at-risk children."  TVPRA § 235(d).

49.      Among other safeguards, the TVPRA provides that USCIS has initial jurisdiction over a UAC's asylum application, even where the UAC is in removal proceedings—a deviation from the ordinary rule that "affirmative" asylum before USCIS is only available to those who are not in proceedings.  TVPRA § 235(d)(7); 8 U.S.C. § 1158(b)(3)(C).  Conferring initial jurisdiction on USCIS instead of an Immigration Judge provides a non-adversarial system more sensitive to the special needs of child immigrants who lack understanding of how to navigate an immigration system designed for adults, and who likely sought safety in the United States without understanding the legal options that exist, including asylum.  Instead of having to be cross examined in an adversarial courtroom by trained government lawyers (without the right to appointed counsel), a UAC applicant is seen by USCIS asylum officers trained to conduct non-adversarial interviews and apply child-sensitive and trauma-informed interview techniques.

50.     Generally, asylum applicants must file their asylum application within one year after entering the United States, subject to two limited exceptions.  8 U.S.C. § 1158(a)(2)(B). Recognizing that children were forced to struggle through a system designed for adults, even though they lack the capacity to understand nuanced legal principles, let alone courtroom and administrative procedures, the second TVPRA protection at issue here makes the one-year filing deadline inapplicable to UACs.  TVPRA § 235(d)(7); 8 U.S.C. § 1158(a)(2)(E).  Accordingly, a UAC who was unable to file within one year will not be required to demonstrate changed or extraordinary circumstances relating to the delay in filing the application, and that the application was nonetheless filed in a reasonable time.  *See* 8 U.S.C. § 1158(a)(2)(D); 8 C.F.R. § 208.4(a)(5).

51.     The TVPRA also requires that federal officials who discover a UAC must transfer the UAC to the custody of HHS within a 72-hour period (absent exceptional circumstances), for care and custody.  TVPRA § 235(b)(3); 8 U.S.C. § 1232(b)(3).  This requirement places UACs under the care of an agency set up to provide for their safety and welfare, rather than an agency whose mission is to enforce immigration laws.  For example, HHS contracts with agencies who have social workers on staff who are trained to work with children.

52.     Nothing in the TVPRA directs or authorizes any government agency to rescind a determination that a child is a UAC, or to abrogate the asylum procedures that apply to a child determined to be a UAC.

53.     In the words of Senator Dianne Feinstein, a co-author of the TVPRA provisions, their purpose was "to ensure that unaccompanied children receive humane and appropriate

treatment while in the custody of the U.S. Government"[3] and to "give unaccompanied minors

access to pro bono legal counsel and someone to look after their best interest."  154 Cong. Rec.

S10886 (daily ed. Dec. 10, 2008).  Senator Feinstein explained that:

> I believe we have a special obligation to ensure that these children are treated
> humanely and fairly.  Unfortunately, without this legislation, there would be no
> procedure to make sure that happens.  Currently, when a child is apprehended by
> immigration authorities, that child usually knows nothing about U.S. courts or
> immigration policies and frequently does not speak English.

*Id.*

54.     Congress instructed USCIS, in order to properly administer the TVPRA, to enact

"regulations which take into account the specialized needs of unaccompanied alien children and

which address both procedural and substantive aspects of handling unaccompanied alien

children's cases."  TVPRA § 235(d)(8); 8 U.S.C. § 1232(d)(8).  USCIS has failed to enact any

such regulations in the ten years since Congress passed the TVPRA.

### Initial Implementation of the TVPRA and the September 2012 Office of the Citizenship and Immigration Services Ombudsman's Report

55.     In 2009, USCIS issued a memorandum instructing asylum officers on the rules to

follow for evaluation of asylum applications filed by UACs in removal proceedings.  Ex. 3

(March 25, 2009 Memorandum re: *Implementation of Statutory Change Providing USCIS with*

*Initial Jurisdiction over Asylum Applications Filed by Unaccompanied Alien Children*).  The

memorandum instructs asylum officers that they must make an initial determination as to

USCIS's jurisdiction for all asylum applications filed by UACs in removal proceedings.  *Id.* at 4.

Further, according to the 2009 memorandum, asylum officers are to determine whether, at the

---

[3] July 31, 2008 Press Release, available at
https://www.feinstein.senate.gov/public/index.cfm/press-releases?ID=7b292e44-b306-86d0-
a0b4-981389abaf5d.

time of filing, the child was under 18 years of age and unaccompanied. *Id.* at 4-5. The 2009

memorandum states that "[f]ederal regulations will ultimately be promulgated in order to reflect

the procedures established for USCIS initial jurisdiction." *Id.* at 1.

56. The procedures set forth in the 2009 memorandum were contrary to the TVPRA,

as acknowledged by the Citizenship and Immigration Services Ombudsman ("Ombudsman").[4]

On September 20, 2012, the Ombudsman issued a report, titled *Ensuring a Fair and Efficient*

*Asylum Process for Unaccompanied Minor Children* (the "2012 Ombudsman Report") (Ex. 4),

providing an independent analysis of problems encountered by UACs seeking asylum in the

United States, and recommendations to improve the process. The Ombudsman recognized that

USCIS had failed to implement the "statutorily required regulations" for UACs seeking asylum.

Instead, USCIS had "developed and implemented certain temporary policies and procedures for

UAC asylum-seekers." *Id.* at 3.

57. To complete its review, the Ombudsman "interviewed USCIS Asylum Division

manager and staff at Headquarters and seven of the eight Asylum Offices, EOIR officials, and

stakeholders throughout the country." Ex. 4 at 2. The Ombudsman "also studied case assistance

requests and reported incidents submitted directly to [its] office by stakeholders." *Id.*

58. According to the Ombudsman, "Congress did not provide language indicating that

the filing of an asylum application should trigger a new or successive UAC determinations that

could eliminate statutory protections or remove the UAC from [removal] proceedings." *Id.* at 5.

59. The Ombudsman also recognized that the "TVPRA's procedural and substantive

protections were designed to remain available to UACs throughout removal proceedings,

---

[4] The Citizenship and Immigration Services Ombudsman, established by the Homeland Security
Act of 2002, provides independent analysis of problems encountered by individuals interacting
with U.S. Citizenship and Immigration Services, and proposes changes to mitigate those
problems. *See* 6 U.S.C. § 272.

housing placement, and the pursuit of any available relief.  Subjecting a child seeking asylum to multiple UAC determinations as is required by USCIS' temporary guidance appears at odds with the TVPRA's express purpose, namely, to provide timely, appropriate relief for vulnerable children." *Id.*

60.    The Ombudsman recognized that, when a child is placed in removal proceedings, the apprehending entity, whether ICE or CBP, "must make a finding that the child is unaccompanied." *Id.* at 5.  However, in the period between enactment of the TVPRA and promulgation of the 2013 policy, USCIS routinely revisited determinations that a child was a UAC, inquiring into whether the applicant was a UAC at the date of filing an asylum application and at the date of the asylum interview.  *Id.* at 3-4.  Based on such redeterminations, USCIS declined to exercise its initial jurisdiction over some children who had filed applications with USCIS pursuant to the TVPRA provisions.  *Id.* at 6.

61.    In the 2012 Ombudsman Report, the Ombudsman outlined numerous problems that flowed from redetermining UAC status at asylum interviews, including inefficiencies attendant upon scheduling and conducting interviews only to disclaim jurisdiction in nearly half the cases (*id.* at  6); officers assessing complex parent-child relationships without specialized training (*id.* at 7); and undermining predictability and uniformity in the handling of children's cases (*id.* at 6).  The Ombudsman explained that instead of "facilitating expedited, non-adversarial interviews envisioned by Congress," the USCIS policy of undertaking a redetermination of UAC status at every asylum interview created "delay and confusion." *Id.* at 4.

62.    Recognizing the deficiencies in this process, the Ombudsman made a number of recommendations "[t]o address confusion related to UAC redeterminations, facilitate improved

interview techniques and adjudications, and reduce post-interview processing delays." *Id.* at 1-2.

As the Ombudsman noted:

> A child's living circumstances or relationship with his or her family may be dynamic, so the child may fall both within and without of the UAC definition while present in the United States.  Given this fluidity, as well as inconsistencies in practice by DHS and EOIR, legal advocates believe that the UAC definition itself is too vague and impractical, and that the status, once attached, should remain with a child through the pendency of his or her case.

*Id.* at 4.[5]

63.     The Ombudsman recommended that USCIS accept jurisdiction of an asylum application filed by a child whom a federal agency had previously determined to be a UAC.  *Id.* at 4-5.

64.     As the Ombudsman correctly concluded based on its extensive assessment, "[e]liminating the practice of USCIS redetermining UAC status during the asylum interview would also restore a level of fairness that comes from having a predictable and uniform process." *Id.* at 6.  According to the Ombudsman, the practice of "adopt[ing a] UAC determination made for custody purposes by CBP and ICE . . . will positively affect all minors apprehended and placed into federal custody with the HHS, helping to ensure a consistent process for scores of children who seek asylum in the United States."[6]

**USCIS Response to the Ombudsman's Report and the 2013 Kim Memorandum**

65.     On April 11, 2013, USCIS responded to the Ombudsman's Report, thanking the Ombudsman "for the opportunity to respond to [the Ombudsman's recommendation] to ensure a fair and effective asylum process."  Ex. 8 at 1.  USCIS recognized that "there is room to

---

[5] The Ombudsman's report quotes an article from the American Immigration Lawyers Association, Immigration Practice Pointers 2011- 2012 Edition, "The ABCs of Representing Unaccompanied Children," (June 2011) at p. 588.

[6] Ex. 6, Annual Report 2013, Citizenship and Immigration Services Ombudsman (June 27, 2013).

improve," and agreed with the Ombudsman's recommendation that USCIS should accept

jurisdiction of asylum applications filed by children in federal custody under DHS.  *Id.* at 2-3.

66.     On May 28, 2013, USCIS issued a memorandum authored by Ted Kim, Acting

Chief, Asylum Division, regarding "*Updated Procedures for Determination of Initial*

*Jurisdiction over Asylum Applications Filed by Unaccompanied Alien Children*" (the "2013 Kim

Memorandum") (Ex. 5).  The 2013 Kim Memorandum provides procedures for "determining

jurisdiction in applications for asylum filed by unaccompanied alien children (UACs) under the

initial jurisdiction provision of the [TVPRA]."  Ex. 5 at 1.

67.     The 2013 Kim Memorandum implemented the Ombudsman's recommendation

that USCIS accept jurisdiction of the asylum applications of those children whom a federal

agency had already determined met the statutory definition of UAC.  *Id.* at 2.  Under the 2013

Kim Memorandum, "[i]n cases in which CBP or ICE has already determined that the applicant is

a UAC, Asylum Offices will adopt that determination and take jurisdiction over the case."  *Id.*

Further, if as of the date of initial filing of the asylum application, that UAC status determination

was still in place, "USCIS will take initial jurisdiction over the case, even if there appears to be

evidence that the applicant may have turned 18 years of age or may have reunited with a parent

or legal guardian since the CBP or ICE determination."  *Id.*

68.     The procedures set forth in the 2013 Kim Memorandum are consistent with the

TVPRA, as acknowledged by the Ombudsman.

69.     USCIS adopted the procedures set forth in the 2013 Kim Memorandum based on

the Ombudsman's analysis and recommendations.

70.     In reliance on the rules set forth in the 2013 Kim Memorandum, Plaintiffs and

other unaccompanied children similarly situated, filed asylum applications with USCIS prior to

June 30, 2019.

71.     As recently as May 20, 2019, USCIS confirmed to public stakeholders that the

asylum policy and procedures set forth in the 2013 Kim Memorandum remained in effect.

USCIS Asylum Division Quarterly Meeting Agenda (May 20, 2019).  Ex. 7 at 3.  This was the

most recent reaffirmation in a series of public statements to stakeholders in which USCIS

confirmed that "[t]he May 28, 2013 Memorandum on initial jurisdiction over asylum

applications filed by UACs and the related June 2013 policy documents remain in effect."  *Id.*

## The 2019 Redetermination Memo Issued by USCIS

72.     On June 14, 2019, USCIS published a memorandum on its website that drastically

changed the rules for determining whether a child is eligible to seek asylum before USCIS.  The

2019 Redetermination Memo, dated May 31, 2019, is authored by John Lafferty (Chief, Asylum

Division) and titled "*Updated Procedures for Asylum Applications Filed by Unaccompanied*

*Alien Children*" (Ex. 1).  Although the memorandum is dated May 31, 2019, USCIS did not

publish this memorandum on its website until June 14, 2019.

73.     The 2019 Redetermination Memo acknowledges that the asylum policy in place

since 2013 allowed "asylum officers to adopt prior UAC determinations made by U.S. Customs

and Border Protection (CBP) or U.S. Immigration and Customs Enforcement (ICE) without

further factual inquiry, so long as those determinations were still in place on the date of filing the

asylum application."  Ex. 1 at 2.

74.     Reversing the 2013 policy, the 2019 Redetermination Memo directs that all

asylum officers must "mak[e] independent factual inquiries in all cases in order to determine

17

whether the individual met the UAC definition on the date of first filing the asylum application"

which in turn determines whether USCIS will exercise jurisdiction, and "examine whether the

individual was a UAC at the time of first filing for the purposes of determining whether the one-

year filing deadline applies." *Id.*

75. Under the new policy set forth in the 2019 Redetermination Memo, a UAC who

was previously determined to be a UAC and who applied for asylum with USCIS after turning

18 or reunifying with a parent or guardian relying on existing USCIS policy would have their

asylum application rejected by USCIS for lack of jurisdiction.  That UAC could also lose

eligibility for asylum in any forum due to the retroactive application of the one-year bar on

filing.

76. The 2019 Redetermination Memo states that its "updated procedures" "apply to

**<u>any</u>** USCIS decision issued on or after the effective date" of the memorandum (emphasis in

original). *Id.* at 1.  The 2019 Redetermination Memo is dated May 31, 2019 and therefore

purports to take effect on June 30, 2019, which is 30 calendar days from the date of the

memorandum.

77. Under the 2019 Redetermination Memo, an individual who was previously

determined to be a UAC, and who applied for asylum relying on the procedures set forth in the

2013 Kim Memorandum, could arrive at an asylum interview to find that USCIS will decline

jurisdiction because the asylum officer determined the applicant was not a UAC at the time of

application.  Indeed, the same retroactive jurisdictional denial could be made for cases that were

interviewed years ago and are still awaiting decision.  In those and other postures, if an asylum

officer determines that, at the time the application was filed, the child was over 18 or had a

parent or legal guardian in the United States who the asylum officer determines was "available to

18

provide care and physical custody," then the asylum officer must decline jurisdiction. For those unaccompanied children in removal proceedings who applied for asylum when they were 18 or older or who later found a parent or guardian, based on its redetermination, USCIS will refer the children's asylum claims to the Immigration Court where they will await an adversarial process. Moreover, as the CIS Ombudsman noted with reference to the initial 2009 policy, any record made in the USCIS interview is then transmitted to ICE, where it can be used to cross-examine the applicant in the adversarial immigration process. The UAC applicant has no opportunity to challenge those USCIS notes, taken in the course of a process USCIS now claims not to have jurisdiction to conduct

78.     There are many reasons an unaccompanied child may have filed for asylum after one year, after turning 18, or after a parent or legal guardian in the United States became able to take custody of the child.

79.     As Congress recognized in passing the TVPRA, children are particularly unable to access complex immigration systems without the aid of a legal representative, and it could take a child a substantial period of time to find legal representation—if she ever does. The TVPRA's procedural protections allow a child additional time to find legal representation and access the asylum process. Many unaccompanied children, including one or more of Plaintiffs, find legal representation after turning 18 or more than one year after entry, and subsequently file for asylum before USCIS.

80.     Other children may find legal representation, but then pursue a form of immigration relief or protection other than asylum first, knowing that that the TVPRA asylum process remains available. For example, many unaccompanied children suffered neglect, abandonment, or abuse by a parent that qualifies them for special immigrant juvenile status

("SIJS") under 8 U.S.C. § 1101(a)(27)(J)(iii)—a form of protection that was substantially

broadened by the TVPRA—or qualify for forms of relief such as T and U visas for victims of

trafficking and other crimes. For many reasons, including speed of processing, ability to avoid

revisiting trauma, and availability of visas, a UAC and his or her legal representative may decide

to pursue SIJS or another form of potential relief prior to filing for asylum before USCIS.

81.     In applying for one of these other forms of relief since 2013, a child applicant

could rely on the opportunity to later file for asylum before USCIS, exempt from the one-year

filing deadline and still be entitled to the child-appropriate non-adversarial interview process in

the first instance.  Then, under the system Congress created, if the child were unsuccessful in the

USCIS process, she would have the case referred back to immigration court, where she could

again present her asylum evidence to the immigration judge in an adversarial procedure.

82.     USCIS has during a period of many months delayed scheduling asylum

interviews for unaccompanied child applicants, preventing them from securing relief under the

established policy.  Upon information and belief, USCIS delayed scheduling interviews in

anticipation of the pronouncement of a new policy.  Further, USCIS may have delayed

interviews and adjudications in anticipation of an effective date such as that of the 2019

Redetermination Memo, with the effect of applying the policy retroactively to bar otherwise

qualified children from benefitting from the protections of the TVPRA.

83.     USCIS asserts in the 2019 Redetermination Memo that USCIS has adopted the

new asylum policy in order to bring USCIS practice in line with a precedential Board of

Immigration Appeals ("BIA") decision regarding jurisdiction over asylum applications.

According to USCIS, the new rule is necessary "[t]o ensure USCIS is making these jurisdictional

determinations in a manner consistent with Immigration Judge determinations on the same issue."  Ex. 1 at 2.

84.     The BIA decision referenced in the 2019 Redetermination Memorandum, *Matter of M-A-C-O-*, 27 I. & N. Dec. 477 (BIA 2018), does not divest USCIS of its authority to determine whether it has jurisdiction over an asylum application.  Indeed, USCIS recognized this in the 2019 Redetermination Memo, stating "both the Immigration Judge and USCIS have authority to make this jurisdictional determination."  Ex. 1 at 2.  USCIS also recognized in its May 20, 2019 report that the *Matter of M-A-C-O-* decision "does not address USCIS determinations about its own jurisdiction.  USCIS continues to make its jurisdictional determinations under its own procedures."  Ex. 7 at 3.

85.     The BIA decision does not mandate any changes to USCIS policy.  It does not invalidate the asylum policy set forth in the 2013 Kim Memorandum or direct USCIS to implement new procedures.  And it only addresses the question of UAC applicants over the age of 18 at time of filing, not the other elements of the UAC statutory definition.

86.     Neither the BIA decision nor the 2019 Redetermination Memo undertakes any examination of the reasons USCIS adopted the asylum policy set forth in the 2013 Kim Memorandum.  Nor do they consider any of the legislative history or Congressional intent in enacting the TVPRA.

87.     The 2019 Memorandum is a final agency action under 5 U.S.C. § 704.  The action "mark[s] the 'consummation' of the agency's decisionmaking process" and it is not "of a merely tentative or interlocutory nature."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997).  The memorandum marks the culmination of USCIS's process for setting rules governing its jurisdiction and legal consequences will flow from it, as existing asylum applicants will lose the

21

right to seek relief from the asylum office and, in some instances, will have their applications

denied as time barred unless they can establish an exception to the bar.

88.     The directives in the 2019 Redetermination Memo establish a binding norm and

leave asylum officers with no discretion.  Specifically, the 2019 Redetermination Memo states,

"The asylum officer **must** evaluate whether the asylum application was filed by a UAC by

making an independent factual inquiry as to whether the individual met the UAC definition at the

time of first filing the asylum application."  Ex. 1 at 3 (emphasis added).

89.     The 2019 Redetermination Memo imposes new legal burdens on and alters the

legal rights and interests of asylum seekers who have previously been determined to be UACs.

Specifically, the 2019 Redetermination Memo provides, "As the party invoking USCIS

jurisdiction, the individual filing for asylum bears the burden to establish that he or she met the

UAC definition, which includes the applicant's burden to establish his or her age, and that the

applicant was unaccompanied, at the time of first filing the asylum application."  *Id.*

90.     Defendants did not undertake notice-and-comment rulemaking prior to issuing the

2019 Redetermination Memo.

91.     The policy announced in the 2019 Redetermination Memo sets forth legislative

rules and is thus not exempt from the APA's requirements of notice and comment.  The 2019

Redetermination Memo reflects a legislative policy judgment, not merely interpretative

guidance.

**Defendants' Failure to Promulgate Regulations Despite the TVPRA's Mandate to Do So**

92.     The TVPRA expressly directs USCIS to promulgate regulations governing the

handling of asylum claims by UACs:  "Applications for asylum and other forms of relief from

removal in which an unaccompanied alien child is the principal applicant shall be governed by

22

regulations which take into account the specialized needs of unaccompanied alien children and which address both procedural and substantive aspects of handling unaccompanied children's cases." TVPRA § 235(d)(8); 8 U.S.C. § 1232(d)(8).

93.     In the fall of 2011, DHS and USCIS included in the Unified Agenda a proposed rule titled "Application of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 to Unaccompanied Alien Children Seeking Asylum." RIN 1615-AB96.[7] The notice indicated that the proposed "rule implements the provisions of the TVPRA" and acknowledged that "[t]he TVPRA mandated promulgation of regulations taking into account the specialized needs of unaccompanied alien children and addressing both procedural and substantive aspects of handling unaccompanied children's cases." The agencies did not publish the text of the proposed rule.

94.     DHS and USCIS included the same notice in the Unified Agenda again in 2012, Spring 2013, Fall 2013, Spring 2014, Fall 2014, Spring 2015, Fall 2015, Spring 2016, Fall 2016, Spring 2017, Fall 2017, Spring 2018, and Fall 2018. Yet in the almost eight years since first including this notice in the Unified Agenda, the agencies have not published a Notice of Proposed Rulemaking, and have made no progress toward promulgating regulations implementing the UAC provisions of the TVPRA.

## Plaintiffs Relied on USCIS's 2013 Policy and the TVPRA and Will Be Deprived of Their Right to Seek Asylum Before USCIS Under the New Policy and Will Be Severely Harmed

95.     Plaintiff M.E.R.E. entered the United States when he was 15 years old. Upon apprehension, he was determined by DHS to be a UAC.

96.     In reliance on the 2013 policy, M.E.R.E. first sought other forms of protection from removal, ultimately applying for asylum in March 2018 after reaching the age of 18.

---

[7] Available at https://reginfo.gov/public/do/eAgendaViewRule?pubId=201110&RIN=1615-AB96.

Almost 15 months later, M.E.R.E. has not had an interview scheduled and his asylum application is still pending.

97.     Under the new policy set forth the in 2019 Redetermination Memo, USCIS will decline jurisdiction over M.E.R.E.'s asylum application because he filed after turning 18. M.E.R.E. will lose the protections associated with USCIS jurisdiction over his asylum application and instead will be subject to an adversarial process in Immigration Court where he will be cross-examined about the abuse and persecution he suffered as a child.  This will further delay the already extended period of time M.E.R.E. has waited for his asylum application to be decided.  The added delay will continue to prevent M.E.R.E. from pursuing his education.

98.     Because of the new policy set forth the in 2019 Redetermination Memo, the government may conclude that M.E.R.E. is ineligible for asylum since he filed his application more than one year after entering the United States.

99.     Plaintiff M.A.L.C. entered the United States when he was 17 years old.  Upon apprehension, he was determined by DHS to be a UAC.

100.     In reliance on the 2013 policy, M.A.L.C. applied for asylum in February 2018, when he was 19 years old.  Over 16 months later, USCIS has not interviewed M.A.L.C. and his asylum application is still pending.

101.     Under the new policy set forth the in 2019 Redetermination Memo, USCIS will decline jurisdiction over M.A.L.C.'s asylum application because he filed after turning 18. M.A.L.C. will lose the protections associated with USCIS jurisdiction over his asylum application and instead will be subject to an adversarial process in Immigration Court where he will be cross-examined about the abuse and persecution he suffered as a child.  This will further

delay the already extended period of time M.A.L.C. has waited for his asylum application to be decided.

102.    Further, M.A.L.C. may be deemed ineligible for asylum at all because his application was filed more than one year after he entered the United States.

103.    Plaintiff K.A.R.C. entered the United States when he was 17 years old.  Upon apprehension, he was determined by DHS to be a UAC.

104.    In reliance on the 2013 policy, K.A.R.C. applied for asylum in the fall of 2017, when he was 18 years old.  K.A.R.C. had an asylum interview in November 2017.  Over 19 months later, K.A.R.C. has not received a decision on his asylum application.

105.    Under the new rules set forth in the 2019 Redetermination Memo, USCIS will decline jurisdiction over K.A.R.C.'s asylum application because he filed after turning 18. K.A.R.C. will lose the protections associated with USCIS jurisdiction over his asylum application and instead will be subject to an adversarial process in Immigration Court where he will be cross-examined about the physical abuse he suffered at the hands of his father and brother and the rape and threats of physical violence by gang members.  This will further delay the already extended period of time K.A.R.C. has waited for his asylum application to be decided. The added delay will prevent K.A.R.C. from pursuing a college education.

106.    Further, K.A.R.C. may be deemed ineligible for asylum at all because his application was filed more than one year after he entered the United States.

107.    Plaintiff J.O.P. entered the United States when he was 15 years old.  Upon apprehension, DHS determined him to be a UAC.

108.    In reliance on the 2013 policy, J.O.P. applied for asylum in February 2018, still

under the age of 18, but after being reunited with his mother in the United States.  J.O.P. has not

been scheduled for an asylum interview.

109.    Under the new policy set forth the in 2019 Redetermination Memo, USCIS will

decline jurisdiction over J.O.P.'s asylum application because he filed after reuniting with his

mother.  J.O.P. will lose the protections associated with USCIS jurisdiction over his asylum

application and instead will be subject to an adversarial process in Immigration Court where he

will be cross-examined about the murder he witnessed and threats he received in his home

country.  This will further delay the already extended period of time J.O.P. has waited for his

asylum application to be decided.

## CLASS ALLEGATIONS

110.    Plaintiffs incorporate by reference the preceding allegations of this Complaint.

111.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(2) on

behalf of themselves and a nationwide class of all other persons similarly situated.

112.    Plaintiffs seek to represent the following nationwide class:

All individuals nationwide who (1) were determined to be an Unaccompanied Alien
Child before June 30, 2019; and (2) who had filed an asylum application that was
pending with United States Citizenship and Immigration Services ("USCIS") as of June
30, 2019; and (3) on the date they filed their asylum application with USCIS, were 18
years of age or older, or had a parent or legal guardian in the United States who is
available to provide care and physical custody; and (4) as of June 30, 2019, USCIS has
not adjudicated the individual's asylum application.

113.    Plaintiffs are each adequate representatives of the proposed class.

114.    The proposed class satisfies the requirements of Rule 23(a)(1) because the class is

so numerous that joinder of all members is impracticable.

26

115.    On information and belief, there are thousands of individuals who fit within the class.

116.    The class meets the commonality requirements of Rule 23(a)(2).  The members of the class are all subject to the 2019 Redetermination Memo and will lose their right to proceed before USCIS on the basis of the new policy.  This lawsuit raises questions of law common to all members of the class, including whether Defendants have violated the class members' due process rights; whether the 2019 Redetermination Memo is arbitrary and capricious under the APA; and whether the 2019 Redetermination Memo is unlawful because it was not promulgated pursuant to notice-and-comment as required by the APA.

117.    The proposed class meets the typicality requirements of Rule 23(a)(3), because the claims of the representative Plaintiffs are typical of the claims of the class.  Plaintiffs and the proposed class share the same legal claims, which assert the same substantive and procedural rights under the due process clause, the APA, and the TVPRA.

118.    The proposed class meets the adequacy requirements of Rule 23(a)(4).  The representative Plaintiffs seek the same relief as other members of the class and have identical interests to the class members in vigorously pursuing that relief.  In defending their own rights, Plaintiffs will defend the rights of all proposed class members fairly and adequately.

119.    The proposed class also satisfied Federal Rule of Civil Procedure 23(b)(2). Defendants have acted on grounds that are generally applicable to each class member.  Injunctive and declaratory relief is thus appropriate with respect to the class as a whole.

## COUNT I
**(Administrative Procedure Act – Arbitrary, Capricious, or Otherwise Not in Accordance With Law)**

120.    Plaintiffs incorporate by reference the preceding allegations of this Complaint.

121.    Title 5, U.S. Code § 706(2) authorizes a court to hold unlawful and set aside final agency action found to be arbitrary, capricious, an abuse of discretion (e.g., irrational), or otherwise not in accordance with law, or in excess of statutory jurisdiction or authority.

122.    The asylum policy set forth in the 2019 Redetermination Memo is arbitrary, capricious, an abuse of discretion, not in accordance law, and is inconsistent with the TVPRA, and therefore in violation of 5 U.S.C. § 706(2).

123.    The 2019 Redetermination Memo violates the TVPRA because the asylum rules set forth therein are contrary to its plain language.  The 2019 Redetermination Memo mandates that all asylum officers must evaluate, in all cases, whether an applicant met the statutory definition of a UAC at the time of filing the asylum application.  This mandate applies in all cases, even where an individual had previously been determined to be a UAC.  These mandates are contrary to the structure and text of the TVPRA, which plainly establish that a child's UAC status determination occurs upon the child's initial contact with a federal government department or agency and is not subject to redetermination by USCIS.

124.    The 2019 Redetermination Memo is arbitrary and capricious because, for example, it does not address, nor acknowledge, any of the reasons for adopting the asylum policy in place since 2013 for UACs seeking asylum before USCIS.  Defendants have failed to provide any explanation, much less a reasoned explanation, of how the 2019 Redetermination Memo addresses the issues leading to the adoption of the 2013 Memorandum, or why consistency with Board of Immigration Appeals precedent relates to whether a UAC has subsequently been reunited with a parent or assigned a legal guardian.

125.    The 2019 Redetermination Memo is also arbitrary and capricious because it fails to consider the reliance interests of children, including Plaintiffs, with pending asylum applications who had relied in good faith on the asylum policy in place since 2013.

**COUNT II**
**(Violation of Due Process)**

126.    Plaintiffs incorporate by reference the preceding allegations of this Complaint.

127.    Defendants violate Plaintiffs' Due Process rights by retroactively applying the asylum rules set forth in the 2019 Redetermination Memo.  Plaintiffs filed for asylum reasonably expecting to benefit from all the protections and rights accorded by the TVPRA to UACs, as outlined by the 2013 Kim Memorandum.  Yet the 2019 Redetermination Memo will actually penalize the Plaintiffs' past conduct taken in reliance on USCIS policy in place since 2013.

128.    The asylum policy set forth in the 2019 Redetermination Memo changes the legal landscape for child asylum applicants by radically rewriting the terms under which applicants like the Plaintiffs, who have been determined to be UACs, can seek asylum.  Pursuant to the asylum policy promulgated by the 2013 Kim Memorandum, USCIS had initial jurisdiction over each of Plaintiffs' asylum applications based on DHS's prior determination that each Plaintiff was a UAC.  Without any meaningful notice to the public, USCIS has changed the rules and stated unequivocally that it will apply its new jurisdictional requirements even to applications that were pending with the agency before the new policy's effective date.  Application of the new asylum policy will prevent USCIS from hearing the Plaintiffs' asylum claims, thereby depriving them of the protections Congress provided for UACs in the TVPRA.   By subjecting Plaintiffs to a one-year bar on filing an asylum applications, application of the new asylum policy will render Plaintiffs completely ineligible for asylum unless they are able to carry the burden of establishing one of two narrow exceptions to the bar in immigration court.

29

129.     The 2019 Redetermination Memorandum violates the procedural protections of

the Fifth Amendments' Due Process Clause.  The 2019 Redetermination Memorandum is

therefore "contrary to constitutional right, power, privilege, or immunity" and invalid under 5

U.S.C. § 706(2)(B).

**COUNT III**
**(Failure to Follow APA Procedure)**

130.     Plaintiffs incorporate by reference the preceding allegations of this Complaint.

131.     Under the Administrative Procedure Act, an agency must provide "[g]eneral

notice of proposed rulemaking . . . published in the Federal Register" whenever the agency seeks

to promulgate a rule.  5 U.S.C. § 553(b).  Exempt from this requirement are "interpretive rules,

general statements of policy, or rules of agency organization, procedure, or practice."  *Id.*  After

the agency has published the required notice, "the agency shall give interested persons an

opportunity to participate in the rule making through submission of written data, views, or

arguments."  *Id.* § 553(c).

132.     Defendants did not provide notice of proposed rulemaking, nor did they invite

comments from interested persons before issuing the 2019 Redetermination Memo.

133.     None of the statutory exceptions to the requirement of notice-and-comment

rulemaking is applicable here.  *See* 5 U.S.C. § 553(b).

134.     The asylum rules set forth in the 2019 Redetermination Memo are legislative

rules, not interpretive rules, because, for example, they effect a substantive change in existing

law.

135.     The 2019 Redetermination Memo is not a statement of policy that is exempt from

public notice, including because it establishes binding rules on all asylum officers without

leaving room for any exercise of discretion.

136.    The asylum policy set forth in the 2019 Redetermination Memo does not constitute rules of agency organization, procedure, or practice.

137.    The May 2019 Policy Memorandum was issued "without observance of procedure required by law" and is invalid under 5 U.S.C. § 706(2)(D).

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs request that the Court:

a)  declare that the 2019 Redetermination Memorandum is unlawful;

b)  vacate the 2019 Redetermination Memorandum;

c)  enjoin Defendants from enforcing or applying any aspect of the 2019 Redetermination Memorandum;

d)  enjoin Defendants from taking adjudicatory or enforcement action against Plaintiffs or members of the proposed class during the pendency of this litigation;

e)  grant Plaintiffs their costs in this action, including reasonable attorneys' fees incurred pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

f)  award other relief that the Court deems just and proper.

Dated: July 1, 2019


Respectfully submitted,

/s/Brian Burgess

Brian Burgess (Bar No. 19251)
Stephen R. Shaw*
Goodwin Procter LLP
901 New York Avenue, NW
Washington, DC 20001-4432
Phone: 202-346-4000
Fax: 202-346-4444
BBurgess@goodwinlaw.com
SShaw@goodwinlaw.com


Elaine Herrmann Blais*
Sarah K. Frederick*
Kevin J. DeJong*
Christie Larochelle*
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
Phone: 617-570-1000
Fax: 617-523-1231
EBlais@goodwinlaw.com
SFrederick@goodwinlaw.com
KDejong@goodwinlaw.com
CLarochelle@goodwinlaw.com

*Attorneys for Plaintiffs*

*\* pro hac vice application forthcoming*

Scott Shuchart*
Kids in Need of Defense
1201 L Street, NW, Floor 2
Washington, DC 20005
Phone: 202-318-0595
Fax: 202-824-0702
sshuchart@supportkind.org

Wendy Wylegala*
Kids in Need of Defense
1251 Avenue of the Americas (c/o
Lowenstein Sandler LLP)
New York, NY 10020
Phone: 862-926-2069
Fax: 202-824-0702
wwylegala@supportkind.org

Michelle N. Mendez
Catholic Legal Immigration Network
(CLINIC)
8757 Georgia Avenue, Suite 850
Silver Spring, MD 20910
Phone: 301-565-4824
Fax: 301-565-4824
mmendez@cliniclegal.org

Rebecca Scholtz*
Catholic Legal Immigration Network
(CLINIC)
30 S. 10th Street (c/o University of St.
Thomas Legal Services Clinic)
Minneapolis, MN 55403
Phone: 651-962-4833
Fax: 301-565-4824
rscholtz@cliniclegal.org

Kristen Jackson*
Mary Tanagho Ross*
Public Counsel
610 South Ardmore Avenue
Los Angeles, CA 90005
Phone: 213-385-2977
Fax: 213-201-4727
kjackson@publiccounsel.org
mross@publiccounsel.org