# EXHIBIT 4

# Citizenship and Immigration Services Ombudsman

## ENSURING A FAIR AND EFFECTIVE ASYLUM PROCESS FOR UNACCOMPANIED CHILDREN

September 20, 2012

It has been a privilege and an honor to have served as Acting Ombudsman these past six months. We welcome our new Citizenship and Immigration Services Ombudsman, Maria Odom, who brings to our mission a tremendous wealth of experience and an abiding commitment to serving those in need.

As promised in our 2012 Annual Report, we are in the process of completing several important recommendations for release over the next 90 days. This recommendation, *Ensuring a Fair and Efficient Asylum Process for Unaccompanied Children*, reviews the handling by USCIS of asylum claims filed by a uniquely at-risk population. It encourages collaboration among key stakeholders to ensure the timely, appropriate processing of asylum cases, consistent with requirements set forth in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008.

Four years have passed without the issuance of formal regulations on the asylum process for unaccompanied children, and interim policies and procedures do not provide adequate protections. While the efforts of USCIS are admirable, further strides must be taken to serve this population.

The Ombudsman's Office is committed to working with USCIS to overcome identified procedural, informational and training barriers. These recommendations seek to improve processes for USCIS staff and customers seeking critical immigration relief. Ultimately, we trust that they will also contribute to the integrity our nation's immigration system.

Sincerely,

Debra Rogers
Acting Citizenship and Immigration Services Ombudsman

### RECOMMENDATIONS

The Ombudsman recommends that USCIS:

1) Accept jurisdiction of UAC cases referred by the Executive Office for Immigration Review.

2) Accept jurisdiction of cases filed by children in federal custody under the U.S. Department of Health and Human Services.

3) Follow established UAC-specific procedures, expand implementation of certain best practices, and enlist clinical experts for quality assurance and training. More specifically, USCIS should:

   a) Establish points of contact for the public to improve communication, coordination, and problem solving,
   b) Pre-assign UAC cases to officers with specialized knowledge and skills, and
   c) Contract with clinical experts adept at interviewing vulnerable children as part of an ongoing quality assurance and training component of the UAC asylum program.

4) Limit Headquarters review to a process that can be managed within 30 days.

5) Issue as soon as possible regulations regarding the UAC asylum process.

### REASONS FOR THE RECOMMENDATIONS

- USCIS' policy of redetermining UAC status creates delay and confusion. Instead of facilitating expedited, non-adversarial interviews for young asylum-seekers, it essentially disregards UAC status determinations rendered by other federal agencies.

- The USCIS Asylum Division Headquarters' review process, focused in part on jurisdiction matters, takes from several months to a year or more. Such delays are untenable, and at times, impact negatively a child's eligibility for foster care, refugee minor benefits, or continued placement in an appropriate care facility.



*Office of the Citizenship and Immigration Services Ombudsman*
*U.S. Department of Homeland Security*
*Washington, DC 20528-0180*
*www.dhs.gov/cisombudsman*

# Citizenship and Immigration Services Ombudsman
## ENSURING A FAIR AND EFFECTIVE ASYLUM PROCESS FOR UNACCOMPANIED CHILDREN

**September 20, 2012**

*The Citizenship and Immigration Services Ombudsman, established by the Homeland Security Act of 2002, provides independent analysis of problems encountered by individuals and employers interacting with U.S. Citizenship and Immigration Services, and proposes changes to mitigate those problems.*

**EXECUTIVE SUMMARY**

This review by the Office of the Citizenship and Immigration Services Ombudsman (Ombudsman's Office) considers U.S. Citizenship and Immigration Services' (USCIS') handling of asylum claims filed by minors designated as unaccompanied alien children (UACs) by other federal agencies.

The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA)[1] changed significantly the asylum process for UACs. Most notably, it shifted initial consideration of asylum claims filed in removal proceedings from the Executive Office for Immigration Review (EOIR) to the USCIS Asylum Division.[2] It further required promulgation of regulations "to govern both the procedural and substantive aspects of adjudicating unaccompanied alien child (UAC) asylum claims."[3] For children apprehended and placed into federal custody and immigration court proceedings, the U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), EOIR, and the U.S. Department of Health and Human Services (HHS) all have a role in determining and validating UAC status. Even after their collective efforts result in the UAC filing and USCIS accepting the Form I-589, Application for Asylum and Withholding of Removal, USCIS redetermines in the context of each asylum interview UAC status.

This procedure with at times protracted supervisory and USCIS Asylum Division Headquarters review creates delay and confusion. Rather than facilitating expedited, non-adversarial interviews envisioned by Congress, the USCIS Asylum Division, as a matter of policy, does not accept the original UAC finding by the immigration judge with ICE's consent or the USCIS Nebraska Service Center's (NSC's) jurisdictional determination rendered in advance of accepting the I-589. While some USCIS asylum officers (AOs) have identified and sought to address through best practices sensitivities and challenges associated with UAC claims, current unresolved problems in addition to the policy of redeterminations include difficulty rescheduling UAC interviews, inadequate methods and approaches, and a general misunderstanding of the roles and responsibilities of certain adults associated with UACs.

**RECOMMENDATIONS**

To address confusion related to UAC redeterminations, facilitate improved interview techniques and adjudications, and reduce post-interview processing delays, the Ombudsman recommends that USCIS:

1. **Accept jurisdiction of UAC cases referred by the Executive Office for Immigration Review.**

2. **Accept jurisdiction of cases filed by children in federal custody under the U.S. Department of Health and Human Services.**

Case 8:19-cv-01944-SAG   Document 3-3   Filed 07/01/19   Page 4 of 17

*Citizenship and Immigration Services Ombudsman*                *Ensuring a Fair and Efficient Asylum Process for Unaccompanied Children*

3. **Follow established UAC-specific procedures, expand implementation of certain best practices, and enlist clinical experts for quality assurance and training. More specifically, USCIS should:**

    (a) **Establish points of contact for the public to improve communication, coordination, and problem solving,**

    (b) **Pre-assign UAC cases to officers with specialized knowledge and skills, and**

    (c) **Contract with clinical experts adept at interviewing vulnerable children as part of an ongoing quality assurance and training component of the UAC asylum program.**

4. **Limit Headquarters review to a process that can be managed within 30 days.**

5. **Issue as soon as possible regulations regarding the UAC asylum process**.

## METHODOLOGY

To complete this review, the Ombudsman's Office interviewed USCIS Asylum Division managers and staff at Headquarters and seven of the eight Asylum Offices, EOIR officials, and stakeholders throughout the country. We also studied case assistance requests and reported incidents submitted directly to our office by stakeholders.

## BACKGROUND

The term UAC as defined by the TVPRA refers to an individual who: (a) has no lawful immigration status in the United States; (b) has not attained 18 years of age; and (c) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody.[4] Recognizing the distinct vulnerabilities of this population, the TVPRA created new procedural and substantive protections, particularly for UAC asylum-seekers. It exempted them from the standard safe third country limitation and the one-year filing deadline.[5] The legislation also made UACs in removal proceedings eligible for initial consideration of asylum claims by the USCIS Asylum Division.[6] Rather than requiring UACs to seek asylum in an adversarial context, Congress deliberately shifted jurisdiction at the earliest point possible to USCIS, and required promulgation of regulations "to govern both the procedural and substantive aspects of adjudicating UAC asylum claims."[7]

Children present in the United States without lawful immigration status may be apprehended by CBP or ICE depending on their circumstances. Pursuant to the TVPRA, such individuals shall be placed into the custody of the HHS Office of Refugee Resettlement (ORR) if determined to be a UAC, and issued a Notice to Appear (NTA).[8] In removal proceedings, ICE attorneys typically complete and provide to each UAC requesting asylum an "Instruction Sheet for an Unaccompanied Alien Child in Immigration Court to Submit an I-589 Asylum Application to U.S. Citizenship and Immigration Services" ("instruction sheet").[9] This requires ICE to sign and date the instruction sheet after noting on it the UAC's full name and alien registration number. The instruction sheet specifically states,

> You are receiving these instructions from a representative of the Immigration and Customs Enforcement (ICE) because you appear to be an unaccompanied alien child, you are in Immigration Court, and you have indicated your intent to file a Form I-589,

2

Case 8:19-cv-01944-SAG   Document 3-3   Filed 07/01/19   Page 5 of 17

*Citizenship and Immigration Services Ombudsman*                         *Ensuring a Fair and Efficient Asylum Process for Unaccompanied Children*

> Application for Asylum and Withholding of Removal. You may submit an I-589 application to USCIS only if you have received these instructions from ICE.[10]

Apart from explaining USCIS NSC I-589 filing procedures and related receipt and Application Support Center notices, the instruction sheet requires the UAC to:

> Provide a copy of your USCIS receipt notice to the ICE Office of the Chief Counsel and to the Immigration Judge at your next hearing… [where] ICE may seek to continue your case in order to allow USCIS to adjudicate your asylum application.[11]

In the absence of statutorily required regulations, USCIS has developed and implemented certain temporary policies and procedures for UAC asylum-seekers. Specifically, on March 25, 2009, USCIS issued a memorandum to all asylum staff stating that,

> Because section 235(d)(7)(B) of the TVPRA places initial jurisdiction of asylum applications filed by UACs with USCIS, even for those UACs in removal proceedings, USCIS will need to determine whether an applicant in removal proceedings is a UAC at the time of filing such that USCIS has initial jurisdiction. The NSC, as the entity where most UACs will file, will make an initial determination as to jurisdiction. It will accept the filing of an applicant in removal proceedings where the filing includes the UAC Instruction Sheet indicating that the applicant is a UAC.[12]

Internal guidance[13] issued by USCIS further indicates:

> Accordingly, NSC should accept the asylum application of an individual in removal proceedings if:
>
> (1) the date of birth on the Form I-589 indicates that applicant is under 18 at the time of filing with USCIS; or
> (2) the applicant has submitted a copy of the UAC Instruction Sheet with the I-589, regardless of any other evidence of the applicant's age at the time of filing.

Specifically with regard to jurisdiction, the guidance notes, "[T]he NSC should reject an I-589 filing due to lack of jurisdiction if the applicant is in removal proceedings, does not include the UAC instruction sheet, and is 18 years of age or more."[14] Where the NSC accepts a Form I-589, USCIS makes clear, "The question as to whether the applicant is in fact a UAC will be examined again at the time of the Asylum Office interview."[15]

This point also appears in USCIS' March 25, 2009, memorandum:

> Even where the NSC accepts the [I-589] filing, the Asylum Office at the time of interview should evaluate whether the applicant was a UAC at the time of filing. Inclusion of the UAC Instruction Sheet in the filing should serve as evidence that the applicant is a UAC. Nonetheless, at the time of direct filing or of interview, the Asylum Office may need to review other factors to determine whether the applicant is a UAC. For instance, while the applicant may have been a UAC at the time of receiving the UAC Instruction Sheet from ICE, the applicant must be a UAC at the time of filing the Form I-589 in order for USCIS to have initial jurisdiction.[16]

3

Case 8:19-cv-01944-SAG   Document 3-3   Filed 07/01/19   Page 6 of 17

*Citizenship and Immigration Services Ombudsman*   *Ensuring a Fair and Efficient Asylum Process for Unaccompanied Children*

Thus every UAC asylum interview typically begins with an AO exploring whether USCIS has jurisdiction over the case. This is true despite earlier conclusions reached by EOIR, ICE, HHS/ORR and the NSC as to the applicant's UAC status; USCIS still requires AOs to confirm that each applicant was under 18 years of age and unaccompanied at the time he or she filed the Form I-589.[17] During the interview, this line of jurisdictional inquiry ultimately merges with evaluation of the actual asylum claim.[18]

At the end of the asylum interview, the AO prepares a memorandum on jurisdiction where it has been found not to exist, or an assessment of the UAC's asylum claim.[19] This is forwarded initially to the AO's supervisor, then to USCIS Headquarters.[20] When a review by Headquarters has been completed, the case is returned to the AO to prepare and issue a final decision. The AO may issue a letter granting asylum, a "Decision Notice for Non-Eligibility" based on the merits with an explanation of why the case did not qualify for asylum, or a "Notice of Lack of Jurisdiction."[21] Stakeholders report that while a few "lack of jurisdiction" redeterminations provide details, most are form letters without specific explanations and deemed final.[22] Regardless of decision type, unless USCIS grants asylum, the case is returned to ICE for continuation of removal proceedings; this involves transferring the actual A-file with the AO's notes and any sworn statements provided by the applicant.[23]

As summarized in an American Immigration Lawyers Association article,

> A child's living circumstances or relationship with his or her family may be dynamic, so the child may fall both within and without of the UAC definition while present in the United States. Given this fluidity, as well as inconsistencies in practice by DHS [the Department of Homeland Security] and EOIR, legal advocates believe that the UAC definition itself is too vague and impractical, and that the status, once attached, should remain with a child through the pendency of his or her case.[24]

TVPRA's procedural and substantive protections were designed to remain available to UACs throughout removal proceedings, housing placement, and the pursuit of any available relief. Subjecting a child seeking asylum to multiple UAC determinations as is required by USCIS' temporary guidance appears at odds with the TVPRA's express purpose, namely, to provide timely, appropriate relief for vulnerable children.

USCIS' policy of redetermining UAC status creates delay and confusion. Instead of facilitating expedited, non-adversarial interviews for young asylum-seekers, USCIS has established a process that essentially disregards not only the original UAC finding by the immigration judge with ICE's consent, but also the NSC's jurisdictional determination rendered in advance of accepting from the UAC his or her Form I-589.

While some USCIS AOs have identified and sought to address through best practices sensitivities and challenges associated with UAC claims, current unresolved problems in addition to the policy of conducting redeterminations include: difficulty rescheduling UAC interviews, inadequate methods and approaches, and a general misunderstanding of the roles and responsibilities of certain adults associated with UACs.

## ANALYSIS AND RECOMMENDATIONS

To address confusion related to UAC redeterminations, facilitate improved interview techniques and adjudications, and reduce post-interview processing delays, the Ombudsman recommends that USCIS:

**1. Accept jurisdiction of UAC cases referred by the Executive Office for Immigration Review.**

In the TVPRA, Congress requires that:

4

Case 8:19-cv-01944-SAG   Document 3-3   Filed 07/01/19   Page 7 of 17

*Citizenship and Immigration Services Ombudsman*     *Ensuring a Fair and Efficient Asylum Process for Unaccompanied Children*

> Any unaccompanied alien child sought to be removed by the Department of Homeland Security, except for an unaccompanied alien child from a contiguous country … shall be … placed in removal proceedings under section 240 of the Immigration and Nationality Act (8 U.S.C. 1229a)[.][25]

When placing a child in §240 proceedings, the apprehending entity, whether ICE or CBP, must make a finding that the child is unaccompanied. DHS is then required to transfer custody of the unaccompanied child to HHS within 72 hours.[26] Prior to doing so, DHS as with any apprehended adult, typically issues an NTA, advising the unaccompanied child of the nature of the proceedings, alleged immigration law violations and consequences of failure to appear in immigration court. HHS maintains the care and custody of children transferred by ICE through a network of shelters. "The facilities provide children with classroom education, health care, recreational opportunities, vocational training, mental health services, family reunification, access to legal services, and case [workers]."[27]

Shelter staff tries to find a secure and safe setting for the child to reside during the pendency of his or her immigration case[28] by learning the needs of the child and screening potential housing sponsors.[29] Sometimes these sponsors are parents, family friends, or siblings. Before placing a child in a home, HHS conducts background checks on all in residence, and determines whether a home study or social services are necessary to further ensure the child's safety.[30] During these processes, children are limited in their external communications by facility rules. HHS places children who do not have viable sponsors, or children with special needs into long-term foster care facilities.[31]

Normally, if an individual in §240 proceedings wants to seek asylum, he or she must file a request with EOIR and present their case to an immigration judge.[32] In the TVPRA, Congress made an exception for unaccompanied children, thus permitting them to request asylum from USCIS rather than EOIR.[33] Under this exception, Congress did not provide language indicating that the filing of an asylum application should trigger a new or successive UAC determinations that could eliminate statutory protections or remove the UAC from §240 proceedings. Rather, the TVPRA exception impacts procedure such that the only way a child in §240 proceedings may file a claim for asylum with USCIS is after the immigration judge determines, with input from ICE, that the child is unaccompanied, and instructs him or her to file an asylum claim directly with USCIS. EOIR has established special dockets for children's cases in different jurisdictions which helps facilitate this process.[34]

When the TVPRA went into effect, USCIS introduced an instruction sheet that must be signed by ICE and provided to the child during §240 proceedings. Judges instruct ICE counsel to provide a signed sheet after they determine that a child wants to request asylum as a UAC.[35] On the occasions when ICE voluntarily provides the instruction sheet ICE essentially agrees that the minor is eligible to pursue a claim outside the adversarial setting of immigration court.[36] Although USCIS introduced this instruction sheet as "evidence of UAC status,"[37] the agency subsequently retreated from that descriptor, and now maintains that the sheet is informational only.[38] If the latter characterization is indeed valid, it remains unclear why USCIS has not posted the sheet in plain language on its public website, translated the information into languages other than English, and omitted the requirement of cooperation and consent by an ICE attorney.

After an immigration judge determines, typically by relying on a prior ICE or CBP UAC finding, and ICE counsel completes and provides to the applicant the instruction sheet, USCIS interprets the TVPRA as requiring it to perform UAC status redeterminations, not only upon receipt of the Form I-589 filing by the NSC, but also during the asylum interview.[39] This practice has created an uncertain process for children who appear in

5

Case 8:19-cv-01944-SAG   Document 3-3   Filed 07/01/19   Page 8 of 17

*Citizenship and Immigration Services Ombudsman*   *Ensuring a Fair and Efficient Asylum Process for Unaccompanied Children*

immigration court alone, without a guardian or other adult, or counsel to represent them. By contrast, less vulnerable children, such as children who have not been detained, live with their parents, and are not subject to immigration court proceedings, may file an affirmative asylum request without USCIS questioning jurisdiction.[40]

After the NSC accepts the Form I-589 for cases referred by EOIR, the USCIS AO conducts a jurisdictional assessment by exploring the parent- or legal guardian-child relationship. This type of assessment detracts from the substantive questioning typically associated with an asylum hearing or adjudication. In fact, stakeholders nationwide report that USCIS UAC asylum interviews have shifted in focus from the merits of a claim to queries on jurisdiction that absorb up to half of the entire interview.[41]

USCIS issues UAC jurisdiction redeterminations only after completing a full asylum interview and two levels of supervisory review. Cases rejected for lack of jurisdiction are returned to the immigration judges that initially referred them to USCIS. The judges must either start a new asylum process in court or terminate proceedings which will require the child to file a new asylum case with USCIS. In fiscal years 2010 and 2011, USCIS returned cases based on jurisdiction at a rate of approximately 44% and 39%, respectively.[42] As of March 2012, USCIS was returning cases to the immigration court on jurisdiction grounds in 45% of its UAC cases.[43] This means USCIS devotes significant time and effort to adjudicating UAC filings, only to dismiss almost half of that work.[44] This circular process of returning cases to EOIR can immediately be eliminated if USCIS relies on determinations made in immigration court. It will also enable AOs to refocus their time and limited resources on evaluating the substance of asylum claims.

### Case Example:

The Ombudsman's Office received a case of a 14-year old that filed for asylum and completed an interview while detained in an HHS facility. Within a short period of time after the interview, HHS arranged transportation to reunite the UAC with a parent, whom the UAC had not seen in years.

After a Headquarters review, USCIS determined that the child was not a UAC at the time of filing and returned the case to the immigration court. In response, the presiding immigration judge terminated the UAC's court case on the grounds that minors filing for asylum while under §240 proceedings and within HHS custody are UACs. By terminating the case, the judge ensured that USCIS would accept jurisdiction of a new filing, at the risk that the UAC would not file an application for a second time.

As a consequence, a year passed since the UAC completed the first asylum interview and the UAC was faced with the tasks of locating a new attorney, re-filing and re-interviewing for asylum before USCIS as an affirmative case.

Eliminating the practice of USCIS redetermining UAC status during the asylum interview would also restore a level of fairness that comes from having a predictable and uniform process. When USCIS returns a case to the immigration court based on an adverse jurisdiction redetermination, it generally does not provide the applicant with any fact-specific explanation as to why USCIS declines to exercise jurisdiction and the decision is final.[45] As a result, some individuals representing minors have commented, "Children enter the USCIS process blind and frequently exit with no clarity for future reference."[46]

Under the law, USCIS will readily accept jurisdiction for cases filed by minors who are not in §240 proceedings.[47] Eliminating jurisdiction redeterminations would increase fairness by preventing disparate treatment of unaccompanied children appearing in immigration court. Furthermore, where USCIS entertains but ultimately returns to EOIR a request for asylum it does so with an adverse record including the AO's interview notes and any sworn statements provided by the applicant.[48] This information is available for use by ICE as it prosecutes the government's case. Applicants lack any opportunity to challenge this record which may be used to cross-examine them months or years after the interview. This seems particularly problematic since the derogatory information gathered and shared with ICE flows from a

6

Case 8:19-cv-01944-SAG   Document 3-3   Filed 07/01/19   Page 9 of 17

*Citizenship and Immigration Services Ombudsman*  *Ensuring a Fair and Efficient Asylum Process for Unaccompanied Children*

process USCIS claims it lacks jurisdiction to administer.

USCIS has explained that sharing asylum office records with ICE is fair to the children because each child and/or their representative may take notes during interviews, and similar information is developed and shared with ICE in affirmative asylum cases.[49] However, Congress determined that unaccompanied children appearing in court alone under §240 proceedings are deserving of a process that will take into account their vulnerability and special needs.[50] In this regard, USCIS does not distinguish assessments based on lack of jurisdiction vs. the merits of an asylum claim when returning A-files to ICE.[51] Nor does it acknowledge the disparate impact of time delays caused by Headquarters review on UAC as opposed to affirmative asylum cases, which tend to be referred more quickly to EOIR. Disturbingly, some UACs in immigration court have started waiving their right to seek asylum before USCIS.[52] While this decision returns unaccompanied children to a pre-TVPRA state, it at least spares them the pain of recounting their experiences to USCIS in a process fraught with delays and the risk of USCIS' forwarding harmful records to ICE.

2. **Accept jurisdiction of cases filed by children in federal custody under the U.S. Department of Health and Human Services.**

HHS has the statutory responsibility to exercise care and custody over unaccompanied children.[53] HHS will not exercise custody over any child unless a U.S. government agency has made a finding that the child meets the definition of a UAC. Children in HHS custody are unable to leave unless HHS releases custody to another entity or individual, or consents to a court order doing the same.[54]

Under the TVPRA section titled "Permanent Protection for Certain At-Risk Children," Congress states:

> An asylum officer … shall have initial jurisdiction over *any* asylum application filed by an unaccompanied alien child (*as defined in section 462(g) of the Homeland Security Act of 2002 (6 U.S.C. 279(g))*), regardless of whether filed in accordance with this section or section 235(b) *(Emphasis added)*.[55]

Through this language Congress determined that children eligible for initial jurisdiction before an AO would be those same children captured under the statutory provision and definition used to determine custody transfers to HHS.[56] Congress did not include language that would require a new determination of UAC status or consequently remove a minor from HHS custody based upon the filing of an asylum application. Nonetheless, USCIS has interpreted the language above as a requirement for AOs to determine UAC status for children that file applications while in HHS custody. As long as these children remain in HHS custody, USCIS has no basis to determine a conflicting status, even in instances where a child may be separated from a parent who is living in the United States.[57]

USCIS explains its practice and interpretation of the law by stating that determinations used to assess whether a parent can provide adequate care are distinct from whether a parent can assist a child with a legal claim for asylum. USCIS policy instructs AOs to determine whether a parent has knowledge of and consents to the child's asylum claim.[58] USCIS expands this a bit in practice by determining whether a parent is available to assist a child with an asylum claim and in daily life.[59]

Based largely upon information provided by the minor, AOs perform assessments of complex parent-child relationships and situations for which they lack specialized training. AOs are not equipped to determine if a parent is able to provide care across domains for a minor child. For example, housing circumstances of UACs frequently shift from federal facilities, state facilities, or individual homes for a variety of reasons unknown to

Case 8:19-cv-01944-SAG   Document 3-3   Filed 07/01/19   Page 10 of 17

*Citizenship and Immigration Services Ombudsman*                    *Ensuring a Fair and Efficient Asylum Process for Unaccompanied Children*

the child.  A parent-child relationship may be particularly complicated and inscrutable to the child who grew up in a separate country and may be getting to know his or her biological parent(s) for the first time or after years of separation.  Exploring questions regarding parental behavior and whether it meets the child's physical, mental, and/or emotional needs is more appropriately within the purview of a trained clinician.[60]  This is especially true where the UACs parents' or legal guardians' interests may be in conflict with their own.[61]

In short, USCIS lacks the clinical expertise to evaluate whether a child in HHS custody has a parent or legal guardian available to provide adequate care, or may have one available in the future.  HHS has social workers on staff and the ability to commission home studies to assess whether a parent or legal guardian's fitness.  For children who begin the asylum process in HHS custody, USCIS should rely on the fact that the child remains a UAC.  Eliminating USCIS jurisdiction redeterminations for these children will help protect them from the same adverse consequences described in Recommendation 1.

3. **Follow established UAC-specific procedures, expand implementation of certain best practices, and enlist clinical experts for quality assurance and training.**

More specifically, USCIS should:

   *(a) Establish points of contact for the public to improve communication, coordination, and problem solving.*

Currently, USCIS regards as a high priority scheduling UAC cases; it frequently does so within weeks of accepting a Form I-589.  Yet UACs routinely need to reschedule interviews when they are set so quickly.  In fiscal years 2010 and 2011, asylum offices granted requests to reschedule 407 and 353 times, respectively.[62]  USCIS confirmed that when interviews are rescheduled, new notices are generated in tracking systems.  Some stakeholders report that they must call the asylum office repeatedly and up until the day before the originally assigned interview date to learn whether their request to be rescheduled was granted.  All asylum offices are required by standard procedures to mail a system-generated interview notice to the UAC's representative.  Where time is of the essence, some offices contact representatives by email or telephone as well.

Rescheduling UAC cases is a logistical challenge for asylum offices, but most requests are preventable when asylum offices coordinate initial interview scheduling with attorneys, HHS, and/or UAC custodians.  By coordinating with stakeholders upon receipt of a UAC filing, asylum offices will reduce rescheduling requests and improve the overall efficiency of the UAC asylum process.  For example, asylum offices will benefit from learning whether the child will soon be transferred or released to a new jurisdiction, is filing for any other forms of immigration relief, and/or has an attorney or other representative who may need time to prepare the case.

An additional scheduling hurdle arises from conflicts between the asylum process and the process for seeking special immigrant juvenile status (SIJS).  The latter requires a family or juvenile court hearing before the UAC can file the immigration petition.  Stakeholders report that immigration judges frequently pressure children to file applications for relief during a time period that is not reasonable or sufficient for obtaining court orders from family or juvenile courts.[63]  In contrast, immigration judges tend to grant lengthy continuances after a child files an immigration application, particularly a Form I-589.[64]

Under these circumstances, children with potentially viable asylum claims who are also strong candidates for SIJS may pursue both in an effort to ensure they can complete the family or juvenile court process before being ordered removed.  Increased coordination when scheduling asylum interviews to ensure they do not conflict with requirements related to other potentially viable forms of relief will increase efficiency and spare children

Case 8:19-cv-01944-SAG   Document 3-3   Filed 07/01/19   Page 11 of 17

*Citizenship and Immigration Services Ombudsman*   *Ensuring a Fair and Efficient Asylum Process for Unaccompanied Children*

unnecessary anxiety. It would also diminish the logistical problem that arises when the asylum office, local field office, and ICE attorney simultaneously require the child's immigration file to proceed with their cases.

USCIS currently has UAC points of contact in each asylum office that serve primarily as internal resources for DHS and other federal agencies.[65] USCIS acknowledges that a spectrum of procedural issues arise in UAC cases.[66] The agency understands that it may be necessary to establish a close working relationship with a minor's attorney and non-government custodian[67] and encourages contact with a child's representative prior to scheduling an interview.[68] Expanding the role of UAC points of contact to help serve the public will help improve communication, coordination and problem solving.

> **Best Practice:** One asylum office has a designated point of contact for coordinating UAC interview schedules. When the office receives a UAC application, the point of contact immediately reaches out to representatives or HHS facilities via telephone to coordinate an interview date. The office reports that this initial communication saves time and resources by scheduling an interview that works well with the various scheduling demands affecting UACs, including detention facility schedules, court schedules, medical evaluations, transportation limitations and school restrictions. If a UAC needs to reschedule an interview, the point of contact is directly accessible by telephone or email and will work with the UAC to choose another date that works for both the UAC and asylum office.

   (b) *Pre-assign UAC cases to officers with specialized knowledge and skills.*

USCIS has issued guidance and training materials including 13 pages of specialized instruction designed to benefit child applicants.[69] However, stakeholders report uneven application of these measures, citing overly invasive, unnecessary and at times insensitive lines of questioning. Developing a cadre of AOs with specialized knowledge and skills concerning children's issues will improve agency efficiency, consistency, and performance for this uniquely vulnerable population.

Asylum offices have varied methods for assigning officers to UAC cases. Some do so randomly and on the day of the interview. USCIS officials using this method of case assignment explain that all AOs are capable of interviewing UACs and this method eases the administrative task of reassigning cases when officers call in sick.

Essentially, this method of case assignment prioritizes administrative needs above a UAC applicant's needs. As a result, stakeholders report that children experience long pre-interview waiting times while the AO reads the file, which generates anxiety. Other asylum offices pre-assign cases to officers who have been designated to interview children. These offices report that this allows AOs to more thoroughly prepare. Asylum officials and stakeholders agree that AOs who have been afforded lead time to review a child's file are better prepared and more efficient during asylum interviews.[70]

Asylum offices that pre-assign cases also report that some officers are more skilled in communicating with children. Initially AOs were assigned to UAC cases with this consideration, but this has changed over time. Stakeholders report that the earlier practice was associated with AOs following USCIS guidelines,[71] and demonstrating appropriate communication skills, such as realizing when to re-phrase questions, offer assuring non-verbal cues, and recognize the child's need for a restroom break. Interviews reflected the non-adversarial process that the TVPRA envisioned for children. Stakeholders report that there has been a shift over time in officer quality and performance. They no longer feel able to set the child's expectations or assure that the interview will involve a conversation with a child-friendly officer in a less adversarial climate than immigration court.

9

Case 8:19-cv-01944-SAG   Document 3-3   Filed 07/01/19   Page 12 of 17

*Citizenship and Immigration Services Ombudsman*  *Ensuring a Fair and Efficient Asylum Process for Unaccompanied Children*

While ideally all AOs should be trained to handle UAC cases, in reality, not all individuals are similarly situated in their ability to interview children. "Reassurance, empathetic support, carefully framed questions, encouragement, and topic-shifting are crucial techniques for facilitating interviews of children."[72] If an AO has the proper questioning[73] and listening skills[74] to interview children, interviews will be more thorough and the officer's case assessments will be more complete and accurate.[75]

Acknowledging the difference in officers does not detract from the professionalism or equities of AOs, but ignoring important distinctions risks undermining the child's ability to convey his or her story effectively to establish a cognizable claim.[76] Given the inherently serious nature of asylum cases, providing vulnerable children with properly skilled interviewing officers is basic to ensuring a fair process. USCIS recognizes this in its guidance but needs to implement it across asylum offices.[77]

Another practice that varies among asylum offices is interviewing adults who bring UACs to their interviews. USCIS policy does not require that a witness or adult be present at a child's interview,[78] but allows trusted adults[79] to participate "as appropriate and with consent of the child."[80] Existing policy stresses that "attention to the nature of the relationship between the child and adult is particularly important."[81] Yet some AOs compel adults appearing with UACs to participate in interviews even when they indicate a desire not to do so.[82]

Stakeholders report that when adults are interviewed without independent counsel and without knowledge of the child's claim, they are extremely concerned about hurting the child's case; children frequently read and mirror that apprehension. As a result, some stakeholders have stopped allowing adults to wait with children or even enter asylum office buildings to prevent the practice of compelled interviews. In accordance with agency guidance, USCIS must ensure that all asylum offices limit adult interviewees to those who are necessary to assist a child or serve as a witness.

Pre-assigning UAC cases to a cadre of AOs with specialized knowledge and skills will better ensure the full and proper implementation of existing USCIS guidance and relevant court rulings, and minimize the costs associated with varied interview practices. Asylum offices with a small volume of UAC cases will also benefit from this approach even if those with specialized knowledge and skills provide input as a collateral duty.

> *(c) Contract with clinical experts adept at interviewing vulnerable children as part of an ongoing quality assurance and training component of the UAC asylum program.*

Currently asylum offices use various methods to monitor UAC interviews[83] and bolster officer training.[84] While USCIS Headquarters' staff reviews paper interview assessments, the agency lacks a reliable system to ensure high quality UAC interviews, or to address the myriad challenges in terms of past injury and effective communication presented by this population. As DHS leaders have often stated, the quality of the process is as important as consistency.[85] Therefore, implementing a mechanism to monitor effectively UAC interviews and calibrate officer training will likely enhance the program.[86]

In this regard, incorporating clinical experts adept at interviewing vulnerable children as part of an ongoing quality assurance and training program offers a potentially valuable, sensible approach to processing UAC claims. Neutral contracted professionals may add integrity and accountability through independent, culturally sensitive evaluations, monitoring, statistical sampling, and training. The presence of unbiased clinicians with a commitment to quality control should not detract from interview experiences of UACs but rather improve it. Expert evaluations also might minimize the number of cases in need of review by Headquarters.

Case 8:19-cv-01944-SAG   Document 3-3   Filed 07/01/19   Page 13 of 17

*Citizenship and Immigration Services Ombudsman*  *Ensuring a Fair and Efficient Asylum Process for Unaccompanied Children*

4. **Limit Headquarters review to a process that can be managed within 30 days.**

As indicated earlier, the Asylum Division at Headquarters reviews all UAC cases.[87] This is not required by law but was established by USCIS to ensure consistency and quality.[88] Despite USCIS' best efforts, the review process, focused in part on jurisdiction matters, takes several months and sometimes a year or more. This pulls time and resources away from developing expertise on substantive UAC asylum issues, and may also impact negatively a child's eligibility for foster care, refugee minor benefits, or continued placement in an appropriate care facility. It is untenable for children to wait so long, especially after having been encouraged early on to file and undergo interviews related to their asylum claims.

Because UACs typically remain in §240 removal proceedings and sometimes HHS custody, the Ombudsman's Office recommends that USCIS implement a review process consistent with its handling of other applications and petitions filed by individuals in removal proceedings and/or detention.[89] A uniform solution is to limit the Headquarters review to a period of thirty business days. This is not intended to undermine the processing of UAC asylum claims, but rather to render it more effective.



5. **Issue as soon as possible regulations regarding the UAC asylum process.**

The TVPRA mandates regulations that consider the special needs of UACs and address the procedural and substantive aspects of UAC cases.[90] For the purpose of this review, the Ombudsman's Office has focused only on procedural aspects of UAC cases. USCIS is currently working with other federal agencies to promulgate regulations.[91] The Ombudsman's Office suggests that during this process, USCIS seize the opportunity to examine and apply policies that have worked and avoid those that have created confusion. While developing regulations, the Ombudsman's Office recommends that USCIS engage in interagency communication with EOIR and ICE to resolve concerns regarding the integrity of UAC determinations and filing processes.

**CONCLUSION**

UAC asylum claims involve a uniquely at-risk population. Until regulations have been promulgated and implemented, the Ombudsman's Office encourages USCIS to collaborate with other government entities and stakeholders to ensure timely, appropriate processing of these cases. Current practices have proven duplicative, inefficient, and more adversarial for UACs than those applied to adults or accompanied children seeking asylum. The Ombudsman's Office is committed to working with USCIS to overcome identified procedural, informational and training barriers to serve better vulnerable children seeking immigration relief.

---

[1] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Pub. L. No. 110-457, 122 Stat. 5044 (2008).
[2] The Immigration and Nationality Act (INA) § 208(b)(3)(C); 8 U.S.C.A. § 1158(b)(3)(C).
[3] TVPRA 2008 § 235(d)(8).
[4] Homeland Security Act of 2002 § 462(g); 6 U.S.C. § 279(g); TVPRA 2008 § 235(g).

Case 8:19-cv-01944-SAG   Document 3-3   Filed 07/01/19   Page 14 of 17

*Citizenship and Immigration Services Ombudsman*                    *Ensuring a Fair and Efficient Asylum Process for Unaccompanied Children*

---

[5] TVPRA 2008 § 235(d)(7)(A); 8 U.S.C.A. § 1158(a)(2)(E).

[6] TVPRA 2008 § 235(d)(7)(B); 8 U.S.C.A. § 1158(b)(3)(C).

[7] TVPRA 2008 § 235(d)(8).

[8] TVPRA 2008 § 235(b)(1); TVPRA 2008 § 235(a)(5)(D).

[9] USCIS Memorandum, "Implementation of Statutory Change Providing USCIS with Initial Jurisdiction over Asylum Applications Filed by Unaccompanied Alien Children" (Mar. 25, 2009); http://www.uscis.gov/USCIS/Laws/Memoranda/Static_Files_Memoranda/2009/uac_filings_5f25mar09.pdf; (accessed Aug. 26, 2012).

[10] U.S. Department of Homeland Security (DHS) Document, "Instruction Sheet for an Unaccompanied Alien Child in Immigration Court to Submit an I-589 Asylum Application to U.S. Citizenship and Immigration Services (USCIS)," (Mar. 2009).

[11] *Id.* at 2.

[12] *See supra* note 9.

[13] USCIS Memorandum, "Statutory Change Affecting Service Center Operations' Procedures for Accepting Forms I-589 Filed by Unaccompanied Alien Children" (April 9, 2009); (accessed Sept. 12, 2012).

[14] *Id.* at 3.

[15] *Id.* at note 2.

[16] *See supra* note 9.

[17] *Id.*

[18] Information provided by stakeholders and USCIS (Jun. 2011-Jun. 2012).

[19] USCIS Asylum Officer Training Materials, "Adjudicating Children's Asylum Claims: TVPRA Issues," provided by USCIS (Mar. 20, 2012).

[20] Information provided by USCIS (2011-2012).

[21] *Id.*

[22] *See supra* note 18.

[23] *See supra* note 9.

[24] American Immigration Lawyers Association, Immigration Practice Pointers 2011- 2012 Edition, "The ABCs of Representing Unaccompanied Children," (June, 2011) at page 588.

[25] TVPRA 2008 § 235(a)(5)(D); 8 U.S.C.A. § 1232(a)(5)(D)(i).

[26] TVPRA 2008 § 235(b)(3); 8 U.S.C.A. § 1232(b)(3).

[27] Elaine M. Kelley, "Our Programs for Vulnerable and Unaccompanied Children," U.S. Department of Health & Human Services, Administration for Children and Families, Office of Refugee Resettlement, http://icpc.aphsa.org/home/Doc/KelleyICPCReviewingPractices.pdf (accessed Aug. 26, 2012).

[28] *Id.*

[29] TVPRA 2008 § 235(c)(2).

[30] TVPRA 2008 § 235(c)(3).

[31] *See supra* note 27.

[32] 8 C.F.R. § 208.2(b).

[33] TVPRA 2008 § 235(d)(7)(C).

[34] *See* EOIR Fact Sheet, "Unaccompanied Alien Children in Immigration Proceedings" (Apr. 22, 2008); http://www.justice.gov/eoir/press/08/UnaccompaniedAlienChildrenApr08.pdf (accessed Aug. 26, 2012).

[35] Information provided by stakeholders (Jun. 2011-Jun.2012).

[36] Legal representatives in interactions with the Ombudsman's Office have confirmed that in some instances, ICE uses the sheet as a tool to compel children to complete pleadings or wait until certain hearing dates, by withholding the sheet and thereby withholding access to the UAC asylum process.

[37] *See supra* note 10.

[38] Information provided by USCIS (Mar. 20, 2012).

Case 8:19-cv-01944-SAG   Document 3-3   Filed 07/01/19   Page 15 of 17

*Citizenship and Immigration Services Ombudsman*      *Ensuring a Fair and Efficient Asylum Process for Unaccompanied Children*

---

[39] *See supra* note 9; "In conducting the interview of someone who appears to be a UAC and who is in removal proceedings, the asylum officer should verify that the applicant was a UAC at the time of filing such that USCIS has jurisdiction over the claim." USCIS Asylum Officer Basic Training Course, "Guidelines for Children's Asylum Claims," (Revised Sep. 1, 2009) at 16.

[40] These children are considered affirmative applicants, a type of applicant that USCIS readily accepts under its jurisdiction. *See* 8 CFR §208.2(a).

[41] Information provided by stakeholders (Jun.2011-Jun.2012). One example included an interview that lasted four hours with two and a half hours discussing jurisdiction matters unrelated to the merits of the asylum claim.

[42] Information provided by USCIS (Mar. 20, 2012).

[43] *Id.*

[44] Asylum officials in local offices have contemplated options to help relieve the strain of jurisdiction redeterminations on their resources including: (1) conducting an initial interview on jurisdiction only, allowing USCIS Headquarters to render a redetermination conclusion, and then scheduling a second interview on the merits of the asylum claim; (2) creating a paper-based jurisdiction redetermination process; (3) allowing asylum officers to play a role in determining jurisdiction in immigration court; and (4) working with ICE to request that immigration judges terminate proceedings once an application has been filed as a matter of fairness so that UACs will receive the same process as children who file but are not within the scope of TVPRA. Information provided by USCIS (May 2011-Apr. 2012).

[45] Some asylum offices have stated that they would consider a written request from the child to reconsider jurisdiction, but there is no formal, public, or uniform process to request reconsideration of a jurisdiction redetermination.

[46] Information provided by stakeholders (Jun.2011-Jun.2012).

[47] *See supra* note 40.

[48] USCIS asylum officer assessments are commonly referred to as a record, although they are not verbatim documentation of a child's sworn statements.

[49] Information provided by USCIS (Mar. 20, 2012).

[50] TVPRA 2008 § 235(d)(8).

[51] Information provided by stakeholders and USCIS (Jun. 2011-Jun. 2012).

[52] Information provided by stakeholders (Jun.2011-Jun.2012).

[53] 6 U.S.C.A. § 279.

[54] 6 U.S.C.A. § 279; 8 U.S.C.A. § 1101 (a)(27)(J)(iii)(I).

[55] TVPRA 2008 § 235(d)(7)(C); 8 U.S.C.A. § 1158(b)(3)(C).

[56] TVPRA 2008 § 235(g).

[57] "This [UAC] definition encompasses separated minors, e.g., those who are separated from their parents or guardians, but who are in the informal care and physical custody of other adults, including family members." USCIS Asylum Officer Basic Training Course, "Guidelines for Children's Asylum Claims," (Revised Sep. 1, 2009) at 17.

[58] "Asylum officers should elicit information about issues of guardianship and parental knowledge of and consent to the application for asylum … These questions provide a general framework for exploration of issues of guardianship and parental knowledge and consent." *Id.* at 20-21

[59] Information provided by USCIS and stakeholders (May 2011-Apr. 2012).

[60] In a parallel context, Congress determined that Special Immigrant Juvenile Status (SIJS) findings on abuse, abandonment and neglect are better handled by family and juvenile courts than USCIS. *See* 8 U.S.C.A. § 1101(a)(J)(i),(ii).

[61] "Courts have recognized that there will always be a potential inherent conflict where the child is in removal proceedings but the parent or legal guardian is not. Cf. Olowa v. Ashcroft, 368 F.3d 692, 704 n.19 (7th Cir. 2004) (observing the need for an "impartial advocate to assist" children whose parents – but not the children –

Case 8:19-cv-01944-SAG   Document 3-3   Filed 07/01/19   Page 16 of 17

*Citizenship and Immigration Services Ombudsman*                              *Ensuring a Fair and Efficient Asylum Process for Unaccompanied Children*

are in removal proceedings, due to the "potential conflict between the parents' interests and those of the children"); Cf. Polovchak v. Meese, 774 f.2d 731, 736 (7th Cir. 1985) (noting, where minor child sought political asylum over objections of his parents, that "a minor may be mature enough to assert certain individual rights that equal or override those of his parents." Information provided by stakeholders (Jun.2011-Jun.2012).

[62] These numbers reflect rescheduled interviews that were granted after an initial interview was generated in USCIS systems, for 282 and 205 cases, respectively. That is, an individual UAC may have asked to reschedule his or her interview more than one time. These numbers do not capture interviews that were rescheduled due to USCIS needs or rescheduling requests that USCIS did not grant. Information provided by USCIS (Mar. 20, 2012).

[63] In some instances, immigration judges require children to file applications for relief within weeks or a few months of being apprehended and detained. Information provided by stakeholders (Jun. 2011-Jun. 2012).

[64] The pressure from immigration judges coupled with swift interview scheduling also nullifies a TVPRA provision that allows children more time to prepare filings for asylum. *See* TVPRA § 235(d)(7)(E); 8 U.S.C.A. § 1158(a)(2)(E).

[65] *See supra* note 9 at 7.

[66] "A range of procedural issues arise related to UAC cases, including scheduling, file transfer requests, UAC decision notices, waiver of presence of representative, and withdrawals." USCIS Training Materials, "Children's Module TVPRA Issues" (Jan. 31, 2011); Information provided by USCIS (Mar. 20, 2012).

[67] "Given the non-adversarial nature of the affirmative asylum adjudication and the special considerations associated with adjudicating a child's claim, a close working relationship with the child's representative and support person may be necessary to ensure that the child's claim is fully explored." *See supra* note 57 at 36.

[68] "For a child under 14, if possible, contact applicant's representative prior to interview to determine if he/she is coming to the interview." USCIS Training Materials, "Children's Module Capacity Issues" (Jan. 24, 2011); Information provided by USCIS (Mar. 20, 2012).

[69] USCIS Asylum Officer Basic Training Course, "Guidelines for Children's Asylum Claims," (Revised Sep. 1, 2009).

[70] For example, after receiving the suggestion from legal representatives, one asylum office decided to try pre-assigning UAC cases. The office noticed a remarkable change in the officer's preparedness for interviews. Legal representatives mentioned that time in the waiting room decreased significantly and applauded officers for skipping questions on matters that were substantially documented.

[71] An AO should be skilled to build rapport with children, deliver a child-appropriate opening statement, use a tone that will build trust and assure a child, be able to read the child and promote entrusting body language that children can read. *See supra* note 69 at 22-24; "The responsibility may fall to the asylum officer to monitor the child's needs… As the interview draws to a close, the asylum officer should … help to restore the child's sense of security at the conclusion of the interview." *See supra* note 69 at 25.

[72] *Id.* at 24.

[73] "Children may not understand questions and statements about their past because their cognitive and conceptual skills are not sufficiently developed. The asylum officer's questions during the interview should be tailored to the child's age, stage of language development, background, and level of sophistication." *Id.* at 25.

[74] "[A]sylum officers should be conscientious of age-related or culturally-related reasons for a child's choice of words." *Id.*

[75] "Proper questioning and listening techniques will result in a more thorough interview that allows the case assessment to be more complete and accurate." *Id.* at 26.

[76] "Asylum officers may have to build rapport with the child to elicit the child's claim and to enable the child to recount his or her fears and/or past experiences. Where the child finds the asylum officer friendly and supportive, the child is likely to give fewer false details." *Id.* at 22.

Case 8:19-cv-01944-SAG   Document 3-3   Filed 07/01/19   Page 17 of 17

*Citizenship and Immigration Services Ombudsman*                                *Ensuring a Fair and Efficient Asylum Process for Unaccompanied Children*

77 "It is in the child's best interests to be interviewed by an official who has specialized training in child refugee issues. To the extent that personnel resources permit, Asylum Offices should attempt to assign asylum officers with relevant background or experience to interview children's cases." *Id.* at 15; "To address the unique situation of child asylum-seekers, asylum officers must make adjustments to their interviews and interview style to facilitate the process. Procedural adjustments made at the asylum office include allowing the child to be interviewed by an officer with relevant experience…" *Id.* at 51.

78 "The policy of allowing a trusted adult to participate in this process does not mean to suggest that the trusted adult serve as a substitute for an attorney or an accredited representative, neither is there a requirement that a trusted adult, attorney, or accredited relative be present at the interview." *Id.* at 19.

79 "A trusted adult is a support person who may help to bridge the gap between the child's culture and the environment of a U.S. asylum interview. The function of the adult is not to interfere with the interview process or to coach the child during the interview, but to serve as a familiar and trusted source of comfort. As appropriate, asylum officers may allow the adult to provide clarification, but asylum officers should ensure that those children able to speak for themselves are given an opportunity to present the claim in their own words." *Id.*

80 "As appropriate and with the consent of the child, asylum officers are encouraged to interview the trusted adult… Note that it is not a requirement that a witness or trusted adult be present at the interview." *Id.* at 20.

81 *Id.*

82 Legal representatives report that when adults resist interviews, asylum officers will offer to reschedule the interview for a date and time when the adult will be willing to cooperate.

83 One asylum office exhibits a greater level of quality assurance over interviews than some other offices. The office has supervisors periodically observe UAC interviews, review cases with officers before interviews, and remain on-call to answer any questions that an officer may have during UAC interviews.

84 One asylum office incorporates the knowledge of local legal representatives and other stakeholders into its training and has sought training from HHS.

85 USCIS Press Release, "U.S. Citizenship and Immigration Services Press Conference on Strategic Goals and Initiatives for 2011" (Feb. 17, 2011); http://www.uscis.gov/USCIS/News/2011%20New%20Items/February%202011/transcript_StrategicGoalsInit_2011.pdf (accessed May 22, 2012).

86 "The ability to gather information on the adjudication of unaccompanied minors' applications assists the Asylum Division in developing or refining policy with regard to these cases." *See supra* note 69 at 16.

87 "All asylum claims filed by principal applicants under the age of eighteen at the time of filing must be submitted to the Headquarters Asylum Division (HQASM) for quality assurance review before they can be finalized." *See supra* note 69 at 17.

88 Information provided by USCIS (Mar. 20, 2012).

89 USCIS Policy Memorandum, "Guidance for Coordinating the Adjudication of Applications and Petitions Involving Individuals in Removal Proceedings; Revisions to the Adjudicator's Field Manual (AFM) New Chapter 10.3(i): AFM Update AD11-16" (Feb. 4, 2011) http://www.uscis.gov/USCIS/Outreach/Interim%20Guidance%20for%20Comment/coordination-adjud-removal-proceedings.pdf; (accessed Aug. 28, 2012).

90 TVPRA 2008 § 235(d)(8).

91 "Application of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 to Unaccompanied Alien Children Seeking Asylum," Fed. Reg. Unified Agenda 1615-AB96 (Fall 2011), http://federalregister.gov/r/1615-AB96 (accessed Aug. 26, 2012); "Implementation of Section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008; Treatment of Unaccompanied Alien Children," Fed. Reg. Unified Agenda 1125-AA70 (Fall 2011), http://federalregister.gov/r/1125-AA70 (accessed Aug. 26, 2012).