# EXHIBIT 7



Agenda

**USCIS Asylum Division Quarterly Meeting**
Monday, May 20, 2019
Tomich Center
111 Massachusetts Avenue, NW
Washington, D.C. 20001
3 – 4:30 p.m. EST

I. **Welcome and Introductions**

II. **Asylum Division Updates**

   a. Regularly Provided Statistics (posted on uscis.gov)
      Affirmative Asylum Statistics (February 2019 – March 2019)
      Credible and Reasonable Fear Statistics and Nationality Reports (February 2019 – March 2019)
      Unaccompanied Alien Children Statistics (October 2018 – March 2019)

      *Please note that the Asylum Division has transitioned to a new case management system. Therefore, the format in which the data is presented during today's engagement will serve as the new format in the future. Also, due to the transition, we are unable to provide updated NACARA statistics at this time.*

   b. Due to ongoing litigation we did not include any Migrant Protection Protocols (MPP)-related questions on the agenda. We are not releasing any information beyond what's publicly available.

III. **Statistics**

   a. Please provide a breakdown of all credible fear interviews by port of entry vs. inland categories as the Asylum Division regularly reported prior to January 2018. If this data will not be provided, please explain why it is no longer available.

      **Response:** The Asylum Division is determining whether we can recreate these reports now that we have transitioned to a new case management system. Additionally, we defer to CBP and ICE regarding whether individuals are encountered between ports of entry or at a port of entry.

IV. **Scheduling of Asylum Interviews and Processing Times**

a. Is the affirmative asylum backlog due to a staffing issue, a budget issue, a policy change, or all of these?

   **Response:** The Asylum Division continues to receive more cases and referrals than we have staff to complete. This has been the case, for the most part, for the last five years.

b. Does the Asylum Division have or plan to implement a division-wide policy to address asylum applications at the end of the backlog due to the LIFO policy shift?

   **Response:** The Asylum Division is fully focused on scheduling LIFO cases. We are currently able to schedule some backlog cases under LIFO, and as more resources become available we will be able to schedule more backlog cases. We are continually hiring and training new asylum officers as a means of addressing the backlog.

c. Does the Asylum Division have a division-wide policy on expediting urgent cases, such as those with medical issues or danger to derivatives in the home country?

   **Response:** Yes. Asylum office directors may consider, on a case-by-case basis, a request to be scheduled for an interview on an urgent basis. Please submit any urgent interview scheduling requests in writing to the asylum office with jurisdiction over your case. Go to the USCIS Service and Office Locator page for contact information.

d. What is the average length of time needed to make a determination on an affirmative asylum application after the interview?

   **Response:** In fiscal year 2019 through March, approximately 70 percent of asylum office final decisions were made within two weeks of the completed interview.

e. Why have some affirmative asylum cases filed following the LIFO policy not been interviewed for months?

   **Response:** The Asylum Division does not have enough resources to interview all newly filed cases even with the LIFO scheduling policy. Those cases not interviewed within 45 days become part of the backlog.

f. How many mandamus actions have been filed against the asylum offices in the past year?

   **Response:** The Asylum Division does not track mandamus actions, and USCIS OCC has not instituted a formal tracking requirement for Asylum mandamus actions.

g. Could you report on any changes in the average number of asylum applications received since the adoption of the LIFO policy and any changes in the overall and office-specific backlogs? Has any analysis been conducted on the effectiveness of the program?

   **Response:** Since the adoption of the LIFO scheduling policy, the Asylum Division has seen an approximately 30% decrease in receipts. Some asylum offices' backlogs have

decreased while others have increased. The Asylum Division continues to seek additional resources to staff those offices having trouble keeping up with receipts.

## V. Unaccompanied Alien Children (UACs)

a. Can you confirm that the May 28, 2013, memorandum on initial jurisdiction over asylum applications filed by UACs and related June 2013 policy documents remain in effect?

**Response:** The May 28, 2013 memorandum on initial jurisdiction over asylum applications filed by UACs and the related June 2013 policy documents remain in effect.

b. Is the Asylum Division considering measures to address the many UAC applicants who applied in early 2018 (around the time LIFO was instituted) and have still not been scheduled for interviews?

**Response:** UACs are subject to the same scheduling priorities as all other applicants. Asylum office directors may consider, on a case-by-case basis, a request to schedule an interview on an urgent basis. Please submit any urgent interview scheduling requests in writing to the asylum office with jurisdiction over your case. Go to the USCIS Service and Office Locator page for contact information.

c. Will USCIS resume scheduling asylum interviews for UACs who are now over 18?

**Response:** USCIS continues to schedule interviews for applicants who have been determined to be UACs who filed their asylum applications when they were 18 years of age or older.

d. Some UAC cases have been pending for over a year post-interview. When inquiries with the local asylum office do not produce results, what is the best way to contact Headquarters to ask about issuing decisions in such cases?

**Response**: The Asylum Division is establishing a process to generate a report on UAC cases that have been pending for more than one year from their interview date. The Asylum Division will generate this report on a monthly basis and will ask asylum offices to adjudicate these cases or explain the delay.

e. How is USCIS handling UAC filings after *Matter of M-A-C-O-*, both for children who have turned 18 and those who've reunified with a parent?

**Response:** *Matter of M-A-C-O-* addresses immigration judge determinations as to whether an asylum application was filed by a UAC. It does not address USCIS determinations about its own jurisdiction. USCIS continues to make its jurisdictional determinations under its own procedures.

f. If a minor reaches his or her 18th birthday without having an interview scheduled, can an interview be expedited after the minor turns 18?

> **Response:** Asylum office directors may consider, on a case-by-case basis, a request to be scheduled for an interview on an urgent basis. Please submit any urgent interview scheduling requests in writing to the asylum office with jurisdiction over your case. Go to the [USCIS Service and Office Locator page](#) for contact information.

g. How is the Asylum Division classifying UACs who filed while they were minors but then turned 18? When does jurisdiction switch over to the immigration court?

> **Response:** Under the TVPRA, USCIS has initial jurisdiction over any asylum application "filed by a UAC." Therefore, the fact that an applicant turned 18 after the date of filing is irrelevant to this issue. If the applicant was considered a UAC on the date of filing, the application is one that was "filed by a UAC." When USCIS makes the determination whether an applicant was considered to be a UAC on the date of filing, it currently applies its 2013 memo that directs asylum offices generally to adopt a prior UAC determination if that determination was still in place on the date of filing. Where an immigration judge makes the jurisdictional determination, the immigration judge applies *Matter of M-A-C-O-*. In either case, the fact that an applicant turned 18 after the date of filing would not preclude a determination that the application was filed by a UAC.

h. Will the Asylum Division take jurisdiction of a case filed by a UAC who has a pending in absentia order of removal?

> **Response:** Yes, if the Asylum Division otherwise has jurisdiction over the case.

## VI. Training

a. Have there been changes to the Asylum Officer Training Modules/Lesson Plans since they were removed from the USCIS website?

> **Response:** Outdated lesson plans were removed from the USCIS website in April 2017. Since that date, several RAIO Lesson Plans have been revised.

b. If so, which Training Modules/Lesson Plans have been revised? Which of these revised lesson plans have been posted publicly? Are there plans to post the remaining revised lesson plans publicly?

> **Response:** Since April 2017, the following Lesson Plans have been revised: Children's Claims, Credibility, and National Security. In addition, a revised version of the Credible Fear Lesson Plan was issued on April 30, 2019. Of these, the revised versions of Credibility and National Security are For Official Use Only (FOUO) and are therefore not posted publicly. The updated Children's Claims Lesson Plan is available in the Electronic Reading Room on uscis.gov. RAIO intends to post all revised Lesson Plans to the Electronic Reading Room as they are updated other than those designated as FOUO.

**VII.   Credible Fear Screenings**

a. Since the beginning of the current fiscal year, what administrative actions, in the broadest sense, has the Asylum Division taken to ensure asylum seekers at the southwest border are interviewed as expeditiously as possible?

   **Response:** The Asylum Division prioritizes credible and reasonable fear processing. We conduct interviews remotely by telephone and also deploy officers to detention facilities to interview in person.

b. What are the types of claims that these applicants made and what are their numbers/percentages based on the types of claims?

   **Response:** The types of claims the Asylum Division receives depends on nationality and the country conditions causing individuals to flee. We do not generally provide a breakdown of the types of claims based on a protected characteristic. For more detailed information please file a formal request for information.

c. If a Notice to Appear (NTA) has been issued after an applicant has been through the CF process but that NTA is not yet filed with the court, will the Asylum Division take jurisdiction over a Form I-589 filed with USCIS so that the applicant does not remain in limbo? If not, why not?

   **Response:** If an asylum office issued the NTA after conducting a credible fear screening, please contact the asylum office to file the NTA with the immigration court.

**VIII.   *Ms. L v. Sessions***

a. Now that the settlement agreement in *Ms. L v. Sessions* has been publicly announced, could the Asylum Division please provide an update on its policies and procedures for conducting credible fear and reasonable fear reviews for parents who are members of the *Ms. L* class? Have asylum officers been trained to conduct these reviews? Have any asylum offices begun conducting these reviews for non-detained parents?

   **Response:** USCIS has been processing cases as required by the *Ms. L/MMM* settlement agreement. We will be distributing guidance shortly to asylum offices on how to process cases under the settlement agreement. We will schedule non-detained parents for interviews as we receive referrals from ICE.

b. Many parents in the *Ms. L* class have approached or are soon approaching their one-year asylum filing deadlines. Is there a way to expedite these reviews? Alternatively, is there a way to extend the one-year deadline to compensate for the delay for those who have not yet received responses on their credible fear or reasonable fear reviews?

    **Response:** Individuals in the reasonable fear process are subject to either a reinstated order of removal under INA § 241(a)(5) or a final administrative order of removal under INA § 238(b) and therefore are not eligible to apply for asylum. Accordingly, the one year filing deadline is not relevant to individuals in the reasonable fear process. Regarding individuals in the credible fear process, due to a joint stay agreement in the *Mendez-Rojas v. Johnson* litigation, the government has agreed, on an interim basis, to treat pending or newly filed asylum applications by certain applicants as though they were filed within the one-year deadline, if the application is adjudicated while the agreement is in effect. Please see the Notice of Interim Stay Agreement that has been posted in asylum office waiting rooms and immigration court waiting areas.

  c.  It is difficult for some *Ms. L* class members to tell whether they are eligible for credible fear or reasonable fear review under the settlement agreement due to gaps in paperwork or unclear details of transfers and releases from detention. Are asylum offices able to confirm, on an individual case basis, whether a class member has an outstanding, unexecuted expedited removal order or reinstated removal order?

    **Response:** Individuals who believe they are class members or their counsel should contact class counsel Zach Best at [zachary.best@hoganlovells.com](mailto:zachary.best@hoganlovells.com) for information on the necessary class member election forms and how to submit them. Once election forms have been properly submitted through class counsel, USCIS will work with ICE on an individual case basis to determine whether an individual is a class member and entitled to procedures under the settlement agreement. Individuals should not reach out to USCIS directly to seek settlement procedures.

## IX. Untimely Filing and Optional Waiver of Asylum Interview

  a.  What is the Asylum Division's policy regarding scheduling interviews where the application is filed more than one year after the applicant's last entry to the United States? Are all one year filing deadline (OYFD) cases subject to a filing deadline screening interview?

    **Response:** All new filings are subject to LIFO priorities, regardless of the claimed date of entry on the Form I-589. All applicants must establish by clear and convincing evidence that they filed within the first year of arrival to the United States. If they cannot meet this burden and they do not establish an exception to the one year filing deadline during an asylum interview, then they are barred from applying for asylum and will be referred to an immigration judge.

  b.  How many cases remain in the backlog that were filed more than five years after their OYFD? 10 years after their OYFD?

    **Response:** As of April 2019, there are more than 30,000 cases pending in the affirmative asylum backlog in which the applicant filed more than 10 years after arriving in United States. We do not presently track data on cases in which the applicant filed more than 5 years after arriving in United States.

c. Does the Asylum Division have plans to continue the interview waiver notice initiative, or will the Asylum Division undertake other programs to address cases filed after the filing deadline?

**Response:** Asylum offices may issue future waiver offers to some applicants. Selection factors will be the length of time the application has been pending in the backlog and the office's available resources to complete the processing of such cases. All waiver offers will be issued in a manner in line with the Asylum Division's commitment to dis-incentivizing the abusive practice of filing non-meritorious late applications.

d. Has the Asylum Division concluded its evaluation of the interview waiver notice initiative? What are the results of that assessment?

**Response:**

- The Asylum Division issued two rounds of notices in 2018 as a pilot designed to adjudicate certain untimely filed cases. The Asylum Division chose cases in which the applicants either claimed entry 10 or more years prior to filing or failed to state any date of entry on the Form I-589.

    1. Round 1: 1,500 Waivers were offered and around 22% accepted
    2. Round 2: 5,000 Waivers were offered and around 27% accepted

- The biggest factors that affected response outcomes seemed to be attorney representation, location within the United States and marital status.

- Asylum officers conducted interviews with applicants who did not accept the waiver offers in order to gather sufficient facts to make a legal determination regarding the timeliness of the Form I-589 and any of the exceptions to the one-year filing deadline enumerated in INA § 208(a)(2)(D); 8 C.F.R. § 208.4(a).

X. **Public Services**

a. What is the best process to obtain a copy of a notice of receipt if one was not received after filing an affirmative asylum application?

**Response:** Please contact the director of the asylum office with jurisdiction over the case to see if there is evidence that a case was filed but a receipt was not sent. Go to the USCIS Service and Office Locator page for contact information.

b. We have heard that some asylum offices are instituting an "INFOPASS inquiry" system. Will this be happening at all asylum offices?

**Response:** The Asylum Division is piloting InfoPass at the Arlington Asylum Office. There are no current plans to expand InfoPass to other asylum offices.

## XI. Staffing

a. What is the current attrition rate for asylum officers? What is the average length of job tenure for an asylum officer?

**Response:** We are not providing this information at this time. Please submit a formal request for this information.

b. What are the current staffing levels (i.e. number of asylum officers, number of supervisory asylum officers) at each asylum office?

**Response:** Resources are shifted throughout the year based on hiring needs, receipts, and space considerations. As of May 6, 2019, there are 763 asylum officer positions in the field offices and 148 supervisory asylum officer positions in the field offices.

c. How many current vacancies are there at each asylum office for asylum officers and supervisory asylum officers?

**Response:** This changes on a biweekly basis. As of May 6, 2019, there are 206 asylum officer vacancies and 24 supervisory asylum officer vacancies.

d. How many asylum officers are currently assigned on a weekly basis to conduct CFIs/RFIs?

**Response:** As of May 14 2019, there are over 200 officers assigned to conduct credible and reasonable fear screenings weekly. This number will fluctuate throughout the year based on receipts.

e. Where is the asylum office considering the opening of new offices?

**Response:** The Asylum Division is currently exploring space options in Atlanta, San Antonio, Seattle, and Tampa.

## XII. Language Services

a. Does the Asylum Division provide language services to asylum applicants? Examples of language services include, but are not limited to, allowing the phone monitor to serve as the interpreter and allowing a bilingual asylum officer to conduct the interview in a language other than English.

**Response:** 8 C.F.R. § 208.9(g) requires an affirmative asylum applicant who is not competent in English to bring an interpreter to an interview. As a general rule, applicants are required to bring interpreters regardless of whether there are asylum officers available to conduct interviews in languages other than English. The Asylum Division provides language services to asylum applicants when the individual has a

hearing disability and requires a sign language interpreter. The Asylum Division may also choose to provide language services to unaccompanied alien children in limited circumstances.

The Asylum Division provides interpreters in credible fear and reasonable fear interviews to applicants consistent with 8 C.F.R. § 208.30(d)(5) and 8 C.F.R. § 208.31(c).

Asylum Division procedures allow an officer to conduct an interview in a language other than English in certain circumstances. The asylum officer must be certified in that language by the Department of State before the officer can conduct an interview in a language other than English.

b. Is there any publicly available data on the Asylum Division's provision of language services?

**Response:** The Asylum Division does not currently publicize any data related to its interpreter contracts.

## XIII. Terminations

a. We've heard reports that in some parts of the United States asylum offices issued notices of intent to terminate asylum for certain Ethiopians based on changed conditions. Can you please share more information about this? Are there any policy memos/directives/other information regarding the intent to terminate based on changed conditions?

**Response:** The Asylum Division initiates termination review when we receive person-specific evidence that an individual asylee may be subject to termination of asylum status for any of the applicable grounds under 8 C.F.R. § 208.24. We have not issued any policy memos/directives/other information regarding the termination of asylum status based on the individual no longer having a well-founded fear of persecution due to changed country conditions in the individual's country of nationality or last habitual residence.

## XIV. Miscellaneous Questions

a. If a beneficiary applied to adjust status based on a family petition, but that family petition is no longer valid, can that person, who was also granted asylum, later apply to adjust status based on asylum?

**Response:** Yes, if an individual has not adjusted status to lawful permanent resident (LPR) and is still retaining asylum status, then this individual can apply to adjust status as an asylee.

b. Is there a division-wide policy regarding attorneys using laptops or iPads during interviews? Attorneys would like to take notes on their computers/iPads and/or bring an

electronic copy of the evidence for their access during the interview. Is this allowed if wi-fi and Bluetooth are disabled?

**Response:** The Asylum Division does not currently have a national policy on attorneys using laptops or iPads during interviews. Applicants, attorneys, interpreters, and other accompanying individuals may not use electronic devices for audio or visual recording purposes during an asylum interview. Asylum office directors may, at their discretion, allow the use of electronic devices to take notes or for other purposes.

d. Is it correct that an asylum office cannot adjudicate spouses' separate principal asylum applications unless both spouses are interviewed on their separate applications and/or one of the two spouses withdraws their application?

**Response:** There is no requirement that a family must submit an asylum application as a family. A husband and wife or a parent and child may each submit separate asylum applications as principal applicants. Each individual is entitled to confidentiality protections and an interview on his or her application.

To the extent practicable, asylum office personnel schedule family members on the same day and with the same asylum officer. Asylum office personnel will not always know in advance that multiple family members have filed principal asylum applications. In this scenario asylum office personnel will attempt to have all family members interviewed by the same asylum officer or have the same supervisory asylum officer review all of the family members' claims. If an individual who is currently included on a Form I-589 as a dependent subsequently files a Form I-589 as a principal applicant, the subsequent filing will be handled under the earlier filing date for scheduling purposes.

e. How is the asylum office treating domestic violence and gang claims?

**Response:** Claims involving domestic violence and gangs are screened or adjudicated in accordance with current laws and regulations.

f. Do all asylum offices have stakeholder engagements, or have some offices discontinued this practice?

**Response:** The New York and Newark Asylum Offices and the Boston Asylum Sub-Office do not host stakeholder engagements; however, they participate in external stakeholder events several times a year. The Chicago Asylum Office does not host stakeholder engagements, but they participate in their District's USCIS/Congressional Liaison meetings and the DHS Office of Civil Rights and Civil Liberties roundtables. The remaining asylum offices and sub-offices (Arlington, Houston, Los Angeles, Miami, New Orleans, and San Francisco) host stakeholder engagements on a regular basis.