## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION

**J.O.P. (by and through Next Friend G.C.P.)**,
**M.A.L.C.**, **M.E.R.E.**, and **K.A.R.C. ,** on behalf
of themselves as individuals and on behalf of
others similarly situated,

       Plaintiffs,

    v.

**U.S. DEPARTMENT OF HOMELAND
SECURITY**, **KEVIN MCALEENAN** (in his
official capacity as Acting Secretary of
Homeland Security), **U.S. CITIZENSHIP &
IMMIGRATION SERVICES**, and
**KENNETH CUCCINELLI** (in his official
capacity as Acting Director of U.S. Citizenship
& Immigration Services)

      Defendants.

Civil Action No.
8:19-CV-01944-GJH

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND .......................................................................................5

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF EACH OF
        THEIR CLAIMS FOR RELIEF .......................................................................14

        A.      The USCIS's New Redetermination Policy Violates the APA Because It Is
                Inconsistent With the TVPRA ..............................................................14

        B.      Retroactive Application of USCIS's New Asylum Procedures Violates
                Plaintiffs' Fifth Amendment Due Process Rights..................................19

        C.      The New USCIS Redetermination Policy Governing Asylum Applications
                From Unaccompanied Children Are Arbitrary and Capricious...........................22

        D.      USCIS Failed to Engage in the Required Notice-and-Comment Procedure for
                Rulemaking ..........................................................................................27

II.     PLAINTIFFS WILL BE IRREPARABLY HARMED BY THE NEW USCIS
        REDETERMINATION POLICY .....................................................................31

III.    THE PUBLIC INTEREST AND THE BALANCE OF HARMS WEIGH
        STRONGLY IN FAVOR OF A TRO ..............................................................35

CONCLUSION...........................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988)...................................................................................................19, 26

*Califano v. Yamasaki*,
442 U.S. 682 (1979).........................................................................................................5

*Casa De Md. v. U.S. Dep't of Homeland Sec.*,
924 F.3d 684 (4th Cir. 2019) ...............................................................................22, 25, 27

*Chamber of Commerce of U.S. v. N.L.R.B.*,
721 F.3d 152 (4th Cir. 2013) ..........................................................................................15

*Chen Zhou Chai v. Carroll*,
48 F.3d 1331 (4th Cir. 1995) ..........................................................................................30

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984)........................................................................................................14

*Children's Hosp. of the King's Daughters, Inc. v. Azar*,
896 F.3d 615 (4th Cir. 2018) ..........................................................................................28

*Citizens for a Responsible Curriculum v. Montgomery Cty. Pub. Sch.*,
2005 WL 1075634 (D. Md. May 5, 2005).......................................................................13

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)........................................................................................................22

*Creosote Council v. Johnson*,
555 F. Supp. 2d 36 (D.D.C. 2008)...................................................................................35

*De Niz Robles v. Lynch*,
803 F.3d 1165 (10th Cir. 2015) (Gorsuch, J.)..................................................................21

*Dep't of Commerce v. New York*,
588 U.S. __, 2019 WL 2619473 (June 27, 2019) .............................................................25

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
653 F.3d 1 (D.C. Cir. 2011).............................................................................................30

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016).....................................................................................................14

i

*Fairfax Nursing Ctr., Inc. v. Califano*,
590 F.2d 1297 (4th Cir. 1979), *abrogated on different grounds by Good
Samaritan Hosp. v. Shalala*, 508 U.S. 402 (1993)....................................................28

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)..............................................................................................23, 26

*Frontier-Kemper Constructors, Inc. v. Dir., Office of Workers' Comp. Programs,
U.S. Dep't of Labor*,
876 F.3d 683 (4th Cir. 2017), *as amended* (Dec. 12, 2017) ....................................19

*Guilford Coll. v. McAleenan*,
No. 18-cv-891, 2019 WL 1980132 (M.D.N.C. May 3, 2019) .............................5, 28

*Hoctor v. U.S. Dep't of Agric.*,
82 F.3d 165 (7th Cir. 1996) ......................................................................................29

*Int'l Refugee Assistance Project v. Trump*,
857 F.3d 554, 604 (4th Cir. 2017) ............................................................................35

*J.L. v. Cissna*,
341 F. Supp. 3d 1048 (N.D. Cal. 2018) ......................................................13, 30, 34

*Kirwa v. U.S. Dep't of Def.*,
285 F. Supp. 3d 21 (D.D.C. 2017) ............................................................................21

*In re M-A-C-O*,
27 I. & N. Dec. 477 (BIA 2018) ..........................................................................24, 26

*Marbury v. Madison*,
1 Cranch 137 (1803) .................................................................................................35

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014)................................................................................29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..............................................................................................22, 24

*Ms. L. v. U.S Immigration & Customs Enf't*,
310 F. Supp. 3d 1133 (S.D. Cal. 2018)....................................................................13

*N. Car. Growers' Ass'n, Inc. v. United Farm Workers*,
702 F.3d 755 (4th Cir. 2012) ...................................................................................31

*N. Mariana Islands v. United States*,
686 F. Supp. 2d 7 (D.D.C. 2009) .............................................................................34

*N.H. Hosp. Ass'n v. Azar,*
   887 F.3d 62 (1st Cir. 2018) .................................................................................29

*New Jersey v. EPA,*
   626 F.2d 1038 (D.C. Cir. 1980) ......................................................................34, 35

*Nken v. Holder,*
   556 U.S. 418 (2009) ...........................................................................................35

*Perez v. Mortg. Bankers Ass'n,*
   135 S. Ct. 1199 (2015) .......................................................................................22

*Real Truth About Obama, Inc. v. Fed. Election Comm'n,*
   575 F.3d 342 (4th Cir. 2009) .............................................................................13

*S.A. v. Trump,*
   No. 18-cv-3539, 2019 WL 990680 (N.D. Cal. Mar. 1, 2019) ...............................27

*Skidmore v. Swift & Co.,*
   323 U.S. 134 (1944) ...........................................................................................15

*Sugar Cane Growers Coop. of Fla. v. Veneman,*
   289 F.3d 89 (D.C. Cir. 2002) .............................................................................34

*United States v. Mead Corp.,*
   533 U.S. 218 (2001) ...........................................................................................15

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .........................................................................................13, 31

*Yates v. United States,*
   135 S. Ct. 1074 (2015) .......................................................................................16

## Statutes and Regulations

5 U.S.C. § 553 ...........................................................................................27, 28, 30, 34

5 U.S.C. § 706(2)(A) ...........................................................................................22

6 U.S.C. § 272 ...................................................................................................7

6 U.S.C. § 279 ...............................................................................................6, 15

8 U.S.C. § 1158 ...........................................................................................*passim*

8 U.S.C. § 1232 ...........................................................................................*passim*

8 C.F.R. § 208.4 ...............................................................................................34

Pursuant to Rule 65.1(c) of the Local Rules of the U.S. District Court for the District of

Maryland and Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs J.O.P. (by and through

next friend, G.C.P.), M.A.L.C., M.E.R.E., and K.A.R.C. ("Plaintiffs") respectfully submit this

Memorandum in support of their application for a temporary restraining order ("TRO").  For the

reasons set forth herein, Plaintiffs request that the Court order the requested relief.

## INTRODUCTION

Plaintiffs, who came to the United States as unaccompanied children to escape violence

and persecution in their home countries, seek a TRO to enjoin Defendants from implementing a

deeply flawed new policy that directs federal agents to take away statutory rights from children

who entered the United States unaccompanied and are now seeking asylum.  The Court should

act now to maintain the status quo and prevent irreparable harm to Plaintiffs and other similarly

situated asylum seekers.

In enacting the William Wilberforce Trafficking Victims Protection Reauthorization Act

of 2008 ("TVPRA"), Congress extended permanent legal protections to a uniquely vulnerable

population:  children who entered the United States without a parent or other legal guardian,

many of whom were fleeing violence and persecution in their home countries.  One key set of

"[p]ermanent protections" established by Congress for these "at risk children" concerns access to

asylum.  TVPRA § 235(d).  Under the TVPRA, children determined to be "unaccompanied alien

children" ("UACs") have the right to pursue asylum relief through a child-friendly, non-

adversarial process administered by the U.S. Citizenship and Immigration Services ("USCIS")

even though they are in removal proceedings.  Generally, asylum applicants must file their

asylum application within one year after entering the United States, but through the TVPRA

UACs are exempt from this one-year filing deadline.  The TVPRA recognizes how difficult it is

for a child alone in a new country to navigate a complex legal system and also provides children

with an opportunity to pursue other time-sensitive relief, such as legal permanent residence through a separate immigration program for abused, abandoned, or neglected children.

After receiving comprehensive recommendations from the Citizenship and Immigration Services Ombudsman in 2012, and recognizing that its "initial procedures" been implemented just 90 days after the TVPRA's enactment and left "room to improve" (Ex. 8), USCIS in 2013 adopted an asylum adjudication policy that comports with the TVPRA's language and purpose. Ex. 5 at 3.[1]  In the early years of the TVPRA, USCIS's policy was to redetermine during the asylum interview if an asylum seeker continued to meet the definition of a UAC.  In its 2012 report, the Ombudsman concluded that it was inefficient, unfair, and contrary to the TVPRA for USCIS to do so and on that basis reject asylum applications filed by children who had turned 18 or reunified with a parent or guardian.  Since 2013, USCIS's asylum adjudication policy has provided that an individual whom the federal government had previously determined is a UAC— as typically occurs immediately upon the child's apprehension after crossing the border—is *necessarily* eligible for crucial asylum protections.  Whether the individual had turned 18 or reunited with a parent or legal guardian before filing an asylum application was immaterial. When USCIS adopted its 2013 policy to align its practices with the TVPRA—after four years of utilizing redetermination practices—it rejected the very approach the agency is now embracing.

But now, contrary to the TVPRA requirements and without the required notice under the APA, USCIS has reversed course.  On June 14, 2019, USCIS posted on its website a memorandum (dated May 31, 2019) that dramatically changes how USCIS implements the TVPRA's asylum provisions, essentially nullifying the TVPRA's permanent protections for

---

[1] The exhibits cited herein are attached the Declaration of Brian Burgess, filed contemporaneously with this memorandum.

unaccompanied immigrant children.  As of June 30, 2019, asylum officers will no longer accept

previous UAC determinations; instead, all asylum officers *must* independently determine

whether an applicant continued to meet the statutory definition of UAC at the time she filed for

asylum; if she did not, USCIS cannot process her claim if she is in removal proceedings, and she

loses her exemption to the one-year filing deadline.  This represents far more than a mere change

in internal procedure:  it means that Plaintiffs, and those similarly situated, will completely lose

the permanent rights conferred by Congress for UACs if, for example, they were appointed a

legal guardian or had turned 18 before applying for asylum.  Most remarkably, the USCIS

memorandum declares that this new policy will apply retroactively to all new *and pending*

asylum applications as of June 30.  Thus, children who at the time they filed asylum applications

unquestionably were entitled to pursue asylum relief before USCIS will now have their

applications summarily rejected for supposed lack of jurisdiction by USCIS and, in some

instances, will lose the ability to pursue asylum entirely by virtue of the one-year bar.

The USCIS memorandum offers scant justification for the complete reversal.  It does not

so much as mention the Ombudsman Report that provided the basis, in part, for the 2013 asylum

policy.  Nor does the memorandum even acknowledge the substantial reliance interests created

by the 2013 asylum policy.  Moreover, although Congress specifically instructed USCIS to

implement the TVPRA's asylum provisions through regulations, 8 U.S.C. § 1232(d)(8), USCIS

failed to go through the notice-and-comment process required by the APA, choosing instead to

post the memorandum on its website without warning mere weeks before it became effective.

If USCIS's new redetermination policy is allowed to go into effect, Plaintiffs will be

denied their promised opportunity for an initial non-adversarial adjudication of their asylum

claims, and will be channeled directly into an adversarial proceeding with an extra burden to

prove they merit an exception to any failure to file within one year of entry.  In the event they are unable to carry this added and unexpected burden, they will be even more vulnerable to the imminent risk of deportation to countries where they fear persecution (or worse).  Even if not imminently deported, the delay and obstacles in processing Plaintiffs' requests for lawful status prolong their unstable status, force them to delay college due to inability to pursue loans or financial aid, and disrupt the progress of their recovery from trauma, posing the possibility of relapse into mental health harms resulting from the violence and persecution they survived.

The USCIS redetermination policy is unlawful in several respects, and Plaintiffs are entitled to a TRO to maintain the status quo.  First, Plaintiffs are likely to prevail on their claims. The agency's new redetermination policy is inconsistent with the TVPRA, arbitrary and capricious in violation of the APA, and procedurally defective for failing to go through notice and comment.  Moreover, retroactive application of the redetermination rule violates Plaintiffs' due process rights by imposing harsh n consequences on actions they took in reasonable reliance on USCIS procedures in place since 2013.  Second, Plaintiffs will suffer irreparable injury absent a TRO preventing Defendants from applying the new redetermination rule to their asylum applications.  Plaintiffs are now at risk of deportation to countries where they fear persecution, a risk that is all the more tangible given the current government's drumbeat of deportation threats.

Third, the additional equitable factors also strongly support emergency relief.  The public interest is served when administrative agencies comply with their obligations under the APA. And upholding the Constitutional due process rights of immigrant children undeniably promotes the public interest.  Requiring Defendants to temporarily halt these latest asylum eligibility rules causes no harm to the Government.

For these reasons, and as set forth below, the Court should order a TRO.  Moreover, the

Court's order should apply universally to bar Defendants from applying the new redetermination

to any new or pending asylum applications while the TRO is in force.  "The scope of injunctive

relief is dictated by the extent of the violation established," and not on the happenstance of the

location of individual plaintiffs.  *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  The APA

mandates that courts set aside agency action that is unlawful, arbitrary, and capricious—here, the

2019 Redetermination Memo is just that, and harms not just Plaintiffs but all those who are

similarly situated, making nationwide injunctive relief not just appropriate, but also necessary to

give Plaintiffs the relief to which they are entitled under the law.  *See Guilford Coll. v.

McAleenan*, No. 18-cv-891, 2019 WL 1980132, at *10-11 (M.D.N.C. May 3, 2019).  Moreover,

Plaintiffs here are proceeding on behalf of a proposed class action of similarly situated children,

and submit that the Rule 23(b)(2) class proposed is likely to be certified.

## FACTUAL BACKGROUND

### Passage of the TVPRA in 2008

In 2002, Congress enacted the Homeland Security Act ("HSA"), creating DHS with

oversight of immigration through several agencies, including USCIS, U.S. Customs and Border

Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE").  Pub. L. No. 107-

296, 116 Stat. 2153.  The HSA defined an unaccompanied alien child ("UAC") as a child who:

> (A) has no lawful immigration status in the United States; (B) has not attained 18 years of
> age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United
> States; or (ii) no parent or legal guardian in the United States is available to provide care
> and physical custody.

6 U.S.C. § 279(g)(2).  Under the HSA, the Department of Health and Human Services ("HHS")

was assigned responsibility for the care and placement of UACs in appropriate custody.  6

U.S.C. § 279(a), (b)(1)(A).  But the HSA failed to adequately protect immigrant children.  These

children were not being screened effectively by DHS to detect whether they were persecuted in their home countries, were at risk of being trafficked, or suffered other harms. Children were summarily turned away at the U.S./Mexico border, where they were left without any protection.[2]

The TVPRA, which was signed into law on December 23, 2008, was passed in response to concerns that immigrant children were not being treated humanely. The TVPRA created procedures for processing the cases of unaccompanied children in recognition of the vulnerability of children traveling alone. In structuring the TVPRA, Congress placed legal protections for UACs, including the asylum provisions, in a section of the statute titled "Permanent protection for certain at-risk children." TVPRA § 235(d). For example, the TVPRA requires that after an unaccompanied child is discovered by the federal government officers (often CBP or ICE officers), she must be transferred to custody of Office of Refugee Resettlement (ORR) within the HHS, typically within a 72-hour period, for care and further screening. This requirement puts children in the care of an agency set up to safeguard their best interest, rather than an agency whose mission is to enforce immigration laws.[3]

The TVPRA also provides that USCIS, not an immigration court, has initial jurisdiction over a UAC's asylum application. 8 U.S.C. § 1158(b)(3)(c). The USCIS asylum process is a less adversarial system more sensitive to the special needs of child immigrants who lack understanding of how to navigate an immigration system designed for adults, and who likely sought safety in the United States without understanding the legal options that exist, including

---

[2] *See, e.g.*, Ex. 13, *Legal Options to Stop Human Trafficking: Hearing Before the Subcomm. on Human Rights & the Law of the S. Comm. on the Judiciary*, 110th Cong. 19 (2007) (statement of Katherine Kaufka, Supervising Attorney, National Immigrant Justice Center); Ex. 14, Jacqueline Bhabha, *"Not a Sack of Potatoes": Moving and Removing Children Across Borders*, 15 B.U. Pub. Int. L.J. 197, 215 (2006).
[3] HHS has social workers who are trained to work with children. TVPRA § 235(b)(3); 8 U.S.C. § 1232(a)(3).

asylum.  Instead of having to be cross examined in an adversarial courtroom by trained

government lawyers, children engage with USCIS  officers trained to conduct non-adversarial

interviews and apply child-sensitive and trauma-informed interview techniques.  The TVPRA

also directs the agency to help make counsel available to these children.  *Id.* § 1232(c)(5).

Most asylum applicants must file their asylum application within one year after entering

the United States.  *Id.* § 1158(a)(2)(B).  Recognizing that children were forced to struggle

through a system designed for adults, even though they lack the capacity to understand nuanced

legal principles, let alone courtroom and administrative procedures, the TVPRA eliminates the

one-year asylum filing deadline for unaccompanied children.  *Id.* § 1158(a)(2)(E).

The TVPRA commands all federal agencies to notify HHS within 48 hours of

apprehending or discovering a UAC, and to transfer custody to HHS within 72 hours of

determining that a child is a UAC.  *Id.* § 1232(a)(3).  The TVPRA does not direct or authorize

any government agency to conduct a redetermination of an individual's UAC status.  The

TVPRA also grants no authority to USCIS to rescind a determination that a child is a UAC.

### The September 2012 Office of the Citizenship and Immigration Ombudsman's Report on *Ensuring a Fair and Effective Asylum Process for Unaccompanied Children*

On September 20, 2012, the Citizenship and Immigration Services Ombudsman[4] issued a

report providing an independent analysis of problems encountered by unaccompanied children

seeking asylum in the United States, and recommendations to improve the process.  Ex. 4.  To

complete its review, the Ombudsman "interviewed USCIS Asylum Division manager and staff at

Headquarters and seven of the eight Asylum Offices, EOIR officials, and stakeholders

---

[4] The Citizenship and Immigration Services Ombudsman, established by the Homeland Security Act of 2002, provides independent analysis of problems encountered by individuals interacting with USCIS, and proposes changes to mitigate those problems.  *See* 6 U.S.C. § 272.

throughout the country." *Id.* at 2.  The Ombudsman "also studied case assistance requests and reported incidents submitted directly to [its] office by stakeholders." *Id.*.

The Ombudsman recognized that, when a child is placed in removal proceedings, the apprehending entity, whether ICE or CBP, "must make a finding that the child is unaccompanied." *Id.* at 5.  Prior to the 2012 Ombudsman Report, USCIS had been performing redeterminations of a child's UAC status upon receipt of an asylum application and again during the asylum interview.  *Id.* at 3-4.  The Ombudsman outlined numerous problems with redetermining UAC status, including difficulty rescheduling UAC interviews, and inadequate methods and approaches to adjudication.  *Id.*  The Ombudsman explained that instead of "facilitating expedited, non-adversarial interviews envisioned by Congress," the USCIS policy of undertaking a redetermination of UAC status at every asylum interview created "delay and confusion." *Id.* at 4.

The Ombudsman recognized that the "TVPRA's procedural and substantive protections were designed to remain available to UACs throughout removal proceedings, housing placement, and the pursuit of any available relief.  Subjecting a child seeking asylum to multiple UAC determinations as is required by USCIS' temporary guidance appears at odds with the TVPRA's express purpose, namely, to provide timely, appropriate relief for vulnerable children." *Id.* Further, the Ombudsman acknowledged that "Congress did not provide language indicating that the filing of an asylum application should trigger a new or successive UAC determinations that could eliminate statutory protections or remove the UAC from [removal] proceedings." *Id.* at 5.

The Ombudsman recommended that USCIS accept jurisdiction of an asylum application filed by children about whom a federal agency had already made a finding that the child met the statutory definition of an "unaccompanied alien child." *Id.* at 4-5.  As the Ombudsman correctly

concluded based on its extensive assessment, "[e]liminating the practice of USCIS redetermining UAC status during the asylum interview would also restore a level of fairness that comes from having a predictable and uniform process." *Id.* at 6.

### USCIS Response to the Ombudsman's Report and the 2013 Kim Memorandum

USCIS substantially adopted the Ombudsman's recommendation, which was grounded in a reasoned and detailed analysis. On April 11, 2013, USCIS responded directly to the Ombudsman, "welcome[ing]" the recommendations and describing its approach to implementing them. Ex. 8. On May 28, 2013, USCIS issued a memorandum, authored by Asylum Chief Ted Kim, with updated procedures for "determining jurisdiction in applications for asylum filed by unaccompanied alien children (UACs) under the initial jurisdiction provision of the [TVPRA]." Ex. 5 at 1 ("2013 Kim Memo"). The 2013 Kim Memo implemented the Ombudsman's recommendation that USCIS accept jurisdiction of an asylum application filed by a child whom a federal agency had previously determined to be an "unaccompanied alien child." *Id.* at 2.

Under the policy set forth in the 2013 Kim Memo, asylum officers are to adopt UAC determinations made by CBP and ICE. The 2013 Kim Memorandum instructs asylum officers that "[i]n case in which CBP or ICE has already determined that the applicant is a UAC, Asylum Offices will adopt that determination and take jurisdiction over the case." *Id.* Further, "[i]f CBP or ICE determined that the applicant was a UAC, and, as of the date of initial filing of the asylum application, that UAC status determination was still in place, USCIS will take initial jurisdiction over the case, even if there appears to be evidence that the applicant may have turned 18 years of age or may have reunited with a parent or legal guardian since the CBP or ICE determination." *Id.* The CIS Ombudsman hailed USCIS's response, saying the new rules "will positively affect

9

all minors apprehended and placed into federal custody with the HHS, helping to ensure a consistent process for scores of children who seek asylum in the United States."[5]

As late as May 20, 2019, USCIS confirmed that the asylum policy set forth in the 2013 Kim Memo remained in effect.[6] Specifically, in a USCIS Asylum Division Quarterly Meeting report, USCIS confirmed that "[t]he May 28, 2013 Memorandum on initial jurisdiction over asylum applications filed by UACs and the related June 2013 policy documents remain in effect." Ex. 7 at 3. USCIS gave no indication or warning that it would soon rescind the Kim Memorandum and replace it with a policy that significantly narrows the meaning of UAC and applies this meaning retroactively.

### The 2019 U.S. Citizenship & Immigration Services Memorandum

On June 14, 2019, USCIS published a memorandum on its website that drastically changed the rules—and in a way that is entirely inconsistent with the TVPRA—for determining whether a child is eligible to seek asylum before USCIS. The 2019 Redetermination Memo, authored by John Lafferty (Chief, Asylum Division), is dated May 31, 2019, but was not made available on the USCIS website until June 14, 2019. The policy set forth in the memo was effective on June 30, 2019, 30 calendar days from the date of the memo.

---

[5] Ex. 6, Annual Report 2013, Citizenship and Immigration Services Ombudsman (June 27, 2013).

[6] Indeed, since 2017 USCIS has repeatedly confirmed that the rules set forth in the 2013 Kim Memorandum remained in effect. Ex. 9 (May 2, 2017 USCIS Asylum Meeting) at 1-2 ("The May 2013 USCIS memo . . . and the June 2013 Q&A's are still in effect. The memo has not been rescinded nor replaced with new procedure for determining initial jurisdiction."); Ex. 10 (Aug. 11, 2017 USCIS Asylum Meeting) at 1-2 ("[T]he May 2013 USCIS memo . . . is still in effect. The memo has not been rescinded nor replaced with new procedures for determining initial jurisdiction."); Ex. 11 (Aug. 7, 2018 USCIS Asylum Meeting) at 7 ("The May 28, 2013 memorandum on initial jurisdiction over asylum applications filed by UACs and the related June 2013 policy documents remain in effect.").

The 2019 Redetermination Memo acknowledges that the policy in place since 2013 allowed "asylum officers to adopt prior UAC determinations made by U.S. Customs and Border Protection (CBP) or U.S. Immigration and Customs Enforcement (ICE) without further factual inquiry, so long as those determinations were still in place on the date of filing the asylum application." *Id.* at 2.  Pursuant to the 2019 Redetermination Memo, all asylum officers are now required to "mak[e] independent factual inquiries in all cases in order to determine whether the individual met the UAC definition on the date of first filing the asylum application." *Id.*  The 2019 Redetermination Memo mandates that asylum officers must now make an independent determination of whether an applicant was a UAC at the time of filing and directs asylum officers to "examine whether the individual was a UAC at the time of first filing for the purposes of determining whether the one-year filing deadline applies." *Id.*

The 2019 Redetermination Memo states that its "updated procedures" "apply to **any** USCIS decision issued on or after the effective date" of the memorandum. *Id.* at 1 (emphasis in original).  Under the new rules in the 2019 Redetermination Memo, an individual who had previously been determined to be a UAC and who applied for asylum in reliance on the existing USCIS policy may be summarily rejected by USCIS, or could arrive at an asylum interview to find that USCIS will decline jurisdiction because the asylum officer determined the applicant was not a UAC at the time of application.  For example, if the asylum officer determines that a child is 18 or older at the time the application was submitted, the asylum officer must reject the application.  As a further example, if the asylum officer determines that, at the time the application was filed, the child had a parent or guardian in the United States that was available to "provide care and physical custody," then the asylum officer must reject the application.

Further, under the new rules, an individual who had previously been determined to be a UAC and who applied for asylum in reliance on the existing USCIS policy could lose all right to asylum due to the imposition of the one-year bar.  *Id.* at 5

### Plaintiffs Relied on USCIS's 2013 Policy and Will Be Deprived of Their Right to Seek Asylum Before USCIS Under the New Policy

Plaintiffs came to the United States as children to escape violence, abuse, or persecution in their home countries.  *See* Decl. of J.O.P.; Decl. of M.A.L.C.; Decl. of M.E.R.E.; Decl. of K.A.R.C.  They arrived in the United States as unaccompanied children without a parent or guardian to care for them and were each determined by the government to be a UAC.  *See* Compl. ¶¶ 15-36.  Plaintiffs have applied for asylum with Defendant USCIS, as they were entitled to do so based on the asylum eligibility policy in place for UACs since 2013.  Under the new policy, they will likely be deprived of their right to seek asylum before USCIS and may lose the ability to seek asylum entirely.

### The Current Executive Administration Seeks to Unlawfully Deter Lawful Immigration by Undermining the TVPRA

The 2019 Redetermination Memo is just the latest in a long line of policies adopted by the current Executive administration to prevent unaccompanied children from seeking protection in the United States, as revealed by a leaked memorandum from DHS.  The memorandum, titled "Policy Options to Respond to Border Surge of Illegal Immigration," reveals in blunt terms that children are being used by the current Executive administration as pawns in a broader goal of deterring asylum seekers.  Ex. 2.[7]  The leaked memorandum identifies the "family separation" policy" as Option #2, and rescission of the 2013 Kim memo as Option #3.  *Id.*  Despite

---

[7] Available at https://www.documentcloud.org/documents/5688664-Merkleydocs2.html.  On information and belief, the leaked memorandum was provided to NBC News by the office of Sen. Jeff Merkley, which obtained the memorandum from a government whistleblower.

acknowledging that the USCIS asylum policy in place since 2013 "affords the minors the protections under the Trafficking in Victims Protection Reauthorization Act (TVPRA)," DHS proposed to rescind that rule in order to respond to a "border surge." *Id.*

Courts have already called for the current administration to halt its unlawful "family separation" policy (Option #1 in the leaked memo), and to halt USCIS's misguided attempt to deny special immigrant protections to classes of eligible applicants (Option #6 in the leaked memo), also in violation of the TVPRA.[8] Plaintiffs respectfully request that this Court halt implementation of the new, unlawful asylum eligibility policy in order to protect their rights, and the rights of others similarly situated, to seek asylum before USCIS as they have every right to do based on the TVPRA and policy in place since 2013. Plaintiffs, tens of thousands of immigrant children, face life-altering consequences absent the Court's immediate intervention.

## ARGUMENT

On a motion for a TRO, the plaintiff must establish that she is likely to succeed on the merits, that she is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in her favor, and that a TRO is in the public interest. *Citizens for a Responsible Curriculum v. Montgomery Cty. Pub. Sch.*, 2005 WL 1075634, at *7 (D. Md. May 5, 2005). Under *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008), "each of [these requirements] must be satisfied as articulated." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009). Each factor weighs in favor of a TRO here.

---

[8] *See Ms. L. v. U.S Immigration & Customs Enf't*, 310 F. Supp. 3d 1133, 1136-37 (S.D. Cal. 2018) (granting a preliminary injunction to stop separation of children from their parents, "many of whom were seeking asylum"); *J.L. v. Cissna*, 341 F. Supp. 3d 1048, 1068-69 (N.D. Cal. 2018) (USCIS failed to follow notice-and-comment procedures in enacting rules that unlawfully denied plaintiffs SIJ status).

I.   **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF EACH OF THEIR CLAIMS FOR RELIEF**

Plaintiffs are likely to succeed on their claims against Defendants, any one of which calls for this Court to preserve the status quo and prevent USCIS from applying its new eligibility policy to bar UACs from seeking asylum before USCIS.  First, USCIS's new redetermination policy violates the APA, because it is inconsistent with the TVPRA, which provides permanent protections to vulnerable children who were determined to be unaccompanied by a parent or guardian following their entry into the United States.  Second, USCIS's decision to apply the new policy to pending applications, without advance notice and in clear disregard of applicants' reliance on the existing rules, violates Plaintiffs' due process rights under the Fifth Amendment.  Third, USCIS's decision adopting the new redetermination policy is arbitrary and capricious in violation of the APA, because the agency's terse explanation for jettisoning its 2013 policy, and upsetting the expectations of thousands of asylum applicants, fails the requirement that an agency provide a reasoned explanation for its decisions.  Fourth, the new redetermination policy is procedurally defective under both the TVPRA and the APA, because it establishes a new legislative rule governing the asylum process but was issued without notice and comment.

A.   **The USCIS's New Redetermination Policy Violates the APA Because It Is Inconsistent With the TVPRA**

Plaintiffs are likely to succeed in their claim that the new redetermination rule must be set aside because it is contrary to the language and purpose of the TVPRA.  As an initial matter, the agency's statutory construction is not entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  USCIS did not engage in notice-and-comment rulemaking, as required by the TVPRA, *infra* pp. 14-18; thus its redetermination memorandum is deserving of, at best, *Skidmore* deference.  *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("*Chevron* deference is not warranted where the regulation is 'procedurally

defective'—that is, where the agency errs by failing to follow the correct procedures in issuing

the regulation." (citation omitted)); *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)

(affording *Skidmore* deference where *Chevron* deference not permitted).  Any deference to an

agency's decision under *Skidmore* is determined on a case-by-case basis, and depends on the

"thoroughness" of the agency's decision, the "validity of its reasoning," its "consistency with

earlier and later pronouncements"—in essence—the decision's "power to persuade." *Skidmore*

*v. Swift & Co.*, 323 U.S. 134, 140 (1944).  Moreover, the agency's interpretation is plainly

inconsistent with Congress's intent to confer permanent protections to children determined to be

UACs, so it would fail under the first step of *Chevron* in any event.  *See Chamber of Commerce*

*of U.S. v. N.L.R.B.*, 721 F.3d 152, 160 (4th Cir. 2013).

     In enacting the TVPRA, Congress endeavored to provide durable protections to a highly

vulnerable group:  children who entered the country without lawful status and without a parent or

legal guardian to take care of them.  Many of these children are fleeing violence.  As evidenced

by the clear text and structure of the TVPRA, Congress intended that once such a child was

discovered by a federal agency and determined to be a UAC, that determination triggers

important protections to which the individual remains entitled, regardless of whether the

individual later turns 18 or obtains a guardian during his or her immigration proceedings.

     To begin with, the structure of the TVPRA directs that a child's UAC determination

generally is made upon "apprehension or discovery"—not years later during an asylum

interview.  8 U.S.C. § 1232(b)(2)(A).  The Homeland Security Act ("HSA") designates a

category of child immigrants as "unaccompanied alien children" (UACs) and entrusts "the care

and custody of all [such] children, including responsibility for their detention, where

appropriate," to the Department of Health and Human Services ("HHS"), which delegates

authority to ORR.  *See* 8 U.S.C. § 1232(b)(1); 6 U.S.C. § 279.  The TVPRA, in turn, imposes on

DHS (and all other federal agencies) the duty to notify HHS within 48 hours not only when a

UAC is discovered or apprehended, but also of "any claim or suspicion that an alien in the

custody of such department or agency is under 18 years of age."  8 USC § 1232(b)(2), (3).

Congress thereby charged federal agencies including CPB and ICE with the duty to determine

that a child in custody is or may be a UAC.  There are no provisions of the TVPRA that give any

agency authority to undertake a redetermination of UAC status, nor does the TVPRA grant any

statutory authority to rescind such a determination or to rescind the many protections to which

such children are entitled once a UAC determination is made.

　　　The UAC status determination then triggers a suite of protections under the TVPRA,

including, as relevant here, provisions related to asylum.  For example, UACs are exempt from

the one-year filing deadline for applying for asylum.  8 U.S.C. § 1158(a)(2)(E).  Significantly,

the asylum-related UAC provisions appear under the heading "*Permanent* protection for certain

at-risk children."  TVPRA, § 235(d), Pub. L. No. 110-457, 122 Stat. 5044, 5079 (2008)

(emphasis added).  That heading alone signals Congress's intent that special asylum provisions

that attach to UAC remain in place throughout the child's pursuit of relief.  *See Yates v. United

States*, 135 S. Ct. 1074, 1083 (2015) (recognizing that although statutory "headings are not

commanding," they provide important "cues" about congressional intent).  Surrounding statutory

provisions further confirm the enduring nature of the TVPRA's protections, undermining

USCIS's new pronouncement that it may redetermine a child's UAC status anytime he or she

seeks to invoke the benefits that Congress conferred.

　　　For example, the TVPRA directs HHS to "ensure, to the greatest extent practicable . . . ,

that all unaccompanied alien children who are or have been in the custody of the Secretary or the

16

Secretary of Homeland Security . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5). Thus, if an agency were to take away an individual's UAC status in the midst of immigration proceedings, that individual seemingly would lose the right to representation by counsel. It is difficult to conceive that Congress would direct HHS to facilitate access to counsel to protect vulnerable UACs, including following their release from custody, while also intending (silently) to revoke that right to counsel if an attorney does her job too well by, for example, helping to connect a child client with an appropriate guardian. It is equally unlikely that Congress would expend resources on those attorneys with an expectation that they would lose funding the moment the child turned 18.

Similarly, other provisions of the TVPRA show that Congress intended for agencies to extend protections to this vulnerable group even if, were a redetermination required or permitted, they would no longer qualify as a UAC. The TVPRA instructs HHS to conduct "home studies" for certain UACs with special needs (*e.g.*, children with a disability) before placing the child with an individual, and also to "conduct follow-up services, during the pendency of removal proceedings." 8 USC § 1232(c)(3)(B). Many children are placed by DHS with their parent. Under USCIS's flawed redetermination policy, a child who had previously been determined to be a UAC would lose TVPRA rights conferred on UACs, if she were placed with a parent. But if a child lost TVPRA rights conferred on UACs, they would no longer be eligible for "follow-up services," thus depriving them of the permanent protections that Congress intended.

The new policy creates a very strange evidentiary burden that is hard to square with the structure of the TVPRA. As the government would have it, a child who is identified as a UAC and files for asylum could, *many years later*, at the time of an interview, be given the burden of

establishing that there was not a "parent or legal guardian available to provide care and physical custody" anywhere in the United States, whether or not the child and parent were in fact in communication.  Delays between UAC asylum filing and interviews frequently last years.  Lopez Decl. ¶¶ 16-19.  Congress's solicitude for the difficulty children might face presenting asylum evidence would be replaced with a burden to prove a negative fact about a time far in the past.

Finally, the new USCIS policy is entirely at odds with the congressional purpose underlying the TVPRA of providing permanent protection to unaccompanied children.  If the protections offered to UACs under the TVPRA could be rescinded upon reunification with a parent or legal guardian, it would create a perverse incentive against reuniting with their parents.  In fact, many children would have a reason to stay in unstable or dangerous situations, or to stay longer in the limited shelter space maintained by ORR, simply to protect their legal rights—a result that would be directly contrary to Congress's intent to ensure immigrant children safety through the TVPRA.  *See* 8 USC § 1232(c)(2)(A) (UACs must be placed in the "least restrictive setting that is in the best interest of the child," with a preference for "suitable family member[s]").[9]  Given this legislative intent, it would be extraordinarily peculiar to construe the statute in a way that allows agencies like USCIS to strip protections from children once they turn 18 or when they reunite with their families.  Once the government has identified a child as a UAC, the TVPRA requires the government to continue to treat that child accordingly.

For all of the above reasons, USCIS's new redetermination rule conflicts with the TVPRA and is contrary to Congressional intent.  Plaintiffs are, therefore, likely to succeed on their claim that the new redetermination rule is not in accordance with law.

---

[9] *See* 154 Cong. Rec. 24,565 (Dec. 10, 2008) (statement of Sen. Feinstein) ("This legislation also requires, whenever possible, family reunification or other appropriate placement in the best interest of the unaccompanied alien children.").

**B.      Retroactive Application of USCIS's New Asylum Procedures Violates Plaintiffs' Fifth Amendment Due Process Rights**

Plaintiffs are also likely to succeed in showing that the USCIS's new asylum policy violates Plaintiffs' Fifth Amendment right to due process because it operates in an unlawfully retroactive manner.  "Retroactivity is not favored in the law."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  "[A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."  *Id.*  In determining whether a rule is impermissibly retroactive, courts "must examine 'whether the new provision attaches new legal consequences to events completed before its enactment' in a way that offends 'familiar considerations of fair notice, reasonable reliance, and settled expectations.'"  *Frontier-Kemper Constructors, Inc. v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 876 F.3d 683, 688 (4th Cir. 2017), *as amended* (Dec. 12, 2017) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994)).

The new redetermination policy here changes the legal landscape for asylum applicants, by radically rewriting the terms under which Plaintiffs can seek relief.  Under the policy in place since 2013, USCIS had initial jurisdiction over Plaintiffs' asylum applications because each had previously been determined to be a UAC.  Ex. 5.  And the Plaintiffs were not subject to any time limits on filing their applications with USCIS.  8 U.S.C. § 1158(a)(2)(E).  Without any meaningful notice to the public, USCIS changed the policy and stated unequivocally that it will apply its new jurisdictional requirements and the one-year filing deadline even to applications that were pending with the agency before the new policy's effective date.

USCIS's abrupt change effectively punishes Plaintiffs and other similarly situated asylum applicants for relying in good faith on the agency's established policies.  Told by USCIS that

their initial UAC determination provided durable procedural protections in the asylum process,

including an exemption from the one-year deadline for filing asylum claims, Plaintiffs had no

reason to file immediate asylum applications—particularly because many chose to pursue

additional forms of relief.[10]  With that protection in place, Plaintiffs could wait until their

evidence was complete or apply for other forms of relief that might be more quickly available,

more inexpensively obtained, or that would require less traumatic forms of evidence and

testimony.  *See* Lopez Decl. ¶¶  11-14.  Others sought reunification with parents or the

appointment of a guardian in the United States—never suspecting that such efforts to bring

stability into their lives would come at the expense of forfeiting valuable rights before USCIS.

 Under USCIS's new redetermination policy, these Plaintiffs and other similarly situated

applicants will be denied the right to a non-adversarial interview with an asylum officer based on

this past conduct that did not, at the time, carry negative consequences for their asylum

eligibility.  Worse, Plaintiffs newly subjected to the one-year filing deadline—a deadline that

USCIS had heretofore *not* applied to asylum applicants whom the federal government had

previously determined to be UACs, *see* Lopez Decl. ¶ 13—could lose the right to seek asylum *at*

*all*, unless they can satisfy the substantially heightened legal standards applicable to untimely

applications.  *See* 8 U.S.C. § 1158(a)(2)(E).  In imposing these new consequences on Plaintiffs'

past decisions—decisions that were entirely reasonable under then-governing USCIS policies—

USCIS's new redetermination rule "surely attaches new consequences to past conduct" and thus

---

[10] For example, a child may also pursue Special Immigrant Juvenile (SIJ) status.  To do so, the child first needs to obtain certain findings of fact from a state juvenile court or family court with jurisdiction over children.  In many states, the juvenile and family courts do not have jurisdiction over children over 18 years old.  Thus, under the asylum policy in place since 2013, a child approaching 18 would likely have pursued SIJ status before filing an asylum application, simply because the SIJ route was more time-sensitive.

"operates retroactively." *De Niz Robles v. Lynch*, 803 F.3d 1165, 1168 (10th Cir. 2015) (Gorsuch, J.) (citation omitted).

Notably, the district court for the District of Columbia recently held that an agency rule was impermissibly retroactive in a case with strikingly similar facts. *See Kirwa v. U.S. Dep't of Def.,* 285 F. Supp. 3d 21, 39-41 (D.D.C. 2017).  In *Kirwa*, the court enjoined the Department of Defense from applying a policy change announced in a Guidance memorandum that altered the standards and procedures used in the expedited path to citizenship provided by certain military service.  *Id.*  As the court recounted, "[b]efore the [new Guidance] enlistees had a right to apply for an expedited path to citizenship and DOD's new procedures rob plaintiffs of this opportunity."  *Id.* at 41.  So too here:  Before USCIS adopted its new redetermination rule, individuals previously determined to be UACs had a right to apply for asylum with USCIS and that right was not impacted by the pendency of removal proceedings or any deadlines on filing asylum applications.  The new rule "rob[s]" Plaintiffs of this opportunity, retroactively stripping them of established rights by changing the rules for eligibility *after* they had received UAC determinations and even *after* they had already applied for asylum.

Moreover, the retroactive effect is quite arbitrary, in that many children who filed for asylum while the 2013 Kim Memo was in effect have had their cases processed fully, while Plaintiffs have not, without any apparent guiding principle.  Other policy changes by Defendants have led to an almost complete halt in the processing of UAC asylum applications since early 2018, meaning that many—but not all—UAC asylum applications in filed recent years remain pending.  *See* Lopez Decl. ¶¶ 16-19.  Thus, by structuring the effective date of the 2019 Redetermination Memorandum to apply to pending cases, rather than only to future filings,

USCIS arbitrarily inflicted a retroactive consequence based solely on the processing status of otherwise similarly-situated applicants.

### C. The New USCIS Redetermination Policy Governing Asylum Applications From Unaccompanied Children Are Arbitrary and Capricious

Plaintiffs are also likely to succeed in their claim that USCIS's new policy for asylum eligibility is arbitrary and capricious, in violation of the APA.  5 U.S.C. § 706(2)(A).  The USCIS memo includes *no* discussion of the reasons the agency adopted the 2013 policy, and certainly makes no effort to justify the abrupt change for determining jurisdiction over asylum claims by unaccompanied children.  Moreover, the agency's memorandum fails even *to consider* the reliance interests of individuals who applied for asylum with USCIS under the old policy, as the agency's memo instead simply stipulates that its new policy would govern all future and pending asylum applications going forward.

A court presented with a claim under the APA must conduct a "thorough, probing, in-depth review" of the agency's reasoning and a "searching and careful" inquiry into the factual underpinnings of the agency's decision.  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971).  After undertaking that review, a court "shall" set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Both formal regulations and informal agency actions are subject to arbitrary and capricious review.  *See, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015); *Casa De Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 702-03 (4th Cir. 2019).  Agency action should be set aside as arbitrary and capricious if the agency fails to consider all relevant factors and articulate a "rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).  And although agencies may change their policies, they must provide "a reasoned explanation"

for the shift.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).  Moreover, the

agency must "provide a more detailed justification" for a change in direction in instances where

"its prior policy has engendered serious reliance interests that must be taken into account."  *Id.* at

515.  "It would be arbitrary and capricious to ignore such matters."  *Id.*

      USCIS's new policy for processing asylum applications by UACs fails arbitrary and

capricious review in several respects.  First, as set forth above, it is contrary to federal law as

articulated in the TVPRA.  Second, despite the dramatic 180-degree turn the agency has adopted

from its established policy declining to re-adjudicate UAC determinations, the reasoning

provided in its memorandum is nearly non-existent.  The USCIS memorandum does not even

*acknowledge* any of the reasons that were before the agency when it adopted the current policy in

2013.  As discussed, pp. 7-10, *supra*, USCIS adopted this policy "as a means of partially

realizing the goal of" two 2012 recommendations of the CIS Ombudsman, an independent

oversight office inside DHS, who documented how a policy of "redetermining UAC status

creates delay and confusion" and thus frustrates Congress's intent of "facilitating expedited, non-

adversarial interviews for young asylum-seekers" and ultimately providing "timely, appropriate

relief for vulnerable children."  Ex. 4 at 1, 4.

      The Ombudsman further found that such redeterminations "detract[] from the substantive

questioning" regarding an applicant's actual eligibility for asylum, as interviews "have shifted in

focus from the merits of a claim to queries on jurisdiction."  Ex. 4 at 6.  These policies were, the

Ombudsman wrote, "at odds with the TVPRA's express purpose," in that "TVPRA's procedural

and substantive protections were *designed to remain available to UACs throughout removal

proceedings*."  *Id.* at 4 (emphasis added).  The Ombudsman thus recommended that

"[e]liminating the practice of USCIS redetermining UAC status during the asylum interview"

would promote efficiency and "restore a level of fairness that comes from having a predictable and uniform practice." *Id.* at 6.  USCIS listened, and adopted the rules set forth in the 2013 Kim Memorandum on the basis of the Ombudsman's recommendations, discussing and endorsing many of those legal justifications. Ex. 4 at 4.  Yet neither the 2019 Redetermination Memo nor any other publicly available source shows whether USCIS grappled with the problems identified in the Ombudsman's report, or the interpretation of the TVPRA that USCIS acted upon in 2013, before reinstating a discarded policy that generated "delay and confusion" "at odds with the TVPRA's express purpose."  This apparent failure "to consider an important aspect of the problem" is a paradigmatic example of arbitrary and capricious agency action. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

The new USCIS memorandum instead justified its change in the applicable jurisdictional rules entirely on a purported need for consistency with the Board of Immigration Appeals's decision in *In re M-A-C-O*, 27 I. & N. Dec. 477 (BIA 2018).  But that rationale does not support USCIS's decision to adopt the redetermination rule for two reasons.

First, there is significant evidence, even at this preliminary stage of the case, that the agency's justification was pretextual.  Contrary to the agency's rationale, the evidence shows that its redetermination rule was in development long before the *M-A-C-O* decision as part of a broader push by the Administration to undercut the rights of unaccompanied children in response to a perceived "border surge of illegal immigration." Ex. 2 (initial capitalization omitted).  As discussed above, p. 12, *supra*, a leaked internal memorandum from 2017—well before *M-A-C-O* was decided—shows that members of the Administration proposed "[d]irect[ing] USCIS to rescind" the 2013 USCIS memorandum in order to "[r]evise" the UAC definition and thus allow the government to take away protections previously secured under the TVPRA.  *Id.*  A

commenter on the memorandum in turn stated that stripping UAC protections through redeterminations was "one of the easiest decisions anyone will ever have to make" and that there was "absolutely no reason not to change" the established USCIS policy. *Id.* at 2. But the USCIS 2019 memorandum does not disclose that the agency's new redetermination rule was adopted to further the Administration's goal of "respond[ing] to [the] border surge." *Id.* at 1 (initial capitalization omitted). "[T]he evidence tells a story that does not match the explanation the [agency] gave for [its] decision." *Dep't of Commerce v. New York*, 588 U.S. __, 2019 WL 2619473, at *16 (June 27, 2019). Because the "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions," the apparent "disconnect between the decision made and the explanation given," *id.*, is likely to require vacating the USCIS's new redetermination rule.

Second, and in any event, the reasoning from the new USCIS memorandum fails on its own terms. The BIA's decision concerning how that agency would evaluate its own jurisdiction in cases involving UACs does not dictate how USCIS undertakes its distinct jurisdictional inquiry when reviewing asylum applications. Indeed, the USCIS memorandum acknowledged that "[t]he BIA's decision . . . does *not* divest USCIS of its authority to determine whether an application before it was filed by a UAC." Ex. 1 at 2 (emphasis added). Yet USCIS then simply declared that it would change policies to prevent "incongruous results" in cases in which USCIS's existing policy could lead to a different jurisdictional conclusion than an immigration judge applying *In re M-A-C-O*. *Id.* This cursory discussion, without any consideration of whether the perceived value in aligning with *In re M-A-C-O* outweighed the significant downsides to a redetermination rule that were previously identified, does not meet the requirements of reasoned agency decision-making. *See Casa De Md.*, 924 F.3d at 705 (holding

that DHS acted arbitrarily and capriciously by changing its policy "without any explanation" for why the analysis underlying its previous policy was no longer reliable).  Moreover, *M-A-C-O-* is exclusively concerned with the question of children who have turned 18, 27 I. & N. Dec. at 477, while the USCIS rule divests the agency of jurisdiction even over the cases of children who applied while under 18, if there has come to be a parent or legal guardian in the United States who might care for them, such as Plaintiff J.O.P.  Reliance on *M-A-C-O-* provides literally no justification for changing the jurisdictional rules for those children's cases.

The decision by USCIS to apply its arbitrary and capricious policy retroactively to applicants who were already determined to be UACs—including individuals with pending asylum applications before the agency—compounds the APA failure.  Agencies do not have authority "to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen*, 488 U.S. at 208.  But nothing in the TVPRA or any other law even hints at the possibility that the USCIS may restrict rules for adjudicating the asylum eligibility of vulnerable children that apply retroactively and without fair notice to those affected.  Nor, for the reasons discussed above, Part I.B, *supra*, is there any question that USCIS's rule has an impermissible retroactive effect.

Even if USCIS's new redetermination rule were not considered formally retroactive (and it should be), the agency *still* acted arbitrarily and capriciously by failing to consider the interests of children with pending asylum applications who had relied in good faith on the agency's existing policy.  *See Fox*, 556 U.S. at 515-16 ("[A] reasoned explanation is needed for disregarding facts and circumstances that . . . were engendered by the prior policy.").  As discussed, pp. 11-12, *supra*, potentially thousands of children have relied on the 2013 policy in structuring how they have pursued legal protections in this country, including children who have

26

taken the opportunity to seek other legal protections afforded by Congress, such as eligibility for

lawful permanent residency under the SIJ program, rather than filing an immediate asylum

application.  Under the new rule, these children would lose the right to pursue asylum relief

through the non-adversarial process designated by Congress.  And in some instances, children

will lose the right to seek asylum based *entirely* based on the agency's decision to engage in

redeterminations when deciding if an applicant is subject to the one-year filing deadline.  There

is no indication from public record that USCIS "considered these interests in connection with

[its] decision to rescind" the 2013 policy; indeed, its new memorandum "makes no mention of

them" at all.  *Casa de Md.*, 924 F.3d at 705.  For that reason as well, the new redetermination

rule is arbitrary and capricious.  *Id.*; *see also S.A. v. Trump*, No. 18-cv-3539, 2019 WL 990680,

at *5 (N.D. Cal. Mar. 1, 2019) (granting preliminary injunction where DHS "failed to take into

account and address the serious reliance interests of those conditionally approved participants

before mass-rescinding their approvals").

> **D.** **USCIS Failed to Engage in the Required Notice-and-Comment Procedure for Rulemaking**

Plaintiffs are also likely to succeed in showing that USCIS's new redetermination rule is

procedurally invalid because it was issued without notice and comment, as required by the APA,

5 U.S.C. § 553; 8 U.S.C. § 1232(d)(8).  The new procedures effect a substantive change in

existing policy and establish categorical rules limiting asylum officers' exercise of discretion.

Therefore, Defendants were required to abide by the full panoply of APA procedures including

notice and comment in order to promulgate it.  They did not do so.  Instead, Defendants kept the

new policy document under wraps for two weeks after it was signed, then unveiled the new

procedures by posting them on the USCIS website just two weeks before their effective date.

Under the APA, legislative rules must go through notice and comment rulemaking before they become effective. *See* 5 U.S.C. § 553(a)–(c); *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 619–20 (4th Cir. 2018). A rule is "legislative," rather than merely "interpretive" in nature, if it "effects a substantive change in existing law or policy." *Children's Hosp.*, 896 F.3d at 620 (citation omitted). USCIS's new redetermination rule clearly meets that standard, as the language of the memorandum itself makes that clear: USCIS acknowledged that the procedure in place since 2013 "allow[ed] asylum officers to adopt prior UAC determinations made by [CBP] or [ICE] without further factual inquiry," but as of July 1, 2019, "USCIS is returning to making independent factual inquiries *in all cases* in order to determine whether the individual met the UAC definition on the date of filing the asylum application." Ex. 1 at 2 (emphasis added).

This substantive reversal in policy required proper notice-and-comment rulemaking. *See Fairfax Nursing Ctr., Inc. v. Califano*, 590 F.2d 1297, 1301 (4th Cir. 1979), *abrogated on different grounds by Good Samaritan Hosp. v. Shalala*, 508 U.S. 402 (1993). And this is not the first time that USCIS has tried to evade the APA. Indeed, in a recent case decided in this circuit, the district court preliminarily enjoined USCIS from implementing a new policy memorandum, issued without notice and comment, that changed how employees were required to calculate unlawful presence in the United States. *See Guilford College*, 2019 WL 1980132, at *7 (M.D.N.C. May 3, 2019). The court held that plaintiffs were likely to succeed in their claim that a new policy memorandum qualified as a procedurally defective legislative rule because the new guidance expressly "changed" existing policy on how the agency implemented the relevant statutory provisions and would be "binding upon *all* employees of USCIS." *Id.* The same considerations apply here: USCIS's May 2019 memorandum expressly purports to "modif[y]"

existing agency policy, and declares unequivocally that the new redetermination rule will apply "to <u>any</u> USCIS decision" after the memorandum's effective date." Ex. 1 at 1.  It is hard to imagine a clearer signal of the agency's intent to promulgate a legislative rule.

The legislative nature of the USCIS's new rule is reinforced by the statutory context. When Congress directs an agency to implement key statutory provisions through regulation, courts "should lean toward finding" that an agency's attempt to exercise delegated policy-making responsibility under the statute "requires notice and comment."  *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 71 (1st Cir. 2018).  That is the case here—Congress specifically delegated authority to enact regulations in the TVPRA:

> **Applications for asylum** and other forms of relief from removal in which an unaccompanied alien child is the principal applicant **shall be governed by regulations** which take into account the specialized needs of unaccompanied alien children and which address both procedural and substantive aspects of handling unaccompanied alien children's cases.

8 U.S.C. § 1232(d)(8) (emphasis added).  Congress's mandatory instruction makes clear that USCIS had the obligation to issue regulations subject to notice and comment.  USCIS should not be allowed to side-step the APA's and TVPRA's requirements by effectively imposing new regulations under the guise of mere interpretative guidance.  If the rule were otherwise, it would be "difficult to imagine what regulations *would* require notice and comment procedures." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (finding that Guidelines issued by the Department of Labor were legislative rules where Congress directed the agency to enact regulations); *see also Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 169–70 (7th Cir. 1996) (a binding rule promulgated pursuant to a delegation of legislative authority is "the clearest possible example of a legislative rule").

No other possible exception to the APA's notice and comment requirements applies here. The USCIS's memorandum is not the kind of "general statement[] of policy" that is exempt from notice and comment.  5 U.S.C. § 553(b)(3)(A).  That category of agency action applies only where an agency statement "does not establish a binding norm and leaves agency officials free to exercise their discretion."  *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 (4th Cir. 1995).  As discussed, the new rules here "apply to <u>any</u> USCIS decision issued on or after [June 30,] the effective date," Ex. 1 at 1, and the memorandum states that asylum officers "*must* evaluate whether the asylum application was filed by a UAC by making an independent factual inquiry as to whether the individual met the UAC definition at the time of first filing the asylum application," *id.* at 3 (emphasis added).  Because asylum officers have no discretion regarding whether and when to reexamine previous UAC determinations, the new procedures cannot be a "general statement[] of policy" for purposes of the APA.  5 U.S.C. § 553(b)(3)(A); *J.L.*, 341 F. Supp. 3d at 1068-69 (USCIS failed to follow notice-and-comment procedures in enacting rules that unlawfully denied plaintiffs SIJ status).  Nor can the USCIS memorandum plausibly be characterized as a "rule[] of agency organization, procedure, or practice."  5 U.S.C. § 553(b)(3)(A).  That exception to notice and comment, which is "narrowly construed," applies only to rules that do not "alter the rights or interests of the parties," but merely prescribe "the manner in which the parties present themselves or their viewpoints to the agency."  *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 5 (D.C. Cir. 2011) (citations omitted).  For all of the reasons discussed above, the new redetermination policy does not qualify as a "rule of agency organization, procedure or practice" because it plainly "alter[s] the rights" of Plaintiffs and other similarly situated applicants:  the rule does not simply structure how asylum interviews

proceed, but denies Plaintiffs the right to pursue asylum relief with USCIS *entirely*, and could deny some the right to pursue asylum at all.[11]

## II.     Plaintiffs Will Be Irreparably Harmed By the New USCIS Redetermination Policy

Plaintiffs will be irreparably harmed unless an injunction issues to prevent USCIS from applying the new asylum redetermination policy to foreclose consideration of Plaintiffs' asylum applications. *See Winter*, 555 U.S. at 20.  That harm to Plaintiffs will arise now—well before this case ends—as long as Defendants are permitted to bypass the forum and procedures expressly prescribed by Congress as appropriate to the claims of this vulnerable population, add a one-year time limit for asylum applications that did not exist yesterday, and execute these changes without having first sought the kind of public feedback required for this kind of legislative action under the TVPRA.

Plaintiffs and those similarly situated are harmed today and every day they are subjected to an adversarial asylum process that Congress deemed inappropriate for these young, traumatized, and largely alone individuals.  Plaintiffs have already been through far too much in their young lives.  Congress thought it fit to give them some procedural relief—an interview before an asylum officer instead of a hearing before a judge and a prosecutor, access to legal representation, time to pursue all their lawful avenues for immigration relief, and a break from the one-year filing deadline for seeking asylum.

---

[11] Defendants may argue in response that the 2013 USCIS policy also did not go through notice and comment.  But the validity of that policy is not at issue here, and need not be considered by this Court in issuing an order to retain the status quo.  Moreover, any argument that the 2013 policy was promulgated through allegedly defective procedure in no way relieves USCIS of its obligation to go through notice and comment in repealing it.  *Cf. N. Car. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 765–66 (4th Cir. 2012) ("[B]y reinstating the superseded and void 1987 regulations (albeit temporarily), the Department engaged in the 'formulating' and the 'repealing' aspects of 'rule making' under the APA.").

The forum change alone (from a USCIS officer to immigration court) will inflict multiple injuries.  First, it will create needless delay in resolving their claims to asylum and paving the way to citizenship.  Each Plaintiffs has already has waited over a year for progress on his or her asylum application before USCIS.  M.E.R.E. Decl. ¶ 9 (filed March 2018); M.A.L.C. Decl. ¶ 5 (February 2018); J.O.P. Decl. ¶ 10 (February 2018); K.R.C. Decl. ¶ 14 (November 2017).  Each would face an uncertain, but potentially enormous, wait before receiving a merits hearing in immigration court.[12]  Equally important are the psychological consequences of this forum change.  Instead of an interview with an asylum officer who is specially trained to interview traumatized children and victims of violence, each Plaintiff will face re-traumatization through adversarial testimony and cross-examination in an immigration court.  This impact will be particularly harmful for K.R.C.; he has already gone through an interview with USCIS for his asylum claims, and yet now USCIS stands to summarily reject his application under the new redetermination policy, forcing him to re-live his suffering and fears in front of an immigration court judge and an adversarial government attorney.  K.R.C. Decl. ¶¶ 22-23.  The harm from this procedural (and actual) delay is compounded because every day during which Plaintiffs must wait for their asylum claims to be adjudicated is a day that they are unable to access the protections and privileges afforded to lawful permanent residents.  Those protections and privileges include the ability to seek financial aid and student loans to make college a possibility.  Without that aid, Plaintiffs M.E.R.E. and K.R.C. will be forced to delay college.  M.E.R.E. Decl. ¶¶ 12-13; K.R.C. Decl. ¶¶ 17.

---

[12] The Department of Justice reports a backlog of over 876,500 pending cases in immigration court as of the second quarter of fiscal year 2019.  U.S. Department of Justice, Executive Office for Immigration Review, "Adjudication Statistics," *at* https://www.justice.gov/eoir/page/file/1060836/download (last visited June 29, 2019).

While these particular Plaintiffs will not automatically lose the benefit of their pro bono legal counsel in immigration court, pro bono legal counsel unfortunately cannot meet all needs, and those similarly situated to Plaintiffs will not be so lucky to have representation in immigration court.  Under the administration's current policy, the TVPRA's direction to make counsel available will not apply to those redetermined to lose their UAC status.  This is likely to permanently handicap these young individuals.  Represented individuals are far more likely to make the requisite showing to obtain asylum; those without access to counsel fare far worse.[13] While this case winds its way through this Court and any appeals, unaccompanied children will be forced to file asylum applications in immigration courts alone, and many will fail because they have been deprived of legal representation.  Plaintiffs and those similarly situated will also lose the opportunity to fully pursue their claim for asylum.  The TVPRA's grant of *initial* jurisdiction to the asylum offices contemplates a dual opportunity for unaccompanied children to present their claims on the merits:  only in the event that the asylum office determines that an approval will not issue is it necessary for the child's claim to proceed de novo before the immigration judge.  For many reasons, a child who does not manage to successfully articulate a claim for relief before the asylum office may be found eligible for asylum on rehearing by an immigration judge.  Where the initial jurisdiction requirement is vitiated, the mandated process is literally cut by half.

Finally, for Plaintiffs and those similarly situated, a delay in enjoining the government's new asylum policy may mean they are forever barred from asylum due to the imposition of a

---

[13] *See* Boston Bar Ass'n Task Force on Expanding the Civil Right to Counsel, GIDEON'S NEW TRUMPET:  EXPANDING THE CIVIL RIGHT TO COUNSEL IN MASSACHUSETTS 23 (Sept. 2008), available at https://www.bostonbar.org/prs/nr_0809/GideonsNewTrumpet.pdf (noting that "asylum applicants represented by counsel win asylum five times more often in Immigration Court than those who are unrepresented").

one-year filing deadline for asylum.  While Plaintiffs may make a plea for equitable relief from the time-bar before an immigration judge, that relief is far short of being secure. [14]  And in the meantime, Plaintiffs and those like them rightly fear being denied the protection they need to stay in the United States to avoid persecution in their home countries.  See J.O.P. Decl. ¶ 14; M.E.R.E. Decl. ¶ 13.  Their fear of deportation is all the more tangible given this Administration's repeated threats of swift deportation.[15]  *See e.g.*, *J.L.*, 341 F. Supp. 3d at 1069 (risk of deportation constitutes irreparable harm).

Finally, Plaintiffs will also be irreparably harmed without an immediate injunction because they are being "depriv[ed] of a procedural protection to which [they are] entitled" under the APA, namely, the opportunity to have notice of, comment on, and have an ability to influence a rule of general applicability that directly impacts them.  *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002).  If preliminary injunctive relief were not unavailable under such circumstances, "section 553 would be a dead letter."  *Id*. at 95.  And unless the new policy is stayed, Plaintiffs' injuries cannot be cured by ultimate success on the merits in this case.  *See N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009).  Section 553 "is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas."  *New Jersey v. EPA*, 626 F.2d 1038, 1049 (D.C. Cir.

---

[14] The statute does provide a general possibility of relief from the one-year filing deadline for "extraordinary circumstances," but there is no indication that the immigration courts would determine retroactive application of the 2019 Redetermination Memorandum to be, per se, such a circumstance, and so the prospect of deprivation remains. *See* 8 U.S.C. § 1158(a)(2)(D) (extraordinary circumstances exception); 8 C.F.R. § 208.4(a)(5).

[15] *See, e.g.*, Ex. 12, *Trump Threatens to Deport 'Millions,' As He Kicks Off Campaign for Reelection*, NPR (June 18, 2019), https://www.npr.org/2019/06/18/733661860/trump-threatens-to-deport-millions-as-he-kicks-off-campaign-for-reelection.

1980) (citation omitted).  Without an injunction, Plaintiffs are harmed by a rule on which the

public was permitted no input, and to which the public had no opportunity to influence.

### III.     The Public Interest and the Balance of Harms Weigh Strongly in Favor of a TRO

The final two factors generally "merge when the Government is the opposing party."

*Nken v. Holder*, 556 U.S. 418, 435 (2009).  First, the public interest is served when agencies

comply with their obligations under the APA.  *See New Jersey*, 626 F.2d at 1045; *Creosote*

*Council v. Johnson*, 555 F. Supp. 2d 36, 40 (D.D.C. 2008).

Second, "upholding the Constitution undeniably promotes the public interest" and "when

we protect the constitutional rights of the few, it inures to the benefit of all."  *Int'l Refugee*

*Assistance Project v. Trump*, 857 F.3d 554, 604 (4th Cir. 2017).  Where this new policy is likely

to be overturned as a violation of Plaintiffs' constitutional due process rights, enjoining the

policy does not cause any harm to the Government (which cannot point to any real harm that

would result from the requested TRO) but instead serves the public interest by halting an unwise

and harmful policy.  *See id.* at 603 (where a governmental action "is likely unconstitutional,

allowing it to take effect would therefore inflict the greater institutional injury").  More

fundamentally, the public interest is served when the Government does not suddenly and

summarily upend the rights and interests of individuals, with retroactive effect and without

recourse.  *See Marbury v. Madison*, 1 Cranch 137, 163 (1803) ("The very essence of civil liberty

certainly consists in the right of every individual to claim the protection of the laws, whenever he

receives an injury.").  Finally, a TRO would be cost-neutral, and the status quo simply allows

Plaintiffs to be heard through the TVPRA where Congress said they should be heard—in a less

adversarial process to avoid further infliction of trauma.  The government also cannot point to

any real harm that would result from the requested TRO.  Further, with regard to the procedural

violations, the government can begin a new rulemaking process, this time following the mandatory procedures.

## **<u>CONCLUSION</u>**

For all of the above reasons, Plaintiffs respectfully request that the Court grant a temporary restraining order on a nationwide basis as to all asylum applicants affected by the USCIS May 31, 2019 Memorandum.

**ATTORNEYS FOR PLAINTIFFS**

Dated: July 1, 2019


Respectfully submitted,

/s/Brian Burgess

Brian Burgess (Bar No. 19251)
Stephen R. Shaw*
Goodwin Procter LLP
901 New York Avenue, NW
Washington, DC 20001-4432
Phone: 202-346-4000
Fax: 202-346-4444
BBurgess@goodwinlaw.com
SShaw@goodwinlaw.com


Elaine Herrmann Blais*
Sarah K. Frederick*
Kevin J. DeJong*
Christie Larochelle*
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
Phone: 617-570-1000
Fax: 617-523-1231
EBlais@goodwinlaw.com
SFrederick@goodwinlaw.com
KDejong@goodwinlaw.com
CLarochelle@goodwinlaw.com

*Attorneys for Plaintiffs*

*\* pro hac vice application forthcoming*

Scott Shuchart*
Kids in Need of Defense
1201 L Street, NW, Floor 2
Washington, DC 20005
Phone: 202-318-0595
Fax: 202-824-0702
sshuchart@supportkind.org

Wendy Wylegala*
Kids in Need of Defense
1251 Avenue of the Americas (c/o
Lowenstein Sandler LLP)
New York, NY 10020
Phone: 862-926-2069
Fax: 202-824-0702
wwylegala@supportkind.org

Michelle N. Mendez
Catholic Legal Immigration Network
(CLINIC)
8757 Georgia Avenue, Suite 850
Silver Spring, MD 20910
Phone: 301-565-4824
Fax: 301-565-4824
mmendez@cliniclegal.org

Rebecca Scholtz*
Catholic Legal Immigration Network
(CLINIC)
30 S. 10th Street (c/o University of St.
Thomas Legal Services Clinic)
Minneapolis, MN 55403
Phone: 651-962-4833
Fax: 301-565-4824
rscholtz@cliniclegal.org

Kristen Jackson*
Mary Tanagho Ross*
Public Counsel
610 South Ardmore Avenue
Los Angeles, CA 90005
Phone: 213-385-2977
Fax: 213-201-4727
kjackson@publiccounsel.org
mross@publiccounsel.org