IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| J.O.P., et al., | : | |
| Plaintiffs, | : | |
| v. | : | Civil No. GJH-19-1944 |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

...o0o...

## DECLARATION OF KIMBERLY SICARD

I, Kimberly R. Sicard, pursuant to 28 U.S.C. § 1746, hereby state as follows:

1.      I am an Asylum Officer within Asylum Division Headquarters at United States Citizenship and Immigration Services (USCIS), within the Department of Homeland Security (DHS). I have held this position since April 2006. As part of my duties, I develop operational procedures and assist in administering the affirmative asylum program. My area of responsibility includes oversight of USCIS procedures for determining whether an Asylum Officer has initial jurisdiction over the asylum applications of applicants in removal proceedings who claim to be filing as unaccompanied alien children (UAC).

2.      I began my career in federal service in September 2001 as an Attorney-Advisor with the Board of Immigration Appeals at the Executive Office for Immigration Review (EOIR), within the Department of Justice (DOJ). Since then, I served as a field Asylum Officer at the Arlington Asylum Office for a year before beginning my job as an Asylum Officer at USCIS Headquarters.

3.      The statements made herein are based on my personal knowledge and the applications at issue, as well as information made available to me in the course of carrying

out my duties and responsibilities as an Asylum Officer.

4.      The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Public Law 110-457, was signed into law on December 23, 2008 and became effective 90 days thereafter, on March 23, 2009. Section 235(d)(7)(B) of the TVPRA provides Asylum Officers with "initial jurisdiction over any asylum application filed by" a UAC.

5.      USCIS issued a memorandum in 2009 describing certain aspects of the manner by which Asylum Officers would review and evaluate asylum applications under the TVPRA.

6.      At the time I began my current role involving oversight of USCIS procedures for determining whether an Asylum Officer has initial jurisdiction over the asylum applications of applicants in removal proceedings who claim to be filing as UACs, USCIS was operating under the USCIS 2009 memorandum.

7.      My understanding is that, at the time the TVPRA came into effect, DOJ EOIR had not issued any guidance addressing whether Immigration Judges (IJs) could or should make the determination about whether an alien in removal proceedings before them who wished to apply for asylum was in fact a UAC.

8.      USCIS issued revised procedures in 2013 to address issues that had developed under the 2009 procedures. Under the procedures that USCIS put in place in 2013, USCIS would adopt undisturbed UAC findings made by ICE or CBP. The Asylum Offices were directed to not expend resources to make an independent factual determination about UAC status on the filing date unless there was no prior determination

2

in place on the filing date. This meant that in such cases the Asylum Offices would not conduct any fact-finding into the applicant's age or unaccompanied status. However, if there was an affirmative act by one of the agencies or components involved in UAC custody, specifically CBP, ICE or HHS, that terminated the UAC finding prior to the date of first filing of the asylum application, whether with EOIR or USCIS, USCIS could not adopt the prior determination, and would make an independent factual inquiry into and determination regarding UAC status on the filing date.

9. In 2013, although IJs were generally allowing possible UACs to pursue their claims that they were filing asylum applications as UACs before USCIS, they were also generally not conducting any fact-finding into whether the individual was a UAC on the filing date. As time passed, however, IJs increasingly began to assert jurisdiction over asylum applications of persons before them who claimed to be UACs and undertaking fact-finding on the UAC status of the individual before them.

10. As time passed after the promulgation of the 2013 memorandum, USCIS recognized that IJ assertions of jurisdiction over UAC asylum applications increasingly raised the possibility that USCIS and the IJ might both assert jurisdiction over the asylum application of the same person. USCIS recognized that where it and an IJ may have asserted jurisdiction, the possibility also existed for an asylum officer and the IJ to reach conflicting results as regards both the question of who had jurisdiction over the claim and the merits of the asylum application.

11. In the years prior to the 2019 memorandum, and in order to avoid the situation where an Asylum Officer and an IJ reached conflicting results, USCIS began the

3

practice of deferring to IJ UAC determinations.

12.     USCIS did not include any reference to this practice of deferring to IJ determinations in the 2013 memorandum because USCIS had as of 2013 not seen frequent conflicts that raised the need to memorialize the practice. As IJs gradually began to assert the authority to determine UAC jurisdiction in the years that passed after 2013, the possibility of conflicting decisions grew. Accordingly, while there is no reference in the 2013 memorandum, and no other formal memorandum issued to articulate this practice, the practice existed well before the 2019 memorandum.

13.     The USCIS practice of deferring to IJ determinations was articulated publicly. USCIS hosted a quarterly stakeholder meeting in November 2017 where the following questions and answers were on the agenda:

> Question: Upon information and belief, EOIR has provided guidance to immigration judges on Unaccompanied Alien Child determinations. What is the Asylum Division's position on the authority of an immigration judge finding that an individual is no longer an unaccompanied alien child?

> Response: Although the May 2013 USCIS memo does not explicitly address all scenarios in which another agency may make determinations that implicate UAC status, ***under current guidance, asylum offices defer to IJ determinations where IJs have made a finding that an asylum application was not filed by a UAC***.

Exhibit 1 (USCIS Asylum Division Quarterly Stakeholder Meeting Agenda Friday, November 3, 2017 publicly available at https://www.uscis.gov/outreach/asylum-division-quarterly-stakeholder-meeting-8) at page 4 (emphasis added).

4

14.     At the same November 2017 meeting, the following question and answer
were also on the agenda:

> Question:  For a UAC in removal proceedings, who has jurisdiction and
> authority to rescind UAC status? Can the IJ do it?

> Response: Under the Trafficking Victims Protection Reauthorization Act
> (TVPRA), USCIS has initial jurisdiction over an asylum application filed by a UAC.
> Under the May 2013 USCIS memo, when USCIS is the agency determining whether
> an application was filed by a UAC, the Asylum Division will adopt a prior UAC
> determination as long as the prior UAC determination has not been terminated at the
> time of filing the application with either EOIR or USCIS. ***If an immigration judge
> determines that an application was not filed by a UAC, USCIS currently defers to
> that finding***. Although immigration judges are not listed in the May 2013 USCIS
> memo on UAC jurisdictional determinations, that memo does not provide an
> exclusive list of all the agency actions that may affect a prior UAC determination,
> nor does it bind immigration judges or limit their jurisdiction to determine their own
> jurisdiction over an asylum claim.

Id. (emphasis added).

15.     The practice of deferring to IJ UAC determinations before the promulgation
of the 2019 memorandum is reflected in case-related emails sent to and from various
personnel at USCIS about specific individual cases over the years. In preparing this
declaration, I attempted to locate relevant emails that could be produced, but the great
majority of the emails are privileged because they either include USCIS counsel or

represent deliberative process, or implicate privacy issues under statute or agency policy. In deference to these privilege and privacy issues, I have not appended hereto any of these pre-2019 emails in individual cases that reflect the application of the IJ deferral practice.

16.     IJ decisions about their jurisdiction over potential UAC asylum applications were varied in form and content. Some IJs did not issue written decisions reflecting a clear determination whether the asylum application in question was filed by a UAC. In order to assist in determining in such cases whether the IJ had in fact made a determination that an application was not filed by a UAC, USCIS asked ICE trial attorneys (TAs) to ask the IJ to issue a written order on this point, or in the alternative to memorialize IJ decisions on jurisdiction made from the bench by completing a memo to the file. In June of 2018, USCIS developed a template for an ICE TA memo to file, that would include the type of information that we would need to have in the record in order to recognize an IJ jurisdictional determination to which we would defer. Exhibit 2 (Template Memo to File). This template was designed to allow USCIS to review the ICE TA memo and ascertain whether the IJ engaged in fact finding to determine whether the asylum applicant was a UAC on the date of filing.

17.     I am familiar with the facts of the E.D.G. case that Plaintiffs have raised. We rejected this applicant's application for lack of jurisdiction under the 2019 memorandum. After the TRO was issued we reconsidered the jurisdictional issue and made a determination on whether we were able to accept the filing of his asylum application following the procedures of the 2013 memorandum.

6

18.     The Asylum Office reviewed the record in E.D.G. and determined that the IJ had conducted a factual inquiry to determine that he, not USCIS, had jurisdiction over the asylum application. Exhibit 3 (IJ Decision and Order). The IJ's decision clearly concludes that E.D.G. was not a UAC on the date he filed his asylum application and therefore the immigration court had jurisdiction over it.

19.     As previously explained, the 2013 memorandum did not specifically address how to handle IJ determinations regarding jurisdiction because at that time, IJs rarely made such determinations. However, when we operated under the 2013 memorandum, we still applied our regulations under which we do not have the authority to accept asylum applications filed by applicants in removal proceedings who are not UACs. The immigration court determined that it had jurisdiction as E.D.G. filed his asylum application after the age of 18 and no longer met the definition of a UAC due to his age at that time. We determined, consistently with our practice while the 2013 memorandum was in effect, that we should defer to the jurisdictional determination made by the IJ. This means that we could not accept E.D.G.'s asylum application.

20.     In notifying the applicant in E.D.G. that it did not have jurisdiction over his asylum claim, the Asylum Office characterized the IJ's jurisdictional determination as an "affirmative act" that terminated the applicant's UAC determination. The 2013 memorandum did not discuss IJ jurisdictional determinations, either as "affirmative acts" that terminate UAC determinations or otherwise, because IJs were not generally making such jurisdictional determinations at the time the 2013 memorandum was developed.  As IJs began to make these determinations with increasing frequency and we had occasion to

consider them, we have generally viewed them as distinct from the kind of "affirmative acts" relating to the care and custody of UAC that ICE, CBP or HHS might take. Because of the complex history surrounding the development of our policies and practices, there may be some variance in the language officers have used to discuss these issues. However, regardless of how the IJ's jurisdictional determination was characterized in the Asylum Office's notice of lack of jurisdiction, the decision appropriately accorded deference to the IJ's jurisdictional determination, consistent with USCIS practice under the 2013 memorandum.

21.     I declare under penalty of perjury that the foregoing is true and correct.


Kimberly R. Sicard

12-18-19
Date

8

# Exhibit 1



U.S. Citizenship
and Immigration
Services

# Agenda

**USCIS Asylum Division Quarterly Stakeholder Meeting**
Friday, November 3, 2017
Tomich Center
111 Massachusetts Avenue, NW
Washington, D.C. 20001
2:00 pm – 4:00 pm EST

I.    **Welcome and Introductions**

II.   **Asylum Division Updates**

   a.  Personnel Updates
      1. Kathy Valerin, Deputy Director of Affirmative/NACARA of Arlington Asylum Office
      2. Irvin Gadson, Deputy Director of Houston Asylum Office
      3. Danielle Lehman, Deputy Director of San Francisco Asylum Office

   b.  The current RAIO-CT and ADOTP classes have over 50 asylum officers enrolled.

   c.  Regularly Provided Statistics (posted on USCIS.Gov)
      Affirmative Asylum Statistics (July 2017 – September 2017)
      NACARA Statistics (June 1999 – September 2017)
      Credible and Reasonable Fear Statistics and Nationality Reports (July 2017 – September 2017)
      Unaccompanied Alien Children Statistics (July 2017 – September 2017)

   *We publish the regularly provided statistics on the USCIS.gov website before the quarterly engagement so you can review them prior to the meeting and print a copy if you so choose.*

III.  **Statistics**

   **a.** Are there statistics released for the amounts of approvals and denials issued by each asylum office? If yes, is it broken down by country?

   **Response:** Yes, decision statistics by office are available online before the meeting. No, decision statistics by nationality and by office are not available online.

IV.   **Asylum Applications Filed by Attorneys Accused of Filing Fraudulent Applications**

a.  An individual filed an asylum application with an attorney who is currently facing legal charges for submitting fraudulent asylum applications/false claims of persecution. This asylum application has been processing with USCIS for a little under 5 years now. All of this attorney's cases are currently under review and have been seized. What are the options available to individuals who are going through this?

**Response:** We make efforts to free up cases for processing as soon as we possibly can. Please direct case specific inquiries and concerns to the interviewing office, which is in the best position to answer your inquiries.

V.    **Scheduling Asylum Interviews and Issuing Decisions**

a.  Is it possible to provide more than 6 days' notice for an interview that some clients have been waiting 2-3 years for?

**Response:** Generally, offices schedule interviews 21 days before the interview takes place and send the notice out within 3 days. It is not the normal procedure for applicants to be notified 6 days before the interview unless the applicant has requested to be placed on a "short-list" or asked for an expedited interview date and is scheduled to fill a rescheduled interview opening. Contact the asylum officer director if you receive interview notices less than 10 days before the interview date and he or she will look into whether they mailed the notice late.

b.  If we need to reschedule an interview, what is the procedure? Would that client be put back into the shuffle and have to wait another 2-3 years or would they get a quicker date? This is important because some attorneys have clients that are out of state and they will need to book flights and update the case where 6 days may not be enough time. Especially if there are extreme weather conditions like we have witnessed.

**Response:** Please contact the asylum office as soon as possible to reschedule an interview, especially if you are scheduled for a circuit ride location. Generally, rescheduled interviews are the first priority when scheduling interviews in each office. However, circuit ride scheduling varies based on numerous factors. Rescheduled interviews are scheduled by filing date, with the latest filing dates scheduled first.

c.  Asylum applicant moves from San Francisco to Los Angeles. The filing application date is 11/2015. Moving date is 04/2017. What will be priority date for interview? Will the date stay the same or it starts again on 04/2017?

**Response:** The Los Angeles Asylum Office will schedule the case based on the scheduling priority. If the case has not been rescheduled and is not filed by an unaccompanied alien child, the office will consider the filing date of the application, November 2015, when scheduling the case for interview.

d.  Many of the Syrian asylum seekers approached our agency seeking assistance. However, their cases have been pending for long time (more than three years) and some of them have already been interviewed more than once. Is the Asylum Office holding decisions for specific countries or nationalities such as Syria?

    **Response:** The Asylum Division is not holding decisions based solely on specific nationalities.

e.  Some cases are taking more than one year with no decision after the interview. Is there a way to contact HQASM directly? Or what other legal channels can be followed?

    **Response:** Direct your inquiries involving individual cases to the local asylum office with jurisdiction over the case. If the office has not acknowledged your inquiry or if your case has been pending for an inordinate amount of time after the interview (such as one year), you may contact Asylum Division headquarters office directly.

VI.  **Credible Fear NTA Not Filed with Immigration Court**

a.  If a person is found to have a credible fear at the border by an asylum officer and an NTA is issued, but the NTA is not filed with the Immigration Court:

    1.  Is the person eligible to file an affirmative asylum application?

    2.  Per 8 CFR § 208.2 (b), "Immigration judges shall have exclusive jurisdiction over asylum applications filed by an alien who has been served a Form I-221, Order to Show Cause; Form I-122, Notice to Applicant for Admission Detained for a Hearing before an Immigration Judge; or Form I-862, Notice to Appear, after the charging document has been filed with the Immigration Court." If the NTA has not been filed with the immigration court, then exclusive jurisdiction should lie with the RAIO and the application should be categorized as AFFIRMATIVE rather than DEFENSIVE. Do you agree that this is correct?

    3.  If an asylum application in this situation has been misclassified as DEFENSIVE and the NTA continues to NOT be filed with the immigration court, how can the alien get the classification corrected so that an interview will be scheduled and the alien will be able to obtain employment authorization?

    **Response:** Due to ongoing litigation in Mendez-Rojas v. Duke, we cannot respond to these questions at this time. Please note that if you have specific cases with related concerns and ICE or CBP issued the NTA, we recommend you contact ICE to file the NTA with the immigration court. If an asylum office issued the NTA after conducting a credible fear screening, please contact that asylum office to file the NTA with the immigration court.

VII.   **Unaccompanied Alien Children (UACs)**

a.   Are the procedures for determining initial jurisdiction over UAC cases in the May 28, 2013 memorandum and subsequent June 10, 2013 Q&A on Updated Procedures for Determination of Initial Jurisdiction over Asylum Applications Filed by Unaccompanied Alien Children still in effect? Are there any changes to how USCIS is treating initial jurisdiction of asylum applications by UACs? Do you anticipate receiving guidance soon that significantly changes the 2013 memo?

**Response:** The May 2013 USCIS memo, *Updated Procedures for Determination of Initial Jurisdiction over Asylum Applications Filed by Unaccompanied Alien Children*, remains in effect and continues to apply to those cases where USCIS is the agency making the determination whether an application was filed by a UAC such that USCIS would have jurisdiction over it. At this time, the memo has not been rescinded or replaced with new procedures for determining initial jurisdiction. Under Executive Order 13767 and the DHS implementation memo for Executive Order 13767, however, DHS is currently considering possible revisions to this guidance. The Asylum Division does not know the particular timeframe for making a decision on the possible changes.

b.   Upon information and belief, EOIR has provided guidance to immigration judges on Unaccompanied Alien Child determinations. What is the Asylum Division's position on the authority of an immigration judge finding that an individual is no longer an unaccompanied alien child?

**Response:** Although the May 2013 USCIS memo does not explicitly address all scenarios in which another agency may make determinations that implicate UAC status, under current guidance, asylum offices defer to IJ determinations where IJs have made a finding that an asylum application was not filed by a UAC.

c.   For a UAC in removal proceedings, who has jurisdiction and authority to rescind UAC status? Can the IJ do it?

**Response:** Under the Trafficking Victims Protection Reauthorization Act (TVPRA), USCIS has initial jurisdiction over an asylum application filed by a UAC. Under the May 2013 USCIS memo, when USCIS is the agency determining whether an application was filed by a UAC, the Asylum Division will adopt a prior UAC determination as long as the prior UAC determination has not been terminated at the time of filing the application with either EOIR or USCIS. If an immigration judge determines that an application was not filed by a UAC, USCIS currently defers to that finding. Although immigration judges are not listed in the May 2013 USCIS memo on UAC jurisdictional determinations, that memo does not provide an exclusive list of all the agency actions that may affect a prior UAC determination, nor does it bind immigration judges or limit their jurisdiction to determine their own jurisdiction over an asylum claim.

d.  How will the asylum office treat an asylum application for a UAC in removal proceedings if the court or DHS rescinded UAC status (because the UAC was over 18 or had reunited with a parent) after the asylum application was filed?

**Response:** Under the 2013 memo currently still in effect, if CBP or ICE determined that an applicant was a UAC, and, as of the date of initial filing of the asylum application, that UAC determination was still in place, where USCIS is the agency making the jurisdictional determination, it will generally adopt the prior determination in order to take initial jurisdiction over the case. If another government agency terminates the prior UAC determination after the asylum application was first filed with either EOIR or USCIS, USCIS would retain initial jurisdiction over the application if USCIS is the agency that is assessing whether the application was "filed by a UAC."

e.  At the August 11, 2017 stakeholder engagement, the Asylum Division announced that it had instituted a new policy requiring headquarters review for the asylum applications of all cases in which (a) the applicant was or at any time had been in secure or staff-secure ORR custody; and/or (b) there was any allegation the applicant was or had been associated with a gang. Is this policy still in effect? Is there an anticipated duration, or is it indefinite? What steps is the Asylum Division taking to minimize processing delays in the cases of children who are currently in secure or staff-secure ORR detention?

**Response:** Yes, this policy is still in effect. There is no anticipated duration at this point, but we re-evaluate on a regular basis which cases are required to come to headquarters for review We make every effort to expedite cases in which the applicant is currently in a secure or staff-secure ORR facility.

f.  What is the best way to follow up on the status of cases under review at headquarters, particularly those pending longer than 6 months? Are there timing targets for cases "under review" and/or mechanisms if those targets are not met? For example, a form notice asks applicants to allow "up to 45 days" processing time before sending repeat inquiries, but in one case this notice was sent to an applicant long after the 45 day mark, and the case remains pending after 120 days. When an asylum office notifies an applicant that the case is "currently under review," does this refer only to review at headquarters, or can there be extended review at the asylum office?

**Response:** When an applicant is informed that his or her case is "under review," it may mean that it is under review by the asylum office or by headquarters. The vast majority of cases are pending review with the local asylum offices. All inquiries regarding pending asylum cases should be submitted to the local asylum office with jurisdiction over the case. As previously discussed in response V.e. above, however, if you do not receive an answer after contacting the local asylum office with jurisdiction over the case, you may contact the Asylum Division headquarters directly.

g.  Do the personnel reviewing the cases at the headquarters level have any relevant training or expertise in the adjudication of children's asylum applications?

**Response:** Yes. HQ asylum officers reviewing children's application are well-prepared to conduct a careful review of the record. All Refugee, Asylum, and International Operations ("RAIO") officers receive extensive training on adjudicating children's claims, including sensitive and non-adversarial interviewing techniques for various vulnerable populations, including minors (of varying ages and maturity levels), survivors of torture and trauma, and victims of gender-based violence, and racial, religious, or sexual minority characteristics.

Since 1998, when INS published Guidelines for Children's Asylum Claims, all asylum officers have received specific guidance and training on asylum claims made by children. More recently, USCIS developed the RAIO Training module, "Children's Claims," which is part of the RAIO Combined Training (RAIO CT) course for new officers. At the training, officers are required to read the lesson plan and participate in a class session on children's claims during which issues specific to child applicants are addressed in depth. Also, HQ asylum officers who review children's cases meet regularly to discuss new cases and trends regarding children's asylum claims.

h.  I understand that this (UAC) is the top priority after re-schedules. Please tell me how long it takes for children to get their interviews? I am interested in the backlog for UAC at the Bethpage, NY Asylum Office.

**Response:** Generally, UACs are scheduled after rescheduled cases (which may include previously scheduled UAC cases). The timeline for scheduling each of these categories of cases depends on the particular office's caseload. UACs encountered by CBP on or after May 1, 2014, are scheduled last in, first out (newest first) based on the filing date. UACs encountered by CBP before May 1, 2014 are scheduled next and are also scheduled last in, first out (newest first) based on filing date.

i.  Are there national or local targets for the scheduling of UAC interviews? The Affirmative Asylum Scheduling Bulletin currently states that UAC are scheduled "promptly," but some offices report waits of many months.

**Response:** No, there are no national or local targets for the scheduling of UAC interviews.

j.  We have learned of a situation in which the San Francisco Asylum Office denied a UAC's asylum claim based on evidence from ICE's EARM (Enforcement Alien Removal Module) system. Counsel for the UAC was not provided with the evidence or given an opportunity to address it at any time during the application process. Has USCIS implemented a new policy permitting asylum officers to issue denials without giving an applicant the opportunity to respond to the evidence used to deny the case? Please provide a copy of any written agency guidance regarding this practice.

**Response:** No, there is no new or revised policy. Please direct case specific inquiries and concerns to the interviewing office.

VIII.  **Asylee Benefits**

a. Asylees are eligible for certain benefits programs to help them find work and access integration assistance but enrollment must take place within 31 days of the final grant of asylum. Many asylees are receiving their grants of asylum well past the 31-day deadline. What accounts for the delays in sending out the grants?

**Response:** Thank you for bringing this to our attention. We will look into this issue.

## IX.   Change of Address

a. On a recent stakeholder call it was mentioned that applicants could file their change of address online and that by putting in their asylum receipt number the relevant asylum office would be notified.

Recently I entered a change of address online for a client. A few weeks later, I followed up with the Arlington Asylum Office to ensure that they did indeed have the new address on file, but they actually did not. Is this a known problem that is in the process of being resolved or should we plan to file AR-11s online and then separately notify the relevant asylum office as we have traditionally done?

**Response:** Thank you for bringing this to our attention. We have reminded the offices that changes of address may come from the online system as well as by mail and must be updated in our case management system promptly.

## X.   Asylum Office Staffing

a. One of the justifications proffered for the historically low presidential determination of refugee admissions for FY18 was the affirmative asylum backlog. Please provide any updates on the current number of asylum officer vacancies and any anticipated timeline for staffing up to the full funded level of 625 asylum officers.

**Response:** The Asylum Division is currently authorized for 625 asylum officers. As of October 2, 2017, there are 542 asylum officers onboard (87%). The Asylum Division has selected a candidate for all remaining vacancies. There are a number of individuals pending security clearance. Due to the background check requirements, it is difficult to provide an estimated timeline.

## XI.   Filing Instructions

a. This is a general question about where to file an asylum application. Please have a more clear website page and/or clarify where to file for the different cases or circumstances of the asylum cases. Examples: cases involving minor, cases with a pending court date, etc.

**Response:** Thank you for your input. We'll consider your suggestions the next time we update the instructions.

b. When the ICE ERO tells me they submit a respondent's "asylum packet" to Arlington, what is included in this packet? Is this the same as actually filing an asylum claim? If it is the same as actually filing an asylum claim, is there any sort of documentation available from USCIS and/or ICE that could serve as proof of timely filing and eligibility for employment authorization?

**Response:** Please follow the Form I-589, Application for Asylum and for Withholding of Removal, filing instructions on uscis.gov.

XII. **Supervising Attorney Attendance at Asylum Interviews**

a. I previously submitted a question asking for guidance about whether a supervising attorney can, after a prior written request, sit on the first asylum interview that a BIA accredited representative whom I supervise (or for that matter a new attorney) is representing a client in. It does not appear that there is a uniform guidance on this. For example, the NJ office just allowed a supervising attorney to sit in with a new attorney. But the New York office would not allow me to sit in with a partially accredited BIA representative. I asked this question over the summer at a stakeholders meeting and was told you'll look into it.

Could HQ Asylum Office give guidance on this? We are a legal fellowship program, training new lawyers and college graduates who will likely go to law school, and it is very helpful for our program, and for us to help train new advocates, that we can watch our fellows and give them feedback. Please let me know.

**Response:** We are continuing to discuss this with asylum office management. Please continue to direct your requests to local asylum office management.

XIII. **Employment Authorization**

a. Would a spouse named on an I-589 be a derivative, if they weren't issued a receipt, A# or biometrics notice? If they are, in fact, a derivative: would they be eligible for employment authorization after the 180 days since filing? Would they be responsible for paying the filing fee or would it too be at no charge like that of the principal?

**Response**: If you checked "yes" to question 24, "If in the U.S., is your spouse to be included in this application?" and followed the form instructions to include your spouse as a dependent, USCIS would issue your spouse an A-Number (if one does not exist) and a biometrics notice. Your spouse would not receive his/her own acknowledgement of receipt. Your spouse's asylum application filing date is the same as the principal applicant's and he or she may file a Form I-765, Application for Employment Authorization, when he or she meets the requirements described in the form instructions. Your spouse must follow the form instructions carefully. Please contact the asylum office with jurisdiction over your address if you are unsure if your spouse was included as a dependent on your application.

XIV. **Form I-730**

a. On August 28, 2017, USCIS announced it would begin to phase in interviews for certain Forms I-730, Refugee/Asylee Relative Petition. The announcement states the interviews "will provide USCIS officers with the opportunity to verify the information provided in an individual's application, to discover new information that may be relevant to the adjudication process, and to determine the credibility of the individual seeking permanent residence in the United States. USCIS will meet the additional interview requirement through enhancements in training and technology as well as transitions in some aspects of case management."

    i.      Which USCIS office will adjudicate the I-730s?

    ii.     Will I-730 interviews be held at USCIS field offices or asylum offices?

**Response:** USCIS asylum offices are not conducting domestic Form I-730 interviews.

### XV.   **Locations for Credible Fear Interviews and Reasonable Fear Interviews**

a. During the May 2, 2017 asylum stakeholder meeting and the August 11, 2017 meeting, the Asylum office indicated that asylum officers had been assigned to conduct credible fear interviews (CFIs) and reasonable fear interviews (RFIs) at the following detention centers: Cibola, Eloy, Florence, Adelanto, Imperial, Otay Mesa, Pearsall, Polk, Dilley, and Karnes.

    i.    Please provide an updated list of the detention centers where asylum officers have been assigned to conduct CFIs and RFIs.

    ii.   Please provide the current number of asylum officers assigned to each facility.

**Response:** The Asylum Division is currently deploying officers to Cibola, Eloy, Florence, Adelanto, Otay Mesa, IRDF, Pearsall, Polk, Dilley, and Karnes. The number of officers at each facility fluctuates due to receipts. As of October 2, 2017, there were 33 asylum officers and supervisory asylum officers deployed to the above listed locations.

### XVI.  **Executive Order Countries**

a. What is the effect of the most recent executive order (effective 10/18/2017) on adjudication of asylum applications for nationals of the listed countries? Please respond in terms of decisions on applications pending on the effective date, as well as application that will be filed after that date.

**Response**: The September 24, 2017 Presidential Proclamation, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public Safety Threats," with portions effective October 18, 2017, does not affect the adjudication of affirmative asylum applications.

b.  My question is about the 90-day rule effective September 1, 2017, and published in the
    Foreign Affairs Manual. Does it apply to asylum applicants who file for asylum within 90 days
    after arrival in the United States?

    **Response:** We do not know the State Department's interpretation of this rule and asylum
    applications. Please contact the Department of State with questions about the Foreign
    Affairs Manual (FAM).

XVII.  **Miscellaneous Questions**

a.  DHS counts and publishes the list of "visa overstayers" by country, yet it is unclear if it
    includes certain asylum seekers who entered with a valid visa and lost status after applying
    for asylum. Are the affirmative asylum seekers who were admitted with a nonimmigrant visa
    counted as "visa over stayers" by DHS?

    **Response:** It is our understanding that the "Fiscal Year 2016 Entry/Exit Overstay Report"
    does not count affirmative asylum applicants as overstays. Please contact the DHS Office of
    Immigration Statistics for more information.

b.  Can spouses make separate asylum petitions?

    **Response:** Yes, married individuals may file separately so that each files an asylum
    application as a principal applicant. Married individuals may also be included on the principal
    applicant's application as a derivative spouse and be simultaneously considered a principal
    and derivative spouse. The Affirmative Asylum Procedures Manual (AAPM) contains
    procedures for individuals who wish to apply for asylum simultaneously as principals and
    derivatives in Section III.E.3.  See the Affirmative Asylum Procedures Manual on uscis.gov
    for more information.

c.  Can family members be added to already submitted petition?

    **Response:** You can find the current procedures for adding a dependent after filing the
    Form I-589 in Section III.E.1 of the Affirmative Asylum Procedures Manual (AAPM) found on
    uscis.gov. If the applicant wishes to add a dependent after filing but before the asylum
    interview (and the dependent did not previously file a Form I-589), the principal applicant
    files with the USCIS service center with jurisdiction over his or her address. If the
    dependent previously filed an affirmative asylum application as a principal applicant and
    attempts to file with the service center, the service center will forward the Form I-589 to
    the asylum office with jurisdiction over the address. Details of what the applicant needs to
    file are in the AAPM. See the Affirmative Asylum Procedures Manual on uscis.gov for more
    information.

d.  Can individuals submit the applications or petitions themselves without involving attorney?

    **Response:** Yes, individuals may file applications or petitions without involving an attorney.

e.  How long does it take to process an asylum petition?

**Response:** The timeframe for adjudicating an affirmative asylum application depends on numerous factors including the affirmative asylum and credible fear workloads of the office with jurisdiction over your case and the interview scheduling priority category under which your application falls. For more information affirmative asylum processing times and interview scheduling priorities, please see the Affirmative Asylum Scheduling Bulletin.

f.  Can applicants whose petitions are in progress apply for a Green Card?

**Response:** An individual who has an asylum application pending may not apply to adjust status as an asylee unless the asylum application is approved and one year has passed since the asylum approval. However, an individual may apply to adjust status based on other adjustment categories, such as a family or employment based petition, as long as he or she meets the requirements for adjustment under the particular category. See https://www.uscis.gov/greencard for more information.

g.  Asylum applicant has a wife and 2 kids. Asylum applicant dies before interview is scheduled. What will be status of wife and kids?

**Response:** Please see the Affirmative Asylum Procedures Manual section III.E.6.b available at uscis.gov. First, contact the interviewing asylum office and notify them of the death of the applicant. Second, after the office becomes aware of the death of the applicant, they will notify the spouse, child, and representative of record in writing that the spouse and child are no longer eligible to be derivatives and must file a new asylum application to continue to pursue asylum status. The loss of derivative status qualifies as a changed circumstance for purposes of determining whether the spouse and child are subject to the 1-year filing deadline, so long as they file the asylum application within a reasonable time after becoming aware of the loss of derivative status.

EXHIBIT 2 PLACEHOLDER

This exhibit referenced has been withheld pending the Court's ruling

On a contemporaneously filed motion to seal exhibit 2.

Copies have been served on counsel and the court.