# Exhibit 5



# Annual Report 2013

Citizenship and Immigration Services
**Ombudsman**

June 27, 2013



# Annual Report 2013

## Citizenship and Immigration Services
## Ombudsman

June 27, 2013



This page intentionally left blank.



*Office of the Citizenship and Immigration Services Ombudsman*
**U.S. Department of Homeland Security**
Mail Stop 0180
Washington, DC 20528-0180

June 27, 2013

The Honorable Patrick Leahy
Chairman
Committee on the Judiciary
United States Senate
Washington, DC 20510

The Honorable Bob Goodlatte
Chairman
Committee on the Judiciary
United States House of Representatives
Washington, DC 20515

The Honorable Chuck Grassley
Ranking Member
Committee on the Judiciary
United States Senate
Washington, DC 20510

The Honorable John Conyers, Jr.
Ranking Member
Committee on the Judiciary
United States House of Representatives
Washington, DC 20515

Dear Chairmen and Ranking Members:

The Office of the Citizenship and Immigration Services Ombudsman is pleased to submit, pursuant to section 452(c) of the Homeland Security Act of 2002, its 2013 Annual Report.

I am available to provide additional information upon request.

Sincerely,

Maria M. Odom
Citizenship and Immigration Services Ombudsman

**www.dhs.gov/cisombudsman**

# A Message from the Ombudsman



It is an honor to present to you the Citizenship and Immigration Services Ombudsman's 2013 Annual Report. This Report describes the work of the Ombudsman, including the key issues and areas of study we have addressed over the year.

As we finalize this Annual Report, we are closely following bipartisan comprehensive immigration reform — the first such legislation that Congress has considered in many years. If enacted, many individuals currently residing in the United States or waiting in long visa backlogs abroad will be able to submit applications for immigration benefits to U.S. Citizenship and Immigration Services (USCIS). The challenge for USCIS will be significant, and the Ombudsman's Office stands ready to support implementation by assisting individuals and employers who encounter problems during that process.

During this past year, USCIS implemented the Deferred Action for Childhood Arrivals (DACA) program. DACA illustrates the agency's ability to develop quickly and successfully a new application and an adjudicatory process accompanied by wide-reaching outreach and education. The agency is to be commended for its effective operational response, public engagement, and interagency work to achieve a common understanding of DACA-related policy and procedures. This type of rapid and comprehensive response will be essential to successful implementation of immigration reform.

At this moment in our nation's immigration history, we recognize the 10-year anniversary of the Office of the Citizenship and Immigration Services Ombudsman. We measure our success, in great part, by the trust placed in us by thousands of individuals and employers who have sought to resolve long delayed or complex cases pending before USCIS. Whether assisting a member of the military seeking relief for a spouse; an immigrant entrepreneur applying to start a new business in this country; a refugee awaiting processing in a dangerous overseas camp; or a long-term permanent resident applying to naturalize, the Ombudsman's Office plays a vital role helping to ensure our government delivers immigration services commensurate with our heritage as a nation of immigrants.

Good government is grounded in a steadfast commitment to efficiency, transparency, and accountability. But sometimes, despite dedicated efforts, government fails to deliver its best, leaving the public to suffer hardship that requires the involvement of a neutral third party. As an office of last resort, the Citizenship and Immigration Services Ombudsman plays that role, working arduously to ensure that individuals applying for an immigration benefit can experience government at its best. We are problem solvers, focused on assisting one case at a time and delivering policy recommendations throughout the year to improve efficiency and fairness in the administration of immigration benefits. Our success is directly related to working as an ally with our partner agency, USCIS, to deliver high-quality service.

It is through meaningful collaboration with Director Alejandro Mayorkas and his team that we have been able to make a difference for the individuals we serve. I thank Director Mayorkas for his leadership and continued positive engagement with our office. My appreciation also extends to the USCIS officers across the country for their expertise and commitment to delivering exemplary immigration services. I would also like to thank Secretary Janet Napolitano and Congress for supporting our work. Finally, I would like to thank my team for their quiet, yet incredibly effective, assistance to the individuals and employers we serve. I often say, "If you want to experience outstanding customer service in government, come visit the Ombudsman's Office." We welcome you to engage with us and learn more about our work.

Many of us respond to the call to public service because we believe that in every branch of government we can contribute meaningfully to our great democracy. Throughout my career, I have had the privilege to touch every sector in the field of immigration: charitable, government, and the private practice of law. Through those experiences I have learned that protecting the integrity and improving the efficiency and quality of the immigration system serves both country and immigrant alike. I embrace the honor and immense responsibility to serve as the new Citizenship and Immigration Services Ombudsman.

Sincerely,

Maria M. Odom

Citizenship and Immigration Services Ombudsman

This page intentionally left blank.

# Executive Summary

## Executive Summary

The Office of the Citizenship and Immigration Services Ombudsman's 2013 Annual Report contains:

- An overview of the Ombudsman's mission and services;

- A review of U.S. Citizenship and Immigration Services (USCIS) programmatic and policy achievements during this reporting period; and

- A detailed discussion of pervasive and serious problems, recommendations, and best practices in the humanitarian, family, and employment areas, and in customer service and Transformation.

## Ombudsman's Office Overview

The Ombudsman's Office, established by the Homeland Security Act of 2002, helps individuals and employers resolve problems with USCIS. Policy and casework is carried out by a group of professionals with wide-ranging skills and areas of subject matter expertise. From April 1, 2012, to March 31, 2013, the Ombudsman received 4,531 requests for assistance. In 74 percent of cases submitted to the Ombudsman, the individuals and employers previously visited USCIS My Case Status online, 66 percent contacted the USCIS National Customer Service Center telephone line, and 30 percent attended InfoPass appointments at a local field office. Overall, the requests were divided equally among humanitarian, family and employment-based matters.

This year, the Ombudsman visited communities and stakeholders in every region of the United States. After extensive research and outreach, the Ombudsman issued four formal recommendations:

- *Improving the Process for Removal of Conditions on Residence for Spouses and Children (February 28, 2013);*

- *Improving the Adjudication of Applications and Petitions under Section 204(l) of the Immigration and Nationality Act (INA) (November 26, 2012);*

- *Ensuring a Fair and Effective Asylum Process for Unaccompanied Children (September 20, 2012); and*

- *Recommendations Regarding USCIS's Role in the Petition Information Management Service (PIMS) (May 16, 2012).*

## Key Developments and Areas of Study

### Humanitarian

**Victims of Abuse, Trafficking and Other Crimes.** The U.S. Department of Homeland Security and USCIS sponsor key initiatives to protect victims of human trafficking, domestic violence, and other crimes. In December 2012, USCIS issued policy guidance on employment authorization for certain Violence Against Women Act (VAWA) self-petitioners and their derivatives, as well as U visa beneficiaries. While stakeholders welcomed this instruction, ongoing concerns remain regarding employment authorization for derivative applicants and limitations on the ability of nonimmigrant victims to obtain work authorization.

**Unaccompanied Children.** The INA and William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) provide procedural and substantive protection for unaccompanied alien children (UACs). Following extensive study, the Ombudsman issued, *"Ensuring a Fair and Effective Asylum Process for Unaccompanied Children."* USCIS subsequently agreed to accept UAC determinations made for custody purposes by U.S. Customs and Border Protection and Immigration and Customs Enforcement. This decision will afford a consistent process to all minors apprehended and placed into custody with the Department of Health and Human Services.

**Special Immigrant Juveniles.** Abused, abandoned or neglected children without immigration status may obtain permission to remain lawfully in the United States. From 2010 to 2011, the Ombudsman received numerous requests for assistance related to Special Immigrant Juvenile (SIJ) cases. Persistent problems include: protracted processing times, inadequate interview techniques and adjudications, and burdensome or intrusive Requests for Evidence (RFEs) relating to juvenile dependency orders. On April 15, 2011, the Ombudsman published a formal recommendation to address these issues. While USCIS adopted some proposed reforms, stakeholders continue to encounter SIJ-related difficulties. The Ombudsman will continue to work with USCIS Field Operations staff to resolve remaining stakeholder concerns.

**Discretionary Relief and Deferred Action for Childhood Arrivals (DACA).**  Deferred action is an exercise of agency discretion to allow an individual to remain in the United States without fear of removal.  Since 2007, the Ombudsman  has issued two formal recommendations identifying ways USCIS can improve transparency and consistency for individuals requesting deferred action.  This year, USCIS adopted many of these changes in the context of the DACA program.  The level of internal and external information-sharing, and institutional willingness to create and monitor the processing of DACA requests, are examples of best practices for processing deferred action and other discretionary applications.

**Reinstatement of Automatically Revoked Petitions.**
USCIS may reinstate certain family-based petitions that were automatically revoked following the death of a petitioner or beneficiary.  Such requests for relief must be submitted by surviving immediate relatives.  Stakeholders reported lengthy delays in the adjudication of humanitarian reinstatement requests and the lack of a standard process for submitting or evaluating those requests.  In practice, humanitarian reinstatement requests can take months if not years to complete, and are frequently denied.  The Ombudsman will continue to monitor agency action in this area.

## Family and Children

**Applications and Petitions for Surviving Relatives.**
On October 28, 2009, Congress enacted legislation to protect an expanded list of beneficiaries in the family and employment-based preference categories following the death of a qualifying relative.  Fourteen months later, USCIS issued a policy memorandum explaining how this new law – INA section 204(l) – should be applied.  The guidance deems previously approved petitions filed on behalf of covered beneficiaries automatically revoked and subject to reinstatement.  After evaluating case assistance requests and performing research, the Ombudsman issued, *"Improving the Adjudication of Applications and Petitions under Section 204(l) of the Immigration and Nationality Act."*  This recommendation urges USCIS to conduct notice and comment rulemaking to create or designate a standard form, establish a receipt protocol, and stop regarding survivor benefits requests as a form of discretionary reinstatement.  The Ombudsman is currently evaluating USCIS's response to this recommendation, which was received on June 3, 2013.

**Petitions to Remove Conditions on Residence.**  On February 28, 2013, following almost two years of outreach to concerned stakeholders, the Ombudsman published, *"Improving the Process for Removal of Conditions on Residence for Spouses and Children."*  Key problems identified in this recommendation include:  ineffective notice and barriers to securing information; inefficient processes and inconsistent adjudications; a lack of professionalism, sensitivity and awareness of legal requirements, especially concerning waivers, by some USCIS adjudicators; and inadequate electronic systems to support the processing of Form I-751 petitions.  To address these difficulties, the Ombudsman called upon USCIS to improve processing protocols, update and consolidate guidance materials and systems, and conduct comprehensive training.  USCIS's response to the recommendation was due May 28, 2013, but has not yet been received.

**Provisional and Other Waivers of Inadmissibility.**
During this reporting period, USCIS began to accept, through the Phoenix Lockbox, waivers of inadmissibility filed by applicants overseas, and shifted the adjudication of such requests to the Nebraska Service Center.  On January 9, 2012, USCIS announced its plan to adjudicate provisional waivers of unlawful presence for certain immediate relatives living in the United States.  On March 4, 2013, after publishing proposed and final regulations, the agency began implementing this initiative.  Centralized waiver filings and adjudication in the United States, along with the Provisional Unlawful Presence Waiver Process, promise to improve consistency and minimize delays for thousands of individuals and their families.  Many have urged USCIS to extend provisional waiver coverage to family preference categories.

## Employment

**Requests for Evidence.**  Individuals and employers continued to raise concerns regarding what they consider inappropriate or unduly burdensome RFEs.  This reporting period, USCIS reviewed and posted for public comment RFE templates for several nonimmigrant employment-based categories, excluding H-1B Specialty Occupations and L-1B Intracompany Transferees with Specialized Knowledge.  While the templates offer a valuable mechanism to standardize and improve employment-based case processing, persistent issues remain.  These include USCIS not recognizing various modern business practices and managerial decisions.

The agency continues to utilize the Validation Instrument for Business Enterprises (VIBE), which aims to reduce the need for companies and organizations to submit identical paper documentation with each petition to establish their current level of business operations.  Some stakeholders find that, contrary to VIBE's express purpose, they continue to have to submit paper documentation with the initial filing and to receive RFEs.

In the context of its Entrepreneurs in Residence initiative, which enlists private sector experts to inform immigration policies and procedures, USCIS conducted training and modified RFE templates for certain nonimmigrant visa categories to incorporate new sources of evidence. Both the California and Vermont Service Centers (CSC and VSC) have implemented periodic quality assurance review of RFEs and other adjudicative decisions.

## H-1B Special Occupation and L-1 Intracompany Transferees.

In earlier Reports, the Ombudsman described problems related to H-1B Special Occupation and L-1 Intracompany Transferee categories. Stakeholders focused on USCIS policies that appear to subject small and start-up companies to inordinate scrutiny. These same concerns were shared with the Ombudsman this year. For example, some denials in these categories state that the petitioner has not demonstrated that the company is sufficiently developed to require the presence of an executive or manager. Such denials may overlook regulations that permit "new office" situations for a limited period of one-year to allow the business to become operational.

## EB-5 Immigrant Investor Program.

From FY 2010 to 2012, USCIS received nearly 300% more filings in the fifth employment-based (EB-5) preference category from immigrants seeking to invest capital and create jobs for U.S. workers. This year the Ombudsman received 441 requests for EB-5 case assistance, representing approximately 10 percent of the office's workload. The vast majority of these inquiries came from investors and regional center applicants whose cases had been pending beyond normal processing times. Other difficulties included a perceived lack of responsiveness by USCIS, the issuance of duplicative RFEs, and needed guidance regarding processing protocols and requirements.

On December 3, 2012, USCIS announced publicly the transfer of its EB-5 adjudications unit from the CSC to Washington, D.C. by mid-2013. Approximately two weeks later, on December 20, 2012, USCIS issued a policy memorandum addressing tenant occupancy methodologies and attribution of tenant jobs to EB-5 enterprises for job creation purposes. On February 14, 2013, USCIS posted a policy memorandum for public comment that appears to reverse the agency's earlier position as to the effect of a "material change" to a business plan. Just prior to the publication of this Report, on May 30, 2013, USCIS issued a detailed *"EB-5 Adjudications Policy."* This memorandum emphasizes that preponderance of the evidence is the standard of proof in EB-5 adjudications, and addresses

many longstanding stakeholder concerns, including when deference will be afforded to prior adjudications and the need for flexibility to accommodate business realities. The Ombudsman will monitor these key efforts by USCIS to address systemic issues affecting the EB-5 program.

## Petition Information Management System (PIMS).

On May 16, 2012, the Ombudsman issued a recommendation to improve the transfer of employment-based immigration petition information by USCIS to the Department of State (DOS). When a nonimmigrant petitioner (or his/her legal representative) fails to submit the required duplicate copy of the Form I-129, *Petition for a Nonimmigrant Worker,* package to USCIS, the agency does not forward evidence of action on the petition to the DOS Kentucky Consular Center. This causes processing delays, economic hardship, and other problems for individuals and employers. The agency declined to implement two of the three actions recommended by the Ombudsman, noting that in the future it plans to provide all petition information to DOS through the USCIS Electronic Information System (ELIS).

# USCIS Customer Service

## Processing Times.

Processing times for Form I-485, *Application to Register Permanent Residence or Adjust Status,* and Form N-400, *Application for Naturalization,* mirror those reported last year, at approximately five and four and a half months, respectively.

## Customer Service and Public Engagement.

During this reporting year, USCIS established the "USCIS Customer Service and Public Engagement Directorate," which is divided into two divisions. The Public Engagement Division coordinates and directs dialogue with external stakeholders, while the Customer Service Division provides information and guidance to USCIS applicants, petitioners and advocates regarding immigration benefits. USCIS continued robust public engagement, hosting over 1,600 public events with over 520,000 participants.

## Policy Manual.

Effective January 22, 2013, USCIS announced the creation of a new, comprehensive Policy Manual designed to adapt easily to changes in immigration law and policy. USCIS has released one chapter of the Policy Manual, titled "Citizenship and Naturalization." No specific timeframe has been established for future releases.

**The Administrative Appeals Office.** The Administrative Appeals Office (AAO) has delegated authority to adjudicate appeals of certain USCIS decisions.  In 2005, in an effort to increase transparency, the Ombudsman recommended that the AAO make available to the public its standard of review; precedent decision process; criteria by which cases are selected for oral argument; and decision-making statistics.  Since that time, the AAO has eliminated lengthy processing times, but stakeholders continue to raise concerns regarding the AAO's authority, independence, and procedures.  The AAO is a current area of study for the Ombudsman.

**Fee Waivers.**  On November 23, 2010, USCIS published a first-ever fee waiver request form. While use of Form I-912, *Request for Fee Waiver,* is optional, it simplifies the process for applicants by specifying eligibility criteria and required documentation.  However, many low-income applicants continue to encounter barriers to securing a fee waiver.  Since 2012, an increasing number of stakeholders have sought assistance from the Ombudsman on this topic.  Applicants report repeated rejections of fee waiver requests, inconsistent adjudications, and misapplication or misunderstanding of proper evidentiary requirements by USCIS officers.

**Transformation.**  The USCIS Office of Transformation Coordination oversees the agency's broad effort to modernize processes and systems, and move from a paper-based application and adjudication environment to an electronic one.  Transformation has the potential to improve dramatically the experience of those seeking immigration benefits and services, but it has been marked by protracted delays in implementation, design defects, and cost overruns.  On May 22, 2012, the agency launched "the foundational release" of its new system, USCIS ELIS.  This release enables individuals seeking immigration benefits and/or their legal representatives to create an account and file a stand-alone Form I-539, *Application to Extend/Change Nonimmigrant Status.*  Additional releases are scheduled for summer 2013.

# Table of Contents

**Letter to Congress** ......................................................................................................................... iii

**Message from the Ombudsman** ........................................................................................................ iv

**Executive Summary** ......................................................................................................................... vii

**Table of Contents** ............................................................................................................................ xi

**Ombudsman's Office Overview** ....................................................................................................... 1

**Key Developments and Areas of Study** ........................................................................................... 8

**Humanitarian** ................................................................................................................................... 9

• Victims of Abuse, Trafficking and Other Crimes ............................................................................ 10

• Unaccompanied Children ............................................................................................................... 13

• Special Immigrant Juveniles ........................................................................................................... 14

• Discretionary Relief and Deferred Action for Childhood Arrivals .................................................. 16

• Reinstatement of Automatically Revoked Petitions ....................................................................... 18

**Family and Children** ....................................................................................................................... 21

• Applications and Petitions for Surviving Relatives .......................................................................... 22

• Petitions to Remove Conditions on Residence ............................................................................... 24

• Provisional and Other Waivers of Inadmissibility ........................................................................... 25

**Employment** ................................................................................................................................... 27

• Requests for Evidence ..................................................................................................................... 28

• H-1B Specialty Occupation and L-1 Intracompany Transferees ...................................................... 30

• EB-5 Immigrant Investor Program .................................................................................................. 33

• Petition Information Management System ...................................................................................... 39

**USCIS Customer Service** ................................................................................................................. 41

• Processing Times ............................................................................................................................ 42

• Customer Service and Public Engagement ..................................................................................... 42

• Policy Manual ................................................................................................................................. 43

• The Administrative Appeals Office ................................................................................................. 43

• Fee Waivers .................................................................................................................................... 47

• Transformation ............................................................................................................................... 49

**Appendices** ..................................................................................................................................... 53

# Ombudsman's Office Overview

The Ombudsman's[1] mission is to:

- Assist individuals and employers in resolving problems with U.S. Citizenship and Immigration Services (USCIS);

- Identify areas in which individuals and employers have problems in dealing with USCIS; and

- Propose changes in the administrative practices of USCIS to mitigate identified problems.[2]

Critical to achieving this mandate is the Ombudsman's role as an independent, impartial and confidential resource within the Department of Homeland Security (DHS).

- **Independent.** The Ombudsman reports directly to the DHS Deputy Secretary, and is not part of USCIS.

- **Impartial.** The Ombudsman works in a neutral, impartial manner to improve the delivery of immigration benefits and services.

- **Confidential.** Individuals and employers seeking assistance from the Ombudsman may do so in confidence. Any release of confidential information must be based on prior consent, unless otherwise required by law or regulation.

The Ombudsman's duties and responsibilities include:

- Analyzing individual complaints and requests for assistance to identify common themes;

- Performing research, writing formal recommendations, and facilitating interagency collaboration; and

- Conducting outreach to a wide range of public and private stakeholders.

As of the date of this Report, the Ombudsman's Office is composed of 30 full-time employees with diverse backgrounds and areas of subject matter expertise in immigration law and policy. These individuals include professionals from non-governmental organizations with experience working with family and vulnerable populations; the private sector with business immigration expertise; and federal agencies including, USCIS, U.S. Immigration and Customs Enforcement (ICE), U.S. Department of Labor (DOL) and U.S. Department of State (DOS). Over the reporting period, the office has suffered reductions in staff through attrition and has been unable to make new hires due to budget constraints. Additional reductions in staff may be needed in Fiscal Years (FYs) 2014 and 2015. The Ombudsman will continue to leverage its investment in online and case management tools, and in human capital, to research and resolve the rising number of requests from the public and to address policy priorities over the next fiscal year.

## Requests for Assistance

Individuals and employers may contact the Ombudsman after encountering problems in the processing of their immigration-related applications and petitions. Requests for assistance are submitted on the Form DHS-7001, *Case Assistance Form*, by mail, email, facsimile, or preferably through the Ombudsman's Online Case Assistance (OCA) system.[3] The Ombudsman evaluates each request for assistance and where appropriate works with the relevant USCIS office to resolve the request. In certain scenarios, the Ombudsman will expedite a case based on an extreme medical emergency or demonstrated economic hardship.[4] Often, when a case request falls outside of the Ombudsman's jurisdiction, the individual or employer is referred to the relevant government agency. ***See Figure 1.***

---

[1] In this Report, the term "Ombudsman" refers interchangeably to the Ombudsman's staff and the office.

[2] Homeland Security Act of 2002 (HSA) § 452, Pub. L. No. 107-296.

[3] Effective October 1, 2012, the Ombudsman replaced its former case management system, Intranet Quorum (IQ) with Case Assistance Analytics and Data Integration (CAADI), which improves data tracking and reporting functions based on information collected through the Ombudsman Form DHS-7001, Case Assistance Form; https://cisomb.dhs.gov/oca/form7001.aspx (accessed May 20, 2013).

[4] U.S. Department of Justice (DOJ) Memorandum, "Service Center Guidance for Expedite Requests on Petitions and Applications" (Nov. 30, 2001). *See also* USCIS Webpage, "Expedite Criteria;" http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=16a6b1be1ce85210VgnVCM100000082ca60aRCRD&vgnextchannel=db029c7755cb9010VgnVCM10000045f3d6a1RCRD (accessed May 20, 2013). Expedite criteria include: severe financial loss to company or individual; extreme emergent situation; humanitarian situation; cultural and social interest of the United States; national interest; service error; or compelling interest of the Service.

**FIGURE 1:   OMBUDSMAN CASE ASSISTANCE PROCESS**

# Helping Individuals and Employers Resolve Problems with USCIS

### Before asking the Ombudsman for help with an application or petition, try to resolve the issue with USCIS by:

- Obtaining information about the case at USCIS My Case Status at **www.uscis.gov**.
- Submitting an **e-Request** with USCIS online at **https://egov.uscis.gov/e-Request**.
- Contacting the USCIS National Customer Service Center (NCSC) for assistance at **1-800-375-5283**.
- Making an InfoPass appointment to speak directly with a USCIS officer in a field office at **www.infopass.uscis.gov**.

**If you are unable to resolve your issue with USCIS, you may request assistance from the Ombudsman.  Certain types of cases involving refugees, asylees, victims of violence, trafficking, and other crimes are required to submit a handwritten signature for consent purposes.  This can be done using Option 1 below and uploading a signed Form DHS-7001 to the online case assistance request.**



**OPTION ①**   Submit an online request for case assistance available on the Ombudsman's website at www.dhs.gov/cisombudsman.  This is the recommended process.



**OPTION ②**   Download a printable case assistance form (Form DHS-7001) from the Ombudsman's website www.dhs.gov/cisombudsman.  Submit a signed case assistance form and supporting documentation by:

**Email:**  cisombudsman@hq.dhs.gov

**Fax:**     202-357-0042

**Mail:** Office of the Citizenship
and Immigration Services Ombudsman
U.S. Department of Homeland Security
Attention: Case Assistance
Mail Stop 0180
Washington, D.C. 20528-0180

*Individuals submitting a request from outside the United States cannot use the online request form and must submit a printable case assistance request form.*

**After receiving a request for assistance, the Ombudsman:**



## STEP 1
Acknowledges receipt of the inquiry and provides a case submission number to confirm receipt.



## STEP 2
Reviews the inquiry for completeness, including signatures and a Form G-28, *Notice of Entry of Appearance as Attorney or Accredited Representative*, if submitted by a legal representative.



## STEP 3
Determines the current status of the application or petition, reviews relevant laws and policies, and determines how the Ombudsman can help.



## STEP 4
Contacts USCIS district offices, service centers, asylum offices, or other USCIS offices to help resolve difficulties the individual or employer is encountering.



## STEP 5
Communicates to the customer the actions taken to help.

The Ombudsman is an office of last resort. Individuals and employers are encouraged to explore USCIS's customer service options prior to contacting the Ombudsman. These include: the NCSC (1-800-375-5283); InfoPass;[5] and the e-Request tool.[6]

Individuals and employers indicate prior attempted remedial actions when submitting requests for case assistance to the Ombudsman.[7] In cases submitted to the Ombudsman, 74 percent of the individuals and employers visited USCIS My Case Status online; 66 percent contacted the NCSC; and 30 percent attended InfoPass appointments at a local field office. ***See Figure 2.***

## FIGURE 2: PRIOR ACTIONS TAKEN



*Source: Information collected by the Ombudsman from the Form DHS-7001, Case Assistance Form.*

[5] InfoPass is a free online service that allows individuals to schedule an in-person appointment with a USCIS Immigration Officer. InfoPass appointments may be made by accessing the USCIS website at http://infopass.uscis.gov/.

[6] USCIS Webpage, "e-Request"; https://egov.uscis.gov/e-Request/Intro.do (accessed May 20, 2013).

[7] The Ombudsman's case assistance form requests the individual or employer identify which USCIS resources were used prior to contacting the Ombudsman.

In the April 1, 2012 to March 31, 2013 reporting period, the Ombudsman received 4,531 requests for assistance.[8] Approximately 91 percent of these were received through the online system. The combined public-facing OCA and Case Assistance Analytics and Data Integration (CAADI) programs resulted in far greater operational efficiency.

By integrating OCA and CAADI, the Ombudsman was able to redirect resources previously devoted to the manual intake of cases received by mail, fax and email. ***See Figure 3.*** Overall, the requests were divided equally among humanitarian, family and employment-based matters. ***See Figure 4.***

**FIGURE 3:  CASE SUBMISSION MODE**




### April 1, 2011 to March 31, 2012

### April 1, 2012 to March 31, 2013

**FIGURE 4:  CASE SUBMISSION TYPE**



| CASE TYPE | TOTAL |
|---|---|
| Humanitarian | 28% |
| Employment | 30% |
| Family | 26% |
| General | 16% |

[8] During the 2013 reporting period, the Ombudsman used two different case management systems.  For this reason, some data highlighted in this Report is from October 1, 2012 to March 31, 2013.

## Outreach

### *In-Person Engagements*

During this reporting period, the Ombudsman visited communities and stakeholders in every region of the United States. Outreach encompassed USCIS site visits, and meetings with state and local officials, Congressional staff, and members of underserved communities with emerging immigrant populations. Travel for outreach sharply declined during the second half of the reporting period due to budget constraints. While the Ombudsman views in-person engagements as mission critical, it is also committed to expanding the use of technology and alternative means to interact with the public and USCIS offices around the country. *See Figure 5.*

**FIGURE 5:  OMBUDSMAN SITE VISITS**



**WEST**

**CENTRAL**

**SOUTHEAST**

**NORTHEAST**

*Teleconferences*

In an effort to inform stakeholders of new initiatives, and to invite feedback, the Ombudsman hosted the following teleconferences:

- *Conditional Permanent Residence:  How Is It Working For You?* (April 25, 2012)

- *Controlling Documents and Travel for Foreign Nationals: A Conversation with Customs and Border Protection (CBP) and the Citizenship and Immigration Services Ombudsman's Office* (June 19, 2012)

- *Special Immigrant Juvenile (SIJ) Status:  Overview of the Law and Challenges in the Application Process* (July 31, 2012)

- *A Conversation with the CBP Liaison for Non-Government Organizations* (August 28, 2012)

- *Meet the New Citizenship and Immigration Services Ombudsman Maria M. Odom* (October 4, 2012)

- *The USCIS Administrative Appeals Office* (December 19, 2012)

- *Ombudsman Update:  Recent Recommendations and Ombudsman Online Case Assistance* (February 14, 2013)

Through in-person engagements and teleconferences, the Ombudsman reached more than 3,800 stakeholders in every state and in Puerto Rico.

## Formal Recommendations and Interagency Liaison

The Ombudsman is required to identify areas in which individuals and employers have problems in dealing with USCIS and, to the extent possible, propose changes in administrative practices to mitigate these problems. To date, the Ombudsman has published 56 formal recommendations.[9]

Recommendations are developed based on:

- Trends in individual complaints and requests for case assistance;

- Outreach conducted through meetings and teleconferences with individuals, community-based organizations, trade and industry associations, faith communities, and immigration attorneys from across the country; and

- Information and data from USCIS and other agencies.

During this reporting period, the Ombudsman released the following recommendations:

- *Improving the Process for Removal of Conditions on Residence for Spouses and Children (February 28, 2013);*

- *Improving the Adjudication of Applications and Petitions under Section 204(l) of the Immigration and Nationality Act (INA) (November 26, 2012);*

- *Ensuring a Fair and Effective Asylum Process for Unaccompanied Children (September 20, 2012); and*

- *Recommendations Regarding USCIS's Role in the Petition Information Management Service (PIMS) (May 16, 2012).*

The Ombudsman also worked to promote interagency liaison through:

- Collaboration with the ICE Office of Enforcement and Removal Operations (ERO) Community Outreach (formerly known as the Office of the Public Advocate);

- Facilitating best practices with the Department of Justice (DOJ), Office of the Special Counsel for Immigration-Related Unfair Employment Practices;

- Regular meetings with the DOS and USCIS aimed at ensuring the orderly and predictable movement of Visa Bulletin cut-off dates; and

- Formation of a working group involving USCIS, CBP, ICE, and the DHS Office of the Chief Information Officer to facilitate problem solving related to data sharing in programs such as the Systematic Alien Verification for Entitlements (SAVE) Program.[10]

On March 21, 2013, Secretary of Homeland Security Janet Napolitano announced the creation of the Council for Combating Violence Against Women.  The Ombudsman will participate in this council and support interagency efforts to identify best practices.

---

[9] Last year, the Ombudsman conducted a comprehensive review of all past recommendations.  *See* Ombudsman Webpage, "Comprehensive Recommendation Review"; http://www.dhs.gov/comprehensive-recommendation-review (accessed May 20, 2013).

[10] The SAVE Program is a web-based service that helps federal, state and local benefit-issuing agencies, institutions, and licensing agencies determine the immigration status of benefit applicants to ensure only those entitled to benefits receive them.  *See* USCIS Webpage, "Systematic Alien Verification for Entitlements (SAVE) Program" (Nov. 28, 2012); http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=1721c2ec0c7c8110VgnVCM1000004718190aRCRD&vgnextchannel=1721c2ec0c7c8110VgnVCM1000004718190aRCRD (accessed May 20, 2013).

## The Ombudsman's Annual Conference

On October 18, 2012, the Ombudsman hosted its second Annual Conference.  Attendees included individuals from non-governmental organizations, the private sector, and federal and state entities.  Secretary Napolitano and USCIS Director Alejandro Mayorkas served as keynote speakers.

Panel discussions included topics such as the Military Accessions Vital to the National Interest (MAVNI) Program; Deferred Action for Childhood Arrivals (DACA); L-1 Intracompany Transferee Adjudications; Judicial Review of Immigration Decisions; Security in the Adjudications Process; and Government Accountability, among others.[11]

## The Ombudsman's Annual Report

The Ombudsman submits an annual report to Congress by June 30 of each calendar year, pursuant to section 452(c) of the Homeland Security Act.  On May 2, 2013, USCIS submitted its response to the Ombudsman's 2012 Annual Report.[12]  The Ombudsman is currently evaluating USCIS's response, which was delivered as this Report was going to press.

Under Homeland Security Act section 452 (c)(1)(E), the Ombudsman is required to "identify any official of the Bureau of Citizenship and Immigration Services [now USCIS] who is responsible for … inaction" related to Ombudsman recommendations and pervasive and serious problems encountered by individuals and employers. In the 2014 Report, the Ombudsman will seek to identify such officials.

---

[11] *See* DHS Blog Posting, "DHS Ombudsman's Office Holds Second Annual Conference" (Oct. 24, 2012); http://www.dhs.gov/blog/2012/10/24/dhs-ombudsman%E2%80%99s-office-holds-second-annual-conference (accessed May 20, 2013).

[12] USCIS 2012 Response to the Citizenship and Immigration Services Ombudsman 2012 Annual Report (May 2, 2013); http://www.uscis.gov/USCIS/Resources/Ombudsman%20Liaison/Responses%20to%20Annual%20Reports/USCIS%20Response%20to%20Ombudsman%202012%20Annual%20Report.pdf (accessed Jun. 12, 2013).

# Key Developments and Areas of Study

The Ombudsman's Report must include a "summary of the most pervasive and serious problems encountered by individuals and employers."[13]  The areas of study presented in this year's Report are organized as follows:

- **Humanitarian;**

- **Family and Children;**

- **Employment; and**

- **USCIS Customer Service.**

---

[13] Homeland Security Act of 2002 § 452(c)(1)(B).



# Humanitarian

U.S. immigration law offers humanitarian relief for immigrants in the most desperate of situations.  During this reporting period, DHS and USCIS sponsored key initiatives to combat violence against individuals and ensure protection for victims of human trafficking, domestic violence, and other crimes.  They demonstrated a willingness to exercise discretion on behalf of individuals seeking deferred action, most notably those brought to the United States as children. USCIS also took significant action in accepting the Ombudsman's recommendations on ways to improve the processing of unaccompanied children applying for asylum.  Extending this same commitment in the context of humanitarian reinstatement would provide meaningful relief for certain surviving immediate relatives.



# Victims of Abuse, Trafficking and Other Crimes

## Background

The Violence Against Women Act (VAWA), enacted in 1994, provides vital immigration protections for victims of trafficking and other violent crimes.[14] VAWA benefits include:  (1) VAWA self-petition (domestic violence victims); (2) the T visa (trafficking victims); and (3) the U visa (victims of specified crimes). DHS components, including USCIS, have implemented these protections.

On March 7, 2013, President Barack Obama signed the Violence Against Women Reauthorization Act of 2013 (VAWA 2013).[15] The reauthorization enhances protection for individuals seeking T and U nonimmigrant status. VAWA 2013 adds "stalking" as a potential basis for U nonimmigrant status; extends age-out protection to unmarried children of U visa petitioners; and strengthens the International Marriage Broker Regulation Act of 2005 by adding prohibitions and penalties for criminal acts involving children.

---

[14] Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322; *see also* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, and Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193.
[15] Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4.

The Blue Campaign, launched by Secretary Napolitano in 2010, is an example of a DHS-wide effort to coordinate and enhance anti-human trafficking efforts.[16] As a part of the Campaign, USCIS participated in training sessions for law enforcement agencies on certification for victims of trafficking or violence.[17]  USCIS has also collaborated with ICE's Homeland Security Investigations Victim Assistance Program and Law Enforcement Parole Unit to deliver training on trafficking and domestic violence to state and local police, immigration-focused non-governmental organizations, and a range of community-based organizations.[18]  In addition, USCIS hosted through the Vermont Service Center (VSC) VAWA Unit quarterly public outreach events. The Ombudsman actively contributed to the Blue Campaign's working group, providing subject matter expertise and hosting engagements.

## Ongoing Concerns

***Processing Times for Humanitarian Applications and Petitions.***  The Ombudsman has been monitoring processing times for T, U, and VAWA cases.  In 2012, USCIS processing times were seven months for T visa applications and nine months for U visa petitions.[19]  As of May 2013, USCIS processing times were four months for T visa applications, while U visa petitions were 15 months.[20]  As of this Report, USCIS is processing VAWA petitions filed before March 5, 2012, which means VAWA self-petitioners are waiting up to 19 months for a decision.[21]  The Ombudsman is concerned about extended processing times for these vulnerable populations, and will work with USCIS in an effort to improve this situation.  Ombudsman Odom traveled in April 2013 to the VSC, where these humanitarian petitions are adjudicated, to meet with service center leaders and staff to discuss processing times and other issues.

***Employment Authorization for Certain VAWA Beneficiaries and Asylum Applicants.***  On December 12, 2012, USCIS published a draft policy memorandum titled, *"Eligibility for Employment Authorization upon Approval of a Violence Against Women Act (VAWA) Self-Petition; and Eligibility for Employment Authorization for Battered Spouses of Certain Nonimmigrants."*[22]  The memorandum provides guidance on employment authorization eligibility for battered spouses of certain A, E, G, and H nonimmigrants.[23]

While stakeholders welcomed the much needed policy guidance, they raised concerns regarding the treatment of children of self-petitioners.  The authorizing statute includes the child of the self-petitioner under the definition of "VAWA self-petitioner," which stakeholders interpret to mean all rights and benefits granted to the self-petitioner extend also to the child.[24]  Contrary to this reading, the USCIS guidance excludes derivative children of a self-petitioner and requires that they request and receive deferred action before becoming eligible to receive employment authorization.[25]

Additionally, the policy guidance applies a limitation to nonimmigrants that is not found in the authorizing statute.  The memorandum instructs that employment authorization should be issued for a period of time equal to the remainder of the applicant's current period of authorized stay.[26]  This limitation does not appear in INA section 106, which allows the Secretary to authorize the foreign national spouse to engage in employment in the United States if during the marriage the nonimmigrant spouse or child was battered or had been the subject of extreme cruelty perpetrated by the spouse.[27]  The INA makes no mention of limiting the employment authorization to the duration of the applicant's nonimmigrant status.  At issue is the ability of an abusive A, E, G, or H nonimmigrant to either terminate the marriage or divest the victim of standing necessary to seek employment.

---

[16] DHS Webpage, "Fact Sheet: DHS Blue Campaign"; http://www.dhs.gov/fact-sheet-dhs-blue-campaign (accessed May 20, 2013).

[17] *Id.*

[18] *Id.*

[19] Ombudsman Annual Report 2012; http://www.dhs.gov/xlibrary/assets/cisomb-2012-annualreport.pdf (accessed May 20, 2013);

[20] USCIS Processing Time Information, "USCIS Processing Time Information for our Vermont Service Center" (Apr. 3, 2013); https://egov.uscis.gov/cris/processingTimesDisplay.do (accessed May 20, 2013).

[21] *Id.*

[22] USCIS Draft Policy Memorandum, "Eligibility for Employment Authorization upon approval of a Violence Against Women Act (VAWA) Self-Petition; and Eligibility for Employment Authorization for Battered Spouses of Certain Nonimmigrants" (Dec. 12, 2012); http://www.uscis.gov/USCIS/Outreach/Feedback%20Opportunities/Draft%20Memorandum%20for%20Comment/VAWA-Authorized-EADs-PM.pdf (accessed May 20, 2013).

[23] *Id.  See also* INA § 101(a)(15)(A), (E), (G), and (H). An "A" nonimmigrant visa is for a diplomat and foreign government official.  An "E" nonimmigrant visa is for a treaty trader and treaty investor.  A "G" nonimmigrant visa is for an employee of a designated international organization, and NATO.  An "H" nonimmigrant visa is for an employee of a specialty occupation in a field requiring highly-specialized knowledge.

[24] INA § 101(a)(51) defines a VAWA self-petitioner to include: the individual filing the petition, or the child of the individual filing the petition, who qualifies for relief under (A) (iii), (iv), or (vii) of section 204(a)(1)(A); (B)(ii) or (iii).

[25] *See supra* note 22.

[26] *Id.  See also* INA § 106, and Violence Again Women and Department of Justice Reauthorization Act of 2005 § 844, Pub. Law No. 109-162.

[27] INA § 106(a).

With regard to asylum applicants, on August 26, 2011, the Ombudsman issued a recommendation to improve coordination and communication related to the "asylum clock."[28] Subsequent litigation on this topic resulted in the federal court for the Western District of Washington on May 8, 2013, issuing an order preliminarily approving a settlement agreement in *A.B.T. et al. v. USCIS, et al.*[29] This nationwide class action lawsuit challenged the denial of work authorization to asylum seekers whose asylum applications remained pending for a period longer than 180 days.

The *ABT Settlement Agreement* changes the method by which USCIS and the Executive Office for Immigration Review (EOIR) calculate the 180-day waiting period before which an asylum applicant can apply for work authorization.[30] A Notice to Class Members describes eligible ABT class members, benefits provided, and how to bring a claim under the settlement agreement.[31]

***Requests for Evidence and VAWA Petitions.*** Stakeholders have raised concerns with USCIS Requests for Evidence (RFEs) in VAWA adjudications. VAWA self-petitioners bear the burden of proof to establish eligibility, and USCIS is required to consider "any credible evidence" submitted.[32] This evidentiary requirement recognizes that abusers often deny victims access to important documents in a deliberate attempt to stop victims from seeking assistance. To ensure that victims are afforded full protection under the law, USCIS adjudicators are specifically directed to, "give due consideration to the difficulties some [VAWA] self-petitioners may experience in acquiring documentation, particularly documentation that cannot be obtained without the abuser's knowledge or consent."[33]

Stakeholders report that USCIS officers, in some cases, issue VAWA applicants RFEs that ask for the type of primary documentation used to prove a good faith marriage in non-VAWA cases (e.g., original marriage certificates, joint bank account statements, etc.). Such RFEs request evidence of a nature and type that is *not* required under the relevant regulations – thereby holding VAWA applicants to a higher standard of proof than is actually required by the applicable law. Such requests add additional processing time to already backlogged VAWA adjudications – time during which, in many circumstances, VAWA applicants are unable to obtain employment authorization.

***U Nonimmigrant Derivatives and Age-Out Provisions.***
On December 12, 2012, USCIS published for comment an interim policy memorandum titled, *"Age-Out Protection for Derivative U Nonimmigrant Status Holders: Pending Petitions, Initial Approvals, and Extensions of Status."*[34] Pursuant to the original U visa legislation, qualifying crime victims may request derivative status for certain relatives, such as unmarried sons or daughters who are under 21.[35] For many years, qualified derivatives who turned 21 during the processing of their request for U status lost eligibility for relief. USCIS's interim policy memorandum sought to address this problem, but has since been rendered moot by VAWA 2013, which protects derivatives as long as a U petition was filed on their behalf prior to the individual turning 21 years old.[36] The Ombudsman urges USCIS to issue updated guidance and regulations.

---

[28] Ombudsman Recommendation 50, "Employment Authorization for Asylum Applicants" (Aug. 26, 2011); http://www.dhs.gov/ombudsman-recommendation-employment-authorization-asylum-applicants (accessed May 20, 2013).

[29] *A.B.T. et al. v. U.S. Citizenship and Immigration Services*, No. 11-02108 (W.D. Wash. filed December 15, 2011).

[30] *Settlement Agreement, B.H., et al. v. United States Citizenship and Immigration Services, et al.*, No. CV11-2108-RAJ (W.D. Wash. 2013); http://legalactioncenter.org/sites/default/files/60-1_Settlement%20Agreement.pdf (accessed May 20, 2013).

[31] *Class Notice, B.H., et al. v. United States Citizenship and Immigration Services, et al.*, No. CV11-2108-RAJ (W.D. Wash. 2013); http://legalactioncenter.org/sites/default/files/Class%20Notice%20to%20be%20posted%20by%20plaintiffs%205-9-13%20FIN.pdf (accessed May 20, 2013).

[32] Victims of Trafficking and Violence Protection Act of 2000 §§ 1504(a)(2)(D), 1505(b)(7)(B), and 1513(o)(4), P.L. 106-386, *see also* Violent Crime Control and Law Enforcement Act of 1994 § 40701(a)(3)(H), P.L. 103-322.

[33] INS Memorandum, "Implementation of Crime Bill Self-Petitioning for Abused or Battered Spouses or Children of U.S. Citizens or Lawful Permanent Residents" (Apr. 16, 1996).

[34] USCIS Interim Policy Memorandum, "Age-Out Protection for Derivative U Nonimmigrant Status Holders: Pending Petitions, Initial Approvals, and Extensions of Status" (Oct. 24, 2012); http://www.uscis.gov/USCIS/Outreach/Feedback%20Opportunities/Interim%20Guidance%20for%20Comment/U-Visa-Age-Out-Interim-PM.pdf (accessed May 20, 2013).

[35] *See supra* note 16 § 805(a)(7)(A): "CHILDREN- An unmarried alien who seeks to accompany, or follow to join, a parent granted status under section 101(a)(15)(U)(i), and who was under 21 years of age on the date on which such parent petitioned for such status, shall continue to be classified as a child for purposes of section 101(a)(15)(U)(ii), if the alien attains 21 years of age after such parent's petition was filed but while it was pending."

[36] Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, § 805 (2013).

*Employment Authorization for T Applicants and U Petitioners.* Stakeholders have expressed concern regarding the inability of T and U applicants to obtain work authorization. The regulations permit USCIS to make "*bona fide* determinations" in such case, which may form the basis for employment authorization.[37] According to stakeholders, USCIS rarely exercises this authority, which presents concerns given that processing times for U cases have increased to approximately 15 months. This creates a situation where applicants are unable to support themselves.

# Unaccompanied Children

## Background

The Immigration and Nationality Act (INA) and William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA)[38] afford procedural and substantive protections to unaccompanied alien children (UACs). By definition, UACs have no lawful immigration status in the United States, have not attained 18 years of age, and have no parent or legal guardian in the United States, or otherwise available to provide care and physical custody.[39] The TVPRA changed significantly the asylum process for UACs by shifting initial consideration of asylum claims filed in removal proceedings from the DOJ EOIR to USCIS.[40] The legislation further required promulgation of regulations "to govern both the procedural and substantive aspects of adjudicating [UAC] asylum claims."[41]

For children apprehended and placed into federal custody and Immigration Court proceedings, the CBP, ICE, EOIR, and the Department of Health and Human Services (HHS) all have a role in determining and validating UAC status. An individual with UAC status is eligible for certain public benefits and protections in the United States. In order to make a UAC determination, the responsible office must interview the child, often discussing potentially traumatic experiences. However, even after these agencies determine that the minor is a UAC, and USCIS accepts Form I-589, *Application for Asylum and Withholding of Removal,* USCIS had undertaken the practice of redetermining UAC status at subsequent asylum interviews with the child.

This procedure, with at times protracted supervisory and USCIS Asylum Division Headquarters review, has created delay and confusion. Rather than facilitating the expedited, non-adversarial interviews envisioned by Congress, the USCIS Asylum Division, as a matter of policy, has not accepted the original UAC finding by the Immigration Judge issued with ICE's consent or the USCIS Nebraska Service Center's (NSC's) jurisdictional determination rendered in advance of accepting Form I-589 (or ICE or CBP's prior UAC determination). Absent guidance, some USCIS asylum offices have identified and developed best practices to address sensitivities and challenges associated with UAC claims. In addition to the UAC redeterminations, issues include inadequate interviewing methods and approaches for UACs, difficulty rescheduling interviews, and a general misunderstanding of the roles and responsibilities of certain adults associated with UACs.

## Recommendations

On September 20, 2012, the Ombudsman recommended that USCIS:

1) Accept jurisdiction of UAC cases referred by the EOIR;

2) Accept jurisdiction of cases filed by children in federal custody under the HHS;

3) Follow established UAC-specific procedures, expand implementation of certain best practices, and enlist clinical experts for quality assurance and training. More specifically, USCIS should:

   a) Establish points of contact for the public to improve communication, coordination, and problem solving;

   b) Pre-assign UAC cases to officers with specialized knowledge and skills; and

   c) Contract with clinical experts adept at interviewing vulnerable children as part of an ongoing quality assurance and training component of the UAC asylum program;

4) Limit headquarters review to a process that can be managed within 30 days; and

5) Issue as soon as possible regulations regarding the UAC asylum process.

---

[37] 8 C.F.R. § 214.11(a).

[38] William Wilberforce Trafficking Victims' Protection Reauthorization Act of 2008 (TVPRA) § 235(d)(8), Pub. L. No. 110-457.

[39] William Wilberforce Trafficking Victims' Protection Reauthorization Act of 2008 (TVPRA) § 235(d)(8), Pub. L. No. 110-457; see also USCIS Webpage, "Questions and Answers: USCIS Initiates Procedures for Unaccompanied Children Seeking Asylum" (Mar. 25, 2009); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=b3b6040faa930210VgnVCM1000004718190 aRCRD&vgnextchannel=68439c7755cb9010VgnVCM10000045f3d6a1RCRD (accessed May 20, 2013).

[40] INA § 208(b)(3)(C).

[41] *See supra* note 38.

## USCIS Response

On April 11, 2013, USCIS responded to the Ombudsman's formal recommendations, stating the agency will adopt UAC determinations made for custody purposes by CBP and ICE.[42] This new policy will positively affect all minors apprehended and placed into federal custody with the HHS, helping to ensure a consistent process for scores of children who seek asylum in the United States. The agency further agreed to follow established UAC procedures, designate points of contact for the public, implement measures to improve the quality and consistency of UAC adjudications, and limit the amount of time cases may be held under review by headquarters' staff. USCIS also stated its intent to issue statutorily mandated regulations regarding the UAC asylum process. The agency declined to pre-assign UAC cases to specially-trained officers.

## Ongoing Concerns

USCIS has taken concrete steps to address many of the Ombudsman's UAC recommendations. It is important for USCIS to commit to timely implementation of its new policy with meaningful training and quality control.

# Special Immigrant Juveniles

## Background

Abused, abandoned or neglected children without immigration status may obtain permission to remain lawfully in the United States through the Special Immigrant Juvenile (SIJ) program.[43] During the past two years, the Ombudsman has shared feedback, requests for assistance, and other concerns regarding the processing of SIJ cases with USCIS. The agency has demonstrated a willingness to address ongoing problems and to intervene as appropriate to resolve pending matters.

Ombudsman outreach in 2010 and 2011 indicated that stakeholders were encountering numerous problems related to SIJ adjudications, including protracted processing times, inadequate interviewing techniques and adjudications, and burdensome or intrusive RFEs relating to underlying juvenile dependency orders. Stakeholders further experienced inconsistent procedures to request expedited review, as well as fee-waiver request denials for cases with *prima facie* evidence of juvenile dependency.

## Recommendations

On April 15, 2011, the Ombudsman published a recommendation titled, *"Special Immigrant Juvenile Adjudications: An Opportunity for Adoption of Best Practices,"*[44] which called on USCIS to:

1) Standardize its practices of:

    a) Providing specialized training for those officers adjudicating SIJ status;

    b) Establishing dedicated SIJ units or points of contacts at local offices; and

    c.) Ensuring adjudications are completed within the statutory timeframe;

2) Cease requesting the evidence underlying state court determinations of foreign child dependency; and

3) Issue guidance, including agency regulations, regarding adequate evidence for SIJ filings, including general criteria for what triggers an interview for the SIJ petition, and make this information available on the USCIS website.

---

[42] USCIS Policy Memorandum, "Updated Procedures for Determination of Initial Jurisdiction over Asylum Applications Filed by Unaccompanied Alien Children," (May 28, 2013); "Updated Service Center Operations Procedures for Accepting Forms I-589 Filed by Unaccompanied Alien Children," (Jun. 4, 2013); http://www.uscis.gov/USCIS/Humanitarian/Refugees%20&%20Asylum/Asylum/Minor%20Children%20Applying%20for%20Asylum%20By%20Themselves/service-ctr-ops-proced-accepting-form-i589-unaccompanied-alien-children.pdf (accessed Jun. 4, 2013).

[43] INA § 101(a)(27)(J); 8 C.F.R. § 204.11.

[44] Ombudsman Recommendation 47, "Special Immigrant Juvenile Adjudications: An Opportunity for Adoption of Best Practices" (Apr. 15, 2011); http://www.dhs.gov/xlibrary/assets/Citizenship-and-Immigration-Services-Ombudsman-Recommendation-Special-Immigrant-Juvenile-Adjudications.pdf (accessed May 20, 2013).



established internal, regional points of contact (POCs) for SIJ cases. These POCs are available to answer questions and provide assistance to USCIS field office personnel. They also work with USCIS Headquarters to update guidance and monitor expedite requests.

USCIS concurred with the recommendation to maintain adjudications within the statutory timeframe.[49]  Monthly reports of all pending SIJ cases are generated and USCIS regional office POCs work with field offices to monitor and complete adjudication-ready cases. Pursuant to the *Perez-Olano Settlement Agreement*, USCIS has also established a dedicated email account to receive complaints related to timely processing. USCIS stated in December 2012 that they had received no complaints through the account, although at the time of reporting, the email address did not appear available on the USCIS webpage.

USCIS noted that it "appreciate[s] that there is a delicate balance between the role of the state juvenile court providing for the best interest of the child and the role of USCIS in ensuring the immigration benefit is granted properly."[50] USCIS further stated that orders lacking specific findings may not be sufficient, and may need to be supplemented by separate findings or other relevant evidence to establish the factual basis for the order. USCIS indicated that it would examine ways to communicate with state courts through the DOJ, provide court personnel information regarding SIJ cases, and clarify the type of language USCIS requires in state court decisions. Since the response in 2011 and in this reporting period, USCIS has completed several in-person trainings for state juvenile attorneys and social workers, and stated that it remains committed to continuing this type of outreach.

USCIS concurred with the recommendation to issue new guidance. On September 6, 2011, USCIS issued a Notice of Proposed Rulemaking (NPRM) for the SIJ program.[51]

## USCIS Response

In 2011, USCIS agreed in part with the recommendations, concurring as to the need for standardization, and noting that the agency "has already provided extensive training …."[45]  This training was delivered to 235 agency employees and discussed eligibility for SIJ status, potential forms of relief, and related processes. It further examined legislative developments from the Trafficking Victims Protection Reauthorization Act of 2008, and SIJ litigation, including the *Perez-Olano, et al. v. Holder, et al.*, Settlement Agreement.[46] USCIS indicated it was contemplating future training initiatives, such as a program on child-sensitive interviewing techniques.

USCIS disagreed with the recommendation to establish local points of contact, stating that the limited number of SIJ cases annually (1,484 in FY 2009 and 1,879 in FY 2010) makes "specific SIJ units, or a dedicated SIJ-officer within each field office, impractical."[47]  USCIS also noted its position that properly trained immigration officers, with appropriate supervision, are capable of handling SIJ adjudications.[48] Furthermore, USCIS stated that in FY 2010, the agency

---

[45] USCIS Memorandum, "Response to Recommendation 47, Special Immigrant Juvenile (SIJ) Applications: An Opportunity for Adoption of Best Practices" p. 2 (Jul. 13, 2011); http://www.uscis.gov/USCIS/Resources/Ombudsman%20Liaison/Responses%20to%20Formal%20Recommendations/cisomb-2011-response47.pdf (accessed May 20, 2013).

[46] *Perez-Olano, et al. v. Holder, et al*, CV 05-3604 (C.D. Cal. 2005).  *See generally* USCIS Memorandum, "Implementation of the Special Immigrant Juvenile Perez-Olano Settlement Agreement" (Apr. 4, 2011); http://www.uscis.gov/USCIS/Laws/Memoranda/2011/April/perez-olano-settlement.pdf (accessed May 20, 2013). The memorandum addresses how, in light of the class action settlement filed on behalf of SIJs, the agency will handle certain motions, post statistics and respond to requests to "rely on the original juvenile court order to establish the current statutory requirement of non-viability of reunification with one or both parents due to abuse, neglect, abandonment, or a similar basis found under State law."

[47] *See supra* note 45 at p. 4.

[48] *Id.*

[49] The agency noted in its response that the 180-day requirement does not relate to the adjustment of status application, and does not include the days between a missed appointment and a rescheduled one, or the days between when USCIS sends an RFE and the date the petitioner responds to an RFE. *See supra* note 45 at p. 4.

[50] *See supra* note 45.

[51] "Special Immigrant Juvenile Petitions," 76 Fed. Reg. 54978 (Sept. 6, 2011).

## Ongoing Concerns

Over this reporting period, stakeholders periodically reported noncompliance by USCIS with the mandatory 180-day processing time for SIJ petitions, often by a significant margin.  Stakeholders encounter persistent problems with specific USCIS field offices applying varying standards of proof, notwithstanding agency efforts to conduct remedial outreach and training.  Frustration emerging from such experiences has led some applicants to propose that SIJ cases be handled by a specialized unit, such as the VSC VAWA Unit.

To date, stakeholders continue to report receiving RFEs related to state court orders that clearly explain the underlying facts and rationale for dependency findings.  They further indicate that USCIS adjudicators question declaratory judgments and require additional information related to state court orders, even when such information is under court seal and can be burdensome to obtain.[52]  Stakeholders report unwarranted delays and Notices of Intent to Deny (NOID) that are not supported by the facts of their case.[53]

> *Case Example:  A County Judge found that a juvenile foreign national had been abused, abandoned, or neglected by his parents and issued a guardianship order.  Through counsel, the child filed a Form I-360, Petition for Amerasian, Widow(er) or Special Immigrant, with USCIS.  Although the petition included the court order from the County Judge, USCIS requested a copy of the court transcripts to evaluate the order.  The child's attorney provided copies of the court transcript.  While awaiting a decision, the attorney contacted the Ombudsman for assistance because he believed the request for the court transcripts was inappropriate.  The Ombudsman contacted USCIS and the petition was approved.*

The Ombudsman continues to monitor cases from the field and work with USCIS leaders to improve the processing of SIJ petitions.

Upon receiving similar and ongoing inquiries involving SIJ cases throughout 2012, the Ombudsman initiated discussions with leaders in the USCIS Field Operations Directorate.  These officials have been instrumental in resolving and forging more effective communications related to SIJ concerns.  The Ombudsman was invited to participate in training calls and looks forward to that opportunity in 2013, when USCIS formalizes these trainings.  Additionally, concerns pertaining to fee waivers are being addressed on a case-by-case basis with relevant agency intake and service center officials.

# Discretionary Relief and Deferred Action for Childhood Arrivals

## Background

Deferred action is an exercise of agency discretion to allow an individual to remain with authorization in the United States without fear of removal.[54]  It has been used since the 1970s to address compelling circumstances involving removable noncitizens.[55]

Factors to be considered in evaluating a request for deferred action include, but are not limited to, the presence of sympathetic or compelling factors related to the applicant's health, ability to travel, home country conditions, family ties and length of time in the United States, history of employment and/or community service, military service, and overall priority for, as well as the likelihood of, removal.[56]  Deferred action may be granted and/or extended for any period of time deemed necessary to address the circumstances presented, and has typically been granted



---

[52] Information provided by stakeholders to the Ombudsman (Aug. 23, 2012).

[53] Information provided by stakeholders to the Ombudsman (Sept. 9, 2011; Dec. 20, 2011; Jan. 9, 2012; Feb. 15, 2012; Feb. 28, 2012).

[54] *See generally* INA § 103(a) (describing DHS Secretary's authority to enforce immigration laws).

[55] *See generally,* Shoba Sivaprasad Wadia, "Sharing Secrets: Examining Deferred Action and Transparency in Immigration Law," University of New Hampshire Law Review, Vol. 10, No. 1 (Jul. 2011).

[56] USCIS Memorandum, "Exercising Prosecutorial Discretion" HQOPP 50/4 (Nov. 17, 2000).

in one-year increments.  Once granted deferred action, a recipient can apply for, upon the showing of economic need, employment authorization for a period commensurate with the grant of deferred action.[57]

Long-standing agency guidance indicates that a request for deferred action should be made to the USCIS field office director.[58]  The request can be submitted in person during an InfoPass appointment or by mail.  A request for deferred action does not require payment of any fee but must include:

- An explanation in writing as to why the individual is seeking deferred action as well as supporting documentation;

- Any available primary or secondary proof of identity and nationality, including a birth certificate, a passport and/or identification card, notarized affidavit(s), school or medical records, etc.;

- A copy of any previously issued visa used by the individual to gain admission to the United States and evidence of such admission; and

- Two passport style photos.[59]

Where the individual requesting deferred action is represented, he or she should also submit a completed Form G-28, *Notice of Entry as Attorney or Accredited Representative*.[60]

## Recommendations

On April 6, 2007, the Ombudsman recommended that USCIS post general information on deferred action, maintain statistics on the issuance and denial of deferred action requests, and designate a headquarters official to review grants and denials of deferred action requests on a quarterly

basis to ensure that like cases are decided in a like manner.[61]  Over four years later, on July 1, 2011, the Ombudsman released a second recommendation on this topic, again urging USCIS to publish information describing deferred action, inventory pending requests at USCIS field offices, and establish internal processes and procedures to ensure the timely, consistent handling of requests for relief.[62]

USCIS stated that because deferred action is not an immigration benefit, but rather a case-specific (not categorical) exercise of prosecutorial discretion, the publication of processing times is not required.[63]

## Ongoing Concerns

Although USCIS previously committed to tracking deferred action requests,[64] the agency is currently unable to provide an inventory of requests and decisions.[65]  The Ombudsman remains concerned with USCIS's tracking of deferred action requests filed at its local field offices.

USCIS maintains limited information related to the processing of deferred action requests.  The agency does not monitor or track RFEs, the frequency or nature of interviews, or any other qualitative or quantitative aspects of deferred action decision-making.  As of March 7, 2012, USCIS did make available to all field offices a Standard Operating Procedure (SOP) for handling deferred action requests.  This internal SOP has not been made available to the public.[66]  Aside from the SOP, USCIS has offered no updated training for field, regional or headquarters staff on deferred action in general, or created any additional guidance materials.[67]  USCIS does not intend to post information on its public website on how to submit deferred action requests to a USCIS district office.[68]

---

[57] 8 C.F.R. § 274a.12(c)(14).

[58] *See supra* note 56.  See also INS, Operations Instructions, O.I. § 103.1(a)(1)(ii) (1975).

[59] Information provided by USCIS to the Ombudsman (Mar. 7, 2012).

[60] *Id.*

[61] Ombudsman Recommendation 32, "Recommendation from the CIS Ombudsman to the Director, USCIS" (Apr. 6, 2007); http://www.dhs.gov/xlibrary/assets/CISOmbudsman_RR_32_O_Deferred_Action_04-06-07.pdf (accessed May 20, 2013).

[62] Ombudsman Recommendation 48, "Deferred Action: Recommendations to Improve Transparency and Consistency in the USCIS Process" (Jul. 11, 2011); http://www.dhs.gov/xlibrary/assets/cisomb-combined-dar.pdf (accessed May 20, 2013).

[63] USCIS Response to Recommendation 48 (Oct. 27, 2011); http://www.uscis.gov/USCIS/Resources/Ombudsman%20Liaison/Responses%20to%20Formal%20Recommendations/cisomb-2011-response-48.pdf (accessed May 20, 2013).

[64] USCIS Response to Recommendation 48 (Oct. 27, 2011), p. 2; http://www.uscis.gov/USCIS/Resources/Ombudsman%20Liaison/Responses%20to%20Formal%20Recommendations/cisomb-2011-response-48.pdf (accessed Jun. 19, 2013).

[65] Information provided by USCIS to the Ombudsman (Jun 19, 2013).

[66] Information provided by USCIS to the Ombudsman (Mar. 7, 2012).

[67] Information provided by USCIS to the Ombudsman (Sept. 2012).

[68] *See supra* note 63.

**Deferred Action for Childhood Arrivals**

On June 15, 2012, Secretary Napolitano announced a special form of deferred action — Deferred Action for Childhood Arrivals (DACA) — for certain young people who were brought to the United States as children, do not pose a risk to national security or public safety, and meet established criteria. In a 60-day timeframe, USCIS made the Secretary's policy into an operational plan, effectively implementing many of the Ombudsman's past recommendations.

USCIS launched DACA as a "program" on August 15, 2012, accompanied by robust community engagement and well-crafted instructions for prospective filers.[69] USCIS also created Form I-821D, *Consideration for Deferred Action for Childhood Arrivals*.[70] The agency has tracked filing data, receipt issuance and decisions, and published results through its website.[71] The agency has also demonstrated through this program a commitment to training staff on how to render discretionary decisions. This level of internal and external information sharing and willingness to create and monitor filing receipts, processing protocols and timeframes is an example of best practices for administering deferred action and other forms of lawful discretionary requests submitted to USCIS every year.

# Reinstatement of Automatically Revoked Petitions

## Background

Certain immediate relatives whose family-based petitions are automatically revoked upon the death of the petitioner may request reinstatement, and USCIS, in its discretion, may grant such a request for humanitarian reasons.[72] Stakeholders have raised concerns that humanitarian reinstatement requests are considered a low priority by USCIS. There is no standardized method for submitting these requests. Once received, requests are subject to protracted processing times and have high rates of denial.[73] Starting in November 2012, USCIS began tracking humanitarian reinstatement requests. Prior to that, USCIS offices were not maintaining statistical records for these requests. *See Figure 6.*

| FIGURE 6:  HUMANITARIAN REINSTATEMENT REQUESTS | | | |
|---|---|---|---|
| **(November 2012 to May 2013)** | | | |
| **OFFICE** | **RECEIPTS** | **DENIED** | **APPROVED** |
| California Service Center | 2,644 | 1,101 | 136 |
| National Benefits Center | 10 | 0 | 0 |
| Vermont Service Center | 450 | 0 | 6 |
| **Total** | **3,104** | **1,101** | **142** |

*Source: Information provided by USCIS to the Ombudsman (May 20, 2013).*

[69] USCIS Webpage, "Consideration of Deferred Action for Childhood Arrivals Process" (Jan. 18, 2013); http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=f2ef2f19470f7310VgnVCM100000082ca60aRCRD&vgnextchannel=f2ef2f19470f7310VgnVCM100000082ca60aRCRD (accessed May 20, 2013).

[70] In implementing DACA, USCIS created and released a dedicated deferred action request form, which also requires individuals seeking relief to simultaneously submit the Form I-765, *Application for Employment Authorization*, with a fee of $380.00 plus a fee of $85 for biometrics capture.

[71] USCIS Webpage, "Data on Individual Applications and Petitions"; http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=1b52d725f5501310VgnVCM100000082ca60aRCRD&vgnextchannel=1b52d725f5501310VgnVCM100000082ca60aRCRD (accessed May 20, 0213).

[72] 8 C.F.R. § 205.1(a)(3)(i)(C).

[73] *See* Ombudsman Teleconference, *"Immigration Survivor Benefits under INA §204(l): A Conversation with USCIS"* (Jul. 27, 2011); http://www.dhs.gov/telecon-recap-survivor-benefits-under-ina-%C2%A7204l-conversation-uscis (accessed May 20, 2013).



The automatic revocation regulation applies to previously approved petitions or self-petitions filed under INA section 204 upon the death of a petitioner, unless:

1) The petition is deemed under 8 C.F.R. section 204.2(i)(1)(iv) to have been approved as a Form I-360, *Petition for Amerasian, Widow(er) or Special Immigrant*, under 8 C.F.R. section 204.2(b); or

2) USCIS determines, as a matter of discretion exercised for humanitarian reasons in light of the facts of a particular case, that it is inappropriate to revoke the approval of the petition.[74]

The burden of requesting humanitarian reinstatement rests with the principal beneficiary of the petition.[75]  Requests are typically submitted by letter to the district office an service center director who originally approved the petition or to the USCIS office responsible for adjudicating any related Form I-485, *Application to Register Permanent Residence or*

*Adjust Status*.[76]  This limited reinstatement possibility is the only means by which surviving relatives, who are not covered by INA section 204(l) or who were not married to a U.S. citizen, may continue to seek immigration benefits after the death of the petitioning relative.[77]

Reinstatement cannot be requested until after USCIS's approval of Form I-130, *Petition for Alien Relative*.  Such requests must be accompanied by Form I-864, *Affidavit of Support under Section 213A* of the Act, from a substitute sponsor, including documents evidencing favorable discretionary factors.  The Adjudicator's Field Manual (AFM) Ch. 21.2(h)(1)(C) states that the discretionary authority to reinstate a revoked petition should be applied in light of the following factors:

1) The impact of revocation on the family unit in the United States, especially on U.S. citizen or Legal Permanent Resident (LPR) relatives or other relatives living lawfully in the United States;

2) The beneficiary's advanced age or poor health;

3) The beneficiary's having resided in the United States lawfully for a lengthy period;

4) The beneficiary's ties to his or her home country; and

5) Significant delay in processing the case after approval of the petition and after a visa number has become available, if the delay is reasonably attributable to the government, rather than the individual.[78]

USCIS has published general guidance regarding how to request humanitarian reinstatement.  The AFM at Ch. 21.2(h)(1)(C) states:

> [T]o request humanitarian reinstatement of a revoked petition, the beneficiary should send a written request for reinstatement to the USCIS service center or field office that approved the

---

[74] 8 C.F.R. § 205.1 (a)(3)(i)(C)(2).  Also, as will be discussed in greater detail in the Family and Children section, at page 22 of this Report, the plain language of §204(l) obviates the need for covered beneficiaries to seek humanitarian reinstatement because it preserves petitions "immediately prior to the death" of the qualifying relative.

[75] The principal beneficiary requesting humanitarian reinstatement must further establish that a person related to him or her in one of the ways described in INA § 213A(f)(5)(B) is willing and able to file an affidavit of support under 8 C.F.R. § 213a as a substitute sponsor, in addition to establishing humanitarian factors described in the Adjudicator's Field Manual (AFM) Ch. 21.2(h)(1)(C); http://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-3481/0-0-0-3513.html#0-0-0-387 (accessed May 20, 2013).

[76] AFM Ch. 21.2(h)(1)(C); http://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-3481/0-0-0-3513.html#0-0-0-387 (accessed May 20, 2013).

[77] *See generally* Ombudsman Recommendation 55, "Improving the Adjudication of Applications and Petitions Under Section 204(l) of the Immigration and Nationality Act" (Nov. 26, 2012); http://www.dhs.gov/sites/default/files/publications/cisomb-improving-adjudication-under-ina-204l-11262012.pdf (accessed May 20, 2013).  Individuals seeking survivor benefits under INA §204(l) must have resided in the United States at the time of the qualifying relative's death, and at the time the immigration survivor benefit application is filed.  If unable to demonstrate such residence, survivors must seek humanitarian reinstatement under 8 C.F.R. § 205.1a(3)(iii)(C)(2).  Stakeholders report that many applicants covered by INA §204(l) are nonetheless required by USCIS to establish their eligibility for humanitarian reinstatement under 8 C.F.R. § 205.1(a)(3)(iii)(C)(2).  The widows and widowers of U.S. citizens are allowed to continue seeking immigration benefits after the death of the petitioner under separate provisions of INA § 201(b)(2)(A)(i).

[78] *See supra* note 71.

petition except that, if the beneficiary has properly filed an application for adjustment with USCIS, the written request should be submitted to the USCIS office with jurisdiction over the adjustment application. The written request must include a   copy of the approval notice for the revoked petition, the death certificate of the petitioner (or other qualifying relative and, if required by section 213A of the Act and 8 CFR part 213a, a Form I-864 from a substitute sponsor and proof of the substitute sponsor's relationship to the beneficiary.[79]

USCIS has acknowledged that such requests often bounce back and forth between district and service centers due to confusion regarding jurisdiction.

## Ongoing Concerns

Stakeholders report that, in practice, factors considered in reinstatement decisions appear to vary depending on where requests are adjudicated.[80]

USCIS local offices and stakeholders report that, because reinstatement requests are treated differently from standard filings with established receipt and processing protocols, they are difficult to track.  USCIS operations for almost all applications are organized by receipting centers called "lockboxes," where forms are processed and data is entered in a case management and tracking system.[81]  However, humanitarian reinstatement requests are not processed through the lockbox system.[82]

Although USCIS has made meaningful progress in tracking humanitarian reinstatement requests, there remains in some, stakeholders who file requests report that they are given little information regarding the review and processing of their cases.  There are no posted processing times or predictable procedures for submitting supplementary information.[83]

*Case Example:  Survivors and beneficiaries of a family petition filed a request for reinstatement with:  evidence of favorable humanitarian factors; an Affidavit of Support from a substitute relative; the relevant death certificate; and a descriptive brief.  On January 10, 2012, the family received an acknowledgment letter from USCIS stating, "[O]ur office processes this case type as our resources and priorities allow.  We do not have an estimated timeframe for how  long it may take to review your request."  Subsequently, the family submitted several follow-up requests, but USCIS did not take any further action on their request.  The survivor was scheduled for a January 2013 removal hearing before the Immigration Court.  Because  reinstatement would provide a basis for terminating proceedings before the Immigration Court, the family urgently needed a response from USCIS.  The Ombudsman made repeated inquiries to USCIS, and the agency responded in December 2012, stating that it would issue a request for evidence to the survivor, but it did not adjudicate the request by the January 2013 hearing date.*

## Conclusion

During this reporting period, USCIS has dedicated significant resources to humanitarian programs.  USCIS, in partnership with other DHS components, has worked to increase public awareness of trafficking and domestic violence, and the immigration relief available to these victims.  USCIS made meaningful strides to clarify policy guidance for some programs including UAC's. Other options, such as humanitarian reinstatement and deferred action, remain in need of attention and more uniform procedures.

---

[79] *See supra* note 71.

[80] One USCIS service center provides that requests should include documentation to identify and document the humanitarian reason for reinstatement.  Documentation may include: (1) Evidence of long-time residence and any equity in the United States; (2) Evidence of relationship to other family members with evidence of their immigration status in the United States; (3) Evidence of health-related factors that would establish the need for reinstatement; or (4) Evidence of current political or religious conditions in the beneficiary's country of origin that would indicate that the beneficiary would suffer if not permitted to immigrate to the United States.  This USCIS service center also requires evidence about the deceased petitioner's immigrant intent if the death occurred outside the United States.  USCIS Vermont Service Center, "VSC Stakeholders Meeting Questions" (Aug. 20, 2009).  One USCIS district office would not state particular criteria in response to a stakeholder question, and informed stakeholders that it was difficult to articulate the exact favorable and negative factors for reinstatement criteria because each case varies.  Stakeholders were advised that the reinstatement decision is solely within the agency's discretion.  USCIS Chicago District Office, "Midyear Stakeholders' Meeting" (Apr. 6, 2009).

[81] USCIS lockboxes are receipting centers for USCIS applications that handle fees and route applications.  They are run by contractor personnel and have a limited number of USCIS personnel attached to them to make decisions on fee waivers and other issues.  The USCIS lockboxes are currently located in Phoenix, AZ and Chicago, IL.

[82] AFM, Ch. 21.2(h)(1)(C) (2013); http://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-3481/0-0-0-3513.html#0-0-0-387 (accessed May 20, 2013).

[83] Ombudsman staff compiled notes during a USCIS Stakeholder Engagement, including a public Question and Answer session.  *See generally* USCIS Webpage, "Approval of Petitions and Applications after the Death of a Qualifying Relative" (Feb. 7, 2013); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=33189acaf228c310VgnVCM100000082ca60aRCRD&vgnextchannel=994f81c52aa38210VgnVCM100000082ca60aRCRD (accessed May 20, 2013).



# Family and Children

As set forth in two far-reaching recommendations issued by the Ombudsman this reporting year, USCIS has the opportunity to improve its processing of applications and petitions filed by surviving relatives, as well as spouses and children seeking to remove the conditions placed upon their permanent residence. Also, the agency implemented the Provisional Unlawful Presence Waiver Program, which will greatly reduce periods of family separation, and in a manner consistent with the Ombudsman's June 2010 recommendations announced centralized processing of certain waivers of inadmissibility.



# Applications and Petitions for Surviving Relatives

## Background

On October 28, 2009, Congress enacted INA section 204(l) to protect certain family and employment-based beneficiaries following the death of a qualifying relative.[84]

INA section 204(l) protects:

- Beneficiaries of a pending or approved immediate relative visa petition;

- Beneficiaries of a pending or approved family-based visa petition, including both the principal beneficiary and any derivative beneficiaries;

- Any derivative beneficiary of a pending or approved employment-based visa petition;

- Beneficiaries of a pending or approved refugee/asylee relative petition;

- Individuals admitted as derivative "T" or "U" nonimmigrants; and

- Derivative asylees.

Prior to the enactment of section 204(l), only widow and widowers of U.S. citizens could continue to seek immigration benefits after the death of the qualifying relative.[85]

On December 16, 2010 – approximately 14 months after INA section 204(l) became law – USCIS issued a policy memorandum titled, "Approval of Petitions and Applications after the Death of the Qualifying Relative under new

---

[84] The DHS Appropriations Act of 2010, Pub. L. No. 111-83, created INA § 204(l) and added a new list of surviving relatives who may continue to seek immigration benefits after the death of a qualifying relative.  *See* Pub. L. No. 111-83, Title V, § 568(d).

[85] The pre-existing legal provision which provided relief to widows and widowers of U.S. citizens at INA § 201(b)(2)(A)(i) was revised in section 568(c)(1) of the DHS Appropriations Act of 2010 by deleting language requiring the beneficiary to have been married to the U.S. citizen for two years at the time of the citizen's death.

Section 204(l) of the Immigration and Nationality Act."[86] The guidance appears to undermine the purpose and plain language of section 204(l) by deeming previously approved petitions filed on behalf of covered beneficiaries automatically revoked and subject to reinstatement under 8 C.F.R. section 205.1(a)(3)(iii)(C)(2).

Congress enacted INA section 204(l) on October 28, 2009, to allow additional classes of surviving relatives to continue to seek immigration benefits. The automatic revocation of family-based petitions upon death of the petitioning relative was established by USCIS regulation, 8 C.F.R. section 205.1(a)(3)(C). The only remedy for automatic revocation is a discretionary humanitarian reinstatement that a family-based beneficiary may request under 8 C.F.R. section 205.1(a)(3)(C)(2). These regulations pre-dated the enactment of INA section 204(l).

Following the enactment of the legislation and the implementation of the USCIS policy memorandum, stakeholders report local and regional USCIS offices do not seem to understand INA section 204(l). Other cases suggest that some USCIS officers are either unaware of or disinclined to follow the agency's December 16, 2010 policy memorandum.

> *Case Example: An individual filed Form I-485, Application to Register Permanent Residence or Adjust Status, with evidence of a pending family-based petition on which she was a derivative. She provided evidence of coverage under section 204(l) and provided a copy of the USCIS policy memorandum. At the adjustment interview, the USCIS immigration services officer advised the individual that the application would be denied and incorrectly instructed that she should file a Motion to Reopen with the USCIS service center. The adjustment application was denied without mention of section 204(l), merely stating that since the petitioner had died the petition was terminated. The case was submitted to the Ombudsman for case assistance and proper application of section 204(l).*

## Recommendations

On November 26, 2012, the Ombudsman recommended that USCIS:

1) Conduct notice-and-comment rule making to create or designate a standard form, establish a receipt protocol and describe an adjudication process consistent with the plain language of INA section 204(l);

2) Train USCIS staff to interpret and apply properly INA section 204(l) and stop regarding survivor benefit requests as a form of discretionary reinstatement;

3) Publish instructions for applicants and petitioners as to the nature and extent of INA section 204(l)'s coverage and related benefit request processes; and

4) Track and monitor the processing of survivor benefit requests.

## USCIS Response

Following the issuance of the Ombudsman's recommendation, USCIS held two public engagements related to survivor benefits. The first took place on February 7, 2013, and was titled, *"Approval of Petitions and Applications after the Death of a Qualifying Relative."*[87] Agency representatives discussed INA section 204(l), self-petitions filed by widows/widowers of U.S. citizens and the reinstatement regulation.[88] They limited their comments to family-based applicants who may be eligible for relief under section 204(l). In doing so, they did not reference or otherwise discuss the December 16, 2010 policy memorandum, which is the sole administrative guidance on this topic. USCIS did describe the agency's application of the reinstatement process for INA section 204(l) beneficiaries. The speakers maintained that USCIS's authority with respect to INA section 204(l) cases is entirely discretionary.

Starting in November 2012, USCIS added an action code to its data system to account for 204(l) reinstatement requests. The code does not distinguish between a reinstatement request made under INA section 204(l) versus humanitarian reinstatement per 8 C.F.R. section 205.1(a)(3)(i)(C).

The Ombudsman's recommendation noted that the USCIS interpretation affords the revocation and reinstatement regulation greater weight than the subsequently enacted statute.[89]

---

[86] USCIS Memorandum, "Approval of Petitions and Applications after the Death of the Qualifying Relative under New Section 204(l) of the Immigration and Nationality Act" (Dec. 16, 2010); http://www.uscis.gov/USCIS/Laws/Memoranda/2011/January/Death-of-Qualifying-Relative.pdf (accessed May 20, 2013).

[87] USCIS Webpage, "Approval of Petitions and Applications after the Death of a Qualifying Relative" (Feb. 7, 2013); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=33189acaf228c310VgnVCM100000082ca60aRCRD&vgnextchannel=994f81c52aa38210VgnVCM100000082ca60aRCRD (accessed May 20, 2013).

[88] *Id.*

[89] Ombudsman Recommendation 55, "Improving the Adjudication of Applications and Petitions Under Section 204(l) of the Immigration and Nationality Act" (Nov. 26, 2012); http://www.dhs.gov/sites/default/files/publications/cisomb-improving-adjudication-under-ina-204l-11262012.pdf (accessed May 20, 2013).

During a second public engagement on February 26, 2013, titled, *"Provisional Unlawful Presence Waiver Process,"* USCIS staff reviewed this new waiver program for immediate relatives.  In the context of section 204(l), eligibility for a provisional waiver may be established through a deceased but previously qualifying relative.[90]  However, USCIS speakers indicated that eligible applicants must have a living, qualifying relative.[91]  This representation is at odds with the statute, as well as USCIS's December 16, 2010 policy memorandum, which correctly states that waivers of inadmissibility may be granted even if the qualifying relationship that would have supported the waiver ended through death.[92]

USCIS responded to the Ombudsman's recommendations on June 3, 2013.[93]  The Ombudsman is unable to fully review in this Report USCIS's response which was due February 26, 2013.

## Ongoing Concerns

Stakeholders continue to report the misapplication of INA section 204(l) at local and regional USCIS offices.  As stated earlier, USCIS staff, in accordance with the agency's December 16, 2010 policy memorandum, subject previously approved petitions under section 204(l) to automatic revocation.  Thus, they require survivors to undergo the long and difficult process of requesting humanitarian reinstatement.  USCIS's stated position with regards to approved petitions undermines the plain language of INA section 204(l).

# Petitions to Remove Conditions on Residence

## Background

On February 28, 2013, following almost two years of research and outreach to concerned stakeholders, the Ombudsman published recommendations aimed at improving USCIS's processing of Form I-751, *Petition to Remove Conditions on Residence.*[94]  Key problems identified in the recommendation include:  ineffective notice and barriers to securing information, including proof of status; inefficient processes and inconsistent adjudications; a lack of sensitivity and awareness of legal requirements (especially concerning waivers) by some USCIS adjudicators; and inadequate electronic systems in use to support the processing of Form I-751 petitions.

Since the passage of INA section 216, the former Immigration and Naturalization Service (INS) and USCIS have issued more than a dozen guidance documents related to this case type.  Only two appear on the agency's public website under the topic of "Conditional Residence."[95]  The AFM lacks comprehensive, up-to-date information on policies and procedures associated with Form I-751 adjudications.  Petitioners and their representatives find it difficult to discern which I-751 guidance remains in effect and how to ensure its proper application.  USCIS adjudicators, in turn, face considerable challenges understanding and applying the universe of I-751 policies and procedures.  When such guidance is misapplied, spouses and children seeking immigration benefits and services may encounter a range of undue burdens, including placement into removal proceedings.

> *Case Example:  The Ombudsman received a request for assistance from an individual in removal proceedings who was seeking proof of status after USCIS denied her jointly-filed Form I-751.  She first appeared at a district office in April 2012 to obtain a temporary I-551 stamp in her passport so she could work, as the law permits, while in proceedings.  Following her attorney's advice, she brought to the InfoPass appointment copies of relevant agency guidance, including the August 6, 1996 INS Memorandum.[96]  The USCIS officer refused to issue proof of status despite the guidance.  Repeated contact with the district by the Ombudsman eventually resulted in issuance of the temporary I-551 stamp in December 2012.*

---

[90] *See supra* note 84.

[91] Ombudsman Teleconference Recap, "Survivor Benefits under INA § 204(l): A Conversation with USCIS"; http://www.dhs.gov/telecon-recap-survivor-benefits-under-ina-%C2%A7204l-conversation-uscis (accessed May 20, 2013).

[92] *See supra* note 84.

[93] USCIS Response to Recommendation 55, (Jun. 3, 2013).

[94] Ombudsman Recommendation 56, "Improving the Process for Removal of Conditions on Residence for Spouses and Children" (Feb. 28, 2013); http://www.dhs.gov/publication/improving-process-removal-conditions-residence-spouses-and-children (accessed May 20, 2013).  In FY 2012, USCIS received 172,786 Form I-751 petitions.  Of those, 132,537 were approved at USCIS service centers, 4,514 were denied at the service centers, and 18,529 were transferred by service centers to local offices for interviews.

[95] USCIS Memorandum, "I-751 Filed Prior to Termination of Marriage" (Apr. 3, 2009) and USCIS Memorandum, "Delegation of Authority to Service Center Directors to Adjudicate Form I-829, Petition by Entrepreneur to Remove Conditions; Adjudication of Form N-400, Application for Naturalization when a Form I-829 is Still Pending; AFM Update: Chapter 25.2" (Dec. 21, 2006);

[96] INS Memorandum, "Legal Opinion: Status of a conditional permanent resident after denial of the I-751 during pendency of review by EOIR" (Aug. 6, 1996).

## Recommendations

To address difficulties associated with the processing of Form I-751 petitions, the Ombudsman recommended that USCIS:

1) Provide timely, effective and accurate notice to petitioner(s) and their attorneys or accredited representatives on I-751 receipt, processing and adjudication requirements and decisions;

2) Ensure AFM Chapter 25 is updated, accurate and complete, or create a superseding source of consolidated information for I-751 adjudications; and

3) Train USCIS staff to apply the updated AFM or superseding guidance with an emphasis on waiver standards and procedures.

## USCIS Response

USCIS's response to the Ombudsman's recommendations was due on May 28, 2013.

## Ongoing Concerns

Stakeholders, along with USCIS employees in service centers and district offices, have called for remedial action to resolve the range of problems related to Form I-751 adjudications discussed in the Ombudsman's recommendations.

# Provisional and Other Waivers of Inadmissibility

## Background

In 1996, Congress enacted what have come to be called the "three- and ten-year bars."[97]  An individual seeking a waiver of either the three- or ten-year bar must demonstrate to the satisfaction of the Secretary that refusal of admission would result in extreme hardship to a qualifying relative as a matter of law and in the exercise of discretion.[98]  Until June 4, 2012, waivers of the three- and ten-year bars could only be sought by applicants who had left the United States to apply for an immigrant visa at the DOS consulate abroad. This led to lengthy periods of family separation since waiver processing took months, if not years, to complete.[99]

Many applicants with close family ties in the United States have been dissuaded from seeking LPR status due to the unlawful presence bars.  After residing in the United States for many years, others may have traveled abroad for what they hoped would be a temporary period, only to have encountered prolonged adjudication delays, or been denied a waiver request.  While remaining abroad, the applicant's sole recourse was to file an appeal with the USCIS Administrative Appeals Office (AAO), where, in 2012, processing times for this particular application type were as long as 26 months.[100]  Even individuals approved for such waivers abroad may have been forced to endure separation from relatives for six months to one year.[101]  Under prior waiver procedures, these applicants had no choice but to travel overseas to complete their application for an immigrant visa.[102]

## Recommendations

For many years, stakeholders have reported concerns to the Ombudsman about unpredictable and protracted processing times and inconsistent adjudication of inadmissibility waivers, particularly those filed on Form I-601, *Application for Waiver of Grounds of Inadmissibility*.  As a result, on June 10, 2010, the Ombudsman recommended that USCIS:

1) Centralize Form I-601 processing;

2) Allow applicants to concurrently filed Form I-601 and Form I-130, *Petition for Alien Relative*;

---

[97] Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208.  INA § 212 (a)(9)(B)(i)(I) is known commonly as the three-year bar, referring to the time an individual is barred from returning to the United States.  It is triggered by 180 days or more of unlawful presence and a departure from the United States, followed by seeking readmission.  INA § 212(a)(9)(B)(i)(II) is commonly known as the 10-year bar, which is triggered by one year or more of unlawful presence and a departure from the United States, followed by seeking readmission.

[98] INA § 212(a)(9)(B)(v).  A qualifying relative is a U.S. citizen or an LPR spouse or parent of the immigrant seeking a waiver of inadmissibility.

[99] USCIS Webpage, "Transition to Centralized Form I-601 Filing" (May 31, 2012); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=6ba6cf1cfaf77310VgnVCM100000082ca60aRCRD&vgnextchannel=e0b081c52aa38210VgnVCM100000082ca60aRCRD (accessed May 20, 2013).  At the time of the Ombudsman 2010 recommendations, average processing time for referred cases (those not readily approvable upon filing) were 10-12 months.  *See* Ombudsman Recommendation 45, "Processing of Waivers of Inadmissibility" (June 10, 2010); http://testdhsgov.edgesuite.net/xlibrary/assets/cisomb_waivers_of_inadmissibility_recommendation.pdf (accessed Apr. 29, 2013).

[100] USCIS Webpage, "AAO Processing Times" (May 10, 2013); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=8ff31eeaf28e6210VgnVCM100000082ca60aRCRD&vgnextchannel=dfe316685e1e6210VgnVCM100000082ca60aRCRD (accessed May 20, 2013).  AAO published processing times are called current when they take six months from date of receipt at the AAO until date of decision.  The time period between receipt of the I-601 appeal at the USCIS office and receipt at AAO is not recorded in this formula.  The I-601 waiver appeals had published processing time of 26 months in March 2012, although that was reduced to "current" by March 2013.

[101] *See also* USCIS Webpage, "USCIS to Centralize Filing and Adjudication for Certain Waivers of Inadmissibility in the United States" (May 23, 2012); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextchannel=68439c7755cb9010VgnVCM10000045f3d6a1RCRD&vgnextoid=8e5b8976a0a77310VgnVCM100000082ca60aRCRD (accessed May 20, 2013).

[102] INA § 245(a) and (c).

3) Prioritize the finalization of the overseas case management system, already under development, to ensure accurate statistical reporting on Form I-601, to  allow processing times to be posted, and to enable customers to track a Form I-601 application via the "My Case Status" feature on the USCIS website;

4) Publish clear instructions for customers seeking expedited waiver processing;

5) Increase coordination between the DOS and USCIS officers who work with I-601 waivers; and

6) Allow USCIS employees to request digitized A-Files upon receipt of interview schedules.[103]

## USCIS Response

USCIS concurred and implemented most of the Ombudsman's recommendations.  This section highlights these changes, along with new policy initiatives that promise to improve consistency and minimize delays for applicants and their families.

***Centralized U.S. Filing of Overseas Immigrant Waivers.*** Effective June 4, 2012, USCIS began accepting through its Phoenix Lockbox waivers of inadmissibility filed by applicants overseas, and shifted the adjudication of such requests to the NSC.[104]  This centralized filing and adjudication in the United States applies to all Forms I-601, as well as I-212, *Application for Permission to Reapply for Admission into the United States After Deportation or Removal*, including related motions and appeals.   USCIS announced in its May 31, 2012 Public Engagement, *"Transition to Centralized Form I-601 Filing,"* that the agency hoped to adjudicate these waivers within three months of receipt.[105]

***Provisional Unlawful Presence Waiver Process.*** On January 9, 2012, USCIS announced its plan to adjudicate provisional waivers of unlawful presence for certain immediate relatives living in the United States.[106]  After publishing proposed and final regulations, the agency began implementing this new initiative on March 4, 2013.[107]  Stakeholders hailed this critical to preserving family unity.  Provisional unlawful

presence waivers are available to immediate relatives who can demonstrate extreme hardship to a U.S. citizen spouse or parent.  If any grounds of inadmissibility applies other than INA section 212(a)(9)(B), the program is not available.

## Ongoing Concerns

Many commenting on the proposed regulation have urged USCIS to extend provisional waiver coverage to family preference categories.[108]  Individuals in LPR status with strong family ties in the United States cannot seek a provisional waiver, and continue to face extended separations related to processing abroad.  USCIS has stated that the agency will consider expansion of the program after assessing its progress and operational impacts.[109]

In addition, those offering feedback on the proposed regulation requested that the government reconsider its decision precluding motions to reopen and appeals of provisional waiver decisions.[110]  Currently, only the government may reverse a provisional waiver denial decision by reopening the matter *sua sponte*.  Alternatively, the applicant may file an entirely new request with an additional fee.[111]

USCIS hosted 24 public engagements and provided useful educational materials related to the Provisional Unlawful Presence Waiver Process.[112]  In doing so, the agency successfully distinguished this initiative from the centralization of overseas waivers in the United States.

## Conclusion

The Ombudsman is committed to working with USCIS to improve processes that support and promote family unity. Over the next year, the Ombudsman will continue to monitor USCIS's handling of cases filed under INA section 204(l).

Centralized waiver filings and adjudications in the United States, along with the Provisional Unlawful Presence Waiver Process, offer examples of meaningful programs.  As such, both initiatives present creative and effective solutions to longstanding challenges in family immigration.

---

[103] Ombudsman Recommendation 45, "Processing of Waivers of Inadmissibility" (Jun. 10, 2010); http://www.dhs.gov/ombudsman-recommendation-processing-waivers-inadmissibility (accessed Apr. 17, 2013).

[104] USCIS lockboxes are receipting centers for USCIS applications that handle fees and route applications. They are run by contractor personnel but have a limited number of USCIS personnel attached to them to make decisions on fee waivers and other issues. The USCIS lockboxes are currently located in Phoenix, AZ and Chicago, IL.

[105] *Id.*

[106] Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives; Proposed Rule, 77 Fed. Reg. 19901 (Jan. 9, 2012).

[107] Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 78 Fed. Reg. 535-575 (Jan. 3, 2013) and Instructions USCIS Form I-601A, Application for Provisional Unlawful Presence Waiver; http://www.uscis.gov/files/form/i-601ainstr.pdf (accessed Apr. 22, 2013).

[108] Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 78 Fed. Reg. 535, 542 (Jan. 3, 2013).  Instructions USCIS Form I-601A, Application for Provisional Unlawful Presence Waiver.

[109] Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 78 Fed. Reg. 535 (Jan. 3, 2013).

[110] Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 78 Fed Reg. 535, 551-552 (Jan. 3, 2013).

[111] Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 78 Fed. Reg. 535 (Jan. 3, 2013).

[112] Information provided by USCIS to the Ombudsman (Apr. 24, 2013).



# Employment

U.S. immigration policy fosters economic growth, responds to labor market needs, and improves U.S. global competitiveness.  As Secretary Napolitano stated, "The United States must continue to attract the best and brightest from around the world to invest their talents, skills, and ideas to grow our economy and create American jobs."[113]  During this reporting period, USCIS initiatives sought to address concerns with Requests for Evidence, and the agency published new policy memoranda for the EB-5 Immigrant Investor Program.  Concerns remain regarding the quality and consistency of employment-based adjudications.



# Requests for Evidence

## Background

In prior Reports, the Ombudsman has discussed concerns raised by individuals and employers regarding the quality and consistency of adjudications, and what they characterize as inappropriate and unduly burdensome RFEs, particularly in employment cases.[114]

***USCIS Request for Evidence Project***. On April 12, 2010, Director Mayorkas introduced the Request for Evidence

Project, an initiative that engages stakeholders in the review and revision of service center RFE templates to ensure they are:  relevant to the classification being adjudicated; tailored to individual cases; and concise and clear.[115]  Some stakeholders have commented positively on the project, reporting that the quality of RFEs appear to be improving. For petitioners, the RFE templates act as a guide to preparing higher quality initial submissions, as the templates contain a list of supporting documents the agency typically expects to be provided with for various petition types.

---

[113] DHS Webpage, "Secretary Napolitano Announces Initiatives to Promote Startup Enterprises and Spur Job Creation" (Aug. 2, 2011); http://www.dhs.gov/news/2011/08/02/secretary-napolitano-announces-initiatives-promote-startup-enterprises-and-spur-job (Aug. 2, 2011).

[114] Ombudsman Annual Report 2012 (Jun. 2012), pp. 16-18; http://www.dhs.gov/xlibrary/assets/cisomb-2012-annualreport.pdf, and Ombudsman Annual Report 2011 (Jun. 2011), pp. 23-29; http://www.dhs.gov/xlibrary/assets/cisomb-annual-report-2011.pdf.

[115] USCIS Webpage, "Review and Revision of Request for Evidence Templates"; http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=95e92d40ee989210VgnVCM100000082ca60aRCRD&vgnextchannel=95e92d40ee989210VgnVCM100000082ca60aRCRD (accessed May 20, 2013).  The Service Center Operations Directorate (SCOPS) instituted the RFE Project email box (scopsrfe@uscis.dhs.gov) which allows stakeholders to bring what they feel are erroneous RFEs to SCOPS's attention.

Thus far, USCIS has reviewed and posted for public comment RFE templates for the following immigrant categories: Outstanding Professor and Researcher, and Multinational Executive and Manager; and nonimmigrant categories: F and M Student, J Exchange Visitor, L-1 Intracompany Transferee (Blanket Petition and L-1A Manager or Executive), and O, Extraordinary Ability or Achievement.[116] USCIS has not issued new RFE templates for two key nonimmigrant employment categories: H-1B Specialty Occupations and L-1B Intracompany Transferees with Specialized Knowledge.

### Validation Instrument for Business Enterprises (VIBE).

In February 2011, USCIS deployed VIBE at all four service centers to enhance the adjudication of employment-based petitions.[117] VIBE uses commercially available data from an independent information provider, currently Dun & Bradstreet, to validate basic information about petitioning companies or organizations. USCIS aims to use VIBE to reduce the need for companies and organizations to submit identical paper documentation with each petition to establish their current level of business operations. Some stakeholders find that contrary to VIBE's express purpose they continue to have to submit paper documentation with the initial filing and to receive RFEs. USCIS is unable to track VIBE-initiated RFEs at this time.

Beginning December 2012, a new VIBE release added enhancements to the system allowing designated service center personnel to add notes pertaining to a specific petitioner in the VIBE system. Comments must be vetted and approved by the VIBE team. USCIS officers are not required to request that comments be added in VIBE, but are encouraged to submit comments for vetting and approval.

USCIS officers are required to check VIBE if more than 60 days have passed since the last VIBE query was done. They are strongly encouraged to review the filing history in VIBE and the USCIS case management system before making a final adjudication.

### Entrepreneurs in Residence Initiative (EIR).

In October 2011, USCIS launched the EIR initiative to "harness industry expertise from the public and private sectors that will increase the job creation potential of employment-based and high-skilled visa categories."[118] Through the EIR initiative, USCIS enlisted experts from the private sector to advise on policies and practices related to "immigrant investors, entrepreneurs and workers with specialized skills, knowledge, or abilities."[119] The EIR initiative was launched as "part of a wider White House and DHS effort to grow the U.S. economy and create American jobs."[120]

In November 2012, USCIS unveiled the Entrepreneur Pathways Web portal, offering immigration resources to entrepreneurs.[121] USCIS lists EIR accomplishments on its website: hosting a workshop for USCIS employment-based immigration officers that focuses on entrepreneurs and the environment for startup companies and early-stage innovations; training a team of specialized immigration officers to handle entrepreneur, startup nonimmigrant visa cases; and modifying RFE templates for certain nonimmigrant visa categories to incorporate new sources of evidence related to entrepreneurs and startup companies into the adjudicative process.[122]

On May 8, 2013, Director Mayorkas released a summary of EIR progress over the past year. The Director also announced the expansion of EIR to cover the areas of performing arts,

---

[116] Id.

[117] See USCIS Webpage, "Validation Instrument for Business Enterprises (VIBE) Program" (Jan. 24, 2012); http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=521d735652f9d210VgnVCM100000082ca60aRCRD&vgnextchannel=521d735652f9d210VgnVCM100000082ca60aRCRD (accessed May 21, 2013).

[118] USCIS Webpage, "USCIS Announces 'Entrepreneurs in Residence Initiative'" (Oct. 11, 2011); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=bd537158910e2310VgnVCM100000082ca60aRCRD (accessed May 21, 2013); see also USCIS Webpage, "Entrepreneurs in Residence (EIR)" (Mar. 8, 2013); http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=d44eee876cb85310VgnVCM100000082ca60aRCRD&vgnextchannel=d44eee876cb85310VgnVCM100000082ca60aRCRD (accessed May 21, 2013).

[119] USCIS Webpage, "USCIS Announces 'Entrepreneurs in Residence Initiative'" (Oct. 11, 2011); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=bd537158910e2310VgnVCM100000082ca60aRCRD (accessed May 21, 2013).

[120] USCIS Webpage, "The Entrepreneur in Residence (EIR) Initiative"; http://www.uscis.gov/portal/site/uscis/menuitem.749cabd81f5ffc8fba713d10526e0aa0/?vgnextoid=6c89760c124a7310VgnVCM10000025e6a00aRCRD&vgnextchannel=6c89760c124a7310VgnVCM10000025e6a00aRCRD (accessed May 21, 2013).

[121] USCIS Webpage, "Entrepreneur Pathways: A Resource for Immigrant Entrepreneurs"; http://www.uscis.gov/portal/site/uscis/eir (accessed May 21, 2013).

[122] Supra note 120.

health care and information technology.[123]  The Ombudsman has observed EIR events but notes that it is difficult to measure the impact of the EIR initiative on the quality and consistency of USCIS employment-based adjudications.

***Adjudications and Supervisory Review.***  The USCIS CSC requires 100 percent supervisory review of all Form I-129, *Nonimmigrant Worker Petition*, Notices of Intent to Deny (NOIDs) and denial decisions prior to issuance.  The VSC requires 100 percent supervisory review of all Form I-129 denial decisions prior to issuance.  At both centers, supervisors conduct post-decision reviews through random monthly audits.  USCIS informed the Ombudsman that both service centers have implemented a periodic qualitative review of RFEs and other adjudication decisions to identify and address consistency issues, trends, and other factors related to performance and training needs.

***Adjudications Data.***  Below are RFE rates for select employment-based categories.  The quality of RFEs is not subject to numerical analysis and is more difficult to assess.  ***See Figure 7 on next page.***  Data include RFE statistics from FY 1995 through FY 2012 for the VSC and CSC for H-1B, L-1A and L-1B nonimmigrant visa petition categories.  Starting in 2007, the data show an increase in RFE rates for both L-1 nonimmigrant categories.

### Ongoing Concerns

Stakeholders continue to express concerns with the frequency and quality of RFEs.  As discussed in previous Reports,[124] employers complain of receiving RFEs that indicate a fundamental misunderstanding by USCIS of the employer's business, despite the submission of industry-standard documents to support petitions.  Stakeholders also question the need for detailed financial or operational information from companies that have a long history of previously approved petitions.  Others assert that they received RFEs seeking documents that were provided with original submissions.  Additional stakeholder concerns

pertaining specifically to USCIS policy and practice in the H-1B and L-1 categories are discussed below.

# H-1B Specialty Occupation and L-1 Intracompany Transferees

## Recommendations

In earlier Reports, the Ombudsman described problems related to H-1B Specialty Occupation and L-1 Intracompany Transferee Programs.[125]  Stakeholder concerns focused on USCIS policies that appear to subject small and start-up companies to heightened scrutiny.  These same concerns were expressed to the Ombudsman this reporting period.

***USCIS Policy Guidance:  H-1B Specialty Occupations.***  On January 8, 2010, USCIS issued a guidance memorandum titled, *"Determining Employer-Employee Relationship for Adjudication of H-1B Petitions, Including Third-Party Site Placements."*[126]  The agency instructed adjudicators to consider carefully petitions to determine whether there is a legitimate "employer-employee relationship."  It further authorized the use of RFEs if the initial submission failed to establish that the petitioner satisfies the "common law" element of control over the proposed beneficiary.  The memorandum also discussed the use of RFEs for filings by entrepreneurs that are characterized as "Self-Employed Beneficiaries."[127]  While there is no readily available data that measures the impact that this memorandum has had on H-1B adjudications, it serves as another basis for issuing RFEs.

On May 18, 2012, USCIS released to the public an internal 2008 policy memorandum titled, *"H-1B Anti-Fraud Initiatives—Internal Guidance and Procedures in Response to Findings Revealed in H-1B Benefit Fraud and Compliance Assessment."*[128]  The "H-1B Anti-Fraud Memorandum" was issued shortly after USCIS completed a Fraud Detection and National Security (FDNS) Directorate H-1B Benefit Fraud & Compliance Assessment (BFCA).[129]  The memorandum states:

---

[123] USCIS Webpage, "USCIS to Expand Entrepreneurs in Residence Initiative" (May 8, 2013); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=2b6be424ac48e310VgnVCM100000082ca60aRCRD&vgnextchannel=68439c7755cb9010VgnVCM10000045f3d6a1RCRD (accessed May 21, 2013); *See also* "Entrepreneurs in Residence: U.S. Citizenship and Immigration Services Initiative Summary" (May 2013); http://www.uscis.gov/USCIS/About%20Us/EIR/EntrepreneursinResidence.pdf (accessed May 21, 2013).

[124] Ombudsman Annual Report 2011, pp. 26-29; http://www.dhs.gov/xlibrary/assets/cisomb-annual-report-2011.pdf; Ombudsman Annual Report 2010, pp. 36-48; http://www.dhs.gov/xlibrary/assets/cisomb_2010_annual_report_to_congress.pdf.

[125] *Id.*

[126] USCIS Interoffice Memorandum, "Determining Employer-Employee Relationship for Adjudication of H-1B Petitions, Including Third-Party Site Placements" (Jan. 8, 2010); http://www.uscis.gov/USCIS/Laws/Memoranda/2010/H1B%20Employer-Employee%20Memo010810.pdf (accessed May 8, 2013).

[127] *Id*, p. 5.

[128] USCIS Memorandum, "H-1B Anti-Fraud Initiatives—Internal Guidance and Procedures in Response to Findings Revealed in H-1B Benefit Fraud and Compliance Assessment" (Oct. 31, 2008).

[129] *See* Ombudsman Annual Report 2010, p. 43.



**FIGURE 7:  H-1B, L-1A, AND L-1B REQUESTS FOR EVIDENCE RATES**

*Source: Information provided by USCIS to the Ombudsman (Nov. 23, 2009; Jan. 26, 2011; May 18, 2011; Apr. 4, 2013).*

The statistical findings of the H-1B BFCA revealed that petitions which had one or more of the following attributes were more likely to have engaged in fraud or committed technical violation(s). These petitioner attributes or fraud indicators include:

- Petitioners with a gross annual income of less than $10 million;

- Petitioners which employ 25 employees or less; or

- Petitioners whose business was established within the last 10 years.

No single indicator or combination of these indicators is necessarily determinative of the merits of an H-1B petition.  However, an [adjudicating officer] who identifies a petitioner that has **two or more** of these indicators (the "10/25/10" formula for ease of reference) should review the H-1B petition with an awareness of the heightened possibility of fraud and/or technical violation … .[130]  (*emphasis in original*)

The H-1B Anti-Fraud Memorandum provides additional instructions to adjudicators on what they should focus on as they scrutinize petitions for the presence of fraudulent, inconsistent or questionable evidence, and when they should refer cases to the agency's fraud unit.

***USCIS Policy Guidance:  L-1B Petitions.***  In 2010, the Ombudsman recommended that USCIS develop new L-1B regulations under the Administrative Procedures Act (APA) to clarify the meaning of "specialized knowledge."[131]  USCIS rejected this recommendation, stating:

USCIS believes that its current approach, which includes issuance in the near future of one or a series of L-1B precedent decisions, in combination with an updated "specialized knowledge" memorandum and a corresponding revision of Chapter 32 of the AFM, is sufficient, without a notice and comment process, to provide guidance regarding the L-1B classification.[132]

Six months later, the agency agreed to issue new L-1B guidance.[133]  To date, USCIS has neither published L-1B precedent decisions nor implemented such guidance.  Meanwhile, business stakeholders continue to assert, and the

RFE data illustrate, that in the absence of such guidance, L-1B petition adjudications remain subject to high RFE rates.

## Ongoing Concerns

***Recognition of Modern Business Practices.***  Stakeholders expressed frustration that, in their view, USCIS often fails to recognize modern business practices.  For example, USCIS at times issues RFEs and denials citing the U.S. Department of Labor's Occupational Outlook Handbook,[134]  finding that the proposed employment does not qualify as a specialty occupation.  Such opportunities often are for a Computer Systems Analyst and Marketing Analyst, which are common professional positions.  Stakeholders also report problems with USCIS accommodating evolving business practices, including the use of virtual offices, managers of contract employees, and new organizational structures that do not have traditional management tiers and functions.

***Business Judgment.***  Stakeholders stated that, in some cases, USCIS inappropriately scrutinizes and substitutes its own judgment pertaining to the business needs of the petitioner – whether the company legitimately requires the executive, manager, or specialty occupation worker sponsored in the petition.

***New Office L-1 Adjudications.***  Stakeholders continued to cite USCIS adjudications that delay or prevent the transfer of executives and managers to open offices or to expand businesses in the United States.  In these cases, the petitioning U.S. company will typically provide a business plan, a proposed organizational chart that identifies current and prospective personnel, and documents showing acquisition of commercial space and funding to initiate its business.  Petitioners state the success of the business plan depends on the transfer of the executive or manager to the United States who is expected to hire the company's initial staff.  Some denials in these cases state that the petitioner has not demonstrated that the company is sufficiently developed to require the presence of an executive or manager.  USCIS asserts that, due to the size of the company, it appears that the proposed beneficiary would be serving as a first-line supervisor, and not as an executive or manager.  Such denials may overlook regulations that permit "new office" situations for a limited period of one-year to allow the business to become operational.[135]

---

[130] *Supra* note 128, p. 2.

[131] Administrative Procedure Act, Pub. L. No. 79-404; 5 U.S.C. § 551 (1946).

[132] USCIS 2010 Annual Report Response, p. 9.

[133] USCIS Teleconference, "L-1B Specialized Knowledge" (June 14, 2011); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=d36c7faca91af210VgnVCM100000082ca60aRCRD (accessed May 12, 2013).

[134] Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, 2012-13 Ed.; http://www.bls.gov/ooh/about/projections-overview.htm (accessed Apr. 30, 2013).

[135] 8 C.F.R. § 214.2(l)(3)(vi) (2009).

# EB-5 Immigrant Investor Program

## Background

In 1990, Congress established the fifth employment-based (EB-5) preference category for immigrants seeking to reside in the United States to engage in commercial enterprises that create jobs.[136]  Congress allocated 10,000 visas annually under this category for qualified foreign entrepreneurs, and their spouses and minor children.[137]  To be eligible for EB-5 status, a foreign entrepreneur must invest a minimum of $500,000 in an enterprise that will create "directly" 10 full-time positions for U.S. workers over a two-year period.[138]

Shortly after launching the EB-5 preference category, Congress in 1992 authorized a pilot program to encourage concentration of EB-5 capital in projects likely to have greater regional and national impacts.[139]  The pilot program is especially attractive to investors because they are permitted to demonstrate through "reasonable methodologies" that their investment will create jobs directly *or indirectly*.[140]  Today, nearly 96 percent of all EB-5 investments flow through the pilot program,[141] which is commonly called the Regional Center Pilot Program.  Applications for regional center designation may be filed on behalf of a state or local governmental entity, a partnership, or any other existing business entity established in the United States and its territories.[142]  Regional Center applications are filed on a Form I-924, *Application For Regional Center Under the Immigrant Investor Pilot Program*.  Below is the filing data for the past three years for Form I-924.  *See Figure 8.*



**FIGURE 8:  FILING DATA ON FORM I 924, APPLICATION FOR REGIONAL CENTER UNDER THE IMMIGRANT PILOT PROGRAM**

| YEAR | I 924 RECEIPTS | I 924 APPROVALS | I 924 DENIALS | RFE RATE |
|------|----------------|-----------------|---------------|----------|
| FY2012: | 240 | 35 | 63 | 75% |
| FY2011: | 278 | 123 | 58 | 56% |
| FY2010: * | 152 | 8 | 41 | 0 |

*\*Form I-924 came into use on November 23, 2010.*

*Source:  USCIS, "U.S. Citizenship and Immigration Services, Form I-526, Immigrant Petition by Alien Entrepreneur and Form I-829, Petition by Entrepreneur to Remove Conditions Service-wide Receipts, Approvals, Denials, Fiscal Year(s): 2005 - 2012" http://www.uscis.gov/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/Employment-based/I526_I924_I829_performancedata_qtr43.pdf (accessed Apr. 11, 2013).*

---

[136] Immigration Act of 1990, § 121(b)(5), Pub. L. No. 101–649; 8 U.S.C. § 1153(b)(5).

[137] INA § 203(b)(5)(A).

[138] INA § 203(b)(5)(B)(ii).  Most foreign entrepreneurs invest in a "targeted employment area," defined as a rural or urban area that has experienced high unemployment (of at least 150% of the national average rate).  Under 8 C.F.R. § 204.6(f), the amount of capital necessary to make a qualifying investment in a targeted employment area within the United States is $500,000.

The individual immigrant investor begins the EB-5 process by filing Form I-526, *Immigrant Petition by Alien Entrepreneur.* If the petition is approved and the investor resides abroad, the investor must seek the issuance of an EB-5 visa through a DOS consular post. From FY 2010 to 2012, USCIS received nearly 300% more Form I-526 filings. Also, USCIS data show a spike in the issuance of RFEs, which reached 72% in FY 2011, then decreased to 44% in FY 2012. *See Figure 9.*



**FIGURE 9: FORM I-526, IMMIGRANT PETITION BY ALIEN ENTREPRENEUR RECEIPTS**



| YEAR | I-526 RECEIPTS | I-526 APPROVALS | I-526 DENIALS | RFE RATE |
|------|----------------|-----------------|---------------|----------|
| FY2012: | 6,041 | 3,671 | 957 | 44% |
| FY2011: | 3,805 | 1,571 | 373 | 72% |
| FY2010: | 1,955 | 1,369 | 165 | 22% |

*Source: USCIS, "U.S. Citizenship and Immigration Services, Form I-526, Immigrant Petition by Alien Entrepreneur and Form I-829, Petition by Entrepreneur to Remove Conditions Service-wide Receipts, Approvals, Denials, Fiscal Year(s): 2005 - 2012" http://www.uscis.gov/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/ Employment-based/I526_I924_I829_performancedata_qtr43.pdf (accessed Apr. 11, 2013); RFE data extracted from prior data published by USCIS, http://www.uscis.gov/USCIS/Outreach/Notes%20from%20Previous%20Engagements/Notes%20 from%20Previous%20Engagements%20by%20Topic/January%20EB-5%20presentation%20FINAL.pdf and information provided by USCIS to the Ombudsman (Apr. 16, 2013).*

[139] The Judiciary Appropriations Act of 1993, § 610, Pub. L. No. 102-395 (Oct. 6, 1992).

[140] *Id.*

[141] U.S. Department of State Visa Office Report, "Table 5 (Part 3): Immigrant Visas Issued and Adjustment of Status Subject to Numerical Limitations, FY 2012" (n.d.); http://www.travel.state.gov/pdf/FY12AnnualReport-TableV-PartIII.pdf (accessed Apr. 3, 2013).

[142] USCIS Webpage, "Form I-924, Application for Regional Center Under the Immigrant Investor Pilot Program, Instructions"; http://www.uscis.gov/files/form/i-924instr.pdf (accessed May 20, 2013).

**FIGURE 10:   EB-5 IMMIGRANT INVESTOR PROGRAM VISA DEMAND**



| FISCAL YEAR | EB-5 VISAS ISSUED* | USCIS DESIGNATED REGIONAL CENTERS** |
|:---:|:---:|:---:|
| 2012: | 7,641 | 209 |
| 2011: | 2,879 | 174 |
| 2010: | 1,885 | 114 |
| 2009: | 4,218 | 72 |
| 2008: | 1,360 | 25 |

*Source:  Visa issuance data found in Table 5, Part 3, of the U.S. Department of State's FY 2012 Visa Office Reports, and at Table V, Part 4 of Visa Office Reports for FY 2008 through 2011.  http://travel.state.gov/visa/statistics/statistics_1476.html (accessed Apr. 3, 2013).

**USCIS Designated Regional Centers data found at  http://www.uscis.gov/USCIS/Resources/Reports%20and%20 Studies/Immigration%20Forms%20Data/Employment-based/I526_I924_I829_performancedata_qtr43.pdf (accessed April, 2013). Considered aberrational due to uncertainty over extension of 2009 Regional Center Pilot program sunset date.

With a valid EB-5 visa, the immigrant investor and any approved dependents may enter the United States as conditional permanent residents with authorization to remain for two years.  Ninety days prior to the second anniversary of such entry or admission, the immigrant investor is required to file Form I-829, *Petition by Entrepreneur to Remove Conditions*.  USCIS's approval of the Form I-829 accords the immigrant investor and any qualified dependents LPR status.

When the Ombudsman issued its *"Employment Creation Immigrant Visa (EB-5) Program Recommendations"* on March 18, 2009, usage of this visa category had been low, with fewer than 1,000 visas issued annually over the 10-year period from 1998 to 2007.[143]  Recent data show a dramatic increase in issuance of EB-5 visas and designation of regional centers.  From 2011 to 2012, there was a 265% increase in EB-5 visa usage.  *See Figure 10.*

On December 3, 2012, USCIS announced in a stakeholder engagement the transfer of EB-5 adjudications from the CSC to Washington, D.C. by mid-2013.[144]  Approximately two weeks later, on December 20, 2012, USCIS issued a guidance memorandum addressing the "tenant-occupancy" economic methodology used by many regional centers to satisfy job creation requirements.[145]  On February 14, 2013, USCIS issued a third draft of a proposed consolidated EB-5 Adjudication Policy Memorandum for public comment.[146]

***Tenant-Occupancy.***  Generally, the tenant-occupancy methodology seeks credit for job creation traced to the independent tenant businesses that lease space in buildings developed with EB-5 funding.  Many regional center projects and individual EB-5 investors relied on this job creation methodology in past years, resulting in project and petition approvals.

In early FY 2012, USCIS began to question EB-5 filings that relied on a tenant-occupancy methodology.  The agency scrutinizes those job models to ensure that petitioners are not counting as new full-time positions existing jobs that are merely relocated as tenant-employers move operations from one site to another.  In January 23, 2012, USCIS acknowledged that it had placed an adjudication hold on certain unspecified EB-5 filings.[147]  On February 17, 2012, USCIS announced that it was "moving forward" with the adjudication of tenant-occupancy related cases, and would be issuing RFEs to "certain applicants and petitioners to address any questions or issues … about the economic methodologies employed in their specific cases."[148]  During the remainder of 2012, USCIS issued numerous RFEs related to the tenant-occupancy methodology, and in some cases, second and third RFEs seeking clarification of earlier responses.  On December 20, 2012, USCIS issued a brief *"Operational Guidance"* memorandum setting out the principles for evaluating whether "a reasonable causal link [exists] between the EB-5 enterprise and the job creation that would allow for the attribution of the tenant jobs to the EB-5 enterprise."[149]

[143] *See* DHS Office of Immigration Statistics 2007, "Yearbook of Immigration Statistics: Table 6" (Sept. 2008); http://www.dhs.gov/yearbook-immigration-statistics-2007-3; DHS Office of Immigration Statistics 2012 "Yearbook of Immigration Statistics: Table 6" (Mar. 2013); http://www.dhs.gov/yearbook-immigration-statistics-2012-legal-permanent-residents (accessed Apr. 30, 2013).

[144] USCIS Webpage, "A Conversation with Director Mayorkas – EB-5 Immigrant Investor Program" (Dec. 4, 2012); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=1eecc0a215a1b310VgnVCM100000082ca60aRCRD&vgnextchannel=994f81c52aa38210VgnVCM100000082ca60aRCRD (accessed Apr. 30, 2013).

[145] USCIS Guidance Memorandum, "Operational Guidance for EB-5 Cases Involving Tenant-Occupancy" (Dec. 20, 2012); www.uscis.gov/USCIS/Laws/Memoranda/Interim%20EB-5%20Tenant-Occupancy%20GM.pdf (accessed Mar. 19, 2013).

[146] USCIS Draft Policy Memorandum, "EB-Adjudications Policy" (n.d.); www.uscis.gov/USCIS/Outreach/Feedback%20Opportunities/Draft%20Memorandum%20for%20Comment/drafteb5adjudication.pdf (accessed Mar. 19, 2013).

[147] USCIS Public Engagement, "EB-5 Immigration Investor Program Stakeholder Meeting" (Jan. 23, 2012); http://www.uscis.gov/USCIS/Outreach/Notes%20from%20Previous%20Engagements/Notes%20from%20Previous%20Engagements%20by%20Topic/January%20EB-5%20presentation%20FINAL.pdf (accessed May 21, 2013).

[148] USCIS Office of Public Engagement: EB-5 Tenant Occupancy Message; http://content.govdelivery.com/bulletins/gd/USDHSCIS-2f4c06 (accessed May 21, 2013).

[149] *Supra* note 145.



***Proposed EB-5 Policy Memorandum Posted for Public Comment.*** USCIS posted the third draft of its policy memorandum for public comment on February 14, 2013.[150] The draft memorandum appears to reverse the agency's earlier position as to the effect of a "material change" to a business plan.[151] The new "draft" states:

> In order to provide flexibility to meet the realities of the business world, USCIS will permit an alien who has been admitted to the United States on a conditional basis to remove those conditions when circumstances have changed. An individual investor can, at the prescribed time, proceed with his or her Form I-829 petition to remove conditions and present documentary evidence demonstrating that, *notwithstanding the business plan contained in the Form I-526*, the requirements for the removal of conditions have been satisfied.[152] (*Emphasis added*)

Additionally, the proposed policy memorandum also addresses a number of other issues, including: (1) when the agency will afford deference to prior adjudications involving the same project; and (2) the agency's presumption that a "reasonable time" to satisfy the job creation requirement may not exceed one year, if this issue remains unresolved when the investor files the petition to remove conditions.

## Ongoing Concerns

The Ombudsman continues to work to resolve individual EB-5 cases, review relevant policies and adjudications, and elevate stakeholder concerns, as appropriate.

At the close of this reporting period, the Ombudsman had received 441 requests for EB-5 case assistance, representing approximately 10 percent of this year's casework. The vast majority of these inquiries came from investors and regional centers' applicants whose cases had been pending past posted processing times. According to USCIS's online "My Case Status" tool, as of February 28, 2013, there were 6,025 Form I-526 petitions pending with an average processing time of 11.7 months.[153] Based on this data and the program requirements, these petitions represent a potential $3 billion and 60,000 new full-time jobs in the United States awaiting USCIS action.

> *Case Example: During the reporting period, the Ombudsman received an inquiry regarding more than 100 Form I-526 petitions associated with a large urban redevelopment project. Although USCIS previously approved this regional center project, the immigrant investor petitions remained pending for up to 212 days past the processing time goal of five months.[154] These delays placed the project at risk of failure, according to counsel for the regional center. Soon after the Ombudsman brought these cases to USCIS's attention, the agency began issuing decisions.*

---

[150] *Supra* note 146, p. 23.

[151] USCIS Webpage, "A Work in Progress: Towards a New Draft Policy Memorandum Guiding EB-5 Adjudications" (Nov. 9, 2011); (http://www.uscis.gov/USCIS/Outreach/Feedback%20Opportunities/Draft%20Memorandum%20for%20Comment/EB_5_Adjudications_Policy3.pdf) (accessed May 21, 2013); USCIS Webpage, "Message From The Director: Revised Draft Policy Memorandum Guiding EB-5 Adjudications" (Jan. 11,2012); (http://www.uscis.gov/USCIS/Outreach/Feedback%20Opportunities/Draft%20Memorandum%20for%20Comment/EB5_coverandmemo_2ndpost.pdf) (accessed May 21, 2013). *See* USCIS Memorandum, "Adjudication of EB-5 Regional Center Proposals and Affiliated Form I-526 and Form I-829 Petitions; Adjudicators Field Manual (AFM) Update to Chapters 22.4 and 25.2" pp. 5, 19-20 (Dec. 11 2009); http://www.uscis.gov/USCIS/Laws/Memoranda/Static%20Files%20Memoranda/Adjudicating%20of%20EB-5_121109.pdf (accessed May 21, 2013).

[152] *Supra* note 146, p. 23.

[153] USCIS Webpage, "National Processing Volumes and Trends: Form I-526, California Service Center" (Feb. 2013); http://dashboard.uscis.gov/index.cfm?formtype=18&office=2&charttype=2 (accessed May 21, 2013); USCIS Webpage, "USCIS Processing Time Information" (n.d.); https://egov.uscis.gov/cris/processTimesDisplayInit.do;jsessionid=bach8S4s9cvN_7pAO2i7t (accessed May 21, 2013).

[154] USCIS EB-5 Public Engagement, "PowerPoint Presentation," p. 12 (Dec. 16, 2010); http://www.uscis.gov/USCIS/Outreach/Notes%20from%20Previous%20Engagements/2010/December%202010/eb-5-dec-16-2010-ppt.pdf (accessed May 20, 2013).

On March 5, 2013, the Ombudsman held a meeting with EB-5 stakeholders.[155]  The purpose of the meeting was to discuss challenges related to the EB-5 Immigrant Investor Program.  Stakeholders focused on the following areas of concern:[156]

- Communications

  – Participants were critical of the dedicated EB-5 Immigrant Investor Program email box, stating that responses are often not timely, and limited to basic case status.

  – Participants requested more direct communication with adjudicators via telephone and email.

- Processing Delays

  – Participants uniformly described posted processing times as unreliable.

  – They also expressed frustration over receipt of multiple RFEs for the same petition.

- Policy Development

  – Participants called for a clear and binding project pre-approval process with subsequent adjudications deference.

  – They underscored that future EB-5 Immigrant Investor Program policy development should be conducted in accordance with business realities and be reasonable commercially.

  – Participants stressed that USCIS should avoid implementing new or more restrictive policy guidance retroactively.

The Ombudsman issued and broadly disseminated an executive summary of the stakeholder engagement findings.  Ombudsman Odom delivered the executive summary along with stakeholder written submissions to USCIS Director Mayorkas.  She continues a robust and constructive dialogue with the Director regarding issues pertaining to the EB-5 program.

## New Development

Just prior to publication of this Report, on May 30, 2013, USCIS issued a new final EB-5 Policy Memorandum.  This memorandum begins by emphasizing that the purpose of the EB-5 Program is to promote the immigration of people who can help create jobs for U.S. workers through their investment of capital into the U.S. economy, and that preponderance of the evidence is the standard of proof in EB-5 adjudications.  The memorandum addresses many longstanding stakeholder concerns, including when deference will be afforded to prior adjudications and the need for flexibility to accommodate business realities.

Ombudsman Odom will continue to engage with Director Mayorkas on EB-5 issues and developments in the next reporting period, including implementation of this important guidance as well as the upcoming move of the EB-5 adjudications unit to Washington, D.C.



---

[155] Stakeholders were notified of this event through an email announcement, and given the opportunity to attend in person or to participate telephonically in listen-only mode.  Approximately 75 stakeholders attended in-person, and another 358 individuals participating telephonically.  Stakeholders were given the option to provide written submissions in advance of the meeting to provide input to the Ombudsman.

[156] A detailed summary of the meeting is available at http://www.dhs.gov/publication/eb-5-stakeholder-meeting-summary (accessed Apr. 19, 2013).

# Petition Information Management System

## Background

The Ombudsman reviewed concerns from stakeholders that the process for transferring immigration petition information from USCIS to the DOS Petition Information Management Service (PIMS) was causing delays in the issuance of visas to certain employment-based beneficiaries in nonimmigrant categories.[157]  PIMS is a component of the Consolidated Consular Database system, enabling consular officers to verify electronically nonimmigrant petition approval and review digital copies of forms and supporting documentation.[158]  DOS informed the Ombudsman that in approximately nine percent of employment-based nonimmigrant cases, consular officers overseas lacked required information regarding USCIS's processing of Form I-129, *Petition(s) for a Nonimmigrant Worker*.[159]

When a nonimmigrant petitioner (or his/her legal representative) fails to submit the required duplicate of the Form I-129 package to USCIS, the agency does not forward evidence of action on the petition to the DOS Kentucky Consular Center (KCC).  Since the KCC is responsible for scanning and uploading information into PIMS, this causes processing delays, economic difficulties, and various other problems for employers and individuals attempting to secure visas through a U.S. consulate.

## Recommendations

On May 16, 2012, the Ombudsman made recommendations to address visa processing delays connected with USCIS's occasional failure to transmit Form I-129 petition approval information and documents to KCC.[160]  The Ombudsman recommended that USCIS:

1) Instruct USCIS service centers to make a copy of Form I-129 petition package regardless of whether a duplicate petition package has been submitted with the filing, and send it to the DOS KCC for uploading into PIMS; or,

2) Send the original petition package to the KCC, for scanning of documents, data entry, and – upon completion – forward the original petition package to the USCIS National Records Center for storage; or,

3) Scan all approved petition packages at a USCIS facility, so electronic copies can be forwarded to the KCC for uploading into PIMS.

## USCIS Response

USCIS responded to these recommendations on August 13, 2012.[161]  The agency declined to implement the first two measures, citing resource limitations, financial costs, decreased productivity, and privacy concerns.  USCIS concurred in principle with the third recommendation, but noted that the agency currently lacks the resources necessary for implementation.  The agency also noted that in the future it plans to provide all petition information to DOS through the recently deployed USCIS Electronic Information System (ELIS).[162]

---

[157] U.S. Department of State Cable, "Accessing NIV Petition Information Via the CCD" (Nov. 17, 2007); http://travel.state.gov/visa/laws/telegrams/telegrams_4201.html (accessed April 11, 2013). These nonimmigrants categories are as follows: H (Specialty Occupations), L (Executives, Managers and Specialized Knowledge workers), O (Extraordinary Ability), P (Athletes, Entertainers and Artists), Q (Cultural Performers), and R (Religious workers).

[158] *Id.*; U.S. Department of State, "Consolidated Consular Database Privacy Impact Assessment," (Mar. 22, 2010).

[159] Information provided by the U.S. Department of State, Kentucky Consular Center to the Ombudsman (June 21, 2011); *See* USCIS Forms, "Instructions for Form I-129, Petition for a Nonimmigrant Worker" (Jan. 19, 2011); http://www.uscis.gov/files/form/i-129instr.pdf  (accessed Apr. 11, 2013).

[160] Ombudsman Recommendation 53, "Recommendations Regarding USCIS' Role in the Petition Information Management Service" (May 16, 2012); http://www.dhs.gov/xlibrary/assets/cisomb/cisomb-pims.pdf (accessed Mar. 26, 2013).

[161] USCIS Response to Recommendation 53, (Aug. 13, 2012); http://www.uscis.gov/USCIS/Resources/Ombudsman%20Liaison/Responses%20to%20Formal%20Recommendations/USCIS%20Response%20to%20 CISOMB%20PIMS%20Recommendation.pdf (accessed Mar. 27, 2013).

[162] *Id.*

## Ongoing Concerns

USCIS declined to accept recommendations offered by the Ombudsman to ameliorate the negative consequences of failure to submit duplicate copies of nonimmigrant petitions. As a result, petitioners who may have inadvertently failed to submit the required duplicate copies will continue to face avoidable DOS visa issuance delays.



## Conclusion

Consistency in RFEs is an important goal, and the Ombudsman will monitor USCIS's efforts in the RFE Project. The Ombudsman will continue to address stakeholders' concerns regarding RFEs, and assess USCIS initiatives designed to improve the quality and consistency of adjudications.  With an eye toward USCIS developing L-1B regulations, the Ombudsman will review H-1B and L-1 adjudication policies and practices this coming year.

Regarding the EB-5 Immigrant Investor program, the Ombudsman anticipates future USCIS and stakeholder engagements, especially to discuss the transition of the EB-5 unit from the CSC to Washington, D.C.



# USCIS Customer Service

Immigration policies and services must be transparent and consistent in order to be effective. This reporting year, USCIS launched new initiatives, continued public engagement, and improved customer access to resources and information. The agency also successfully reduced the AAO processing times. Despite this progress, certain programmatic challenges persist.



# Processing Times

Processing times for Form I-485, *Application to Register Permanent Residence or Adjust Status*, and Form N-400, *Application for Naturalization*, adjudications remained comparable to last year, at approximately five months and four and half months, respectively.  ***See Figure 11 on page 44.***  The AAO notably eliminated nearly all of its extended processing times.  It is now adjudicating appeals within USCIS's processing time goal of six months or less.[163]

# Customer Service and Public Engagement

During this reporting year, USCIS established the "USCIS Customer Service and Public Engagement Directorate," which is divided into two divisions.  The Public Engagement

Division coordinates and directs agency-wide dialogue with external stakeholders, while the Customer Service Division provides information and guidance to USCIS applicants, petitioners and advocates regarding immigration benefits.  It oversees the Customer Assistance Office (CAO) and Contact Center Enterprise (CCEO), as well as the NCSC.  USCIS continued public engagement, hosting more than 1,600 public events with over 520,000 participants.[164]

As stated earlier, in approximately 66 percent of all cases brought to the Ombudsman, individuals and employers attempted to resolve problems through the NCSC.  When NCSC staff cannot resolve a customer's inquiry, USCIS uses the Service Request Management Tool (SRMT), an electronic inquiry system that transfers the request to a USCIS field or service center location.  An individual can also make an e-Request to generate an SRMT inquiry.[165]  ***See Figure 12 on page 45.***

---

[163] USCIS Webpage, "AAO Processing Times," http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=8ff31eeaf28e6210VgnVCM100000082ca60aRCRD&vgnextchannel=dfe316685e1e6210VgnVCM100000082ca60aRCRD (accessed May 20, 2013).

[164] Information provided by USCIS to the Ombudsman (Apr. 24, 2013).

[165] *See supra* note 6.



Every SRMT inquiry receives a reference number for tracking purposes.  USCIS received 1,022,490 SRMT requests during this reporting period.

## Policy Manual

Effective January 22, 2013, USCIS announced the creation of a new Policy Manual designed to adapt easily to changes in immigration law and policy.[166]  To date, USCIS has released one chapter of the Policy Manual, titled *"Citizenship and Naturalization,"* and hosted a series of public engagements on this resource.[167]  Ultimately, USCIS intends to replace the AFM and the Immigration Policy Memoranda portion of its public website with the Policy Manual.[168]  No specific timeframe has been established for future releases.

## The Administrative Appeals Office

### Background

The AAO has delegated authority to adjudicate appeals of certain USCIS decisions.[169]  The AAO exercises jurisdiction over matters described in 8 C.F.R. section 103.1(f)(3)(iii).[170]  The AAO reviews the decisions made by USCIS on applications and petitions for immigration benefits, including, but not limited to, employment-based petitions, applications for Temporary Protected Status (TPS), SIJ petitions, and applications relating to citizenship.[171]

In 2005, the Ombudsman recommended that the AAO make available to the public its standard of review, precedent decision process, criteria by which cases are selected for oral argument, and decision-making statistics.[172]  Since that time, the AAO has eliminated lengthy processing times,[173]  but stakeholders continue to express concern and confusion regarding the AAO's authority, independence, and procedures.

---

[166] USCIS Policy Manual - Effective as of Jan. 22, 2013; http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=d58459009ccfb310VgnVCM100000082ca60aRCRD&vgnextchannel=d58459009ccfb310VgnVCM100000082ca60aRCRD (accessed May 21, 2013).

[167] USCIS Policy Manual Webinars; http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=a891fe78ac41c310VgnVCM100000082ca60aRCRD&vgnextchannel=58479a485510e210VgnVCM100000082ca60aRCRD (accessed May 21, 2013).

[168] *Id.*

[169] DHS Delegation Number 0150.1 (effective Mar. 1, 2003), which was created pursuant to the authority vested in the Secretary through the HSA of 2002, Pub. L. 107-296.

[170] USCIS Webpage, "Appeals of Denied Petitions Under the Jurisdiction of the Administrative Appeals Office (AAO) by subject matter," http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=b2521eeaf28e6210VgnVCM100000082ca60aRCRD&vgnextchannel=dfe316685e1e6210VgnVCM100000082ca60aRCRD; USCIS Webpage, "Appeals of Denied Petitions Under the Jurisdiction of the Administrative Appeals Office (AAO) by Form Number," http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=e0a21eeaf28e6210VgnVCM100000082ca60aRCRD&vgnextchannel=dfe316685e1e6210VgnVCM100000082ca60aRCRD (both accessed May 21, 2013).  The AAO does not exercise jurisdiction over petitions for approval of schools and the appeals of decisions to withdraw approval of schools for attendance by foreign students.

[171] USCIS Webpage, "The Administrative Appeals Office (AAO)" (Mar. 19, 2013); http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=dfe316685e1e6210VgnVCM100000082ca60aRCRD&vgnextchannel=dfe316685e1e6210VgnVCM100000082ca60aRCRD (accessed May 21, 2013).

[172] Ombudsman Recommendation 20, "Recommendation from the CIS Ombudsman to the Director, USCIS" (Dec. 6, 2005); http://www.dhs.gov/xlibrary/assets/CISOmbudsman_RR_20_Administrative_Appeals_12-07-05.pdf (accessed May 21, 2013).

[173] USCIS Webpage, "AAO Processing Times" (May 10, 2013); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=8ff31eeaf28e6210VgnVCM100000082ca60aRCRD&vgnextchannel=dfe316685e1e6210VgnVCM100000082ca60aRCRD (accessed May 21, 2013).

**FIGURE 11:  AVERAGE PROCESSING TIMES FOR FORMS N 400 AND I 485**



**U.S. Citizenship and Immigration Services Application for Naturalization (N-400) Cycle Times by Field Office for Fiscal Year 2013 (through 2nd Qtr)**

*Source: Information provided by USCIS to the Ombudsman (Apr. 24, 2013).*



**U.S. Citizenship and Immigration Services Application to Register Permanent Residence or Adjust Status (I-485) Cycle Times by Field Office for Fiscal Year 2013 (through 2nd Qtr)**

*Source: Information provided by USCIS to the Ombudsman (Apr. 24, 2013).*

**FIGURE 12: SRMT REQUESTS**

## Summary of Service Requests (April 2012 to March 2013)



| CASE TYPE | TOTAL |
|---|---|
| Nondelivery | 236,786 |
| Processing Times | 195,661 |
| Expedite Request | 57,468 |
| Change of Address | 324,905 |
| Typo Error | 94,104 |
| Other | 113,566 |
| Total | 1,022,490 |



*Source: Information provided by USCIS to the Ombudsman (May 28, 2013).*

### Ongoing Concerns

*Appellate Authority.* Stakeholders question whether the AAO is an independent appellate body.[174] According to the AAO, its officers maintain independence in the adjudication process. They may verify information provided in the record using VIBE[175] or other web-based resources; consult with the USCIS Office of Chief Counsel if a case involves novel or complex issues of legal interpretation; and speak with USCIS component staff on operational or policy issues impacting appellate decisions.[176]

*Need for Regulations and Practice Manual.* The standard of review applied by the AAO is *de novo*.[177] This standard

does not appear in the regulations. USCIS first indicated to the Ombudsman in 2005 that it hoped to publish the AAO's standard of review in the *Federal Register* as part of a new Interim Rule, titled the *"Administrative Appeals Office: Procedural Reforms to Improve Efficiency."*[178] USCIS reiterated this expectation during a national stakeholder engagement held on October 20, 2010.[179] Agency leaders noted that the proposed regulation would help streamline the appeal process, offer the public a better understanding of what to expect when filing an appeal, and address certain policy and procedural issues, such as the accrual of unlawful presence during the pendency of an appeal.[180]

---

[174] Ombudsman Teleconference Recap, "The USCIS Administrative Appeals Office" (Dec. 19, 2012); http://www.dhs.gov/ombudsman-teleconference-recap-uscis-administrative-appeals-office (accessed May 21, 2013).

[175] VIBE is a web-based tool designed to enhance USCIS's adjudications of certain employment-based immigration petitions. For more information on VIBE, *see generally* USCIS Webpage; http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=521d735652f9d210VgnVCM100000082ca60 aRCRD&vgnextchannel=521d735652f9d210VgnVCM100000082ca60aRCRD (accessed May 21, 2013). The Ombudsman reported that immediately following VIBE's rollout, stakeholders reported that the database underlying VIBE, at times, contained inaccurate and outdated information, and that continued problems connected with VIBE have led to burdensome Requests for Evidence and erroneous denials. *See* Ombudsman Annual Report 2012, pp. 17-18; http://www.dhs.gov/xlibrary/assets/cisomb-2012-annualreport.pdf (accessed May 21, 2013).

[176] Information provided by USCIS to the Ombudsman (Dec. 18, 2012).

[177] *Id. De novo* review means that the AAO takes a new look at the entire case as if no decision had previously been issued. The AAO maintains that its de novo review has been upheld in federal court. *See*, e.g., *Dor v. INS*, 891 F.2d 997, 1002 n. 9 (2d Cir. 1989); *Soltane v. DOJ*, 381 F.3d 143, 145 (3d Cir. 2004); *Spencer Enterprises Inc. v. U.S.*, 229 F. Supp.2d 1025, 1043 (E.D. Cal. 2001), aff'd. 345 F.3d 683 (9th Cir. 2003)). Authority for AAO review under the former Immigration and Naturalization Services, 8 C.F.R. § 103.1(f)(3)(iii); http://www.gpo.gov/fdsys/pkg/CFR-2003-title8-vol1/xml/CFR-2003-title8-vol1-sec103-1.xml (accessed May 21, 2013).

[178] USCIS Response to Recommendation 20 (Dec. 19, 2005); http://www.dhs.gov/xlibrary/assets/CISOmbudsman_RR_20_Administrative_Appeals_USCIS_Response-12-19-05.pdf (accessed May 21, 2013).

[179] USCIS Webpage, "Listening Session with the Administrative Appeals Office (AAO)" (Oct. 20, 2010); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=09df1980a9aaa210VgnVCM100000082ca60a RCRD&vgnextchannel=994f81c52aa38210VgnVCM100000082ca60aRCRD (accessed May 21, 2013).

[180] *Id.*

More recently, USCIS indicated that it intends to publish a Notice of Proposed Rulemaking (NPRM).[181]  It is not clear whether this NPRM will specify the AAO's standard of review or address other matters discussed in earlier proposed rules.  In the absence of a final rule, stakeholders continue to seek clarifying information as to AAO policies and procedures.[182]  In a meeting with the Ombudsman in February 2013, AAO leaders indicated that they are in the process of creating a practice manual they hope will address common stakeholder questions and concerns.[183]  They compared the manual to a similar resource published by the Board of Immigration Appeals, which discusses the following topics:  jurisdiction and authority; scope of review; filing requirements, fees and processes; how to request expedited handling; and protocols for oral arguments.[184]

***Need for Precedent Decisions.***  Generally, AAO decisions are deemed precedent or non-precedent.  Precedent decisions serve as binding legal authority for determining later cases involving similar facts or issues, whereas non-precedent decisions are binding only on the parties to the case or controversy at issue.[185]

Pursuant to 8 C.F.R. section 103.3(c), the Secretary of Homeland Security, with the Attorney General's approval, may designate AAO decisions as precedential.[186]  The AAO published one precedent decision in FY 2011, and two precedent decisions in FY 2010.[187]

Stakeholders believe that by publishing more precedent decisions, the AAO will help USCIS adjudicators understand and apply the law more consistently.[188]  Future precedent decisions may also offer stakeholders more information as to evidentiary and other requirements.[189]

***Searchable Index to AAO Decisions.***  While AAO non-precedent decisions are generally available on USCIS's website, stakeholders point out that they are neither timely published nor indexed based on case name.[190]  USCIS has indicated that its records office aims to redact and post non-precedent decisions within six months of issuance.[191]

***Processing Times.***  As of March 2013, nearly all appeal categories were current despite sharp increases in caseloads over the past several years.[192]  While this is a positive accomplishment, it must be noted that the AAO considers a case to be current as long as it is decided within six months from the time of receipt of the appeal by the AAO.  This timeframe does not include when the appeal was pending at the USCIS field office or service center that issued the original denial decision.[193]

---

[181] Unified Agenda of Federal Regulatory and Deregulatory Actions, 78 Fed. Reg. 1586 (Jan. 8, 2013).  This includes RIN: 1601-AA65, "Administrative Appeals Office:  Procedural Reforms to Improve Efficiency."  According to the abstract, "[t]his proposed rule revises the requirements and procedures for the filing of motions and appeals before the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services, and its [sic] Administrative Appeals Office.  The proposed changes are intended to streamline the existing processes for filing motions and appeals and will reduce delays in the review and appellate process.  This rule also proposes additional changes necessitated by the establishment of DHS and its components."

[182] Ombudsman Teleconference, "The USCIS Administrative Appeals Office (AAO)" (Dec. 19, 2012).

[183] Information provided by USCIS to the Ombudsman (Feb. 7, 2013).

[184] *See generally* BIA Practice Manual; http://www.justice.gov/eoir/vll/qapracmanual/apptmtn4.htm, and the Executive Office of Immigration Review (Immigration Court) Practice Manual; http://www.justice.gov/eoir/vll/OCIJPracManual/ocij_page1.htm (both accessed May 21, 2013).

[185] Information provided by USCIS to the Ombudsman (Dec. 18, 2012).  While non-precedent decisions are not binding, stakeholders report instances where changes in USCIS policy have been accomplished, in part, through such AAO decisions.  The Ombudsman provided information about a non-precedent AAO decision's logic and rationale that USCIS adjudicators were incorporating into L-1B RFEs, Notices of Intent to Deny, and denials.  *See* Ombudsman Annual Report 2010, p. 46; http://www.dhs.gov/xlibrary/assets/cisomb_2010_annual_report_to_congress.pdf (accessed May 21, 2013).

[186] 8 C.F.R. § 103.3(c).

[187] *Matter of Skirball Cultural Center*, 25 I&N Dec. 799 (AAO 2012); *Matter of Al Wazzan*, 25 I&N Dec. 359 (AAO 2010); and *Matter of Chawathe*, 25 I&N Dec. 369 (AAO 2010).

[188] Information provided by Stakeholders to the Ombudsman during Ombudsman Teleconference, "The USCIS Administrative Appeals Office (AAO)" (Dec. 19, 2012); http://www.dhs.gov/ombudsman-teleconference-recap-uscis-administrative-appeals-office (accessed May 21, 2013).

[189] *Id.*

[190] *Id.*

[191] Information provided by USCIS to the Ombudsman (Dec. 18, 2012).  USCIS Webpage, "Administrative Decisions"; http://www.uscis.gov/portal/site/uscis/menuitem.2540a6fdd667d1d1c2e21e10569391a0/?vgnextoid=0609b8a04e812210VgnVCM100000653919 0aRCRD&vgnextchannel=0609b8a04e812210VgnVCM100000653919 0aRCRD (accessed May 21, 2013).

[192] Information provided by the AAO to the Ombudsman (Feb. 7, 2013).  USCIS Webpage, "AAO Processing Times" (May 10, 2013); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=8ff31eeaf28e6210VgnVCM100000082ca60aR CRD&vgnextchannel=dfe316685e1e6210VgnVCM100000082ca60aRCRD (accessed May 21, 2013).

[193] Information provided by the AAO to the Ombudsman (Feb. 7, 2013).



Stakeholders report that USCIS field offices and service centers typically retain appeals well beyond the 45-day period allotted to reopen or reconsider the decision.[199] This practice impacts the accuracy of processing times published for the AAO on USCIS's website.[200] Several case assistance requests received by the Ombudsman in 2012 involved cases pending well beyond these published processing times.[201] Because the appeal process, including USCIS field office or service center review and AAO adjudication, can take years to conclude, stakeholders point out that circumstances and potential eligibility for benefits may change significantly by the time the AAO issues its decisions. This wait time is not commercially viable for employers trying to staff time-sensitive projects or bring new products to the United States. It also causes prolonged family separation, as well as humanitarian hardships.

## Fee Waivers

### Background

Almost all immigration applications and petitions require a filing fee. There are approximately 70 USCIS forms with corresponding fees ranging from $85 to more than $985.[202] Not all those seeking immigration benefits can afford these fees, and the regulations allow discretionary waivers for low-income individuals filing certain types of applications.[203] In November 2010, USCIS improved the fee waiver process by publishing a new form and guidance. Yet, some stakeholders continue to experience inconsistent adjudications and repeated rejections of fee waiver requests.

Stakeholders are frustrated with delays caused by the transfer of cases to the AAO.[194] When USCIS denies a petition or application, a properly filed appeal may be treated as a motion to reopen or reconsider within 45 days of receipt, and treated favorably rather than forwarded to the AAO.[195] If the reviewing official declines to take favorable action or decides such action is not warranted, the appeal must be forwarded "promptly" to the AAO.[196] The regulations and USCIS field guidance do not make clear what constitutes "promptly" for purposes of forwarding an appeal to the AAO. The AAO cannot observe through USCIS systems when a Form I-290B, *Notice of Appeal or Motion*, is received in a field office;[197] how long the appeal remains pending in such settings; and how and when the appeal and record of proceeding are forwarded for review.[198]

---

[194] *See supra* note 182.

[195] 8 C.F.R. § 103.3(a)(2)(iii).

[196] 8 C.F.R. § 103.3(a)(2)(iv); AFM Chapter 10.8(a)(1), "Preparing the Appellate Case Record: Administrative Appeals (AAO) Cases"; http://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-1067/0-0-0-1482.html (accessed Mar. 18, 2013). *See generally* Ombudsman Recommendation 42, "Motions Matter: Improving the Filing and Review Process for Motions to Reopen or Reconsider" (May 15, 2009); http://www.dhs.gov/sites/default/files/publications/cisomb/cisomb_recommendation_42_5-15-09.pdf (accessed May 21, 2013).

[197] Information provided by USCIS to the Ombudsman (Feb. 7, 2013).

[198] Information provided by the AAO to the Ombudsman (Feb. 7, 2013).

[199] *See supra* note 182.

[200] *Id.*

[201] One such request involved an appeal of a denied Form I-140, *Immigrant Petition for Alien Worker*, that was pending at the AAO for 24 months (17 months beyond AAO published processing times). In response to the Ombudsman's inquiry, the AAO requested an additional 60 days to issue a decision.

[202] 8 C.F.R. § 103.7 (2013). The fee for biometrics capture is $85, and the fee for Form I-485, *Application to Register for Permanent Residence or Adjust Status*, is $985.

[203] 8 C.F.R. § 103.7(c) (2013) allows the possibility of fee waivers for enumerated applications. Waivers apply to 19 of the 70 form types listed at http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=db029c7755cb9010VgnVCM10000045f3d6a1RCRD&vgnextchannel=db029c7755cb9010VgnVCM10000045f3d6a1RCRD (accessed May 21, 2013).

Prior to 2010, stakeholders raised concerns with USCIS regarding inconsistency and unpredictability in fee waiver processing. There was no form or clear standards to guide the fee waiver process. In years past, applicants submitted a sworn statement, but the content and criteria of a qualifying fee waiver were not clear.[204] When Haitian TPS was announced early in 2010, the fee waiver issue came to the fore because, according to advocates, multiple fee waiver rejections and time consuming legal work to correct them placed applicants at risk of missing the TPS registration deadline.[205]

USCIS solicited extensive public feedback in developing the 2010 fee waiver changes. On November 23, 2010, USCIS published guidance and a first-ever fee waiver request form, the Form I-912, *Request for Fee Waiver*.[206] USCIS stated:

> The fee waiver form reflects significant input from stakeholders … USCIS heard concerns that the absence of a standardized form led to confusion about the criteria and standards … The new form identifies clear requirements for documenting a fee waiver request … USCIS will use the same methodology in reviewing all fee waiver requests.[207]

While use of the form is optional, it simplifies the process for applicants by specifying eligibility criteria and necessary documentation.

The new form and instructions contain three standards for fee waiver eligibility: (1) current receipt of a federal or state means-tested benefit; (2) annual household income that is at or below 150% of the federal poverty level;[208] or (3) financial hardship such as recent unemployment, high medical expenses and/or other large unexpected expenses.[209] These criteria are listed in the alternative, meaning only one must be shown to qualify for a fee waiver. Further details on types of documentation are provided in the form's instructions.

## Ongoing Concerns

Certain low-income applicants continue to encounter difficulties in the fee waiver process. Since late 2012, an increasing number of stakeholders have sought assistance from the Ombudsman on this topic.[210] The Ombudsman received requests for assistance from applicants who experienced multiple rejections of fee waivers by a USCIS lockbox, although upon the second or third submission the same request was sometimes approved.[211] Other cases

---

[204] USCIS had eight policy memoranda that were superseded by the new fee waiver guideline document, *see* USCIS Memorandum "Fee Waiver Guidelines as Established by the Final Rule of the USCIS Fee Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9 AFM Update AD11-26" (Mar. 31, 2011); http://www.uscis.gov/USCIS/Laws/Memoranda/2011/March/FeeWaiverGuidelines_Established_by_the_Final%20Rule_USCISFeeSchedule.pdf (accessed May 21, 2013).

[205] *See* "Designation of Haiti for Temporary Protected Status," 77 Fed. Reg. 3476 (Jan. 21, 2010). The Director of USCIS promised "generosity of spirit" in the adjudication of Haitian Fee Waivers, and USCIS invested extensive time in public engagement during the program. Haitian fee waiver approval rates were over 80 percent by June 2010. *See also* USCIS Webpage, "Teleconference-Temporary Protected Status for Haiti" (Apr. 3, 2010); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=ad3544c04e697210VgnVCM100000082ca60aRCRD&vgnextchannel=994f81c52aa38210VgnVCM100000082ca60aRCRD (accessed May 21, 2013).

[206] USCIS Webpage, "USCIS Publishes First-Ever Proposed Fee Waiver Form" (Jul. 16, 2010); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=0fb5ac6b49cd9210VgnVCM100000082ca60aRCRD&vgnextchannel=a2dd6d26d17df110VgnVCM1000004718190aRCRD (accessed May 21, 2013). *See also* USCIS Memorandum "Fee Waiver Guidelines as Established by the Final Rule of the USCIS Fee Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9 AFM Update AD11-26" (Mar. 31, 2011); http://www.uscis.gov/USCIS/Laws/Memoranda/2011/March/FeeWaiverGuidelines_Established_by_the_Final%20Rule_USCISFeeSchedule.pdf (accessed May 21, 2013).

[207] USCIS Webpage, "USCIS Publishes First-Ever Proposed Fee Waiver Form" (Nov. 22, 2010); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=2a1c003cf147c210VgnVCM100000082ca60aRCRD (accessed May 21, 2013).

[208] In determining whether a household is at or below 150% of the HHS Poverty Guidelines, applicants are instructed to consult Form I-912P, *HHS Poverty Guidelines for Fee Waiver Request*; http://www.uscis.gov/files/form/i-912p.pdf (accessed May 21, 2013). The form also contains instructions on counting household size.

[209] *See* Instructions for Form I-912, *Request for Fee Waiver*, p. 2; http://www.uscis.gov/files/form/i-912instr.pdf (accessed May 21, 2013).

[210] The Ombudsman received approximately 50 cases where fee waivers were rejected multiple times for various reasons, including means-tested benefit documentation. Some of these cases were reopened after a second and third re-submission. Typical fact situations from cases filed with the Ombudsman include: a case rejected by a USCIS lockbox stating that no payment was included, but a fee waiver and Form I-912 were enclosed; a case denied where applicant submitted proof of means-tested benefit (food stamps) and tax return to demonstrate income less than 150% of the HHS Poverty Guidelines; a fee waiver rejected twice where evidence of means-tested benefit was provided, the identical fee waiver by the applicant's sister was accepted on initial submission; and five cases that were initially rejected where applicants showed receipt of means-tested benefits or income less than 150%, but accepted on re-submission.

[211] USCIS lockboxes are receipting centers for USCIS applications that handle fees and route applications. They are run by contractor personnel but have a limited number of USCIS personnel attached to them to make decisions on fee waivers and other issues. The USCIS lockboxes are currently located in Phoenix, AZ and Chicago, IL.

showed evidence of inconsistent application of fee waiver standards on documentation of means-tested benefits and income below 150% of the HHS Poverty Guidelines.

The fee waiver form requests information pertaining to receipt of means-tested benefits by the applicant.  In that regard, the form specifies that such programs can be state or federal, but must be based on the applicant's income and other resources available.  Applicants are instructed to provide evidence of current receipt of such a benefit.  The instructions further state:

> This evidence should be in the form of a letter, notice, and/or other official document(s) containing the name of the agency granting you the public benefit.  The document(s) submitted must show the name of the recipient of the means-tested benefit and the name of the agency awarding the benefit.[212]

Stakeholders find that social service agencies will not issue individualized letters confirming receipt of a means-tested benefit. Thus, applicants are only able to present with their filing a confirmation of an amount received, along with a description of the particular means-tested benefit program.

In February 2013, after a series of USCIS trainings for lockbox employees, USCIS indicated to the Ombudsman that fee waivers were being subjected to closer examination.  This practice has appeared to result in the rejection of documents earlier deemed adequate to show receipt of means-tested and placement at or below 150% of the HHS Poverty Guidelines.[213]

Applicants for SIJ status and individuals in removal proceedings experience problems with conflicting instructions, inconsistent standards, and repeated rejections of fee waiver requests at the Texas Service Center (TSC).[214]  The USCIS filing instructions distributed in Immigration Court advise individuals to file applications with USCIS for receipting while their court proceedings are pending.[215]  Respondents in removal can seek a fee waiver from the immigration judge,[216]  but the fee waiver order must subsequently be presented to USCIS along with a copy of the related application or petition.[217]  Stakeholders report multiple rejections of applications with immigration judge fee waiver orders.  Rejections also occur in cases with extensive evidence of income below the USCIS standard and receipt of means-tested benefits, and in cases with court orders granting juveniles dependency as a supporting document.[218]

# Transformation

The USCIS Office of Transformation Coordination (OTC) oversees the agency's broad effort to modernize processes and systems, and move from a paper-based application and adjudication environment to an electronic one.[219]  OTC includes four major divisions:  Business Integration, Stakeholder Readiness, Program Management, and Release Management.[220]  Through transformation, USCIS estimates that it will be able to receive and process six to eight million benefit requests annually, with easier access to information, streamlined adjudications, and enhanced fraud detection.[221]

---

[212] USCIS Form, "Instructions for Request for Fee Waiver," p. 3; http://www.uscis.gov/files/form/i-912instr.pdf (accessed Jun. 13, 2013).

[213] Information provided by USCIS to the Ombudsman (Feb. 13, 2013 and Apr. 23, 2013).  *See also* U.S. Department of Health and Human Services, "2013 Poverty Guidelines"; http://aspe.hhs.gov/poverty/13poverty.cfm (accessed May 21, 2013).

[214] *See* DHS Form, "Instructions for Submitting Certain Applications in Immigration Court and For Providing Biometric and Biographic Information to U.S. Citizenship and Immigration Services" (n.d.); http://www.uscis.gov/files/article/PreOrderInstr.pdf (accessed May 21, 2013).

[215] *Id.*

[216] *See* 8 C.F.R. § 1103.7(c) and the Immigration Court Practice Manual, Chapter 3.4(d); http://www.justice.gov/eoir/vll/OCIJPracManual/Chap%203.pdf (accessed May 21, 2013).

[217] *Supra* note 214.

[218] Immigration Court rules only require that an individual demonstrate inability to pay to be eligible for a fee waiver, as long as the application type is one for which USCIS permits fee waivers.  *See* Immigration Court Practice Manual, Chapter 3.4(d); http://www.justice.gov/eoir/vll/OCIJPracManual/Chap%203.pdf (accessed May 21, 2013); *See* USCIS Forms, "Instructions for form I-912, Request for Fee Waiver" p. 4; http://www.uscis.gov/files/form/i-912instr.pdf (accessed May 21, 2013).

[219] Information provided by USCIS to the Ombudsman (May 5, 2013).  USCIS intends to allow paper filings for all applications and petitions to accommodate customers that have difficulties accessing its electronic platform.

[220] USCIS Webpage, "Office of Transformation Coordination" (Oct. 1, 2012); http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=d1808ac6f0dbc210VgnVCM100000082ca60aRCRD&vgnextchannel=d1808ac6f0dbc210VgnVCM100000082ca60aRCRD (accessed May 21, 2013).

[221] USCIS Webpage, "Executive Summary, USCIS Transformation Customer and Advocate Feedback Sessions" (Aug. 30, 2010); http://www.uscis.gov/USCIS/Outreach/Public%20Engagement/National%20Engagement%20Pages/2010%20Events/September%202010/Executive%20Summary%20-%20External%20Stakeholder%20Feedback%20Sessions.pdf (accessed May 21, 2013).

On May 22, 2012, the agency launched "the foundational release" of its new system, named USCIS Electronic Immigration System (USCIS ELIS).[222]  This release enables individuals seeking immigration benefits and/or their legal representatives to create an account and file for certain benefits online.[223]  Customers may now file in ELIS a stand-alone Form I-539, *Application to Extend/Change Nonimmigrant Status*.[224]

On March 28, 2013, USCIS elicited feedback from stakeholders about adding Form I-526, *Immigrant Petition by Alien Entrepreneur*, to ELIS.[225]  The agency has indicated that ELIS capabilities will be deployed on a four-month cycle, with Form I-526 scheduled for release in summer 2013.  The next major release is scheduled for the end of September 2013.  OTC is assessing the possibility of reducing the length of these cycles to three months, beginning in FY 2014.  If this is feasible, the next release would be in January, instead of February 2014.[226]

Currently, 15 adjudicators at the TSC and 23 adjudicators at the VSC are adjudicating applications using ELIS.[227]  An estimated 679 contractor and government staff outside of the OTC provide technical and business subject matter expertise to the program.[228]  In 2014, USCIS plans to incorporate the following functions into ELIS:  "end-to-end paperless processing" for immigrants entering the United States; applications for TPS; DACA requests; Provisional Waiver applications; family-based adjustment of status petitions and related waiver applications; and the "product line" associated with Petitions for Alien Entrepreneurs.[229]

While Transformation has the potential to improve dramatically the experience of those seeking immigration benefits and services, it has been marked by protracted delays in implementation, design-defects, and cost overruns.[230]  Transformation was originally expected to be a five-year program likely to cost between $400 and $500 million.[231]  Actual expenditures have reached $740 million.[232]

---

[222] USCIS Webpage, "USCIS Launches Online Immigration System, USCIS ELIS" (May 22, 2012); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=4eaa169ccc477310VgnVCM100000082ca60aRCRD&vgnextchannel=68439c7755cb9010VgnVCM10000045f3d6a1RCRD (accessed May 21, 2013).

[223] USCIS Webpage, "USCIS ELIS" (May 20, 2013); http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=b1659e415d116310VgnVCM100000082ca60aRCRD&vgnextchannel=b1659e415d116310VgnVCM100000082ca60aRCRD (accessed May 21, 2013).

[224] *See supra* note 223.  See also USCIS Webpage, "The Benefits of USCIS ELIS Fact Sheet" (Apr. 10, 2013); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=4b2b74686c238310VgnVCM100000082ca60aRCRD&vgnextchannel=8a2f6d26d17df110VgnVCM1000004718190aRCRD (accessed May 21, 2013).

[225] Ombudsman staff compiled notes during a USCIS Stakeholder Engagement.  *See generally* USCIS Webpage, "USCIS ELIS and the EB-5 Immigrant Investor Program" (Mar. 29, 2013); http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=d3e4f2911188d310VgnVCM100000082ca60aRCRD&vgnextchannel=e0b081c52aa38210VgnVCM100000082ca60aRCRD (accessed May 21, 2013).

[226] Information provided by USCIS to the Ombudsman (May 9, 2013).

[227] Information provided by USCIS to the Ombudsman (May 10, 2013).

[228] *Id.*

[229] *Id.*

[230] DHS Office of the Inspector General (OIG), "USCIS Faces Challenges in Modernizing Information Technology," OIG-05-41 (Sept. 2005); U.S. Government Accountability Office (GAO) Report, "Information Technology: Near-Term Effort to Automate Paper-Based Immigration Files Needs Planning Improvements," GAO-06-375 (Mar. 31, 2006); GAO Report, "Homeland Security: DHS Enterprise Architecture Continues to Evolve but Improvements Needed," GAO-07-564 (May 9, 2007); GAO Report, "USCIS Transformation: Improvements to Performance, Human Capital, and Information Technology Management Needed as Modernization Proceeds," GAO-07-1013R (Jul. 17, 2007); GAO Report, "Immigration Benefits: Consistent Adherence to DHS's Acquisition Policy Could Help Improve Transformation Program Outcomes," GAO-12-66 (Nov. 22, 2011).

[231] Aliya Sternstein, "USCIS Mismanaged Immigration Processing Report, Auditors Report," Nextgov (Nov. 22, 2011); http://www.nextgov.com/technology-news/2011/11/uscis-mismanaged-immigration-processing-project-auditors-report/50175/ (accessed May 21, 2013); David Perera, "USCIS Transformation Behind Schedule, Over Budget," FierceGovernmentIT (Nov. 23, 2011); http://www.fiercegovernmentit.com/story/uscis-transformation-behind-schedule-over-budget/2011-11-23 (accessed May 21, 2013).

[232] *Supra* note 227.



Since the USCIS ELIS release, the Ombudsman has received few inquiries specifically related to this system. Some community-based organizations have expressed concern that the individuals they represent may lack regular access to a computer, or feel uncomfortable navigating an electronic system. Others note that the ELIS platform remains English-only. [233]

## Conclusion

USCIS strives to provide meaningful customer service through a wide variety of programs and initiatives.[234] This year, the agency maintained under six-month processing times for both the Forms I-485 and N-400. In releasing the first chapter of its new Policy Manual, USCIS further provided consolidated and updated information on citizenship and naturalization adjudications. With regard to the AAO, USCIS reduced Form I-290B processing times virtually across the board. Stakeholders question the AAO's authority, independence and timely tracking of appeals at field and service center locations. USCIS also worked to streamline the filing process for fee waiver requests in light of stakeholder reports of repeated rejections and inconsistent adjudications. The Ombudsman will continue to monitor USCIS's customer service efforts and looks forward to promised improvements through Transformation.

---

[233] USCIS Webpage, "Frequently Asked Questions: e-filing using USCIS ELIS" (May 13, 2013); http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextchannel=c5f924fa49716310VgnVCM100000082ca60aRCRD&vgnextoid=c5f924fa49716310VgnVCM100000082ca60aRCRD (accessed May 21, 2013).

[234] USCIS Webpage, "About Us" (Sept. 12, 2009); http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=2af29c7755cb9010VgnVCM10000045f3d6a1RCRD&vgnextchannel=2af29c7755cb9010VgnVCM10000045f3d6a1RCRD (accessed May 21, 2013).

This page intentionally left blank.

# Appendix 1:  Homeland Security Act – Section 452 – Citizenship and Immigration Services Ombudsman

## SEC.452.CITIZENSHIP AND IMMIGRATION SERVICES OMBUDSMAN.

(a) IN GENERAL—Within the Department, there shall be a position of Citizenship and Immigration Services Ombudsman (in this section referred to as the 'Ombudsman').  The Ombudsman shall report directly to the Deputy Secretary.  The Ombudsman shall have a background in customer service as well as immigration law.

(b) FUNCTIONS—It shall be the function of the Ombudsman—

(1) to assist individuals and employers in resolving problems with the Bureau of Citizenship and Immigration Services;

(2) to identify areas in which individuals and employers have problems in dealing with the Bureau of Citizenship and Immigration Services; and

(3) to the extent possible, to propose changes in the administrative practices of the Bureau of Citizenship and Immigration Services to mitigate problems identified under paragraph (2).

(c) ANNUAL REPORTS—

(1) OBJECTIVES—Not later than June 30 of each calendar year, the Ombudsman shall report to the Committee on the Judiciary of the House of Representatives and the Senate on the objectives of the Office of the Ombudsman for the fiscal year beginning in such calendar year.  Any such report shall contain full and substantive analysis, in addition to statistical information, and—

(A) shall identify the recommendation the Office of the Ombudsman has made on improving services and responsiveness of the Bureau of Citizenship and Immigration Services;

(B) shall contain a summary of the most pervasive and serious problems encountered by individuals and employers, including a description of the nature of such problems;

(C) shall contain an inventory of the items described in subparagraphs (A) and (B) for which action has been taken and the result of such action;

(D) shall contain an inventory of the items described in subparagraphs (A) and (B) for which action remains to be completed and the period during which each item has remained on such inventory;

(E) shall contain an inventory of the items described in subparagraphs (A) and (B) for which no action has been taken, the period during which each item has remained on such inventory, the reasons for the inaction, and shall identify any official of the Bureau of Citizenship and Immigration Services who is responsible for such inaction;

(F) shall contain recommendations for such administrative action as may be appropriate to resolve problems encountered by individuals and employers, including problems created by excessive backlogs in the adjudication and processing of immigration benefit petitions and applications; and

(G) shall include such other information as the Ombudsman may deem advisable.

(2) REPORT TO BE SUBMITTED DIRECTLY—Each report required under this subsection shall be provided directly to the committees described in paragraph (1) without any prior comment or amendment from the Secretary, Deputy Secretary, Director of the Bureau of Citizenship and Immigration Services, or any other officer or employee of the Department or the Office of Management and Budget.

(d) OTHER RESPONSIBILITIES—The Ombudsman—

(1) shall monitor the coverage and geographic allocation of local offices of the Ombudsman;

(2) shall develop guidance to be distributed to all officers and employees of the Bureau of Citizenship and Immigration Services outlining the criteria for referral of inquiries to local offices of the Ombudsman;

(3) shall ensure that the local telephone number for each local office of the Ombudsman is published and available to individuals and employers served by the office; and

(4) shall meet regularly with the Director of the Bureau of Citizenship and Immigration Services to identify serious service problems and to present recommendations for such administrative action as may appropriate to resolve problems encountered by individuals and employers.

(e) PERSONNEL ACTIONS—

(1) IN GENERAL—The Ombudsman shall have the responsibility and authority—

(A) To appoint local ombudsmen and make available at least 1 such ombudsman for each State; and

(B) To evaluate and take personnel actions (including dismissal) with respect to any employee of any local office of the Ombudsman.

(2) CONSULTALTION—The Ombudsman may consult with the appropriate supervisory personnel of the Bureau of Citizenship and Immigration Services in carrying out the Ombudsman's responsibilities under this subsection.

(f) RESPONSIBILITIES OF BUREAU OF CITIZENSHIP AND IMMIGRATION SERVICES—The Director of the Bureau of Citizenship and Immigration Services shall establish procedures requiring a formal response to all recommendations submitted to such director by the Ombudsman within 3 months after submission to such director.

(g) OPERATION OF LOCAL OFFICES-

(1) IN GENERAL—Each local ombudsman—

(A) shall report to the Ombudsman or the delegate thereof;

(B) may consult with the appropriate supervisory personnel of the Bureau of Citizenship and Immigration Services regarding the daily operation of the local office of such ombudsman;

(C) shall, at the initial meeting with any individual or employer seeking the assistance of such local office, notify such individual or employer that the local offices of the Ombudsman operate independently of any other component of the Department and report directly to Congress through the Ombudsman; and

(D) at the local ombudsman's discretion, may determine not to disclose to the Bureau of Citizenship and Immigration Services contact with, or information provided by, such individual or employer.

(2) MAINTENANCE OF INDEPENDENT COMMUNICATIONS—Each local office of the Ombudsman shall maintain a phone, facsimile, and other means of electronic communication access, and a post office address, that is separate from those maintained by the Bureau of Citizenship and Immigration Services, or any component of the Bureau of Citizenship and Immigration Services.

# Appendix 2:  U.S. Department of Homeland Security Organizational Chart



# Appendix 3:  USCIS Action Regarding Ombudsman Recommendations

The following chart lists the Ombudsman recommendations issued over the past two reporting periods and denotes USCIS action related to each recommendation.  USCIS's response and action include:

**Implemented.**  USCIS has accepted and implemented the Ombudsman's recommendation.

**Active.**  USCIS has accepted and is taking action to adopt the Ombudsman's recommendation.

**Declined.**  USCIS has declined to accept the Ombudsman's recommendation.

| RECOMMENDATION | DATE | IMPLEMENTED | ACTIVE | DECLINED |
|---|---|---|---|---|
| 56. Improving the Process for Removal of Conditions on Residence for Spouses and Children | 02/28/13 | Waiting for USCIS response. | | |
| 55. Adjudication of Applications and Petitions Under INA Section 204(l) | 11/26/12 | | | X |
| 54. Ensuring a Fair and Effective Asylum Process for Unaccompanied Children | 09/20/12 | X | | |
| 53. Recommendations Regarding USCIS's Role in the Petition Information Management Service | 05/16/12 | | | X |
| 52. USCIS Service Requests: Recommendations to Improve the Quality of Responses to Inquiries from Individuals and Employers | 03/05/12 | | X | |
| 51. Recommendations to Improve the Quality in Extraordinary Ability and Other Employment-Based Adjudications | 12/29/11 | | | X |
| 50. Employment Authorization for Asylum Applicants: Recommendations to Improve Coordination and Communication | 08/26/11 | | X | |
| 49. Employment Authorization Documents:  Meeting the 90-Day Mandate and Minimizing the Impact of Delay on Individuals and Employers | 07/18/11 | | X | |
| 48. Deferred Action:  Recommendations to Improve Transparency and Consistency in the USCIS Process | 07/11/11 | | | X |
| 47. Special Immigrant Juvenile Adjudications:  An Opportunity for Adoption of Best Practices | 04/15/11 | | X | |
| 46. Customer Complaints:  A Tool for Quality Customer Service and Accountability | 03/23/11 | | X | |

This page intentionally left blank.



**Citizenship and Immigration Services Ombudsman**
**U.S. Department of Homeland Security**

Mail Stop 0180
Washington, DC 20528
Telephone:  (202) 357-8100
Toll-free:  1-855-882-8100

http://www.dhs.gov/cisombudsman

Send your comments to:   **cisombudsman@hq.dhs.gov**