**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| **J.O.P.**, *et al.*, | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Case No.: GJH-19-1944** |
| **U.S. DEPARTMENT OF** | * | |
| **HOMELAND SECURITY**, *et al.*, | * | |
| **Defendants.** | * | |
|  | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

Pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* ("APA"), and the Due Process Clause of the Fifth Amendment to the United States Constitution, a group of undocumented immigrants who entered the United States as unaccompanied children ("Plaintiffs"), on behalf of themselves and a class of all others similarly situated, brought this action against the U.S. Department of Homeland Security ("DHS") and several of its officials and components ("Defendants"). Plaintiffs allege that the government unlawfully modified policies governing treatment of asylum applications by unaccompanied immigrant children ("UACs") in a May 2019 Memorandum.

On August 2, 2019, the Court granted Plaintiffs' Motion for Temporary Restraining Order ("TRO"), enjoining enforcement of the May 2019 Memorandum, ECF Nos. 54, 55, and on October 15, 2019, granted Plaintiffs' consent motion, converting the Order into a preliminary injunction. ECF Nos. 70, 71. Pending before the Court now is Plaintiffs' Motion for Class Certification and Appointment of Class Counsel, ECF No. 117, Plaintiffs' Motion to Amend the

Preliminary Injunction, ECF No. 124, a Joint Motion to Stay Summary Judgment Schedule, ECF

No. 135, and a Joint Motion for Entry of Parties' Proposed Protective Order, ECF No. 136.[1] No

hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the following reasons, Plaintiffs'

Motion for Class Certification is granted; Plaintiffs' Motion to Amend is granted, in part, and

denied, in part; the Joint Motion to Stay is granted; and the Joint Motion for Entry of Parties'

Proposed Protective Order is granted.

## I.       BACKGROUND

Because of the complexity of this case and the number of motions now pending before

the Court, the Court begins by outlining the procedural history before turning to the statutory and

regulatory regime at issue and Plaintiffs' specific allegations.

### A.       Procedural Background

Plaintiffs J.O.P. (by and through next friend, G.C.P.), M.A.L.C., M.E.R.E., and K.A.R.C.

filed a Complaint on July 1, 2019,[2] against DHS, its then-Acting Secretary Kevin McAleenan,

U.S. Citizenship and Immigration Services ("USCIS"), and USCIS's Acting Director Kenneth

Cuccinelli, alleging that a change in Defendants' policy with respect to asylum applications filed

by unaccompanied alien[3] children violated the APA and the Due Process Clause of the Fifth

Amendment of the U.S. Constitution. ECF No. 1. Plaintiffs simultaneously filed a Motion for

TRO. ECF No. 14.

The Court held a hearing on the Motion for TRO on July 19, 2019, ECF Nos. 43, 53, and

---

[1] Also pending is Defendants' Motion for Extension of Time to Respond to Plaintiffs' Motion for Class Certification and Appointment of Class Counsel. ECF No. 123. This Motion is granted.

[2] Plaintiffs filed motions to seal an unredacted version of their Complaint, ECF No. 5, and to proceed under pseudonyms, ECF No. 12, which the Court granted, ECF Nos. 55, 114.

[3] The Court recognizes that "many consider 'using the term 'alien' to refer to other human beings' to be 'offensive and demeaning.' [The Court uses] . . . the term only where necessary 'to be consistent with the statutory language' that Congress has chosen and 'to avoid any confusion in replacing a legal term of art with a more appropriate term.'" *See Trump v. Hawaii*, 138 S. Ct. 2392, 2443 n.7 (2018) (Sotomayor, J., dissenting) (quoting *Flores v. U.S. Citizenship & Immigration Servs.*, 718 F.3d 548, 551–52 n.1 (6th Cir. 2013)).

issued a Memorandum Opinion and Order granting the Motion on August 2, 2019, ECF Nos. 54,

55. In its Order, the Court:

> a. enjoined and restrained [Defendants] from applying their new asylum eligibility policy, as set forth in USCIS's May 31, 2019 memorandum, to bar individuals previously determined to be unaccompanied alien children ("UACs") from seeking asylum before the agency; and
>
> b. enjoined and restrained [Defendants] from rejecting jurisdiction over the application of any UAC (as defined in the Homeland Security Act, 6 U.S.C. § 279(g)(2)) under the Trafficking Victims Protection Reauthorization Act ("TVPRA") whose application would have been accepted under the USCIS policy predating the May 31, 2019 memorandum;
>
> . . .
>
> [and ordered Defendants to] retract any adverse decision already rendered in an individual case applying the 2019 UAC Memorandum . . . and reinstate consideration of such case applying the 2013 UAC Memorandum[.]

ECF No. 55. On August 9, 2019, Defendants filed a Motion for Extension of Time to Comply

with Court Order because of logistical challenges in reviewing decisions that may have been

rendered under the May 2019 Memorandum. ECF No. 57. Following a teleconference, ECF No.

59, the Court extended the TRO to September 3, 2019, ECF No. 60, and accordingly denied

Defendants' Motion as moot, ECF No. 116. The Court extended the TRO two additional times at

the parties' joint request. ECF Nos. 63, 66. On October 9, 2019, Plaintiffs filed a consent motion

to convert the TRO into a preliminary injunction, ECF No. 70, which the Court granted on

October 15, 2019, ECF No. 71.

Plaintiffs filed an unopposed Motion to File an Amended Complaint on November 21,

2019. ECF No. 74. A month later, on December 20, 2019, Plaintiffs filed the Amended

Complaint, adding a new Plaintiff, E.D.G., replacing former Defendant McAleenan with new

Acting DHS Secretary, Chad Wolf, and adding as Defendants U.S. Immigration and Customs

Enforcement ("ICE") and ICE's Acting Director, Matthew T. Albence. ECF No. 91. As with the

original Complaint, Plaintiffs filed a motion for permission for new Plaintiff E.D.G. to proceed

under a pseudonym and omit his home address from the caption of the pleading, ECF No. 92,

and a motion to seal a copy of the Amended Complaint containing that information, ECF No. 93.

On June 3, 2020, this Court granted all three procedural motions, ECF Nos. 74, 92, 93, and held

that Plaintiffs' Amended Complaint, ECF No. 91, will be treated as the operative pleading for

this action. ECF No. 115 at 2, 5;[4] ECF No. 116.

 On November 22, 2019, Plaintiffs filed a Motion to Enforce the Preliminary Injunction,

asserting that Defendants were failing to fully comply with the Court's Order by continuing to

implement some portions of the May 2019 USCIS Memorandum—namely Footnote 5, which

directs USCIS asylum officers to defer to Executive Office for Immigration Review ("EOIR")

determinations that an applicant was not an UAC at the time of filing. ECF Nos 75, 76. The

Court issued a Memorandum Opinion and Order denying Plaintiffs' Motion on June 3, 2020.

ECF Nos. 115, 116. However, the Court denied Plaintiffs' Motion without prejudice "to

Plaintiffs' right to move for emergency equitable relief to enjoin the enforcement of the

[immigration judge ("IJ")] deferral policy if Plaintiffs believe such enforcement threatens

impending irreparable harm." ECF No. 115 at 24–25.

 Defendants filed a Motion to Dismiss the Amended Complaint on January 3, 2020. ECF

No. 101. Through its June 3, 2020 Memorandum Opinion and Order, the Court denied that

Motion as well. ECF Nos. 115, 116. Moreover, the Court ordered Defendants to produce an

administrative record so that the Court could consider the record before the agency at the time

the agency acted. ECF Nos. 115, 116.

 Plaintiffs filed a Motion for Class Certification and Appointment of Class Counsel on

---

[4] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

June 15, 2020, requesting that this Court certify the following class with named Plaintiffs as

class representatives:[5]

> All individuals nationwide who prior to the effective date of a lawfully
> promulgated policy prospectively altering the policy set forth in the 2013 Kim
> Memorandum (1) were determined to be an Unaccompanied Alien Child; and (2)
> who filed an asylum application that was pending with the United States
> Citizenship and Immigration Services ("USCIS"); and (3) on the date they filed
> their asylum application with USCIS, were 18 years of age or older, or had a
> parent or legal guardian in the United States who is available to provide care and
> physical custody; and (4) for whom USCIS has not adjudicated the individual's
> asylum application on the merits.

ECF No. 117. Defendants responded in Opposition on July 13, 2020. ECF No. 126. Plaintiffs

replied in support of the Motion for Class Certification on July 27, 2020. ECF No. 130.

Additionally, on July 7, 2020, Plaintiffs filed a Motion to Amend the Preliminary

Injunction, requesting that the Court enjoin Defendants from engaging in three practices that

allegedly threaten to irreparably harm prospective class members before the Court has the

opportunity to rule on the merits in this case—(1) USCIS's deferral to IJ determinations that an

asylum application was not one filed by a UAC; (2) ICE's advocacy in immigration courts for IJs

to exercise jurisdiction over prospective class members despite the preliminary injunction in this

case; and (3) USCIS's alleged practice of treating agency records that indicate nothing more than

that a UAC had turned 18 or been reunited with a parent or legal guardian as an "affirmative

act." ECF No. 124. Defendants responded in Opposition on July 21, 2020. ECF No. 127.

Plaintiffs replied in support of the Motion to Amend the Preliminary Injunction on August 4,

2020. ECF No. 134.

Finally, the parties have filed two Joint Motions: (1) a Joint Motion to Stay Summary

---

[5] In light of named plaintiff K.A.R.C. being granted asylum, Plaintiffs request that the Court specifically identify
remaining named plaintiffs as the class representatives. ECF No. 130 at 7 n.1. Plaintiffs' revised proposed order
reflects this request. ECF No. 130-3.

Judgment Schedule, ECF No. 135, requesting that briefing on the parties' motions for summary judgment be stayed pending the resolution of the parties' disputes regarding the contents of the administrative record; and (2) a Joint Motion for Entry of Parties' Proposed Protective Order, ECF No. 136. These motions were filed on August 10, 2020, and August 25, 2020, respectively. ECF Nos. 135, 136.

> **B.**     **Statutory and Regulatory Framework, Initial Complaint, and Enjoined Policy**

While the Court has described the statutory and regulatory regime at issue in this case in previous Memorandum Opinions, *see, e.g.*, ECF Nos. 54, 115, it is useful to review it again here. In 2002, Congress enacted the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 ("HSA"). Among other provisions, the HSA assigned the care of "unaccompanied alien children who are in Federal custody by reason of their immigration status" to the Director of the Office of Refugee Resettlement of the Department of Health and Human Services ("HHS"). *See id.* § 462(a), (b), *codified at* 6 U.S.C. § 279(a), (b). The statute defines "unaccompanied alien child" ("UAC") as a child who: "(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom-- (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." *Id.* § 462(g), *codified at* 6 U.S.C. § 279(g).

In 2008, Congress enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"). Pub. L. No. 110-457, 122 Stat. 5044. Among a variety of provisions establishing protections for at-risk immigrant children, the statute provides that any federal agency that apprehends or discovers a UAC must notify HHS within 48 hours and must transfer custody of the child to HHS within 72 hours. *Id.* § 235(b), *codified at* 8 U.S.C. § 1232(b)(2), (3). Importantly, the TVPRA also provides that USCIS asylum officers "shall have

initial jurisdiction over any asylum application filed by an unaccompanied alien child." *Id.* § 235(d)(7)(B), *codified at* 8 U.S.C. § 1158(b)(3)(C). Demonstrating the significance of this provision to the issues raised in this case requires a brief overview of the regime governing asylum claims.

There are two processes by which a UAC can apply for asylum: affirmative and defensive. The affirmative asylum process, overseen by USCIS, occurs when an immigrant, who is present in the U.S. and has been here for less than a year, affirmatively files an asylum application. *See* 8 U.S.C. § 1158. The application then appears before an asylum officer who conducts a private interview "in a nonadversarial manner." 8 C.F.R. § 208.9(b). Asylum officers are specially trained by USCIS in "international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles." *Id.* § 208.1(b).

The second process begins when an individual is placed in section 240 removal proceedings in immigration court and raises their asylum claim as a defense to removal.[6] Individuals enter section 240 proceedings after receiving a "notice to appear." *Id.* § 1229(a). If the applicant has been served, IJs, not USCIS, "shall have exclusive jurisdiction" over the individual's asylum application during the adversarial immigration court proceedings. 8 C.F.R. § 208.2(a), (b). Immigration courts are operated by EOIR, a DOJ component established by regulation. *Id.* §§ 1003.0, 1003.9, 1003.10.

UACs are unique among asylum applicants in that, under the TVPRA's initial jurisdiction provision, USCIS has initial jurisdiction over their applications even when removal proceedings have been initiated. The statute also exempts UACs from the requirement that a

---

[6] Section 240 of the Immigration and Nationality Act ("INA") concerns "the inadmissibility or deportability of an alien." 8 U.S.C. § 1229a(a)(1).

potential asylee file an application within a year of arriving in the United States. *See* 8 U.S.C. § 1158(a)(2))(B), (E). Therefore, whether an applicant is considered a UAC can have a significant impact on his or her progression through the asylum process—this status determines whether the asylum application is adjudicated by USCIS after a non-adversarial interview or by an IJ in adversarial removal proceedings.

The TVPRA delegates authority to adopt regulations governing UAC asylum applications that "take into account the specialized needs of [UACs] and which address both procedural and substantive aspects of handling [UACs'] cases." 8 U.S.C. § 1232(d)(8). The statute does not specify which agency should promulgate such rules, however, and to date no agency has done so, leaving the relationship between pre-TVPRA asylum regulations and the statute's special provisions for UAC applicants somewhat unspecified. USCIS has partially filled this gap with a series of agency memoranda that have addressed, among other issues, if and how asylum officers should assess whether asylum applicants are UACs. The memoranda, as well as other USCIS publications, are included as exhibits and cited in Plaintiffs' Amended Complaint. *See* ECF No. 91. The first memorandum, issued March 25, 2009 by USCIS Asylum Division Chief Joseph Langlois ("2009 Langlois Memo"), directed that the agency would assess, both when an asylum application was received and during the applicant's interview, whether the applicant qualified as a UAC at the time of filing the application. *Id.* ¶ 76; *see* ECF No. 91-2 at 5. Such an inquiry was necessary, Chief Langlois explained, because USCIS lacks jurisdiction over applications filed by individuals in removal proceedings that are not UACs. ECF No. 91-2 at 5.

In September 2012, the Citizenship and Immigration Services Ombudsman, an oversight official within DHS, *see* 6 U.S.C. § 272, issued a report finding that "USCIS' policy of redetermining UAC status creates delay and confusion." ECF No. 91-3 at 6. The report used the

term "redetermination" to describe USCIS's practice under the 2009 Langlois Memo of reexamining whether each claimed UAC asylum applicant was in fact a UAC and disregarding the earlier UAC determination made by the DHS component that apprehended the applicant— either U.S. Customs and Border Patrol ("CPB") or ICE—that enabled the individual to file an application with USCIS despite being in removal proceedings. *See id.* at 4, 7; *see also* ECF No. 91 ¶ 81. The report noted that USCIS's redeterminations frequently resulted in the agency rejecting applications for lack of jurisdiction, producing unfairness and unpredictability for applicants, as well as a significant waste of time and resources. ECF No. 91-3 at 8. The Ombudsman further stated that "[s]ubjecting a child seeking asylum to multiple UAC determinations as is required by USCIS' temporary guidance appears at odds with the TVPRA's express purpose, namely, to provide timely, appropriate relief for vulnerable children." *Id.* at 6. The report thus recommended that USCIS eliminate redeterminations and simply accept and adjudicate the applications of individuals previously determined to be UACs by ICE or CBP. *Id.* at 4–6; *see* ECF No. 91 ¶ 84.

USCIS adopted this recommendation in a May 28, 2013 memorandum by Acting Asylum Division Chief Ted Kim ("2013 Kim Memo"), which modified the procedures established in the 2009 Langlois Memo. ECF No. 91-4 at 2. Under the new policy, in cases in which CPB or ICE had already determined that an applicant was a UAC and that determination "was still in place on the date the asylum application was filed," USCIS would adopt that determination without another factual inquiry. *Id.* at 2–3. The memorandum further clarified that "[u]nless there was an affirmative act by HHS, ICE or CBP to terminate the UAC finding before the applicant filed the initial application for asylum," USCIS would adopt the previous determination that the applicant was a UAC "and take initial jurisdiction over the case." *Id.* at 3. USCIS would follow this

procedure and decline to "question the applicant regarding his or her age and whether he or she is accompanied by a parent or legal guardian . . . even if there appears to be evidence that the applicant may have turned 18 years of age or may have reunited with a parent or legal guardian since the CPB or ICE determination." *Id.*; *see* ECF No. 91 ¶¶ 87–88.

Six years later, on June 14, 2019, USCIS published on its website the memorandum at issue in this case, which revised the procedures established in the 2013 Kim Memo. ECF No. 91-1 at 2. The memorandum ("2019 Redetermination Memo"), which was dated May 31, 2019, discussed a decision by the Board of Immigration Appeals ("BIA"), an appellate body within EOIR that, among other duties, reviews IJ decisions in section 240 proceedings, *see* 8 C.F.R. § 1003.1(a), (b)(1). ECF No. 91-1 at 3. The 2019 Redetermination Memo explained that in that BIA decision, *Matter of M-A-C-O-*, 27 I. & N. Dec. 477 (BIA 2018) ("*MACO*"), the BIA concluded that IJs have jurisdiction to determine whether an individual previously determined to be a UAC, but who turned 18 years old before filing an asylum application, no longer qualifies as a UAC. ECF No. 91-1 at 3 (citing *MACO*, 27 I. & N. Dec. at 478). If the IJ makes such a finding, the BIA held, the IJ should conclude that the TVPRA's initial jurisdiction provision no longer applies and that jurisdiction over the application is held solely by the immigration court. *Id.* (citing *MACO*, 27 I. & N. Dec. at 478). The memorandum clarified, however, that *MACO* does not divest USCIS of its authority to determine whether an application was filed by a UAC, with the result that both IJs and USCIS have authority to determine whether USCIS has jurisdiction over a given application. *Id.*

The 2019 Redetermination Memo then stated the policy change it was implementing:

> To ensure that USCIS is making these jurisdictional determinations in a manner consistent with Immigration Judge determinations on the same issue under *Matter of M-A-C-O-*, USCIS is returning to making independent factual inquiries in all cases in order to determine whether the individual met the UAC definition on the

date of filing the asylum application. This will help prevent incongruous results where USCIS would otherwise have deferred to a prior UAC determination that fails to take into consideration the age and other circumstances of the applicant at the time of filing the application.

*Id.* at 3–4. The memorandum set forth the procedures that an asylum officer should apply when making a determination whether an applicant qualified as a UAC at the time of filing, stating that "[t]he asylum officer must evaluate whether the asylum application was filed by a UAC by making an independent factual inquiry." *Id.* at 4. Additionally, citing *MACO* for the proposition that "EOIR has jurisdiction to determine its own jurisdiction," the memorandum stated in a footnote ("Footnote 5") that "[i]f EOIR has explicitly determined that USCIS does not have jurisdiction over an asylum application because it is not one filed by a UAC, the asylum officer will defer to that determination." *Id.* at 5 n.5. Finally, the memorandum stated that it becomes effective 30 days from its issuance and that its new procedures apply to "any USCIS decision issued on or after the effective date." *Id.* at 2 (emphasis in the original).

In their initial Complaint and TRO Motion, Plaintiffs alleged that the 2019 Redetermination Memo's requirement that USCIS reevaluate whether each claimed UAC asylum applicant was a UAC at the time of filing violated the APA, the TVPRA, and Plaintiffs' due process rights. ECF No. 1 ¶¶ 123–25, 127–29, 132–37; ECF No. 14 at 2. As described previously, the Court, on August 2, 2019, granted the TRO and barred enforcement of the 2019 Redetermination Memo. ECF Nos. 54, 55. Specifically, the Court enjoined Defendants: (1) "from applying their new asylum eligibility policy, as set forth in USCIS's May 31, 2019 memorandum, to bar individuals previously determined to be unaccompanied alien children ('UACs') from seeking asylum before the agency;" and (2) "from rejecting jurisdiction over the application of any UAC (as defined in the Homeland Security Act, 6 U.S.C. § 279(g)(2)) under the Trafficking Victims Protection Reauthorization Act ("TVPRA") whose application would

have been accepted under the USCIS policy predating the May 31, 2019 memorandum." ECF No. 55 at 1.

The Court also ordered USCIS to "retract any adverse decision already rendered in an individual case applying the 2019 UAC Memorandum [2019 Redetermination Memo] within one week following entry of this Order and reinstate consideration of such case applying the 2013 UAC Memorandum." *Id.*[7] The basis of the Court's ruling was the finding that Plaintiffs were likely to succeed on claims that Defendants violated the APA by failing to use notice-and-comment rulemaking to implement the policies in the 2019 Redetermination Memo and by failing to consider the reliance interests created by the 2013 Kim Memo. ECF No. 54 at 8.

### C.      Original Plaintiffs

Plaintiffs in this action allege that they came to the United States as children to escape violence, abuse, and persecution in their home countries. *See* ECF No. 91 ¶¶ 25–26, 32, 37, 43, 48.

Plaintiff J.O.P. is an 18-year-old from Guatemala currently residing with his mother in College Park, Maryland. *Id.* ¶ 25. J.O.P. fled his home country when he was 15 years old after witnessing a murder and receiving threats of violence. *Id.* ¶¶ 26, 132. DHS agents determined that he was a UAC on or about November 25, 2015, after which he was reunified with his mother. *Id.* ¶¶ 28–29. He filed an asylum application with USCIS on February 20, 2018, when he was 17 years old, but he has yet to obtain an interview and is currently in section 240 removal proceedings. *Id.* ¶¶ 27, 30, 133.

Plaintiff M.A.L.C. is 21 years old and is also from Guatemala, where he experienced repeated threats of violence and extortion after his parents were murdered. *Id.* ¶¶ 31–32. He fled

---

[7] The Court's later Preliminary Injunction Order, which indefinitely extended the TRO, included the same language with minor immaterial modifications. ECF No. 71 at 1–2.

to the United States in August 2016 when he was 17 years old and was determined to be a UAC by DHS agents at that time. *Id.* ¶¶ 32, 34, 124. On February 14, 2018, when he was 19 years old, he filed an asylum application with USCIS. *Id.* ¶ 35. Currently residing in Los Angeles, California, he has yet to obtain an asylum interview and is now in section 240 removal proceedings. *Id.* ¶¶ 31, 35.

Plaintiff M.E.R.E. is a 20-year-old currently residing in Temple Hills, Maryland. *Id.* ¶ 36. He fled his home country of El Salvador at 15 years old because of the abuse, discrimination, and persecution he experienced based on his sexual orientation. *Id.* ¶¶ 37, 120. On or about November 15, 2014, DHS agents determined that M.E.R.E. was a UAC, although he was subsequently reunified with his mother. *Id.* ¶¶ 39–40. On March 30, 2018, when he was 18 years old, M.E.R.E. filed an asylum application with USCIS. *Id.* ¶ 41. He has not yet been scheduled for an interview and is now in section 240 removal proceedings. *Id.* ¶¶ 38, 41, 122.

Plaintiff K.A.R.C. is 20 years old and currently resides in Gaithersburg, Maryland. *Id.* ¶ 42. K.A.R.C. is also from El Salvador and fled the country when he was 17 years old because of the abuse, discrimination, and persecution he experienced based on his perceived sexual orientation. *Id.* ¶¶ 43, 128, 130. In approximately May 2016, DHS agents determined that K.A.R.C. was a UAC. *Id.* ¶ 45. K.A.R.C. filed an asylum application with USCIS in the fall of 2017 when he was 18 years old and was interviewed in November 2017. *Id.* ¶¶ 46, 129. On July 1, 2020, USCIS issued a letter to K.A.R.C. granting him asylum. ECF No. 126 at 22 n.3; ECF No. 130 at 7 n.1.

### D.     Amended Complaint and Motion to Amend the Preliminary Injunction

Plaintiff E.D.G. was added to this action in the Amended Complaint. ECF No. 91. E.D.G. is a 20-year-old from Honduras who currently resides in Kansas City, Missouri. ECF No. 91

¶ 47. E.D.G. fled Honduras when he was 17 years old after years of sexual, physical, and emotional abuse and grievous harm inflicted by a gang whose recruitment efforts he had refused. *Id.* ¶¶ 48, 135. DHS agents determined that E.D.G. was a UAC on or about July 4, 2016, and he was placed in section 240 removal proceedings the following day. *Id.* ¶¶ 49–50. E.D.G. filed an asylum application with USCIS in late 2017, when he was 18 years old, and was interviewed on March 6, 2018. *Id.* ¶ 51. Before a decision was issued, however, an IJ ordered E.D.G. removed on October 10, 2018, after concluding that the immigration court had jurisdiction over E.D.G.'s asylum application and denying the application on the merits. *Id.* ¶ 52. E.D.G.'s appeal is currently pending before the BIA. *Id.* On July 25, 2019, in reliance on the 2019 Redetermination Memo, USCIS rejected jurisdiction over E.D.G.'s asylum application because he had not established that he was under 18 years old at the time he filed it. *Id.* ¶ 53.

The Court's TRO, barring enforcement of the 2019 Redetermination Memo, was issued on August 2, 2019, ECF No. 55, and USCIS reopened E.D.G.'s case in compliance with the Order on August 5, 2019, ECF No. 91 ¶¶ 53, 137. On September 30, 2019, however, while the TRO remained in effect, USCIS again rejected jurisdiction over E.D.G.'s application. ECF No. 91 ¶ 54. The agency issued to E.D.G. a Notice of Lack of Jurisdiction stating that the "Immigration Judge made an affirmative act to terminate UAC status on October 10, 2018." *Id.* ¶ 137. Plaintiffs allege that this decision was made pursuant to Footnote 5 of the 2019 Redetermination Memo, which directs USCIS to defer to EOIR determinations that USCIS lacks jurisdiction over an application because it was not filed by a UAC. *Id.* ¶¶ 15, 137. Plaintiffs allege in the Amended Complaint and in the Motion to Amend the Preliminary Injunction that Defendants' deferral to IJ determinations—illustrated by Plaintiff E.D.G.'s experience—is in

violation of the Due Process Clause and the APA and thus should be enjoined. ECF No. 91 at 159–62, 171–79; ECF No. 124-1 at 18–19.

Plaintiffs further allege in the Amended Complaint that "Defendants have maintained a policy and practice that erroneously deprives" Plaintiffs, and the class of similarly situated UAC asylum applicants that they seek to represent, "of USCIS's statutory initial jurisdiction over their asylum applications[.]" *Id.* ¶ 141. Newly added Defendant ICE, Plaintiffs contend, contributes to this deprivation in its role as a prosecutor in immigration courts. *Id.* ¶¶ 18, 60, 140. According to Plaintiffs, ICE maintains a policy or practice of advocating for IJs to conclude that applicants who have turned 18 or reunified with a parent before applying for asylum are not within USCIS's jurisdiction. *Id.* ¶ 22.

Specifically, Plaintiffs assert that ICE attorneys argue before IJs that EOIR should assert its jurisdiction in such cases in order to deprive USCIS of the opportunity to exercise initial jurisdiction, given the IJ deferral policy in the 2019 Redetermination Memo. *Id.* ¶¶ 18, 108. Further, Plaintiffs allege that ICE prosecutors actively oppose in removal proceedings efforts by UACs to delay IJ consideration of their asylum claims while USCIS considers them. *Id.* ¶ 140. Instead, ICE advocates for scheduling IJ hearings on the asylum claims and actively opposes continuances or postponements. *Id.* ¶¶ 140–41. Plaintiffs allege that this advocacy before IJs is directly related to USCIS's decision to defer to IJ jurisdictional determinations, evidencing a concerted, cross-agency strategy of attempting to evade or minimize the impact of the TVPRA's initial jurisdiction provision for UACs, and thus should be enjoined. *Id.* ¶¶ 18, 141; *see also* ECF No. 124-1 at 21–23.

Plaintiffs illustrate ICE's alleged behavior by introducing proposed class member J.S.G.C. in the Motion to Amend the Preliminary Injunction. ECF No. 124-1 at 10. J.S.G.C. is an

18-year-old from Mexico. *Id.*; ECF No. 124-5 ¶ 2. DHS classified J.S.G.C. as a UAC when he entered the United States on June 26, 2019, but later released J.S.G.C. to the care of his mother on his eighteenth birthday. ECF No. 124-1 at 10; ECF No. 124-5 ¶¶ 3–4. In August 2019, DHS served J.S.G.C. with a Notice to Appeal and placed him in removal proceedings. ECF No. 124-1 at 10; ECF No. 124-5 ¶ 5. On December 20, 2019, J.S.G.C.'s counsel filed an asylum application with USCIS on his behalf. ECF No. 124-1 at 10; ECF No. 124-5 ¶ 6. His application remains pending, but USCIS has not scheduled an asylum interview for J.S.G.C. yet. *Id.*

At a February 12, 2020, master calendar hearing in immigration court, J.S.G.C.'s counsel moved, in reliance on this Court's preliminary injunction order, to hold J.S.G.C.'s removal proceedings in abeyance while USCIS adjudicated his asylum application. ECF No. 124-1 at 10; ECF No. 124-5 ¶¶ 8, 10. The ICE Assistant Chief Counsel filed an opposition to J.S.G.C.'s motion in April 2020, arguing that USCIS does not have initial jurisdiction over J.S.G.C.'s asylum application under *MACO* because J.S.G.C. filed his asylum application with USCIS after he turned 18 years old. ECF No. 124-1 at 10–11; ECF No. 124-5 ¶¶ 11–12. The ICE Assistant Chief Counsel dismissed J.S.G.C.'s counsel's arguments regarding this Court's preliminary injunction as reliance on "an internal USCIS memorandum[] and . . . district court decisions from other jurisdictions, none of which bind the Immigration Judge[.]" ECF No. 124-7 at 4. On April 16, 2020, the immigration judge denied J.S.G.C.'s motion, explicitly relying on ICE's arguments against USCIS's initial jurisdiction. ECF No. 124-1 at 11; ECF No. 124-5 ¶ 13; ECF No. 124-8 at 3.[8]

Finally, in the Motion to Amend the Preliminary Injunction, ECF No. 124, Plaintiffs

---

[8] However, through further motion practice based on his pursuit of an additional form of relief (Special Immigrant Juvenile Status), on June 23, 2020, J.S.G.C.'s counsel persuaded the judge to place his case on the status docket. ECF No. 124-1 at 11; ECF No. 124-5 ¶ 15.

allege additional problematic behavior by Defendants that is indicative of Defendants' policy and practice of depriving Plaintiffs, and the proposed class of others similarly situated, of USCIS's statutory initial jurisdiction over their asylum applications. Specifically, Plaintiffs claim that "Defendant USCIS has adopted a practice of treating agency records, indicating nothing more than that a UAC has turned 18 or been reunited with a parent or legal guardian, as an 'affirmative act' even though that interpretation is at odds with the 2013 Kim Memo and the asylum applicants are never made aware of any putative redetermination." ECF No. 124-1 at 6. Plaintiffs claim that this behavior—like USCIS's deferral to IJ determinations and ICE's advocacy in immigration courts for IJs to exercise jurisdiction over prospective class members despite the preliminary injunction in this case—is a back door method of effectuating the policy goal outlined in the 2019 Redetermination Memo while maintaining that USCIS is now operating under this Court's Order to revert to the 2013 Kim Memo.

Plaintiffs further illustrate Defendants' actions through the introduction of a prospective class member, L.M.Z. ECF No. 124-1 at 11. L.M.Z. is a 9-year-old from Mexico who entered the United States on or about May 20, 2018. *Id.*; ECF No. 124-9 ¶¶ 2–3. Upon his entry, Defendant DHS determined that L.M.Z. was a UAC, issued him a Notice to Appear, and placed him in removal proceedings in immigration court. ECF No. 124-1 at 11; ECF No. 124-9 ¶¶ 3–4. HHS released L.M.Z. to the care of his mother on or about June 8, 2018. ECF No. 124-1 at 11; ECF No. 124-9 ¶ 5. On February 8, 2019, while his removal proceedings were pending in immigration court, L.M.Z. filed his asylum application with USCIS. ECF No. 124-1 at 12; ECF No. 124-9 ¶ 7.

On February 5, 2020, L.M.Z. appeared with counsel for his scheduled asylum interview with USCIS. ECF No. 124-1 at 12; ECF No. 124-9 ¶¶ 9–10; ECF No. 124-13 ¶ 7. The asylum

officer did not ask any questions about the merits of L.M.Z.'s asylum claim, and, instead, asked a series of questions about the care provided by his mother. ECF No. 124-1 at 12; ECF No. 124-13 ¶¶ 7–8. The officer ended the interview following those questions, stating that she was making a final factual finding that L.M.Z. was not a UAC. ECF No. 124-1 at 12; ECF No. 124-13 ¶ 8. L.M.Z.'s counsel informed the officer that USCIS must exercise jurisdiction under the 2013 Kim Memo, as affirmed by this Court's Preliminary Injunction Order, but the officer, after conferring with her supervisor, refused to complete the interview. ECF No. 124-1 at 12; ECF No. 124-13 ¶ 8.

On March 13, 2020, USCIS issued a "Notice of Lack of Jurisdiction (Non-UAC)," denying jurisdiction over L.M.Z.'s case. ECF No. 124-1 at 12; ECF No. 124-9 ¶ 12. In the asylum officer's declaration, she stated that she "reviewed the comments tab in the ENFORCE Alien Removal Module (EARM) and determined that ICE had taken affirmative action on August 14, 2018 that terminated the prior UAC designation." ECF No. 125-5 ¶ 6. On that date, an ICE agent entered a notation in the computer system that "[s]ubject is no longer designated a UAC under the TVPRA as of date of release to sponsor-mother- on 06/08/2018." *Id.* Plaintiffs contend that such a notation is not an "affirmative act" as described in the 2013 Kim Memo, and USCIS's "litigation-inspired reinterpretation . . . is substantively indistinguishable from the 2019 Redetermination Policy that the Court enjoined[.]" ECF No. 124-1 at 24. Thus, Plaintiffs argue that "Defendants' practice of treating a mere recognition [in a government database] that UAC had turned 18 or been reunited with a parent or legal guardian" as an "affirmative act" violates the Due Process Clause and the APA and should thus be enjoined. ECF No. 124-1 at 24–27.

## II.  DISCUSSION

The Court discusses the parties' pending motions below separately and in the order they

were filed for maximum clarity.

     **A.**     **Plaintiffs' Motion for Class Certification and Appointment of Class Counsel**

A class action allows representative parties to prosecute not only their own claims, but also the claims of other similarly situated individuals. *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th Cir. 2006). "Chief among the justifications for this device is its efficiency[.]" *Id.* Adjudication of a properly-constituted class action "saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion." *Id.* (alteration in original) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). "Class certification is strictly a procedural matter, and the merits of the case at stake are not to be considered when deciding whether to certify a class." *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 214 (D. Md. 1997) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974)).

Class certification is governed by Fed. R. Civ. P. 23, which provides a two-step framework for certifying a class. First, the proposed class must satisfy the four prerequisites identified in Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequate representation"). Fed. R. Civ. P. 23(a). If those requirements are satisfied, the action must further qualify for one of the three categories of classes identified in Rule 23(b): (1) prosecuting separate actions would create a risk of inconsistent or varying adjudications or impair the ability of nonparties to protect their interests; (2) final injunctive or declaratory relief is appropriate; or (3) questions of law or fact common to all class members

predominate over any questions affecting only individual members, and a class action is superior

to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P.

23(b).

In addition to the two-step framework expressly laid out in Rule 23, the Fourth Circuit

has "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the

members of a proposed class be 'readily identifiable.'" *EQT Prod. Co. v. Adair*, 764 F.3d 347,

358 (4th Cir. 2014) (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)). Other

circuits have described this rule as an "ascertainability" requirement. *Id.* "However phrased, the

requirement is the same. A class cannot be certified unless a court can readily identify the class

members in reference to objective criteria." *Id.*

### 1.     Readily Identifiable

Defendants contend that Plaintiffs' class definition fails to meet the "ascertainability"

requirement because "identifying who did not meet the UAC definition at the time of filing their

asylum application—a pivotal element of Plaintiffs' proposed class definition—entails

substantial administrative difficulties[,]" and because "Plaintiffs' class definition lacks sufficient

clarity to even identify such relevant class." ECF No. 126 at 11. Plaintiffs' responding argument

is twofold: (1) the ascertainability threshold does not apply to Rule 23(b)(2) classes; and (2) even

if it did, the proposed class is ascertainable. ECF No. 130 at 7, 11. The Court addresses both

arguments below.

### a.     The "Readily Identifiable" or "Ascertainability" Standard Applies to Class Certification under Fed. R. Civ. P. 23(b)(2) Under Fourth Circuit Precedent

The Fourth Circuit first adopted the threshold requirement that members of a proposed

class be "readily identifiable" in *Hammond*, 462 F.2d at 1055. The Fourth Circuit, without

discussion, concluded in *Hammond* that "the class [was] adequately delineated" and that "[a]t the

time of judgment the individual members of the class [would] be readily identifiable." *Id.* The Fourth Circuit later explained that this "readily identifiable" threshold requirement is implicit in Rule 23. *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 728 (4th Cir. 1989) ("Though not specified in the Rule, establishment of a class action implicitly requires . . . that there be an identifiable class"). It was not until *EQT Production Co.*, 764 F.3d 347, however, that the Fourth Circuit expounded on the meaning of the "readily identifiable" requirement.

In *EQT Production Co.*, the Fourth Circuit vacated the class certification decision of the district court and remanded the case for reconsideration of the ascertainability issues, concluding that the district court had previously "failed to rigorously analyze whether the administrative burden of identifying class members . . . would render class proceedings too onerous." 764 F.3d at 358. The Fourth Circuit explained "[a] class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *Id.* (citing *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012); *Crosby v. Soc. Sec. Admin. of U.S.*, 796 F.2d 576, 579–80 (1st Cir. 1986)). Specifically, although "plaintiffs need not be able to identify every class member at the time of certification[,] . . . '[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Id.* (quoting *Marcus*, 687 F.3d at 593). *EQT Production Co.* has come to stand for the proposition that the goal of the "readily identifiable" requirement is "to define a class in such a way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (quoting *EQT Prod. Co.*, 764 F.3d at 358). Moreover, opinions of this Court have further expounded that a "plaintiff cannot merely identify a mass of data which could aid the process of identifying class members[,] . . . the Plaintiff must also provide an efficient

method of using this information." *Spotswood v. Hertz Corp.*, No. RDB-16-1200, 2019 WL 498822, at *6 (D. Md. Feb. 7, 2019).

While not all Circuits agree with the Fourth Circuit's articulation of the ascertainability requirement, *see, e.g.*, *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017) ("conclud[ing] that a freestanding administrative feasibility requirement is neither compelled by precedent nor consistent with Rule 23"); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017) (declining to interpret Rule 23 to require that class representatives "demonstrate that there is an 'administratively feasible' means of identifying absent class members"); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 672 (7th Cir. 2015) ("declin[ing] Direct Digital's invitation to adopt a heightened ascertainability requirement" and instead holding that "[d]istrict courts should continue to insist that the class definition satisfy the established meaning of ascertainability by defining classes clearly and with objective criteria"), several Circuits have adopted a similar administrative feasibility interpretation of the threshold requirement, *see, e.g.*, *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016) ("we adopted the ascertainability requirement noting that certification necessitated 'a class description [that is] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member'" (internal citations omitted)); *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) ("The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class member fall within the class definition." (internal quotation marks omitted)); *Karhu v. Vital Pharm.*, 621 F. App'x 945, 946 (11th Cir. 2015) ("a class is not ascertainable unless the class definition contains objective criteria that allow for class members to be identified in an administratively feasible way"); *Crosby*, 796 F.2d at 580

(requiring that the "description of class . . . be sufficiently definite so that it is administratively feasible to determine whether a particular individual is a member").

Yet, of the Circuits that have espoused a heightened ascertainability requirement similar to that of the Fourth Circuit's, the First, Third and Sixth Circuits have said this administrative feasibility requirement does not apply in the context of certification under Fed. R. Civ. P. 23(b)(2). *See, e.g.*, *Cole*, 839 F.3d at 542 ("a judicially created implied requirement of ascertainability—that the members of the class be *capable* of specific enumeration—is inappropriate for (b)(2) cases" (emphasis in original)); *Shelton v. Bledsoe*, 775 F.3d 554, 561 (3d Cir. 2015) (same); *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972), *abrogated on other grounds by Gardner v. Westinghouse Broad. Co.*, 437 U.S. 478 (1978) ("Although notice to and therefore precise definition of the members of the suggested class are important to certification of a subdivision (b)(3) class, notice to the members of a (b)(2) class is not required and the actual membership of the class need not therefore be precisely delimited."). In reaching this conclusion, these courts have observed that the purposes for which courts created the heightened ascertainability requirement are absent in (b)(2) actions. "[A]scertainability is a requirement tied almost exclusively to the practical need to notify absent class members and to allow those members a chance to opt-out[,]" however, unlike (b)(3) classes, (b)(2) class members are not entitled to such notice and opportunity to opt-out. *Cole*, 839 F.3d at 541 (citing *Marcus*, 687 F.3d at 593); *see also Yaffe*, 454 F.2d at 1366. Thus, "the practical efficiencies that come with knowing the precise membership of the class are nonexistent" in a (b)(2) action. *Id.*; *see also Shelton*, 775 F.3d at 560–61. These courts also have observed, in reaching their conclusion, that, "because a remedy obtained by one member [of a (b)(2) class] will naturally affect the others, the identities of individual class members are less critical in a (b)(2) action[.]" *Shelton*, 775 F.3d at

561; *see also Cole*, 839 F.3d at 542. "If relief is granted . . . the defendants are legally obligated to comply, and it is usually unnecessary to define with precision the persons entitled to enforce compliance, since . . . the representative plaintiffs would be available to seek . . . relief if necessary." *Shelton*, 775 F.3d at 561 (internal quotations omitted) (quoting *Rice v. City of Phila*, 6 F.R.D. 17, 19 (E.D. Pa. 1974)). Lastly, these courts support their conclusion by citing to an Advisory Committee note to Fed. R. Civ. P. 23 that lists as an example of a (b)(2) class "various actions . . . where a party is charged with discriminating unlawfully against a class, *usually one whose members are incapable of specific enumeration.*" *Id.* (emphasis in original) (citing Fed. R. Civ. P. 23); *see also Cole*, 839 F.3d at 542; *Yaffe*, 454 F.2d at 1366. Such a class would undoubtedly fail an administrative feasibility requirement, and thus the courts conclude such a requirement must not apply to (b)(2) actions. *Shelton*, 775 F.3d at 561.

Plaintiffs now ask this Court to hold that the Fourth Circuit's interpretation of the "readily identifiable" threshold requirement aligns with that of the First, Third, and Sixth Circuits and thus to hold that the heightened ascertainability requirement outlined in *EQT Production Co.* does not apply to Plaintiffs' request to certify a class under Rule 23(b)(2). ECF No. 130 at 7–11. The problem with this request, however, is that it would not square with the Fourth Circuit's statements on the issue.

It is fair to say that the Fourth Circuit has not explicitly discussed whether the requirement that plaintiffs identify an administratively feasible way to identify class members should apply with equal force regardless of whether plaintiffs are attempting certification under Rule 23(b)(1), (2), or (3). But *EQT Production Co.*, 764 F.3d 347, at least suggests that it does. In *EQT Production Co.*, the Fourth Circuit discussed ascertainability with respect to the plaintiffs' "ownership classes" for which plaintiffs sought class certification under *both* Rules

24

23(b)(2) and (3). *See* 764 F.3d at 357. Specifically, the classes that the Fourth Circuit ultimately ordered the district court to reconsider on ascertainability grounds sought "a *declaration* that the class members [were] true owners of CBM, *as well as payment of the royalties* they believe [defendants] have improperly escrowed or withheld." *Id.* at 358 (emphasis added). The Fourth Circuit did not suggest a different analysis for each rule. Nor does the Fourth Circuit's expressed fear that, without an ascertainable class, it will "have little conception . . . of who may be bound by a potential merits ruling[,]" *id.* at 359–60, distinguish between rulings that involve declaratory relief, covered by Rule 23(b)(2), and rulings rewarding royalties or other individualized relief.

Despite the lack of explicit guidance on this issue, it appears that the Fourth Circuit's administrative feasibility interpretation of ascertainability applies equally to all classes regardless of the section of Rule 23(b) under which certification is pursued. While the Fourth Circuit may eventually decide to align with the reasoning of the First, Third, and Sixth Circuits and hold that the administrative feasibility requirement is inappropriate in the context of Rule 23(b)(2) because the purposes for which the requirement was created are absent; it has not yet done so. Based on the Court's reading of *EQT Production Co.,* the threshold requirement of ascertainability that is implicit in Rule 23 applies to Plaintiffs' proposed class.

### b.     Plaintiffs' Proposed Class is Readily Identifiable or Ascertainable

Although the ascertainability requirement applies to Plaintiffs' proposed class under Fourth Circuit precedent, Plaintiffs' class satisfies this requirement. Defendants present two arguments to the contrary: (a) "identifying who did not meet the UAC definition at the time of filing their asylum application . . . entails substantial administrative difficulties[,]" ECF No. 126 at 11; and (b) the class "definition is too vague to enable the court to identify a relevant class[,]" *id.* at 15. This Court will address each argument in turn.

**i.**     **Administrative Difficulties**

Defendants first argue that Plaintiffs' proposed class is not ascertainable because "identifying who did not meet the UAC definition at the time of filing their asylum application . . . entails substantial administrative difficulties." ECF No. 126 at 11. However, Defendants' argument ignores the circumstances of this case and the context in which class members would need to be identified.

The implicit prerequisite in Rule 23 that a class must be ascertainable stems from the requirement that a class must exist. *See* 7A Charles Alan Wright, et al., *Federal Practice and Procedure* § 1760 (3d ed. 2020). "Whether a class exists is a question of fact that will be determined on the basis of the circumstances of each case." *Id.* A court must analyze whether the members of a proposed class are readily identifiable in the context of the class proceedings at issue. *See EQT Production Co.*, 764 F.3d at 358. The relevant inquiry is whether "the administrative burden of identifying class members in the [instant case] *would render class proceedings too onerous.*" *Id.* (emphasis added). The answer here is no.

As discussed above, under Fourth Circuit precedent "[t]he goal [of the ascertainability requirement] is not to 'identify every class member at the time of certification,' but to define a class in such a way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." *Krakauer*, 925 F.3d at 658. As Plaintiffs point out, "this assessment is not made for mere curiosity, but in order to ensure compliance with the Court's orders." ECF No. 130 at 11. In a "Rule 23(b)(2) action, notice is not required, and the requested relief (vacatur of the [2019 Redetermination Memorandum] and a declaration of its invalidity) will be the same for all class members[,]" decreasing the likelihood that any individualized assessment of precise class membership will be

26

necessary. *Planned Parenthood of Md., Inc. v. Azar*, No. CV CCB-20-00361, 2020 WL 3893241,

at *5 (D. Md. July 10, 2020) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011)

("The Rule provides no opportunity for (b)(1) or (b)(2) class members to opt out, and does not

even oblige the District Court to afford them notice of the action.")). Moreover, because the

members of Plaintiffs' proposed class do not seek any form of monetary damages, the

probability that it will be necessary to identify particular individuals as class members is further

reduced. *Id.* at *5 n.9.

 Nevertheless, "[i]t is possible that the court might at some point need to decide whether a

specific individual is a class member and bound by the court's judgment or has the power to

enforce non-compliance with the judgment." *Id.* at *5. In this case, however, when that time

comes, it will likely be in the context of one of four scenarios: (1) USCIS denies jurisdiction over

an asylum applicant after determining that at the time of application the applicant did not qualify

as a UAC; (2) USCIS defers to an IJ's determination that an asylum applicant was not an UAC at

the time of filing and thus denies jurisdiction over the asylum application; (3) ICE advocates that

an IJ exercise jurisdiction over an asylum applicant because the applicant was not an UAC at the

time of filing; or (4) USCIS denies jurisdiction over an asylum applicant that was previously

determined to be a UAC after observing a notation in a government database indicating that the

applicant was not an UAC at the time of filing. In all four of these scenarios, by the time the

issue of class membership arises, Defendants will already have made, and documented in their

records, the determinations which Defendants complain will involve "extremely complex factual

issue[s]" and thus are not "administratively feasible[,]" ECF No. 126 at 13—*i.e.*, whether the

asylum applicant qualified as a UAC at the time of application..

 The circumstances of this case are therefore unlike the situation in *EQT Production Co.*,

764 F.3d 347, the case on which Defendants heavily rely. In *EQT Production Co.*, the Fourth

Circuit remanded the case for the district court to determine whether the proposed class—"(1) all

persons or their successors, (2) whom [defendants] have identified as being the owners of the gas

estate in a tract underlying a [coalbed methane gas ("CBM")] drilling unit, (3) whose interest in

the CBM is 'in conflict' because a different person owns the coal estate in the same tract"—was

ascertainable. *Id.* at 355, 360. The district court had concluded that the court could identify class

members in reference to ownership schedules listing all potential interest holders, but the Fourth

Circuit noted that some of the ownership schedules were twenty years old and did not reflect

changes in ownership such that ownership would have to be resolved based on land records, "a

complicated and individualized process." *Id.* at 353, 359. In contrast, here "[t]here is no need for

'extensive and individualized fact-finding or 'mini-trials'' to determine who [met the definition

of an UAC at the time of their asylum application]." *Planned Parenthood of Md., Inc.*, 2020 WL

3893241 at *6 (quoting *EQT Prod. Co.*, 764 F.3d at 358). Rather, by the time the inquiry occurs,

the court need only to look to Defendants' records. *See id.*

### ii.    Vagueness

Defendants next argue the proposed class fails the threshold ascertainability requirement

because the class "definition is too vague to enable the court to identify a relevant class." ECF

No. 126 at 15. This argument is broken into several parts, all of which are unavailing.

Defendants first claim that Plaintiffs' class is too vague to satisfy ascertainability because

"Plaintiffs fail to identify by whom the UAC determination need be made, under what authority,

and through which means of documentation in order to identify those individuals who 'were

determined to be a UAC.'" ECF No. 126 at 15. Plaintiff offers the following satisfactory

response: "determination of UAC status for purpose this class action is clear. The 2013 Kim

Memo, which this action seeks to restore and enforce, specifies that '[i]n cases in which CBP or

ICE has already determined that the applicant is a UAC, Asylum Offices will adopt that

determination and take jurisdiction over the case.'" ECF No. 130 at 13 (citation omitted). The

only exception is if HHS, CBP, or ICE vacate that determination through an affirmative act. ECF

No. 91-4 at 2–3. Thus, there is no ambiguity as to the meaning of "were determined to be an

Unaccompanied Alien Child[,]" ECF No. 117. Rather, it is clear that CBP and ICE's

determinations in the first instance that an individual is a UAC and HHS, CBP, and ICE's

affirmative acts to vacate those determinations, ECF 91-4 at 2–3, are the designations on which

this element of the class definition will rely.

    Next Defendants argue that the class definition is vague because Plaintiffs failed to

consider the impact of several different events on elements of the definition: (1) "how a USCIS

determination that it did not have jurisdiction under the 2013 Memo" would affect the "pending"

nature of the application; (2) how "an applicant's change of UAC status would affect the

'pending' nature of the application[;]" and (3) "how filing with the EOIR would affect the

operative filing date in determining whether an individual was an UAC 'on the date they filed

their asylum application with USCIS.'" ECF No. 126 at 15. However, Defendants fail to explain

what problems they envision and how those events would affect the ascertainability of Plaintiffs'

proposed class.

    Defendants' final vagueness argument again centers on the term "pending" and whether

Plaintiffs' class definition uses the term in the same way that Defendants use it internally. *Id.* at

16–18. However, the Court agrees with Plaintiffs that "pending" should be given its ordinary

meaning, which is sufficiently clear: "an application is pending during that period between

submission and action taken by USCIS." ECF No. 130 at 14. Thus, Plaintiffs' class definition is

not too vague to enable the court to readily identify members of the class.

Therefore, Plaintiffs have satisfied their burden of demonstrating that their class definition meets the threshold "readily identifiable" requirement implicit in Rule 23. *See Thorn*, 445 F.3d at 317 ("[P]laintiffs bear the burden . . . of demonstrating satisfaction of the Rule 23 requirements" (quoting *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 370 (4th Cir. 2004))).

## 2.     Commonality

"To establish commonality, the party seeking certification must 'demonstrate that the class members have suffered the same injury' and that their claims 'depend upon a common contention.'" *Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451, 458 (D. Md. 2014) (quoting *Dukes*, 564 U.S. at 350). "The inquiry is not whether common questions of law or fact predominate, but only whether such questions exist." *Hewlett*, 185 F.R.D. at 216. "Minor differences in the underlying facts of individual class members' cases do not defeat a showing of commonality where there are common questions of law." *Id.* "Thus, the commonality requirement is not a high bar[.]" *Minter v. Wells Fargo Bank, N.A.*, 274 F.R.D. 525, 533 (D. Md. 2011).

Here, Plaintiffs seek adjudication of a single legal issue that is common to all class members: whether the 2019 Redetermination Memo is unlawful. ECF No. 91 at 41. This issue has several subsidiary questions: (i) whether the 2019 Redetermination Memo is arbitrary and capricious under the APA; (ii) whether the 2019 Redetermination Memo violates the TVPRA; (iii) whether the 2019 Redetermination Memo violates due process; (iv) whether Defendants failed to comply with notice-and-comment rulemaking, as required by the APA, by issuing the 2019 Redetermination Memo; (v) whether Defendants' policy of deferring to an EOIR determination as to whether an asylum applicant is a UAC, as outlined in Footnote 5 of the 2019

Redetermination Memo, is arbitrary and capricious; and (iv) whether Defendants' adoption of the policy of deferral to EOIR determinations violated the APA. *Id.* ¶¶ 152–179. The 2019 Redetermination Memo and the policies that it outlines, including deference to EOIR determinations, govern USCIS's consideration of all asylum applications filed by applicants formerly determined to be UACs, including applications filed by proposed class members. All proposed class members are subject to, and fear, the same result: USCIS denying jurisdiction over their application based on policies that deviate from the policies outlined in the 2013 Kim Memo, on which the class members had previously relied. All proposed class members seek the same relief: a declaration that those policies are unlawful and an order permanently enjoining Defendants from implementing them.

In contesting the commonality requirement, Defendants argue that: (1) the legality, in substance and in process, of the 2019 Redetermination Memo and its subsidiary questions are not common to the entire class because these "are not questions that currently affect any applicants who have filed with USCIS because USCIS had rescinded the 2019 Memo, retracted all its jurisdictional determinations under it, and has not applied it to any case since it was rescinded[,]" ECF no. 126 at 19; (2) "[w]hether USCIS may deny jurisdiction based on novel 'affirmative acts' such as EOIR jurisdictional determinations . . . is not a question common to all members of the proposed class because not all individuals so described have received EOIR jurisdictional determinations[,]" *id.*; (3) Plaintiffs' proposed class does not satisfy commonality because "members of the proposed class are in a variety of procedural postures regarding their asylum applications[,]" *id.* at 20; and (4) the proposed class does not satisfy commonality because "a class action is not the appropriate method for resolving Plaintiffs' alleged Due Process harms[,]" *id.* at 21. The Court disagrees.

Defendants' first commonality argument can easily be discarded. This Court has already held that—regarding Plaintiffs' requests that the Court declare the 2019 Redetermination Memorandum unlawful, that it be vacated, and that Defendants be enjoined from "enforcing or applying any aspect of the 2019 Redetermination Memo[,]" ECF No. 91 at 41–4—"Plaintiffs ha[ve] not obtained all of the relief they [seek.]" ECF No. 115 at 33. This was true before Plaintiffs filed the Amended Complaint, and especially after. *Id.* While Defendants now assert that the 2019 Redetermination Memo has been rescinded, ECF No. 126 at 19, it is not clear that agreeing to the injunction and providing notice on the USCIS website that USCIS may not rely on the 2019 Redetermination Memo to reject jurisdiction over any asylum application filed by a UAC is tantamount to a formal rescission that carries the force of law. *See* ECF No. 126-2 ¶ 10. Moreover, proposed class members are all still subject to the same risk that, before USCIS reviews their applications on its merits, an IJ will make a finding that they were not a UAC at the time of filing their asylum application—perhaps as a result of ICE advocacy—and thus USCIS will deny jurisdiction over their application while still maintaining that USCIS no longer relies on the 2019 Redetermination Memo to accept or reject jurisdiction over an applicant.

Defendants' second and third commonality arguments can be combined into a single argument that Plaintiffs' lack commonality because they are "in a variety of procedural postures regarding their asylum applications." ECF No. 126 at 20. That argument, too, is unavailing. "Commonality does not require class members to share *all* issues in the suit, but simply a single common issue," and "[t]hus, factual differences among members' cases will not preclude certification if the class members share the same legal theory." *Bullock v. Bd. of Educ. of Montgomery Cty.*, 210 F.R.D. 556, 560 (D. Md. 2002) (emphasis in original). Here, the purported differences among proposed class members are not determinative of the legal issues

32

that Plaintiffs present in the case. Again, all members of the proposed class are subject to, and

fear, the same result—denial of their asylum application based on policies that were not lawfully

promulgated and that depart from those on which they relied—and seek the same relief. Class

members do not ask the Court to determine whether their asylum applications should be

approved by USCIS, an inquiry to which the purported differences could be relevant. Rather,

they simply request the opportunity to have their asylum applications considered by USCIS

under lawfully promulgated policies, and they ask the Court to determine that Defendants'

current variations from the policies outlined in the 2013 Kim Memo, on which proposed class

members relied, are unlawful in process and in substance. Such an outcome would not entitle

proposed class members to any specific outcome in their asylum applications, and the fact that

some class members may have their applications rejected for other reasons does not impact the

Court's assessment of this common legal issue.

Defendants' final commonality argument is that, under Supreme Court precedent as

articulated in *Jennings v. Rodriguez*, 138 S. Ct. 830, 852 (2018), a class action is not the

appropriate method for resolving Plaintiffs' alleged due process harms because of the flexibility

of the due process analysis combined with the proposed class's inclusion of "UACs whose

asylum applications USCIS would not have adjudicated on the merits even under the 2013

Memo[.]" ECF No. 126 at 21–22. Defendants argue that the dissimilarities in the Plaintiffs'

proposed class "would require the Court to engage in fact-intensive analyses of each putative

class member." *Id.* at 22. However, this argument also fails to convince the Court.

First, as Plaintiffs note, the Supreme Court in *Jennings v. Rodriguez* did not state a class

action *cannot* be certified if it pursues a due process claim. ECF No. 130 at 19; *see Jennings*, 138

S. Ct. at 852. Rather, it merely suggested that "some members of the certified class may not be

entitled to bond hearings[, *i.e.*, the requested remedy,] as a constitutional matter." *Id.* Moreover,

the instant case is distinguishable. Here, regardless of whether all proposed class members would

have had their asylum applications adjudicated on the merits under the 2013 Kim Memo, there is

a single inquiry and a single relief requested; whether applying the 2019 Redetermination

Memorandum and associated policies retroactively to asylum applicants who had already filed

violates the Due Process clause, and, if so, whether the application of the Memorandum should

be enjoined. This inquiry and relief does not "require the Court to engage in fact-intensive

analyses of each putative class member." ECF No. 126 at 22.

### 3.    Typicality

"Typicality determines whether a sufficient relationship exists between the injury to the

named plaintiff and the conduct affecting the class, so that the court may properly attribute a

collective nature to the challenged conduct." *Hewlett*, 185 F.R.D. at 217. "[T]he 'plaintiff's

claim cannot be so different from the claims of absent class members that their claims will not be

advanced by plaintiff's proof of his own individual claim.'" *Edmondson v. Eagle Nat'l Bank*,

336 F.R.D. 108, 116 (D. Md. 2020) (quoting *Dieter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th

Cir. 2006)). A "claim may differ factually and still be 'typical' of the claims of class members if

it arises from the same event or practice or course of conduct that gives rise to the claims of other

class members[.]" *Bullock*, 210 F.R.D. at 560 (internal quotation marks omitted); *see Ealy v.

Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013) (internal citations omitted)

("Although a representative's claims and the claims of other members of the class need not be

'perfectly identical or perfectly aligned,' the representative's pursuit of his own interests 'must

simultaneously tend to advance the interests of the absent class members.'"). As Defendants

note, the inquiries under the typicality and commonality requirements of Rule 23(a) "tend to

merge." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).

Defendants argue that typicality has not been met because "jurisdiction has not yet been determined for many of those described in the proposed class" and "[w]ithout jurisdictional decisions, the Plaintiffs cannot assert that the 2019 Memo has been applied to them." ECF No. 126 at 22. Defendants further argue that because Defendants "have [allegedly] retracted decisions applying the 2019 Memo to decline USCIS jurisdiction for all of the named Plaintiffs as well as for all applications pending before it" and have instead "applied the 2013 Memo to all of these cases[,]" Plaintiffs cannot assert that the 2019 Memo has been applied to them. *Id.* at 22–23. Finally, Defendants argue that the different procedural postures of the proposed class members defeat typicality. *Id.* at 23. None of these arguments are persuasive.

As Plaintiffs point out, and as already analyzed in the Court's commonality discussion, "[r]egardless of their individual differences, each prospective class member pursues the same claims for the same result[,]" ECF No. 130 at 20–21: a declaration that the 2019 Redetermination Memo and associated policies are unlawful, both in substance and in process, and an order enjoining the application of those policies. "Whether a prospective class member has already received a jurisdictional denial based on the 2019 Redetermination Memorandum or has a pending application but meets the criteria that would warrant denial under the 2019 Redetermination memorandum, each has the same unified interest in not having that policy applied to their asylum application." ECF No. 130 at 21. This is true even if some proposed class members might eventually have their asylum applications denied for other reasons. Thus, typicality is met. *See Edmondson*, 336 F.R.D. at 1177 (finding typicality despite potential differences in class members' claims, as "the kickback scheme described by Plaintiffs would be violative of RESPA (if proven), regardless of whether an individual class member had engaged

in first-time financing or refinancing").[9]

### 4.    Other Factors

Although Defendants do not challenge numerosity, fair representation, or whether the class meets the requirements of Rule 23(b)(2), the court has an independent obligation to ensure that these prerequisites are met. *Thorn*, 445 F.3d at 318 ("district courts must conduct a rigorous analysis to ensure compliance with Rule 23, paying careful attention to the requirements of [that] Rule" (internal quotation marks and citations omitted)).

The proposed class meets the numerosity requirement. "To satisfy the numerosity requirement, the proposed class must be so numerous that 'joinder of all members is impracticable.'" *Amaya v. DGS Constr., LLC*, 326 F.R.D. 439, 446 (D. Md. 2018) (quoting Fed. R. Civ. P. 23(a)(1)). The Fourth Circuit has said that 74 members is "well within the range appropriate for class certification," *Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984), and has upheld the certification of a class with as few as 18 members, *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967). USCIS records reflect that, at the end of March 2019, there were 27,106 pending asylum cases filed under the initial jurisdiction provision of the TVPRA while applicants were in removal proceedings, ECF No. 117-1 at 11 (citing U.S. Citizenship & Immigration Servs., *MPA and PRL Report – Fiscal Year 2019* (2019), https://www.uscis.gov/outreach/asylum-division-quarterly-stakeholder-meeting-10; U.S. Citizenship & Immigration Servs., *Asylum Statistics Key* (2019), http://www.uscis.gov/outreach/asylum-division-quarterly-stakeholder-meeting-10), and, according to a public statement by USCIS, it is likely that a substantial portion of these

---

[9] To the extent Defendants argue that Plaintiffs' proposed class fails to meet the requirements of typicality for the reasons Defendants' articulated regarding commonality, those arguments fail for the reasons discussed in the Commonality section. *See* ECF No. 126 at 22.

36

applications involve UACs who have been placed with one or more parents. *Id.* (citing Memorandum from John Kelly, Secretary of the U.S. Dep't of Homeland Sec. 10 (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf ("Approximately 60% of minors initially determined to be 'unaccompanied alien children' are placed in the care of one or more parents")). The thousands of UACs who submitted these applications come from throughout the country and joinder of all members is impracticable.[10]

There is adequate representation under Fed. R. Civ. P. 23(a)(4). "Representation is adequate if: (1) the named plaintiffs' interests are not opposed to those of other class members, and (2) the plaintiffs' attorneys are qualified, experienced and able to conduct the litigation." *Planned Parenthood of Md., Inc.*, 2020 WL 3893241 at *7. Here, there does not appear to be any conflict between the named plaintiffs and the other class members, *see* ECF No. 117-4; ECF No. 117-5; ECF No. 117-6; ECF No. 117-8, and counsel is qualified and experienced, s*ee* ECF No. 117-9; ECF No. 117-10; ECF No. 117-11; ECF No. 117-12; ECF No. 117-13; ECF No. 117-14; ECF No. 117-15; ECF No. 117-16.

Finally, Rule 23(b)(2) is met. Rule 23(b)(2) provides that a class action may be maintained if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . ." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class

---

[10] At the very least, as of October 9, 2019, "[t]he Asylum Offices have identified 192 cases where the 2019 memo was applied." ECF No. 77-2 at 4. Moreover, "[t]he A files [were] being retrieved still [and thus the Government acknowledged that the] 192 number may therefore rise a bit." *Id.* These proposed class members alone would satisfy the requirements of numerosity.

members or as to none of them." *Dukes*, 564 U.S. at 360 (citation and internal quotation marks omitted); *see also* Fed. R. Civ. P. 23, Advisory Committee Note to 1966 Amendment of Subdivision (b)(2) ("Action or inaction is directed to a class within the meaning of [Rule 23(b)(2)] even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on ground which have general application to the class."). Because the 2019 Redetermination Memo and associated policies apply generally to the class, and the requested relief—declaring the Memorandum and policy unlawful under the APA and/or the Due Process clause and preventing Defendants from applying those policies—"would provide the same relief to all class members[,]" Plaintiffs' proposed class meets the requirements of Fed. R. Civ. P. 23(b)(2). *Planned Parenthood of Md., Inc.*, 2020 WL 3893241 at *7 (quoting *Healthy Futures of Texas v. Dep't of Health & Human Servs.*, 326 F.R.D. 1, 8 (D.D.C. 2018)).

Plaintiffs' proposed class meets the threshold "readily identifiable" requirement, satisfies all four parts of Rule 23(a), and satisfies Rule 23(b)(2), and thus this Court will grant Plaintiffs' Motion for Class Certification and Appointment of Class Counsel.

### B.    Plaintiffs' Motion to Amend the Preliminary Injunction

Plaintiffs filed a Motion to Amend the Preliminary Injunction pursuant to Rule 54(b). ECF No. 124. Specifically, Plaintiffs request that the Court "enjoin Defendants from engaging in three practices that threaten to irreparably harm prospective class members before the Court has the opportunity to rule on the merits in this case[,]" ECF No. 124 at 1: (1) USCIS's deference to IJ's jurisdictional determinations, ECF No. 124-1 at 8–10; (2) ICE's advocacy against USCIS jurisdiction in removal proceedings, ECF No. 124-1 at 10–11; and (3) USCIS's treatment of a mere determination or notation that a child has been reunited with a parent as an "affirmative act," ECF No. 124-1 at 11–13.

Under Federal Rule of Civil Procedure 54(b), "any order . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P 54(b). Accordingly, when appropriate, a district court retains the power to reconsider and modify its interlocutory judgments at any time before final judgment. *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir. 2003). Resolution of the motion is "committed to the discretion of the district court," *id.* at 515, and "the goal is to reach the correct judgment under law," *Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F. Supp. 2d 612, 618 (D. Md. 2013) (citation and quotation marks omitted).

The Fourth Circuit has not articulated a standard for review of a Rule 54(b) motion. *CytImmune Scis., Inc. v. Paciotti*, No. PWG-16-1010, 2016 WL 6879942, at *1 (D. Md. Nov. 22, 2016). Nevertheless, this court frequently looks to the standard for Rule 59(e) when considering Rule 54(b) motions. *Id.* (citing *Cezair v. JPMorgan Chase Bank, N.A.*, No. CIV.A. DKC-13-2928, 2014 WL 4955535, at *1 (D. Md. Sept. 30, 2014)); *see also Harper v. Anchor Packing Co.*, No. CIV.A. GLR-12-460, 2014 WL 3828387, at *1 (D. Md. Aug. 1, 2014), *aff'd sub nom. Hurley v. CBS Corp.*, 648 F. App'x 299 (4th Cir. 2016) (looking to Rule 59(e) standard); *Potter v. Potter*, 199 F.R.D. 550, 552 n.1 (D. Md. 2001) (applying Rule 59(e) standard). Aligning with the Rule 59(e) standard, this Court has held that granting a Rule 54(b) motion is appropriate if "(1) there has been an intervening change in controlling law; (2) there is additional evidence that was not previously available; or (3) the prior decision was based on clear error or would work a manifest injustice." *Scalia v. Peters*, No. GLR-18-2933, 2020 WL 4734414, at *1 (D. Md. Aug. 14, 2020) (internal quotation marks and citation omitted); *see also Potter*, 199 F.R.D. at 552 n.1 (citations omitted). "Although there may be many valid reasons to reconsider an order, 'a motion to reconsider is not a license to reargue the merits or present new evidence' that was previously

available to the movant." *Carrero v. Farrelly*, No. CV JKB-16-3939, 2018 WL 1761957, at *2
(D. Md. Apr. 12, 2018) (internal citation omitted). "A motion to modify a preliminary injunction
is meant only to relieve inequities that arise *after* the original order." *Brightview Grp., LP v.
Teeters*, No. CV SAG-19-2774, 2020 WL 4003168, at *5 (D. Md. July 15, 2020) (emphasis in
original) (quoting *Favia v. Indiana Univ. of Pa.*, 7 F.3d 332, 338 (3d Cir. 1993)). "[M]odification
[of an injunction] is not warranted if the court determines that the moving party is relying upon
events that actually were anticipated when the decree was entered." 11A Charles Alan Wright, et
al., *Federal Practice and Procedure* § 2961 (3d ed. 2010); *see also Merrell-Nat'l Labs., Inc. v.
Zenith Labs., Inc.*, 579 F.2d 786, 791–92 (3d Cir. 1978) (affirming a trial court's denial of a
motion to modify a preliminary injunction because the evidence presented "could have been
produced on the original motion for an injunction").

      The purpose of a preliminary injunction is to "protect the status quo and to prevent
irreparable harm during the pendency of a lawsuit[,] ultimately to preserve the court's ability to
render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d
517, 525 (4th Cir. 2003). The grant of a preliminary injunction is an "extraordinary remedy that
may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Dewhurst
v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (quoting *Winter v. Nat. Res. Def.
Council*, 555 U.S. 7, 22, 129 S.Ct. 365, 376 (2008)) (internal quotation marks omitted). Thus, the
burden placed upon Plaintiffs to state a claim for a preliminary injunction is high.

      The Supreme Court and the Fourth Circuit recognize that, in order to receive a
preliminary injunction, a plaintiff must establish:

> [(1)] he is likely to succeed on the merits, [(2)] that he is likely to suffer
> irreparable harm in the absence of preliminary relief, [(3)] that the balance of
> equities tips in his favor, and [(4)] that an injunction is in the public interest.

*Dewhurst*, 649 F.3d at 290. All four requirements must be met in order for a preliminary

injunction to be granted. *See id.* However, the final two factors generally "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As discussed above, Plaintiffs have requested the Court essentially expand the current injunction to include three of Defendants' alleged practices and policies. The Court will analyze each policy separately.

### 1.    USCIS's Deference to IJ's Jurisdictional Determinations

#### a.    Reconsideration is Appropriate under Rule 54(b)

Plaintiffs argue that, under Rule 54(b), it is appropriate for this Court to amend its preliminary injunction order and enjoin defendants from deferring to IJs' jurisdictional determinations because new evidence "indicates that more specific prohibitions are required to protect prospective class members while this case is still pending." ECF No. 124-1 at 15. Additionally, Plaintiffs argue that—since this Court initially entered its injunction  to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit, ultimately to preserve the court's ability to render a meaningful judgment on the merits[,]" ECF No. 124-1 at 15 (quoting ECF No. 54 at 7)—it would be manifestly unjust for some proposed class members, "who would share in the relief afforded by a favorable resolution of the claims in the Amended Complaint, to be excluded from the preliminary injunction and thus potentially subject to removal before those claims could proceed to judgment." ECF No. 124-1 at 15.

Defendants respond that, "[a]s a threshold matter, this motion . . . should be denied because no new evidence has become available since the preliminary injunction was entered[.]" ECF No. 127 at 14. According to Defendants, "the IJ deferral practice predated the 2019 Memo, [and thus] its application cannot be considered 'new evidence' making amendment to the preliminary injunction [in]appropriate before the resolution of this case on the merits." ECF No.

127 at 15. Rather, Defendants characterize Plaintiffs' Motion as simply "repackage[ing] a request this Court has already denied[.]" *Id.* Defendants, however, do not address Plaintiffs' argument that this Court should amend the preliminary injunction in order to prevent a manifest injustice.

First, the Court disagrees with Defendants that Plaintiffs' motion is simply a repackaged Motion to Enforce. As Plaintiffs' note, this Court denied Plaintiffs' Motion to Enforce "without prejudice . . . to Plaintiffs' right to move for emergency equitable relief to enjoin enforcement of the IJ deferral policy if Plaintiffs believe such enforcement threatens impending irreparable harm." ECF No. 134 at 6 (quoting ECF No. 115 at 24–25). Moreover, this Court, in denying Plaintiffs' Motion to Enforce, declined to decide whether the IJ deferral policy was consistent with the TVPRA, Defendants' past practice, and the APA because it would "narrow [the] issues presented by the Amended Complaint without the benefit of the record and briefing that litigating the Amended Complaint would entail." ECF No. 115 at 24. The current Motion elicits a different analysis; resolving Plaintiffs' Motion to Amend the Preliminary Injunction only requires the Court to find that Plaintiffs are likely to succeed on the merits and that proposed class members are likely to suffer irreparable harm if Defendants' policy is not enjoined. *See Dewhurst*, 649 F.3d at 290.

With respect to Plaintiffs' two proposed bases for a Rule 54(b) Motion—the availability of new evidence and the need to prevent a manifest injustice—the Court finds that, to the extent Plaintiffs can satisfy each element of the preliminary injunction standard, amending the preliminary injunction to enjoin the Defendants' policy of deference to IJs' jurisdictional determinations is necessary to correct a manifest injustice. "The exception for manifest injustice appears to be concerned essentially with fairness in the administrative process[,]" *Kasey v.*

*Sullivan*, 3 F.3d 75, 79 (4th Cir. 1993) (discussing the standard for Fed. R. Civ. P. 59(e), which this court has used to guide the analysis under Rule 54(b)), and this Court agrees with Plaintiffs that it would be manifestly unfair for some proposed class members, "who would share in the relief afforded by a favorable resolution of the claims in the Amended Complaint, to be excluded from the preliminary injunction and thus potentially subject to removal before those claims could proceed to judgment."[11] ECF No. 124-1 at 15. Because the Court finds that this Motion is properly brought under Rule 54(b) to prevent a manifest injustice, it is not necessary to address the parties' dispute regarding whether there is "new evidence."

> **b.      Plaintiffs are Entitled to a Preliminary Injunction**

Despite this Court's finding that a Rule 54(b) Motion is proper, to be entitled to the relief they request, Plaintiffs still must show that enjoining USCIS's deferral policy is appropriate under the preliminary injunction standard. Plaintiffs must show they are likely to succeed on the merits—*i.e.*, it is likely that USCIS's deferral policy is unlawful—and that proposed class members are likely to suffer irreparable harm in the absence of an injunction.

> **i.      Likelihood of Success on the Merits**

The grant of a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Dewhurst*, 649 F.3d at 290 (quoting *Winter*, 555 U.S. at 22). Thus, the burden placed upon Plaintiffs to show that each requirement of a preliminary injunction is met is high. Consequently, merely "providing sufficient factual allegations to meet the [Fed. R. Civ. P.] 12(b)(6) standard of *Twombly* and

---

[11] In alignment with the legal authority, this inequity did not arise until after the initial preliminary injunction and it does not appear that Plaintiffs anticipated this result at the time of the original injunction. *Brightview Grp., LP*, 2020 WL 4003168 at *5; 11A Charles Alan Wright, et al., *Federal Practice and Procedure* § 2961. For example, USCIS reopened E.D.G.'s case based on this Court's preliminary injunction on August 5, 2019, only for USCIS to again reject initial jurisdiction over E.D.G.'s asylum application "on the grounds that the 'Immigration Judge made an affirmative act to terminate UAC status on October 10, 2018' (almost 10 months after he filed the application with the USCIS)." ECF No. 124-1 at 9–10.

*Iqbal*" does not show a likelihood of success on the merits. *Allstate Ins. Co. v. Warns*, No. CIV. CCB-11-1846, 2012 WL 681792, at \*14 (D. Md. Feb. 29, 2012). Moreover, "[c]ourts have declined to issue a preliminary injunction when there are significant factual disputes." *Chattery Int'l, Inc. v. JoLida, Inc.*, No. CIV. WDQ-10-2236, 2011 WL 1230822, at \*9 (D. Md. Mar. 28, 2011); *see also Torres Advanced Enter. Sols., LLC v. Mid-Atl. Prof'ls Inc.*, No. PWG-12-3679, 2013 WL 531215, at \*3 (D. Md. Feb. 8, 2013). Defendants articulate two arguments why Plaintiffs have not met this high bar: (1) Plaintiffs are unlikely to succeed on the merits because "the IJ deferral practice predated and arose separately from the 2019 Memo[,]" ECF No. 127 at 17; and (2) the BIA's ruling in *MACO* dictated that "USCIS had no choice but to defer to an IJ assessment that a person was not a UAC on her filing date when an IJ made such an assessment[,]" *id.* at 17–18.

As to the first argument, while there is no disputing that the deferral policy was memorialized in Footnote 5 of the 2019 Redetermination Memo, the parties disagree as to when the policy first changed. Importantly, however, it is also undisputed that this deferral practice was binding on "<u>any</u> USCIS decision" regarding jurisdiction over an asylum case, ECF No. 91-1 at 2 (emphasis in original), and was adopted, at some juncture, without the benefit of notice-and-comment rulemaking.

As explained in this Court's Memorandum Opinion granting Plaintiffs' original Motion for a TRO, under the APA, legislative rules must go through notice-and-comment rulemaking before they become effective. *See* 5 U.S.C. § 553(a)–(c); *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 619–20 (4th Cir. 2019). This requirement does not apply to interpretive rules. *Children's Hosp*, 896 F.3d at 620. A rule is "legislative," rather than "interpretive," if it "effects a substantive change in existing law or policy." *Id.* When a rule

affects "individual rights and obligations" it is "a substantive rule—or a 'legislative-type rule.'" *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) (internal citation omitted) (quoting *Morton v. Ruiz*, 415 U.S. 199, 232, 236 (1974)). Additionally, legislative rules "are rules issued by agencies pursuant to statutory authority and which implement the statute[.]" *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1340 (4th Cir. 1995). Because Defendants' policy of deferral, regardless of when it was adopted, did not go through the notice-and-comment procedure, the question for the Court is whether it is a legislative or interpretive rule.

Plaintiffs are likely to succeed in demonstrating the deferral policy is legislative in nature because the policy—regardless of whether it was adopted before the 2019 Redetermination Memo—is inconsistent with prior agency policy, as articulated in the 2013 Kim Memo, and thus caused a "substantive change in existing law or policy." *Children's Hosp*, 896 F.3d at 620. Pursuant to the deferral policy, USCIS officers must now defer to an IJ's jurisdictional determination, if one exists, even if that determination was made after the UAC filed their asylum application with the USCIS. This appears to be inconsistent with the clear instructions in the 2013 Kim Memo that "[i]n cases in which CBP or ICE [have] already determined the applicant is a UAC" and there is not "an affirmative act by HHS, ICE or CBP to terminate the UAC finding *before* the applicant filed the initial application for asylum, Asylum Offices *will* adopt the previous DHS determination that the applicant was a UAC." ECF No. 91-4 at 3 (emphasis added). Under the deferral policy, E.D.G. or similar individuals, who under the plain language of the 2013 Kim Memo would have had their asylum application considered by USCIS, where techniques and procedures sensitive to the needs and challenges of UACs are employed, ECF No. 54 at 2–3, are now at risk of USCIS denying jurisdiction in deference to an IJ determination. Thus, Plaintiffs will likely be able to establish that the USCIS's policy of

deferring to IJs' jurisdictional determinations is a change in policy and should have gone through notice-and-comment.

Defendants' argument that the BIA ruling in *MACO* requires deference is also unpersuasive. As Plaintiffs point out, this argument presents "an entirely new position that is contradicted by the 2019 Redetermination Memorandum itself and Defendants' earlier positions in this litigation." ECF No. 134 at 9. The 2019 Redetermination Memo explains: "The BIA's decision [in *MACO*] . . . does not divest USCIS of its authority to determine whether an application before it was filed by a UAC, such that USCIS has jurisdiction over it. Rather, both the Immigration Judge and USCIS have authority to make this jurisdictional determination." ECF No. 91-1 at 3; *see also* ECF No. 128-31 at US-000282 (agenda for May 2019 USCIS Asylum Division Quarterly Meeting, stating *MACO* "addresses immigration judge determinations as to whether an asylum application was filed by a UAC" but "does not address USCIS determinations about its own jurisdiction. USCIS continues to make its jurisdictional determinations under its own procedures."). Thus, Defendants argument that *MACO* "is binding on USCIS and requires that, where an IJ has determined that the TVPRA's jurisdictional provision . . . does not apply, USCIS must defer to that determination[,]" ECF No. 127 at 20, fails.[12]

### ii.     Irreparable Harm

Plaintiffs have also met their burden to demonstrate that USCIS's policy of deferring to IJs' jurisdictional determinations will cause irreparable harm if this Court does not grant Plaintiffs' Motion to Amend the Preliminary Injunction. Plaintiff E.D.G.'s precarious position is

---

[12] Because Plaintiffs' are likely to succeed on their claim that USCIS's policy of deferring to IJs' jurisdictional determinations violates the notice-and-comment requirements of the APA, it is unnecessary to consider whether Plaintiffs' other claims that the deferral policy is unlawful are meritorious.

demonstrative. "E.D.G.'s appeal of his asylum denial is pending before the BIA, and if the BIA dismisses his appeal, he will have a final, enforceable removal order[,]" and may be removed before this Court is able to rule on the merits of the parties' cross-motions for summary judgment. ECF No. 124-1 at 19. Removal constitutes irreparable harm, *see Sanchez v. McAleenan*, No. GJH-19-1728, 2020 WL 607032, at *7 (D. Md. 2020); *Tefel v. Reno*, 972 F. Supp. 609, 619 (S.D. Fla. 1997), and, in the absence of preliminary injunctive relief, proposed class members similarly situated to E.D.G. will likely continue to be removed and will later have a difficult time returning to the United States even if Plaintiffs and the proposed class receive a favorable ruling. A preliminary injunction will therefore maintain the status quo and ensure that asylum applicants whose applications allegedly should have been reviewed on the merits by USCIS under the 2013 Kim Memo can actually benefit from any final ruling in their favor. Defendants' insistence that "there is no immediate risk of removal[,]" ECF No. 127 at 7, does not convince the Court otherwise. Defendants fail to offer any timeline for how far E.D.G. might be from the conclusion of removal proceedings and do not contest the declaration of Miguel Mariscal, stating, "I anticipate that within weeks of the BIA decision ICE would issue a 'bag and baggage' letter requiring E.D.G. to report to ICE with his belongings for removal to Honduras[,]" ECF No. 124-3 ¶ 21; *see also* ECF No. 124-1 at 19–20. ECF No. 134 at 16–17.

In addition, Defendants do not dispute that some proposed class members, who delayed filing their asylum applications in reliance on Defendants' 2013 Kim Memo, may lose their opportunity to pursue asylum entirely if USCIS defers to an IJ determination that the class member was not a UAC at the time of the application. As discussed in the background section of this Memorandum Opinion, UACs are exempted from the one-year bar for filing an asylum application. If an IJ determines a proposed class member was not a UAC at the time of filing his

or her asylum application, accepts jurisdiction over the application, denies such application because the application was filed past the one year mark, and USCIS then defers to the IJ's jurisdictional determination, that proposed class member will lose their opportunity to pursue asylum entirely.

### iii.    Balance of Equities

Analysis of the last two factors—the balance of equities and the public interest—merge here because the Government is the opposing party. *Nken*, 556 U.S. at 435. Substantially identical to this Court's conclusion in its Memorandum Opinion granting the original TRO, "[t]here is no evidence in the existing record that either Defendants or children applying for asylum will be harmed by pressing pause on enforcing [USCIS's policy of deferral to IJ's jurisdictional determination,] . . . but Plaintiffs have shown that the new policy will cause them harm." ECF No. 54 at 15. Thus, at this time, the balance of the harms favors a preliminarily enjoining USCIS's deferral policy.

The Court grants Plaintiffs' Motion to Amend the Preliminary Injunction to the extent they request that this Court enjoin USCIS's policy of deferring to IJ jurisdictional determinations.

### 2.    ICE's Advocacy Against USCIS Jurisdiction in Removal Proceedings

#### a.    Reconsideration is Appropriate under Rule 54(b)

Plaintiffs' Motion to Amend the Preliminary Injunction in order to enjoin ICE's advocacy against USCIS jurisdiction in removal proceedings is also properly brought under Rule 54(b) because an amendment to this Court's preliminary injunction will prevent a manifest injustice. *See Scalia v.* Peters, 2020 WL 4734414, at *1.

Plaintiffs argue ICE should not be able to implement policies that this Court has enjoined

by advocating against USCIS jurisdiction in removal proceedings in circumstances where USCIS

should accept initial jurisdiction over the asylum application under the 2013 Kim Memo. This

Court agrees and finds that it would be manifestly unjust to require Plaintiffs and proposed class

members to defend their asylum application in an adversarial setting—rather than the non-

adversarial forum that the TVPRA promises them—because of ICE's implementation of policies

that this Court has enjoined.

**b.**      **Plaintiffs are Entitled to a Preliminary Injunction**

**i.**      **Likelihood of Success on the Merits**

Plaintiffs' claim regarding ICE's advocacy is intertwined with behavior by Defendants

that this Court has already enjoined. Thus—with regard to the success on the merits element of

the preliminary injunction standard—Plaintiffs' request that the Court amend the preliminary

injunction to enjoin ICE from advocating in immigration court for IJs to exercise jurisdiction

over asylum applications filed by UACs cannot be analytically separated from Plaintiffs'

previously granted request that this Court enjoin USCIS's implementation of the 2019

Redetermination Memo and Plaintiffs' most recent request that this Court enjoin USCIS's

deferral to IJ jurisdictional determinations. As this Court recognized in its Memorandum Opinion

denying Defendant's Motion to Dismiss the Amended Complaint, "Plaintiffs have set forth an

APA claim against ICE and Acting Director Albence *based on* their implementation of those

policies[.]" ECF No. 115 at 39 (emphasis added). In short, Defendants should not advocate for

outcomes that are inconsistent with the Court's injunction. Thus, if Plaintiffs are likely to

succeed on the merits as to their claims regarding USCIS's application of the 2019

Redetermination Memo and the deferral policy, then Plaintiffs are likely to succeed on their

49

claim against ICE as well.[13]

### ii.    Irreparable Harm

The Court finds convincing Plaintiffs' argument that ICE's advocacy against USCIS jurisdiction in removal proceedings will result in irreparable harm and Defendants provide no rebuttal. If an IJ accepts ICE's arguments in immigration court, presented in opposition to the policy of its sister agency within DHS, and decides that it has jurisdiction to evaluate a UAC's asylum application, the UAC must defend his asylum claim in immigration court, subject to cross-examination and without the benefit of USCIS' child-sensitive and trauma-informed interview techniques. ECF No. 124-1 at 22–23. Even if the UAC later succeeds in bringing his asylum application before USCIS, the experience of reliving his trauma in the face of hostile interrogation cannot be erased. Accordingly, regardless of whether this Court orders USIC not to defer to IJ jurisdictional determinations—which it does here—ICE's advocacy may still result in members of the proposed class suffering irreparable harm. Thus, Plaintiffs have satisfied the irreparable harm element as required by the preliminary injunction standard.

### iii.    Balance of Equities

Again this Court's reasoning in its Memorandum Opinion granting the TRO applies with equal force here: "[t]here is no evidence in the existing record that either Defendants or children applying for asylum will be harmed by pressing pause on [ICE's advocacy against USCIS in removal proceedings,] . . . but Plaintiffs have shown that the new policy will cause them harm." ECF No. 54 at 15. Thus, the balance of equities tips in favor of amending this Court's

---

[13] Defendants' sole argument against this Court enjoining ICE's advocacy against USCIS jurisdiction is that Plaintiffs are attempting to add a named plaintiff, J.S.C.G., without amending the Amended Complaint and that, regardless, the new Plaintiff does not have standing. ECF No. 127 at 12–14. However, J.S.C.G.'s circumstances are solely illustrative of allegations that are already explicitly pled in the Amended Complaint, ECF No. 91 ¶ 108, the dismissal of which this Court has already denied. ECF No. 115 at 38–40.

preliminary injunction.

The Court grants Plaintiffs Motion to Amend the Preliminary Injunction in so far as they request the injunction of ICE's advocacy against USCIS jurisdiction in removal proceedings.

**3.      USCIS's Policy of Denying Jurisdiction over a Child's Asylum Application Based on an Alleged "Affirmative Act" Involving a Mere Notation that the Child Has Been Reunited with a Parent or Legal Guardian or Has Turned 18 Years Old**

The 2013 Kim Memo instructed USCIS asylum officers to accept initial jurisdiction over asylum applications filed by those previously determined to be a UAC, "[u]nless there was an *affirmative act* by HHS, ICE, or CBP to terminate the UAC finding before the applicant filed the initial application for asylum." ECF No. 91-4 at 3 (emphasis added). In particular, "even if there appears to be evidence that the applicant may have turned 18 years of age or may have reunited with a parent or legal guardian since the CBP or ICE determination[,]" the 2013 Kim Memo directed asylum officers to accept initial jurisdiction. *Id.* The 2019 Redetermination Memo changed this policy by directing asylum officers to re-examine UAC status in all cases and to decline initial jurisdiction if they concluded that the asylum applicant had turned 18 or been reunited with a parent or legal guardian at the time they filed their asylum application. *See* ECF No. 91-1 at 4–5. This Court has since enjoined USCIS's implementation of the 2019 Redetermination Memo. ECF No. 71.

However, Plaintiffs now argue that USCIS continues to reject jurisdiction over asylum applications based on a child's reunification with a parent or legal guardian or attainment of 18 years of age, ECF No. 124-1 at 24, and does so on the theory that "an agent's notation in a government record or database reflecting the child's age or reunification constitutes an 'affirmative act . . . to terminate the UAC finding before the applicant filed the initial application for asylum.'" *Id.* (quoting ECF No. 91-4 at 3). Plaintiffs' request to enjoin this particular practice

fails primarily because it asserts a claim not made in its Amended Complaint.

In the Motion to Amend the Preliminary Injunction, Plaintiffs question whether Defendants are violating the 2013 Kim Memo by treating documents where evidence of the UAC's age or reunification with parents has been recorded as an "affirmative act." ECF No. 124-1 at 24. In essence, therefore, Plaintiffs disagree with USCIS's construction of the 2013 Kim Memo, not the validity of the 2019 Redetermination Memo that is at issue in the Amended Complaint. The 2013 Kim Memo does, in fact, permit denial of jurisdiction by UCIS in the event of an affirmative act by HHS, ICE, or CBP to terminate the UAC finding. A notation made in the system may or may not qualify as such an act, but that is a separate question from whether the policy has changed as a result of the 2019 Redetermination Memo. Plaintiffs may not raise new claims through motions without amending their complaint. *See Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 946 (4th Cir. 2013); *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009); *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 758 n.5 (D. Md. 2015).

Plaintiffs try to skirt the deficiency of their Amended Complaint by arguing that the practice at issue "*is* an application of the 2019 Redetermination Memorandum *through* a litigation-inspired reinterpretation of the 2013 Kim Memo's narrow affirmative-act exception." ECF No. 134 at 13 (emphasis in original). The Court is not convinced. Thus, this Court denies Plaintiffs' Motion to Amend the Preliminary Injunction to the extent Plaintiffs request the Court to enjoin USCIS's policy of denying jurisdiction over a child's asylum application based on an alleged "affirmative act" involving a mere notation that the child has been reunited with a parent or legal guardian or has turned 18 years old. In anticipation of this result, Plaintiffs have requested "leave to amend [their complaint] to remove any doubt that USCIS's dramatic

expansion of the 'affirmative act' exception from the 2013 Kim memo is at issue here, as it effectively seeks to implement the same policy as the 2019 Redetermination memorandum in an equally unlawful manner." ECF No. 134 at 15. The Court grants this request and Plaintiffs may file a second amended complaint within 14 days.

### C.   Joint Motion to Stay Summary Judgment Schedule

Pursuant to the Court's June 29, 2020 scheduling order, summary judgment briefing was scheduled to begin on August 21, 2020 and to be completed on October 16, 2020. ECF No. 135. In accordance with the June 29 scheduling order, Defendants produced the administrative record on July 24, 2020. *Id.* After reviewing the produced record, Plaintiffs raised issues with Defendants regarding what Plaintiffs believe to be deficiencies with the administrative record as produced. *Id.* The parties filed a Joint Motion to Stay Summary Judgment Schedule on August 10, 2020, requesting the Court to stay briefing on the parties' motions for summary judgment pending resolution of the parties' disputes regarding the contents of the administrative record. ECF No. 135-1. Defendants filed an amended administrative record with the Court on October 2, 2020. ECF No. 139 at 2. Plaintiffs, however, continue to believe that significant deficiencies remain. *Id.* The parties have not yet come to an agreement and believe that the Court's involvement may be necessary. *Id.*

The Court grants the parties' Joint Motion to Summary Judgment Schedule pending the resolution of the parties' disputes regarding the contents of the administrative record and instructs the parties to contact chambers to schedule a status call.

### D.   Joint Motion for Entry of Parties' Proposed Protective Order

The parties filed a Joint Motion for Entry of Parties' Proposed Protective Order on August 25, 2020. ECF No. 136. Having considered the parties' motion and the attached

Protective Order, the Court finds that the parties' Proposed Protective Order, ECF No. 136-1, complies with the requirements of Loc. R. 104.13 (D. Md. 2018) and thus grants the parties' joint motion and enters the parties' Proposed Protective Order.

## III.    CONCLUSION

For the foregoing reasons, this Court grants Plaintiffs' Motion for Class Certification and Appointment of Class Counsel, ECF No. 117 and certifies the following class: All individuals nationwide who prior to the effective date of a lawfully promulgated policy prospectively altering the policy set forth in the 2013 Kim Memorandum (1) were determined to be an Unaccompanied Alien Child; and (2) who filed an asylum application that was pending with the United States Citizenship and Immigration Services ("USCIS"); and (3) on the date they filed their asylum application with USCIS, were 18 years of age or older, or had a parent or legal guardian in the United States who is available to provide care and physical custody; and (4) for whom USCIS has not adjudicated the individual's asylum application on the merits. Plaintiff J.O.P., M.A.L.C., M.E.R.E., and E.D.G. are appointed as class representatives.

Additionally, this Court grants, in part, and denies, in part, Plaintiffs' Motion to Amend the Preliminary Injunction, ECF No. 124, and accordingly amends the previous preliminary injunction, ECF No. 71, such that Defendants, during the pendency of this litigation and until further Order of this Court are: (1) enjoined and restrained from relying on the policies set forth in the 2019 Redetermination Memorandum as a basis to decline jurisdiction over asylum applications of individuals previously determined to be unaccompanied alien children ("UACs"), to subject an asylum applicant to the one-year time limit for filing described at 8 U.S.C. § 1158(a)(2)(B), or for any other purpose; (2) enjoined and restrained from rejecting jurisdiction over any asylum application filed by Plaintiffs and members of the class whose applications

would have been accepted under the 2013 Kim Memorandum; (3) enjoined and restrained from deferring to EOIR determinations in assessing jurisdiction over asylum applications filed by Plaintiffs and members of the proposed class; and (4) enjoined and restrained during the removal proceedings of any Plaintiff or member of the class (including EOIR proceedings before immigration judges and members of the Board of Immigration appeals) from seeking denials of continuances or other postponements in order to await adjudication of an asylum application that has been filed with USCIS, from seeking EOIR exercise of jurisdiction over any asylum claim where USCIS has initial jurisdiction under the terms of the 2013 Kim Memorandum, or from otherwise taking a position in such individual's removal proceedings that, inconsistent with the 2013 Kim Memorandum, USCIS does not have initial jurisdiction over the individual's asylum application. Defendant USCIS will retract any adverse decision rendered on or after June 30, 2019 that is based in whole or in part on any of the actions enjoined and restrained by (1), (2), or (3) above.

Finally, the Court grants parties' Joint Motion to Stay Summary Judgment Schedule, ECF No. 135, and grants parties' Joint Motion for Entry of Parties' Proposed Protective Order, ECF No. 136.

A separate Order shall issue.

Date: <u>December  21, 2020</u>                              <u>      /s/                              </u>
                                                                          GEORGE J. HAZEL
                                                                          United States District Judge