**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION**

_____

|  |  |  |
|---|---|---|
| J.O.P., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 8:19-cv-01944-SAG |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.* | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

_____

## **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE**

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

   I.    J.O.P. Litigation ................................................................................................ 2

   II.   The Alien Enemies Act .................................................................................... 5

   III.  Cristian's Removal and Plaintiffs' Motion ...................................................... 8

ARGUMENT ................................................................................................................. 9

   I.    The Court Has No Jurisdiction Over Plaintiffs' Claims ................................... 9

      A.   There is no jurisdiction to review removal under the AEA outside of habeas. .............. 9

   II.   The Settlement Agreement does not encompass aliens subject to AEA ......................... 12

   III.  The settlement agreement does not bar removal under Title 50 ....................................... 17

   IV.  If Section III of the settlement agreement bars removal under AEA, it must be voided as contrary to law and the public interest. ........................................................................... 22

   CONCLUSION............................................................................................................ 23

## **TABLE OF AUTHORITIES**

## Cases

*Citizens Protective League v. Clark*,
    155 F.2d 290 (D.C. Cir. 1946) ............................................................ passim

*Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*,
    117 Md. App. 72, 699 A.2d 482 (1997) .......................................................... 17

*Gilroy*,
    257 F. 110 (S.D.N.Y. 1919) .......................................................................... 10

*Haig v. Agee*,
    453 U.S. 280 (1981) ...................................................................................... 22

*Heck v. Humphrey*,
    512 U.S. 477 (1994) ...................................................................................... 12

*Huisha-Huisha v. Mayorkas*,
    27 F.4th 718 (D.C. Cir. 2022) ........................................................ 14, 15, 19

*LoBue v. Christopher*,
    82 F.3d 1081 (D.C. Cir. 1996) ...................................................................... 12

*Lockington v. Smith*,
    15 F. Cas. 758 (C.C.D. Pa. 1817) .................................................................. 6

*Ludecke v. Watkins*,
    335 U.S. 160 (1948) ............................................................................ 6, 10, 11

*Medex v. McCabe*,
    372 Md. 28, 811 A.2d 297 (2002) ................................................................ 22

*State Farm Mut. Auto. Ins. Co. v. Nationwide Mut. Ins. Co.*,
    307 Md. 631, 516 A.2d 586 (1986) .............................................................. 22

*Trump v. J. G. G.*,
    No. 24A931, 2025 WL 1024097 (U.S. Apr. 7, 2025) ............................... 9, 11

*United States ex rel. Von Kleczkowski v. Watkins*,
    71 F. Supp. 429 (S.D.N.Y. 1947) ................................................................ 20

*U.S. ex rel. Schlueter v. Watkins*,
    67 F. Supp. 565 (S.D.N.Y. 1946) .......................................................... 12, 13

*Wells v. Chevy Chase Bank, F.S.B.*,
   363 Md. 232 (2001) ................................................................... 17

## Statutes

6 U.S.C. § 279(g)(2) .................................................................... 3

8 U.S.C. 1229a .......................................................................... 21

8 U.S.C. § 1158(a)(2)(B) ............................................................... 3

8 U.S.C. § 1158(b)(3)(C) .............................................................. 20

8 U.S.C. § 1231(b)(3)(A) .............................................................. 14

8 U.S.C. § 1232(a)(5)(D) .............................................................. 21

8 U.S.C. §§ 1182(b)(3)(B) .............................................................. 8

50 U.S.C. Ch. 3 .......................................................................... 8

50 U.S.C. § 21 ..................................................................... passim

## Regulations

8 C.F.R. § 1208.16(a) ................................................................. 14

8 C.F.R. § 1241.1 ...................................................................... 18

## Other Authorities

*Habeas Corpus, Executive Detention, and the Removal of Aliens*,
   98 Colum L. Rev. 961 (1998) ...................................................... 11

Presidential Proclamation 10,903, *Invocation of the Alien Enemies Act Regarding theInvasion of
   The United States by Tren De Aragua* (Mar 14, 2025) ............................. 8

## INTRODUCTION

Pursuant to this Court's April 15, 2025 Order, ECF No. 233, Defendants Department of Homeland Security, *et al*. (Defendants) submit their opposition to Plaintiffs' Motion to Enforce the Settlement Agreement. *See* Pls' Mot. Enforce, ECF No. 227. Plaintiffs allege Defendants' removal of Cristian,[1] a member of the terrorist organization Tren de Aragua (TdA), *see* Exhibit A, Declaration of Robert L. Cerna (Cerna Declaration) at ¶ 13, is a violation of the settlement agreement in this case and seek his return to the United States. *See* Memo Mot. Enforce at 15, ECF No. 227-1. Plaintiffs are wrong and the Court should deny their Motion to Enforce.

As a threshold matter, the Court should reject Plaintiffs' blatant attempt to recast the parties' filed and ordered settlement agreement to include claims and disputes never before raised in the litigation. The settlement agreement is undisputedly keyed to Plaintiffs' challenges to the 2019 Redetermination Memo—the nucleus of all the pleadings, injunctions, and class certification—and cannot be expanded to address Plaintiffs' newfound claims not tied to UAC determinations. First, the Court lacks jurisdiction to review Defendants' removal of Cristian pursuant to the Alien Enemies Act (AEA), 50 U.S.C. § 21 and to compel his return to the United States. Second, even assuming the Court has jurisdiction, Cristian's removal under the AEA does not violate the settlement agreement because individuals designated as alien enemies under the AEA are not class members. Third, even if the Court considers alien enemies under the AEA to be members of the class, the settlement agreement only prohibits execution of a "Class Member's final removal order" under Title 8; the settlement agreement does not bar removal pursuant to Title

---

[1] Pursuant to this Court's scheduling order, ECF No. 233, Defendants are proceeding as if the Court has granted Plaintiffs' Motion to Proceed Under Pseudonym, ECF No. 231, for this Plaintiff. Defendants will submit their opposition to proceeding under pseudonym on April 18, 2025, for the Court's consideration.

50. Finally, if the Court does interpret Section III of the settlement agreement as barring removal of individuals designated as alien enemies, then it must void Section III of the settlement agreement as contrary to the public interest and law. The Court should accordingly deny Plaintiffs' motion to enforce.

## **BACKGROUND**

### I.    **J.O.P. Litigation**

On July 1, 2019, Plaintiffs J.O.P., M.A.L.C., M.E.R.E., and K.A.R.C. commenced this litigation for declaratory and injunctive relief (the "Action") based on allegations that USCIS had adopted policies, as reflected in the May 31, 2019 memorandum titled "Updated Procedures for Asylum Applications Filed by Unaccompanied Alien Children" ("2019 Redetermination Memo"), that changed how USCIS would implement protections provided to Unaccompanied Alien Children ("UAC") under the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), which policies were contrary to the TVPRA, and violative of the Administrative Procedure Act ("APA") and the Due Process Clause of the Fifth Amendment to the U.S. Constitution. Settlement Agreement, ECF 199-2 at 2, Section I.A. Under the 2019 Redetermination Memo, USCIS made factual determinations as to whether an asylum applicant met the UAC definition at the time of filing. 2019 Redetermination Memo, ECF No. 3 at 3. Applicants that had previously been determined to be UACs by CBP or ICE who applied for asylum after turning 18 or reunifying with a parent or legal guardian would have their asylum application rejected by USCIS for lack of jurisdiction. ECF 199-2 at 2, Section I.A. The 2019 Redetermination Memo also directed that an individual previously determined to be a UAC would be subject to the One-Year Deadline for filing asylum applications—a deadline from which UACs are statutorily exempt—if they applied for asylum after turning 18 or reunifying with a parent or legal guardian. *Id.*

The Court entered a temporary restraining order on August 2, 2019, and converted it to a preliminary injunction on October 15, 2019, enjoining and restraining Defendants, during the pendency of the litigation, from (i) applying the policy set forth in the 2019 Redetermination Memo, to bar individuals previously determined to be UACs from seeking asylum before USCIS; and (ii) rejecting jurisdiction over the application of any UAC (as defined in the Homeland Security Act, 6 U.S.C. § 279(g)(2)) under the TVPRA whose application would have been accepted under the USCIS policy predating the 2019 Redetermination Memo. *Id.*, Section I.B. The Court also ordered Defendant USCIS to retract any adverse decision already rendered in an individual case applying the 2019 Redetermination Memo and reinstate consideration of such case applying the 2013 UAC Memorandum (also known as the 2013 Kim Memo). *Id.* at 1–2, Section I.B.

On December 20, 2019, Plaintiffs J.O.P., M.A.L.C., M.E.R.E., K.A.R.C., and E.D.G. filed an amended complaint that included their prior allegations and also alleged, *inter alia*, that USCIS had adopted an unlawful policy, as reflected in the 2019 Redetermination Memo, to defer to a determination by an Executive Office for Immigration Review ("EOIR") immigration judge that USCIS does not have jurisdiction over an asylum application because it was not one filed by a UAC. *Id.* at 2, Section III.C; *see also* First Am. Compl., ECF No. 91.

On December 21, 2020, the Court entered an amended preliminary injunction, that "(1) enjoined and restrained [Defendants] from relying on the policies set forth in the 2019 [Redetermination Memo] as a basis to decline jurisdiction over asylum applications of individuals previously determined to be unaccompanied alien children ("UACs"), to subject an asylum applicant to the one-year time limit for filing described at 8 U.S.C. § 1158(a)(2)(B), or for any other purpose; (2) enjoined and restrained [Defendants] from rejecting jurisdiction over any

asylum application filed by Plaintiffs and members of the class whose applications would have been accepted under the 2013 Kim Memo; (3) enjoined and restrained [Defendants] from deferring to EOIR determinations in assessing jurisdiction over asylum applications filed by Plaintiffs and members of the proposed class; and (4) enjoined and restrained [Defendants] during the removal proceedings of any Plaintiff or member of the class "(including EOIR proceedings before immigration judges and members of the Board of Immigration Appeals)" from seeking denials of continuances or other postponements in order to await adjudication of an asylum application that has been filed with USCIS, from seeking EOIR exercise of jurisdiction over any asylum claim where USCIS has initial jurisdiction under the terms of the 2013 Kim Memo, or from otherwise taking a position in such individual's removal proceedings that, inconsistent with the 2013 Kim Memo, USCIS does not have initial jurisdiction over the individual's asylum application. *Id.* at 2, Section I.D; *see also* ECF No. 144.

On January 11, 2021, Plaintiffs filed a second amended complaint that included their prior allegations and also alleged, *inter alia*, that USCIS had adopted an unlawful policy or practice of treating recognitions or notations as to evidence that an individual has turned 18 or been reunited with a parent or legal guardian as "affirmative acts" under the 2013 Kim Memo. ECF No. 199-2 at 3, Section I.F.

Thereafter, the Parties, through counsel, conducted discussions and arm's length negotiations regarding a compromise and settlement "with a view to settling all matters in dispute." ECF No. 199-2 at 3, Section I.I. The agreement provides that the "class" is defined as:

> all individuals nationwide who prior to the effective date of the superseding memorandum discussed in Section III(A): (1) were determined to be a UAC; and (2) who filed an asylum application that was pending with USCIS; and (3) on the date they filed their asylum application with USCIS, were 18 years of age or older, or had a parent or legal guardian in the United States who is available to provide care and physical custody; and (4) for

4

whom USCIS has not adjudicated the individual's asylum application on the merits.

*Id.*at 4, Section II.E.

Concerning relief, the agreement in relevant part provides that USCIS fully rescind the 2019 Redetermination Memo, assume initial jurisdiction of most asylum applications filed by individuals previously determined to be UACs , and that DHS will refrain from taking the position that USCIS does not have Initial Jurisdiction over a Class Member's asylum application in removal proceedings. *Id.* at 6, Section III.A-B; *Id.* at 8 Section III.H. The agreement includes compliance reporting, a ninety-day timeline for the parties to discuss compliance disputes, and includes a severability clause. *Id.* at 12–14, Sections V, VIII.F. Finally, the agreement specifies the "Settled Claims" are only the "claims for relief that were brought in the Action on behalf of Named Plaintiffs and Class Members alleged in Plaintiffs' Complaints." *Id.* at 5, Section II.R.

## II.    The Alien Enemies Act

The AEA grants the Executive Branch broad power to remove enemy aliens from the United States. Specifically, Section 21 of the AEA provides that:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

50 U.S.C. § 21. Section 21's second sentence elaborates on related powers:

> The President is authorized in any such event, by his proclamation thereof, or other public act, to direct the conduct to be observed on the part of the United States, toward the aliens who become so liable; the manner and degree of the restraint to which they shall be subject and in what cases, and upon what security their residence shall be permitted, and to provide for the removal of those who, not being permitted to reside within the United

> States, refuse or neglect to depart therefrom; and to establish any other
> regulations which are found necessary in the premises and for the public
> safety.

*Id.* The Act's remaining provisions outline procedures for implementing the
President's broad authority.

The courts have recognized the legitimacy of the AEA as an exercise of the war power
reserved to Congress and the Executive. The Supreme Court has observed that the AEA is "as
unlimited" a grant of power "as the legislature could make it." *Ludecke v. Watkins*, 335 U.S. 160,
164 (1948) (quoting *Lockington v. Smith*, 15 F. Cas. 758, 760 (C.C.D. Pa. 1817)); *see also id.* at
165 n.8 (collecting cases). The Court has further explained that the statute encompasses "matters
of political judgment for which judges have neither technical competence nor official
responsibility." *Id.* at 170 (holding that the President's power under the AEA remained in effect
even after actual hostilities in World War II had ceased). And the D.C. Circuit has held that this
statute confers "[u]nreviewable power in the President to restrain, and to provide for the removal
of, alien enemies." *Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946). The
courts have therefore limited their review in prior challenges to very narrow questions: "the
construction and validity of the statute," whether, when relevant, there is a "declared war," and
whether the "person restrained is an enemy alien fourteen years of age or older." *Ludecke*, 335
U.S. at 171 & n.17.

On March 14, 2025, the President signed a proclamation, which was published on March
15, invoking his authorities under the Alien Enemies Act (AEA), 50 U.S.C. § 21 *et seq.*, against
members of TdA. *See* Proclamation No. 10,903 § 1 (Mar. 14, 2025), 90 Fed. Reg. 13,033 (Mar.
20, 2025) (Proclamation), https://www.whitehouse.gov/presidential-actions/2025/03/invocation-
of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/.    The

Proclamation outlines the President's findings that TdA members meet the statutory criteria for removal under the AEA. The President found that TdA, which "commits brutal crimes" including murder and kidnapping, is "conducting irregular warfare and undertaking hostile actions against the United States." *See id.* The President further found that TdA has "engaged in and continues to engage in mass illegal migration to the United States" as a means of supporting Maduro's goal of "harming United States citizens, undermining public safety," and "destabilizing" the United States. *Id.* And the President found that TdA works with the Maduro-sponsored Cartel de los Soles to use "illegal narcotics as a weapon to 'flood' the United States." *Id.*

The President additionally found that TdA and other criminal organizations have taken control over Venezuelan territory, resulting in a "hybrid criminal state." *Id.* Moreover, TdA is "closely aligned with" Maduro's regime in Venezuela, and indeed has "infiltrated" the regime's "military and law enforcement apparatus." *Id.* The resulting hybrid state, the President determined, "is perpetrating an invasion of and predatory incursion into the United States," posing "a substantial danger" to the Nation. *Id.*

Based on those findings, the President proclaimed that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies" pursuant to 50 U.S.C. § 21. *Id.* Further, "all such members of TdA are" "chargeable with actual hostility against the United States" and "are a danger to the public peace or safety of the United States." *Id.*

The Proclamation adds that all such TdA members "are subject to immediate apprehension, detention, and removal." *Id.* To that end, the President directed the Attorney General and the Secretary of Homeland Security to "apprehend, restrain, secure, and remove every Alien Enemy

described" above. *Id.* Any such TdA member found within the United States is "subject to summary apprehension." *Id.* Aliens apprehended under the Proclamation may be detained until their removal, then may be removed to "any such location as may be directed" by the enforcing officers. *Id.* TdA members remain deportable under other authorities, including pursuant to a final order of removal issued under Title 8 as members of a foreign terrorist organization or otherwise. 8 U.S.C. §§ 1182(b)(3)(B), 1227(a)(4)(B). But the Proclamation lets the President use a particularly expeditious, statutorily authorized removal method for individuals found to present serious national-security threats under specified circumstances.

### III.    Cristian's Removal and Plaintiffs' Motion

On January 7, 2025, Cristian was transferred into ICE custody from the Harris County Jail in Texas based on an ERO detainer. Cerna Declaration at ¶¶ 11–12. He was served with a Notice to Appear charging him as inadmissible pursuant to 8 U.S.C. §§ 1182(a)(6)(A)(i) and 1182(a)(7)(A)(i)(II), as an alien present in the United States without being admitted or paroled and as an alien convicted of a controlled substance offense. *Id.* ¶ 12. Following the announcement of Presidential Proclamation 10,903, *Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua*, ICE determined that Cristian was subject to the Proclamation. *Id.* ¶ 13. On March 15, 2025, Cristian was removed under the Alien Enemies Act, 50 U.S.C. Ch. 3, pursuant to Presidential Proclamation 10,903 as a Venezuelan citizen 14 years of age or older who is a member of TdA. *Id.* ¶ 14.

On March 18, 2025, pursuant to the dispute resolution mechanism of the settlement agreement, *see* ECF No. 199-2 at 14, Section V.D., class counsel alerted counsel for Defendants that Cristian had been deported to El Salvador. *See* ECF No. 227-2 at 69. Counsel maintained this was a violation of the settlement agreement because "removal of a J.O.P. class member who is

awaiting an asylum adjudication by USCIS violates the J.O.P. settlement agreement" and requested "DHS to promptly remedy the violation by returning the class member to the United States so that he can have his asylum application adjudicated by USCIS, as he is entitled to by section III.B of the agreement." *Id.* Two days later, on March 20, 2025, Defendants informed class counsel that Cristian was removed to El Salvador pursuant to the AEA. *Id.* at 68. On March 21, class counsel requested "a meet and confer pursuant to Section V.D of the settlement agreement. *Id.*[2] On April 11, 2025, the parties met and conferred but were unable to resolve the dispute informally. ECF No. 227-1 at 10–11.

## ARGUMENT

### I.    The Court Has No Jurisdiction Over Plaintiffs' Claims

#### A.  There is no jurisdiction to review removal under the AEA outside of habeas.

As a preliminary matter, this Court lacks jurisdiction to review a removal pursuant to the AEA. While Plaintiffs frame their motion as an invocation of the Court's jurisdiction "to supervise the implantation of this Settlement Agreement and to enforces its provision and terms," ECF No. 227-1 at 8, the practical effect of Plaintiffs' request to "facilitate the return to the United States of Cristian and any other Class members wrongfully removed, so that they can await USCIS adjudication of their asylum application on the merits," *id.* at 17, is a challenge to whether they were properly subject to removal under the AEA. Plaintiffs are essentially asking the Court to conclude that because of the settlement agreement the AEA does not apply to Cristian nor permit his removal. The Supreme Court has been clear: such an action can only sound in habeas. *Trump*

---

[2] Defendants reject Plaintiffs' assertion that Defendants "delayed a meet and confer." *See* ECF No. 227-1 at 10. Section V.D. of the settlement agreement, provides the parties 90 days from "Defendants' receipt of the written notice of the alleged noncompliance from Class counsel" to meet and confer. ECF No. 199-2 at 14, Section V.D. The parties exchanged several emails and meet and conferred virtually within 24 hours.

*v. J. G. G.*, No. 24A931, 2025 WL 1024097, at *1 (U.S. Apr. 7, 2025) ("Challenges to removal under the AEA, a statute which largely 'preclude[s] judicial review,'. . .  must be brought in habeas.") (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163–164 (1948)).

The Supreme Court has long recognized that the President's broad national security authority under the AEA is generally "not to be subjected to the scrutiny of courts." *Ludecke*, 335 U.S. at 165. The Act grants the President an authority "as unlimited as the legislature could make it." *Id.* at 164 (citation omitted). Drawing from the established English rule that "alien-enemies have no rights, no privileges, unless by the king's special favour, during the time of war," 1 William Blackstone, *Commentaries on the Laws of England* 361 (1765), the Act confers on the President the power to determine which alien enemies are subject to removal. 50 U.S.C. 21; *see Citizens Protective League*, 155 F.2d at 294  ("Unreviewable power in the President" is "the essence of the Act."); 1 Blackstone, *Commentaries* at 252 (aliens are "liable to be sent home whenever the king sees occasion").

The "very nature" of that sweeping authority "rejects the notion that courts may pass judgment upon the exercise of [the President's] discretion." *Ludecke*, 335 U.S. at 164. *Ludecke* thus declined to second-guess the President's power to detain and remove a German alien enemy after World War II fighting ended, explaining that "judges have neither technical competence nor official responsibility" over such "matters of political judgment." *Id.* at 170. Consistent with that general rule, courts have held for over a century that the President's authority and discretion under the AEA is not a proper subject for judicial scrutiny: "The authority of the President to promulgate by proclamation or public act 'the manner and degree of the restraint to which they (alien enemies) shall be subject, and in what cases,' is, of course, *plenary and not reviewable*." *Ex parte Gilroy*, 257 F. 110, 112 (S.D.N.Y. 1919) (emphasis added); *see also id.* ("Once the person is an alien

enemy, obviously the course to be pursued is essentially an executive function, to be exercised in the discretion of the President."). AEA proclamations are thus conclusive and preclusive.

The only avenue for judicial review for individuals subject to the AEA is habeas. Aliens subject to the AEA may bring individual claims regarding *whether* a proclamation has been properly applied against them. *Ludecke* thus acknowledged that "the question as to whether the person restrained is in fact an alien enemy fourteen years of age or older may" be "reviewed by the courts." *Ludecke*, 335 U.S. at 171 n.17. Such review is limited to questions like "whether the detainee is an alien, and whether the detainee is among the 'natives, citizens, or subjects of the hostile nation' within the meaning of the Act." Gerald L. Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens*, 98 Colum L. Rev. 961, 994 & n.196 (1998); *see Ludecke*, 335 U.S. at 171.

Here, Plaintiffs' motion is effectively a challenge to the Executive's authority to remove Cristian pursuant to the AEA because of the settlement agreement. Such a challenge to the lawfulness of their removal under the AEA is a quintessential habeas claim because it seeks to challenge the exercise of custodial authority under the AEA. *J. G. G.*, 2025 WL 1024097, at *1 ("Regardless of whether the detainees formally request release from confinement, because their claims for relief " 'necessarily imply the invalidity' " of their confinement and removal under the AEA, their claims fall within the "core" of the writ of habeas corpus and thus must be brought in habeas."). In other words, Plaintiffs' claims regarding the impact of the settlement agreement on their removal pursuant to the AEA are core habeas claims because prevailing would defeat the basis of their removal under the AEA; they cannot claim otherwise by purporting to attack only the collateral consequence of an alleged breach of a settlement agreement. A state prisoner cannot evade the procedural requirements of habeas by bringing claims for other forms of relief, such as

damages, that would "necessarily imply the invalidity of his conviction or sentence." *Heck v. Humphrey*, 512 U.S. 477, 483 (1994). Likewise, a fugitive cannot prevent extradition through a suit for declaratory relief rather than in habeas. *LoBue v. Christopher*, 82 F.3d 1081, 1083 (D.C. Cir. 1996) (explaining that habeas was the correct remedy even though the plaintiffs there had "not formally sought a release from custody" because prevailing on their claims would immediately entitle them "to release or a new trial because of the issue preclusion effect of the judgment").

In short, outside of limited habeas review "[t]he control of alien enemies has been held to be a political matter in which the executive and the legislature may exercise an unhampered discretion," and an "alien enemy" otherwise "is not, under the Constitution and the Statute, entitled to any hearing." *U.S. ex rel. Schlueter v. Watkins*, 67 F. Supp. 565, 565 (S.D.N.Y. 1946). The Court accordingly lacks jurisdiction to review Plaintiffs' collateral challenge to Cristian's removal under the AEA and enjoin removal of similarly situated individuals in the future and should deny Plaintiffs' motion to enforce.

## II.    The Settlement Agreement does not encompass aliens subject to AEA

Cristian's removal did not violate the settlement agreement because he is not a *J.O.P.* class member. While Cristian at one point may have met the requirements for class membership, his designation as an alien enemy pursuant to the AEA results in him ceasing to be a member of the *J.O.P.* class subject to the settlement agreement. This is because aliens designated as alien enemies pursuant to the AEA are no longer eligible for asylum, a requirement for class membership.

As defined in the Settlement Agreement, and pursuant to the Court's Final Approval Order, the Class is defined as:

> All individuals nationwide who prior to the effective date of the superseding memorandum discussed in Section III(A) of the Settlement Agreement: (1) were

12

determined to be a UAC; and (2) who filed an asylum application that was pending with USCIS; and (3) on the date they filed their asylum application with USCIS, were 18 years of age or older, or had a parent or legal guardian in the United States who is available to provide care and physical custody; and (4) *for whom USCIS has not adjudicated the individual's asylum application on the merits*.

ECF No. 205 ¶ 2 (emphasis added); ECF No. 199-2 at 5, Section II.E. Upon the President's invocation of the AEA, prong No. 4 of the class definition was not met. While prong Nos. 1-3 of the class definition are written in the past tense, prong No. 4 requires that USCIS have a present ability to adjudicate the asylum application on the merits. *Id.* (*compare* "were determined," "filed," and "had," with "has."). Put plainly, AEA invocation moots the asylum application such that USCIS cannot adjudicate. Because adjudication is not pending, prong No. 4 of the class definition is unmet. Alien enemies are not entitled to seek any relief or protection in the country that has designated them enemies, including asylum, unless the President permits such applications. *See Citizens Protective League*, 155 F.2d at 294 (noting common law rule that "alien enemies have no rights, no privileges, unless by the king's special favor"). In contrast to Title 8, asylum provides no relief from removal pursuant to Title 50 and does not provide legal status that permits an alien subject to the AEA to remain in the United States. Whereas the Immigration and Nationality Act (INA), which provides a system for determining removability and any relief or protection from removal—such as asylum—for aliens under the authority of Title 8, the AEA provides its own mechanism permitting the President or his delegates to implement procedures and regulations governing removal, detention, and any other issue related to invocation of the AEA, *see* 50 U.S.C. § 21.

The text and structure of the INA, as well its regulatory implementation, support the prohibition on consideration of applications for protection from removal such as asylum. Those provisions are fundamentally concerned with *removal* under the INA, a legal principle not relevant

13

to the mechanics of the AEA. *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 1208.16(a), 1208.18(b). The instant Proclamation does not deal with removal proceedings or any other aspect of removal, and thus any constraint these provisions may impose on the *removal* of an alien are not implicated. Here, the President has determined that Venezuelan nationals who are 14 years or older and members of the terrorist organization TdA are alien enemies and not entitled to apply for asylum. Because Cristian, by way of his designation as an alien enemy, is no longer eligible for and cannot apply for asylum, he can no longer be considered a class member which requires an asylum application filed with USCIS.

Courts have previously recognized such restrictions on applications for asylum because asylum is a discretionary form of relief, and eligibility for such relief may be foreclosed on a categorical basis. *See, e.g.*, *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 730–31 (D.C. Cir. 2022) (holding categorical restrictions on applications for asylum were permitted in the context of Title 42). In *Huisha-Huisha*, the D.C. Circuit observed "in normal times—when the Executive has not invoked [Title 42]—the Plaintiffs are of course correct" that "Section 1158(a)(1) entitles aliens—even those who enter the country illegally—to apply for asylum before they are expelled." *Id.* Invocation of Title 42, however, foreclosed the aliens' eligibility and ability to apply for asylum. The D.C. Circuit held that such a bar was not unlawful "based on the discretionary nature of asylum," concluding "here, for public-health reasons, the Executive has shown an intent to exercise that 'discretion' by foreclosing asylum for the specific subset of border crossers covered by [Title 42]." *Id.* at 731. So too here. The AEA disallows relief for covered enemy aliens, and that represents the Executive's categorical conclusion that such aliens are not entitled to relief in the exercise of discretion.

The Circuit then went further and explained why "foreclose[ing] the statutorily mandated procedures that aliens use to apply for asylum" was also necessarily permitted by the foreclosure of just the grant of asylum: because "if the asylum decision has already been made—by the [Title 42] Order—then those procedures would be futile." *Id.* So too here. Because individuals subject to the AEA, such as Cristian, have already been determined to be ineligible for asylum by operation of the AEA, the asylum petition is moot and prong No. 4 of the class definition is not met.

This also contravenes Plaintiffs only argument in support of their contention that Cristian is a class member. Plaintiffs contend that "Defendants were aware of the AEA when they entered into the Settlement Agreement, but still agreed to the terms of the agreement" and that Defendants should not now be permitted to alter the class definition. *See* ECF No. 227-1 at 13; *see also* 16 ("It cannot be reasonably argued that, in formulating the Settlement Agreement, the parties contemplated that Class Members with pending asylum applications could be removed from the United States to places where they have no access to counsel or their family *and, importantly, are rendered ineligible for asylum*.") (emphasis added). Plaintiffs' argument however is necessarily premised on the assumption that the settlement agreement, in providing relief to removal pursuant to Title 8 via asylum, also provides relief to removal under the AEA. Since asylum provides no relief to removal pursuant to the AEA, as made clear above, it is a far-fetched assertion that Defendants agreed to "binding commitments" that provide no actual relief to individuals in the AEA context. The only reasonable conclusion is that the class definition, and the relief provided to the class in the settlement agreement, only extends to those eligible for asylum as relief from removal pursuant to Title 8 and not those subject to the AEA. Cristian accordingly cannot be considered a member of the class, and his removal cannot be considered a violation of the settlement agreement.

Another reason to reject Plaintiffs' assertion regarding the scope of the settlement agreement is the subject matter of the allegations underlying their Complaint. Plaintiffs alleged that the 2019 memo violated the William Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA). 2d Am. Compl. ¶191, ECF No. 145. As asserted by Plaintiffs in their Complaint, the TVPRA was passed in part to provide protections to minors that were determined to be UACs. *Id.* ¶¶ 80–86. The AEA, however, by its plain terms extends to minors that are age 14 and up. *See* 50 U.S.C. § 21 (applying to "all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized"). It is unclear how Plaintiffs believe a lawsuit expressly premised on one statute that extends procedural protections to minors that are determined to be UACs in the immigration removal process also encompasses a different statute, never referenced in the litigation, that by its express terms provides for the removals of a subset of the same group of minors without any of the specified procedural protections of the other statute. Further, to accept Plaintiffs' late reasoning is to ignore that the pleadings in the litigation and injunctive relief ordered by the Court were entirely focused on Plaintiffs' challenges to the 2019 Redetermination Memo—not hypothetical deprivations untethered to UAC determinations. The settlement agreement exhaustively lays out the exclusive purpose of the agreement is to reset UAC determinations and restore procedures available under the 2013 Kim Memo. ECF No. 199-2 at 7, Section III.B.  Indeed, as Section I.I. makes clear, the settlement agreement resolved the parties' "disputes" and "settled claims" as defined by the claims in the operative pleadings. Nowhere does the settlement agreement—or the underlying pleadings—purport to address USCIS's lack of jurisdiction to adjudicate asylum applications on a basis unrelated to UAC determinations.

Accordingly, the Court should reject Plaintiffs' attempt to graft into the settlement agreement an entirely new request for relief never litigated.

### III.    The settlement agreement does not bar removal under Title 50

Even if the Court were to conclude Cristian is a class member, removal pursuant to the AEA does not violate the settlement agreement. Plaintiffs misinterpret Section III.I of the settlement agreement which provides that "[w]ith respect to any Class Member with a final removal order, ICE will refrain from executing the Class Member's final removal order until USCIS issues a Final Determination on one properly filed asylum application under the terms of this Agreement." ECF No. 199-2 at 9, Section III.I. Plaintiffs contend that Section III.I applies to "removal" regardless of whether it is in the context of Title 8 removal proceedings under the INA or Title 50 under the AEA. ECF No. 227-1 at 14 – 15. Plaintiffs are wrong. "Final removal order," when read in the broader context of the settlement agreement makes clear that it only applies to final orders of removal in removal proceedings under Title 8.

Plaintiffs assert that under Maryland contract law, "final removal order," as an undefined term in the settlement agreement must be defined by "its plain meaning." ECF No. 14 (citing *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251 (2001)). But Plaintiffs omit an important caveat to the application of the plain meaning rule: "[t]he words employed in the contract are to be given their ordinary and usual meaning, *in light of the context within which they are employed*." *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251 (2001) (emphasis added); *see also Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 117 Md. App. 72, 106, 699 A.2d 482, 498–99 (1997) ("In so doing, we note that, absent a provision to the contrary, the same words used in different clauses will be construed to have been used in the same sense."). Here, consistent with Plaintiffs' overarching challenge to UAC determinations under the 2019 memo, the use of "removal order"

in the settlement agreement in section III.J makes clear that the phrase only applies in the context

of removal under Title 8, not Title 50.

　　As a threshold matter, relevant DHS regulations—in place for over two decades—define

"final order of removal" as a removal order at the conclusion of removal proceedings under INA

§ 240.  *See* 8 C.F.R. § 1241.1. Additionally, as noted, "removal order" only appears in two sections

of the settlement agreement: Section III.I and Section III.J. Section III.J provides that:

> Following a grant of asylum by USCIS to a Class Member *with a removal order*:
>
> 1.　　Defendants agree that, where DHS has chosen not to file a response to a properly filed and served Class Member's motion to reopen, this provision of the Settlement Agreement serves as evidence of DHS's non-opposition to the motion filed on behalf of a Class Member described in this section. To avoid the time and number bars for motions to reopen, Defendants agree that Class Members may style their motions to reopen as a "joint motion to reopen" . . . . DHS will generally join or not oppose a motion to reopen. . . . The joinder framework found in this paragraph only applies to motions to reopen and shall have no effect on any combination or concurrently filed motions, e.g., motions to reopen and dismiss.
> 2.　　In conjunction with or following reopening of such proceedings, DHS will generally join or non-oppose termination or dismissal of removal proceedings, but retains discretion to oppose termination or dismissal if it deems such opposition warranted based on the individual facts of a case, as long as DHS's opposition is not based, in whole or in part, on a position that USCIS did not have Initial Jurisdiction over the Class Member's asylum application.
> 3.　　Nothing in this provision prevents DHS from filing an unopposed or joint motion to reopen the removal proceedings of a Class Member described in this section, or from filing an unopposed or joint motion to dismiss or terminate proceedings of a Class Member described in this section.

ECF No. 199-2 at 10, Section III.J (emphasis added). Section III.J references to "time and number

bars for motions to reopen" and "termination or dismissal of removal proceedings" makes clear

"removal order" is only meant to be read in the context of Title 8 removal proceedings. This is

because while the rules and procedural mechanisms mentioned in Section III.J appear in the

context of Title 8 removal, *see, e.g.*, 8 U.S.C. § 1229a(c)(7)(C)(i) ("Except as provided in this

subparagraph, the motion to reopen shall be filed within 90 days of the date of entry of a final

administrative order of removal."), there are no equivalent procedural mechanisms in the context of removal under the AEA. *See generally* 50 U.S.C. § 21. Because the various procedural protections to which Section III.J mandates Defendants give class members with "removal orders" following a grant of asylum by USCIS only exist in the context of removal pursuant to Title 8 and not Title 50, it is impossible for Plaintiffs to assert the plain meaning of "removal orders" applies to both.

This conclusion is further supported by the numerous other references to the "Executive Office for Immigration Review (EOIR)," "immigration proceedings," and "removal proceedings" throughout the settlement. *See, e.g.*, ECF No. 199-2 at 9, Section III.H ("With respect to DHS's treatments of Class Members *in removal proceedings* . . . DHS will join or non-oppose Class Members' motion(s) for a continuance, administrative closure unless unavailable under controlling law in a particular jurisdiction, and, where available, assignment of cases to the EOIR status docket, that have been filed or made orally on the record *in immigration proceedings* . . . .") (emphasis added). Again, the section makes reference to procedural protections that do not exist in the context of removal under the AEA but DO exist in the context of removal under Title 8.

While Title 8 and Title 50 may both effectuate removal of certain aliens, they are each distinct and separate statutory mechanisms for doing so, just as Title 42 and the INA constituted different and distinct bases for excluding aliens from the United States. *See generally Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022). Not all alien enemies will be subject to removal under Title 8 because the authority under Title 50 extends to aliens regardless of lawful status in the United States. Likewise, not all aliens subject to Title 8 will be subject to removal under the AEA—as removal under the AEA is premised on discrete findings, such as nationality and age, beyond admissibility or removability as defined in the INA. And for aliens subject to both

Title 8 and Title 50 removals, the Executive has discretion in deciding how and whether to proceed under either or both statutes. *See United States ex rel. Von Kleczkowski v. Watkins*, 71 F. Supp. 429, 437 (S.D.N.Y. 1947) (recognizing this discretion under pre- INA immigration law). The Court should accordingly recognize removal under Title 8 and Title 50 as distinct and separate statutory mechanisms for the removal of certain aliens and find that the context in which "removal orders" is used in the settlement agreement makes clear it only applies to Title 8. [3]

The settlement agreement also makes this clear, specifically defining "initial jurisdiction" as "USCIS['s] jurisdiction over an individual's asylum claim pursuant to 8 U.S.C. § 1158(b)(3)(C) despite the individuals' being in *removal proceedings*." *See, e.g.*, ECF No. 199-2 at 5, Section II.M. Because, as discussed, "removal proceedings" refer to removal proceedings under Title 8, the settlement agreement accordingly cannot be interpreted to apply to loss of initial jurisdiction outside of this context; not Title 50 removal, or, for another example, extradition under Title 18. This conforms with Plaintiffs' challenge to the 2019 Redetermination Memo, and the settlement's purpose of effectuating a return to adjudicating under the procedures of the 2013 Kim Memo. *See id.* at 6, Section III.A. Both memos confirm "removal proceedings" means proceedings under Title 8. For example, the 2019 Redetermination Memo notes that in determining whether an individual is in removal proceeding "if an NTA [Notice to Appear] has been served on the applicants but has not been served on EOIR, then the applicant *is not yet in removal proceedings*." *See* 2019

---

[3] Plaintiffs' other argument to the contrary also does not hold water for the reasons discussed in Section II. While Plaintiffs assert that Cristian's removal further violates the settlement agreement because it prevents him from "receiving an adjudication on the merits of their asylum application" in contravention to Section III.B of the settlement agreement, this again ignores that invocation and application of the AEA to an alien renders them ineligible, and unable to apply for, asylum in the first instance. *Supra* Section II; *see Citizens Protective League*, 155 F.2d at 294 (noting common law rule that "alien enemies have no rights, no privileges, unless by the king's special favor").

Redetermination Memo at 5 n.4, ECF No. 3. Both the 2019 and 2013 Kim Memo also cite Section

235(a)(5)(D) of the TVPRA, codified at 8 U.S.C. § 1232(a)(5)(D). *See* 2019 Memo at 6n.6, ECF

No. 3; 2013 Kim Memo 4 n.5, ECF No. 3-4. 8 U.S.C. § 1232(a)(5)(D) plainly states:

> Any unaccompanied alien child sought to be removed by the Department of
> Homeland Security, except for an unaccompanied alien child from a contiguous
> country subject to exceptions under subsection (a)(2), shall be-
>
> (i)      placed in *removal proceedings under section 240 of the Immigration and
>          Nationality Act* (8 U.S.C. 1229a);

8 U.S.C. § 1232(a)(5)(D) (emphasis added). This makes clear that USCIS's loss of initial

jurisdiction over asylum applications for other reasons outside of placement in Title 8 removal

proceedings, the context for which the 2013 Kim Memo and 2019 Redetermination Memo existed,

was not the subject of this litigation nor the settlement agreement. It accordingly cannot be read to

apply to other reasons for why USCIS may lack jurisdiction over an asylum application nor

prohibit removal outside of Title 8 proceedings.

Consistent with the issues in dispute in the pleadings which centered on the Plaintiffs'

challenges to the 2019 Redetermination Memo, the Court should reject Plaintiffs' novel

interpretation and conclude the settlement agreement only applies to Title 8 removal. Because

Cristian was removed pursuant to the AEA and Title 50, it was not a violation of the settlement

agreement.[4]

---

[4] Plaintiffs assert Defendants' position "is an attempt to circumvent the Settlement Agreement
because they no longer wish to be bound to its terms" and imply the Government has negotiated
in bad faith. *See* ECF No. 227-1 at 16 (citing *S.Coal Corp.*, 64 F.4th at 517). Defendants strongly
reject both assertions and note for the Court that Defendants on at least two prior occasions have
acted on Plaintiffs' warnings that a class member was at risk of being removed pursuant to a
final order of removal and ensured that the individuals' removal was stayed pending an
adjudication of their asylum application by USCIS under the settlement agreement. Both
individuals were subject to administratively final removal orders under Title 8.

IV.    **If Section III of the settlement agreement bars removal under AEA, it must be voided as contrary to law and the public interest.**

If the Court disagrees with Defendants and concludes that Section III of the settlement agreement as currently constructed bars removal of alien enemies pursuant to the AEA until after the adjudication of an asylum application by USCIS on the merits, then the Court must also find Section III void and unenforceable because "a contract conflicting with public policy set forth in a statute is invalid to the extent of the conflict between the contract and that policy." *Medex v. McCabe*, 372 Md. 28, 39, 811 A.2d 297, 304 (2002); *see also State Farm Mut. Auto. Ins. Co. v. Nationwide Mut. Ins. Co.*, 307 Md. 631, 643, 516 A.2d 586, 592 (1986) ("A contractual provision that violates public policy is invalid, but only to the extent of the conflict between the stated public policy and the contractual provision."). Here there is a strong public interest in ensuring the safety of the citizens of the United States and protecting them from foreign invasion and designated terrorist organizations. *See Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation.") (quotation omitted). The AEA gives the President the exclusive and plenary power to make determinations regarding the Acts invocation and its execution in order to carry out this important public interest. *Citizens Protective League*, 155 F.2d at 294 ("Unreviewable power in the President" is "the essence of the Act."). Here, the President has determined that members of TdA pose a threat to the United States and are part of an "invasion" of the United States and invoked the AEA. *See* Proclamation No. 10,903 § 1 (Mar. 14, 2025), 90 Fed. Reg. 13,033 (Mar. 20, 2025) (Proclamation), https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/. Given the strong public interest in ensuring the national security of the country from foreign invasion and terrorist organizations, any

contract that purports to limit the President's ability to invoke and apply the AEA in support of such public interest must be treated as void. Accordingly, as permitted by Section VII.F. of the agreement, the Court should severe Section III.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny Plaintiffs' Motion to Enforce.

Dated: April 17, 2025                    Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director
Office of Immigration Litigation

YAMILETH G. DAVILA
Assistant Director

*/s/Richard Ingebretsen*
RICHARD G. INGEBRETSEN
Trial Attorney (DC Bar No. 1736200)

U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-4848
Fax: (202) 305-7000
richard.ingebretsen@usdoj.gov

Attorneys for Defendants