# Ex. C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION

| | |
|---|---|
| J.O.P., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br> Defendants. | No. 8:19-cv-01944-SAG <br><br> Declaration of Christopher Landau |

**DECLARATION OF DEPUTY SECRETARY OF STATE CHRISTOPHER LANDAU**

I, Christopher Landau, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am the Deputy Secretary of State of the United States of America. In that capacity, I am the principal deputy, adviser, and alter ego to the Secretary of State, the President's chief foreign affairs advisor. I serve as Acting Secretary of State in the Secretary's absence, and I assist the Secretary in the formulation and conduct of U.S. foreign policy and in giving direction to all elements of the Department of State. I carry out the President's foreign policy through the State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a. I have served in this role since March 25, 2025, and previously served as United States Ambassador to Mexico, among other positions.

2. I am familiar with the facts and court orders in this case, including the Court's order of April 23, 2025, ordering Defendants—the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), and certain officials of those agencies—to facilitate the return to the United States of a

1

class member who is proceeding under the pseudonym "Cristian." ("April 23 Order," ECF 254). I am also aware of the Court's order of May 20, 2025, requiring Defendants to provide a status report on, *inter alia*, the steps they have taken to facilitate Cristian's return to the United States ("May 20 Order," ECF 280), as well as the court's order of June 5, 2025, to provide further regular status reports ("June 5 Order," ECF 293). I have made the statements herein based on my personal knowledge, on information provided to me in my official capacity, on reasonable inquiry, and on information obtained from various records, systems, databases, State Department employees, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3.  On March 13–14, 2025, the United States and El Salvador memorialized a non-legally binding arrangement under which El Salvador committed to accept approximately 300 Venezuelan deportees associated with the designated foreign terrorist organization Tren de Aragua, *see* https://foia.state.gov/FOIALIBRARY/QNI2.aspx, and under which El Salvador also gave its assurance that it would comply with domestic and international legal obligations with respect to these individuals. DHS had responsibility for identifying the individuals to be removed under the arrangement.

4.  For reasons the State Department has publicly explained to the Inter-American Commission on Human Rights on July 22, 2025, https://www.youtube.com/watch?v=5zJpvgzxnwg, the United States thereafter deported to El Salvador 252 Venezuelan nationals associated with Tren de Aragua, including Cristian. From that point forward, Cristian and the others were in the custody of El Salvador, which chose to house them in the Terrorism Confinement Center (CECOT). El Salvador had sovereign discretion over their ultimate disposition.

5. On April 20, 2025, President Bukele of El Salvador proposed to Nicolás Maduro of Venezuela a deal whereby El Salvador would repatriate the Venezuelans in its custody in exchange for Maduro releasing political prisoners in his custody. https://x.com/nayibbukele/status/1914070199659098258; *see also* https://x.com/nayibbukele/status/1914802146325004726 (posting formal version of offer). As explained in detail to the Inter-American Commission at the July 22 public hearing, the State Department resolved to use its diplomatic good offices to help the two sides reach a deal.

6. On May 30, 2025, cognizant of the May 20 Order requiring a report on steps taken to facilitate Cristian's return, I spoke with DHS/ICE Enforcement and Removal Operations Acting Deputy Assistant Director Mellissa Harper. I related to Ms. Harper that Secretary Rubio has a personal relationship with President Bukele and senior officials in the Salvadoran government that dates back over a decade to the Secretary's service on the Senate Foreign Relations Committee. I went on to tell her that based on this deep experience with El Salvador and his familiarity with political and diplomatic sensitivities in that country, Secretary Rubio was personally handling the discussions with the government of El Salvador regarding persons subject to court orders— whether by this Court or others—detained in El Salvador. I additionally assured Ms. Harper that Secretary Rubio had read and understood this Court's order, and that Secretary Rubio wanted to assure this Court that he was committed to making prompt and diligent efforts on behalf of the United States to comply with that order. I understand that Ms. Harper then included this information in her declaration attached to Defendants' status update to the Court, dated June 2, 2025 (ECF 290).

7. Even as the State Department was undertaking the diplomatic efforts described above, the State Department also assisted Defendants' compliance with the May 20 and June 5

Orders by regularly requesting location and status updates on Cristian from El Salvador. Even though the State Department made frequent requests to El Salvador for updates, those requests were not always met with a response. We conveyed to Defendants whatever information El Salvador provided us as soon as we obtained it, and it is my understanding that Defendants then reported that information to the Court. It should go without saying that El Salvador is a sovereign country, and we cannot control when, how, or if it responds to our inquiries.

8. After weeks of sensitive diplomatic discussions, the United States helped secure a deal between El Salvador and Maduro's regime. On July 18, El Salvador decided to release the 252 Venezuelans who were in its custody, including Cristian, in exchange for the Maduro regime's release of 10 Americans along with dozens of Venezuelan political prisoners. To help ensure the greatest possible compliance with the Court's order regarding Cristian, the State Department sought and obtained assurances from the Maduro regime that the regime will not impose obstacles to any transferred Venezuelan's travel if three conditions are all met: (1) U.S. legal proceedings reach a stage where the appearance of one of the 252 Venezuelan nationals formerly housed at CECOT may be called for in legal proceedings or required by a court; (2) the U.S. government is prepared to facilitate the person's travel to the United States for that purpose; and (3) the individual is willing to travel to the United States for that purpose.

9. The Bukele-Maduro deal came to fruition over several hours on July 18 and involved simultaneous flights taking off from Venezuela and El Salvador carrying the respective individuals who would be repatriated. Due to logistical factors beyond anyone's control, the deal was still actively being implemented at noon on July 18, when Defendants' weekly status update was due to the Court under the June 5 Order. To mitigate the risk that the deal would fall apart under public scrutiny, the State Department asked Defendants to delay filing their report until we

4

had confirmation that the respective planes had safely taken off. If Defendants had filed their report, we feared that the deal would have collapsed and 10 Americans and 80 Venezuelan political prisoners would have remained in detention. At the same time, we were determined not to mislead the Court or Plaintiffs by having Defendants file a report at noon that omitted any mention of the operation then underway. As soon as we had confirmation that the planes had safely taken off—approximately 3:45pm Eastern Daylight Time on July 18—the State Department notified Acting Deputy Assistant Director Harper so that she could include the information in her declaration accompanying the status report. It is my understanding that she did so and that the Justice Department filed the status report with the Court within minutes thereafter. We regret this brief delay in filing the status report, but the operation's success and sensitive diplomatic engagement depended on maximum discretion.

10. Secretary Rubio publicly testified to the Senate Foreign Relations Committee on May 20, 2025, that if high-level State Department officials were compelled to share with third parties the details of their conversations with our foreign counterparts, we would break trust with those counterparts, chilling their willingness to discuss matters candidly with us and harming our ability to conduct foreign affairs. Maintaining a relationship of trust and mutual respect with foreign counterparts is the cornerstone of effective diplomacy, and achieving a diplomatic goal often involves complex negotiations that the foreign counterpart does not want divulged publicly. Diplomacy also involves careful timing—sometimes achieving a goal is contingent upon another action that can only happen at a later time. These considerations impeded us from providing further detail to Defendants for their weekly status reports on the specific steps the State Department was taking at that time to facilitate Cristian's return, and we can likewise not divulge many of those

details now. Suffice it to say that our diligent efforts put Cristian in a position to return to the United States if he ever so chooses.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 11th day of September, 2025.

Christopher Landau
Deputy Secretary of State