**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| J.O.P., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 8:19-cv-01944-SAG |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

 

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL BRIEF IN
SUPPORT OF THEIR MOTION TO ENFORCE AND FOR CIVIL CONTEMPT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS.........................................................................................................i

TABLE OF AUTHORITIES .................................................................................................ii

INTRODUCTION ................................................................................................................ 1

RELEVANT BACKGROUND ............................................................................................. 3

STANDARD OF REVIEW .................................................................................................. 6

ARGUMENT....................................................................................................................... 8

    I.    Because Defendants Have Followed the Settlement Agreement, Their Actions Under It Do Not Merit Civil Contempt..................................................... 8

        A.    Plaintiffs Did Not Address Critical Legal Authority That Limit Civil Contempt.................................................................................. 8

        B.    The Settlement Agreement Does Not Prohibit the Many Actions by Defendants that Plaintiffs Target. .................................................... 10

        C.    The Settlement Agreement Does Not Require Adjudication Within Any Timeframe..................................................................................... 12

        D.    Defendants' Obligations Under Section III.I Are Far Narrower Than Plaintiffs Claim. ...................................................................... 13

        E.    Because Defendants Have Consistently Followed the Terms of Section V.D's Error-Correction System, They Have Not Violated the Settlement Agreement.................................................................... 17

    II.    Even Assuming Some Number of Violations, Defendants Have Demonstrated a Good Faith Attempt to Comply. ........................................... 18

    III.    This Court Lacks Jurisdiction and Authority To Impose Plaintiffs' Proposed Remedies.............................................................................................. 22

        A.    This Court Lacks Jurisdiction to Grant Plaintiffs' Proposed Sanctions. ...... 23

        B.    Plaintiffs' Proposed Sanctions Are Too Punitive, and Too Far Removed From the Settlement Agreement, For Civil Contempt.................................. 24

CONCLUSION................................................................................................................... 29

**TABLE OF AUTHORITIES**

Page(s)

Cases

*Coal Co. v. Local 1702*, United Mine Workers of Am.,
   683 F.2d 827 (4th Cir. 1982) ......................................................................................... 6

*Consumer Fin. Prot. Bureau v. Klopp*,
   957 F.3d 454 (4th Cir. 2020) ................................................................................... *passim*

*Dada v. Mukasey*,
   554 U.S. 1 (2008)......................................................................................................... 19

*De Simone v. VSL Pharms., Inc.*,
   36 F.4th 518 (4th Cir. 2022) ....................................................................... 6, 8, 9, 29

*Estes v. Clarke*,
   No. 7:15-CV-00155, 2022 WL 2383956 (W.D. Va. July 1, 2022) ................................... 21, 22

*Fernando T. v. Noem*,
   No. 26-CV-445 (ECT/EMB), 2026 WL 508807 (D. Minn. Feb. 23, 2026)........................... 22

*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022)...................................................................................................... 23

*Gompers v. Buck's Stove & Range Co.,*
   221 U.S. 418 (1911)...................................................................................................... 25

*Hardy v. Asture*,
   No. 1:11CV299, 2013 WL 566020 (W.D.N.C. Feb. 13, 2013)................................................. 26

*In re Gen. Motors Corp.*,
   61 F.3d 256 (4th Cir. 1995) ...................................................................................... *passim*

*J.L. v. Cuccinelli*,
   No. 18-CV-04914-NC, 2020 WL 2562895 (N.D. Cal. Feb. 20, 2020) ................................. 22

*Leroy v. Great W. United Corp.*,
   443 U.S. 173 (1979)...................................................................................................... 24

*Maersk Line, Ltd. v. United States*,
   513 F.3d 418 (4th Cir. 2008) .................................................................................. 14, 15

*McComb v. Jacksonville Paper Co.*,
   336 U.S. 187 (1949)......................................................................................................... 6

*McLean v. Cent. States, Se. & Sw. Areas Pension Fund*,
   762 F.2d 1204 (4th Cir. 1985) ..................................................................................... 7

*McMellon v. United States*,
   387 F.3d 329 (4th Cir. 2004) ....................................................................................... 7

*N.S. v. Dixon*,
   141 F.4th 279 (D.C. Cir. 2025)..................................................................................... 23

*Orkin v. Jacobson*,
   274 Md. 124, 332 A.2d 901 (1975) ...................................................................... 10, 11, 14, 15

*Portland v. City of Portland*,
   No. 3:20-CV-00917-HZ, 2021 WL 982613 (D. Or. Mar. 16, 2021)...................................... 26

*Rufo v. Inmates of Suffolk County Jail*,
   502 U.S. 367 (1992)...................................................................................................... 24

*Sugar v. Burnett*,
   130 F.4th 358 (4th Cir. 2025) ................................................................. 7, 13

*Taggart v. Lorenzen*,
   587 U.S. 554 (2019) ................................................................................ *passim*

*United States v. Armour & Co.*,
   402 U.S. 673 (1971) ....................................................................................... 9

*United States v. Cotton*,
   535 U.S. 625 (2002) ..................................................................................... 24

*United States v. Darwin Const. Co.*,
   873 F.2d 750 (4th Cir. 1989) ...................................................... 2, 6, 18, 22

*United v. Ali,*
   874 F.3d 825 (4th Cir. 2017) ............................................................ 6, 18, 22

*Willie M. v. Hunt*,
   657 F.2d 55 (4th Cir. 1981) ........................................................................ 1

## Statutes

8 U.S.C. § 1229a ..................................................................................... 19, 20
8 U.S.C. § 1229c ......................................................................................... 19
8 U.S.C. § 1252(f)(1) ................................................................................... 23

## Rules

Fed. R. Civ. P. 60 ........................................................................................ 24

## Regulations

8 C.F.R. § 208.8 .......................................................................................... 28
8 C.F.R. § 240.25 ........................................................................................ 20
8 C.F.R. § 1240.26 ...................................................................................... 20

**INTRODUCTION**

Perhaps most notable about Plaintiffs' various filings that seek a finding of civil contempt against Defendants is what they omit. On the law, their discussions ignore or misstate legal elements required for civil contempt. On the facts, they disregard holes they left in the Settlement Agreement that they negotiated and agreed to. As two examples, but by no means the only ones: the Settlement Agreement does not require Defendants to create, update, maintain, or share internally or externally (1) lists of actual or potential class members; or (2) lists of removed actual or potential class members. Many of Plaintiffs' key arguments fail given those omissions from the Settlement Agreement.

Even assuming for argument that noncompliance of Settlement Agreement terms may have occurred, that does not mean that Defendants violated the Settlement Agreement. That is due to the agreed-on and capacious error-correction mechanism in the Settlement Agreement itself, at Section V.D. By following Section V.D, Defendants are following the agreement. The Settlement Agreement nowhere exempts removals of aliens from Section V.D. And despite the limited nature of the contractual obligations, Defendants have gone far above and beyond the terms of the Settlement agreement. That is, despite having no obligation to do so, they have repeatedly reported possible removals, and have even undertaken on their own initiative a review of removals that led to the disclosure of the additional removals in Court. *See* ECF No. 549-2.

Plaintiffs may wish that they had struck a different bargain than the one that they signed. But that is not enough for contempt: "the district court 'has no authority to expand or contract the judgment's terms to reflect what might have been.'" *Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 454, 463 (4th Cir. 2020), *quoting Willie M. v. Hunt*, 657 F.2d 55,

60 (4th Cir. 1981). Rather, to meet their burden, Plaintiffs must—but cannot—demonstrate that Defendants have violated an "unequivocal command."[1] And for the many areas where the Settlement Agreement is silent on an issue, for purposes of civil contempt, "the inescapable conclusion is that the parties *intended* the omission." *Klopp*, 957 F.3d at 464 (cleaned up, emphasis added). "Words matter." *Id.*

Plaintiffs also allege violations of this Court's order of April 23, 2025, ECF No. 254. Given the wording of that order, Defendants admit to some number of violations.[2] But that is not the end of the civil contempt analysis. Any aliens who departed voluntarily were not removed, so their exits are not violations. For the noncompliant removals that did take place, Defendants can establish that they acted in "good faith" and with "substantial compliance" because "all *reasonable* steps have been taken to ensure compliance." *United States v. Darwin Const. Co.*, 873 F.2d 750, 755 (4th Cir. 1989) (emphasis added). That substantial compliance includes the many decisions that Defendants have processed during the lifespan of the Settlement Agreement, along with Defendants' actions reporting noncompliance to Defendants.

Finally, Defendants' actions do not justify Plaintiffs' requests to in effect rewrite wholesale the Settlement Agreement in ways that are detached from the both the Settlement Agreement and from Defendants' actions. As the Supreme Court has stated, "only the *least* possible power adequate to the end proposed should be used in contempt cases." *Taggart v. Lorenzen*, 587 U.S. 554, 562 (2019) (civil contempt case) (cleaned up, emphasis added). The remedies that Plaintiffs propose go far beyond any least possible power. It follows that,

---

[1]     *In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995) (discussed more below).

[2]     *See also* Tr. Feb. 18, 2026, at 79 (Defendants' counsel admitting violations).

even if this Court does find civil contempt, it should deny the sanctions that Plaintiffs propose.

Therefore, this Court should deny Plaintiffs' motion to enforce the court-ordered settlement agreement and to find Defendants in civil contempt.

## **RELEVANT BACKGROUND**

After Plaintiffs filed their complaint in this case, the parties, through counsel, conducted discussions and arm's length negotiations for five years, regarding a compromise and settlement "with a view to settling all matters in dispute." ECF No. 199-2 at 3, § I.I. [3]

Several sections of the resulting Settlement Agreement address removal of aliens: removal orders, removal procedures, or reference to a person being removed appear over a dozen times in the Settlement Agreement. *See* ECF No. 199-2, at §§ I.A, I.D, II.M, III.C.3, III.G.3, III.H, III.I, III.J.2, III.J.3, V.D, VI.B.

The agreement defines the class. *Id.* § I.E. But it does *not* require Defendants to create a comprehensive or even a partial list of who the Class Members are in this case. As this Court has stated: "It is an unusual settlement agreement in that we don't have a defined list of class members, a defined way of identifying who is and is not a member." Tr. May 6, 2025, at 10.

There are many other issues that the Settlement Agreement also does not address. It does not discuss whether Defendants need to share any list of actual or potential class

---

[3]    This Court is already aware of the general background of this case. *See, e.g.*, ECF No. 333 at 3-7 (decision on fees); ECF No. 568 at 2-5 (Defendant's opposition to Plaintiffs' Rule 60(b) motion). The background discussion above focuses on what is most relevant here, specifically, the terms of the Settlement Agreement, and Defendants' compliance.

members internally within DHS. It also does not contain any specific schedule that DHS should follow for internally distributing lists of actual or potential class members. The Settlement Agreement does not require DHS to use any sort of specific coding system; that is, it is silent about special group codes, or codes called "PRL." The Settlement Agreement does not contain the words "train" or "training."[4] The terms "voluntary departure" or "voluntarily depart" do not appear anywhere in the Settlement Agreement. The Settlement Agreement contains no provision requiring Defendants to take any actions before the termination date with regard to anyone whose applications for adjudication are still pending before DHS. And it also contains no provisions at all concerning detentions of aliens pending adjudication of their asylum applications.

In light of Plaintiffs' arguments, it is important to highlight the terms of three provisions of the Settlement Agreement: Sections III.I, III.K, and V.D.

***Section III.I***: In this provision of the Settlement Agreement, two of its three sentences explicitly limit the scope of its reach. The opening words of the first sentence state that Section's III.I's terms apply "[w]ith respect to any Class Member with a final removal order." It continues that, for that circumscribed subset of Class Members—those with a final removal order—"ICE will refrain from executing the Class Member's final removal order until USCIS issues a Final Determination." The opening words of the second sentence incorporate by reference the limits of the first sentence, stating: "[i]n order to comply with *this* provision . . . ." (emphasis added). With that narrowed scope established, the second sentence continues to require ICE to "make an entry indicating there is a stay in its system

---

4    Section III.A did require DHS to "issue a superseding memorandum explaining and implementing this Settlement Agreement."

4

of records." Further emphasizing its narrow bounds, the second sentence continues that ICE should make this "entry" only for Class Members that it has "identified," meaning, class members "with a final removal order" specified at the start of Section III.I. The third and final sentence concludes that "this alert will not be removed" until "USCIS indicates it is appropriate." No other section of the Settlement Agreement contains any language indicating that ICE or USCIS must mark or collate names of class members.

*Section III.K:* This is one of the agreement's provisions addressing the responsibilities of the parties in Immigration Courts. It specifically concerns "sufficient evidence of class membership," a phrase that appears only in this provision, but nowhere else in the entire Settlement Agreement. The provision requires, in part that, when an alien makes a motion concerning the Settlement Agreement in Immigration Court, it should be "submitted with sufficient evidence of Class membership." The provision does not require Defendants to find or submit any evidence concerning class membership.

*Section V.D:* For this provision, the heading reads: "*Noncompliance* with This Agreement" (emphasis altered). Its opening words discuss "alleged noncompliance with this Settlement Agreement, on an individual or class-wide basis." In such situations, "the complaining Class Member(s) or their legal representative(s) shall provide written notice of the alleged noncompliance." Section V.D contains no corresponding obligation on Defendants to provide any notice of noncompliance that they discover or are aware of. The remainder of Section V.D lays out the procedure that the parties, and the Court, must follow to resolve alleged violations. Section V.D nowhere exempts any type or category of alleged noncompliance from its procedures. The section repeatedly uses the phrase "noncompliance" but does not contain the word "violation."

5

**STANDARD OF REVIEW**

"[C]ivil contempt is a severe remedy." *Taggart*, 587 U.S. at 561 (cleaned up). Additionally, "civil contempt should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Id.* (cleaned up). In the Fourth Circuit, the Court follows a multi-step burden-shifting procedure to decide allegations of civil contempt. *De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 529 (4th Cir. 2022). Initially,

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's favor; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result.

*Id*. To be "clear and convincing," the evidence must be "highly probable." *United v. Ali,* 874 F.3d 825, 831 n.2 (4th Cir. 2017). And "[c]ivil contempt is an appropriate sanction" only where there is "an *unequivocal* command which a party has violated." *In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995) (emphasis added).

If the complainant meets the initial criteria discussed above, then the burden switches to the other party "to demonstrate that she made in good faith all reasonable efforts to comply with the enforcement order." *Ali*, 874 F.3d at 831 (cleaned up). The Fourth Circuit has further explained that "a good faith attempt to comply, as well as substantial compliance or the inability to comply, can be defenses to a civil contempt order." *Darwin Const. Co.*, 873 F.2d at 754, *citing Consol. Coal Co. v. Local 1702*, United Mine Workers of Am., 683 F.2d 827, 832 (4th Cir. 1982); *see also De Simone, Inc.*, 36 F.4th at 529.

There has been some inconsistency in the precedent, and some cases do not discuss burden shifting based on good faith or substantial compliance. *See Taggart*, 587 U.S. at 561 ( "the absence of wilfulness does not relieve from civil contempt"); *McComb v. Jacksonville*

6

*Paper Co.*, 336 U.S. 187 (1949); *McLean v. Cent. States, Se. & Sw. Areas Pension Fund*, 762 F.2d 1204, 1210 (4th Cir. 1985); *Sugar v. Burnett*, 130 F.4th 358 (4th Cir. 2025) (not recognizing burden shifting based on good faith or substantial compliance).

The most reasonable reading of Fourth Circuit and Supreme Court precedent is to apply the burden-shifting system based on good-faith and on substantial compliance. This is because the Fourth Circuit's *De Simone* decision cites to the Supreme Court's *Taggart* decision, and *De Simone* still applies the burden-shifting system. It follows that the Fourth Circuit in *De Simone* interpreted *Taggart* to allow burden-shifting based on good faith and substantial compliance when considering allegations of civil contempt.[5]

Finally, if a court ultimately does find civil contempt, in crafting "an appropriate sanction . . . only the least possible power adequate to the end proposed should be used in contempt cases." *Taggart*, 587 U.S. at 562 (*citing* criminal contempt case). Also, especially for sanctions, the Court has "not held, however, that subjective intent is always irrelevant." *Id.* at 561.

---

[5]     *Sugar*, which does not recognize burden shifting, was decided after *De Simone*, which does recognize burden shifting. But one panel case cannot overturn another in the Fourth Circuit. *See McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) ("When published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled by an intervening opinion from this court sitting en banc or the Supreme Court."). *Sugar* also does not cite intervening Supreme Court decision following *De Simone* that would have overturned *De Simone*. *Id.*

**ARGUMENT**

I.    **Because Defendants Have Followed the Settlement Agreement, Their Actions Under It Do Not Merit Civil Contempt.[6]**

Concerning the Settlement Agreement, Plaintiffs cannot demonstrate "that the alleged contemnor by its conduct violated the terms of the decree." *De Simone.*, 36 F.4th at 529. In order to prevail, Plaintiffs must show more than a mere violation. Rather, they must demonstrate that the violation breaches an "*unequivocal* command." *In re Gen. Motors Corp.*, 61 F.3d at 258 (emphasis added). For the reasons discussed below, Plaintiffs cannot do that, and therefore this Court cannot base contempt on any alleged violations of the Settlement Agreement. That is especially so because, as anticipated by the Settlement Agreement, there would be disputes and cases requiring potential remediation.

A.    **Plaintiffs Did Not Address Critical Legal Authority That Limit Civil Contempt.**

Plaintiffs ignore critical aspects of how the Fourth Circuit determines civil contempt, in their motion to enforce and find for civil contempt (ECF No. 459-2), their Reply (ECF No. 463) and their Supplemental Brief (ECF No. 558). Especially important is the Fourth Circuit's *Klopp* decision. While Plaintiffs do acknowledge that binding authority, ECF No. 463, they do not discuss critical aspects of the holding.

There, a district court initially imposed civil contempt sanctions onto Mr. Klopp, for allegedly violating an consent order that banned him from certain activities related to mortgage brokerage banks. *Id.* at 459-61. Even though the consent order did not bar him

---

[6]    Defendants acknowledge that the Court ultimately disagreed with their interpretation of the Settlement Agreement as it pertains to the removal of Cristian, which Defendants did not ultimately appeal. *See* ECF No. 253. This Court has already denied Plaintiffs' motion for criminal contempt based on the exit of Cristian from this country. ECF No. 441.

from managing a brokerage business, the district court held him in civil contempt for doing so, and as a sanction ordered him to disgorge his profits from that work. *Id.* at 460. The Fourth Circuit in part overturned the order. While it held that Mr. Klopp had violated other parts of the consent order, the words of the order did not prohibit him from managing a brokerage business. *Id.* at 463, 467.

According to the Fourth Circuit, when determining whether civil contempt is appropriate for a party's actions under a settlement agreement, "[w]ords matter." *Klopp*, 957 F.3d at 464. That is, "the scope of a consent order must be discerned within its four corners, and not by reference to what might satisfy its purposes." *Id.* at 463 (*quoting United States v. Armour & Co.*, 402 U.S. 673, 681 (1971)). As a result, "if parties to a contract omit terms . . . the inescapable conclusion is that the parties intended the omission." *Klopp*, 957 F.3d at 464. That is especially true when contracts "are entered into by parties to a case after careful negotiation has produced agreement on their precise terms." *Id.* at 463 (*quoting Armour & Co.*, 402 U.S. at 681).

At the hearing in February, the Court asked about the standards of contract interpretation for purposes of civil contempt. Tr., Feb. 18, 2026, at 70-71. The answer is that the standard is stringent for civil contempt. Of course, a violation of a decree is one of the underlying conditions for civil contempt. *De Simone*, 36 F.4th at 529. But the law of civil contempt actually requires more. The violation must be of an "*unequivocal* command." *In re Gen. Motors Corp.*, 61 F.3d at 258 (emphasis added). Indeed, as the Supreme Court has made clear, if "there is a fair ground of doubt as to the wrongfulness of the defendant's conduct," then civil contempt is not appropriate. *Taggart*, 587 U.S. at 561.

9

Plaintiffs' briefs do not acknowledge these critical principles that limit the application of civil contempt. Therefore, and for the reasons discussed below, Plaintiffs' motion must be denied.

**B.      The Settlement Agreement Does Not Prohibit the Many Actions by Defendants that Plaintiffs Target.**

*Klopp*'s holding about the importance of the language and terms of a settlement agreement for purposes of determining civil contempt are especially important here. Plaintiffs have targeted a range of Defendants' conduct under the Settlement Agreement, for allegedly violating the Settlement Agreement. But the Settlement Agreement simply does not prohibit issues that Plaintiffs raise.

For instance, Plaintiffs criticized Defendants for not having created or maintained a continuously up-to-date list of all class members. *See*, e.g., Supp. Br. (ECF No. 558) at 1 ("USCIS fails to identify all Class Members to ICE"); 4 (discussing Defendants' allegedly "facially inadequate procedures to identify class members" and asserting that Defendants "Class list" was deficient). But as mentioned in the Background section, above, the Settlement Agreement nowhere requires that any party create or distribute a "Class list." There is certainly no *unequivocal* command, as precedent requires. *In re Gen. Motors Corp.*, 61 F.3d at 258.

Indeed, Section III.K—also discussed in the Background section above—provides important context here. In Maryland, "all parts" of a contract "are to be read together" and "all parts are to be reconciled and harmonized if possible." *Orkin v. Jacobson*, 274 Md. 124, 332 A.2d 901, 904, 905 (1975). Therefore, Section III.K's terms are relevant. Section III.K is the only provision in the Settlement Agreement that includes the phrase "sufficient

10

evidence of Class Membership."[7] And that provision squarely places the burden of providing that "evidence of Class Membership" onto the *aliens*, not the Defendants. That is, for Defendants to create the "Class list," Supp. Br. (ECF No. 558), at 4, that Plaintiffs assert is deficient, Defendants would need to create it based on something. That something could only be "evidence of Class Membership"—otherwise it would not be a "Class list" in the first place. Yet for Defendants to have an obligation to find and use evidence of Class Membership to create that list would directly contradict Section III.K, which places the evidentiary burden of Class membership onto the *aliens*. That contradiction would violate the requirement for Section III.K to be "read together" and "harmonized" with the rest of the Settlement Agreement. *Orkin*, 332 A.2d at 905. Because the Settlement Agreement places no obligation on Defendants to create a class list in the first place, whatever lists Defendants happen to create for internal purposes do not violate any unequivocal command of the Settlement Agreement, and so cannot serve as the basis for civil contempt. *See In re Gen. Motors Corp.*, 61 F.3d at 258.

Similarly, Plaintiffs criticize Defendants for how it has used "special group codes," including the "PRL" codes. Supp. Br. (ECF No. 558), at 4. Again, nothing in the Settlement Agreement mentions the use of either of these codes, so Defendants' actions with regard to them do not breach an unequivocal command. That same reasoning applies to Plaintiffs' complaint that USCIS allegedly did not circulate its lists frequently enough to ICE. Supp. Br. (ECF No. 558), at 5; *see also id.* at 17-18. Plaintiffs assert that Defendants' had "woefully inadequate timing of transmitting" such lists, *id.*—but, yet again, the Settlement Agreement mentions nothing at all about how frequently USCIS must circulate any lists of

---

[7]    Section III.C.I, II place additional evidentiary and persuasion burdens onto aliens.

11

any kind to ICE. Similarly, Plaintiffs claim that Defendants allegedly "delayed months" before adding people to their lists. ECF No. 558, at 6. Again, the Settlement Agreement omits any terms on how frequently DHS must update lists (because the Settlement Agreement as mentioned omits any requirement to create lists in the first place). The same conclusion applies to any allegations of "inadequate training," Supp. Br. (ECF No. 558), at 5, because the Settlement Agreement contains not a single requirement to train or for training. And the Settlement Agreement also does not contain any provisions addressing how Defendants should treat Class Members whose applications for asylum are still pending when the Settlement Agreement terminates.[8]

For these areas that form the core of many of Plaintiffs' allegations against Defendants, the Settlement Agreement contains only silence. But "if parties to a contract omit terms . . . the inescapable conclusion is that the parties intended the omission." *Klopp*, 957 F.3d at 464. Because the parties therefore "intended," *id.*, no obligations to any party about any of these areas that were not addressed, this Court must disregard them as grounds for civil contempt.

C.      **The Settlement Agreement Does Not Require Adjudication Within Any Timeframe.**

Plaintiffs also raise the "Hold and Review" memos. Supp. Br. (ECF No. 558), at 6-8, 22, 28. This issue is discussed in more detail in Defendants' opposition to Plaintiffs' Rule 60 motion. ECF No. 568 at 9-11. For purposes of civil contempt, the key point is that no term in the Settlement Agreement states that USCIS will adjudicate asylum applications in

---

[8]      The situation of Class Members whose applications are still pending at termination of the Settlement Agreement was raised by Class Counsel at the February hearing. *See* Tr. Feb. 18, 2026, at 33-34.

12

a given period of time. As the Fourth Circuit has made clear concerning civil contempt, "[w]ords matter." *Klopp*, 957 F.3d at 464.

> **D.      Defendants' Obligations Under Section III.I Are Far Narrower Than Plaintiffs Claim.**

Plaintiffs repeatedly point to Section III.I of the Settlement Agreement, asserting that Defendants are not fulfilling their obligations under it. *See, e.g.*, Supp. Br. (ECF No. 558), at 4, 16, 17, 22. But their position reflects a fundamentally incorrect reading of that provision.

Section III.I repeatedly makes clear that it is limited to "any Class Member with a final order of removal." Those are the first words in the first sentence of Section III.I. The opening words of the second sentence refer back to that limit, stating: "[i]n order to comply with *this* provision" (emphasis added). And the language in the section that spells out Defendants' responsibilities makes clear that they apply only to people who have been "identified" by ICE or USCIS—meaning "any Class Member with a final order of removal."

Plaintiffs, by contrast, seek to use the explicitly limited terms of Section III.I as the source of effectively unlimited and unending obligation for Defendants. According to Plaintiffs, this provision requires Defendants to include alien class members "*not* in removal proceedings," (emphasis added), along with those "if their asylum application was not currently pending." Supp. Br. (ECF No. 558) at 17. Plaintiffs also apparently rely on Section III.I to impose on Defendants obligations to update their lists, and to distribute them within DHS, more frequently. *Id.* at 406. And they claim that Section III.I's requirement for Defendants to "make an entry indicating there is a stay" applies across the board to all Class Members. *See* Supp. Br. (ECF No. 558) at 1 ("USCIS fails to identify *all* Class Members to ICE") (emphasis added); ECF No. 459-2 at 14 (alleging "ICE is thus violating the

Agreement's requirement to make an entry indicating a stay for all identified Class Members, irrespective of how they are identified.").

Plaintiffs' boundless reading of this provision is unmoored from its actual terms. The key limit that runs throughout Section III.I is its explicit application *only* to Class Members "with a final removal order." Given that limit, despite Plaintiffs' claims to the contrary, the Settlement Agreement contains no obligation for any part of DHS to make entries in their systems for *all* Class Members. *See* Supp. Br. (ECF No. 558) at 1 ("USCIS fails to identify *all* Class Members to ICE") (emphasis added).

To follow Plaintiffs' logic, this Court would need to ignore the limiting word "identified" that precedes "Class Members." But ignoring that word would violate a fundamental rule of contract interpretation. According to both Fourth Circuit and Maryland precedent, courts must give meaning to and enforce *every* word in a contract. *Maersk Line, Ltd. v. United States*, 513 F.3d 418, 423 (4th Cir. 2008) ("in contractual disputes every word is important"); *Orkin*, 332 A.2d at 905 (both statutes and contracts are "to be read so that no word, clause, sentence or phrase shall be rendered surplusage, superfluous, meaningless or nugatory") (cleaned up).

Plaintiffs have made clear that they view Section III.I's obligations on Defendants, to mark their systems, as extending to *all* possible Class Members. *See* Supp. Br. (ECF No. 558), at 4-5 ("likely thousands of Class Members never made it onto USCIS's Class lists"). But there is no obligation for DHS to make an entry in its systems for "Class Members"— Section III.I's obligation on Defendants concerns only "all identified Class Members, including Class Members identified by USCIS." The word "identified" appears twice in that

14

phrase. It must mean something, and cannot be ignored. *Maersk Line, Ltd.*, 513 F.3d at 423; *Klopp*, 957 F.3d at 464 ("Words matter").

"Identified" means "to have or assert an identity of a specified kind."[9] For purposes of the Settlement Agreement, the most obvious meaning for "specified kind" comes from context, so that "identified" is "read together" and "harmonized" with the rest of Section III.I. *Orkin*, 332 A.2d at 905. That means "identified" serves to *limit* the reach of Defendants' obligations to "any Class Member with a final removal order," the boundary that serves as the opening words to all of Section III.I.

With this appropriate use of "identified" that refers only to Class Members with final removal orders, it becomes clear that the actions Defendants took were appropriate under Section III.I, and that Plaintiffs' criticisms concerning that section are baseless. For instance, it was completely appropriate for USCIS to use codes for aliens in removal proceedings, Tr. Mar. 19, 2026, at 52. And even the use of the codes concerning aliens in removal proceedings goes above and beyond what Section III.I requires, since that section references the narrower category of "any Class Member with a final removal order." Certainly, the terms of Section III.I do not contain an "unequivocal command" for USCIS or ICE to update lists on any time frame (or at all), or share lists frequently (or at all), or include *all* Class Members when it makes entries in its systems. *In re Gen. Motors Corp.*, 61 F.3d at 258.

By contrast, and in order to accommodate their criticisms, Plaintiffs effectively read out "identified" as a modifier. They seek to require Defendants to execute Section III.I's requirements on "Class Members," full stop. "Class Members" and "identified Class

---

[9]     "Identify." Merriam-Webster.com, *available at*: https://www.merriam-webster.com/dictionary/identify (last accessed on May 4, 2026).

Members" cannot mean the same thing. *Maersk* and *Orkin* do not permit Plaintiffs to simply ignore a word that they previously agreed to but now dislike.

Even if Plaintiffs were to argue that "identified Class Members" means aliens who USCIS and ICE have identified to be Class Members, there are two flaws. First, this does not take into account the context of Section III.I, as *Orkin* requires, as discussed above. Second, such a reading refers to identify in the *past* tense: identified. So it cannot be used as grounds to criticize USCIS or ICE for failing to *continue* to update or maintain their internal lists.

Finally, Plaintiffs have repeatedly argued that ICE has improperly relied on USCIS for names of Class Members who require an entry under Section III.I. *See, e.g.*, Supp. Br. (ECF No. 558) at 1 ("USCIS fails to identify all Class Members to ICE") (emphasis added). However, this Court has already discussed how Plaintiffs' reading of Section III.I would risk ICE duplicating the work of USCIS. *See* Tr. Feb. 18, 2026, at 29 ("Because from my reading of what you're asking for, it almost sounds like what you're looking for is just a duplicative process to serve as a check."). Of course, Section III.I nowhere explicitly calls for such a duplicative process.[10] In any case, Section III.I certainly does not impose an "unequivocal command" for USCIS and ICE to separately repeat each other's work to determine which aliens merit entries in DHS systems. *In re Gen. Motors Corp.*, 61 F.3d at 258, which is the pre-requisite for civil contempt.

---

[10]    Notably, these internal lists were created by USCIS upon ICE's request to assist ICE with complying with Section III.I of the settlement agreement. *See* Tr. Mar. 19, 2026 Tr., at 63 (testimony of Kim Sicard that "I believe ICE asked [USCIS] to create these lists and send them to them so that they could put the notation in EARM . . . .").

USCIS and ICE have not violated the terms of Section III.I, and Plaintiffs criticisms involving III.I cannot serve as grounds for civil contempt.[11]

### E. Because Defendants Have Consistently Followed the Terms of Section V.D's Error-Correction System, They Have Not Violated the Settlement Agreement.

It is telling that, in their many criticisms of Defendants' conduct, Plaintiffs' supplemental brief does not assert violations of Section V.D. In fact, Section V.D is an integral part of the Settlement Agreement. It is the sole mechanism that the parties agreed to in the deal they struck for every "event of an alleged noncompliance with this Settlement Agreement, on an individual or class-wide basis." *Id.*

Critically, Section V.D applies to *all* allegations of noncompliant conduct by Defendants under the Settlement Agreement, including but not limited to allegations of noncompliant removals. Plaintiffs themselves have implicitly acknowledged this, by using Section V.D. to flag allegedly noncompliant removals. In other words, noncompliant conduct alone does not demonstrate a violation of the Settlement Agreement. Where Defendants have followed the procedure set forth in Section V.D, there is simply no violation of the Settlement Agreement "on an individual or class-wide basis." Section V.D. *See also Klopp*, 957 F.3d at 463 ("the district court has no authority to expand or contract

---

[11]    Even Plaintiffs tacitly admit that the Settlement Agreement's bar on removal only covers people who have been in removal proceedings (though really, as explained above, only people with final orders of removal). Among the sanctions that Plaintiffs propose, they recommend adding a newly defined group of "Proposed Class Members" who cannot be removed pending additional steps, and which would include people regardless of whether they have been in removal proceedings. ECF No. 558-6 at 1 ¶ 2, 3 ¶ 4. Plaintiffs would have no need to propose this new bar on removal if they understood the existing bar on removals to already cover people outside removal proceedings.

17

the judgment's terms to reflect what might have been"). Notably, Section V.D itself does not even use the word "violation," but instead discusses "noncompliance."

In other words, where Defendants have followed the terms of Section V.D, they have followed the terms of the Settlement Agreement. It follows that conduct by Defendants that Plaintiffs allege violated the Settlement Agreement are not actual violations and therefore cannot serve as the foundation for civil contempt.

## II.   Even Assuming Some Number of Violations, Defendants Have Demonstrated a Good Faith Attempt to Comply.

Should the Court find some number of violations of this Court's Order of April 23, 2025 or of the Settlement Agreement, then in the Fourth Circuit, the burden shifts to Defendants to demonstrate that they have acted in good faith, or that they have substantially complied with the agreement. *See De Simone*, 529; *Ali*, 874 F.3d at 831; *Darwin Const. Co.*, 873 F.2d. at 755. A finding of either good faith or substantial compliance is sufficient to deflect any finding of civil contempt. *Id.* Here, for all of the reasons discussed below, Defendants satisfy each of these findings: good faith and also substantial compliance with the April order and with the Settlement Agreement.

Taking a step back, it is critical to emphasize the high number of determinations that that USCIS has completed since the Settlement Agreement was entered into. According to statistics compiled by DHS, over 9,000 decisions have been made by USCIS. *See* Exh. A (Declaration of Margaret Massey). This work demonstrates diligent and ongoing effort to honor the Settlement Agreement, demonstrates DHS's good faith under the Settlement Agreement, and also demonstrates DHS's substantial compliance with the Settlement Agreement.

18

Also relevant to substantial compliance, pursuant to Sections III.A and IV.K, USCIS will continue to process all former Class Members' applications in accordance with its existing policy; that is to say, USCIS will exercise initial jurisdiction over their asylum applications and adjudicate them on the merits in the same way it adjudicates asylum applications for all asylum applicants with prior UACs determinations. ECF No. 199-2, §§ III.A, IV.K.

Significantly, the number of reported removals of Class Members in alleged violation of the April 23, 2025 order or the Settlement Agreement is lower than Plaintiffs claim. Plaintiffs assert that "likely more than one hundred Class Members have been removed." Supplemental Brief (ECF No. 558) at 1. In fact, of the roughly 100 narratives of aliens that DHS has submitted to class counsel since the March hearing, approximately one third involve voluntary departure rather than removal.[12] Neither the Settlement Agreement nor the April 23 Order prohibit voluntary departure.

To be clear, voluntary departure and final orders of removal are distinct concepts under the Immigration and Nationality Act ("INA"). *See, e.g.*, *Dada v. Mukasey*, 554 U.S. 1, 4-5 (2008) (discussing the interplay between 8 U.S.C. §§ 1229a(c)(7) and 1229c(b)(2) and noting that an alien "ordered removed" may file one motion to reopen removal proceedings as of right but that voluntary departure "has the effect of withdrawing the motion to reopen."). Under 8 U.S.C. § 1229c, the Secretary of Homeland Security and Attorney General may, in relevant part, "*permit* an alien voluntarily to depart the United

---

[12] As this Court is aware, Defendants are continuing to review their records, so while some of the numbers discussed in this section might shift, the general points about the significance of departures versus removals, and of potential class members versus actual class member, remain the same.

States . . . in lieu of being subject to proceedings under" 8 U.S.C. § 1229a (emphasis added).

This authority, in turn, may be exercised either by an immigration judge or by DHS. *See*

8 C.F.R. § 1240.26 (immigration judge); 8 C.F.R. § 240.25 (DHS). In the vast majority of

the narratives, the alien requested or accepted voluntary departure in removal proceedings

from an immigration judge. In others, the alien request or accepted voluntary departure from

DHS.[13]

Additionally, DHS has consistently made clear that the departures and removals

were for *both* potential and confirmed Class Members. Therefore, for the number of aliens

removed, a portion are not confirmed Class Members. Of the approximately 110 aliens

identified thus far to Class Counsel, slightly over half appear to be Class Members at the

time USCIS initially reviewed their case.[14] In all, DHS records indicate that only roughly

one-fifth of the aliens reported to Class Counsel involve aliens who USCIS has previously

identified as Class Members and who were removed from the United States.[15] Finally, it is

critical to take into account the scope of the undertaking here. The working lists that DHS

---

[13]     Defendants have thus not had an opportunity to fully review the cases after initially reporting narratives to Class Counsel. Accordingly, while the total number of voluntary departures and removals is unlikely to fluctuate substantially, the precise numbers may change.

[14]     A full review of each case is fact intensive and could result in a finding either that a previously identified Class Member was misidentified or has become a non-class member—including where USCIS issues a Final Adjudication on the Class Member's asylum application or where the Class Member withdraws his or her pending applications—or potential Class Members being confirmed as Class Members—such as where DHS discovers or Class Counsel provides sufficient evidence of Class Membership, most likely by providing evidence that there was a "parent or legal guardian in the United States available to provide care and physical custody. Thus, this number represents a best estimate based on available information compiled at the time of USCIS's initial review of an alien's case.

[15]     *See* footnotes above, regarding how this number could change based on further review.

compiles refer to tens of thousands of individuals. Given the sheer number of potential class members, actual Class Members, and adjudications involved, for purposes of civil contempt, one "cannot expect perfection." *Estes v. Clarke*, No. 7:15-CV-00155, 2022 WL 2383956, at *7 (W.D. Va. July 1, 2022).

That case involved an inmate who sued when prison officials did not always provide his kosher meals in accordance with an agreement. *Id.* Despite the errors, the Court declined to impose contempt, given the sheer scope of the task of feeding prisoners. "Occasionally, there will be some mistakes," that court concluded, holding that litigants "are unlikely to satisfy the standard for civil contempt" where "despite those mistakes, there is still substantial compliance." *Id.* The parallels between the situation there and here are substantial. In both cases, a government entity had agreed to a certain system going forward. Also in both situations, the government was engaged in processing an extremely high number of instances; there, meals to prisoners, and here, processing of aliens. Given the extreme high volumes at issue, and also the logistics involved, the Court in *Estes* concluded that mistakes would be inevitable, and could not justify civil contempt. That same conclusion very much applies here.

Together, these statistics in Exhibit A illustrate the day-in, day-out work that USCIS has put into diligently deciding many asylum applications. *See* ECF No. 254 ("Once USCIS adjudicates a Class Member's asylum application on its merits, the individual is no longer a Class Member"). That happens as part of the larger removal operations within DHS. Taking all this into account, even with the violations, Defendants have demonstrated both good faith and substantial compliance. Therefore, it is not appropriate for the Court to make

a finding of civil contempt here. *See Ali*, 874 F.3d at 831; *Darwin Const. Co.*, 873 F.2d at 755; *see also Estes*, 2022 WL 2383956.

Plaintiffs rely on two out-of-circuit cases to support their argument for civil contempt sanctions, but which have facts far afield from the ones here. In *Fernando T. v. Noem*, No. 26-CV-445 (ECT/EMB), 2026 WL 508807 (D. Minn. Feb. 23, 2026), the judge awarded $568.29 to an alien for a plane ticket. That case did not involve a consent decree or settlement agreement between the parties, which is the situation here. Moreover, the damages there were compensatory, literally to pay back the alien for out of pocket expenses. That amount of money was minimal, and cannot serve as support for the sweeping systemic changes to the country's immigration system that Plaintiffs seek here. In *J.L. v. Cuccinelli*, No. 18-CV-04914-NC, 2020 WL 2562895, at *3 (N.D. Cal. Feb. 20, 2020), the district court held that the defendants there violated a preliminary injunction, which says nothing one way or the other about whether Defendants here have followed the terms of the Settlement Agreement. There, the defendants removed five aliens that the district court ruled it should not have. Tellingly, the civil contempt sanctions that the district court there imposed were tightly linked to the five removed individuals, including, for instance, requirements to facilitate return and pay fines for delay. None of the sanctions in that case concerned other class members or potential class members. In other words, the sanctions there included none of the sweeping systemic changes to immigration law and procedures that Plaintiffs here are seeking.

## III. This Court Lacks Jurisdiction and Authority To Impose Plaintiffs' Proposed Remedies.

Even if this Court does find civil contempt, it must deny the remedies that Plaintiffs proposed. ECF Nos. 558 at 21-28; 558-6. This Court has no jurisdiction to impose them.

And Plaintiffs' proposed sanctions are in any case too detached from the Settlement Agreement, and too punitive for civil contempt sanctions. *See Taggart*, 587 U.S. 554, 562; *Klopp*, 957 F.3d at 464.

**A.    This Court Lacks Jurisdiction to Grant Plaintiffs' Proposed Sanctions.**

By granting Plaintiffs' proposed sanctions, changes not agreed upon by the parties and in direct contravention of the terms of the Settlement Agreement, this Court would exceed its jurisdiction to issue sanctions. As the Supreme Court has held, 8 U.S.C. § 1252(f)(1) "prohibits lower courts from entering injunctions"—"on behalf of an entire class of aliens"—"that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550-51 (2022). That prohibition governs "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action." 8 U.S.C. §1252(f)(1).

Here, Plaintiffs' proposed sanctions are barred by Section 1252(f)(1) because they restrain the operation of a covered provision in a manner not limited to an individual alien. *See* 8 U.S.C. § 1252(f)(1). An order restrains the operation of a covered provision when it "require[s] officials to take actions that (in the Government's view) are not required by [a covered statute] and to refrain from actions that (again in the Government's view) are allowed by [that statute]." *Aleman Gonzalez*, 596 U.S. at 551. Here, Plaintiffs' proposed sanctions do that. *See, e.g., N.S. v. Dixon*, 141 F.4th 279, 289 (D.C. Cir. 2025) (class-wide injunction violated Section 1252(f)(1), which "bars an inferior court from classwide injunctive relief that would interfere with ICE's operation.") (*citing Aleman Gonzalez*, 596 U.S. at 550-51).

23

Defendants have not waived arguments under Section 1251(f)(1) by entering into the settlement agreement. Section 1252(f)(1) is a jurisdictional provision not subject to forfeiture. Because jurisdictional limitations speak to "a court's *power*," a jurisdictional defect "can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002) (emphasis added). And Section 1251(f)(1) cannot be waived because it does not confer any "personal privilege[]" on a party. *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979).

Regardless, even if Section 1251(f)(1) could be forfeited, it was not here. Even if entering into the Settlement Agreement waived Section 1251(f)(1) objection for the agreed-upon duration, that could not constitute waiver for any later unilateral efforts to expand the settlement agreement through sanctions over Defendants' objection.

**B.    Plaintiffs' Proposed Sanctions Are Too Punitive, and Too Far Removed From the Settlement Agreement, For Civil Contempt.**

Even if this Court does have jurisdiction, the sweeping changes that Plaintiffs propose go far beyond what this Court has authority to implement as a sanction for civil contempt. To the extent the Court issues any remedy it must be "suitably tailored" and narrow in scope to any judicial finding. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992).[16]

Any remedies must fit with the Settlement Agreement or the April 2025 Order. In *Klopp*, 957 F.3d at 464, the Fourth Circuit held that a "civil contempt sanction . . . imposed by the court must be *causally connected* to the reasons for contempt" (emphasis added) (striking down disgorgement) (cleaned up). Additionally, "only the *least* possible power

---

[16]    To the extent that Plaintiffs are seeking to rely on Fed. R. Civ. P. 60, they cannot meet the standards, for the reasons discussed throughout Defendants brief opposing Plaintiffs' motion based on that Rule. *See generally* ECF No. 568.

adequate to the end proposed should be used in contempt cases." *Taggart*, 587 U.S. at 562 (cleaned up, emphasis added). Indeed, the whole point of civil contempt sanctions is "remedial" rather than "punitive." *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 441 (1911). Plaintiffs' proposals cross that line.

Plaintiffs' proposals span eight paragraphs, including multiple subparts. ECF No. 558-6, ¶¶ 2-9. Defendants object to each proposal individually and together, as punitive and unworkable, and as reaching far beyond anything that Defendants agreed to in the Settlement Agreement.

*First*, while the Settlement Agreement, and indeed Plaintiffs' case, concerned a narrowly defined group of UACs, Plaintiffs now baselessly seek to expand their reach in a way that is totally divorced from the Settlement Agreement. The proposed sanction would for the first time require Defendants to create and update a master list of "Potential Class Members," ECF No. 558-6 at 3, ¶ 4, a group of people who are nowhere defined in either the Settlement Agreement or in this Court's April 2025 order. Plaintiffs would define this group to sever and rewrite key aspects of the current Class Member definition; notably, "Potential Class Members" would include people regardless of whether they have ever been in removal proceedings, and regardless of whether they have been in the care and custody of a legal guardian or parent. *Compare* ECF No. 558-6 at 3, ¶ 4 with Settlement Agreement I.E & ECF No. 254. Further, this proposal places the burden of establishing membership in a relevant group onto Defendants, even though the Settlement Agreement's only discussion of "evidence of class membership" places that burden onto Plaintiffs. Settlement Agreement § III.K.

*Second*, Plaintiffs seek to institute training, ECF No. 558-6 at 2-3, ¶ 3, even though neither the Settlement Agreement nor the Court's April 2025 order mention training. And having all of ICE's agents and officers—now numbering more than 20,000 people— "undergo training" would be a significant undertaking all by itself.

Plaintiffs cite two cases to support this proposed sanction, ECF No. 558 at 26, but neither one is relevant given the facts. The first one, *Hardy v. Asture*, No. 1:11CV299, 2013 WL 566020, at *1 (W.D.N.C. Feb. 13, 2013), does not even mention contempt. The second one, *Portland v. City of Portland*, No. 3:20-CV-00917-HZ, 2021 WL 982613 (D. Or. Mar. 16, 2021), did involve civil contempt. But there the parties *agreed* to training, and the decision did not mention any underlying contract, agreement, or consent decree. Neither of these cases serves to change the points made above, namely, that the Settlement Agreement does not mention training, so there is no causal connection to a sanction involving training.

*Third*, Plaintiffs seek to institute special protections for people in detention, ECF No. 558-6 at 3-4, ¶¶ 5-7, even though, again, neither the Settlement Agreement nor the April 2025 order mention detention. The proposal calls for a new slate of reports, even though the parties already negotiated reports Defendants would provide, which did not include what Plaintiffs now seek to impose. *Compare* ECF No. 558-6 at 304, ¶¶ 4, 7, 8 *with* ECF No. 199-2 Sections III.A-G, V.B-C. This is another example of where Plaintiffs' propose to inflate sanctions far beyond this litigation.

Some proposed reports are especially punitive and unrelated to the Settlement Agreement. One requires a report every two weeks, with sworn declarations, of a wide range of topics, including but not limited to "[a]ll procedures used to identify Class Members, in particular when ICE detains individuals and when ICE prepares to remove individuals."

26

ECF No. 558-6 at 304, ¶ 7. The vagueness of this alone seems designed to set up Defendants for failure: determining the meaning of "all procedures" and what counts as conduct done "when ICE prepares to remove individuals" is likely not possible with any certainty. That could trigger round after round of new motions to enforce and new motions for contempt *ad infinitum*, a truly Sisyphean form of punishment. It is also unrelated to the Settlement Agreement: there is no reason for this special treatment for detained aliens, when the Settlement Agreement and April 2025 order are silent on that issue. *See Klopp*, 957 F.3d at 464 (stating that "if parties to a contract omit terms . . . the inescapable conclusion is that the parties intended the omission" and that civil contempt sanctions must be "causally connected" to the underlying agreement).

Another report requires Defendants to create a regularly updated list of removed *potential* Class Members. ECF No. 558-6 at 304, ¶ 8. And it requires ICE and USCIS employees to perform cumbersome searches for possible members of this group. This contains all of the flaws discussed above concerning new requirements to this group. And by requiring such information on short timeline, it does not take into account the nature of DHS removal operations, discussed above, or the resulting logistical complexities.

Additionally, Plaintiffs severely mischaracterize Defendants' actions on identification of past removal. They remark: "Although Defendants had the means to identify removed Class Members, they lacked the will to do so." ECF No. 558 at 27. That is demonstrably false. Defendants have identified and reported nearly every removal themselves. They have done this even though the Settlement Agreement does not require them to do so. And they have even undertaken on their own initiative a review of removals that led to the disclosure of the additional removals in Court. See ECF No. 549-2 (public

declaration of Patrick R. Hopple). As that declaration makes clear, at the time of the hearings DHS was in the process of ascertaining whether and how many removals may have taken place the time. Defendants have repeatedly gone above and beyond what the Settlement Agreement requires with regard to reporting removals, so there are no grounds—no causal connection—supporting this proposed sanction.

The final proposed sanction seems truly detached from Defendants' conduct. ECF No. 558-6 at 304, ¶ 9. It calls for DHS not to treat the asylum applications of removed Class Members as abandoned, and requires expedited processing if requested. The abandonment is addressed in a regulation, 8 C.F.R. § 208.8, and in any case, procedures already exist for asylum officers to consider individual situations. *See* Asylum Officer Procedure Manual, ECF No. 459-5, at 13 ("An applicant can overcome the presumption of abandonment . . . ."). Plaintiffs cite to no evidence that Defendants have applied this presumption in a way that has prevented any removed person from reentering under the Settlement Agreement. ECF No. 558 at 21-22. Therefore, there is no causal connection to any violation, and so this cannot be used a sanction. *See Klopp*.

For all these reasons, this Court should deny the sanctions that Plaintiffs propose. It should do this especially in light of the good faith efforts that Plaintiffs have made to comply. *Taggart*, 587 U.S. at 562 (the Court has "not held, however, that subjective intent is always irrelevant" for sanctions). Instead, if this Court finds civil contempt, it should permit Defendants to propose additional procedures with a close fit to any contempt grounds.[17]

---

[17]    Plaintiffs spend multiple pages discussing alleged "misrepresentations" by Defendants and their counsel. ECF No. 558, at 13-16. These allegations do not concern the

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for civil contempt, and in the alternative, it should deny the sanctions that Plaintiffs proposed.

Dated:  May 4, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANTHONY NICASTRO
Acting Director

CATHERINE M. RENO
Acting Assistant Director

RUTH ANN MUELLER
Senior Litigation Counsel

LARISSA K. JOHNSON
JOSHUA A. CLEM
Trial Attorneys

*/s/ Evan P. Schultz*
EVAN P. SCHULTZ
Trial Attorney (D.C. Bar No.
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
Telephone: (202) 892-0873
Evan.P.Schultz2@usdoj.gov
*Counsel for Defendants*

---

listed criteria of the burden-shifting procedures to establish civil contempt established by the Fourth Circuit. *See De Simone*, 36 F.4th at 529. Therefore, while Defendants do not agree with any of Plaintiff's characterizations or conclusions, there is no need for Defendants to address them in any detail.

Additionally, Plaintiffs rely repeatedly on a single sentence from Defendants' initial brief opposing civil contempt, stating: "Defendants did not have knowledge of the potential violations before or during the removals." ECF No. 462 at 16-17. Defendants withdraw that sentence from that filing.