**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION**

| | |
|---|---|
| J.O.P., *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>U.S. Department of Homeland Security, *et al.*,<br><br>    Defendants. | Civil Action No.<br>8:19-CV-01944-SAG |

**CLASS COUNSEL'S REPLY IN SUPPORT OF THEIR MOTION UNDER FEDERAL
RULE OF CIVIL PROCEDURE 60(b) TO EXTEND THE TERMINATION DATE OF
<u>THE SETTLEMENT AGREEMENT</u>**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     THE AGREEMENT'S PLAIN LANGUAGE REQUIRES DEFENDANTS TO
        ADJUDICATE CLASS MEMBERS' ASYLUM APPLICATIONS AND
        DEFENDANTS' VIOLATION IS A CHANGED CIRCUMSTANCE............................ 2

        A.      The Settlement Agreement Imposes an Affirmative Obligation to
                Adjudicate Class Members' Asylum Applications.................................................. 2

        B.      Defendants' Failure to Adjudicate Likely Well Over 74,000 Class
                Members' Applications Is a Changed Circumstance.............................................. 4

III.    DEFENDANTS' VIOLATIONS OF THE STAY PROVISION WERE SUBSTANTIAL
        AND NOT ANTICIPATED ..................................................................................... 5

IV.     CLASS COUNSEL'S EXTENSION PROPOSAL IS SUITABLY TAILORED TO
        DEFENDANTS' NONCOMPLIANCE ...................................................................... 8

V.      THE COURT HAS JURISDICTION TO EXTEND THE AGREEMENT ..................... 11

VI.     CONCLUSION.................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ARCO Nat'l Constr., LLC v. MCM Mgmt. Corp.*,
 No. 20-03783, 2024 WL 4041527 (D. Md. Sept. 4, 2024)........................................................6

*Biden v. Texas*,
 597 U.S. 785 (2022).................................................................................................................12

*Castañon-Nava v. U.S. Department of Homeland Security*,
 __ F.4th __, 2026 WL 1223250 (7th Cir. May 5, 2026)..........................................7, 12, 13, 14

*Cochran v. Norkunas*,
 398 Md. 1 (2007) .......................................................................................................................2

*Garland v. Aleman Gonzalez*,
 596 U.S. 543 (2022).............................................................................................................13, 14

*Horne v. Flores*,
 557 U.S. 433 (2009).............................................................................................................10, 11

*Lithko Contracting, LLC v. XL Ins. Am., Inc.*,
 487 Md. 385 (2024) ...................................................................................................................2

*Lovo v. Miller*,
 107 F.4th 199 (4th Cir. 2024) ...................................................................................................2

*Miranda v. Garland*,
 34 F.4th 338 (4th Cir. 2022) ...................................................................................................12

*Perez-Funez v. DHS*,
 2026 WL 98262 (C.D. Cal. Apr. 6, 2026) .........................................................................14, 15

*Rufo v. Inmates of Suffolk Cnty. Jail*,
 502 U.S. 367 (1992)..........................................................................................................9, 10, 11

*Spell v. McDaniel*,
 824 F.2d 1380 (4th Cir. 1987) ................................................................................................13

*Thompson v. U.S. Dep't of Hous. & Urban Dev.*,
 404 F.3d 821 (4th Cir. 2005) ........................................................................................ *passim*

**Statutes**

8 U.S.C. § 1158(b)(3)(C) ................................................................................................................14

8 U.S.C. §§ 1221-1231 ........................................................................................................11

8 U.S.C. § 1225 .............................................................................................................14, 15

8 U.S.C. § 1229c .........................................................................................................14, 15

8 U.S.C. §  1232(d)(4)(8) .................................................................................................14

8 U.S.C. § 1252(f)(1) ................................................................................. *passim*

**Rules**

Fed. R. Civ. P. 60(b) ......................................................................1, 4, 5, 8, 12, 13, 14

## I.    INTRODUCTION

Defendants claim they "have upheld their side of this bargain." Opp. 27. Not even close. A core element of the bargain, codified in Section III.B, is that USCIS "will … adjudicate [Class Members' asylum applications] on the merits." Defendants admit they have made minimal progress on fulfilling that commitment and that the bulk of the Class will be deprived of this right if the Agreement lapses later this month. But Defendants now say that "Section III.B is a statement of policy," not an "affirmative obligation." *Id.* at 6-7. That interpretation contradicts the Agreement's plain language and the parties' repeated characterizations. And given the evidentiary hearings held in March 2026, Defendants can no longer deny their repeated violations of another core protection of the Agreement—the prohibition on removing Class Members. Defendants have not substantially complied with the Agreement, and Class Counsel did not foresee that Defendants would violate the Agreement in such sweeping fashion.

The proposed modification is suitably tailored to Defendants' noncompliance and designed to effectuate the essence of the parties' bargain. Class Counsel do not suggest "overwhelmingly burdensome obligations," Opp. 1, but rather a reasonable and efficient opt-in procedure designed to give Class Members an opportunity to get what they bargained for. That is exactly what Rule 60(b)(5) modifications are supposed to accomplish.

Finally, Defendants' late-breaking "jurisdictional" objection is baseless, not least because it has been waived. And the proposed relief does not violate section 1252(f)(1) in any event. The Court has jurisdiction to extend the Agreement; it should exercise that jurisdiction so that Class Members may receive what they were promised.

II.    **THE AGREEMENT'S PLAIN LANGUAGE REQUIRES DEFENDANTS TO ADJUDICATE CLASS MEMBERS' ASYLUM APPLICATIONS AND DEFENDANTS' VIOLATION IS A CHANGED CIRCUMSTANCE**

A.    **The Settlement Agreement Imposes an Affirmative Obligation to Adjudicate Class Members' Asylum Applications**

Defendants lead with the surprising argument that "the settlement agreement does not provide the affirmative obligation" to adjudicate Class Members' asylum applications before the contract terminates, because "Section III.B is a statement of policy." Opp. 6-7. That new interpretation directly conflicts with the Agreement's plain language and with the repeated expressions of both Defendants themselves and the Court.

"Maryland courts follow the objective theory of contract interpretation." *Lithko Contracting, LLC v. XL Ins. Am., Inc.*, 487 Md. 385, 401 (2024). "If the language of a contract is unambiguous, [Maryland courts] give effect to its plain meaning and do not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Cochran v. Norkunas*, 398 Md. 1, 16 (2007).

The Agreement's plain language refutes Defendants' interpretation. Section III.B provides that "USCIS *will* exercise Initial Jurisdiction over Class Members' asylum applications in accordance with the terms of this Settlement Agreement *and adjudicate them on the merits*." ECF No. 199-2 at 6 (emphases added). The "word 'will'" denotes "'unmistakably mandatory' language." *Lovo v. Miller*, 107 F.4th 199, 211 (4th Cir. 2024) (citation omitted). Indeed, Defendants do not appear to dispute that the Agreement imposes an affirmative obligation to exercise initial jurisdiction over Class Members' asylum applications. There is no basis for treating the second clause ("and adjudicate them on the merits") any differently. Because this language unambiguously requires Defendants to actually adjudicate Class Members' asylum applications, the Court must "give effect to [that] plain meaning." *Cochran*, 398 Md. at 16.

2

This reading is exactly how the parties and the Court have consistently described the Agreement's obligations. When the parties jointly moved for preliminary approval of the Agreement in July 2024, they told the Court that one of the "significant benefits" the Agreement provides to Class Members is that USCIS "will adjudicate [their asylum] applications on the merits," ECF No. 199-1 at 8; *see also id.* at 16. The parties were clear that USCIS had assumed these affirmative obligations. This was certainly not a mere "statement of policy."

Likewise, at the April 22, 2025 hearing on Class Counsel's first motion to enforce the Agreement, Class Counsel stated that "a core right under this agreement has always been that these class members have a right to have their asylum application adjudicated on the merits." ECF No. 255 at 43:3-5. Defendants, too, acknowledged that "adjudicat[ion] on the merits … is what is required by [the] settlement agreement." *Id.* at 27:8-9. The Court's subsequent decision thus explained that "Section III.B is among the Settlement Agreement's core protections for Class Members," specifically that "USCIS will exercise Initial Jurisdiction over Class Members' asylum applications in accordance with the terms of this Settlement Agreement *and adjudicate them on the merits*." ECF No. 253 at 3 (emphasis added; citation omitted).

Ignoring Section III.B's plain language, Defendants argue instead that Class Counsel should have raised this objection in Defendants' compliance reports. *See* Opp. 7. But, as Defendants elsewhere acknowledge, Class Counsel did not discover that there were likely well over 74,000 Class Members remaining until December 2025. *Id.* at 11. Indeed, Class Counsel had no information about Defendants' progress in adjudicating Class Members' asylum applications. At the April 2025 hearing, the Court asked Class Counsel: "Do we know what the current posture of adjudications in USCIS is? Are they continuing to move along?" ECF No. 255 at 10:24-25. Class Counsel responded, "Your Honor, I wish we knew that." *Id.* at 11:2. Defendants then told

3

the Court that "asylum adjudications for UACs for class members and for all individuals continue. There hasn't been any stop to adjudications." *Id.* at 26:21-24. As far as Class Counsel knew, then, Defendants were progressing in adjudicating Class Members' asylum applications pursuant to Section III.B. It was not until March 2026 that Defendants confirmed that they were in fact applying the No Asylum Adjudications Policy to Class Members. *See* Mot. 6. Class Counsel filed this Rule 60(b) motion promptly after learning the magnitude of Defendants' failure to adjudicate Class Members' asylum applications.

### B.    Defendants' Failure to Adjudicate Likely Well Over 74,000 Class Members' Applications Is a Changed Circumstance

Defendants do not dispute that, if Section III.B does impose an affirmative obligation to adjudicate Class Members' asylum applications, then Defendants have failed to substantially comply by not adjudicating likely well over 74,000 Class Members' asylum applications and imposing a moratorium on *all* asylum adjudications for several months. *See* Mot. 22-25. Nor could they. Yet Defendants argue that this is not a changed circumstance "because the rate of Defendants' asylum processing was entirely foreseeable." Opp. 12.

This argument does not get off the ground. The proper inquiry "is whether the parties *actually* anticipated the events giving rise to the modification request; that the events were theoretically foreseeable does not foreclose a modification." *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 404 F.3d 821, 828 (4th Cir. 2005). And even if some amount of non-compliance was foreseen, Class Counsel certainly "did not anticipate *the degree* of … Defendants' non-compliance." *Id.* at 829 (emphasis added). It was entirely unforeseen that Defendants would impose a moratorium on all asylum adjudications during the life of the Agreement, or that Defendants would lag so far behind that likely far more than 74,000 Class Members' asylum applications would remain unadjudicated by May 2026. *See* Mot. 25-27. In fact, just this week

4

Defendants disclosed for the first time that USCIS has adjudicated only 2,255 "PRL" asylum applications on the merits during the life of the Agreement—a tiny percentage. ECF No. 583-1 ¶ 5. Nor was it foreseen that, a month before the Agreement is set to expire, Defendants would suddenly take the position that Section III.B is a mere "statement of policy" and they were never obligated to adjudicate any Class Member's asylum application at all. That staggering degree of non-compliance is an unanticipated changed circumstance that warrants extending the Agreement.

### III. DEFENDANTS' VIOLATIONS OF THE STAY PROVISION WERE SUBSTANTIAL AND NOT ANTICIPATED

Defendants downplay the growing number of unlawful removals in violation of Section III.I of the Agreement as well as those removals' significance, accusing Class Counsel of "attempt[ing] to sensationalize this litigation" by providing ICE's arrest and removal policies as relevant context. Opp. 20. No sensationalizing, however, is necessary—since Defendants' conduct in removing Class Members to the very countries from which they are seeking asylum, on display in the March 2026 evidentiary hearing, is dramatic enough. The Court should reject Defendants' minimizing of their stay of removal violations as well as their specious argument that this type and degree of nearly irreversible noncompliance was anticipated.

The stay provision violations that Class Counsel describes are not meaningfully countered by Defendants. That they continue to disclaim responsibility for not removing Class Members only emphasizes why a modification under Rule 60(b) is warranted. Defendants overlook that Section III.I *does* require ICE to affirmatively determine Class membership. Defendants cannot comply with their duty under Section III.I not to remove Class Members unless they rule out Class membership for each person they ultimately remove, and the fact that the Agreement did not explicitly require the creation of a list of the certified Class does not relieve that obligation. Of course, once Class membership is ruled out ICE is free to remove an individual, as both parties

5

acknowledge that the Agreement does not prohibit the removal of non-Class Members. But every removal without ruling out Class membership risks a violation, and Defendants' briefing and witness testimony demonstrate they have no intention of determining whether the people they remove are Class Members, an overt disregard of the Court's orders. If Defendants were committed to compliance, they would confirm Class membership and adjudicate on the merits each Class Member's pending asylum application—not send large numbers of potential Class Members abroad without fulfilling their duties under the Agreement.

Defendants' attempt to further narrow the scope of their violations by claiming that the Court need not concern itself with Class Members who "departed the United States pursuant to a different section of law, such as voluntary departure … or withdrawal of an application for admission" fails. Opp. 13. As the Court already observed, "[j]ust because we fall into a withdrawal or voluntary departure situation doesn't necessarily mean that they weren't entitled to the protections they should have received under the settlement." ECF No. 517 at 96:5-8; *see also* ECF No. 253 at 9 ("The Settlement Agreement does not limit the protection against removal provided in Section III.I to any specific statutory mechanism for removal."). And as discussed in more detail in Class Counsel's reply in support of their motion to compel E.M.P.'s return, whatever label is used does not insulate these removals from constituting violations. This is so because even assuming, *arguendo*, that these removals were somehow "voluntary" rather than compelled, Class Members did not first waive their rights under the Agreement to an adjudication on the merits of their asylum claim and not to be removed without that adjudication. To establish waiver of a right, Defendants must show "the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right." *ARCO Nat'l Constr., LLC v. MCM Mgmt. Corp.*, No. 20-03783, 2024 WL 4041527, at *6 (D. Md. Sept. 4, 2024) (cleaned up).

Defendants cannot show that the removed Class Members waived their rights under the Agreement, and indeed Defendants take the position such a waiver is unnecessary. *See* ECF No. 571 at 8 (insisting that they "need not suggest that E.M.P. 'waived his rights'" under the Agreement to justify proceeding with a purportedly voluntary removal that vitiated E.M.P.'s rights under the Agreement).

That the Agreement contains a dispute resolution process at Section V.D permitting class-wide enforcement does not mean that the parties both clearly contemplated and foresaw the scope and severity of Defendants' noncompliance with the stay provision—arguably the Agreement's most important term from a harm-reduction angle. If that were the case, then no number of unlawful removals—hundreds, thousands, or that of *every Class Member*—would justify modification. But reading it as they do, Defendants treat Section V.D as license to ignore the Agreement with an empty promise that they will remedy violations after the fact. This, of course, is deeply flawed. That the Agreement has a "process to correct any violations," Opp. 1, does not function as a pre-authorization to cast it aside. And, thus far, Defendants have failed to effectuate this correction in even one case. They are actively fighting a request to return Class Member E.M.P. from Guatemala after maximizing delay with shifting rationales. *See* ECF No. 571. And they withheld knowledge of nearly 100 removals for weeks and slowly provided incomplete information about those removed. *See* ECF No. 558 at 14-15, 20. Moreover, Defendants' claim that they have adequate systems in place to prevent unlawful removals of Class Members (an odd assertion given their position that ICE has no obligation to identify Class Members)—thus distinguishing this case from *Castañon-Nava* and *Thompson*—is plainly belied by testimony at the March 2026 evidentiary hearing. *See id.* at 8-12; *see also* ECF No. 583 at 28-29 n.17 (withdrawing previous claim that Defendants lacked knowledge of the potential violations before or during

removals). The unlawful removals are substantial and unanticipated noncompliance that warrants the Agreement's modification under Rule 60(b).

**IV.     CLASS COUNSEL'S EXTENSION PROPOSAL IS SUITABLY TAILORED TO DEFENDANTS' NONCOMPLIANCE**

No matter what termination mechanism Class Counsel might have proposed—a simple addition of months or years to the life of the Agreement or a performance-based metric designed to ensure Class Members receive the benefits to which they are entitled—Defendants would have resisted because, remarkably, they claim "[they] have upheld their side of this bargain." Opp. 27. Defendants' noncompliance has been severe and pervasive, as detailed above, treating their obligations as optional. In light of Defendants' deeply problematic conduct that has rendered the current termination framework wholly insufficient to protect Class Members' rights, Class Counsel's proposal is suitably tailored to the changed circumstances that have befallen the Class.

Defendants' characterization of Class Counsel's proposal as one that would make the Agreement "last[] almost indefinitely" is hyperbole. Opp. 1. First, in Class Counsel's proposal it is Defendants who hold the key to terminating the Agreement. Aside from some set periods (a year after provision of removed Potential Class Members' contact information to Class Counsel and 180 days after notice to Potential Class Members, which could run concurrently), Defendants would be in full control of how fast termination occurs. *See* ECF No. 535-24 at 2-3. If the Agreement extended "indefinitely," Defendants' delays would be to blame. Second, Class Counsel's proposal does *not* require merits adjudications of "hundreds of thousands" of Potential Class Members' asylum applications as Defendants imply. Opp. 25. Instead, it requires these adjudications for Class Members alone, and only the ones who affirmatively opt-in during a narrow window. *See* ECF No. 535-24 at 2. The Agreement's February 24, 2025 Class cutoff would remain

intact, and only a subset of Class Members would request adjudications, so Defendants' obligations would be far from "extending into perpetuity." Opp. 24.

Defendants' claim that the proposed termination mechanism rewrites the Agreement in a way that fails to preserve the essence of the parties' bargain is unfounded. The Agreement's core provisions—related to the rescission of the 2019 Redetermination Memo, the issuance of a new memorandum, the exercise of initial jurisdiction over and adjudication on the merits of Class Members' asylum applications, the retractions of prior decisions and the release of holds, the expediting of applications, the treatment of Class Members in removal proceedings and after a grant of asylum, and the stay of removal provision—all remain intact. *See* ECF No. 199-2 at 6-10, §§ III.A-K. Class Counsel's proposal simply creates a mechanism for those provisions to serve their intended benefit to the Class, benefits that have been undermined or outright denied by Defendants. For example, the addition of the defined term "Potential Class Member List" is not in service of a new set of substantive obligations. Instead, it is a tool to vindicate the rights of Class Members whom Defendants have yet to recognize. Potential Class Members are not entitled to an adjudication on the merits by virtue of being on the list, nor does being on the list entitle them to return to the United States if they have been removed. ECF No. 535-24 at 2-3. Only Class Members can elect to enforce these rights, which are rooted in the Agreement (one as a vindication of Section III.B and the other as a remedy for a violation of Section III.I). *Id.*

Governing Supreme Court and Fourth Circuit precedents are no barrier to the requested relief. In setting what the Supreme Court acknowledged is a "flexible standard" for modification of consent decrees, *Rufo* makes clear that courts must be guided by what equity requires in the face of "problems created by the change in circumstances." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 391 (1992). Here, the proposed termination mechanism is the minimum of what equity

requires.[1] It directly responds to the problems—Defendants' refusal to adjudicate Class Members' asylum applications and their removal of Class Members—by incorporating remedies for those violations into the termination framework itself. Simply extending the life of the Agreement to give Defendants more time to violate it would do little to address the presenting problems. And *Thompson* is not to the contrary. There, the Fourth Circuit affirmed the district court's fashioning of a performance-based termination mechanism (rather than extending the decree for the three years that the plaintiffs requested), relying upon *Rufo*. 404 F.3d at 825, 834. Defendants try to distinguish *Thompson* by pointing to the fact that the defendant HUD had obligations that already extended beyond the termination date—like the obligations of Defendant USCIS here—but that was only one of several factors the Fourth Circuit considered. *Id*. at 832-34. In concluding that extending the decree via a performance-based mechanism served the public interest, the court rejected many arguments Defendants repurpose here. *Id*. at 832 ("According to HUD, the Consent Decree's retention-of-jurisdiction provision was 'the heart' of its bargain … and the district court's re-writing of that clause can hardly be considered a suitably tailored remedy.").

Moreover, the Court should reject Defendants' invitation, purportedly under *Rufo* and *Horne v. Flores*, 557 U.S. 433 (2009), to place considerable weight on, and even defer to, their views as the ones who would implement Class Counsel's proposal. The circumstances here are markedly different. In *Rufo*, a sheriff raised financial constraints to support the requested modification of a consent decree addressing unconstitutional conditions at a county jail. *See* 502 U.S. at 392. The Supreme Court found the financial issues relevant to whether there was "a change

---

[1] As the Fourth Circuit recognized in *Thompson*, "The essence of a court's equity power lies in its inherent capacity to adjust remedies in a feasible and practical way to eliminate the conditions or redress the injuries caused by unlawful action. Equitable remedies must be flexible if these underlying principles are to be enforced with fairness and precision." 404 F.3d at 830 (*quoting Freeman v. Pitts*, 503 U.S. 467, 487 (1992)).

in conditions making it substantially more onerous to abide by the decree." *Id*. This is wholly different from the situation here, where Defendants' own noncompliance is the reason modification is necessary. To allow Defendants' concerns about expense to defeat an otherwise necessary modification would sanction what *Rufo* prohibits, namely, "[f]inancial constraints may not be used to justify the creation or perpetuation of [] violations." *Id*. And the passages from *Horne* that Defendants quote address federalism concerns that are absent here, where a federal court is assessing an Agreement involving only federal defendants.[2] *Horne* does not mandate deference to Defendants here.

Defendants focus on their anticipated woes while failing to register that they created the conditions that made this proposed termination mechanism necessary. In doing so, they discount the interests of the Class and of the *public* in extending the life of the Agreement—which the Supreme Court has named as relevant to modification requests. *See Rufo*, 502 U.S. at 381-84 (significant change in factual circumstances can support a modification if the "enforcement of the decree without modification would be detrimental to the public interest," which in reform cases includes "the public's right to the sound and efficient operation of its institutions"); *see also Thompson*, 404 F.3d at 831. Rather than give undue weight to Defendants' claims of burden, the Court should protect the Class's and the public's interest by granting Class Counsel's motion.

## V.    THE COURT HAS JURISDICTION TO EXTEND THE AGREEMENT

Defendants argue that the Court lacks "jurisdiction" to extend the Agreement's termination date because of 8 U.S.C. § 1252(f)(1), which prohibits class-wide relief to "enjoin or restrain the operation of" 8 U.S.C. §§ 1221-1231. Opp. 27-30. This argument fails for two reasons.

---

[2] This distinction also renders nonsensical Defendants' suggestion that Class Counsel must establish that their termination proposal is specifically related to the TVPRA. *See* Opp. 26.

11

***First***, Defendants have waived any objection under § 1252(f)(1) by entering into the Agreement. According to Defendants, "Section 1252(f)(1) is a jurisdictional provision not subject to forfeiture." *Id.* at 28. But the Supreme Court has squarely held that there is "no basis for the conclusion that section 1252(f)(1) concerns subject matter jurisdiction." *Biden v. Texas*, 597 U.S. 785, 801 (2022). Although "section 1252(f)(1) uses the phrase 'jurisdiction or authority,'" the Court explained "jurisdiction is a word of many, too many meanings." *Id.* (citation modified).[3] Defendants conspicuously avoid mentioning *Biden v. Texas* at all, despite its obvious relevance. Although the Supreme Court did not reach the question whether § 1252(f)(1) may be forfeited, *id.* at 801 n.4, other courts have since held that it can.

In *Castañon-Nava v. U.S. Department of Homeland Security*, __ F.4th __, 2026 WL 1223250  (7th Cir. May 5, 2026), for example, the Seventh Circuit rejected the same argument raised by Defendants here and held that the government waived any § 1252(f)(1) objection to the extension of a consent decree under Rule 60(b)(5). *Castañon-Nava* explains that willingly entering into a consent decree is "a textbook example of an 'intentional relinquishment of a known right'" that waived any limitation under § 1252(f)(1). *Id.* at *4 (citation omitted). The Seventh Circuit rejected the government's argument that "a § 1252(f)(1) objection is unwaivable because it is jurisdictional," noting that *Biden v. Texas* held that "§ 1252(f)(1) does not limit a federal court's subject matter jurisdiction" and "there is ample reason to believe that it is" waivable, "given that objections to similar rules limiting the power of the federal courts are waivable." *Id.* at *4-5 (discussing, *e.g.*, equitable jurisdiction, personal jurisdiction, and sovereign immunity).

---

[3] *Biden v. Texas* thus overrules the Fourth Circuit's earlier decision holding that "the word jurisdiction in § 1252(f)(1)" implicates the court's "subject-matter jurisdiction" and therefore cannot be waived. *Miranda v. Garland*, 34 F.4th 338, 354-56 (4th Cir. 2022).

That reasoning applies here. Before entering into the Agreement, Defendants were well aware of § 1252(f)(1). *See* ECF No. 174. Yet, as in *Castañon-Nava*, Defendants then waived that objection by agreeing to the Agreement's terms that expressly authorize the Court "to enforce the Agreement on an individual *or class-wide basis*." ECF No. 199-2 at 13 (§ V.D; emphasis added). Nor did Defendants raise any § 1252(f)(1) objection when Defendants moved to enforce the Agreement and sought a class-wide order that "Defendants will refrain from the future removal from the United States of any other Class Members who have not yet received a Final Determination on their asylum application," ECF No. 227-4 at 5, which the Court subsequently issued, ECF No. 254 at 1. Any § 1252(f)(1) objection has therefore been waived.

Defendants protest that their waiver must be limited to the Agreement's scheduled termination date. Opp. 29-30. But the *Castañon-Nava* decision applied the government's waiver to an *extension* of a consent decree, beyond the original agreed-upon term. That makes good sense, because an extension under Rule 60(b)(5) "'preserve[s] the essence of the parties' bargain.'" *Thompson*, 404 F.3d at 833. In willingly entering into the Agreement, Defendants allowed the Court to enforce the Agreement on a class-wide basis knowing that, under Rule 60(b)(5), the Court may extend the Agreement to effectuate the parties' bargain. The extension thus implements the Agreement as a whole, including the Defendants' waiver of any § 1252(f)(1) objection.

**Second**, regardless of waiver, courts have recognized that nothing prohibits enjoining the "operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision." *Aleman Gonzalez*, 596 U.S. at 553 n.4; *see Castañon-Nava*, 2026 WL 1223250, at *5 (explaining that "such indirect, collateral effects do not run afoul of § 1252(f)(1)" and collecting cases). As the Court has observed, the "Agreement's core protections for Class Members" concern USCIS exercising jurisdiction over and adjudicating

13

Class Members' asylum applications on the merits. ECF No. 253 at 3. Those protections involve the asylum provisions set forth in 8 U.S.C. § 1158(b)(3)(C) and § 1232(d)(4)(8), which do not implicate § 1252(f)(1). To be sure, the Agreement collaterally affects removals. But it does so because, as the Court has explained, "a core purpose of the Settlement Agreement would be nullified if Class Members with pending asylum applications could be summarily removed from the United States and thus rendered ineligible for asylum." ECF No. 253 at 10.   Thus, the Agreement's removal provisions are collateral to its asylum protections.

The recent decision in *Perez-Funez v. DHS*, 2026 WL 98262 (C.D. Cal. Apr. 6, 2026), reinforces this point. That case involves a long-running injunction governing immigration processes for a nationwide class of unaccompanied children ("UAC"). *Id.* at *1, 4. The government argued that the injunction runs afoul of § 1252(f)(1) because it enjoins the operation of "voluntary departure under 8 U.S.C. § 1229c, and the withdrawal of an application for admission, under 8 U.S.C. § 1225(a)(4)." *Id.* at *8. The court disagreed. Applying the collateral effects exception, the court explained that "it is clear that Congress saw fit to take the treatment of UAC completely out of the [immigration statute's] generalized provisions with the enactment of the [Trafficking Victims Protection Reauthorization Act (TVPRA)]." *Id.* at *9. Even though "the TVPRA cross-references the covered provisions of §§ 1225 and 1229c … the Government is first and foremost required to follow the TVPRA when it encounters [UAC]." *Id.* at *10. Since "the TVPRA now 'occupies the field' insofar as the processing of UAC is concerned," the court concluded, "the Injunction's procedural requirements" enjoin the operation of "the ***TVPRA***, rather than any covered provision" under § 1252(f)(1). *Id.* at *9-10.

The same is true here. The core of the Agreement's protections addresses asylum adjudications for Class Members, which lie outside § 1252(f)(1)'s covered provisions. The

Agreement's provisions regarding removal of Class Members likewise primarily concern the TVPRA and asylum issues animating the Agreement, with only collateral effects on § 1252(f)(1)'s covered provisions.  Accordingly, § 1252(f)(1) does not preclude extending the Agreement.

## VI.    CONCLUSION

For the reasons given above and in Class Counsel's Motion, the Court should grant the Motion to extend the termination date of the Settlement Agreement.

Dated:  May 8, 2026


Respectfully submitted,

*/s/ Brian T. Burgess*

Brian T. Burgess (Bar No. 19251)
Daniel L. Farraye*
Goodwin Procter LLP
1900 N Street, NW
Washington, DC 20036
Phone: 202-346-4000
Fax: 202-346-4444
BBurgess@goodwinlaw.com
DFarraye@goodwinlaw.com

Elaine Herrmann Blais*
Kevin J. DeJong*
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
Phone: 617-570-1000
Fax: 617-523-1231
EBlais@goodwinlaw.com
KDeJong@goodwinlaw.com

Wendy Wylegala*
Kids in Need of Defense
252 West 37th Street, Suite 1500W
New York, NY 10018
Phone: 646-970-2913
Fax: 202-824-0702
WWylegala@supportkind.org

Michelle N. Mendez (Bar No. 20062)
National Immigration Project
1763 Columbia Road NW
Suite 175 #896645
Washington, DC 20009
Phone: 410-929-4720
Fax: 617-227-5495
Michelle@nipnlg.org

Rebecca Scholtz*
National Immigration Project
30 S. 10th Street (c/o University of St. Thomas Legal Services Clinic)
Minneapolis, MN 55403
Phone: 202-742-4423
Fax: 617-227-5495
Rebecca@nipnlg.org

Kristen Jackson*
Public Counsel
610 South Ardmore Avenue
Los Angeles, CA 90005
Phone: 213-385-2977
Fax: 213-201-4727
KJackson@publiccounsel.org

Mary Tanagho Ross*
Bet Tzedek Legal Services
3250 Wilshire Blvd., #1300
Los Angeles, CA 90010
Phone: 323-939-0506
Fax: 213-471-4568
MRoss@betzedek.org

*Attorneys for Plaintiffs*

*Admitted pro hac vice

16