**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **J.O.P.**, *et al.*, | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| v. | * | **Civil No. SAG-19-01944** |
| | * | |
| **U.S. DEPARTMENT OF** | * | |
| **HOMELAND SECURITY**, *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**<u>MEMORANDUM OPINION</u>**

In November, 2024, following many months of extensive negotiations, this Court approved a Settlement Agreement (the "Agreement") the Parties reached. Nearly all of the provisions of that Agreement are set to terminate on May 27, 2026 (the "Termination Date"), as will, ostensibly, this Court's authority to enforce those expiring terms. In light of the approaching Termination Date, and what they perceive as Defendants' substantial noncompliance with the Agreement's requirements, Class Counsel have moved to extend the Termination Date, requesting that this Court so modify the Agreement pursuant to Federal Rule of Civil Procedure 60(b)(5) and this Court's inherent power to modify its own orders. ECF 535. Defendants have opposed the motion to extend, ECF 568, and Class Counsel filed a reply in further support, ECF 594. This Court held a motions hearing on May 19, 2026. For the reasons set forth below, this Court will grant the motion to extend, though not on the terms proposed by Class Counsel.[1]

---

[1] Also currently pending before this Court are Class Counsel's third emergency motion to enforce the Settlement Agreement, ECF 459, and Class Counsel's motion to compel the return of E.M.P., an alleged Class Member, ECF 544. Those motions will be adjudicated in separate forthcoming memoranda.

## I.    BACKGROUND

### A.  The Settlement Agreement

On July 1, 2019, a group of undocumented immigrants who entered the United States as unaccompanied children ("Plaintiffs") brought this action against the government Defendants[2] for declaratory and injunctive relief, arguing that a May 31, 2019 USCIS memorandum (the "2019 Redetermination Memo"), ECF 15-2, unlawfully modified policies governing treatment of asylum applications by unaccompanied alien children ("UACs"),[3] in violation of the Administrative Procedure Act ("APA") and the Due Process Clause of the Fifth Amendment of the United States Constitution. ECF 1. A previous (May 2013) USCIS memorandum had implemented a policy that USCIS would accept jurisdiction of all asylum applications filed by individuals previously determined to be UACs. *See* ECF 15-6. The 2019 Redetermination Memo revised this policy to require asylum officers to make their own determinations of whether the applicant was still a UAC at the time they filed their application, and, in doing so, redetermine whether the applicant was eligible for protections afforded UACs under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (the "TVPRA").[4] Specifically, the TVPRA provides, *inter alia*, that USCIS, rather than an immigration court, has initial jurisdiction over a UAC's asylum application notwithstanding the existence of removal proceedings in an immigration court, 8

---

[2] Defendants are the U.S. Department of Homeland Security ("DHS"), U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and several officials of these agencies (collectively "Defendants").

[3] An "unaccompanied alien child" or "UAC" means "'a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom— (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody,' as set forth in 6 U.S.C. § 279(g)(2)." ECF 199-2 at 6 (Section II.U).

[4] Pub. L. No. 110-457 § 235(d), 122 Stat. 5044, 5074, codified at 8 U.S.C. §§ 1158, 1232(d).

U.S.C. § 1158(b)(3)(c), and that UACs' applications are exempt from the general requirement that asylum applications be filed within one year of entering the United States, 8 U.S.C. § 1158(a)(2)(E).[5]

In 2024, the parties reached a final Settlement Agreement providing relief to a certified class of young asylum seekers previously determined to be UACs, ECF 199-2. This Court granted final approval of the Agreement on November 25, 2024, ECF 205. The Agreement defines the certified Class as

> all individuals nationwide who prior to [February 24, 2025[6]]: (1) were determined to be a UAC; and (2) who filed an asylum application that was pending with USCIS; and (3) on the date they filed their asylum application with USCIS, were 18 years of age or older, or had a parent or legal guardian in the United States who is available to provide care and physical custody; and (4) for whom USCIS has not adjudicated the individual's asylum application on the merits.

ECF 199-2 at 5 (Section II.E).[7] The Agreement required USCIS to rescind the 2019 Redetermination Memo and issue a superseding memorandum (which it did, on January 30, 2025, with an effective date of February 24, 2025) explaining and implementing the Agreement, including its requirement that USCIS would assume initial jurisdiction over Class Members' asylum applications. *Id.* at 7 (Sections III.A, III.B).

---

[5] This Court incorporates herein the extensive discussion of the statutory and regulatory background in this matter from its prior opinion, ECF 54 at 2–7.

[6] Section III.A provides that USCIS has "fully rescinded the 2019 Redetermination Memo" and will issue "a superseding memorandum explaining and implementing this Settlement Agreement" which "will remain in effect for at least three years" from its effective date. ECF 199-2 at 7. "The superseding memorandum's effective date will be 90 days after the Court's final approval of this Settlement Agreement," which is February 24, 2025. *Id.* The Defendants filed a Compliance Report stating that USCIS had issued a superseding memorandum in accordance with Section III.A of the Agreement. ECF 217 ¶ A.

[7] For pincites, in all instances where an ECF header is affixed to the top of a page, this Court uses the ECF page number in that header; where such headers are *not* affixed, this Court uses the page numbers of the underlying document.

In the instant motion to extend, Class Counsel have cited Defendants' alleged noncompliance with Sections III.B and III.I of the Agreement as changed circumstances warranting modification. Section III.B provides that "USCIS will exercise Initial Jurisdiction over Class Members' asylum applications in accordance with the terms of this Settlement Agreement and adjudicate them on the merits, and USCIS will hold such applications exempt from the One-Year Deadline." *Id.* at 7. Section III.I provides:

> With respect to any Class Member with a final removal order, ICE will refrain from executing the Class Member's final removal order until USCIS issues a Final Determination on one properly filed asylum application under the terms of this Agreement. In order to comply with this provision, ICE Enforcement and Removal Operations (ERO), the agency responsible for executing removal orders, will make an entry indicating there is a stay in its system of records for all identified Class Members, including Class Members identified by USCIS. This alert will not be removed from any individual case until such time as USCIS indicates it is appropriate to remove it.

*Id.* at 9–10. The Agreement provides for this Court to retain jurisdiction over "1. Claims by any Party in accordance with the provisions laid out in Section V of this Agreement that any other Party has committed a violation of this Agreement; 2. The express repudiation of any of the terms of this Agreement by any Party; and 3. Plaintiffs' claims for attorney fees and/or litigation costs." *Id.* at 13 (Section IV.H). However, that jurisdiction is to terminate on the Agreement's "Termination Date," defined as "548 days after the Effective Date." *Id.* at 6 (Section II.S), 13 (Section IV.H ("[T]he Court shall retain jurisdiction . . . only until the date the Agreement terminates as described in Section IV.K."); Section IV.K ("This Settlement Agreement shall terminate 548 days after the Effective Date . . . ."); Section V.A ("This Court shall retain exclusive jurisdiction to supervise the implementation of this Settlement Agreement and to enforce its provisions and terms until the

4

Termination Date . . . .")).[8] Because the Effective Date was November 25, 2024, *see* ECF 205, the Termination Date is May 27, 2026.

### B. The Class

There does not appear to be a dispute among the parties that, at the time the Settlement Agreement was executed, the parties did not know the precise size of the Class. Class Counsel have asserted that, at the time this litigation was commenced in 2019, they contemplated that the universe of Class Members would be some subset of 27,106. *See* ECF 535-1 at 29 ("[A]t the start of this litigation, the available evidence suggested that the universe of *potential* Class Members would be some fraction of 27,106—which is the number, as of March 31, 2019, of pending asylum cases filed under the initial jurisdiction provision of the TVPRA while applicants were in removal proceedings.") (emphasis in original) (citing ECF 117-1 at 7.).[9] Class Counsel have noted, however, that "in October 2024, about a month before the Court granted final approval of the Settlement Agreement, there were 73,939 individuals on USCIS's very first list of 'potential' *J.O.P.* Class Members," and that, at the March, 2026 evidentiary hearing, "a USCIS official revealed that there were 73,460 individuals on USCIS's March 9, 2026 list of 'potential' *J.O.P.* Class Members who are still awaiting a USCIS adjudication on the merits." ECF 535-1 at 8 (citing ECF 535-5 (Mar. 20, 2026 Hr'g Tr.) at 86, 96). Class Counsel have represented, most recently at the May 19th

---

[8] The Settlement Agreement includes one exception to the 548-day term, providing a separate "Termination Date – USCIS Memo" whereby Section III.A of the Agreement remains in force— and this Court retains jurisdiction to enforce it—for *three years* after the Effective Date. ECF 199-2 at 6 (Section II.S.1), 13 (Section IV.K ("[T]he Court shall have jurisdiction to enforce Paragraph III.A of this Agreement until three years after the superseding memorandum'[s effective date."); Section V.A ("[T]he Court shall retain jurisdiction over Paragraph III.A (USCIS superseding memorandum) until the Terminate Date – USCIS Memorandum.")).

[9] At the May 19, 2026 motions hearing, Class Counsel asserted that they also understood this to be the number when the Settlement Agreement was executed because they had not been provided any updated information to suggest otherwise.

motions hearing, that they were only first made aware that the size of USCIS's potential Class Member list exceeded 70,000 in December, 2025.

The lists prepared by USCIS are apparently both overinclusive (in that they include *potential* Class Members who are in removal proceedings[10]) and underinclusive (in that, as argued by Class Counsel, they exclude Class Members who either (1) "were not in removal proceedings at the time they filed their asylum application"; (2) have asylum applications that "are not considered by USCIS to be currently pending due to, for example, a jurisdictional rejection by USCIS (which also violates the Settlement Agreement)" or (3) have been removed from USCIS's lists on the basis of "administrative closure" of their applications. ECF 535-1 at 8–9, 16–17 (citing ECF 535-4 (Mar. 19, 2026 Hr'g Tr.) at 71–73, 77–78; ECF 535-5 (Mar. 20, 2026 Hr'g Tr.) at 66, 70, 90, 102–03). The true size of the Class remains unsettled; however, Class Counsel have summarily asserted that "during the 16 months the Settlement Agreement has been in effect, Defendants have failed to adjudicate on the merits the asylum applications of likely well over 74,000 Class Members." ECF 535-1 at 12. Thus, Class Counsel appear to be equating Defendants' list of *potential* Class Members with the number of *actual* unadjudicated Class Members.

### C.  Removals of Class Members in violation of Section III.I

The March, 2026 evidentiary hearing was convened to investigate, *inter alia*, the removals of nine potential and/or confirmed Class Members without those individuals having received an adjudication on the merits of their asylum applications. *See* ECF 472. However, at that hearing, it was revealed that upwards of one hundred potential (including at least 49 actual) Class Members had been removed in violation of the Settlement Agreement and this Court's April 23, 2025 Order, ECF 254. ECF 535-4 (Mar. 19, 2026 Hr'g Tr.) at 90–94; ECF 535-6 (Mar. 23, 2026 Tr.) at 91.

---

[10] *See* ECF 535-4 (Mar. 19, 2026 Hr'g Tr.) at 52–53, 63, 71.

Class Counsel attribute these failures to a number of Defendants' practices, including the parameters employed to create USCIS's lists of potential Class Members and the infrequency of USCIS's delivery of its lists to ICE. ECF 535-1 at 16–17. Class Counsel further argue that the consequences of the "inadequa[cy]" of these practices are exacerbated by Defendants' "unprecedented series of policies aimed at detaining and deporting as many noncitizens as possible[,] . . . greatly increas[ing] the likelihood that ICE has removed multiples of 100 Class Members in violation of the Agreement." ECF 535-1 at 18–20.

At the motions hearing held on May 19, 2026, Defendants' counsel represented to this Court that, after Defendants re-ran a search of their systems for individuals assigned a "Removed UAC" tag, the number of identified *potential* Class Members who had been removed in potential violation of Section III.I was 142.[11] In a subsequent filing, Defendants reported that they had provided Class Counsel with a list of 71 confirmed Class Members and 57 potential Class Members who have been removed. ECF 618.

**D. The December, 2025 USCIS Memorandum**

On December 2, 2025, USCIS issued a policy memorandum that directed USCIS personnel to, *inter alia*, "[p]lace a hold on all Forms I-589 (Application for Asylum and for Withholding of Removal), regardless of the alien's country of nationality, pending a comprehensive review." ECF 535-7 (USCIS Policy Memorandum PM-602-0192, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries* (Dec. 2, 2025)) (the "USCIS Hold Memo") at 2. The Hold Memo provided:

> USCIS has determined that it must implement an adjudicative hold on all pending asylum applications, regardless of the alien's country of nationality . . . . This hold

---

[11] Defendants maintain that not all of these instances of "Removed UAC[s]" constitute a violation of Section III.I, as they assert that this number includes individuals who "voluntarily departed" or "voluntarily withdrew their applications."

will remain in effect until lifted by the USCIS Director through a subsequent memorandum. Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director.

*Id.* at 3–4. At the March, 2026 evidentiary hearing. testimony confirmed that the USCIS Hold Memo is being applied to Class Members, *see* ECF 535-4 (Mar. 19, 2026 Hr'g Tr.) at 100:18–24; ECF 535-6 (Mar. 23, 2026 Hr'g Tr.) at 119:25–120:2. On January 1, 2026, USCIS issued another policy memorandum (PM-602-0194[12]) which outlined a set of ten discrete exceptions to the adjudication hold implemented by the USCIS Hold Memo. ECF 535-4 (Mar. 19, 2026 Hr'g Tr.) at 102:17–103:5. "Exception 7" excepts from the adjudicative hold "[b]enefit requests that are a priority for law enforcement and where ICE has requested USCIS take adjudicative action to uphold public safety or national security." *Id.* at 104:6–12; USCIS January 2026 Memo at 5. Testimony at the March, 2026 hearing further confirmed that on February 13, 2026, USCIS issued guidance providing that it could, *at ICE's request*, except detained UACs (such as Class Members) from the adjudicative hold pursuant to Exception 7. ECF 535-4 (Mar. 19, 2026 Hr'g Tr.) at 106–07.

According to one witness at the March, 2026 hearing, "between February 13th[, 2026] and a date as of a few days" prior to the hearing, 81 asylum applications had been adjudicated, ECF 535-4 (Mar. 19, 2026 Hr'g Tr.) at 110; another witness testified that, between December 2, 2025 and the March, 2026 hearing, 96 individuals with a prior UAC determination had their asylum applications adjudicated.[13] ECF 535-6 (Mar. 23, 2026 Hr'g Tr.) at 121:4–7. Neither witness was

---

[12] USCIS, Policy Memorandum PM-602-0194, *Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries* (Jan. 1, 2026) ("USCIS January 2026 Memo"). Publicly available at: https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0194-PendingApplicationsAdditionalHighRiskCountries-20260101.pdf

[13] According to the witness, of these 96 individuals, 95 were denied asylum, with the other individual having purportedly withdrawn his application. ECF 535-6 (Mar. 23, 2026 Hr'g Tr.) at 122:3–15.

able to confirm how many of these individuals were confirmed, as opposed to potential, Class Members. *See* ECF 535-4 (Mar. 19, 2026 Hr'g Tr.) at 110:16–18; ECF 535-6 (Mar. 23, 2026 Hr'g Tr.) at 131:19–21, 146:9–15.

On April 2, 2026, Defendants notified this Court that on March 30, 2026, USCIS had published a public "Update on USCIS' Strengthened Screening and Vetting." ECF 523. This "Update" reported, *inter alia*, that at some unspecified time, USCIS had lifted the hold on asylum applications "from non high-risk countries."[14] At a motions hearing held on May 19, 2026, Defendants confirmed that the hold is still in effect for individuals from forty "high-risk" countries,[15] and conceded that, while they believe the USCIS Hold Memo no longer is being applied to most Class Members, they cannot definitively estimate how many Class Members continue to be subject to the hold.

### E. Class Counsel's motion and proposed modifications

On April 10, 2026, Class Counsel filed the instant motion to extend the Agreement's Termination Date, citing Defendants' alleged violations of Sections III.B and III.I. Regarding the former, Class Counsel argue not only that the USCIS Hold Memo creates substantial noncompliance, but also argue for the first time that Section III.B requires Defendants to adjudicate *all* Class Members' pending asylum applications on the merits before the May 27, 2026 Termination Date, and that Defendants' clear inability to satisfy that alleged obligation places them

---

[14] Publicly available at: https://www.uscis.gov/newsroom/alerts/update-on-uscis-strengthened-screening-and-vetting.

[15] Those forty countries are identified in Presidential Proclamation 10949, 90 Fed. Reg. 24497 (June 4, 2025), *Restricting the Entry of Foreign Nationals to Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, and Presidential Proclamation 10998, 90 Fed. Reg. 59717 (Dec. 16, 2025), *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*.

in substantial non-compliance with the Agreement. Class Counsel propose a list of modifications to address the alleged noncompliance.

The most substantive of Class Counsel's proposed modifications appear tailored primarily to address the alleged noncompliance with Section III.B. They would replace the current Termination Date with a "performance-based termination mechanism," ECF 535-1 at 21, requiring Defendants to complete a series of actions before filing a motion to terminate the Agreement. In pertinent part,[16] they propose:

(1) Defendants' creation of a "Potential Class Member List," including "all people who: (1) were determined to be a UAC; and (2) who filed an asylum application that was pending with USCIS on or before February 24, 2025; and (3) for whom USCIS has not adjudicated the person's asylum application on the merits," and "includ[ing] people who are, were, or never were in removal proceedings, as well as people whose asylum applications USCIS rejected for lack of jurisdiction in violation of Paragraph III.B" of the Settlement Agreement.

(2) Defendants' (a) identification of all individuals from the above list whom Defendants have removed since November 24, 2024, (b) provision of complete contact information for those individuals to Class Counsel, (c) allowance of at least a year from the date of such provision for those individuals to elect to return to the United States for adjudication of the merits of their asylum applications, (d) financing and facilitation of

---

[16] Class Counsel also propose modifications to certain definitions contained in Section II of the Agreement to reflect the new termination mechanism, and addition of a paragraph to the "Compliance Reports" requirement contained in Section V.B to reflect the additional compliance obligations that Class Counsel has proposed as part of the performance-based termination mechanism. *See* ECF 535-24 (Proposed Order).

the return of those individuals who so elect, and (e) adjudication of returned individuals' applications on the merits.

(3) Defendants' provision of individualized notice to each individual on the "Potential Class Member List," including those in DHS custody, and their attorney of record with instructions on how that individual can request—"opt-in" to—adjudication of their asylum application under the terms of the Settlement Agreement, with a deadline for such request set no earlier than 180 days after provision of notice.[17]

(4) Defendants' adjudication on the merits of the asylum applications of any Class Members who so opt-in.

*See* ECF 535-24 at 1–3. At the May 19, 2026 motions hearing, Class Counsel proposed an alternative to performance based termination: a temporal extension of the Termination Date of at least three years.

## II.    LEGAL STANDARDS

"[T]he power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 381 n.6 (1992) (quoting *New York State Ass'n for Retarded Child., Inc. v. Carey*, 706 F.2d 956, 967 (2d Cir. 1983)).[18] Despite the parties' agreement being titled as a "Settlement Agreement," this Court views it—and

---

[17] In suggesting that the performance-based termination mechanism be tied only to the adjudication of asylum applications "for those applicants *who affirmatively opt in*," ECF 535-1 at 32 (emphasis added), Class Counsel acknowledge that their proposal "would allow the Settlement Agreement to terminate before *all* Class Members receive an adjudication on the merits." *Id.* (emphasis in original).

[18] This Court notes the Fourth Circuit's view that a court's "inherent power to modify injunctions they have issued[,] . . . also exists with regard to a court's consent decrees, which regulate future conduct *and thus operate as injunctions*." *Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 404 F.3d 821, 825–26 (4th Cir. 2005) (emphasis added) (citing *United States v. Swift & Co.*, 286 U.S. 106, 114–15 (1932)).

the parties have not disputed its operation as—a consent decree since it became an order of the court. ECF 205 (Nov. 25, 2024 Order granting joint motion for final approval of Settlement Agreement). *See Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 281 (4th Cir. 2002) ("A consent decree, because it is entered as an order of the court, receives court approval and is subject to the oversight attendant to the court's authority to enforce its orders, characteristics not typical of settlement agreements."), *overruled on other grounds*, *Stinnie v. Holcomb*, 77 F.4th 200 (4th Cir. 2023); *Duvall v. Hogan*, No. ELH-94-2541, 2021 WL 2042295, at *9–10 (D. Md. May 21, 2021) (rejecting argument that "Settlement Agreement" was not a consent decree, where the agreement provided for court to retain jurisdiction to enforce the agreement's terms (among numerous provisions indicating the parties' intent to render it enforceable in federal court), and the agreement was approved by the court) ("The Agreement is titled 'Settlement Agreement.' But, the title is not dispositive. . . . The question of whether a court order is the functional equivalent of a consent decree may be determined by asking 'whether the order contains the sort of judicial involvement and actions inherent in a court-ordered consent decree.'") (quoting *Aronov v. Napolitano*, 562 F.3d 84, 90 (1st Cir. 2009) (internal quotation marks omitted)). Under the Supreme Court's decision in *Rufo*, "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." 502 U.S. at 383.

In assessing whether circumstances have so changed that a modification is warranted, the court must determine whether the moving party, at the time it entered into the agreement, actually anticipated the events that it now cites as the basis for modification; if the movant did actually anticipate these circumstances, modification ordinarily should not be granted. *Id.* at 385. However,

"that the events were theoretically foreseeable does not foreclose a modification"; "the issue is whether the parties *actually* anticipated the events giving rise to the modification request." *Thompson*, 404 F.3d at 828 (emphasis in original).

"A court's inherent power to modify a consent decree," which "springs from the court's inherent equitable power over its own judgments," "is not circumscribed by the language of the decree." *Id.* at 830, 832 n.6 (emphasis removed) (collecting cases); *see also Johnson v. Robinson*, 987 F.2d 1043, 1050 (4th Cir. 1993) ("[A] district court may, of course, modify a consent decree to impose new duties upon a party."). However, "generally speaking, a district court modifying a consent decree should strive to 'preserve the essence of the parties' bargain.'" *Thompson*, 404 F.3d at 833 (quoting *Pigford v. Veneman*, 292 F.3d 918, 927 (D.C. Cir. 2002). *See also id.* at 831–32 ("[T]he district court modified the decree no more than was necessary to approximate the positions the parties would have occupied had the Local Defendants lived up to their obligations under the Consent Decree.") (citing *Pigford*); *Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016) ("[A] modification of a court order is 'suitably tailored to the changed circumstance' when it 'would return both parties as nearly as possible to where they would have been absent' the changed circumstances.") (quoting *Pigford*, 292 F.3d at 927 (emphasis omitted)).

"The court's inherent authority to modify a consent decree or other injunction is now encompassed in Rule 60(b)(5) of the Federal Rules of Civil Procedure." *Thompson*, 404 F.3d at 826. Rule 60(b)(5) provides that a court may relieve a party or its legal representative from a final judgment or order if, *inter alia*, "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5).

### III.   DISCUSSION

#### A. Changed Circumstances

Class Counsel cite multiple changed circumstances that they argue warrant modification of the Settlement Agreement. Primarily, they cite (1) Defendants' failure to adjudicate the applications of all Class Members, the number of whom has, in Class Counsel's words, "balloon[ed]" from that known to Class Counsel at the execution of the Settlement Agreement, *see* ECF 535-1 at 30; (2) the USCIS Hold Memo, which instituted a hold on *all* adjudications of asylum applications through at least February 13, 2026, and which likely continues to apply to some subset of Class Members;[19] and (3) the number of Class Members removed in violation of Section III.I, which, depending on which of Defendants' estimates is used, ranges from at least 71 individuals to over one hundred.

First, this Court does not find the substantial increase in the number of potential Class Members to, by itself, constitute a changed circumstance warranting modification. Regardless of whether the increase was anticipated, if Defendants were meeting their obligations under the Agreement for all Class Members, there would be no need to modify. Thus, this Court must decide those obligations: whether Section III.B's guarantee that USCIS "will . . . adjudicate [Class Members' asylum applications] on the merits" indicates that the parties intended that *all* Class Members' applications be adjudicated on the merits *by* the Termination Date (Class Counsel's

---

[19] Defendants have estimated the number of Class Members still subject to the hold to be no more than two percent, although they cite no sourcing for that estimate. See ECF 568 at 15 ("[A]s of March 30, 2026, likely fewer than two percent of class members fall into categories still placed under hold."). While recognizing that USCIS's lists provided to ICE include *potential*, not confirmed, Class Members, if the potential Class size exceeds 73,000 individuals, then "two percent" of that number would translate to nearly 1,500 potential Class Members who continue to be denied a fundamental benefit of the Parties' bargain. And again, USCIS may not have identified all potential Class Members.

position), or that *any* Class Members' applications that came before USCIS, exercising initial jurisdiction pursuant to the Settlement Agreement, *during the term* of the Settlement Agreement would be decided on the merits (Defendants' position). To resolve this dispute, this Court turns to Maryland contract law.[20]

Under Maryland's objective theory of contract interpretation, "[u]nless the language of the contract is ambiguous, [courts] interpret it based on what a reasonable person in the position of the parties would have understood the language to mean and not the subjective intent of the parties at the time of formation." *Tapestry, Inc. v. Factory Mut. Ins. Co.*, 286 A.3d 1044, 1053 (Md. 2022) (quoting *Credible Behav. Health, Inc. v. Johnson*, 220 A.3d 303, 310 (Md. 2019)). "Under Maryland law, . . . [a] contract's language is ambiguous 'when, viewing the plain language *in its full context*, a reasonably prudent person could ascribe more than one reasonable meaning to it.'" *Walmart Real Est. Bus. Tr. v. Quarterfield Partners LLC*, No. 24-1355, 2025 WL 1577562, at *4

---

[20] This Court notes that federal Courts of Appeals appear to be divided as to whether state law or federal common law should govern interpretation of consent decrees. *See Evoqua Water Techs., LLC v. M.W. Watermark*, 940 F.3d 222, 245 (6th Cir. 2019) (Bush, J., concurring) (collecting cases). While the Agreement does not, itself, identify the law to be applicable to its interpretation, this Court has previously applied Maryland contract law to resolve disputes under the Agreement, *see* ECF 253, as has a majority of the Fourth Circuit. *See J.O.P. v. U.S. Dep't of Homeland Sec.*, No. 25-1519, 2025 WL 1431263, at *4 n.6 (4th Cir. May 19, 2025) (Benjamin, J., concurring) ("The parties agree that Maryland law governs interpretation of the Settlement Agreement."). Thus, this Court will continue to do so. Even if federal common law were to apply, it does not appear to be in conflict with Maryland contract law here. Like under the "objective" approach to interpretation applied by Maryland courts, federal common law allows consideration of certain "aids to construction" to guide interpretation without departing from the "four corners" approach. *See United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 ("Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree. Such reliance does not in any way depart from the 'four corners' rule of [*United States v. Armour & Co.*, 402 U.S. 673 (1971)].") (internal footnotes omitted).

(4th Cir. June 4, 2025) (unpublished opinion) (quoting *Lithko Contracting, LLC v. XL Ins. Am., Inc.*, 318 A.3d 1221, 1230 (Md. 2024) (internal quotation marks omitted) (emphasis added)).

As noted during the recent motions hearing, both parties' interpretations of Section III.B are, in the abstract, plausible. However, under Maryland's plain-language, objective theory of contract interpretation, courts "do not interpret contractual language in a vacuum." *Lithko Contracting, LLC*, 318 A.3d at 1230. Rather, for purposes of "providing relevant context," Maryland courts allow consideration of "'not only the text of the entire contract'" but also of "evidence beyond the 'four corners' of the contract itself," including "'the contract's character, purpose, and the facts and circumstances of the parties at the time of execution,'" to interpret the disputed language. *Id.* (quoting *Credible Behav. Health, Inc.*, 220 A.3d at 310–11 (internal quotation marks omitted)); *see also Catalina Enters., Inc. Pension Tr. v. Hartford Fire Ins. Co.*, 67 F.3d 63, 65 (4th Cir. 1995) (applying Maryland contract law) ("In addition to the contractual language, the court may look to the character of the contract, its object and purposes, and the factual circumstances of the parties at the time of execution."). Such evidence is treated as distinct from extrinsic or parol evidence of the parties' subjective intent,[21] which may only be considered for the purpose of resolving any ambiguity that survives the objective contextual inquiry. *See Lithko Contracting, LLC*, 318 A.3d at 1230–31; *W.F. Gebhardt & Co., Inc.*, 252 A.3d at 77–78.[22]

---

[21] *See also Lithko Contracting, LLC*, 318 A.3d at 1230 n.9 (collecting cases for distinction between "extrinsic evidence of the parties' subjective intent, such as documentation of their course of dealings in negotiating the contract at issue or other agreements" (impermissible for objective assessment) and "information about the context in which the contract at issue was entered" (permissible)); *W.F. Gebhardt & Co., Inc. v. Am. Eur. Ins. Co.*, 252 A.3d 65, 74, 77–78 (Md. Ct. Spec. App. 2021) (noting that factual evidence regarding location and use of fire-escape ladder "provides context that suggests that a reasonable person reading the Policy and being aware of those facts would conclude that the fire escape would be covered. It is less clear that those facts constitute evidence of the parties' subjective intent at the time of contract formation" such that they should be considered "extrinsic evidence").

[22] The Settlement Agreement contains an integration provision, Section VIII.D, which states:

16

With these principles in mind, this Court cannot conclude that Section III.B requires Defendants to adjudicate *all* Class Members' asylum applications on the merits by the Termination Date. Looking first at the Agreement's text, the plain language of Section III.B does not include any express terms mandating completion, such as "all" or "every," even as other provisions in the Settlement Agreement do. *See*, *e.g.*, ECF 199-2 at 8 (Section III.E.2) ("Defendants shall retract *all* other Adverse Jurisdictional Determinations rendered on or after June 30, 2019 that are inconsistent with Paragraphs III.B and/or III.D . . . .") (emphasis added). In addition, the Settlement Agreement contains a specific provision permitting Class Members to request expedited adjudication of their applications. *See* ECF 199-2 at 9 (Section III.G). Inherently, processing all Class Members' adjudications within 548 days would be expedited adjudication in light of existing backlogs. Thus, interpreting Section III.B as Class Counsel urges would render Section III.G

---

> **Entire Agreement**. The terms and conditions set forth in this Agreement constitute the complete and exclusive statement of the agreement between the Parties relating [to] the subject matter of this Agreement, superseding all previous negotiations and understandings, and may not be contradicted by evidence of any prior or contemporaneous agreement. The Parties further intend that this Agreement constitute the complete and exclusive statement of its terms as between the Parties, and that no extrinsic evidence whatsoever may be introduced in any judicial or other proceeding, if any, involving the interpretation of this Agreement.

ECF 199-2 at 15. While both Parties have referenced this provision, neither has raised the extrinsic evidence bar in any significant way. Regardless, this Court does not read Section VIII.D as being intended to supersede Maryland contract law. *See Stokes Lawrence, P.S. v. Block 24 Seattle Ltd. LP*, No. C12-1366-JCC, 2013 WL 104548, at *4–5 (W.D. Wash. Jan. 8, 2013) (integration clause stating that "no extrinsic evidence whatsoever may be introduced in any judicial proceeding involving this Lease" did not prohibit consideration of extrinsic evidence "regarding the interpretation of the lease's terms when it is not inconsistent therewith"; such prohibition would supplant established state law on the issue). This approach is consistent with that cited by Judge Benjamin, filing a concurrence for the majority of the Fourth Circuit in an earlier proceeding in this case and interpreting the same Settlement Agreement. *See J.O.P.*, 2025 WL 1431263, at *4 (Benjamin, J., concurring) (quoting *Credible Behav. Health, Inc.*, 220 A.3d at 310–11) (internal quotation marks omitted) (emphasis added).

superfluous. Moreover, the fact that Section III.A of the Agreement is subject to an extended time frame of three years makes little sense if all of the Class Members would have their cases adjudicated on the merits in the first 548 days. Finally, the fact that the Settlement Agreement contains no discussion of the size of the Class—or the corresponding number of outstanding asylum applications covered by the Agreement—further undermines Class Counsel's suggestion that Defendants were intended to adjudicate all Class Members' applications within the 548-day term of the Agreement. It is unreasonable to conclude that Defendants would have bound themselves to adjudicate all applications for a Class of undefined size, potentially committing themselves to a wholly infeasible obligation.[23]

Class Counsel assert that Section III.B's use of the word "will" with respect to the adjudication obligation "unambiguously requires Defendants to actually adjudicate Class Members' asylum applications" during the term of the Agreement. ECF 594 at 6. This proposition does not seem to be in dispute, however, the use of the word "will" provides no indication of the pace or volume of adjudication that the parties intended during the 548-day term. Here, the facts and circumstances at the time of the Agreement's execution are quite relevant. Defendants have

---

[23] In this way, Section III.B of the Settlement Agreement differs notably from the consent decree at issue in *Thompson*. In *Thompson*, the consent decree contained specific quantitative and temporal metrics with which certain of the defendants were intended to comply (and upon which *other* defendants' compliance depended): among other things, the construction of 911 units of housing within six and a half years of the approval of the decree. 404 F.3d at 825. Based on these clear metrics with which to measure the extent of the defendants' performance, the Fourth Circuit affirmed the lower court's conclusion that the defendants' construction of just *eight* units constituted an unanticipated change in circumstances that warranted modification. *Id.* at 825, 828–29. In affirming the district court's modification order, the Fourth Circuit specifically noted that the lower court had "extend[ed] the period of jurisdiction only until the Local Defendants reach the *milestones* that should already have been reached when jurisdiction over HUD originally was to expire." *Id.* at 831–32 (emphasis added). Here, no such metrics or milestones were provided in the Settlement Agreement; indeed, that is the basis of the parties' dispute over Defendants' obligations.

noted, *see* ECF 568 at 13, that, in June, 2024—around the time the Parties executed the Settlement Agreement—Defendants issued an Interim Final Rule in which they noted that "the USCIS backlog of affirmative asylum cases stands at over 1.16 million and is growing. USCIS does not have enough AOs to . . . even marginally reduce the affirmative asylum backlog." *Securing the Border*, 89 Fed. Reg. 48,710, at 48,730 (June 7, 2024). In light of that fact, and with no clear terms in the Settlement Agreement suggesting that Class Members' applications were to be prioritized for adjudication over other applicants', this Court cannot conclude that "a reasonable person in the position of the parties would have understood the language" of Section III.B to require Defendants to adjudicate *all* Class Members' applications on the merits *by* the Termination Date. *Credible Behav. Health, Inc.*, 220 A.3d at 310.[24] Neither, then, can this Court conclude that Defendants' failure to do so constitutes a changed circumstance warranting modification.[25]

As for the USCIS Hold Memo, however, this Court has no difficulty concluding that the Memo constituted a dramatic change in circumstances. Adjudication on the merits of those Class Members' applications processed by Defendants during the term of the Agreement is a core benefit of the Agreement. While the parties may dispute the required pace, even if Defendants were not

---

[24] "Where the language of a contract is open to an interpretation which is reasonable and in accordance with the general purpose of the parties, the hardship of a different interpretation is strong ground for belief that such a meaning was not intended." *Canaras v. Lift Truck Servs., Inc.*, 322 A.2d 866, 877 (Md. 1974) (quoting *Sorensen v. J.H. Lawrence Co.*, 79 A.2d 383, 386 (Md. 1951)). *See also Catalina Enters., Inc. Pension Tr.*, 67 F.3d at 66 (citing *Canaras*) ("[W]hen [a] provision is susceptible to more than one meaning, a fair and reasonable construction of contract should always be favored over one that leads to harsh and unreasonable result.").

[25] Class Counsel have also suggested that the relatively small number of adjudications of Class Members' applications that have actually occurred during the term of the Agreement is itself evidence of substantial noncompliance and, consequently, a "changed circumstance." *See* ECF 594 at 8–9 (citing, for first time in their reply, Defendants' recent disclosure, ECF 583-1 ¶ 5, indicating "USCIS has adjudicated only 2,255 'PRL' asylum applications on the merits during the life of the Agreement—a tiny percentage."). This argument suffers from similar defects (namely, that the Agreement contained no language suggesting that Class Members' applications were to be prioritized over other applicants and/or adjudicated at any particular pace).

required to *prioritize* adjudications of all Class Members' applications during the term of the Agreement, there can be no dispute that Defendants' unilateral cessation of adjudications violated Section III.B of the Agreement in a fashion that Class Counsel could not have actually anticipated. Indeed, this Court has previously recognized that the USCIS Hold Memo constitutes a "massive changed circumstance" in that "the entirety of what this settlement was intended to achieve" was "rendered impossible by virtue of th[e] memo." ECF 471 (Feb. 18, 2026 Hr'g Tr.) at 74:9–13, 82:12–15.[26]

Having found sufficiently changed circumstances in the USCIS Hold Memo and the to warrant a modification of the Settlement Agreement, this Court now turns to deciding whether Class Counsel's proposed modifications—either performance-based or temporal—are suitably tailored to resolve the problems created by these circumstances.

**B. Class Counsel's Proposed Modifications**

**1. Class Counsel's proposed performance-based termination mechanism is not "suitably tailored" to the changed circumstance of the USCIS Hold Memo.**

Here, Class Counsel's primary proposed modification is a "performance-based termination mechanism," whereby Defendants would have to file a motion to terminate the Agreement after satisfying multiple substantive obligations. ECF 535-1 at 20–24. The significant majority of Class Counsel's proposed obligations appear intended to address Defendants' alleged failure to adjudicate *all* Class Members' asylum applications by the Termination Date. Having declined to find that obligation, this Court will not order such relief. *See Rufo*, 502 U.S. at 391 ("A court should

---

[26] Class Counsel also argue changed circumstances in the alleged "wrongful removals" in violation of Section III.I. Even assuming, *arguendo*, that this Court were to agree, this Court disagrees that extension of the Termination Date would be a suitably tailored modification to address wrongful removals during the original term. Whether there are modifications suitably tailored to address wrongful removals is better addressed in connection with the pending "motion to enforce," which includes alternative arguments for modification.

do no more" than modify a decree "to resolve the problems created by the change in circumstances."); *Thompson*, 404 F.3d at 833 (finding no abuse of discretion in lower court's modification order where "the district court modified the decree no more than was necessary to approximate the positions the parties would have occupied had the Local Defendants *lived up to their obligations* under the Consent Decree.") (emphasis added).[27] However, a limited temporal extension may be suitably tailored to address the changed circumstance of the USCIS Hold Memo.

### 2. Defendants' Section 1252(f)(1) objection does not preclude this Court's approval of an extension of existing obligations to a later date certain.

Before assessing whether Class Counsel's proposed three-year extension is "suitably tailored" to address Defendants' noncompliance, this Court must address a "jurisdictional" question that Defendants have raised for the first time in this litigation. Specifically, Defendants argue that, even if this Court were to find modification warranted under FRCP 60(b), to grant Class Counsel's proposed modifications would "exceed its jurisdiction to issue equitable relief," because Section 1252(f)(1) of the INA "prohibits lower courts from entering injunctions"—"on behalf of an entire class of aliens," as opposed to an individual alien—"that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." ECF 568 at 32 (quoting *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550–51 (2022)). Section 1252(f)(1), under the heading, "Limit on injunctive relief," provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of

---

[27] Having declined to order Class Counsel's proposed performance-based termination mechanism on this basis, this Court need not address whether the proposed substantive obligations would merely add duties to "preserve the essence of the parties' bargain," *Johnson*, 987 F.2d at 1050, or would transform the Agreement in a more meaningful way.

such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). *Aleman Gonzalez* confirmed that a lower court cannot order injunctive relief for an entire class that would interfere with the Government's operation of Sections 1221 through 1232 of the INA (the "covered provisions"). This prohibition applies even to "injunctions enjoining . . . the *unlawful* operation" of the covered provisions. *Sanchez v. McAleenan*, No. GLR-19-1728, 2024 WL 1256264, at *13–15 (D. Md. Mar. 25, 2024) (emphasis added) (citing *Aleman Gonzalez*, 96 U.S. at 551).

However, there are important limitations on the scope of the bar contained in § 1252(f)(1). First, the prohibition of injunctive relief contained in 1252(f)(1) is restricted to interference with the operation of the *covered provisions*, *only*. *See*, *e.g.*, *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 209–11 (5th Cir. 2024) (holding that because § 1252(f)(1) "does not encompass an injunction against statutes it does not cross-reference" (and it only cross references 8 U.S.C. §§ 1221–1232), where the injunctive relief sought is pursuant to a different statutory provision, the injunction is not barred). "The provisions identified by the Supreme Court as subject to § 1252(f)(1) all relate to 'the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens.'" *CASA, Inc. v. Noem*, 792 F. Supp. 3d 576, 595 (D. Md. 2025) (quoting *Aleman Gonzalez*, 96 U.S. at 549–50 (discussing 8 U.S.C. §§ 1221–1232)).

In *Aleman Gonzalez*, the Supreme Court expressly left undisturbed the proposition that "a court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision." *Aleman Gonzalez*, 596 U.S. at 553 n.4 (emphasis in original) (citing *Gonzales v. DHS*, 508 F.3d 1227 (9th Cir. 2007)). *See also Dep't of Homeland Sec. v. D.V.D.*, -- U.S. --, 145 S. Ct. 2153, 2160–61 (2025)

22

(Sotomayor, J., dissenting) ("This Court has indicated that courts 'may enjoin the unlawful operation' of laws 'not specified in § 1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision.'") (quoting *Aleman Gonzalez*, 596 U.S. at 553 n.4 (emphasis deleted)); *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, 767 F. Supp. 3d 293, 319 (D. Md. 2025) ("[Section] 1252(f)(1) does not bar injunctions affecting DHS's authority pursuant to provisions of the INA outside of §§ 1221–1232 simply because of collateral effects on a covered provision.") (internal quotation marks removed).

Assuming, *arguendo*, that § 1252(f)(1) applies to consent decrees with the same force as it does to injunctions, this Court ultimately concludes, based on considerations of waiver and the "collateral effect" rule, that it does have "jurisdiction or authority" to approve some modification to the Agreement.

The assessment of waiver entails, in fact, two questions here: (1) whether, as Class Counsel argue, Defendants waived any objections—under § 1252(f)(1)—to the terms of the Agreement by entering into it; and (2) if so, whether that waiver extends to a temporal extension of that Agreement.

Defendants suggest that their entering into the Agreement did not waive their objections under § 1252(f)(1), because "a jurisdictional defect 'can never be forfeited or waived.'" ECF 568 at 33 (quoting *United States v. Cotton*, 535 U.S. 625, 630 (2002)). For their part, Class Counsel rely on the Seventh Circuit's recent decision in *Castañon-Nava v. U.S. Department of Homeland Security*,[28] in which the court rejected Defendants' argument:

---

[28] The Seventh Circuit has addressed the § 1252(f)(1) issue in two separate opinions, having first engaged with it in denying Defendants' motion to stay the district court's order granting Rule 60(b)(5) relief to extend the consent decree, *see Castañon-Nava v. U.S. Department of Homeland Security*, 161 F.4th 1048 (7th Cir. 2025), and, more recently, in adjudicating Defendants' subsequent appeal of that order, -- F.4th --, No. 25-3050, 2026 WL 1223250 (7th Cir. May 5, 2026).

> [W]hile it is true that the Supreme Court did not expressly decide in *Biden v. Texas* whether § 1252(f)(1) is waivable, [597 U.S. 785, 801 (2022)], 142 S. Ct. 2528 n.4, there is ample reason to believe that it is, given that objections to similar rules limiting the reach of a federal court's power are waivable, *see*, *e.g.*, *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584, 119 S. Ct. 1563, 143 L.Ed.2d 760 (1999) (personal jurisdiction is waivable); *Hoffman v. Blaski*, 363 U.S. 335, 343, 80 S. Ct. 1084, 4 L. Ed.2d 1254 (1960) ("[V]enue, like jurisdiction over the person, may be waived."); *Pusey & Jones Co. v. Hanssen*, 261 U.S. 491, 500, 43 S. Ct. 454, 67 L. Ed. 763 (1923) (equitable jurisdiction defect is waivable); *Sossamon v. Texas*, 563 U.S. 277, 284, 131 S. Ct. 1651, 179 L. Ed. 2d 700 (2011) (state sovereign immunity is waivable). . . . [D]efects in equitable jurisdiction are waivable. *See Pusey & Jones Co.*, 261 U.S. at 500, 43 S. Ct. 454 ("[U]nlike lack of jurisdiction as a federal court . . . lack of equity jurisdiction (if not objected to by a defendant) may be ignored by the court, [in certain cases]. And where the defendant has expressly consented to action by the court, or has failed to object seasonably, the objection will be treated as waived."); *Am. Mills Co. v. Am. Sur. Co. of N.Y.*, 260 U.S. 360, 363, 43 S. Ct. 149, 67 L. Ed. 306 (1922) (finding that the defendant had waived its adequate-remedy-at-law objection). In much the same way, § 1252(f)(1) limits a court's power to grant equitable relief (here, in the form of a classwide injunction) under certain conditions. Accordingly, as in the case of equitable jurisdiction, we conclude that any objection based on § 1252(f)(1) is waivable, and Defendants did so here.

2026 WL 1223250, at *4–5 (alterations in original and added).[29] This Court agrees with the Seventh Circuit's reasoning, and finds an even more compelling basis for waiver here. In *Castañon-Nava*, the parties had entered into a consent decree well after the passage of § 1252(f)(1) (though months before the Supreme Court's decision in *Aleman Gonzalez*), and the Defendants had raised § 1252(f)(1) objections to the district court on at least two separate occasions before

---

Class Counsel cited the former decision in their motion, and the latter decision (having been rendered in the interim) in their reply.

[29] While otherwise dissenting from the *Castañon-Nava* majority's affirmance of the lower court's orders, Judge Kirsch of the Seventh Circuit Court of Appeals appears to have agreed that § 1252(f)(1) objections are waivable—and were waived—with respect to the *original* consent decree:

> When the litigation began, the government raised § 1252(f)(1) as a bar to the consent decree itself and then dropped that objection when it entered the agreement. But that means the government waived argument that *the decree itself* violated § 1252(f)(1)—it didn't forever bar the government from raising § 1252(f)(1) against any order implicating the injunction bar *in a new way* in this litigation.

*Castañon-Nava*, -- F.4th --, 2026 WL 1223250, at *33 (Kirsch, J., dissenting) (emphasis added).

agreeing to the Consent Decree. The Seventh Circuit consequently concluded that Defendants, having, "to obtain the benefits of settlement, . . . abandoned the argument, thereby waiv[ed] it." *Id.* at *4 (citing, *inter alia*, *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971) ("Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms.")). Here, the parties entered into the Settlement Agreement in June, 2024, and this Court approved it in November, 2024. Defendants had the benefit of the Supreme Court's clear holding in *Aleman Gonzalez* (decided two years earlier), and had apparently contemplated its consequences for negotiations of key terms.[30] Nevertheless—and in contrast to other settlement agreements entered into by government defendants at the time[31]—they made no mention of the case nor raised any § 1252(f)(1) objections to the terms of the Agreement in any substantive filings at any point in this litigation before their opposition to the instant motion.[32] Thus, independent of any question regarding the presence of certain provisions in the Agreement that could be interpreted as interfering, at least collaterally, with covered provisions, this Court concludes that Defendants waived their § 1252(f)(1) objections to the class-wide relief set forth in the Agreement when they entered into it.

---

[30] *See* ECF 177 (Telephonic Status Conference held on March 6, 2023) (Defendants' counsel offering, as explanation of delay in progress of settlement negotiations, Defendants' need to assess impact of recently decided Supreme Court case on key proposed terms of potential settlement).

[31] *See Jimenez v. Mayorkas*, 2024 WL 4528415, at *1 (D. Mass. Oct. 18, 2024) (on motion for preliminary approval of a settlement agreement, the parties stated that the agreement "considers the impact of the Supreme Court's decision in *Garland v. Aleman-Gonzalez*, 596 U.S. 543 (2022), which relates to the availability of class-wide injunctive relief and was decided during the parties' negotiations. While the parties do not necessarily share the same view of the application of *Aleman-Gonzalez* in the settlement context or otherwise, they agree the Settlement Agreement has been drawn to comply with any limitations that the case may impose.").

[32] In addition, this Court notes that this is not the first time that Defendants have raised a jurisdictional challenge, *see* ECF 253 at 5–6, yet Defendants have not formally raised a § 1252(f)(1) challenge until now.

Defendants' primary argument regarding waiver, however, is that their entering into the Agreement did not waive any such objections *to later proposed modifications*. *See* ECF 568 at 33 ("Even if entering into the settlement agreement waived Section 1251(f)(1) [sic] objection for the agreed-upon duration, that could not constitute waiver for any later unilateral efforts to extend the settlement agreement over Defendants' objection."). Class Counsel again cite to *Castañon-Nava*, where the Seventh Circuit, in holding that the lower court's order extending the term of the consent decree by 118 days was not barred by § 1252(f)(1) because defendants had waived their § 1252(f)(1) objection to the consent decree, implicitly extended the finding of waiver to the time-based extension of the decree's termination. Finding *Castañon-Nava* quite analogous to the instant case, this Court concludes that Defendants have waived their § 1252(f)(1) objection to an extension to a date certain. A purely temporal extension here would not modify any of the original substantive terms of the Agreement to which Defendants already agreed and, in this Court's view, have not fully performed.

Additionally, and notably, Defendants have not raised any meaningful argument that the provisions of the original Settlement Agreement have anything more than collateral effect on the operation of covered provisions under § 1252(f)(1). *See, e.g.*, *Aleman Gonzalez*, 596 U.S. at 553 n.4. Defendants have argued only that Class Counsel's "proposed *modifications* to indefinitely extend Sections III.H-III.K would restrain the operation of the Executive's removal authority under 8 U.S.C. §§ 1220-1231—covered provisions." ECF 568 at 33 (emphasis added) (citing 8 U.S.C. § 1231(a)(1)(A), which provides that "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days.").

Even had Defendants argued with any force that the terms of the Agreement directly interfere with operation of covered provisions, multiple authorities weigh against such a

conclusion. The Settlement Agreement was the result of negotiations to settle claims brought to honor protections afforded UACs under the TVPRA with respect to asylum processes, including those in 8 U.S.C. §§ 1158 and 1232(d).[33] Multiple federal courts of appeals have held that injunctions primarily relating to asylum processes, specifically, do not contravene § 1252(f)(1) even if resulting in collateral effects to operation of covered provisions. *See, e.g.*, *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1126–28 (9th Cir. 2025), *cert. granted sub nom.*, *Noem v. Al Otro Lado*, 146 S. Ct. 604 (Mem) (Nov. 17, 2025); *Refugee and Immigrant Ctr. for Educ. and Legal Servs. v. Mullin*, -- F.4th --, No. 25-5243, 2026 WL 1110616, at *24–25 (D.C. Cir. Apr. 24, 2026) (holding that where lower court had enjoined government officials from, *inter alia*, (1) "removing any individual plaintiffs or class members without complying with the asylum statute, 8 U.S.C. § 1158(a)"; and (2) "relying on the Proclamation or Guidance to 'narrow[] the eligibility criteria for asylum without complying with 8 U.S.C. § 1158(b)(2)(C),'" the injunctive relief was not barred by § 1252(f)(1), because "[t]he asylum statute, 8 U.S.C. § 1158, appears in Part I of the INA," not Part IV of the INA, "[s]o Section 1252(f)(1)'s injunction constraints do not apply."). And at least one district court has held that where the claims at issue pertain to UACs, the TVPRA has "occupie[d] the field" and thus any interference with operation of covered provisions is by

---

[33] Class Counsel specifically argue that the Agreement honored protections in asylum provisions set forth in 8 U.S.C. § 1158(b)(3) and § 1232(d)(8). *See* ECF 594 at 18. While § 1238(d)(8) does fall within part IV of subchapter II within the INA, and thus would appear to fall within the ambit of § 1252(f)(1), § 1232(d)(8) was enacted in 2008 by § 235(d)(8) of the TVPRA. "Although some provisions of the TVPRA directly amend the INA, including some provisions within § 235 of the TVPRA, [§ 235(d)(8)] does not amend the INA. Thus, the law that [§ 235(d)(8)] of the TVPRA enacted is not a provision of the INA even though it has been placed within Title 8, Chapter 12, Subchapter II of the United States Code. . . . Accordingly, . . . the jurisdictional bar of [§ 1252(f)(1)] does not apply to an order that" interferes with the operation of § 1232(d)(8). *Galvez v. Jaddou*, 52 F.4th 821, 829–31 (9th Cir. 2022) (so holding with respect to § 235(d)(2) of the TVPRA, codified at 8 U.S.C. § 1232(d)(2)). This Court also notes that Defendants, themselves, asserted in their opposition that § 1252(f)(1) prohibits a lower court from enjoining or restraining the operation of 8 U.S.C. §§ 1221–*1231*, without including § 1232. *See* ECF 568 at 10, 32, 33.

definition collateral to the operation of the TVPRA. *See Perez-Funez v. Dep't of Homeland Sec.*, No. CV 81-01457-MWF (Ex), 2026 WL 982623, at *10 (C.D. Cal. Apr. 6, 2026) (denying motion to terminate permanent injunction on basis of § 1252(f)(1) objection) ("[T]he government is first and foremost required to follow the TVPRA when it encounters unaccompanied children. . . . Therefore, where the TVPRA 'occupies the field' and constitutes a 'binding' legal framework on DHS's processing of UAC, as the Government insists, the Injunction's procedural requirements are thus enjoining or restraining the way the Government 'enforces, implements, or carries out' the **TVPRA**, rather than any covered provision.") (emphasis in original).

In light of the above, this Court concludes that § 1252(f)(1) does not bar this Court from ordering an extension of the Agreement, as otherwise drafted, to some later date certain.

### 3. A specific temporal extension of the Termination Date of the Settlement Agreement is warranted and suitably tailored to the changed circumstance.

"'Modification of a court order is suitably tailored to the changed circumstance when it would return both parties as nearly as possible to where they would have been absent the changed circumstances,' and extending the term of a consent decree by the amount of time that a party failed to comply with the decree meets that standard." *Dep't of Fair Emp. & Hous. v. L. Sch. Admission Council Inc.*, No. 12-cv-01830-JCS, 2018 WL 1156605, at *17 (N.D. Cal. Mar. 5, 2018) (quoting *Kelly*, 822 F.3d at 1097–98 (internal quotation marks omitted)); *see also Duvall v. Moore*, No. MJM-94-2541, 2024 WL 4529261, at *6 (D. Md. Oct. 18, 2024) (collecting cases).

Class Counsel, at the May 19th motions hearing, requested that the Termination Date be extended by three years. They proposed this extension in part to account for the nearly six months between the issuance of the USCIS Hold Memo and the Termination Date, but primarily based on their estimate of how long it would take Defendants to adjudicate the applications of all Class Members—based on USCIS's recent lists of potential Class Members, numbering approximately

74,000 individuals—at the rate of adjudication that they assert they expected at the time they entered into the Settlement Agreement (approximately 27,000 Class Members within 548 days).

Again, this proposal is primarily geared towards addressing Defendants' alleged noncompliance with Section III.B, and this Court has rejected Class Counsel's interpretation. Having concluded that the Settlement Agreement did not require Defendants to adjudicate *all* Class Members' asylum applications by the Termination Date, this Court need not consider whether the proposed extension would be "suitably tailored" for purposes of ensuring such performance.

However, this Court does believe that an extension is warranted to address the unanticipated changed circumstances in the USCIS Hold Memo. Since the Memo's issuance on December 2, 2025, it has applied to at least some portion of the Class. Thus, for the 175 days between its issuance and the date of this opinion, some portion of the Class has been denied the benefit of the Parties' bargain—a full 548-day window during which Defendants are obligated to adjudicate Class Members' applications on the merits. An extension of the Termination Date equal to the period of deprivation of that benefit is suitably tailored to address the deprivation. *See Castañon-Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823, 862–63 (N.D. Ill. 2025). Thus, this Court orders that the Termination Date be extended to November 18, 2026.

Of course, as of today, the adjudicative holds continue to prevent at least some Class Members from enjoying the benefit of their 548-day bargain. The decision about how long those holds will continue is within the purview of Defendants and the Executive Branch. But to the extent the situation persists and deprives some Class Members of the ability to have their applications adjudicated consistent with the Agreement, Class Counsel may again move to modify the Agreement to extend its term.

## IV.    CONCLUSION

For the reasons stated above, Class Counsel's motion to modify the Settlement Agreement, ECF 535, is granted in that the Agreement's Termination Date is extended to November 18, 2026. A separate order will follow.


Dated: May 26, 2026                                          /s/
                                              Stephanie A. Gallagher
                                              United States District Judge