**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **J.O.P.**, *et al.*, | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| v. | * | **Civil No. SAG-19-01944** |
| | * | |
| **U.S. DEPARTMENT OF** | * | |
| **HOMELAND SECURITY**, *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM OPINION**

Currently pending before this Court are two motions. (1) Class Counsel's (Third) Emergency Motion to Enforce the Court-Ordered Settlement Agreement and Find Defendants[1] in Civil Contempt, ECF 459; and (2) Class Counsel's Motion to Compel the Return of Class Member E.M.P.,[2] ECF 544. This Court has reviewed the motions and multiple related filings, including ECF 462; ECF 463; ECF 558; ECF 559; ECF 571; ECF 583; ECF 592 (sealed). This Court has also heard argument and testimony related to these motions in hearings on February 18, March 19, 20, and 23, and June 22, 2026. For the reasons set forth below, this Court will grant in part and deny in part the motion to enforce and deny the motion to compel.

---

[1] Defendants are the U.S. Department of Homeland Security ("DHS"), U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and several officials of these agencies (collectively "Defendants" or "government Defendants").

[2] Early in this litigation, this Court approved a Protective Order that directs the parties to maintain the confidentiality of Class Members' "identifying information" including "their names." ECF 136-1 at 2-3 ("Plaintiffs' and other putative class members' identifying information, including their names . . . shall be subject to the terms of this Order, and pursuant to the Court's orders granting Plaintiffs' motions to proceed using pseudonyms, the Parties will, in all public documents or Court filings or discussions in open Court, reference Plaintiffs and other putative class members only by their initials"); ECF 144 at 3 (order entering proposed protective order).

## I.    BACKGROUND[3]

### A.  Procedural Background

On November 25, 2024, this Court approved a Settlement Agreement executed by the Parties to resolve long-running litigation related to the rights of unaccompanied alien children ("UACs") under certain USCIS policies. The Settlement Agreement, *inter alia*, (1) provided for the rescission of a USCIS memorandum pursuant to which USCIS had required asylum officers to make their own determinations of whether the applicant was still a UAC at the time they filed their application, and, in doing so, redetermine whether the applicant was eligible for certain statutory protections afforded UACs; (2) provided for promulgation of a superseding memorandum which guaranteed that USCIS would exercise initial jurisdiction over UACs' pending asylum applications, and otherwise implemented the terms of the Settlement Agreement, ECF 199-2 at 6 (Sections III.A., III.B); (3) defined—but did not identify members of—the *J.O.P.* Class;[4] and (4) prohibited ICE from removing any identified Class Member with a pending asylum application until that application had been adjudicated on the merits, *id.* at 8 (Section III.I). On April 23, 2025, Defendants removed a Class Member (Cristian) under the Alien Enemies Act and in violation of Section III.I of the Settlement Agreement. In response to Class Counsel's first motion to enforce the Settlement Agreement, this Court ordered Defendants to facilitate Cristian's return and further

---

[3] For pincites, in all instances where an ECF header is affixed to the top of a page, this Court uses the ECF page number in that header; where such headers are *not* affixed, this Court uses the page numbers of the underlying document.

[4] The Agreement defines the certified Class as "all individuals nationwide who prior to [February 24, 2025]: (1) were determined to be a UAC; and (2) who filed an asylum application that was pending with USCIS; and (3) on the date they filed their asylum application with USCIS, were 18 years of age or older, or had a parent or legal guardian in the United States who is available to provide care and physical custody; and (4) for whom USCIS has not adjudicated the individual's asylum application on the merits." ECF 199-2 at 5 (Section II.E).

ordered Defendants "not to remove from the United States members of the certified 'Class,' defined in Section II.E of the Settlement Agreement." ECF 254 (the "April 23, 2025 Order").

Class Counsel's pending motions seek to enforce Section III.I of the Settlement Agreement, which states:

> With respect to any Class Member with a final removal order, ICE will refrain from executing the Class Member's final removal order until USCIS issues a Final Determination on one properly filed asylum application under the terms of this Agreement. In order to comply with this provision, ICE Enforcement and Removal Operations (ERO), the agency responsible for executing removal orders, will make an entry indicating there is a stay in its system of records for all identified Class Members, including Class Members identified by USCIS. This alert will not be removed from any individual case until such time as USCIS indicates it is appropriate to remove it.

ECF 199-2 at 9. Class Counsel's instant motion to enforce picks up on many of the arguments raised in its *second* motion to enforce, ECF 428, which this Court denied without prejudice on procedural grounds on November 20, 2025. ECF 448. In the order denying the second motion, this Court directed the parties to meet and confer regarding Defendants' process for compliance with Section III.I and why that process failed in certain instances. The parties subsequently met on December 22, 2025 (the "M&C").[5] Unable to resolve their dispute informally, Class Counsel filed the instant motion, their third motion to enforce, on January 22, 2026.

Once the motion became ripe, this Court convened a motions hearing on February 18, 2026. In advance, it directed Defendants to be prepared to provide additional information regarding the removals of eight potential Class Members; specifically, whether banners marking those individuals as potential Class Members were missing from ICE's systems at the time of the removals or whether banners were present but disregarded. ECF 464 (Feb. 6, 2026 Letter Order).

---

[5] This Court ordered that the M&C "be video and audio recorded for this Court's review should a renewed motion be filed." ECF 448 at 2. The parties subsequently provided this Court with a copy of the recorded M&C on a USB drive.

Finding Defendants' showing at the hearing woefully inadequate with respect to these and other questions (including Defendants' technological ability to ascertain certain facts surrounding the removals), this Court subsequently ordered an evidentiary hearing at which Defendants were to produce individuals with personal knowledge regarding, *inter alia*, the facts and circumstances surrounding Defendants' removal of nine confirmed and potential Class Members, ICE's capabilities for identification and/or verification of Class membership beyond consultation of their internal systems for banners and/or case comments, the criteria employed by USCIS for compilation of its potential Class Member lists, and the application to Class Members of a policy memo placing a hold on adjudication of certain asylum applications.[6] ECF 472.

Originally scheduled for one day, the evidentiary hearing ultimately extended over three days, in part due to the inability of certain witnesses to offer adequate testimony on the topics for which Defendants offered them, and the consequent need to call additional witnesses. After the hearing, Class Counsel filed a supplemental brief in light of the newly developed record, to which Defendants responded. On June 22, 2026, this Court held another motions hearing to address issues first raised by the parties in their supplemental briefing.

---

[6] USCIS Policy Memorandum PM-602-0192, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries* (Dec. 2, 2025) (the "USCIS Hold Memo"). On June 5, 2026, the United States District Court for the District of Rhode Island vacated and set aside the USCIS Hold Memo, concluding it violated the APA. *See Dorcas Int'l Inst. of Rhode Island v. USCIS*, -- F. Supp. 3d –, No. 26-cv-00132-JJM-PAS, 2026 WL 1622708 (D.R.I. June 5, 2026). While the government has appealed the decision, they have represented that, in compliance with that court's order, "that policy is not being implemented." ECF 626 (June 22, 2026 Hr'g Tr.) at 47–48; *see also* ECF 634 at 4 ("[T]he adjudications pause has been vacated by the U.S. District Court for the District of Rhode Island and is no longer being applied by USCIS."), 8 ("Defendants are not currently applying the December 2, 2025 adjudications hold.").

### B. Defendants' asserted attempts at compliance with Section III.I

Defendants represent that "USCIS is the agency responsible for identifying *J.O.P.* class members," and that it has done so in the form of reports sent to ICE (on a monthly basis from October 2024 through November 2025, when the agencies agreed that reports would be provided to ICE on a biweekly basis). ECF 459-4 at 3; ECF 462 at 13, 14, ECF 513 (Mar. 19, 2026 Hr'g Tr.) at 63:2–7 (Officer Sicard testifying that "the lists contain Class Members and potential Class Members. We are sending these lists to ICE so that they can mark in their system that the person should not be removed because they're a member of this class."). These reports contain lists of "potential class members" based on the following criteria: (1) the individual is a UAC in removal proceedings, as indicated by a "special group code"[7] added during a review that occurs at intake; (2) the individual is the principal applicant; (3) the individual filed an asylum application on or before February 24, 2025; and (4) that application remains pending with USCIS. ECF 459-4 (Nov. 28, 2025 email from Defendants to Class Counsel) at 3; ECF 459-2 at 9–10. USCIS's first list, sent in October, 2024, contained nearly 74,000 individuals. *See* 459-2 at 28 (citing M&C at 00:20:13–00:20:23).; ECF 514 (Mar. 20, 2026 Hr'g Tr.) at 84–86 (Testimony of Officer Orendach).

In preparing its lists, USCIS did not confirm Class membership because it took no steps to ascertain whether the applicants had a parent or legal guardian available at the time of their applications. *See* ECF 459-4 at 3 ("[W]ithout an interview, USCIS is unable to determine if there was a parent or legal guardian available."); ECF 513 (Mar. 19, 2026 Hr'g Tr.) at 48 (Testimony of Officer Sicard) (Defendants' counsel: "Does CIS, before that interview happens, have any current

---

[7] This code was either "PRL" or "PRP-PRL." *See* ECF 459-2 at 9 n.4 (citing M&C Tr. at 0:18:25–0:18:37); ECF 513 (Mar. 19, 2026 Hr'g Tr.) at 70–72 (Testimony of Officer Sicard).

process to determine if an individual has a parent or legal guardian available?" Sicard: "No.").[8]

USCIS's lists are, therefore, likely overinclusive. However, Class Counsel contend that USCIS's lists "are also underinclusive, in that they exclude Class Members whose removal proceedings had not been initiated when they applied for asylum, as well as those whose applications USCIS erroneously rejected for lack of jurisdiction." ECF 459-2 at 10 (citing ECF 459-7 (Class Counsel's Dec. 10, 2025 email to Defendants) at 4 (noting that "[m]any *J.O.P.* Class Members are not in removal proceedings at the time they file the I-589 and thus would not have had th[e] [special group code] assigned at intake.")), 19 (citing M&C at 00:21:14–00:22:33). Class Counsel have speculated that USCIS's lists have failed to account for "likely thousands" of individuals in the former category and "likely . . . hundreds" of individuals in the latter category. ECF 558 at 8–9; *see also* ECF 459-2 at 13 & 13 n.8.

Upon receipt of the USCIS lists, for each individual named, ICE adds to its "ENFORCE Alien Removal Module" ("EARM") a "banner" with a "stay of removal alert" and a "case comment" with "multiple email contacts that ICE officers can use to get more information and clarification." ECF 459-4 at 3–4. "Defendants admit that when ICE plans to remove individuals, 'further checks beyond the information provided by USCIS [are] not done as a matter of course." ECF 459-2 at 19 (quoting M&C at 01:40:16–01:40:25).

If ICE officers have questions regarding potential Class membership, the banner directs them to contact the ICE Office of the Principal Legal Advisor ("ICE OPLA"). ECF 459-4 at 4; ECF 459-2 at 10. Either alternatively or in addition, ICE officers are "supposed to reach out to

---

[8] Elsewhere, Defendants state that the USCIS lists identify "potential" Class Members because "confirming each class member individually would 'require automated and potentially manual confirmation processes' presenting a 'substantial and burdensome workload.'" ECF 462 at 14 (quoting ECF 438-2 at ¶ 23).

their local asylum office UAC" points of contact to assist with a determination of Class membership. ECF 459-4 at 4. "ICE officers who wish to remove an alien with an alert within EARM are instructed to contact USCIS as soon as possible to confirm class membership. They can also request USCIS to expedite any outstanding adjudication process." ECF 459-4 at 4. Only if USCIS determines the individual is not a Class Member or adjudicates the individual's asylum application without granting asylum may ICE remove the banner and remove the individual; until that point, no removal can take place. ECF 459-4 at 4.

While maintaining that the above process is all that is required of Defendants to comply with Section III.I, Defendants have admitted that the process is not free from coding errors which may result in an individual being incorrectly included in or excluded from USCIS's lists. *See* ECF 459-2 at 19 (citing M&C 00:18:25–00:19:01); ECF 513 (Mar. 19, 2026 Hr'g Tr.) at 52 (Testimony of Officer Sicard) ("[T]he intake is done by people who make mistakes, so sometimes we realize that the PRL code was not applied at intake, and we can apply it later."). Class Counsel further allege that Defendants' identification process is deficient due to delays in USCIS's addition of potential Class Members to its lists,[9] delays in USCIS's transmission of those lists to ICE, and delays or errors in ICE's placement of banners in its system for individuals on those lists.[10] *See* ECF 559-1 (sealed) at 9–10, 12, 13; ECF 459-2 at 13–14. Finally, Class Counsel assert that even where ICE has made entries in its systems for individuals USCIS has identified as potential Class Members, those entries have been insufficient to ensure a stay of removal.

---

[9] Class Counsel cite the case of Class Member O.O.O., who apparently filed an asylum application with USCIS in February, 2025 and was not added to a Class list until December, 2025, two months after ICE removed him pursuant to an election of voluntary departure. *See* ECF 559-1 at 10, 22; ECF 559-2 (Declaration of Wendy Wylegala) ("Wylegala Decl.") ¶ 9.

[10] Class Counsel cite the case of R.L.T., a potential Class Member removed in June, 2025 who, despite having been on USCIS's October, 2024 list, never had a banner added to his EARM file (though a case comment was entered in his file in December, 2024).

### C. Removals of Class Members

The original briefing of this motion to enforce concerned the removals of ten potential Class Members that Defendants had self-reported to Class Counsel. ECF 459 at 2; ECF 459-2 at 7; ECF 462 at 6. Defendants' self-reports, as described by the parties, were as follows:

- In April, 2025, Defendants reported to Class Counsel the removal of B.A.G., whom Class Counsel later confirmed to be a Class Member. ECF 459-2 at 7–8; ECF 428-3 ¶ 5; ECF 462 at 7.

- In July, 2025, Defendants reported to Class Counsel the removal of a potential Class Member. *See* ECF 459-2 at 7 n.1; ECF 428-3 at 2 n.1. Class Counsel subsequently determined, and notified Defendants, that this individual was not a Class Member. *Id*.

- On September 29, 2025, Defendants reported to Class Counsel the removal, in May and June of 2025, of six additional potential Class Members. ECF 459-2 at 8; ECF 428-3 ¶ 6 & n.1; ECF 462 at 7. Class Counsel subsequently determined, and notified Defendants, that one of these six individuals was not a Class Member. *Id.*

- On November 10, 2025, Defendants reported to Class Counsel the removal of two additional potential Class Members. ECF 459-2 at 17; ECF 462 at 7.

Defendants have stated that they became aware of these removals only during the adjudication of these individuals' asylum applications. *See* ECF 459-2 at 14 (citing M&C at 00:42:00–00:45:20); ECF 513 (Mar. 19, 2026 Hr'g Tr.) at 54 (Testimony of Officer Sicard) (Defendants' counsel: "How did those removals come to your attention?" Sicard: "So our asylum offices – I think for all of them, our asylum offices discovered them. Like they were looking in systems, getting ready to interview the person and could see in EARM that the person had been removed. So they knew that *J.O.P.* Class Members were not supposed to be removed. They reported it up to my office, and

8

then we reported it up."). As noted above, of these ten individuals whose removals were self-reported by Defendants, Class Counsel subsequently confirmed that two individuals were *not* Class Members. ECF 459-2 at 11 n.6; ECF 462 at 6–7. Of the remaining eight individuals—R.L.T., E.P.P., W.M.C., F.D.E., M.M.V., L.O.B., W.U.P., and B.A.G.—along with E.M.P., Class Counsel assert the following:

- Seven individuals (E.M.P., R.L.T., W.M.C., E.P.P., B.A.G., M.M.V., and L.O.B.) are Class Members, one (F.D.E.) is a potential Class Member, and one (W.U.P.) is not a Class Member. ECF 558 at 12–16 (citing ECF 535-23 (Declaration of Rebecca Scholtz) (sealed)).

- Six individuals (E.M.P., R.L.T., W.M.C., E.P.P., B.A.G., M.M.V.) appeared on both USCIS's October 28, 2024 and its March 9, 2026 lists of potential Class Members. *Id.* (citing ECF 514 (Mar. 20, 2026 Hr'g Tr.) at 87–88, 96–98).

- Seven of the individuals had *J.O.P.* banners (in some instances with case comments as well) added to their EARM files (E.M.P. (on December 2, 2024 and January 26, 2026), W.M.C. (November 26, 2024), E.P.P. (December 1, 2024), B.A.G. (December 5, 2024), M.M.V. (November 25, 2024), L.O.B. (October 8, 2025), and W.U.P. (April 7, 2025)[11]), *see* ECF 497-1 (Declaration of ICE Program Manager Lewis) ("Lewis Decl.") (sealed), and two other individuals, though no banner was added, had a case comment added to their EARM file (R.L.T. (on December 4, 2024), *see* ECF 514 (Mar. 20, 2026 Hr'g Tr.) at 9–10, 12–15 (testimony of Officer Martinez, who handled the removal of

---

[11] As noted, W.U.P. has been confirmed to *not* be a Class Member, and thus, his removal does not constitute a violation of the Settlement Agreement. However, the circumstances of his case remain relevant as evidence of Defendants' adherence to the cautions contained in the banners and case comments.

R.L.T.), and F.D.E. (on July 1, 2025 and October 10, 2025), *see* ECF 536-13 (sealed) at 4). For all but three of these individuals, the banner and/or case comment in their EARM profile was present at the time the individual was removed (a banner was added to L.O.B.'s EARM file on October 8, 2025, two weeks after he first appeared on a USCIS list (on September 26, 2025) but nearly two months after he had already been removed, *see* ECF 514 (Mar. 20, 2026 Hr'g Tr.) at 92; ECF 517 (Mar. 23, 2026 Hr'g Tr.) at 25; a case comment was first added to F.D.E.'s EARM file on July 1, 2025, weeks after he had already been removed, *see* ECF 514 (Mar. 20, 2026 Hr'g Tr.) at 125; a banner previously added to B.A.G.'s EARM file was removed before his removal (under circumstances described in more detail below)).

At the parties' December 22, 2025 meet-and-confer, the only explanations offered by Defendants for why individuals with banners and/or case comments may have still been removed were (1) that those signifiers were not present in ICE's systems *at the time of removal*, or (2) that they were simply disregarded. *See* ECF 459-2 at 11 (citing M&C at 00:05:43–00:06:10).

During the March, 2026 evidentiary hearing, ICE officers involved in the removals of certain of these individuals described either failures to note the banners and case comments or having proceeded in disregard of them. In the case of R.L.T., Officer Martinez testified that he had not, at the time R.L.T. was removed in June, 2025, seen the case comment in R.L.T.'s file indicating his potential Class membership. ECF 514 (Mar. 20, 2026 Hr'g Tr.) at 9–10, 12–15. Officer Martinez further testified that he had, in email correspondence with USCIS, asked if R.L.T. was cleared for removal, but could not, in reviewing his email history in preparation for his testimony, find any response from USCIS from prior to R.L.T.'s removal. ECF 513 (Mar. 19, 2026 Hr'g Tr.) at 145–46. In the case of W.M.C., Officer Romero testified that he had "missed" the

10

*J.O.P.* banner and comment in W.M.C.'s EARM file when W.M.C. was removed in June, 2025. ECF 517 (Mar. 23, 2026 Hr'g Tr.) at 66 ("I missed it whenever I served him and went to his EARM to get his IJ order"), 78. In the case of E.P.P., Officer Zamir testified that she did not remember whether she had checked E.P.P.'s EARM file for a *J.O.P.* banner before E.P.P. was removed in May, 2025. ECF 514 (Mar. 20, 2026 Hr'g Tr.) at 139–40. In the case of M.M.V., Officer Rey testified that he could not recall whether he or anyone else had checked M.M.V.'s EARM profile for a *J.O.P.* banner or case comment, or contacted OPLA or a USCIS asylum office before M.M.V. was removed in June, 2025. ECF 517 (Mar. 23, 2026 Hr'g Tr.) at 53–54, 57–58. In the case of W.U.P., Officer Stambaugh testified that he "would have seen [the banner] probably before" W.U.P. was scheduled for removal in August, 2025, and "would have spoke [sic] with my supervisor about it." ECF 514 (Mar. 20, 2026 Hr'g Tr.) at 120, 125, 128. He further testified that he "was told that we were good for removal so we had [W.U.P.] scheduled," *Id.* at 121–22, 130; however, Officer Stambaugh's supervisor later testified that he did not recall speaking with Stambaugh about anything related to *J.O.P.* at any point. ECF 517 (Mar. 23, 2026 Hr'g Tr.) at 82–84.

In the case of B.A.G., as noted above, while a *J.O.P.* banner had been added to his EARM file on December 5, 2024, it was not present at the time he was removed on April 9, 2025. It had been removed on April 3, 2025, one day after an immigration judge had issued an order of removal for B.A.G. ECF 497-1 (Lewis Decl.) (sealed); ECF 514 (Mar. 20, 2026 Hr'g Tr.) at 50. Officer Parsons, who handled B.A.G.'s removal, recalled there being a banner and comment in B.A.G.'s EARM file, but testified that he had not contacted the local OPLA office or USCIS asylum office before removing B.A.G. *Id.* at 56. On April 7, 2025, the same immigration judge rescinded the removal order based on their belief that B.A.G. might be a *J.O.P.* Class Member, and ordered that

11

B.A.G. "SHALL NOT BE REMOVED" until the impact of the Settlement Agreement was addressed and a removal order was re-entered; however, the banner apparently was not reapplied. ECF 536-1 (Apr. 7, 2025 IJ order) (sealed). Parsons testified that he received a notification about the rescinded order on the same day on which B.A.G. was removed, April 9, 2025. *Id.* at 50–52.

Testimony at the March, 2026 hearing demonstrated that many ICE officers responsible for handling removals—and stays of removal—were unsure of their obligations pursuant to the *J.O.P.* Settlement Agreement and this Court's orders. One officer did testify that deportation officers had received "training at the academy and periodic[] . . . emails" instructing them to check EARM files for *J.O.P.* banners before removing an individual from the United States (though she also testified that she could not remember performing this check, herself, in the case of E.P.P.) ECF 514 (Mar. 20, 2026) Hr'g Tr.) at 139 (Testimony of Officer Zamir). Others recalled having seen email guidance, but not with regularity. *See* ECF 513 (Mar. 19, 2026 Hr'g Tr.) at 138 (Testimony of Officer Martinez) ("I remember, like, seeing it but I'm not – it was a long time ago when I dealt with docket."). And others stated they could not recall having received any training or guidance (in emails or otherwise) related to the *J.O.P.* litigation or instructing them to check an individual's EARM records for a banner before removing them. *See* ECF 517 (Mar. 23, 2026 Hr'g Tr.) at 48–49, 53–54 (Testimony of Officer Rey), 62, 69 (Testimony of Officer Romero).

While Class Counsel's original motion to enforce was limited to, and the March, 2026 evidentiary hearing was convened to investigate, nine specific removals of potential Class Members, the number of wrongful removals identified has grown considerably during the pendency of the motion. At the March, 2026 hearing, it was revealed that at least 91 removals of

12

confirmed Class Members (49) and potential Class Members (42) had occurred,[12] in actual or potential violation of the Settlement Agreement and this Court's April 23, 2025 Order. ECF 513 (Mar. 19, 2026 Hr'g Tr.) at 90–94; ECF 517 (Mar. 23, 2026 Hr'g Tr.) at 91; ECF 558 at 20–21.[13]

At a motions hearing held on May 19, 2026 regarding Class Counsel's motion to extend, Defendants' counsel represented to this Court that Defendants had re-run a search of their systems for individuals assigned a "Removed UAC" tag and identified 142 such individuals. They stressed that many individuals in that group had only been identified as *potential* Class Members, and further asserted that some subgroup had "voluntarily departed from the United States" (Defendants also suggested that "[t]here may also be individuals who voluntarily withdrew their applications to USCIS."). Thus, they posited that not all of those 142 removals were in violation of Section III.I. ECF 622 (May 19, 2026 Hr'g Tr.) at 36–38. In a subsequent filing, Defendants reported that they had provided Class Counsel with a list of 71 confirmed Class Members and 57 potential Class Members who have been removed; they continued to maintain, however, that certain of these individuals had voluntarily departed, and emphasized that the list was subject to change based on additional information relevant to Class membership, and thus did not constitute "a conclusion of law." ECF 618.

---

[12] Officer Sicard first testified that more than one hundred Class Members had been removed before receiving an adjudication of their asylum applications, *see* ECF 513 (Mar. 19, 2026 Hr'g Tr.) at 90–94. Defendants' counsel subsequently asserted the number was in the low nineties. *See* ECF 517 (Mar. 23, 2026 Hr'g Tr.) at 91.

[13] In their original briefing of Class Counsel's third motion to enforce, Defendants argued that "[a] small handful of errors in execution reflects the immense scale of removal proceedings handled by Defendants," and that "a few human errors or mistakes in marking are not systemic failures but rather isolated events that should be treated as such by the Court." ECF 462 at 9–13. In light of the disclosures at the March 19, 2026 hearing, Defendants withdrew these and other arguments that had been based on the far smaller number of removals originally briefed. ECF 501.

On June 26, 2026, Defendants provided another update on the number of confirmed and potential Class Members removed and, for the first time, provided a specific breakdown of individuals removed pursuant to (1) execution of final removal orders (107 individuals),[14] (2) grants of voluntary departure (66 individuals), and (3) "other" bases (2 individuals). ECF 629-1 at 1–2; ECF 631 at 3–4. Among the 107 individuals identified as having been removed pursuant to a final removal order, 54 are confirmed Class Members and 53 are potential Class Members.

### D. Corrective action taken by Defendants

At the time of the original briefing of Class Counsel's third motion to enforce, Defendants represented that they had "offered a viable remedy for the mistake[n] [removals]—the facilitation of the return of the potential class members." ECF 462 at 12. In the wake of Class Counsel's *first* motion to enforce the Settlement Agreement and this Court's April 23, 2025 Order, Defendants "updated and reissued" guidance, on May 12, 2025, "outlin[ing] that potential *J.O.P.* class members cannot be removed until USCIS confirms either that the individual is not a class member or that an adjudication on the merits of the asylum application has been completed." ECF 459-4 at 4. After self-reporting additional potential wrongful removals in July and September, 2025, Defendants reissued a "duplicate reminder" on October 14, 2025, and increased the frequency of the issuance of USCIS's lists from monthly to biweekly starting in November 2025. *Id.* at 3; ECF 462 at 14.

In late February, 2026, prior to the evidentiary hearing, Defendants undertook a more substantive review of their systems for individuals for whom a "Removed UACs" tag had been placed in those systems, to identify instances of removals of confirmed and potential Class

---

[14] Defendants stated that their "records prepared for this case do not distinguish between orders of removal issued under 8 U.S.C. § 1229a (removal proceedings) and 8 U.S.C. § 1225(c) (expedited removal of inadmissible arriving aliens)." ECF 631 at 3 n.2.

Members. The results of this review were inadvertently revealed at the hearing. *See* ECF 511-1; ECF 549-1; ECF 549-2; ECF 611-1; n.13, *supra*. In response to the revelation that around 100 confirmed and potential Class Members had been removed, this Court ordered that Defendants produce to Class Counsel regular reports with detailed narratives regarding the larger universe of removed actual and potential Class Members that had come to light. *See* ECF 517 (Mar. 23, 2026 Hr'g Tr.) at 101–02. After completing the narrative production ordered by the Court, Defendants have, on multiple occasions, "rerun" a search for individuals with a "Removed UACs" tag in Defendants' systems to identify additional removed potential and actual Class Members for whom the tag had not yet been placed in the USCIS system at the time of previous reports. *See* ECF 612.

Finally, Defendants have represented that on May 28, 2026, email guidance was sent to all ICE ERO personnel describing the extension of the Settlement Agreement ordered by this Court (with this Court's relevant opinion and order attached to the email), and containing "(1) [a] definition of the class; (2) a 'refresher' of the terms of, and ICE's obligations under, the settlement agreement; (3) an explanation and screenshots of how class members are identified in EARM; and (4) . . . points of contact for follow-up questions." ECF 629-1 at 3.

## II.    CLASS COUNSEL'S MOTION TO COMPEL THE RETURN OF CLASS MEMBER E.M.P.

### A. Additional Factual Background

The parties have offered, in their briefing of Class Counsel's motion to compel, additional facts regarding the circumstances of the removal of E.M.P. On January 9, 2026, ICE detained E.M.P., a Class Member originally from Guatemala, in Massachusetts. ECF 544-1 at 6; ECF 544-11 (Declaration of Gal Seger ("Seger Decl.")) ¶¶ 5, 11, 12. He was subsequently transferred to detention centers in two other states. *Id.* (citing Seger Decl. ¶¶ 12, 13). During E.M.P.'s nearly one

month in detention, his immigration counsel attempted to contact him numerous times without success. *Id.* (citing Seger Decl. ¶¶ 12, 13).

On or around January 23, 2026, while E.M.P. was detained, Deportation Officer Olson presented E.M.P. with an ICE Form I-210 regarding "Voluntary Departure and Verification of Departure." ECF 575 (sealed); ECF 639 (Redacted Declaration of Deportation Officer Olson ("Olson Decl.") ¶ 6. Without speaking to the specific circumstances of E.M.P.'s initial request for incentivized voluntary departure (for which an individual receives some amount of money),[15] Olson has stated that, generally, Form I-210 is served on an individual after (1) the individual requests incentivized voluntary departure, and (2) ICE Enforcement and Removal Operations, if the individual is determined eligible for such departure, approves their request. *Id.* ¶¶ 4, 5. In serving the Form I-210 on E.M.P., Olson communicated with him in Spanish and orally translated the Form into Spanish. *Id.* ¶ 6. After she described to E.M.P. the waivers of rights (e.g., "to seek any form of relief from removal," "any further relief in immigration proceedings," and "to appeal any issues") attendant to his voluntary departure, and advised him that "there is no reentry bar for receiving incentivized voluntary departure," E.M.P. reiterated his request for incentivized voluntary departure and executed the Form I-210. *Id.* ¶ 6; ECF 575 (sealed).

E.M.P.'s immigration counsel has declared that "ICE never informed E.M.P. of his rights under the *J.O.P.* Settlement Agreement." Seger Decl. ¶ 16. USCIS had identified E.M.P. as a potential *J.O.P.* Class Member as early as October 28, 2024, and comments and banners regarding his potential *J.O.P.* Class membership were added to his EARM profile in December, 2024 and

---

[15] Olson has stated that multiple spaces at the facilities where E.M.P. was detained have "flyers" displayed explaining, in languages including English and Spanish, the process for requesting incentivized voluntary departure. ECF 639 (Olson Decl.) ¶¶ 10, 11.

16

January, 2026. ECF 544-1 at 7; ECF 544-4 (Excerpt of Mar. 20, 2026 Hr'g Tr.) at 3–4; ECF 545 (EARM record) (sealed) at 3, 5; ECF 497-1 (Lewis Decl.) (sealed) at 1–2.[16]

The competing declarations submitted by Class Counsel and Defendants raise the question of the extent to which E.M.P. understood the nature and consequences of the Form I-210. E.M.P.'s immigration counsel has asserted that E.M.P. has an intellectual disability, one of the consequences of which is that he cannot read or write in any language, and further asserted that, on January 29, 2026, his immigration counsel "learned through a family member of E.M.P." that E.M.P. had notified the ICE officers of his disability and signed a document based on the understanding that it was a habeas petition. ECF 544-1 at 6–7 (citing Seger Decl. ¶¶ 4, 11). Deportation Officer Olson has asserted that she has no recollection of being told, by E.M.P. or otherwise, that he had a disability or was unable to read or write. ECF 639 (Olson Decl.) ¶ 9.[17]

The executed I-210 form reflects that DHS granted voluntary departure on January 23, 2026, and that E.M.P. was required to depart from the United States "under safeguard," on or before March 24, 2026. ECF 575 (sealed); *see also* ECF 545 (EARM record reflecting "Alien Requested/Accepted Incentivized Voluntary Departure" on January 23, 2026) (sealed).

---

[16] ICE Supervisory Detention and Deportation Officer Boyd testified at a March 23, 2026 evidentiary hearing in this case that, when reviewing E.M.P.'s EARM profile prior to his deportation, Boyd had not seen either banners or comments. ECF 544-5 (Excerpt of Mar. 23, 2026 Hr'g Tr.) at 3, 8–10.

[17] At the March 23, 2026 evidentiary hearing, ICE Supervisory Detention and Deportation Officer Boyd acknowledged, contradicting previous testimony that he had "no indication" that E.M.P. was unable to read or write, that June and July, 2018 notations in E.M.P.'s EARM profile referenced that inability. ECF 544-5 (Excerpt of Mar. 23, 2026 Hr'g Tr.) at 5–7. The EARM record attached as Exhibit G to Class Counsel's motion reflects, in June 29 and July 3, 2018 narratives, that E.M.P. "stated he does not know how to read or write so his fingerprint was taken instead of his signature." ECF 545 (sealed) at 6. Officer Boyd testified that these records would have been available to the ICE officers who presented E.M.P. with the Form I-210. ECF 544-5 at 7.

On February 3, 2026, E.M.P.'s immigration counsel spoke with an ICE officer, informing the officer of E.M.P.'s disability and expressing her concerns that E.M.P. may have signed a "stipulation." ECF 544-1 at 7 (citing Seger Decl. ¶ 13). The ICE officer noted no stipulation in E.M.P.'s file but noted a Notice to Appear ("NTA"), which he suggested must have been the document E.M.P. signed, and which he stated would be filed in immigration court to commence removal proceedings against E.M.P. Seger Decl. ¶ 13. On February 4, 2026, ICE transported E.M.P. to Guatemala on a plane that departed from Harlingen, Texas. ECF 544-1 at 7 (citing Seger Decl. ¶ 14); ECF 575 (sealed). Upon learning of E.M.P.'s deportation, his immigration counsel spoke to another ICE officer and was told that E.M.P. had accepted voluntary departure on January 23rd. ECF 544-1 at 7 (citing Seger Decl. ¶ 14).

"Upon his removal, E.M.P. immediately indicated his intent to return to the United States and he has remained unwavering in that intent." Seger Dec. ¶ 15; ECF 544-1 at 7. He is currently in Guatemala "and is terrified to leave the house." *Id.* Since E.M.P.'s deportation to Guatemala on February 4, 2026, Class Counsel made multiple requests to Defendants for Defendants to return E.M.P. to the United States. *See* ECF 544-7 at 6–13 (reflecting February 5, February 25, February 26, March 6, March 17, and April 6, 2026 requests). Defendants, in response, demurred, asserting a lack of clarity as to E.M.P.'s Class membership and whether he had affirmatively requested return. *Id.* at 8–9, 11. On April 6, 2026, Defendants provided their formal written response under Section V.D of the Settlement Agreement,[18] asserting that the Settlement Agreement does not

---

[18] Section V.D of the Settlement Agreement prescribes a specific procedure for addressing noncompliance with the Agreement. *See* ECF 199-2 at 14. As part of this process, Defendants are required, after receiving written notice of the alleged noncompliance, to "send a written response to Class Counsel within a reasonable period of time not to exceed 60 days." *Id*. Defendants repeatedly invoked this 60-day period in their interactions with Class Counsel regarding E.M.P. *See, e.g.*, ECF 544-8 at 2. Section V.D further prescribes that the parties hold a meet-and-confer

preclude a Class Member from accepting voluntary departure before their asylum application has been adjudicated, and that available evidence did not establish E.M.P.'s Class membership. *See* ECF 544-7 at 5–6. Defendants have since withdrawn the latter position, conceding E.M.P.'s membership in the Class. ECF 571 at 8.

### B. Discussion

The briefing of Class Counsel's motion to compel the return of E.M.P. raises multiple issues. First, one of interpretation: (a) whether Section III.I's prohibition on execution of a Class Member's final removal order before USCIS's adjudication of the Class Member's pending asylum application also prohibits Defendants' removal of a Class Member to effectuate that Class Member's election for voluntary departure before adjudication,[19] and (b) whether this Court's April 23, 2025 Order that Defendants may not remove Class Members from the United States has the same effect. Second, whether E.M.P.'s election for voluntary departure was, itself, voluntary— that is, whether he knowingly waived his rights *under the Settlement Agreement* when he made that election without access to counsel. This inquiry would necessarily entail a fact-intensive review of the circumstances of the election and grant.

With respect to the second issue, Defendants have raised a challenge to this Court's subject matter jurisdiction, arguing that Section 242 of the Immigration and Naturalization Act (the "INA") (codified at 8 U.S.C. § 1252)—Defendants specifically invoke 8 U.S.C. § 1252(a)(2)(B)(i)—expressly precludes judicial review of any judgments regarding grants of

---

within 90 days of Defendants' receipt of notice of alleged noncompliance to informally resolve the dispute. The parties held a meet-and-confer on April 8, 2026. ECF 544-1 at 11.

[19] Defendants most recently reported that 43 confirmed Class Members and 24 potential Class Members have voluntarily departed, with the majority (about three-quarters) of those departures being granted by immigration judges, and the remainder by DHS. ECF 631 at 3–4.

voluntary departure.[20] Ordinarily, that jurisdictional question would require this Court's first attention. However, this Court views the dispute of contract interpretation as, in itself, a kind of jurisdictional question, and one that precedes the operability of § 1252(a)(2)(B)(i) here. For the INA's bar of judicial review to be implicated, this Court would have to first conclude that the Settlement Agreement, in conferring "exclusive jurisdiction" upon this Court to supervise and enforce Section III.I's prohibition on pre-adjudication removals, contemplated that "voluntary departures" could constitute "final removal orders." Indeed, Defendants appear to have raised their § 1252(a)(2)(B)(i) challenge in this way, as an alternative to their arguments regarding the scope of the Settlement Agreement and Section III.I's prohibition. *See* ECF 571 at 12 ("Even setting aside the fact that the Settlement Agreement must be governed by its text, . . . the grant of E.M.P.'s request for voluntary departure in lieu of removal proceedings is not subject to judicial review."). Thus, this Court will proceed to address the contract interpretation issue.

Setting aside, for the moment, the issue of voluntariness, E.M.P executed an I-210 Form. ECF 575 (sealed). Despite Class Counsel asserting that Defendants have simply "re-cast[] E.M.P.'s removal with their preferred terminology of an 'incentivized voluntary departure,'" ECF 638 at 4, the record reflects that E.M.P. requested and was granted voluntary departure.

Nevertheless, Class Counsel seize on the fact that Defendants in fact removed—in the practical sense—E.M.P. from the United States to Guatemala after approving his request for voluntary departure. *See* ECF 544-9 (sealed) (stating that after E.M.P. was offered and accepted

---

[20] Section 1252(a)(2)(B) provides, "Notwithstanding any other provision of law (statutory or nonstatutory), . . . except as provided in sub paragraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review—(i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c [voluntary departure], or 1255 of this title, or (ii) any other decision or action . . . specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title."

voluntary departure on January 23, 2026, he was, on January 26, 2026, "scheduled for staging to

IWA, pending removal," and, on February 4, 2026, "removed by IAO Charter").[21]  Thus, they

assert a violation of Section III.I meriting this Court exercising its enforcement authority. *See* ECF

544-1 at 15; ECF 592 at 7.[22] Section III.I, however, contains no mention of "voluntary departure";

nor, for that matter, does the entire Settlement Agreement.

Class Counsel correctly note that this is not the first time this Court has been asked to

interpret the scope of the applicability of Section III.I's prohibition. This Court has previously

held, for example, that "[t]he Settlement Agreement does not limit the protection against removal

provided in Section III.I to any specific statutory mechanism for removal," ECF 253 at 9; *See* ECF

544-1 at 15 (quoting ECF 253 at 9), an interpretation subsequently endorsed by Judge Benjamin

of the Fourth Circuit Court of Appeals. *See J.O.P. v. U.S. Dep't of Homeland Sec.*, No. 25-1519,

2025 WL 1431263, at *4 (4th Cir. May 19, 2025) (Benjamin, J., concurring) (inferring from the

---

[21] That Defendants removed E.M.P. to effectuate his voluntary departure is not, in itself, remarkable. Regulations governing grants of voluntary departure by DHS, prior to the initiation of removal proceedings, provide that "[t]he Service may attach to the granting of voluntary departure any conditions it deems necessary to ensure the alien's timely departure from the United States, including the posting of a bond, continued detention pending departure, and removal under safeguards." 8 C.F.R. § 240.25(b). In addition, "8 U.S.C. [Section] 1231(e)(3)(C) permits the government to pay the expenses of removal for 'an alien who has been granted voluntary departure under section 240B [8 U.S.C. [Section] 1229c] and who is financially unable to depart at the alien's own expense." *United States v. Chavez-Garcia*, 2021 WL 6063670, at *5 n.4 (D. Or. Dec. 21, 2021). While acknowledging that both of these provisions expressly use the term "removal," this Court maintains, for the reasons provided *infra*, that the fact of physical removal in the voluntary departure context does not bring voluntary departures within the ambit of Section III.I.

[22] Class Counsel also argue that, in assessing whether Defendants removed E.M.P. akin to a "final removal order" as prohibited by Section III.I, we should consider definitions for the term "remove" recently offered by Defendants in other litigation. ECF 544-1 at 15 (citing *In re Donald J. Trump et al.*, No. 25-5452 (D.C. Cir. Apr. 14, 2026)). But consideration of this material is barred by the Settlement Agreement's prohibition on extrinsic evidence. ECF 199-2 at 15 (Section VIII.D ("Entire Agreement")) ("The Parties . . . intend that this Agreement constitute the complete and exclusive statement of its terms as between the Parties, and that no extrinsic evidence whatsoever may be introduced in any judicial or other proceeding, if any, involving the interpretation of this Agreement.").

Settlement Agreement that "the parties deliberately chose not to limit the types of removals which trigger Section III.I's protections.").

However, these statements came in a particular context. In Class Counsel's first motion to enforce the Settlement Agreement, the question before this Court and the Fourth Circuit was whether Section III.I's prohibition on execution of a "final removal order" also encompassed compulsory removals purportedly executed pursuant to the Alien Enemies Act (the "AEA"). Faced with that question, it was no great leap for this Court, and Judge Benjamin, to conclude that, based on the "character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution," ECF 253 at 9 (quoting *ACAS, LLC v. Charter Oak Fire Ins. Co.*, 626 F. Supp. 3d 866, 874 (D. Md. 2022)); *J.O.P.*, 2025 WL 1431263, at \*5 (quoting *Ocean Petroleum, Co. v. Yanek*, 5 A.3d 683, 691 (Md. 2010)), Cristian's forced removal pursuant to the AEA violated Section III.I. Indeed, this Court stated that "a core purpose of the Settlement Agreement would be nullified if Class Members with pending asylum applications could be *summarily removed* from the United States and thus rendered ineligible for asylum." ECF 253 at 10 (emphasis added).

Voluntary departure is meant to provide an alternative to forcible removal, offering the requesting individual certain benefits, including the possibility of "avoiding extended detention," and some degree of autonomy to depart on their own terms (within a defined period of time). *See Dada v. Mukasey*, 554 U.S. 1, 8, 11 (2008) ("Voluntary departure is a discretionary form of relief that allows certain favored aliens—either before the conclusion of removal proceedings or after being found deportable—to leave the country willingly."). In addition, an individual granted voluntary departure, in certain circumstances, may "avoid substantial penalties associated with a forcible removal." *Monsalvo v. Bondi*, 604 U.S. 712, 715 (2025) (citing *Dada*, 554 U.S. at 11–12).

22

The Supreme Court has described the option of voluntary departure as constituting a kind of "*quid pro quo*" between the Government and the requesting individual:

> From the Government's standpoint, the alien's agreement to leave voluntarily expedites the departure process and avoids the expense of deportation—including procuring necessary documents and detaining the alien pending deportation. The Government also eliminates some of the costs and burdens associated with litigation over the departure. . . . Benefits to the alien from voluntary departure are evident as well. He or she avoids extended detention pending completion of travel arrangements; is allowed to choose when to depart (subject to certain constraints); and can select the country of destination. And, of great importance, by departing voluntarily the alien facilitates the possibility of readmission.

*Dada*, 554 U.S. at 11. The Third Circuit, noting the language in *Dada*, has described the difference between voluntary departures and removals:

> The voluntary departure option seeks to encourage prompt departure of the alien with various privileges accruing to an alien who departs within the specified period[.] . . . An order of removal, in contrast, is not an agreed-upon exchange between the alien and the Government. It does not implicate a choice in view of incentives and penalties like those which are part of the voluntary departure bargain. In short, an order of removal and a grant of voluntary departure are different decrees implicating different equities.

*Sandie v. Att'y Gen.*, 562 F.3d 246, 254–55 (3d Cir. 2009). Thus, a removal order has been referred to as "the 'stick' to voluntary departure's 'carrot.'" *Zazueta-Carrillo v. Ashcroft*, 322 F.3d 1166, 1175 (9th Cir. 2003) (Berzon, J., concurring). Indeed, the Supreme Court has recently referred to the grant of voluntary departure as a "[s]uspen[sion] [of] removal." *Monsalvo*, 604 U.S. at 715. In light of these characterizations, this Court cannot conclude that the execution of "final removal order[s]" prohibited by Section III.I of the Settlement Agreement was meant to include removals pursuant to grants of voluntary departure.

To be sure, the above description is of how the voluntary departure mechanism is *intended* to operate. Class Counsel argue that Defendants' conduct here fell far short of this, such that E.M.P.'s election for voluntary departure was not, itself, truly voluntary. While this Court, based

23

on the record presented, shares Class Counsel's concern, it cannot provide the remedy that Class Counsel seek. It is one thing to ask this Court, *as enforcer of the Settlement Agreement*, to analyze the specific circumstances of a compulsory removal to determine whether the Settlement Agreement has been violated. However, it is beyond the scope of this Court's enforcement authority to analyze the specific circumstances of Defendants' grant of discretionary relief to determine whether those circumstances suggest something *akin* to a compulsory removal.[23]

Furthermore, to extend the meaning of "final removal order" to include the government's facilitation of the removal of an individual who has elected and been granted voluntary departure could have deleterious effects. It could invite a scenario in which Class Members genuinely seeking voluntary departure, but without the means to effect that departure themselves, could not have that departure effectuated by Defendants. Or, Class Members could be effectively barred from obtaining the benefits associated with voluntary departure and would have to wait (in detention) for adjudication of their asylum application even where they preferred an expeditious resolution. This Court cannot conclude that Section III.I dictates such a scenario.

This Court expresses no view on whether E.M.P. may have another avenue to address the alleged shortcomings in Defendants' conduct. This Court holds only that because E.M.P. was removed by Defendants after requesting and being granted voluntary departure, his removal does

---

[23] This Court further declines to find that Defendants' execution of E.M.P.'s voluntary departure rendered them in noncompliance with this Court's April 23, 2025 Order, in which, having rejected Defendants' argument that *removals under the AEA* were excepted from the requirements of the Settlement Agreement, it ordered Defendants "not to remove from the United States members of the certified 'Class,' defined in Section II.E of the Settlement Agreement . . . ." ECF 254 ¶ 1. That Order, too, made no reference to voluntary departures.

not fall within Section III.I's prohibition. Thus, this Court cannot compel Defendants to return E.M.P.[24]

### III.    CLASS COUNSEL'S MOTION TO ENFORCE AND TO FIND DEFENDANTS IN CIVIL CONTEMPT

In the other pending motion, Class Counsel allege that Defendants have committed multiple violations of the Settlement Agreement and this Court's orders. Class Counsel have proposed a suite of actions they say Defendants should take to address the noncompliance. Class Counsel have cited three sources for this Court's authority to order such measures: (1) its authority to enforce the Settlement Agreement pursuant to Section V.A of said Agreement; (2) its "inherent authority to issue a remedy for civil contempt"; and (3) its authority to modify the Settlement Agreement pursuant to Federal Rule of Civil Procedure 60(b). ECF 459-2 at 21–22. To adjudicate Class Counsel's motion, this Court must first assess the nature and scope of Defendants' violations of the Settlement Agreement and this Court's orders, before assessing whether it has authority, on the various bases asserted by Class Counsel, to order the remedies requested.

### A.    Enforcement – The nature and scope of Defendants' alleged violations of the Settlement Agreement and this Court's orders

"[T]he scope of a consent [order] must be discerned within its four corners, and not by reference to what might satisfy [its] purposes." *Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 454, 463 (4th Cir. 2020) (quoting *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971)) (second and third alterations in *Klopp*). *See also Willie M. v. Hunt*, 657 F.2d 55, 60 (4th Cir. 1981) (describing a "cardinal principle[]" for interpreting a consent decree: "[I]ts meaning is properly to

---

[24] Having so concluded, this Court need not address the separate jurisdictional issue raised by Defendants.

be sought within the confines of the judicially approved documents expressing the parties' consent.").[25]

Class Counsel assert that Defendants have violated Section III.I of the court-approved Settlement Agreement in multiple ways. First, by removing identified potential Class Members before adjudicating their asylum applications on the merits, including in instances where alerts were present in ICE's records. Defendants have not disputed that removals of confirmed Class Members violated the Settlement Agreement *and* this Court's April 23, 2025 Order. *See, e.g.*, ECF 462 at 12 (Defendants "acknowledging that removals of class members are noncompliant with the settlement agreement, whether or not USCIS correctly identified the individual."); ECF 583 at 6 ("Defendants admit to some number of violations."); ECF 471 at 79 (Defendants' counsel: "At least for the improper removals, we can say there's been a violation . . . .").[26] Defendants have reported that, as of June 26, 2026, 54 confirmed and 53 potential Class Members have been removed pursuant to a final removal order. ECF 631 at 3–4.

---

[25] This Court has, in a previous opinion, noted that, "[d]espite the parties' agreement being titled as a 'Settlement Agreement,' this Court views it—and the parties have not disputed its operation as—a consent decree since it became an order of the court." ECF 619 at 11–12.

[26] Strangely, Defendants have nevertheless argued that the improper removals do *not* constitute a breach of the Settlement Agreement because the Agreement includes specific language, in Section V.D of the Agreement, addressed to potential noncompliance, demonstrating, in Defendants' view, that the parties "explicitly anticipate[d] that Defendants will encounter issues in execution." ECF 462 at 11. Defendants reiterate this argument in their supplemental brief, asserting that "noncompliant conduct alone does not demonstrate a violation of the Settlement Agreement. Where Defendants have followed the procedure set forth in Section V.D, there is simply no violation of the Settlement Agreement 'on an individual or class-wide basis.'" ECF 583 at 21 (quoting ECF 199-2 at 14 (Section V.D)). Defendants' argument appears to be that because the Agreement discussed what to do in instances of noncompliance, that noncompliance is *not*, in fact, noncompliance. This assertion, to borrow language used by Defendants to characterize Plaintiffs' arguments, is "absurd on its face." ECF 462 at 11 ("For Plaintiffs to assert that conduct by Defendants that the settlement anticipates somehow functions instead to breach the agreement is absurd on its face."). *See* ECF 463 at 8 (Class Counsel rejecting Defendants' argument).

26

Defendants have argued that because Section III.I refers only to a stay of removal for "identified Class Members," that any removals by ICE of individuals identified to them only as *potential* Class Members cannot be considered to have violated Section III.I's prohibition. *See* ECF 568 at 19–21 ("To equate ICE's execution of a removal order against individuals whose class membership is potential, but not confirmed, with a violation of Section III.I, Class Counsel must import some obligation on ICE ERO to affirmatively determine membership during the removal process. No such language occurs in either Section III.I or the settlement agreement more broadly, and the Court should limit consideration of the magnitude of Defendants' noncompliance to those cases in which confirmed Class Members have been removed prior to adjudication of their asylum applications."), 20–21 ("ICE's removal of a potential class member due to the overinclusive nature of USCIS's reporting mechanisms cannot, by definition, be considered a violation of the Court's order unless that individual meets *all* prongs for Class membership. . . . In the absence of confirmation that individuals meet the class definition, there can be no obligation on ICE to stay removal based on the settlement agreement."). It is not immediately clear whether Defendants' argument is (1) that for purposes of evaluating, quantitatively, the extent of Defendants' noncompliance with Section III.I, this Court should limit its consideration to the number of removed individuals who *have been confirmed* to be Class Members, or (2) that, to the extent that any of the removals, *including* those of individuals who were subsequently confirmed to be Class Members, were executed at a time where those individuals had only yet been identified as *potential* Class Members, those removals did not violate Section III.I. To the extent it is the former, even crediting the argument does not change this Court's conclusion regarding a finding of contempt based on the number (more than 50) of reported removals of confirmed Class Members. To the extent it is the *latter*, this Court finds the argument wholly incompatible with what Defendants

have represented as their attempts at compliance with Section III.I. *See* ECF 462 at 13 ("USCIS . . . prepares and sends ICE lists of *potential* class members . . . in order to facilitate compliance with Section III.I of the settlement agreement.") (emphasis added); ECF 513 (Mar. 19, 2026 Hr'g Tr.) at 63:2–7 (Officer Sicard testifying that "the lists contain Class Members *and potential* Class Members. We are sending these lists to ICE so that they can mark in their system that the person should not be removed because they're a member of this class.") (emphasis added). USCIS compiles lists of *potential* Class Members—specifically, individuals who satisfy all prongs of the *J.O.P.* Class definition except for that prong (concerning presence of parent or legal guardian at time of filing application) which can only be confirmed by USCIS asylum officers through asylum interviews—because "[t]hese lists ensure both the broadest protection for the class and a tailored burden to ICE and USCIS in which manual confirmation processes only need to be conducted for those individuals identified for final removal." ECF 462 at 14. To credit an argument that ICE has only violated Section III.I in those instances where it removes an individual who, at the time of removal, has already been confirmed to be a Class Member would render Defendants' asserted attempts at compliance with Section III.I completely pointless, and would severely undermine Defendants' assertion that their compilation of such lists evidences their "good faith" efforts at compliance. Such an interpretation would allow Defendants to, in effect, err on the side of noncompliance.

In addition to violating the prohibition on removal, however, Class Counsel assert Defendants have not satisfied their *affirmative* obligations under Section III.I to *identify* Class Members. Specifically, they assert that Defendants have violated Section III.I through (1) deficiencies (including underinclusive parameters and coding errors) in USCIS's process for identifying Class Members; (2) ICE's reliance on USCIS's potential Class Member lists, alone,

for identification of Class Members, without any effort at independent identification or verification; and (3) deficiencies in ICE's process for making entries (banners and case comments) in its systems indicating stays of removal for identified Class Members—an obligation plainly required by Section III.I. ECF 459-2 at 17.

Defendants argue that the Settlement Agreement "does not provide for or contain a comprehensive list of who the class members are in this case," ECF 462 at 5, 11, nor does it prescribe what they must do for identification of Class Members, and so to find them in violation of the Agreement based on failures in identification would go beyond the terms of the Agreement. *Id.* at 13 ("Defendants did not negotiate or agree to specific mechanisms for broad initial identification or notice to the class members, beyond specified groups such as those with active administrative stays.").

This Court has previously noted, on multiple occasions, the Agreement's lack of a specifically defined list of Class Members or method for identifying Class Members. *See* ECF 255 (April 22, 2025 Hr'g Tr.) at 7:14–15 (this Court stating, at hearing on, *inter alia*, Class Counsel's (First) Emergency Motion to Enforce the Settlement Agreement, "My understanding is that there is no comprehensive list of who the class members are in this case."); ECF 272 (May 6, 2025 Hr'g Tr.) at 10:21–23 (this Court, at hearing on Defendants' Motion to Vacate Section Two of the Court's Order Granting Plaintiff's Motion to Enforce the Settlement Agreement, describing the Settlement Agreement as "unusual . . . in that we don't have a defined list of class members, [or] a defined way of identifying who is and is not a member."). While reserving judgment for the moment as to the extent to which the alleged deficiencies in that methodology may contribute to the wrongful removals, this Court cannot conclude that Defendants' chosen methodology itself violated the Settlement Agreement.

Class Counsel's primary critique of Defendants' process is what they characterize as a failure by ICE, "the Defendant responsible for not removing Class Members," to itself identify Class Members among those it is preparing to remove before executing final removal orders. ECF 459-2 at 12, 18. Class Counsel derive this obligation from Section III.I's requirement that ICE make an entry in its systems "for all identified Class Members, *including* Class Members identified by USCIS." ECF 199-2 at 9 (emphasis added).[27]

To the extent Class Counsel argue that this language shows that identification of potential class membership by USCIS was not intended to be the exclusive method of such identification upon which ICE may rely, *see* ECF 459-2 at 18, this Court agrees. While the fact that Section III.I only expressly cites identification by USCIS suggests an acknowledgment that USCIS's determinations are one appropriate basis of identification for ICE to rely on, there is nothing in Section III.I to suggest that ICE may treat USCIS's lists as definitive and all-encompassing if Class Members are otherwise identified to it.

However, as noted above, Section III.I does not "mandate[] that Defendants identify Class Members." ECF 459-2 at 6. Rather, as previously noted by this Court, it appears "the agreement

---

[27] Defendants, in their response to Class Counsel's supplemental brief, argue that because Section III.I begins, in setting out the bar on removal, by saying, "With respect to any Class Member with a final removal order," Section III.I's additional requirement that ICE make an entry in its systems indicating a stay of removal for "all identified Class Members," also applies only to individuals whom ICE or USCIS have identified as Class Members *with a final removal order*. *See* ECF 583 at 17–20 ("The key limit that runs throughout Section III.I is its explicit application *only* to Class Members 'with a final removal order.'"). They argue that the "most obvious" connotation of the word "identified" is to "th[ose] opening words to all of Section III.I" *Id.* at 19. This Court is not convinced of Defendants' narrow reading. With no language expressly tying "identified" back to the opening clause (e.g., "all *such* identified Class Members"), it is far from obvious that ICE's obligation is so limited. While Section III.I, as noted, does not prescribe the methodology or parameters for identification, by the plain meaning of the provision ICE must make entries in its systems for all individuals identified as Class Members, regardless of whether they have a "final removal order" at the time they are identified. And, in practice, ICE must make these entries for individuals identified to it by USCIS as *potential* Class Members.

was drafted with some degree of . . . trust that the Government would be acting in good faith and would maintain this list itself and would take appropriate actions with respect to these people." ECF 272 (May 6, 2026 Hr'g Tr.) at 10:23–11:1. Accordingly, that Section III.I requires ICE to make entries in its systems "for all identified Class Members, irrespective of how they are identified," ECF 459-2 at 18, does not necessarily translate to a mandate that *ICE*, specifically, independently identify potential Class Members among individuals it is preparing for removal.

Class Counsel argue that the language regarding identification of Class Members must be read in context. Specifically, they suggest that it would "def[y] both common sense and the Agreement's context, character, and purpose" for Section III.I's categorical bar on execution of Class Members' final removal orders before USCIS issues a Final Determination on that individual's asylum application to be triggered "only if it happens to come to [ICE's] attention that an individual is a Class Member." ECF 463 at 10–11. However, Section III.I's second sentence— in which the language regarding identification of Class Members appears—can be read as providing detail to clarify what action, at minimum, ICE must take in service of the categorical bar. *See* ECF 199-2 at 8–9 (Section III.I) ("*In order to comply with this provision*, ICE Enforcement and Removal Operations (ERO), the agency responsible for executing removal orders, will . . . .") (emphasis added). The only conduct specifically prescribed to ICE is to make entries in its systems for "identified Class Members" and to honor those alerts—and the corresponding prohibition of execution of final removal orders—until USCIS indicates it is appropriate for ICE to do otherwise. Based on the above, this Court declines to find a requirement in Section III.I that ICE undertake its own independent identification of potential Class Members before removal. Thus, ICE's failure to do so is not a violation of the Settlement Agreement.

31

As for deficiencies in ICE's process for entering stays of removal for *identified* Class Members, this Court notes that nothing in the Settlement Agreement speaks to the pace of the entry. To the extent Class Counsel argue that delays between ICE's receipt of USCIS's lists and ICE's entry of banners or comments into its systems constitute distinct violations of the Settlement Agreement, this Court disagrees (though it again reserves judgment for later in this opinion as to whether an order addressing the pace of entry may be appropriate to prevent future noncompliance). Thus, the only violations which this Court is prepared to address through exercise of its enforcement authority are the wrongful removals.

### B. Contempt – Whether Defendants' removal of Class Members in violation of this Court's orders amounts to civil contempt

Class Counsel seek a finding of civil contempt based on Defendants' alleged violations of this Court's orders. *See* 459-1 at 2–3.[28] For a finding of civil contempt, a court must find that (1) a valid decree exists of which the alleged contemnor had actual or constructive knowledge; (2) the decree was in "favor" of the party moving for contempt; (3) the alleged contemnor by its conduct violated the terms of the decree, and had at least constructive knowledge of such violations; and (4) the movant suffered harm as a result. *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir.

---

[28] "Civil contempt sanctions," were this Court to order them, "require nothing more than notice and an opportunity to be heard." *Warn v. Sears*, No. 23-2466-BAH, 2026 WL 915214, at *4 (D. Md. Apr. 3, 2026) (internal quotation marks omitted). The requisite notice is often provided through a court's issuance of a "show cause" order to the alleged contemnor. While this Court did not specifically issue a "show cause" order regarding Class Counsel's motion for civil contempt, the procedural requirements for a civil contempt action were amply satisfied here, as Defendants were given notice of the contempt charge through Class Counsel's motion, and were provided many opportunities to be heard (through extensive briefing and at multiple motions and evidentiary hearings). *See Ledo Pizza Sys., Inc. v. Singh*, No. WDQ-13-2365, 2014 WL 1347113, at *2 (D. Md. Apr. 3, 2014) (finding that alleged contemnor had adequate notice and opportunity to be heard for imposition of civil contempt sanctions where, "[a]lthough the record does not show that Singh was served with a copy of the show cause order, he was properly served by mail with a copy of Ledo's motion, which gave him notice of Ledo's request for sanctions and an opportunity to respond to the motion.").

2000). These elements "must be shown by clear and convincing evidence." *Id.* "Once the [movant] establishes that the [alleged contemnor] violated the [decree], the burden shifts to the [alleged contemnor] . . . to demonstrate that she made in good faith all reasonable efforts to comply with the [decree]." *De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 529 (4th Cir. 2022) (quoting *United States v. Ali*, 874 F.3d 825, 831 (4th Cir. 2017)) (alterations in *De Simone*).

This Court's order approving the Settlement Agreement, ECF 205, and its April 23, 2025 Order prohibiting the removal of Class Members, ECF 254, were valid decrees, in favor of Plaintiffs, of which Defendants had actual knowledge. Defendants have conceded that removals of Class Members—with the exception of those pursuant to a Class Member's election of voluntary departure—violated the prohibition on removal.[29] While Defendants originally asserted that they "did not have knowledge of the potential violations before or during the removals," ECF 462 at 16–17, they have since withdrawn that argument. *See* ECF 583 at 33 n.17. And Class Members, "hav[ing] been sent back to countries from which they are seeking asylum and hav[ing] been denied their rights under the Settlement Agreement," ECF 459-2 at 20, have been harmed. *See Nutramax Labs, Inc. v. Manna Pro Prods., LLC*, No. 0:16-cv-01255-JMC, 2016 WL 11604340, at *8 (D.S.C. Dec. 1, 2016) ("[W]hen a motion for civil contempt is based on the violation of a consent decree, the contractual nature of consent decree itself gives rise to the necessary harm because it is presumed that the terms of the consent decree embody a contractual right procured by the movant in exchange for a right which it relinquished."). With Defendants

---

[29] *See, e.g.*, ECF 583 at 6 ("Given the wording of [the April 23, 2025] order, Defendants admit to some number of violations.") & n.2 (citing ECF 471 (Feb. 18, 2026 Hr'g Tr.) at 79 (Defendants' counsel stating, "Moving to the contempt for a moment, . . . [a]t least for the improper removals, we can say there's been a violation . . . .")). Having conceded these violations, Defendants' caution that the "severe remedy" of civil contempt "should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct," ECF 583 at 10 (quoting *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (cleaned up by Defendants), loses its potency.

33

having effectively conceded these points,[30] this Court agrees that Defendants acted in civil contempt of this Court's orders. It is important, however, for this Court to clearly define what it views as the contumacy.

In *Klopp*, the Fourth Circuit provided the following summary of a district court's authority to find a party in contempt, specifically with the terms of a consent decree:

> District courts possess broad contempt authority to ensure that litigants respect and adhere to court orders. But broad authority is not unlimited authority. When a court enters a consent order, its power is constrained by the objective terms of that order. So the court may not find a party in contempt of that order unless its terms are violated.

957 F.3d at 467. With the Settlement Agreement containing no express requirements as to the methods and/or parameters for identifying Class Members, nor any independent obligation of ICE to identify Class Members in the first instance, this Court declines to find that removals of Class Members executed as a result of alleged deficiencies in identification methods and/or parameters, despite constituting violations, amount to contempt. However, where an individual has been identified to ICE as a potential Class Member, Defendants are obligated not to remove that individual until the individual is confirmed not to be a Class Member. Any removals of individuals executed in ignorance or disregard of identification of their potential Class membership were and are in contempt of that order.

Defendants, despite having conceded the four *Ashcroft* prongs for civil contempt, nevertheless argue that a finding of civil contempt is not warranted because "[f]or the noncompliant removals that did take place, Defendants can establish that they acted in 'good faith'

---

[30] *See* ECF 626 (June 22, 2026 Hr'g Tr.) at 67 ("I do not believe at this point we are necessarily disputing the four provisions [of contempt]. . . . [W]e believe that the defendants have made significant efforts here to comply with the Court's orders, continue to act in good faith to disclose any violations that come up through reporting, so I think those are what we're relying on, not necessarily the actual aspects of contempt.")

and with 'substantial compliance' because 'all *reasonable* steps have been taken to ensure compliance.'" ECF 583 at 6 (quoting *United States v. Darwin Constr. Co.*, 873 F.2d 750, 755 (4th Cir. 1989) (emphasis added by Defendants)).[31]

Defendants assert that "[a] finding of *either* good faith *or* substantial compliance is sufficient to deflect any finding of civil contempt." ECF 583 at 22 (emphasis added). But "[c]ourts within the Fourth Circuit have disagreed whether good faith is a stand-alone defense to civil contempt," distinct from that of "substantial compliance." *Schwartz v. Rent-A-Wreck of Am.*, 261 F. Supp. 3d 607, 616 (D. Md. 2017). *See also id.* at 616 n.8 (comparing *Consol. Coal Co. v. Local 1702, United Mineworkers of Am.*, 683 F.2d 827, 832 (4th Cir. 1982) (recognizing that a good faith attempt at compliance with a court's order, even if ineffective, can be a defense to civil contempt, and that "[s]ubstantial compliance or the inability to comply, likewise, can constitute such a defense.") *with McLean v. Cent. States, Se. & Sw. Areas Pension Fund*, 762 F.2d 1204, 1210 (4th Cir. 1985) ("[G]ood faith alone does not immunize a party from a civil contempt sanction.")); *Mountain Valley Pipeline, LLC v. Easements*, No. 7:17-cv-00492, 2018 WL 2088762, at *7 n.10 (W.D. Va. May 4, 2018) (recognizing *McLean*'s apparent rejection of *Consolidated Coal Co.* but acknowledging, "Nonetheless, several lower courts and even the Fourth Circuit itself have continued to rely on a 'good faith' defense, without mentioning *McLean*."); *Estes v. Clarke*, No. 7:15-cv-00155, 2022 WL 2383956, at *5 (W.D. Va. July 1, 2022) (citing same cases and stating,

---

[31] Defendants, citing *In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995), have also argued that they can only be held in contempt of "unequivocal command[s]" of the Court. *See* ECF 583 at 13–15, 19–20. However, they have since clarified that they were only making the argument with respect to Class Counsel's efforts to seek civil contempt for "failure to identify Class Members or failure to create a list" and other "alleged systemic violations," and not with respect to the prohibition on removals. ECF 626 (June 22, 2026 Hr'g Tr.) at 68. With this Court having concluded that those alleged failures do not constitute violations of the Settlement Agreement or this Court's orders, this Court need not engage with the argument.

"[T]here remains some uncertainty as to whether good faith can serve as a defense to civil contempt, at least in the Fourth Circuit," before recognizing that in *De Simone*, the Fourth Circuit appeared to combine the two into one standard for defense). Here, this Court will apply the standard recently articulated by the Fourth Circuit in *De Simone*: Defendants must demonstrate that they "made in good faith all reasonable efforts to comply." 36 F.4th at 529.

The actions offered by Defendants as evidence of their "good faith" and "substantial compliance" are insufficient to satisfy their burden; indeed, many are irrelevant to the issue of their compliance with this Court's prohibition on removals. Defendants first asserted that their "self-reports [of removed potential Class Members] are good-faith efforts . . . to appropriately disclose potential non-compliance . . . to facilitate dispute resolution proceedings" and that the motion for civil contempt "is unfounded in the face of Defendants' good faith efforts to report potential violations and cure those violations by facilitating the return of any removed class members." ECF 462 at 4, 17. However, this Court agrees with Class Counsel that "a post-violation demonstration of good faith does not undo the violation," ECF 463 at 14. Put another way, it cannot credit purported "good faith" attempts at remedying admitted non-compliance as somehow constituting a "good faith" attempt at compliance in the first place.[32] *See, e.g.*, *Birks v. Small Cmty. Specialists, L.L.C.*, No. 23-837-BAH, 2025 WL 2962719, at *5 (D. Md. Oct. 20, 2025) (rejecting defense of substantial compliance where, "[c]ertainly, Defendants took many reasonable steps *after* learning

---

[32] Moreover, Defendants' "good faith" efforts to self-report removals of potential and confirmed Class Members appear to have waned by February and March, 2026, when Defendants had become aware of a slew of additional potential wrongful removals. Ostensibly due to agency counsel's "significant responsibilities" related to the *J.O.P.* litigation and concerns about whether the discovered information "was sufficiently accurate to report," ECF 611-1, they failed to promptly notify Class Counsel (or their own counsel, for that matter) That information was first revealed as part of sworn testimony given at the evidentiary hearing convened by this Court. *See* ECF 513 (Mar. 19, 2026 Hr'g Tr.) at 90–94; ECF 517 (Mar. 23, 2026 Hr'g Tr.) at 91.

of the lapses to ensure compliance with the Settlement Order[,] [b]ut Defendants fail to explain the extent of the measures taken to comply with the Settlement Order after it was entered but prior to Plaintiffs' email informing them of the lapses.").

In their supplemental brief, Defendants have asserted that their "good faith" and "substantial compliance" is demonstrated by the number of "decisions" reached by USCIS on Class Members' asylum applications since the approval of the Settlement Agreement in November, 2024, and USCIS's intention to "continue to process all *former* Class Members' applications in accordance with its existing policy," "exercis[ing] initial jurisdiction over their asylum applications and adjudicat[ing] them on the merits in the same way it adjudicates asylum applications for all asylum applicants with prior UACs determinations." ECF 583 at 22–23.

However, these actions do not pertain to compliance with the orders the violations of which are the basis for Class Counsel's motion. The "day-in, day-out work that USCIS has put into diligently deciding many asylum applications," ECF 583 at 25, pertains more to compliance with Section III.B of the Settlement Agreement, and the assurance of continued adherence to existing USCIS policy, as noted by Defendants themselves, would be "pursuant to Sections III.A and IV.K" of the Settlement Agreement." ECF 583 at 23. These actions will not defeat a finding of contempt.

Finally, Defendants argue that "[g]iven the sheer number of potential class members, actual Class Members, and adjudications involved, for purposes of civil contempt, one 'cannot expect perfection.'" ECF 583 at 24–25 (quoting *Estes*, 2022 WL 2383956, at *7). Setting aside the fact that, in arguing that Defendants violated the prohibitions on removal for only a small percentage of the Class, Defendants appear to be resurrecting an argument they previously stated they were withdrawing from their briefing of the motion to enforce,[33] Defendants appear to misconstrue the

---

[33] *See* n.13, *supra*; ECF 501.

standard for "substantial compliance." The standard does not simply connote some particular acceptable rate of successful compliance that may be considered "substantial." As Class Counsel have noted, "a single violation of an order is sufficient to support a finding of contempt." *Klopp*, 957 F.3d at 459 (cleaned up) (quoting *Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC*, 887 F.3d 610, 618 (4th Cir. 2018)).

Rather, as has been articulated by the Fourth Circuit and this District on numerous occasions, "[t]o benefit from the substantial compliance defense, the violating party must show that it took all reasonable steps to ensure compliance." *Schwartz*, 261 F. Supp. 3d at 615; *De Simone*, 36 F.4th at 530; *Birks*, 2025 WL 2962719, at *4 ("The Fourth Circuit has . . . emphasized that it is not enough to take some reasonable steps to ensure compliance—Defendants must take '*all* reasonable steps.'") (quoting *De Simone*). *See also Coleman v. Newsom*, 131 F.4th 948, 956 (9th Cir. 2025) ("[T]he substantial compliance defense excuses an alleged contemnor who, despite not achieving total compliance, has achieved near-total compliance *through the exhaustion of all reasonable efforts*.") (emphasis added); *Bunzl Distrib. Ne., LLC v. Boren*, No. 07-3706(GEB)(JJH), 2008 WL 43995, at *2 (D.N.J. Jan. 2, 2008) (rejecting defendant's argument that, despite conceded violations of injunction through profits from sales to prohibited customers, he was in substantial compliance based on comparison of the violations (approximately $5,000 of profits) to his total sale volume ($9 million): "Substantial compliance is not measured by a ratio of sales to profits, but is determined by whether the party took all reasonable steps to comply with the order.") (internal quotation marks omitted).

Defendants rely on *Estes* to argue that where a government entity is responsible for "processing an extremely high number of instances," "mistakes would be inevitable," and are insufficient to justify civil contempt. ECF 583 at 25. But *Estes* stands simply for the proposition

38

already articulated above. In recognizing that contempt may not be warranted where an entity, even having made all reasonable efforts to comply, falls short of perfect compliance, it in no way suggested that such circumstances excused defendants from making all reasonable efforts in the first place. 2022 WL 2383956, at *7.

*Estes* is distinguishable in another important respect. In *Estes*, an inmate plaintiff filed multiple motions for contempt stemming from alleged violations of court orders, including orders requiring the Virginia Department of Corrections ("VDOC") to provide him with meals bearing specific kosher certifications. One order had excluded a certification of a particular kosher facility from its list of "acceptable" certifications for preparation of entrees, but a subsequent order had allowed VDOC to provide discrete items packaged under the supervision of a rabbi from that facility. Later, VDOC built its own kosher kitchen, and began providing prepackaged meals under the supervision of a rabbi from the same facility; in doing so, they argued that they were providing one of the forms of relief the plaintiff originally sought in the previous litigation: meals cooked and prepared by VDOC and certified as kosher by an orthodox rabbi. *Id.* at *1–2. The plaintiff, however, argued that this process violated the original consent order. While the court agreed that VDOC's actions were "technically a violation of the 2018 consent order," it noted—after concluding that the plaintiff had suffered no harm from the violation—that "because the entire purpose of the orders was to ensure that Estes received kosher meals, which Estes [was] being provided[,] [i]t was certainly reasonable of VDOC to conclude, therefore, that its actions complied with the Consent Orders and that any violation was a mere technicality." *Id.* at *6. By contrast, here, Defendants' violations of this Court's orders prohibiting removal are no "mere technicality." By removing, by Defendants' count, more than fifty confirmed Class Members—sometimes in disregard of notifications in their EARM profiles—pursuant to a final order of removal before

39

adjudicating their asylum applications, Defendants have squarely and substantively violated the prohibition (and deprived Class Members of a core benefit of the Settlement Agreement).

This Court does not discount that Defendants have taken some good faith steps to ensure compliance. Despite there being nothing in the Settlement Agreement or this Court's orders specifically prescribing it, Defendants have created a list of potential Class Members which ICE relies on for purposes of entering notifications in those individuals' EARM profiles to indicate their potential eligibility for a stay of removal. Those notifications, themselves, offer guidance on which entities within the Defendant agencies to contact for clarification of an individual's eligibility for the stay. However, these processes have proven inadequate to prevent noncompliance, and after becoming aware of this inadequacy, Defendants have not taken *all* reasonable steps to prevent future noncompliance.

After they became aware of and self-reported the removals that became the subject of Class Counsel's second motion to enforce, Defendants responded to the violations and Class Counsel's concerns by (1) issuing, in October, 2025, a "duplicate reminder" of guidance issued in May, 2025, and (2) beginning in November, 2025, increasing the frequency of USCIS's provision of lists to ICE from monthly to biweekly. However, improper removals continued, even after Defendants discovered, in late February, 2026, that the scope of their noncompliance was far greater than previously understood. *See* ECF 629-1 at 2 (reporting that 25 confirmed Class Members were removed pursuant to execution of a final removal order between December, 2025, and June 26, 2026, including 13 confirmed Class Members between March, 2026 and June 26, 2026). Defendants have run (and re-run) searches of their databases to identify actual and potential Class Members *already* removed (and in doing so, have voluntarily undertaken a sort of "retrospective accounting" like that requested by Class Counsel). While a welcome development, these searches

do not work to ensure *future* compliance with the stay of removal. The only additional step that Defendants appear to have taken toward that end is their issuance of the May 28, 2026 email guidance to ICE ERO personnel. ECF 629-1 at 3.

Beginning with their second motion to enforce, Class Counsel have suggested a number of additional practices they believe would help ensure compliance with the stay of removal. At various times since, Defendants have challenged the proposed relief because it would "'require automated and potentially manual confirmation processes' presenting a substantial and burdensome workload,'" ECF 462 at 14 (quoting ECF 438-2 (sealed)), would be "unnecessary[] and burdensome," *id.* at 18, or, more generally, add obligations not contained in the Settlement Agreement in a "punitive and unworkable" fashion. ECF 583 at 28–32. Setting aside the fact that previous assertions by Defendants of "burdensome" or "cumbersome" tasks have been glaringly contradicted,[34] flat assertions that additional steps at compliance would be "burdensome," "cumbersome," or "complex," without more, do not render them unreasonable.[35] Moreover, that

---

[34] For example, after Defendants' representations to Class Counsel that review of USCIS's databases and compiled lists to confirm whether particular individuals were listed and/or identified in ICE's systems at the time of their removal would require a "cumbersome" manual review, *see* ECF 459-2 at 11, and to this Court that Defendants' computer systems were "built for operation as opposed to litigation," making determinations of the dates on which banners and/or case comments were entered into individuals' EARM profiles "difficult," ECF 471 (Feb. 18, 2026 Hr'g Tr.) at 12–14, it was later revealed that both tasks could, in fact, be performed with minimal effort using electronic search tools. *See* ECF 513 (Mar. 19, 2026 Hr'g Tr.) at 80–81 (Testimony of Officer Sicard) (confirming that USCIS's lists of potential Class Members are in Excel format and are compatible with a search function, including for an individual's A-Number); ECF 517 (Mar. 23, 2026 Hr'g Tr.) at 12, 14 (Testimony of ICE Program Manager Lewis) (confirming that Defendants' "Enforcement Integrated Database" could be searched specifically to determine when a *J.O.P.* banner was placed and/or removed from an individual's EARM file); ECF 497-1 (Lewis Decl.) (sealed).

[35] Further, "[c]ourts have been particularly unsympathetic to purported excuses for less-than-substantial compliance where the contemnor has participated in drafting the order against which compliance is measured." *United States v. Tennessee*, 925 F. Supp. 1292, 1302 (W.D. Tenn. 1995). "A party participating in drafting an order does so with an understanding of what it reasonably can accomplish. When that party subsequently fails to live up to the particulars of the order, it is more

they might not be required by the express terms of the Settlement Agreement does not by definition render them unreasonable.

Class Counsel's proposed changes in process have been just that—proposals. This Court raises them only as examples of possible measures that have not been employed. Nevertheless, Defendants have failed "to demonstrate that [they] made in good faith all reasonable efforts to comply" with this Court's orders. *De Simone*, 36 F.4th at 529. With no meritorious defense to preclude this Court from doing so, it concludes that Defendants are in contempt, providing another potential basis for this Court to consider Class Counsel's suggested remedies.

### C. Rule 60(b) Modification – Whether "changed circumstances" warrant modification of the Settlement Agreement

"The court's inherent authority to modify a consent decree or other injunction is now encompassed in Rule 60(b)(5) of the Federal Rules of Civil Procedure." *Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 404 F.3d 821, 826 (4th Cir. 2005). Rule 60(b)(5) provides that a court may relieve a party or its legal representative from a final judgment or order if, *inter alia*, "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5).

Class Counsel, in their briefing, argued much more strenuously for this Court to exercise its enforcement or contempt authority than they did for modification, with arguments for the latter being largely confined to footnotes. *See* ECF 459-2 at 27 n.16; *id.* at 30; ECF 463 at 17 n.7; ECF 558-1 at 27 n.10. In fact, Class Counsel expressly stated that they "invoked that [modification] authority *only in the event* the Court were to conclude that the civil contempt or enforcement sources of authority are inapposite. If the Court agrees with Class Counsel that each of those

---

difficult for a court to excuse that failure than if the order had been court imposed." *Id.* Here, Defendants participated in the drafting of both the Settlement Agreement and this Court's November 25, 2024 Order approving and incorporating it.

sources independently supports the remedial measures requested, the Court need not address Rule 60(b) at this time." ECF 463 at 17 n.7 (emphasis added) (internal quotation marks and citations omitted). This Court provided Class Counsel an opportunity to elaborate on their Rule 60(b) arguments at a motions hearing held on June 22, 2026. This Court will, taking Class Counsel's suggestion, only analyze the Rule 60(b) arguments with respect to any remedies this Court concludes it will not order pursuant to its other sources of authority. However, that still requires this Court to determine whether there is a basis for it to exercise that authority in the first place.

"[A] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). In assessing whether circumstances have so changed that a modification is warranted, the court must determine whether the moving party, at the time it entered into the agreement, actually anticipated the events that it now cites as the basis for modification. *Id.* at 385. "[T]hat the events were theoretically foreseeable does not foreclose a modification"; "the issue is whether the parties *actually* anticipated the events giving rise to the modification request." *Thompson*, 404 F.3d at 828 (emphasis in original).

Class Counsel assert that the "changed circumstance" warranting modification is Defendants' "substantial noncompliance with Section III.I of the Agreement" evidenced by the wrongful removals. ECF 535-1 at 27. Defendants, while acknowledging that the removal of Class Members before adjudication of their applications has put Defendants in non-compliance with Section III.I, challenge this proposition on multiple grounds.

Defendants have argued that the Agreement's express prescription, in Section V.D, of a process for addressing non-compliance—including on a "class-wide basis"—indicates that the parties "foresaw the possibility of a need for dispute resolution to address allegations of systemic noncompliance as applied to the entire class," and, therefore, Class Counsel cannot argue that "violations of Section III.I potentially numbering near 100 from a class that includes tens of thousands [of] individuals [were] unforeseeable." ECF 568 at 21. This argument is unavailing. That the parties may have included a provision in the Settlement Agreement to account for the circumstance of class-wide noncompliance indicates prudent drafting rather than the parties having actually anticipated systemic noncompliance. Moreover, if credited, Defendants' interpretation would preclude this Court from finding any level of non-compliance, even with regard to the *entire Class*, to constitute a changed circumstance warranting modification. Thus, this Court interprets Defendants' argument to be that the *extent* of the noncompliance with Section III.I is not a sufficiently changed circumstance to warrant modification.

Defendants have argued that Class Counsel have "grossly misstate[d] the magnitude" of Defendants' noncompliance by (1) including under the ambit of Section III.I removals pursuant to elections of voluntary departure; and (2) citing Defendants' removal of not only confirmed Class Members, but *potential* Class Members as well. ECF 568 at 17–20. Defendants have themselves identified 107 removals of confirmed (54) or potential (53) Class Members pursuant to final orders of removal (that is, without including voluntary departures), some portion of which were executed despite overt indicators of those individuals' potential Class membership. *See* ECF 629 at 12 n.2; ECF 629-1 at 2. Notwithstanding Defendants' series of disclaimers regarding the potential for these numbers to fluctuate, the degree and nature of Defendants' noncompliance with what Class Counsel characterize as "arguably the Agreement's most important term from a harm-reduction

angle," ECF 594 at 11, constitutes, in this Court's view, an unanticipated circumstance sufficient

to support this Court's exercise of its modification authority.[36]

### D. The relief sought by Class Counsel (and this Court's sources of authority to order it)

Class Counsel have requested that this Court order a suite of remedies to address

Defendants' noncompliance. Class Counsel have described their requested relief as falling into

two categories: preventing further removals or compensating for those already executed by

Defendants. *See* ECF 626 (June 22, 2026 Hr'g Tr.) at 10. They argue that this Court has authority

to order their proposed relief pursuant to (1) its authority to enforce the Settlement Agreement; (2)

its authority to modify the Settlement Agreement under Rule 60(b) in light of changed

circumstances; or (3) its authority to issue remedies for civil contempt. Defendants, while

maintaining their challenges to the specific relief proposed by Class Counsel, have effectively

conceded that at least the latter two sources of authority—modification and contempt—allow this

---

[36] This Court also finds unavailing Defendants' attempt to distinguish the Fourth Circuit's decision in *Thompson*. In *Thompson*, the consent decree contained specific quantitative and temporal metrics with which certain of the defendants were intended to comply—among other things, the construction of 911 units of housing within six and a half years of the approval of the decree. 404 F.3d at 825. Based on these clear metrics, the Fourth Circuit affirmed the lower court's conclusion that the defendants' construction of just *eight* units constituted an unanticipated change in circumstances that warranted modification. *Id.* at 825, 828–29 ("Plaintiffs did not anticipate the degree of the Local Defendants' non-compliance."). Defendants have argued that the number of wrongful removals here does not approach the level of substantial noncompliance found in *Thompson*. *See, e.g.*, ECF 626 (June 22, 2026 Hr'g Tr.) at 48–49. However, they fail to appreciate a key distinction between the consent decree in *Thompson*, which set out specific *affirmative* metrics and milestones by which to measure the defendants' performance, and Section III.I of the Settlement Agreement here, which sets out an unqualified prohibition on the removal of identified Class Members prior to adjudication of their applications. The quantitative metric for evaluating compliance, while not stated expressly, is clear by virtue of it being a prohibition: *zero* such removals are permitted. Had Class Counsel anticipated that Defendants would remove at least 54 (and likely many more) confirmed Class Members prior to adjudication of their applications, in many cases in spite of clear indications of potential Class membership in Defendants' own systems, they may have approached the Settlement Agreement differently.

Court wider discretion in ordering remedies than does its enforcement authority. *See* ECF 462 at 21 ("The only legal bases for the Court to impose such sweeping remedial actions as those proposed by the Plaintiffs are (1) pursuant to a finding of contempt or (2) modification of the settlement agreement itself pursuant to Fed. R. Civ. P. 60(b)."). However, each source of authority carries specific limitations on what this Court may order pursuant to it.

Pursuant to its authority to *enforce* the Settlement Agreement, this Court may "order the performance of duties contained within the 'four corners' of the consent decree." *Johnson v. Robinson*, 987 F.2d 1043, 1049 (4th Cir. 1993) (quoting *Firefighters Loc. Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984)). "[R]emedies that would greatly 'enlarge . . . the duties on which the parties have agreed and which the court has approved' . . . seek to modify rather than enforce the terms of [a] consent decree." *Int'l Longshoremen's Ass'n Loc. 333 v. Int'l Longshoremen's Ass'n, AFL-CIO*, 687 F. App'x 315, 327 (4th Cir. 2017) (unpublished per curiam) (quoting *Johnson*, 987 F.2d at 1046 (citations omitted)).

Regarding this Court's authority to *modify* the Settlement Agreement, if a party demonstrates that changed circumstances warrant revision of a consent decree, the court considers "whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383. "A court's inherent power to modify a consent decree," which "springs from the court's inherent equitable power over its own judgments," "is not circumscribed by the language of the decree." *Thompson*, 404 F.3d at 830, 832 n.6 (emphasis removed) (collecting cases). However, "generally speaking, a district court modifying a consent decree should strive to 'preserve the essence of the parties' bargain.'" *Id.* at 833 (quoting *Pigford v. Veneman*, 292 F.3d 918, 927 (D.C. Cir. 2002). *See also id.* at 831–32 ("[T]he district court modified the decree no more than was necessary to approximate the positions the parties would have occupied had the

46

Local Defendants lived up to their obligations under the Consent Decree.") (citing *Pigford*); *Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016) ("[A] modification of a court order is 'suitably tailored to the changed circumstance' when it 'would return both parties as nearly as possible to where they would have been absent' the changed circumstances.") (quoting *Pigford*, 292 F.3d at 927 (emphasis omitted)).

As for this Court's authority to order civil contempt sanctions, "[t]he appropriate remedy for civil contempt is within the court's broad discretion." *In re Gen. Motors Corp.*, 61 F.3d 256, 259 (4th Cir. 1995). Oft-cited language from the Supreme Court summarizes the factors that courts should consider when assessing the propriety of different types of civil contempt sanctions:

> Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. . . . [W]here the purpose is to make the defendant comply, . . . [the court] must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the desired result.

*United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04 (1947) (internal citations and footnotes omitted); *see also Darwin Constr. Co., Inc.*, 873 F.2d at 756 ("[A] district court has broad discretion to fashion an appropriate coercive remedy in a case of civil contempt, based on the nature of the harm and the probable effect of alternative sanctions.") (quoting *N.A. Sales Co., Inc. v. Chapman Indus. Corp.*, 736 F.2d 854, 857 (2d Cir. 1984)).

A court's discretion in ordering remedies for civil contempt is not without limitation; "in selecting contempt sanctions, a court is obliged to use the least possible power adequate to the end proposed." *Spallone v. U.S.*, 493 U.S. 265, 276 (1990) (internal quotation marks omitted). "Generally, the minimum sanction necessary to obtain compliance is to be imposed." *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992). And "[b]ecause the sanctions for civil

47

contempt must be causally related to contemptuous conduct, . . . resolution of . . . sanctions arguments depends on the violations found by the district court." *Klopp*, 957 F.3d at 461 (citing *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017)). With that, this Court turns to evaluating the propriety of the specific remedial actions proposed by Class Counsel under the legal standards summarized above.

<u>Class Counsel's requests pertaining to adjudication of asylum applications</u>

In Paragraphs 6 and 9 of their proposed order, Class Counsel have requested that this Court order Defendants to (1) promptly adjudicate on the merits—without the application of any "asylum adjudication hold" (including the USCIS Hold Memo)—the asylum application of any (a) detained Class Member or (b) Class Member removed in violation of the Settlement Agreement who elects to return, who requests an expedited adjudication of their application pursuant to Section III.G of the Settlement Agreement, and (2) refrain from (a) applying a presumption of abandonment to the asylum application of any Class Member removed in violation of the Settlement Agreement who elects to return for adjudication of their application, and (ii) using the wrongful removal as a factor weighing against a grant of asylum. ECF 558-6 ¶¶ 6, 9.

This Court declines to order this relief. Class Counsel's request that this Court prohibit application of any "hold" on adjudication of asylum applications to detained or returning Class Members would be advisory, and thus improper, considering that no hold is currently in effect (the USCIS Hold Memo having been vacated on June 5, 2026). The same principles preclude this Court from prohibiting Defendants from applying a presumption of abandonment to the applications of wrongfully removed Class Members seeking to return to the United States, as Class Counsel have cited no instance of Defendants applying the presumption as of yet. Finally, this Court declines to order "prompt[] adjudicat[ion]" of the asylum application of any detained or returning Class

Member who requests expedited adjudication pursuant to Section III.G of the Settlement Agreement. Section III.G only required Defendants to "adopt procedures permitting Class Members to request that USCIS exercise its discretion to expedite adjudication of asylum applications pending with USCIS" in certain circumstances; it said nothing of a required pace at which "expedited adjudication" must proceed. ECF 199-2 at 9. And Class Counsel have not alleged any noncompliance with that provision.

Class Counsel's request for more inclusive lists of potential Class Members (by USCIS) and prompt entry of identifiers in internal systems (by ICE)

Class Counsel have proposed that USCIS be ordered to prepare a more inclusive list of potential Class Members. Specifically, they seek for USCIS to, within 30 days of this Court's order, provide ICE with a complete list of "Potential Class Members," including all individuals who—regardless of whether they are or ever were in removal proceedings—(a) were determined to be a UAC; (2) filed an asylum application that was pending with USCIS on or before February 24, 2025; and (3) have not had their application adjudicated on the merits by USCIS. ECF 558-6 ¶ 4.

With nothing in the Settlement Agreement speaking to the creation of any sort of Class list—an omission noted by this Court on multiple previous occasions—this Court cannot order this relief pursuant to its enforcement authority. Neither will it order it pursuant to its contempt authority. This Court has found Defendants in contempt specifically for their disregard or ignorance of their own identification of potential Class membership; more inclusive parameters for identification of potential Class Members do not directly remedy that conduct.

That leaves modification. As a threshold issue, it is important to note that this Court's conclusion that Defendants' execution of final removal orders for 54 confirmed Class Members constitutes a changed circumstance supporting modification does not, necessarily, support this

specific modification. That is because this relief pertains to a smaller subset of removals that Class Counsel specifically attribute to USCIS having failed to identify those individuals in their lists. To warrant this requested modification, this Court would need to find, specifically, that the number of removals of Class Members *who failed to appear on USCIS's lists due to their not being in removal proceedings* is of such unanticipated magnitude as to necessitate relief on a class-wide basis, rather than addressing those instances through individual relief. Based on the current record, this Court declines to order this class-wide relief as a modification to the Settlement Agreement.

Class Counsel, in a declaration filed in late April, stated that "[f]rom information Defendants have so far provided describing 76 cases of potential Class Members, 24 of the potential Class Members did not appear on the USCIS Class list at the time they were removed." ECF 559-2 (Wylegala Decl.) ¶ 9. This Court notes its presumption that Class Counsel's estimates, in line with their arguments regarding voluntary departures, include individuals removed by that mechanism. With this Court having concluded—in adjudicating Class Counsel's motion to compel—that such grants are not violations of Section III.I's prohibition, it assumes, then, that Class Counsel's estimates may be overestimates.

It also notes that Class Counsel have not alleged, concretely, the extent to which certain individuals' exclusion from the list at the time of their removal was due to identification through USCIS's allegedly "underinclusive" parameters being impossible or simply delayed. *See* ECF 558 at 10 ("Defendants' recent disclosures to Class Counsel regarding certain removed Class Members also suggest that USCIS sometimes delayed months from the time a Class Member filed their asylum application with USCIS (and thus became a Class Member) before adding that person to the list."); ECF 559-2 (Wylegala Decl.) ¶ 9 ("In some instances, months passed between the time a potential Class Member filed an asylum application and the time USCIS added the individual to

50

a Class list."). Accordingly, Class Counsel have alleged only that the "underinclusivity" of USCIS's lists "*likely* explains why two removed Class Members, F.D.E. and L.O.B., did not appear on a Class list until after ICE removed them." ECF 558 at 9 (emphasis added); *see id.* at 8–9 (positing that "design flaw[s]" in USCIS's list parameters "*likely* prevented hundreds" to thousands "of Class Members from being timely included on the Class list.") (emphasis added).

In light of the above, the specific changed circumstance that this Court would need to find to order Defendants to expand their parameters for compilation of a list of potential Class Members—which would require this Court to add an entirely new obligation to the Settlement Agreement—is, at the moment, too speculative for this Court to conclude that ordering such relief would be an appropriate exercise of this Court's modification authority.

Class Counsel further requested, should this Court order USCIS to compile an expanded list of Potential Class Members, that it also order ICE to, within one business day, place system alerts into EARM for any individual on that list for which a system alert does not already exist. While declining to order the compilation of the requested list, this Court will order that for any individual who is identified to ICE as a potential Class Member and for whom a system alert does not currently exist in ICE's EARM system, ICE must place a system alert in that individual's EARM file *as promptly as possible*, and no more than two business days after the individual is identified.[37] This Court does so pursuant to its enforcement authority. Section III.I requires that ICE ERO, in order to effectuate the prohibition on removals, "will make an entry indicating there

---

[37] Chief Nichols testified, at the March, 2026 evidentiary hearing, that his team, which is responsible for putting inputting banners into EARM for individuals identified on USCIS's lists, ordinarily accomplishes this task within one business day. *See* ECF 513 (Mar. 19, 2026 Hr'g Tr.) at 30–32 (Class Counsel: "Chief Nichols, after the list is received from USCIS by your team, is there a deadline as to which they need to input a banner or system alert into the system for a name that appears on the list?" Nichols: "We generally complete it within – within a business day.").

is a stay in its system of records for all identified Class Members, including Class Members identified by USCIS"; requiring ICE to make these entries on a timely basis does not impermissibly expand Defendants' obligations under the Settlement Agreement. Unlike the timetable at issue in *Johnson*, for example, which, beyond mandating a complex and specific schedule for completion of repairs, called for "a range and quality of improvements not contemplated in the [original] Agreement," a requirement of prompt entry here to ensure compliance with the removal prohibition does not expand Defendants' obligations by "such a magnitude that [it] cannot be enfolded into the [Settlement Agreement] through the simple mechanism of enforcement." *Johnson*, 987 F.2d at 1049.

Class Counsel's additional requests regarding ICE's compliance with Section III.I's bar on removals

Next, Class Counsel have requested that this Court order Defendants—including ICE—to, prior to the removal of any individual with a UAC determination, "take all necessary steps to determine whether the individual is a Class Member." ECF 558-6 ¶ 2. This Court declines to order relief in such broad and vague terms. As noted above, nothing in the Settlement Agreement placed any affirmative obligation on Defendants to identify Class Members. Thus, this Court cannot order such relief pursuant to its enforcement authority. And with this Court having found contumacious conduct only in Defendants' disregard or ignorance of their own identifiers of potential Class Membership, ordering Defendants to "take all necessary steps to determine whether [an] individual is a Class Member" would not be an exercise of the "least possible power" to address the contempt. *Spallone*, 493 U.S. at 276. Finally, ordering such broad and vague relief is not "tailored" in any respect, let alone "suitably tailored" as is necessary to support an exercise of this Court's modification authority.

52

However, while this Court declines to order the Paragraph 2 relief in its *broadest* articulation, certain of the specific measures proposed in the subparagraphs are appropriate. Specifically, Class Counsel have proposed that:

(1) Prior to the removal of "any individual," ICE must search the individual's EARM records (closed and active files) for banners, case comments, and/or a "'JO' Special Class Code" indicating potential membership in the *J.O.P* Class.[38] If any of these notations is present, ICE may not remove the individual unless and until USCIS adjudicates their asylum application on the merits or the USCIS Asylum Office confirms the individual is not a Class Member. ECF 558-6 ¶ 2.a.

(2) For any individual ICE seeks to remove who self-identifies—or is identified by their counsel—as a *J.O.P.* Class Member, ICE may not remove that individual unless and until USCIS adjudicates their asylum application on the merits or the USCIS Asylum Office confirms the individual is not a Class Member. ECF 558-6 ¶ 2.b.

(3) ICE may not remove any individual with a prior UAC determination who filed their asylum application with USCIS on or before February 24, 2025—as confirmed through consultation by ICE officials of "relevant databases"—unless and until USCIS

---

[38] A declaration filed by Defendants, and accompanying testimony at the March, 2026 evidentiary hearing, suggest that Defendants can query their "Enforcement Integrated Database" using a "special class code of 'JO'" that "was assigned for this [*J.O.P.*] banner," "to identify all individuals with the special class code referencing J.O.P." ECF 517 (Mar. 23, 2026 Hr'g Tr.) at 18–19 (Testimony of ICE Program Manager Lewis); ECF 497-1 (Lewis Decl.) (sealed). The "special class code" corresponds to a field in an individual's EARM profile for "Special Class." ECF 517 at 20. Indeed, screenshots of certain removed Class Members reflect an entry next to "Special Class" stating, "Potential J.O.P. Class Member." *See, e.g.*, ECF 536-12 at 2 (sealed). Thus, this Court interprets Class Counsel's reference to a "'JO' Special Class Code" as being to such an entry.

adjudicates their asylum application on the merits or the USCIS Asylum Office confirms the individual is not a Class Member. ECF 558-6 ¶ 2.c.

Drawing on subparagraph 2.a, this Court will order that, prior to the removal of any individual, ICE must search the individual's EARM records (including both closed and active files) for a *J.O.P.* banner, *J.O.P.* case comment, and/or an entry in the "Special Class" field connoting potential *J.O.P.* Class membership, and if any of these notations is present, ICE may not remove the individual unless and until USCIS adjudicates their asylum application on the merits or the USCIS Asylum Office confirms the individual is not a Class Member. ECF 558-6 ¶ 2.a. This Court so orders pursuant to its enforcement authority. Ordering ICE to specifically review the EARM records of any individual it seeks to remove for ICE's own signifiers of potential Class membership only makes explicit an implicit requirement of Section III.I. That is, with Section III.I plainly requiring that ICE make an entry in its systems indicating a stay of removal for any individual identified to it as a Class Member, the function of the provision would be—and, it appears, has been—undermined by ICE officers' failure, through ignorance or disregard, to make note of those signifiers. For the intended function of the banners and case comments to be realized, compliance with the stay of removal cannot depend merely on the reviewing ICE officer having happened to notice those signifiers; reviewing officers must review the EARM records with specific attention to them.

In addition, this Court will order that ICE make an entry in its systems for any individual who either self-identifies or is identified by their counsel as a *J.O.P.* Class Member, and refrain from removing any such individual unless and until USCIS adjudicates their asylum application on the merits or the USCIS Asylum Office confirms the individual is not a Class Member. ECF 558-6 ¶ 2.b. This Court interprets the ¶ 2.b "relief" not as a request for enforcement, or

54

modification, or to remedy contempt, but rather, simply for clarification of the terms of Section III.I of the Settlement Agreement. "While they may construe or clarify what a consent decree provides, courts are not entitled to expand or contract the agreement of the parties as set forth in the consent decree under the guise of clarification." *United States v. Broadcast Music, Inc.*, No. 64 Civ. 3787 (LLS), 2000 WL 280034, at *1 (S.D.N.Y. Mar. 15, 2000) (internal quotation marks omitted), *aff'd in part and vacated in part*, 275 F.3d 168 (2d Cir. 2001); *see also United States v. Microsoft Corp.*, 147 F.3d 935, 941 (D.C. Cir. 1998) ("[A] clarification [of a consent decree] may properly take the form of an injunction. . . . Indeed, as a consent decree contains an injunction already, a clarification naturally acquires the same character. (Of course, if the supplementary language goes beyond the consent decree, it is a modification rather than a clarification, and is governed by different standards. . . .)") (internal citations omitted).

The plain language of Section III.I requires ICE to "make an entry indicating there is a stay in its system of records for all identified Class Members, including Class Members identified by USCIS." ECF 199-2 at 10. This Court has already recognized that, while not placing an affirmative obligation on ICE to itself identify Class Members, this language requires ICE to make entries for identified Class Members *regardless* of how they are identified. For this Court to order proposed ¶ 2.b would not, then, amount to a modification of the Settlement Agreement. Thus, this Court will, as part of its forthcoming order, issue the requested clarification.

Defendants have raised a "jurisdictional" challenge under 8 U.S.C. § 1252(f)(1) exclusively with respect to the relief proposed in Paragraph 2 (and its subparagraphs) of Class

55

Counsel's proposed order.[39] That section of the INA, entitled "Limit on injunctive relief," provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). Pursuant to this provision, Defendants argue that this Court cannot order any of the relief in Paragraph 2 (and its subparagraphs) of Class Counsel's proposed order because, by enjoining removal, it would interfere with the operation of 8 U.S.C. § 1231, the provision of the INA addressing the removal of aliens, which is among the "covered provisions" under § 1252(f)(1). ECF 583 at 27–28; ECF 629 at 2–10 (citing *Sanchez v. McAleenan*, No. GLR-19-1728, 2024 WL 1256264, at *13–14 (D. Md. Mar. 25, 2024) ("Removal and detention are authorized under section 1231(a), a provision indisputably covered by section 1252(f)(1). . . . Because the proposed class-wide injunction would directly enjoin the operation, even the unlawful operation, of section 1231, it is barred by the Supreme Court's interpretation of section 1252(f)(1).")).

Specifically, Defendants argue that "Section 1231 . . . does not require ICE to engage in searching any system, let alone searching EARM for a *J.O.P.* banner [or] *J.O.P.* case comment . . . prior to removal," and that "condition[ing] any removal of three groups of aliens— those with *J.O.P.* markers in EARM, those who identify themselves as *J.O.P.* class members, and

---

[39] *See* ECF 626 (June 22, 2026 Hr'g Tr.) at 46 (Defendants' counsel: "[I]tem 2, that's the one we want to focus on the strongest. I think that is very clearly prohibited under 1252(f)(1), especially to the extent that Class Counsel is seeking to enjoin the removal of individuals who are not being removed pursuant to final orders of removal." The Court: "Are there others that you wish to focus on, or are we sort of ending it there?" Defendants' counsel: "With regards to 1252(f)(1), not specifically."); ECF 629 at 2 ("This Court Lacks Jurisdiction to Order Item 2 of Class Counsel's Proposed Order Pursuant to 8 U.S.C. § 1252(f)(1).").

potential *J.O.P.* class members—upon adjudication of their asylum application or USCIS confirmation that the alien is not a *J.O.P.* Class Member" would be an "impermissible" restraint, "regardless of the ease of conducting such a search or possibility that the conditions could be satisfied within 90 days" (the period within which § 1231 requires removals pursuant to an order of removal to be executed). ECF 629 at 3. This is a bizarre argument, considering that Section III.I, to which Defendants agreed, expressly conditions removal of Class Members on "USCIS issu[ing] a Final Determination on one properly filed asylum application under the terms of this Agreement" or "USCIS indicat[ing] it is appropriate to remove" the stay of removal. ECF 199-2 at 9–10.

In its opinion granting Class Counsel's motion to extend the termination date of the Settlement Agreement, this Court concluded that Defendants had waived any § 1252(f)(1) objections to the terms of the Settlement Agreement when they entered into the Agreement. *See* ECF 619 at 23–25. Defendants argue that, while this Court may have previously found their § 1252(f)(1) objection to have been waived with respect to Defendants' obligations pursuant to the Settlement Agreement, this Court cannot extend that waiver to any additional obligations requested in Class Counsel's proposed order. ECF 628 at 5 ("The Court's holding on May 26, 2026 that § 1252(f)(1) is waivable, however, does not require a finding that it has been waived with respect to Item 2 of the Proposed Order."). However, this Court, for the reasons described above, does not find that its order for affirmative, specific checks of EARM records for banners and case comments, nor its clarification of the scope of ICE's obligation to make entries and stay removals for identified Class Members, create additional obligations beyond those contemplated by the terms of the Agreement. Moreover, its order with respect to checks of EARM for banners and case comments simply seeks to make more effective the specific system that Defendants, themselves, have interpreted as necessary to facilitate their compliance with Section III.I. *See United States v.*

57

*Atl. Refin. Co.*, 360 U.S. 19, 23–24 (1959) (holding that the "where the language of a consent decree in its normal meaning supports an interpretation," that the "interpretation has been adhered to over many years by all the parties, including those government officials who drew up and administered the decree from the start," can support an interpretation of a consent decree) (internal footnote omitted). For these reasons, this Court concludes that § 1252(f)(1) does not bar this relief.[40]

Class Counsel's request for provision of notice of rights to detained Class Members

Class Counsel requests that Defendants be ordered to provide prompt written individualized notice of their rights under the Settlement Agreement to any individual identified as a potential Class Member and detained by DHS. ECF 558-6 ¶ 5; ECF 428-7 (Class Counsel's proposed notice). This Court declines to order that relief.

As Class Counsel have recognized, there is nothing in the Settlement Agreement calling for such individualized notice. *See* ECF 626 (June 22, 2026 Hr'g Tr.) at 18. The Parties previously agreed for provision of notice to potential Class Members of their rights under the Settlement Agreement upon the approval of the Agreement, through the posting of a notice on various websites and its dissemination to certain email mailing lists. *See* ECF 199-2 at 13 (Section IV.J) (stating that, upon approval of the Agreement, "the Parties shall provide an Updated Class Notice (in English and Spanish) . . . to the same websites and distribution lists as set forth in Section

---

[40] This Court declines to order the relief proposed in subparagraph 2.c (requiring ICE to "independently check for indicia of Class membership by searching records for prior UC determinations and asylum applications filed with USCIS," ECF 558 at 29) for the same reasons it declines to order that Defendants produce a more inclusive potential Class Member list or "take all necessary steps" to determine Class membership. Moreover, because this subparagraph describes a process *beyond* that which Defendants are currently employing to facilitate compliance with Section III.I (like that described in subparagraph 2.a), this Court cannot conclude that Defendants' waiver of § 1252(f)(1) would extend to this requested process.

IV.E"); *id.* at 12 (Section IV.E) (directing the Parties to post the Class Notice on various websites (including Defendants' respective websites), Class Counsel to "distribute the Class Notice . . . on relevant (as determined by Class Counsel) email or list serv mailing lists for legal services providers," and USCIS's Office of Public Affairs to "email the Class Notice . . . to its approximately 47,000 subscribed users."). Thus, the Parties appear to have agreed to have general notice of the Settlement Agreement only "be made available" to Class Members, *see* ECF 199-2 at 22 (proposed order granting the Parties' joint motion for preliminary approval of the Settlement Agreement), rather than have it be disseminated directly to individual Class Members.

The Agreement does identify certain additional forms of notice that Defendants are required to provide to certain Class Members in particular circumstances, *see* ECF 199-2 at 8 (Section III.E) (regarding cases of retractions of Adverse Jurisdictional Determinations); *id.* (Section III.F) (regarding releases of holds on asylum applications); *id.* at 51–52 (agreed-upon format for Defendants' compliance reports as required by Section V.B). But in those provisions, the Agreement laid out a specific obligation and then immediately provided that Defendants "shall mail to such Class Members a notice" regarding the effect of those obligations. Section III.I, while also prescribing a specific obligation to Defendants, contains no such language regarding notice. Thus, this Court will not order such relief pursuant to its enforcement authority.

Notably, Class Counsel are proposing that Defendants be required to provide individualized notice to "any Class Member detained by DHS," including those for whom there is a database entry indicating potential Class membership, and those otherwise identified to Defendants, including in USCIS's lists of potential Class Members. Thus, for Defendants to honor Class Counsel's request that Defendants personally serve detained Class Members with this notice, they would have to have already identified those Class Members. But such identification itself

would trigger the protections of Section III.I, guaranteeing those Class Members a stay of removal. Class Counsel have effectively conceded as much, characterizing the proposed notice as merely a "further safeguard" of Class Members' Section III.I rights in the event that Defendants fail to abide by the alerts in their systems. *See* ECF 459-2 at 25–26 ("Defendants admit that ICE may be removing Class Members in violation of the Agreement even if a system alert was put in place to prevent their removal. The requested notice is necessary as a further safeguard to try to prevent further wrongful removals of Class Members.")

Considering the relief this Court is otherwise ordering herein to ensure Defendants' compliance with Section III.I as intended, including with respect to ICE's recognition of and adherence to the entries in its systems indicating potential Class membership and a stay of removal, imposition of this additional obligation on Defendants would not constitute an exercise of the "least possible power adequate to the end proposed" with regard to Defendants' contempt, nor would it be "suitably tailored" to the changed circumstance. ECF 459-2 at 26.

Class Counsel's request for a retrospective accounting of removed potential Class Members

Class Counsel seek to have Defendants undertake a retrospective accounting to identify all potential Class Members removed since this Court's approval of the Settlement Agreement on November 24, 2024, and for Defendants to report to Class Counsel and, in biweekly status reports, to this Court on the parameters used for and the results of that review, "until a responsible official certifies on Defendants' behalf that that review is complete and all removed potential Class Members have been identified." ECF 558-6 ¶ 3. Class Counsel request this accounting "so that removed Class Members can return to the United States." ECF 558 at 31.

This is not the first time in this case that Class Counsel have requested this relief. A motions hearing and status conference held on May 6, 2025 concerned, *inter alia*, "whether to require

60

Defendants to provide a list of all Class Members who have been removed from the United States on or after November 25, 2024." ECF 259 at 2. As noted by Defendants, *see* ECF 462 at 18, this Court declined to order Defendants to produce Class Counsel's requested list, finding that the request would require this Court "to read something into the agreement that isn't there with respect to language in a mechanism for getting a list of people removed or a list of class members or a list that combines those two things." ECF 272 (May 6, 2025 Hr'g Tr.) at 17. Noting that "[the] motion before me is a motion to enforce the Settlement Agreement," this Court, while "certainly understand[ing] the equitable reasons why [Class Counsel] might be asking for" the accounting, stated, "I *at this point* don't see any reason that I should enforce anything other than the deal that the plaintiff class made with respect to what its remedies and rights are under the agreement." *Id.* (emphasis added).

However, as this Court has concluded herein, circumstances have changed. At the time this Court previously denied Class Counsel's request, only two removals of Class Members (Cristian, pursuant to the AEA, and another Class Member, pursuant to Title 8) had been brought to this Court's attention. *Id.* at 8–9. Defendants have now reported dozens of removals of confirmed Class Members, and dozens more of potential Class Members, pursuant to final removal orders. Based on these changed circumstances, this Court thinks that a retrospective accounting to identify removed potential Class Members, as Defendants have already undertaken, is a suitably tailored remedy to address those circumstances.[41]

---

[41] Defendants, in challenging this Court's authority to order the accounting as a means of *enforcing* the Settlement Agreement, specifically highlighted that Section V.B does not require Defendants to supply information related to compliance with Section III.I. *See* ECF 462 at 19. That omission does not, however, preclude this Court from ordering such relief pursuant to its modification authority. *See Thompson*, 404 F.3d at 832 n.6. And, arguably, the fact that compliance with Section III.I was not included among the agreed-upon contents of the Section V.B compliance reports can be interpreted as further suggesting that the parties did not anticipate this level of noncompliance

This Court appreciates that the "changed circumstances" upon which it is prepared to order Defendants to undertake a retrospective accounting have, in fact, come to light as a direct result of Defendants having already undertaken just such an accounting. *See* ECF 583 at 31. While those voluntary efforts at identification of noncompliance are welcomed, and have been recognized by Class Counsel, see ECF 558 at 31 n.12, they do not negate the function of the noncompliance thereby identified as a basis for this Court to officially order Defendants to continue those efforts.

In their original motion, Class Counsel argued that a retrospective accounting was necessary because the removals that Defendants had self-reported to that point had only been discovered in the course of processing those individuals' asylum applications. *See* ECF 459-2 at 29 ("No doubt there are removed Class Members whose applications remain untouched by USCIS, and thus their unlawful removals go unrecognized."). Now, Class Counsel argue that the accounting that Defendants have so far undertaken—running (and rerunning) a search of USCIS's systems for individuals with a "Removed UAC" tag—is inadequate because, they allege, (1) the "Removed UAC" tag does not include Class Members who are not in removal proceedings at the time they filed their asylum application, (2) the tag is only added to correspond with certain events ("[l]ike if someone doesn't show up for an interview"), and (3) Defendants' searches to this point have only queried USCIS databases, but not ICE databases, which Class Counsel allege "capture all the relevant information to identify removed Class Members." *See* ECF 626 (June 22, 2026 Hr'g Tr.) at 20–22.

However, despite Class Counsel's assertion that they have "offered a specific proposal about how [Defendants] can search for removed Class Members," ECF 626 (June 22, 2026 Hr'g

---

with Section III.I, further bolstering this Court's conclusion that that level of noncompliance is a changed circumstance.

Tr.) at 22, their proposed order simply requests that Defendants should "undertake a review of removed potential Class Members" and report to this Court and Class Counsel on, *inter alia*, "the parameters used to conduct the review, including searches performed." ECF 558-6 ¶ 8.

In light of this lack of specificity, and having declined to find a basis for it to order Defendants to identify Class Members not in removal proceedings, this Court orders Defendants to continue to re-run, and to report to Class Counsel and this Court on the results of, the search of USCIS's systems using the "Removed UACs" tag. That accounting has proven, contrary to Defendants' arguments of a "burdensome" and "cumbersome" undertaking, ECF 462 at 19; ECF 583 at 31, to be readily doable and, it appears, has identified previously unreported removals each time it has been run. Defendants shall re-run this search every two weeks, and report on the results of each search—as well as any other potentially wrongful removals of potential Class Members of which Defendants become aware through any other means—as part of biweekly status reports.

<u>Class Counsel's request for written guidance and training for ICE</u>

Class Counsel have requested that this Court order Defendants to, on certain timelines, disseminate written guidance to and require training of all ICE personnel nationwide regarding ICE's obligations under Section III.I of the Settlement Agreement. ECF 558-6 ¶ 3. As provided above, this Court will order (1) that ICE make an entry in its systems for, and refrain from removing, any individual identified to it as a potential *J.O.P.* Class Member by any means (including self-identification or identification by counsel); (2) that ICE make those entries as quickly as possible after that identification is made; (3) that ICE affirmatively and specifically review EARM records of any individual it seeks to remove, prior to their removal, for banners, case comments, or "Special Class" entries indicating potential *J.O.P.* Class membership; and (4) that Defendants continue to regularly run the "Removed UACs" search to identify removed

63

potential Class Members. To effectuate this relief, this Court will, pursuant to its enforcement authority and in recognition of Defendants' proven capability of disseminating written guidance to their personnel, also order Defendants to issue written guidance detailing the first three requirements, in the context of describing ICE's obligations under Section III.I of the Settlement Agreement, to all ICE personnel nationwide.[42] With respect to the first two requirements, this guidance must not only describe steps to be taken by ICE upon receipt of lists from USCIS, but also specific steps to be taken by ICE personnel in the event that an individual either self-identifies as a Class Member or is identified as such by counsel.

As proposed by Class Counsel, ECF 588-6 ¶ 3, this Court will order that Defendants disseminate this guidance within 15 days of this Court's order and monthly thereafter. The written guidance should provide contact information for USCIS Asylum Office personnel authorized to

---

[42] Guidance regarding prompt entries in ICE's systems after identification as a potential Class Member is particularly pertinent considering testimony offered by Chief Nichols at the March, 2026 hearing that no written guidance existed for the ICE personnel responsible for inputting banners into EARM:

> Class Counsel: Chief Nichols, do you know if there's any procedure or guidance as to specific actions that must be taken by ICE in relation to these class lists provided by USCIS?
>
> Nichols: Not that I'm aware of.
>
> Class Counsel: No written guidance?
>
> Nichols: Not that I know of.
>
> Class Counsel: But your team is responsible for inputting banners; is that right?
>
> Nichols: Correct.
>
> Class Counsel: So there's no written guidance on how to do that?
>
> Nichols: No, there's not.
>
> Class Counsel: No policy on how to do that?
>
> Nichols: No, there's not.

ECF 513 (Mar. 19, 2026 Hr'g Tr.) at 29.

advise ICE personnel on individuals identified as potential Class Members being eligible for removal, as provided for in Section III.I. *See* ECF 199-2 at 10 ("This alert will not be removed from any individual case until such time as USCIS indicates it is appropriate to remove it.").

This Court will not order that ICE personnel attend training regarding the same requirements. This Court is cognizant of the testimony of certain ICE personnel at the March, 2026 evidentiary hearing suggesting an inadequacy of training regarding ICE's obligations under the *J.O.P.* Settlement Agreement. However, ordering training for all of the tens of thousands of ICE personnel, nationwide, is beyond this Court's authority under any of the three sources argued by Class Counsel. There is nothing in the Settlement Agreement regarding training of ICE personnel, and such broad relief is neither a "suitably tailored" remedy nor the "least possible power" that this Court could exercise to remedy Defendants' contempt.[43]

Ultimately, this Court orders no sanctions specifically pursuant to its finding of contempt. This Court stresses that this result in no way should be interpreted as this Court ignoring or excusing Defendants' contumacious conduct. "[A] party seeking civil contempt 'ha[s] a right to judicial assessment as to whether the defendant [is] in contempt of the court's previous order,'" and this Court has made that assessment herein, against Defendants. *Potter v. District of Columbia*, 126 F.4th 720, 724 (D.C. Cir. 2025) (quoting *Thompson v. Cleland*, 782 F.2d 719, 722 (7th Cir.

---

[43] The cases cited by Class Counsel do not convince this court otherwise; the courts in those cases ordered training either for an individual (*Hardy v. Asture*, No. 1:11cv299, 2013 WL 566020, at *8 (W.D.N.C. Feb. 13, 2013) (ordering attorney to attend eight hours of live continuing legal education courses on the subject of the practice of social security litigation in federal court)) or a much smaller workforce (*Portland v. City of Portland*, No. 3:20-cv-00917-HZ , 2021 WL 982613, at *2 (D. Or. Mar. 16, 2021) (ordering all grenadiers and supervisors on the Portland Police Bureau's Rapid Response Team to receive nine hours of training regarding limitations on use of force at protests, with all grenadiers receiving training every six months). *See* ECF 558 at 30.

1986)) (alterations in *Potter*).[44] Moreover, this Court, while having found certain of Class Counsel's proposed remedies to be beyond the bounds of even its broad discretion to address contempt, *is* granting certain relief that will address Defendants' contumacious conduct, it simply is doing so based on other of its inherent authorities. To order the same or similar relief pursuant to the finding of contempt would be unnecessarily duplicative. "[A] district court has broad discretion in fashioning coercive remedies, including declining to award sanctions." *Next Invs., LLC v. Bank of China*, 12 F.4th 119, 130 (2d Cir. 2021). *See also Sec. and Exch. Comm'n v. Stanford Int'l Bank, Ltd.*, 2009 WL 10663409, at *2 (N.D. Tex. Dec. 16, 2009) ("Though the Court finds Defendants and their attorneys in contempt of its September 28 order, it declines to impose sanctions."); *Farm Credit Servs. of Am., FLCA v. Mens*, 456 F. Supp. 3d 1173, 1192 (D. Neb. 2020) ("A court need not issue sanctions even if it finds a party in contempt.").

Having declined to order sanctions pursuant to its finding of contempt, it is not entirely clear whether this Court is nevertheless required to provide Defendants with a method by which to purge that finding. While purgation has been described, in broad terms, as the "hallmark of civil contempt," *see, e.g.*, *Bridgeport Guardians v. Delmonte*, 371 F. Supp. 2d 115, 120 (D. Conn. 2005), it is often more specifically described as the hallmark that distinguishes a conditional coercive *sanction* (civil contempt) from a punitive sanction (criminal contempt);[45] that is, *if* the

---

[44] In *Potter*, the lower court had denied plaintiffs' motion for contempt by "assert[ing] a general discretion to withhold contempt." 126 F.4th at 724. The D.C. Circuit "reject[ed] the . . . argument that district courts have 'negative discretion' to deny a civil contempt motion alleging the violation of an injunction protecting private legal rights." *Id.* at 726; *id.* at 724 n.1 (collecting cases).

[45] Defendants have specifically argued that Class Counsel's proposed remedies are, in fact, punitive, and thus improper as civil contempt sanctions. *See* ECF 583 at 29 ("[T]he whole point of civil contempt sanctions is remedial rather than punitive. Plaintiffs' proposals cross that line.") (internal quotation marks and citations omitted). Because this Court is not ordering any relief specifically pursuant to its contempt finding, it need not address the argument. Nevertheless, it notes that the proposed remedies, being geared entirely toward either preventing future noncompliance with Section III.I or returning removed Class Members to the position they would

court imposes a contempt sanction, it is the inclusion of the purgation provision that renders the sanction civil rather than criminal. *See Carbon Fuel Co. v. United Mine Workers of Am.*, 517 F.2d 1348, 1349 (4th Cir. 1975) ("Civil contempt is conditional or contingent in nature, terminable if the contemnor purges himself of the contempt."); *see also, e.g.*, *Hicks v. Feiock*, 485 U.S. 624, 635 n.7 (1988) ("The critical feature that determines *whether the remedy* is civil or criminal in nature is . . . whether the contemnor can *avoid the sentence imposed on him*, or *purge himself of it*, by complying with the terms of the original order.") (emphasis added); *F.T.C. v. Trudeau*, 579 F.3d 754, 777 (7th Cir. 2009) ("[A]n essential ingredient to any coercive contempt sanction is the opportunity to purge."); *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) ("[C]oercive civil sanctions, intended to deter, generally take the form of conditional fines. . . . Thus, the ability to purge is perhaps the most definitive characteristic of coercive civil contempt.") (internal citations omitted); *Askew v. Bon Secours Health Sys., Inc.*, No. WMN-06-666, 2008 WL 11509380, at *1 (D. Md. July 30, 2008) ("The sanctions imposed for criminal and civil contempt are often of the same type – fines and imprisonment – but, in the case of civil contempt, the contemnor must be permitted to purge his contempt by complying with the Court's order."); *E.E.O.C. v. Mgmt. Hosp. of Racine, Inc.*, 794 F. Supp. 2d 921, 924 (E.D. Wisc. 2011) ("A coercive

---

have been in if not for the wrongful removal, have a "prospective and corrective" function, *Omega World Travel, Inc. v. Omega Travel, Inc.*, 905 F.2d 1530, 1990 WL 74305, at *3 (4th Cir. May 10, 1990) (unpublished per curiam), thus rendering them appropriate as civil contempt remedies (should an opportunity for purgation also be provided). That the proposed remedies resemble injunctive relief, rather than the commonly-employed coercive sanctions of fines or coercive incarceration, would not alter their character as such (indeed, Defendants appear to have conceded that injunctive relief may be ordered as a civil contempt remedy, *see* ECF 462 at 21). *See Schwartz*, 261 F. Supp. 3d at 617–18, 622–23 (holding, pursuant to finding of civil contempt that "[i]njunctive relief in this case is not only merited, but necessary and appropriate."); *S.E.C. v. Christen Grp.*, No. PX-22-3231, 2024 WL 5046041, at *1 (D. Md. Sept. 19, 2024) ("The Court may, in its discretion, grant injunctive relief to address the contemnor's lack of compliance with a court order."); *Talaria Co., LLC v. Duplessie*, No. 23-cv-468-ABA, 2025 WL 1545350, at *3 (D. Md. Apr. 25, 2025), *appeal dismissed*, No. 25-1597, 2026 WL 1507883 (4th Cir. Jan. 5, 2026).

*sanction* must afford the contemnor an opportunity to 'purge' his or her contempt, meaning that the contemnor can *avoid punishment* by complying with the court order.") (emphasis added).

Again, this Court is not ordering any relief specifically pursuant to the finding of contempt, But, out of an abundance of caution, to the extent that Defendants must be provided with an opportunity to purge the finding of contempt even in the absence of contempt sanctions (or to avoid this Court's consideration of future sanctions), this Court orders that Defendants may purge that finding by demonstrating to the satisfaction of this Court, through briefing and supporting declarations and evidence, their ability and willingness to comply with Section III.I and this Court's orders; specifically, that they have refrained from removing any individual in ignorance or disregard of identification of that individual's potential *J.O.P.* Class membership. *See Whittaker Corp.*, 953 F.2d at 518.

## IV.    CONCLUSION

For the reasons stated above, Class Counsel's Motion to Compel the Return of Class Member E.M.P., ECF 544, is denied, and Class Counsel's (Third) Emergency Motion to Enforce the Court-Ordered Settlement Agreement and Find Defendants in Civil Contempt, ECF 459, is granted in part and denied in part. A separate order will follow.


Dated: July 29, 2026                                    _____/s/_____

                                                        Stephanie A. Gallagher
                                                        United States District Judge

68