**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION**

J.O.P., *et al.*,

Plaintiffs,

v.

U.S. Department of Homeland Security, *et al.*,

Defendants.

Civil Action No.
8:19-CV-01944-SAG

**CLASS COUNSEL'S BRIEF IN SUPPORT OF THEIR MOTION TO REMEDY DEFENDANTS' CONTEMPT AND ENFORCE THE SETTLEMENT AGREEMENT AS TO CLASS MEMBER ELA**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 2

A. Class Member ELA Sought Protection in the United States ..... 2

B. ICE Removed ELA in Violation of the Settlement Agreement, Then Returned Him to the United States, Where He Spent Three and Half Weeks in Immigration Detention ..... 3

C. Defendants Removed ELA a Second Time, in Contempt of the Court's Orders ..... 6

III. ARGUMENT ..... 10

A. Defendants Must Be Ordered to Return ELA and to Render a Decision on the Substance of his Asylum Claim ..... 12

B. Defendants Should Be Ordered to Immediately Release ELA Upon His Arrival in the United States ..... 18

C. Defendants Should be Ordered to Provide Entry and Release Papers, Advance Notice of the Time and Place of His Planned Arrival, His Scheduled Asylum Interview, and Any Planned Removal ..... 21

D. Defendants Should be Ordered to Return ELA's Property ..... 22

IV. CONCLUSION ..... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Consumer Fin. Prot. Bureau v. Klopp*,
957 F.3d 454 (4th Cir. 2020) ....................20

*De Simone v. VSL Pharms., Inc.*,
36 F.4th 518 (4th Cir. 2022) ....................10

*In re Gen. Motors Corp.*,
61 F.3d 256 (4th Cir. 1995). Civil ....................15

*L.A. v. Warden*,
No. 3:26-cv-03058 (W.D. La. Aug. 14, 2026)....................6

*Lithko Contracting, LLC v. XL Insurance America, Inc.*,
318 A.3d 1221 (Md., 2024) ....................12

*of North Carolina v. Price*,
876 F.3d 573 (4th Cir. 2017) ....................17

*Omega World Travel, Inc. v. Omega Travel, Inc*.,
905 F.2d 1530 (4th Cir. May 10, 1990) ....................18

*Ramos-Lopez v. Bondi*,
--- F. Supp. 3d ---, 2026 WL 1745700 (D. Md. June 17, 2026) ....................19

*Schwartz v. Rent-A-Wreck of Am*.,
261 F. Supp. 3d 607 (D. Md. 2017)....................18, 21

*Transamerica Premier Life Ins. Co. v. Selman & Co., LLC*,
401 F. Supp. 3d 576 (D. Md. 2019)....................13

*United States v. United Mine Workers of Am.*,
330 U.S. 258 (1947)....................15

**Statutes**

8 U.S.C. § 1158(d)(5)(A)(ii) ....................14

8 U.S.C. § 1182(d)(5) ....................20

8 U.S.C. § 1231....................6

**Other Authorities**

8 C.F.R. § 208.9(b) ..........................................................................................................................14

## I. INTRODUCTION

Two times in the last six months, Defendants have placed Class Member ELA[1] on a plane to El Salvador, the country in which he fears persecution, and removed him in violation of the Settlement Agreement and this Court's Orders. He was first removed in March 2026, despite having an asylum application pending before USCIS. After advocacy by Class Counsel, Defendants returned ELA to the United States in August 2026. Three and a half weeks later, on September 1, 2026, Defendants unilaterally cancelled an appointment scheduled by ELA's counsel, confiscated his personal belongings, forced him on a plane, and again removed him to El Salvador, leaving him stranded there with no belongings, money, or even his phone, wearing a detention jumpsuit and no change of clothes. And yet, ELA's asylum application still remains pending before USCIS and has not been adjudicated on the merits as the Settlement Agreement requires. Class Counsel brings this motion to remedy Defendants' egregious violations of the Court's Orders and to protect ELA's rights under the Settlement Agreement.

While Defendants agree to return ELA to the United States, this alone will not remedy the second unlawful removal, because they plan to deprive him of an asylum adjudication on the merits based on a misreading of the Settlement Agreement and despite their compounded contempt. After two months of discussing ELA's return with Class Counsel, Defendants asserted for the first time in declarations filed on September 3, 2026 that ELA's asylum application will be closed once he is returned to the United States due to biometrics appointments he missed in 2025. Apparently, Defendants plan to return ELA and serve him notice on the tarmac that his asylum application is closed—or perhaps detain him first for days, weeks, or longer before serving him the notice, and

[1] ELA's full name is set forth in the exhibits to the Declaration of Wendy Wylegala, filed under seal, *e.g.*, Ex. B at 29. Class Counsel requests to proceed using ELA's initials only and thereby protect his identity and sensitive personal information, as he is a young person seeking asylum who is now in the country from which he sought asylum. Wylegala Decl. ⁋⁋ 5, 27-30.

then force him right back on a plane to El Salvador. Having been twice wrongfully removed, Class Member ELA will not receive an asylum adjudication on the merits without the Court's intervention. Class Counsel asks this Court to exercise its contempt authority or enforcement authority to ensure that ELA receives the process that the Class bargained for—a decision on the *substance* of his asylum claim, not having his application closed based on a non-substantive issue raised as a post-hoc pretext for his second unlawful removal.

Class Counsel also respectfully requests additional remedies pursuant to the Court's enforcement or contempt authority. ELA will be safe from further unlawful removals only if Defendants are ordered to immediately release him upon his arrival in the United States. Defendants must be ordered to return all of ELA's property that they took from him. Defendants should also be ordered to provide ELA, ELA's immigration counsel, and Class Counsel with copies of his entry and release paperwork and at least three weeks' advance notice of his scheduled asylum interview. Finally, if Defendants intend to remove ELA again for any reason, they must provide ELA, ELA's immigration counsel, Class Counsel, and the Court with at least 5 business days of advance notice, including the legal authority they assert authorizes the re-removal.

## II. FACTUAL BACKGROUND

### A. Class Member ELA Sought Protection in the United States

Class Member ELA arrived in the United States as a 16-year-old unaccompanied child. Wylegala Decl. ¶ 3. By the time ELA filed his asylum application with USCIS on February 14, 2025, USCIS had already granted him another form of humanitarian protection, Special Immigrant Juvenile Status with deferred action. *Id.* ¶ 6. In connection with his successful application for

work authorization on that basis, ELA had been scheduled for and had attended a biometrics appointment with USCIS on September 4, 2024. *Id.*, Ex. A (biometrics appointment notice).

In late March 2025, ELA lost his legal representation due to cuts in federal funding for legal services for unaccompanied children. Wylegala Decl. ¶ 7. Without his attorney's support, ELA missed a biometrics appointment scheduled by USCIS for April 1, 2025 in connection with his asylum application. *Id.* The office of his former attorney discovered the missed appointment in the fall of 2025, and emailed the Arlington Asylum Office on November 13, 2025, copying ELA, to request rescheduling of the biometrics appointment, but received only a form response, neither approving nor denying the rescheduling request. *Id.*

### B. ICE Removed ELA in Violation of the Settlement Agreement, Then Returned Him to the United States, Where He Spent Three and Half Weeks in Immigration Detention

On or about February 18, 2026, ICE initiated removal proceedings against ELA. The record of his only immigration court hearing on February 25, 2026 reflects that the immigration judge incorrectly concluded that no applications from ELA were pending before or approved by USCIS, and the DHS attorney did not correct the record. Wylegala Decl. ¶ 8. The judge ordered ELA removed, and ICE executed that final removal order on March 14, 2026. *Id.* ¶¶ 8-9. USCIS had failed to include ELA on its potential Class Member lists before ELA's removal. *Id.* ¶ 4 n.1.

Defendants disclosed ELA's removal to Class Counsel on March 30, 2026, and conceded ELA's Class membership on May 22, 2026. *Id.* ¶ 10, ¶ 4 n.1. When Class Counsel made contact with ELA after learning about his removal from Defendants, he stated he wished to return to the United States for his asylum adjudication because he feared for his safety in El Salvador. *Id.* ¶ 11.

On June 15, 2026, Class Counsel informed Defendants that ELA "wishes to return to the United States for adjudication of his pending asylum application pursuant to section III.B of the Settlement Agreement." Wylegala Decl. ¶ 13, Ex. B at 29. Class Counsel further asked for

assurances that Defendants would return ELA in a manner that best approximated the status quo ante before the unlawful removal: an independent determination regarding releasing ELA upon return; copies of ELA's entry documents; the location to which ICE would return ELA; in the event ELA was to be detained, the location of detention; and advance notice of ELA's asylum interview. *Id.*

On June 18, 2026, Defendants confirmed they would return ELA. Ex. B at 26. Their email further stated that "ICE and USCIS continue to evaluate the other questions from class counsel regarding detention and notification and will follow up as soon as additional information is available." *Id*. In emails sent June 21, July 29, August 3, August 5, and August 6, Class Counsel sought responses to the unanswered questions on the process for ELA's return and adjudication, explaining that the information was essential to ensure that ELA's return best approximated the status quo ante. *Id.* at 17-20, 25. Yet Defendants never provided answers to these questions to ELA, his immigration attorney, or Class Counsel.[2]

On July 28, 2026, Class Counsel learned directly from ELA that Defendants had scheduled his flight to the United States for August 7, 2026. *See* Ex. B at 22.

On the morning of August 6, 2026, Defendants identified the airport where ELA would arrive the following day but declined to answer Class Counsel's questions. Ex. B at 19. Class Counsel then reiterated the need for information about ELA's custody and asylum adjudication, noting that withholding this information interfered with ELA's ability to prepare for the adjudication and his due process rights. Ex. B at 17-18. Although they provided no substantive

[2] On July 20, 2026, Defendant DHS approved ELA for parole into the United States at any port of entry, valid until July 19, 2027. Ex. C, "Authorization of Parole of an Alien into the United States" issued to ELA by ICE. Class Counsel received this document from ELA after his second unlawful removal, not from Defendants in response to Class Counsel's requests for entry documents since June 15. Wylegala Decl. ¶ 14.

information, Defendants acknowledged this Court's ruling that any "Class Member who has been removed in violation of the Settlement Agreement[ ] must be returned to the United States to await adjudication of his asylum application on the merits by USCIS." Ex. B at 16, citing ECF No. 253 at 13. Defendants further stated that they were complying with the Court's orders "by returning ELA to the United States to await adjudication of his asylum application on the merits by USCIS." *Id.*

On August 6, 2026, ELA's new immigration counsel notified the Arlington Asylum Office (which had jurisdiction over ELA's asylum application) of her entry of appearance. Wylegala Decl. ¶ 16, Ex. D at 3. ELA's counsel further informed USCIS that ELA was an unlawfully removed *J.O.P.* Class member whose return was arranged by ICE for the following day, adding, "Once he has returned, we request that the asylum office resume processing of his application." Ex. D at 3-4. Counsel also acknowledged that in advance of his interview ELA would need to pay the "annual asylum fee" (AAF), and asked the office to issue a new notice to facilitate ELA's payment. *Id.* Finally, counsel requested, "Please let me know if there is any additional information or documentation needed." *Id.* USCIS did not respond until August 28, as discussed below.

On August 7, ELA boarded a plane with a travel bag of his belongings at approximately 11:00 a.m. local time in San Salvador (1:00 p.m. Eastern time). That afternoon, Class Counsel emailed Defendants again, stating in part:

> If ICE will detain ELA, his counsel of record needs to contact the relevant detention facility immediately to schedule a legal appointment with ELA so that their meeting can take place at the earliest opportunity. This is particularly important because Defendants have not yet notified us or ELA's immigration counsel of the timing for the asylum interview, and his counsel needs to arrange for necessary resources and preparation. As you know, time lags of several days are typical before a person's location appears in the online ICE Detainee Locator, so his location is unlikely to be available to counsel of record today or this weekend without information from your clients. We recognize you have offered the suggestion that G-28 counsel before ICE will receive notice of any transfers; however, that has not

> been the experience reported by counsel to detained Class Members. As you know, this lack of information implicates the right to counsel and other due process rights.

Ex. B at 14-15. Defendants provided no substantive response. *Id.* at 14. That evening, Class Counsel learned of ELA's arrival in the United States when the ICE Detainee Locator showed he was detained at a Winnfield Parish, Louisiana ICE facility. Wylegala Decl. ¶ 18. On the morning of August 8, Defendants' counsel informed Class Counsel that ELA would be transferred to Jefferson Parish Correctional Center in Louisiana.[3] Ex. B at 13.

Between August 10 and August 28, ELA's immigration counsel conducted about nine virtual legal meetings with him to prepare for ELA's asylum adjudication on the merits. Wylegala Decl. ¶ 19. His counsel also arranged for an evaluation by a psychologist through two two-hour meetings on August 31 and September 1. *Id.*

On August 28, the Arlington Asylum Office forwarded ELA's counsel's August 6 inquiry to the New Orleans Asylum Office, stating that ELA's case "is in your jurisdiction." Ex. D at 2. The New Orleans Asylum Office then emailed ELA's counsel acknowledging receipt of her notice of entry of appearance, but did not address other information in counsel's August 6 email, and gave no indication that the asylum adjudication would not proceed on the merits. *Id.* at 1-2.

### C. Defendants Removed ELA a Second Time, in Contempt of the Court's Orders

According to Defendants, the *J.O.P.* banner on ELA's EARM record was removed "due to case closure," ECF No. 668-2 at 2, despite the fact that his asylum case was not closed, ECF No.

[3] Represented by pro bono counsel, ELA filed a habeas petition on August 14, 2026, seeking immediate release. *L.A. v. Warden,* No. 3:26-cv-03058 (W.D. La. Aug. 14, 2026). The petition argued, *inter alia*, that no statutory authority exists for ELA's immigration detention, as he was not in current removal proceeding nor was there a pending unexecuted removal order to provide a basis for detention under 8 U.S.C. § 1231. The court had not yet issued an order requiring the government's response before ELA's removal on September 1.

668-1 at 2.[4] Defendants also shared that at approximately 2:21 a.m. ET on September 1, 2026, ELA was moved from the Louisiana detention center where he had been detained, and transferred to a staging facility for removal. ECF No. 668-2 at 2.

At approximately 8:40 a.m. ET that same day, ELA's immigration counsel received an automated email from an ICE Service Desk canceling that day's mental health evaluation appointment, giving the reason "[n]o longer at this facility." Wylegala Decl. ¶ 25, Ex. F. Until at least 9:30 a.m. ET, the ICE Detainee Locator reflected that ELA was at Jackson Parish. Wylegala Decl. ¶ 25. At about 9:37 a.m. ET, the Jackson Parish facility emailed ELA's counsel, stating, "He is no longer at our facility, so we will not be able to conduct today[']s meeting." Ex. H at 2. ELA's counsel replied immediately, asking for ELA's current location. *Id.* Two hours later, another member of ELA's legal team wrote to the facility asking ELA's whereabouts, and stating that the cancelation "impacts our client['s] ability to properly prepare his case." *Id.* at 1. They received no response.

According to Defendants, at approximately 9:45 a.m., the plane carrying ELA took off for San Salvador. ECF No. 668-2 at 2.

At 11:22 a.m. ET, with the ICE Detainee Locator reflecting no record for ELA, Class Counsel emailed Defendants' counsel "to seek urgent corrective action, today, for the cancellation of a professional evaluation." Ex. B at 10-11. The email noted that "[t]he evaluation is central to

[4] In their September 10, 2026 Status Report, Defendants state that the USCIS employee who communicated with ICE in August 2026 about the planned closure of ELA's asylum application, ECF No. 668-1, which led to ICE's removal of the banner, *see* ECF No. 668-2, at 2, "is not one of the USCIS POCs identified in an attachment to the ICE guidance. Those USCIS POCs have greater familiarity with Defendants' obligations under the J.O.P. settlement agreement." ECF No. 674 at 2.

ELA's due process rights" and sought ELA's location in order to proceed with or reschedule the meeting. *Id.*

Defendants had yet to respond when, between 5:00 p.m. and 5:15 p.m. ET on September 1, ELA's immigration counsel conveyed to Class Counsel a series of updates immigration counsel received from a family member whom ELA had phoned from the San Salvador airport, using a stranger's phone, stating that ICE had removed him once again. Wylegala Decl. ¶ 27. At approximately 5:23 p.m., members of the Class Counsel team received the same report directly from ELA's family member, along with additional details. *Id.* ¶ 28.

At 5:36 p.m. ET, in an email tagged as high priority, Class Counsel notified Defendants' counsel that "[w]e were told moments ago that ELA was told he would be transferred to another detention center and has instead been deported to El Salvador." Ex. B at 9-10. Defendants' counsel acknowledged receipt. *Id.* at 9. Class Counsel sent a further mail at 6:18 p.m., outlining Defendants' violation of and contempt of multiple Court orders, and asking for a response. *Id.* at 8-9. The only substantive information Defendants provided on September 1 is that ELA's name appeared on the manifest of a flight that had landed in El Salvador. *Id.* at 7.

On the morning of September 3, 2026, Defendants asked "whether ELA wishes to return to the United States," and Class Counsel responded, "ELA very much wants to return to the United States due to fear for his safety." Ex. B at 5. In a second message, Class Counsel added: "Given that ICE has already twice removed ELA unlawfully, and given his active parole status that allows him to be paroled into the United States at any port of entry until July 19, 2027, ICE must release ELA upon entry. Moreover, Defendants have never disclosed a lawful basis for detaining ELA." *Id.* at 3. Defendants acknowledged receipt of the email after filing their status reports with the Court. *Id.* at 2-3.

On September 4, 2026, Class Counsel asked Defendants to respond to Class Counsel's position that the remedy for ELA's second removal must include releasing ELA from DHS custody upon his return to the United States, an adjudication by USCIS on the merits of his asylum application, providing Class Counsel and immigration counsel with copies of ELA's entry documents and adequate notice of ELA's return and of his asylum interview, return of ELA's confiscated documents and personal possessions, and reimbursement of expenses ELA incurred in connection with the unlawful removals. Ex. B at 1-2. Class Counsel's email asked Defendants to provide their position on these issues by the end of the day on September 8. *Id.* at 1. Defendants finally responded on September 11, 2026. Ex. 3.

ELA remains in fear for his safety in El Salvador. Wylegala Decl. ¶ 33. ELA informed Class Counsel that when the plane carrying him landed in San Salvador, the government employee onboard the flight turned to ELA, welcomed him to the country, and laughed. *Id.* ELA had no notice that his removal was imminent and no opportunity to communicate with his counsel or seek assistance with transportation after arrival. *Id.* ICE left ELA at the airport in El Salvador dressed in a uniform issued by the detention center, and deprived him of the identification documents, clothing, shoes, cash, and phones he had with him when he entered ICE detention. *Id.* ELA wishes to return to the United States and receive a merits adjudication on his asylum application from USCIS. *Id.*

According to Defendants, ELA's asylum claim "has not been closed with USCIS," but that "if ELA returns to the United States, USCIS's policy will be to move forward with closing the case due to ELA's failure to attend his biometrics appointments" and that "USCIS would provide ELA with notice of that closure." ECF No. 668-1 at 2. On September 11, 2026, Defendants responded to Class Counsel's request for specific remedies stating that (1) DHS will facilitate

ELA's return to the United States and issue a "Final Determination" which "may include a determination by USCIS that ELA failed to comply with his statutory biometrics obligations"; (2) DHS will detain ELA upon his return, (3) ELA may make a request to ICE for return of his property and copies of entry documents, (4) that Defendants will not reimburse ELA for the expenses he incurred, and (5) USCIS "will follow normal protocols for any notifications regarding ELA's asylum application." Ex. 3.

## III. ARGUMENT

While Defendants are willing to return ELA to the United States to remedy the second unlawful removal, they plan to deprive him of an asylum adjudication on the merits in violation of the plain language of Section III.B of Settlement Agreement and despite their compounded contempt. Rather than attempt to purge their contempt for their ongoing removal of Class Members, ECF No. 645, Defendants continue to violate the Court's orders. Defendants' removal of ELA—for the second time—is yet another violation of the Settlement Agreement in contempt of the Court's Orders of November 25, 2024, April 23, 2025, and July 29, 2026.[5] All elements of contempt are yet again met: (1) the Court's Orders are valid decrees; (2) the Court's Orders were in favor of the Class; (3) the removal of ELA was in violation of the Orders, and Defendants had

[5] ECF No. 205 (granting final approval of Settlement Agreement, which provides that "ICE will refrain from executing the Class Member's final removal order until USCIS issues a Final Determination on one properly filed asylum application under the terms of this Agreement"); ECF No. 254 (ordering Defendants "not to remove from the United States members of the certified 'Class'"); ECF No. 642 (ordering Defendants that, "if an individual is identified to ICE as a potential J.O.P. Class Member by any other means (including, but not limited to, USCIS's compiled lists of potential Class Members, self-identification, or identification by counsel), ICE must refrain from removing the individual unless and until USCIS adjudicates their asylum application on the merits or the USCIS Asylum Office confirms the individual is not a Class Member").

knowledge of the violations; and (4) ELA was harmed as a result. *See De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 529 (4th Cir. 2022).

Notably, Defendants' second removal of ELA on September 1, 2026 occurred less than a month ***after*** ICE issued written guidance to all ICE personnel instructing them to "refrain from executing an order of removal entered against a Class Member until USCIS issues a final determination on the Class Member's properly filed asylum application." ECF No. 653-2. But even that guidance went unheeded by ICE personnel, as ELA was removed before USCIS adjudicated his asylum application on the merits. ECF No. 668-1 at 2 (showing that ELA's asylum application remained pending); *see* Settlement Agreement, ECF No. 199-2, at II.L (defining Final Determination). Indeed, ELA was removed even before USCIS closed his case, which remains pending. ECF No. 668-2 at 2; ECF No. 668-1 at 2. Defendants do not follow the Court's Orders, nor do they follow their own written guidance.

In view of Defendants' egregious contempt, Class Counsel requests that the Court order five specific and tailored remedies: (1) that USCIS promptly return ELA and adjudicate his application on the merits, without regard for any alleged failure to attend a prior biometrics appointment, (2) that Defendants immediately release ELA upon his arrival in the United States, (3) that Defendants return all of ELA's property that they took from him, (4) that Defendants provide ELA, ELA's immigration counsel, and Class Counsel with copies of his entry and release paperwork and at least three weeks advance notice of his scheduled asylum interview, and (5) that if Defendants intend to remove ELA again for any reason, they provide ELA, ELA's immigration counsel, Class Counsel, and the Court with at least 5 business days of advance notice, including the legal authority they assert authorizes the re-removal.

### A. Defendants Must Be Ordered to Return ELA and to Render a Decision on the Substance of his Asylum Claim

#### 1. *Defendants' Refusal to Adjudicate ELA's Application on the Merits is a Violation of Section III.B of the Settlement Agreement*

Although Defendants agree to return ELA, they refuse to adjudicate his asylum application on the merits in violation of Section III.B of the Settlement Agreement. The plain language of Section III.B, confirmed by Maryland's objective theory of contract interpretation, requires more than that which Defendants are offering to give ELA—a return to the United States so that USCIS can hand him a notice stating that USCIS is closing his asylum application for failure to appear for biometrics more than a year ago.

The plain language of Section III.B and the definition of "adjudicate on the merits" are clear that anything less than a ***substantive*** review of an asylum claim violates the Settlement Agreement. Under the objective theory of contract interpretation, it is "the written language embodying the terms of an agreement [that] will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract." *Lithko Contracting, LLC v. XL Insurance America, Inc*., 318 A.3d 1221, 1230 (Md., 2024) (quoting *Tapestry, Inc. v. Factory Mut. Ins. Co.*, 286 A.3d 1044, 1053 (Md. 2022) (internal citations omitted). Section III.B provides that "USCIS will exercise Initial Jurisdiction over Class Members' asylum applications in accordance with the terms of this Settlement Agreement and adjudicate them on the merits." ECF No. 199-2 at 6. The Settlement Agreement defines "adjudicate on the merits" as "to render a decision on the substance of an asylum claim by either granting an approval or issuing a determination of non-eligibility." ECF No. 199-2 at 3. Allowing USCIS to simply close a Class Member's asylum application for any alleged procedural flaw does not comport with Section III.B.'s mandate that USCIS must "render a decision on the substance of an asylum claim." If closing the asylum application based on a procedural deficiency sufficed

as a permissible outcome for an adjudication "on the merits," the sole two permissible outcomes of "an approval or issuing a determination of non-eligibility" would not have been necessary.

Indeed, USCIS has given the phrase "determination of non-eligibility," one of the two permissible outcomes in the Settlement Agreement for an adjudication on the merits, specific meaning. The USCIS Affirmative Asylum Procedures Manual shows that a "[d]etermination of non-eligibility" is the name of the document USCIS issues to Unaccompanied Children in removal proceedings when it denies their asylum claim on the merits. Ex. 1 (AAPM) at 90-91 (referencing "UAC Decision Notice for Non-Eligibility"). In contrast, the section in the AAPM discussing the procedures for when USCIS closes an application for failure to attend a biometrics appointment does not use the phrase "decision notice for non-eligibility." *Id.* at 29. Therefore, a "determination of non-eligibility" specifically denotes that USCIS has assessed the merits of the application and denied asylum.

What is not included in Section III.B or the definition of an "adjudicate on the merits" is also telling. Nowhere in Section III.B or the definition of "adjudicate on the merits" are Defendants allowed any loophole to reject Class Members' asylum applications for alleged procedural flaws rather than affording them "a decision on the substance of an asylum claim." As Defendants have argued time and time again, the absence of terms or a gap in the Settlement Agreement is indicative of the parties' position at the time of execution as either party could and should have negotiated for the missing language. *See e.g.*, ECF No. 568 at 11; Ex. 2 (June 22, 2026 Motion to Enforce Hearing Tr.) at 60. Stated simply, Defendants cannot "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used" in the Settlement Agreement. *Transamerica Premier Life Ins. Co. v. Selman & Co., LLC*, 401 F. Supp. 3d 576, 593 (D. Md. 2019). In sum, no part of Section III.B or the definition of an "adjudication

on the merits" allows USCIS to refuse to adjudicate the substance of a Class Member's asylum application due to missing a biometrics appointment.

The remaining four corners of the agreement reinforce that closure of an asylum application due to missing biometrics is contrary to the general purpose of the Agreement. The Class Definition at Section II.E encompasses those whose asylum applications have yet to be adjudicated on the merits. In other words, once USCIS provides an adjudication on the merits, Class Membership ends because this core benefit has been accomplished. Section III.I requires ICE to "refrain from executing the Class Member's final removal order until USCIS issues a Final Determination on one properly filed asylum application under the terms of this Agreement." Section II.L provides just two outcomes that count as a "Final Determination" with the first being "an adjudication on the merits, as defined in Paragraph II.B" and the second being an "Adverse Jurisdictional Determination as defined in Paragraph II.C," meaning a determination by USCIS that it lacks jurisdiction over an asylum claim because the immigration court instead has jurisdiction, an outcome that the Agreement generally prohibits for Class Members unless a narrow exception applies relating to pre-filing adult immigration detention. Allowing Defendants to close an asylum application due to missing biometrics would moot Class Members' asylum applications and render the purpose of the Agreement meaningless.

To be clear, to "adjudicate on the merits" and "render a decision on the substance of an asylum claim" requires a specific process. Rendering a decision on the substance of an asylum claim necessarily entails, among other things, the applicant's testimony during an asylum interview and opportunity to present evidence regarding their asylum eligibility. *See, e.g.*, 8

U.S.C. § 1158(d)(5)(A)(ii); 8 C.F.R. § 208.9(b) (2024).[6] The interview "is one of the main tools [asylum officers] use to gather the information necessary to make a correct decision." Refugee, Asylum, and International Operations Directorate ("RAIO"), Lesson Plan, Interviewing – Introduction to the Non-Adversarial Interview (Dec. 2024) at 11.[7] Among other things, USCIS policy requires that during the interview the asylum officer must use a question and answer format and take the asylum applicant's testimony as a sworn statement. *See, e.g.*, Refugee, Asylum, and International Operations Directorate, Lesson Plan, Interviewing – Note Taking, at 11, 38-39 (Dec. 2024).[8] The Affirmative Asylum Procedures Manual devotes an entire section on how asylum officers should conduct asylum interviews and mentions "interview" 784 times.[9] USCIS has considered the non-adversarial asylum interview so important that it has issued multiple training manuals for asylum officers about how to conduct it.[10] The opportunity to present testimony and

---

[6] At the time of the Settlement Agreement's execution and the Court's Order approving it, and until July 28, 2026, 8 C.F.R. § 208.9(b) required interviews as part of a USCIS merits adjudication of an asylum application. On July 28, 2026, USCIS issued an Interim Final Rule (IFR) permitting but not requiring USCIS to refer certain asylum applications to immigration court without interviewing them but noted that "this this rule will not hinder USCIS' ability to comply with any legislation or settlement agreement in litigation that would require USCIS to schedule interviews for certain aliens and/or populations of aliens." USCIS, Affirmative Asylum Referrals Without Interview, 89 Fed. Reg. 47101, 47102 n.1 (July 28, 2026). Class Counsel has repeatedly asked Defendants to confirm that USCIS will not apply this Rule to Class Members, as doing so would violate the Agreement; Defendants have not provided a substantive response citing pending litigation challenging the legality of the IFR. *See Immigration Equality v. Mullin*, No. 26-cv-02921 (D.D.C. filed Aug. 18, 2026).

[7] Available at: https://www.uscis.gov/sites/default/files/document/foia/Interviewing_-_Intro_to_the_NonAdversarial_Interview_LP_RAIO.pdf.

[8] Available at: https://www.uscis.gov/sites/default/files/document/foia/Interviewing_-_Note_Taking_LP_RAIO.pdf.

[9] USCIS RAIO, Affirmative Asylum Procedures Manual (2025), available at: https://www.uscis.gov/sites/default/files/document/guides/AAPM.pdf.

[10] *See, e.g.*, RAIO Lesson Plan, Non-Adversarial Interview; RAIO Lesson Plan, Interviewing – Eliciting Testimony (Feb. 2025), available at: https://www.uscis.gov/sites/default/files/document/foia/Interviewing_-

evidence to establish eligibility through a non-adversarial USCIS asylum interview is at the heart of this case. *See, e.g.,* Complaint, ECF No. 1 at 2 ¶ 5 ("Instead, the TVPRA allows unaccompanied immigrant children to pursue asylum in the first instance through a non-adversarial administrative interview with a trained asylum officer within USCIS, a process more appropriate for traumatized young applicants."); *id*. at 10 ¶¶ 49, 81; First Amended Complaint, ECF No. 91 ¶¶ 6, 70, 82, 103; Second Amended Complaint, ECF No. 145 ¶¶ 6, 82, 94, 118. This USCIS "adjudication on the merits" through a non-adversarial asylum interview is therefore a core benefit of the bargain that Class Counsel agreed to by entering in the Settlement Agreement and in exchange agreeing to release, relinquish, and discharge the class-wide claims. *See* ECF No. 199-2 at 14.

Accordingly, the Court should exercise its enforcement authority to order Defendants not only to return ELA to the United States, but to order Defendants to comply with Section III.B of the Settlement Agreement to render a decision on the substance of his asylum claim.

#### 2. *The Court Can Also Order Defendants To Adjudicate ELA's Asylum Application Pursuant to the Court's Contempt Authority*

Even if the Court is not inclined to enforce Section III.B of the Settlement Agreement, it may still order Defendants to adjudicate ELA's asylum application pursuant to the Court's contempt authority in view of their repeated unlawful removals of ELA in violation of the Court's orders. "The appropriate remedy for civil contempt is within the court's broad discretion." *In re Gen. Motors Corp.*, 61 F.3d 256, 259 (4th Cir. 1995). Civil contempt sanctions can serve two purposes: (1) to compensate a complainant for his losses incurred by the contemptuous conduct; and (2) to coerce a party to comply with a court order. *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947). Here, the proposed remedy serves both purposes.

---

_Eliciting_Testimony_LP_RAIO.pdf; RAIO Lesson Plan, Interviewing – Note-taking (Dec. 2024), *supra* note 7; RAIO Lesson Plan, Interviewing – Introduction to the Non-Adversarial Interview (Dec. 2024), *supra* note 8.

To restore ELA's rights as a Class Member, he must not only be returned to the United States, he must also receive the expected adjudication on the merits of his asylum application, without regard to a missed biometrics collection that could have been conducted on any one of the 24 days ELA spent in ICE's custody last month. Indeed, there was never any indication that Defendants would bring ELA back for anything other than an asylum adjudication on the merits. When Defendants agreed on June 18, 2026 to facilitate ELA's return to the United States as a remedy to their prior Section III.I violation, Defendants misled ELA into believing that he would receive an asylum adjudication on the merits as required by Section III.B. Defendants then misled this Court and Class Counsel on June 22, 2026 by using their agreement to facilitate ELA's return as evidence that they were remedying their past violations of the Settlement Agreement and the Court's April 23, 2025 Order. Ex. 2 (June 22, 2026 Hearing Tr.) at 44, 49-50. In ELA's three and a half weeks in ICE custody preceding his second removal, his immigration counsel scheduled numerous legal visits through ICE's scheduling system and corresponded with USCIS about ELA's anticipated interview, putting both on notice that ELA was preparing for an asylum merits adjudication. Wylegala Decl. ¶¶ 16, 19, 21, 23. In the months of correspondence between Class Counsel and Defendants' counsel regarding ELA's return for an adjudication on the merits of his asylum application, neither USCIS nor ICE ***ever*** raised the missed biometrics appointments, leading ELA and his counsel to believe that ELA would receive an adjudication on the merits of his asylum application.[11] Wylegala Decl. ¶ 15, Ex. B at 14-26.

[11] Had Defendants ever indicated that their plan was to bring ELA to a U.S. immigration detention center for an undefined period of time and then to reject his asylum application without reaching its merits, Class Counsel would have shared this information with ELA prior to his departure. *See* Wylegala Decl. ⁋⁋ 12, 15. But Defendants said nothing, and instead of allowing Defendants to raise this argument after the fact in explaining away yet another violation of the Agreement, the

Furthermore, an order that Defendants adjudicate ELA's asylum application on the merits will coerce Defendants into complying with the Court's Orders to prevent further removals of other Class Members for similar pretextual reasons. According to Defendants' most recent status report filed on September 10, 2026, Defendants have removed 148 confirmed and potential Class Members from the United States. ECF No. 674-3. And Defendants' removal of ELA shows that Defendants continue to violate the Court's Orders, and that ICE's written guidance is not adequate to ensure that Class Members are not removed. Further relief is necessary to coerce Defendants into compliance. By ordering Defendants to adjudicate ELA's application on the merits, despite a missed biometrics appointment in 2025, Defendants should be coerced into being more diligent to ensure that other Class Members are not removed. In other words, by forcing Defendants' hand to order them to adjudicate ELA's application, Defendants should take heed to avoid the same consequence for other Class Members.

For these reasons, Defendants should be ordered to adjudicate ELA's asylum application on the merits, without closing the case for a pretextual procedural excuse of failing to attend a biometrics appointment.

### B. Defendants Should Be Ordered to Immediately Release ELA Upon His Arrival in the United States

Defendants should also be ordered to immediately release ELA upon his arrival in the United States.[12] This proposed remedy is "prospective and corrective" in function as it is will help prevent future noncompliance with Section III.I and return ELA to the position he was in prior to the first wrongful removal. *Omega World Travel, Inc. v. Omega Travel, Inc.*, 905 F.2d 1530, 1190

Court should find that Defendants have waived this argument. *See Hensley on behalf of North Carolina v. Price*, 876 F.3d 573, 580 (4th Cir. 2017) (holding that deputy sheriffs failed to raise and, therefore, waived any argument that the plaintiff's right at issue was not clearly established).

[12] Class Counsel takes no position as to monitoring requirements should release be ordered.

WL 74305, at *3 (4th Cir. May 10, 1990) (unpublished per curiam). As such, immediate release from detention upon returning to the United States is an appropriate civil contempt remedy. To the extent that this remedy is injunctive in nature, the Court has already recognized that "Defendants appear to have conceded that injunctive relief may be ordered as a civil contempt remedy," ECF 645, and "[i]njunctive relief in this case is not only merited, but necessary and appropriate." *Schwartz v. Rent-A-Wreck of Am*., 261 F. Supp. 3d 607, 617 (D. Md. 2017).

Ordering ELA's immediate release is the minimum necessary to ensure ELA will not be improperly removed for a third time. Defendants have now wrongfully removed ELA twice while he was in their custody. Before ELA's second removal, a *J.O.P.* banner was present within his EARM file, ECF No. 668-2 at 2-3, and Defendants were on notice of his Class Member status due to his prior improper removal and eventual return. Moreover, three separate orders of this Court prohibited Defendants from removing Class Members like ELA. ECF No. 205; ECF No. 254; ECF No. 642. None of this prevented ELA's removal, nor did it protect ELA's access to counsel and ability to assert his rights as a Class Member. However, returning to a non-detained status would ensure that Defendants do not again awake ELA in the middle of the night misrepresenting that he was being transferred to another detention facility while failing to provide Class Counsel and his immigration counsel notice of his imminent removal. Indeed, a non-detained status would ensure that he has "access to [his] counsel" who can prevent another unlawful removal. *See J.O.P. v. U.S. Dep't of Homeland Sec.*, No. 25-1519, 2025 WL 1431263, at *4 (4th Cir. May 19, 2025) (Benjamin, J., concurring). In ordering ELA's release, this Court can ensure that ELA is not

removed to El Salvador a third time before an asylum adjudication on the merits or notice to his immigration counsel and Class Counsel.

Further, an order of ELA's release would restore ELA to the condition he was in prior to his first improper removal. *Cf. Ramos-Lopez v. Bondi*, --- F. Supp. 3d ---, 2026 WL 1745700 (D. Md. June 17, 2026) (in Administrative Procedure Act lawsuit challenging DHS's removal of a youth with SIJS-based deferred action, ordering return and release upon return to restore *status quo ante*). Prior to his first improper removal, ELA had resided in the United States outside of detention while awaiting his USCIS asylum merits adjudication. Thus, such an order would restore him to the status he had leading up to Defendants' series of unlawful actions and eventual contempt of this Court's orders.

Finally, there would be no harm nor undue burden to Defendants, as Defendants have not offered any legal grounds for ELA's detention to this Court, Class Counsel or immigration counsel, nor in response to ELA's habeas petition. Defendants cannot point to pending removal proceedings, nor a final, unexecuted order of removal. To the contrary: before his first removal, ELA was granted SIJS and deferred action; before his second removal, ELA was granted humanitarian parole pursuant to 8 U.S.C. § 1182(d)(5) which still has 10 months to run. And, ELA has made clear that he intends to pursue an asylum adjudication on the merits and will attend the asylum interview. Had this not been his intention, he would have not returned to the United States. Wylegala Decl. ¶¶ 11-23.

Ultimately, "[b]ecause the sanctions for civil contempt must be causally related to contemptuous conduct, . . . resolution of . . . sanctions arguments depends on the violations found by the district court." *Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 454, 461 (4th Cir. 2020). Due to the extraordinary circumstances of Defendants' contemptuous conduct, removing ELA—

not once, but twice—to the country from which he seeks asylum, an order of release pending ELA's asylum hearing is appropriate and necessary to protect him from a third unlawful removal.

### C. Defendants Should be Ordered to Provide Entry and Release Papers, Advance Notice of the Time and Place of His Planned Arrival, His Scheduled Asylum Interview, and Any Planned Removal

The Court should also order Defendants to provide ELA, ELA's immigration counsel, and Class Counsel with (1) copies of his entry and release paperwork; (2) at least three business days' advance notice of the time and place of his planned arrival in the United States; (3) at least three weeks advance notice of his scheduled asylum interview; and (4) at least five days' notice of any planned removal. These remedies would return ELA to the position he would have been in prior to the first wrongful removal and prevent future noncompliance with Section III.I of the Agreement and the Court's Orders. *See Omega World Travel, Inc.*, 905 F.2d 1530, 1190 WL 74305, at *3.

Restoration of the status *quo ante* to the "last uncontested status between the parties which preceded the controversy" entails providing copies of his entry and release paperwork and providing advance notice of his asylum interview. *League of Women Voters of N.C. v. North Carolin*a, 769 F.3d 224, 236 (4th Cir. 2014). When ELA came to the United States seeking protection and was released from a federally-run children's shelter, he received entry paperwork and release documents that clearly denoted the legal authority underpinning his release. If ELA returns to the United States for an asylum adjudication on the merits, Defendants must provide him with the same documentation to place him in the status *quo ante*. Furthermore, ELA's entry and release paperwork contain information that is essential to him understanding his legal rights in the United States. Similarly, had Defendants not wrongly removed ELA, ELA would have received notice from USCIS informing him of his asylum interview and providing sufficient time

to prepare for the interview. Therefore, the status *quo ante*—as well as procedural due process—requires providing ELA advance notice of his asylum interview.

Providing at least three business days' advance notice of the time and place of his planned arrival in the United States and at least five business days of advance notice of any planned future removal, including the legal authority they assert authorizes the re-removal, will ensure that Defendants comply with Section III.I. If Class Counsel know when and where ELA will enter the United States and whether Defendants plan to remove him again, Class Counsel will have the opportunity to seek the Court's intervention prior to another contemptuous act.

Without these remedies, ELA would not return to the status quo ante and the risk of future violations of the Settlement Agreement and the Court's Orders remains high.

**D. Defendants Should be Ordered to Return ELA's Property**

Finally, the Court should order Defendants to return all of ELA's confiscated personal property, including his El Salvador identity card, three cell phones, clothing, and money. Wylegala Decl. ⁋ 33. The court "may impose sanctions for civil contempt to coerce obedience to a court order *or to compensate the complainant for losses sustained as a result of the contumacy*." *Schwartz v. Rent–A–Wreck of America*, 261 F. Supp. 3d 607, 617 (D. Md. 2017) (quoting *In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995)) (emphasis added). As such, in addition to ordering injunctive relief, a court can order "the contemnor to reimburse the complainant for losses sustained and for reasonable attorney's fees." *Id.* (quoting *Enovative Techs., LLC v. Leor*, 86 F.Supp.3d 445, 447 (D. Md. 2015). The last time ELA saw his bag of belongings was in Louisiana before he boarded a plane destined for Texas. Wylegala Decl. ⁋ 33. Class Counsel is prepared to provide Defendants additional details so that they may identify and retrieve his bag of belongings.

If Defendants are unable to retrieve his belongings, ELA expects Defendants to compensate him for the loss of his personal property as a result of their contumacy.

## IV. CONCLUSION

For all the reasons discussed above, the Court should find that Defendants have again violated the Settlement Agreement and the Court's prior orders, and use its enforcement or contempt authority to order the requested remedies.

Dated: September 11, 2026

Respectfully submitted,

_/s/ Brian T. Burgess_

Brian T. Burgess (Bar No. 19251)
Daniel L. Farraye*
Goodwin Procter LLP
1900 N Street, NW
Washington, DC 20036
Phone: 202-346-4000
Fax: 202-346-4444
BBurgess@goodwinlaw.com
DFarraye@goodwinlaw.com

Elaine Herrmann Blais*
Kevin J. DeJong*
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
Phone: 617-570-1000
Fax: 617-523-1231
EBlais@goodwinlaw.com
KDeJong@goodwinlaw.com

Adam J. Horowitz*
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Phone: 212-813-8800
Fax: 212-355-3333
AHorowitz@goodwinlaw.com

Wendy Wylegala*
Kids in Need of Defense
252 West 37th Street, Suite 1500W
New York, NY 10018
Phone: 646-970-2913
Fax: 202-824-0702
WWylegala@supportkind.org

Michelle N. Mendez (Bar No. 20062)
National Immigration Project
1763 Columbia Road NW
Suite 175 #896645
Washington, DC 20009
Phone: 410-929-4720
Fax: 617-227-5495
Michelle@nipnlg.org

Rebecca Scholtz*
National Immigration Project
30 S. 10th Street (c/o University of St. Thomas Legal Services Clinic)
Minneapolis, MN 55403
Phone: 202-742-4423
Fax: 617-227-5495
Rebecca@nipnlg.org

Kristen Jackson*
Public Counsel
610 South Ardmore Avenue
Los Angeles, CA 90005
Phone: 213-385-2977
Fax: 213-201-4727
KJackson@publiccounsel.org

Mary Tanagho Ross*
Bet Tzedek Legal Services
3250 Wilshire Blvd., #1300
Los Angeles, CA 90010
Phone: 323-939-0506
Fax: 213-471-4568
MRoss@betzedek.org

*Attorneys for Plaintiffs*

*Admitted *pro hac vice*