**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION**

| | |
|---|---|
| **J.O.P.**, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. DEPARTMENT OF HOME.L.A.ND SECURITY**, et al.,<br><br>Defendants. | Civil Action No. 8:19-CV-01944-SAG |

**DECLARATION OF WENDY WYLEGALA IN SUPPORT OF CLASS COUNSEL'S MOTION TO REMEDY DEFENDANTS' CONTEMPT AND ENFORCE THE SETTLEMENT AGREEMENT AS TO CLASS MEMBER E.L.A.**

I, Wendy Wylegala, hereby declare as follows:

1. I am an attorney at law, licensed to practice law by the State of New York, and admitted *pro hac vice* before this Court. I am part of the Class Counsel team in this case.

2. I make this declaration in support of Class Counsel's Motion to Remedy Defendants' Contempt and Enforce the Settlement Agreement as to Class Member E.L.A. This declaration is based on personal knowledge and review of records pertaining to E.L.A.'s case. If called upon to testify, I could and would testify competently to the facts herein.

**E.L.A.'s Class Membership and Pursuit of Legal Protection in the United States**

3. E.L.A. was born in 2006. When E.L.A. arrived in the United States in May 2023 at age 16, DHS determined him to be an "unaccompanied alien child," according to documentation issued by the Office of Refugee Resettlement of the Department of Health and Human Services ("ORR").

4. At that time, DHS issued E.L.A. a Notice to Appear charging him with removability based on unauthorized entry into the United States, *see* 8 U.S.C. § 1182(a)(6)(A)(i). However, DHS chose not to file the Notice to Appear with the immigration court to initiate removal proceedings against E.L.A.[1]

5. Assisted by immigration counsel employed by KIND, the same organization where I work, E.L.A. filed an asylum application that USCIS received on February 14, 2025. He was then 18 years old. According to USCIS's case status online web tool, the asylum application remains pending with USCIS.

6. By the time E.L.A. filed his asylum application with USCIS in February 2025, he had already attended a biometrics appointment that USCIS scheduled in connection with an application for work authorization that E.L.A. filed after USCIS granted him Special Immigrant Juvenile Status and deferred action. Attached as Exhibit A is a true and correct copy of the notice of that biometrics appointment, which E.L.A. attended on September 4, 2024.

7. In late March 2025, E.L.A.'s KIND attorney informed E.L.A. that she could no longer represent him and was withdrawing her appearance before USCIS because her employment was terminated due to cuts in the federal funding for legal services for unaccompanied children. In the fall of 2025, KIND discovered that E.L.A. had not attended a scheduled April 1, 2025 biometrics appointment, contacted E.L.A., and emailed the Arlington Asylum Office on November 13, 2025, copying the pro se E.L.A., to request rescheduling of the biometrics appointment. USCIS

[1] Because USCIS develops lists of potential *J.O.P.* Class Members by identifying people with UC determinations who were placed in removal proceedings, USCIS failed to include E.L.A. on its potential Class Member lists before E.L.A.'s removal. However, on May 22, 2026, Defendants disclosed to Class Counsel their assessment that E.L.A. is a Class Member.

acknowledged the email with a form response, but neither granted nor denied the rescheduling request. KIND had no record of a notice for any other biometrics appointment for E.L.A.

**ICE Removes E.L.A. for the First Time in Violation of the Settlement Agreement**

8. On or about February 18, 2026, Defendant ICE initiated removal proceedings against E.L.A. On or about February 19, 2026, KIND staff received an automated alert that E.L.A. was scheduled for a Master Calendar Hearing in Jonesboro, LA on February 25, 2026. Immigration court records reflect that E.L.A. attended that master calendar hearing, and that the immigration judge issued a removal order on that date. The digital audio recording of the hearing reflects that the immigration judge asked: "Has anyone ever filed documents for you to remain lawfully in the US, such as a petition or visa?" E.L.A. responded, "No," *id.,* even though he had filed with USCIS a petition for special immigrant juvenile status, a work permit application, and an asylum application –the first two approved (along with deferred action) and the latter still pending. The attorney representing DHS said nothing to correct the record.

9. On March 14, 2026, ICE executed the final removal order by removing E.L.A. to El Salvador.

10. Defendants disclosed E.L.A.'s removal to Class Counsel on March 30, 2026, and supplemented their disclosure on July 23, 2026.

11. Defendants' March 30 disclosure included the address of a detention center where ICE had held E.L.A. for several weeks, and contact details for his former attorney at KIND, whose office had a working phone number for E.L.A. and contacted him in early April 2026. When told it could be possible for him to return to the United States for his asylum adjudication as a remedy for Defendants' violation of the settlement agreement, E.L.A. immediately stated he wished to return because he feared for his safety in El Salvador.

12. Over the next two months, Class Counsel had several privileged discussions with E.L.A. relating to the possibility of returning to the U.S. for an asylum adjudication on the merits. These discussions were hampered because Defendants had declined Class Counsel's requests for information about their intended processing and treatment of returning removed Class Members. Class Counsel also arranged for E.L.A. to have a privileged consultation with independent counsel and sought counsel to represent E.L.A. pro bono after his return, both in his asylum matter and in seeking release if detained by Defendant ICE.

**Defendants Agree to Return E.L.A. for an Adjudication on the Merits**

13. Attached as Exhibit B is a true and correct copy of an email chain between Class Counsel and Defendants' counsel, spanning June 15, 2026 to September 4, 2026. On June 15, 2026, I emailed Defendants' counsel, stating that E.L.A. "wishes to return to the United States for adjudication of his pending asylum application pursuant to section III.B of the Settlement Agreement." Ex. B at 29. The email provided confirmation of E.L.A.'s Class membership, and continued:

> Please commit to making an independent and fact-specific determination regarding releasing E.L.A. upon return, and communicating that custody determination to Class Counsel in advance of his return. Please confirm that in advance of return, Defendants will provide Class Counsel with copies of E.L.A.'s entry documents and the location to which he will be returned, as well as the location of detention if the government plans to detain him for any period. Finally, please commit to notifying Class Counsel as soon as an asylum interview is scheduled.
>
> Please respond within the week to confirm that DHS will expeditiously return this wrongfully removed J.O.P. class member to the United States, and let us know what further information you need from Class Counsel to coordinate E.L.A.'s travel.

14. On June 18, 2026, Defendants responded, "ICE has confirmed it will facilitate E.L.A.'s return to the United States if he continues to want to return." Defendants added that ICE and USCIS "continue[d] to evaluate" Class Counsel's questions on detention and notification, and

would "follow up as soon as additional information is available." Ex. B at 26. On July 20, 2026, DHS issued an "Authorization of Parole of an Alien into the United States," authorizing E.L.A.'s parole into the United States at any port of entry and valid until July 19, 2027. A true and correct copy of this document is attached as Exhibit C. Defendants did not provide this document to Class Counsel, who received it from E.L.A. after his second removal.

15. On July 28, 2026, E.L.A. told Class Counsel that a government official had informed him the previous day that his flight to the United States was scheduled for August 7. On June 21, July 29, August 3, August 5, and August 6, I emailed Defendants highlighting the need for immediate responses to the unanswered questions Class Counsel posed on June 15, pertaining to the planned process for E.L.A.'s return and adjudication. Ex. B at 17-25. On the morning of August 6, Defendants identified the airport where E.L.A. would arrive the following day but declined to answer the open questions. *Id.* at 19. Class Counsel's August 6 response stated that in withholding the requested information, Defendants were interfering with E.L.A.'s due process rights. Class Counsel reiterated the need for information about E.L.A.'s custody and the legal basis for any planned detention, as well as the venue for the asylum adjudication and the date, time, and place of the interview, noting that withholding this information interfered with E.L.A.'s ability to prepare for the adjudication. *Id.* at 17-18. Responding the same day, Defendants provided no substantive information, but acknowledged this Court's ruling that "under contract law principles, . . . any . . . Class Member who has been removed in violation of the Settlement Agreement, must be returned to the United States to await adjudication of his asylum application on the merits by USCIS." *Id.* at 16, citing ECF No. 253 at 13. Defendants continued, "Defendants are complying by returning E.L.A. to the United States to await adjudication of his asylum application on the merits by USCIS." *Id.*

16. On August 6, E.L.A.'s new immigration counsel, also employed by KIND, emailed the Arlington Asylum Office, which had jurisdiction over E.L.A.'s asylum application, to provide the office notice of her entry of appearance. A true and correct copy of that correspondence is attached as Exhibit D. E.L.A.'s counsel informed USCIS of E.L.A.'s J.O.P. Class membership and unlawful removal, adding:

> Pursuant to the ongoing litigation, arrangements have been made for his return to the United States, and he is scheduled to arrive tomorrow. Given these unique circumstances, I wanted to ensure that you are aware of his imminent return and that I am now counsel of record for purposes of his pending asylum application. Once he has returned, we request that the asylum office resume processing of his application.
>
> Moreover, we are aware that the AAF must be paid before the application can proceed to interview. However, at the time the AAF notice was issued, [E.L.A.] had already been unlawfully removed from the United States. As a result, the payment period has expired, and we are unable to pay the fee. In light of these circumstances, would it be possible for the asylum office to issue a new AAF notice? We are prepared to pay the fee as soon as a new notice is issued and request that the application proceed to an interview thereafter.
>
> Please let me know if there is any additional information or documentation needed.

Ex. D at 3-4.

17. On August 7, E.L.A. boarded a plane at approximately 11am local time in San Salvador (1pm Eastern time). At that point, Class Counsel and immigration counsel remained unaware of whether and where E.L.A. would be detained or released on arrival. That afternoon, Class Counsel emailed Defendants again, stating in part,

> If ICE will detain E.L.A., his counsel of record needs to contact the relevant detention facility immediately to schedule a legal appointment with E.L.A. so that their meeting can take place at the earliest opportunity. This is particularly important because Defendants have not yet notified us or E.L.A.'s immigration counsel of the timing for the asylum interview, and his counsel needs to arrange for necessary resources and preparation. As you know, time lags of several days are typical before a person's location appears in the online ICE Detainee Locator, so his location is unlikely to be available to counsel of record today or this weekend without information from your clients. We recognize you have

> offered the suggestion that G-28 counsel before ICE will receive notice of any transfers; however, that has not been the experience reported by counsel to detained Class Members. As you know, this lack of information implicates the right to counsel and other due process rights.

Ex. B at 14-15. Defendants provided no substantive response. *Id.* at 14.

18. On the evening of August 7, Class Counsel learned of E.L.A.'s arrival in the United States when the ICE Detainee Locator showed he was detained at a Winnfield Parish, Louisiana ICE facility. The following morning, Defendants' counsel emailed Class Counsel stating that E.L.A. would be transferred to Jefferson Parish Correctional Center in Louisiana. Ex. B at 13.

19. During E.L.A.'s ICE custody, his immigration counsel conducted about nine virtual legal meetings with him between August 10 and August 28 focused on preparing E.L.A. for adjudication on the merits of his asylum claim. To further support E.L.A.'s asylum claim, his counsel arranged through a nonprofit organization for an evaluation by a psychologist in two two-hour meetings on August 31 and September 1. E.L.A.'s counsel used ICE's online scheduler to schedule these sessions, and further corresponded with the facility about cancelation messages and ELA's scheduling needs.

20. Attached as Exhibit E is a true and correct copy of correspondence sent between August 9 and 18 between E.L.A.'s immigration legal team and the Jackson Parish Correctional Center where E.L.A. was detained. Attached as Exhibit F is a true and correct copy of the immigration legal team's correspondence with an ERO officer who had initiated contact in July, sent between August 7 and 18 and copying the parties' counsel.

21. In several instances, immigration counsel received last-minute notices canceling scheduled meetings, and/or was told that E.L.A. was not at the Jackson Parish Corrections Center, only to later be told he was. On Sunday, August 9, E.L.A.'s counsel notified the Jackson Parish facility that her attempt to schedule a legal visit was met with an error message stating, "Your

client is not currently in an ICE detention facility." The next morning, the facility replied that E.L.A. was still detained at Jackson Parish, but did not explain the contrary system message of the day before. Ex. E at 10. On August 13, E.L.A.'s counsel inquired about the cancellation of a legal visit scheduled for that day. *Id.* at 9. On August 17, ICE again canceled a legal visit, about ten minutes before its start time, for the stated reason that E.L.A. was no longer detained at Jackson Parish. E.L.A.'s counsel informed both the facility and the ERO point of contact, and asked for E.L.A.'s location. Ex. E at 8, Ex. F at 3. When there was no response, Class Counsel raised the question with Defendants' counsel, in view of their previous assurances that immigration counsel would be informed of any transfers, but received no response. Ex. B at 11-12. The following day, the ERO officer responded that E.L.A. was detained at Jackson Parish. Ex. F at 1.

22. After the August 17 notification that E.L.A. was not at Jackson Parish, E.L.A.'s counsel contacted ERO seeking to either confirm or reschedule the professional appointments scheduled at Jackson Parish for August 31 and September 1. Ex. F at 2. On August 18, assured that E.L.A. remained at Jackson Parish, counsel exchanged multiple emails with Jackson Parish regarding logistics for the mental health evaluation. Ex. E at 1-5.

23. On the morning of August 28, the Arlington Asylum Office forwarded E.L.A.'s counsel's August 6 inquiry to the New Orleans Asylum Office, stating that E.L.A.'s case "is in your jurisdiction" and asking the office to respond to counsel's email. Ex. D at 2. The same day, the New Orleans Asylum Office emailed E.L.A.'s counsel acknowledging receipt of her notice of entry of appearance but did not address any other aspect of counsel's August 6 email, did not request further action, and gave no indication that the asylum adjudication would not proceed on the merits. *Id.* at 1-2.

24. On the afternoon of August 31, the mental health professional engaged by E.L.A.'s counsel notified me that they had completed a two-hour evaluation session with E.L.A. that day.

**Defendants Remove E.L.A. a Second Time**

25. On September 1 at approximately 8:40 am ET, E.L.A.'s counsel received an automated email from an ICE Service Desk stating that the mental health evaluation appointment was canceled, with the reason given as "[n]o longer at this facility." A true and correct copy of that email is attached as Exhibit G. Until at least 9:30am ET, the ICE Detainee Locator reflected that E.L.A. was at Jackson Parish. I communicated with the mental health professional to suggest contacting ICE to ascertain whether the notice was issued in error, like previous notifications, and the appointment would proceed as planned. A true and correct copy of correspondence between the facility and E.L.A.'s immigration counsel team is attached as Exhibit H. At about 9:37 ET, the Jackson Parish facility emailed E.L.A.'s counsel, stating, "He is no longer at our facility, so we will not be able to conduct today[']s meeting." Ex. H at 2. E.L.A.'s counsel replied immediately, asking for E.L.A.'s current location. *Id.* When about two hours passed with no reply, another member of E.L.A.'s legal team wrote to the facility asking E.L.A.'s whereabouts, seeking to resume the disrupted appointment, and stating that the cancelation "impacts our client['s] ability to properly prepare his case." *Id.* at 1.

26. By 11:18am ET, the ICE detainee locator reflected no record for E.L.A. Based on the information available, I believed at the time that ICE had undertaken a badly timed transfer between facilities. At 11:22am ET, I emailed Defendants' counsel "to seek urgent corrective action, today, for the cancellation of a professional evaluation," and noting that the notifications E.L.A.'s counsel received initially appeared erroneous in light of past erroneous notifications. My email stated, "The evaluation is central to E.L.A.'s due process rights, and the professional fees

are a significant expense. . . . Since your client has not responded to G-28 counsel, we request immediate information about E.L.A.'s location so that his counsel can attempt to salvage part of the scheduled meeting, and/or your cooperation in ensuring that the appointment can be rescheduled."

27. Between 5:00pm and 5:15pm ET on September 1, I received a series of updates from E.L.A.'s counsel notifying me that a family member of E.L.A.'s had contacted his counsel reporting that E.L.A. had phoned from the San Salvador airport, using a stranger's phone, stating that ICE had removed him once again.

28. On a three-way call at approximately 5:23pm, I took notes while my co-counsel Michelle Mendez spoke with E.L.A.'s family member, who provided us with the same report shared with E.L.A.'s counsel, plus additional details.

29. At 5:36pm, I notified Defendants' counsel in an email tagged as high priority that "We were told moments ago that E.L.A. was told he would be transferred to another detention center and has instead been deported to El Salvador." Defendants' counsel acknowledged receipt. Ex. B at 9-10. Class Counsel sent a further mail at 6:18pm, outlining Defendants' violation of and contempt of multiple Court orders, and asking for a response. *Id.* at 8-9. The only substantive information Defendants provided on September 1 is that E.L.A.'s name appeared on the manifest of a flight that had landed in El Salvador. *Id.* at 7.

30. On September 3 at 10:09am Eastern, Defendants' counsel emailed Class Counsel to inquire "whether E.L.A. wishes to return to the United States." Class Counsel responded a few minutes later that "E.L.A. very much wants to return to the United States due to fear for his safety." *Id.* at 5. At 10:38am, Class Counsel emailed Defendants stating: "Given that ICE has already twice removed E.L.A. unlawfully, and given his active parole status that allows him to be paroled

into the United States at any port of entry until July 19, 2027, ICE must release E.L.A. upon entry. Moreover, Defendants have never disclosed a lawful basis for detaining E.L.A." Defendants acknowledged receipt of the email after filing their status reports with the Court. *Id.* at 3.

31. Class Counsel learned for the first time through Defendants' declarations filed September 3 (ECF Nos. 668-1, 668-2) that USCIS was taking the position that it would not exercise jurisdiction over E.L.A.'s asylum application which has been pending since February 14, 2025, as confirmed by USCIS's online case status tool.

32. On September 4, Class Counsel emailed Defendants stating that the remedy for the contumacious second removal of E.L.A. must include: returning E.L.A. to the United States, USCIS's adjudication on the merits of E.L.A.'s asylum application, release from ICE custody on arrival given E.L.A.'s parole valid until July 19, 2027, providing Class Counsel and immigration counsel with copies of E.L.A.'s entry documents, return of E.L.A.'s confiscated documents and personal possessions, reimbursement of the expenses E.L.A. incurred in connection with the unlawful removals, advance notice to Class Counsel and immigration counsel of the time and location for E.L.A.'s return, and at least 21 days' notice of the time and place of E.L.A.'s asylum interview. Ex. B at 1-2.

33. E.L.A. has told Class Counsel that he remains in fear for his safety in El Salvador. E.L.A. informed Class Counsel that when the plane carrying him landed in San Salvador, the government employee onboard the flight turned to E.L.A. and welcomed him to the country while laughing. With no notice that his removal was imminent, E.L.A. had had no opportunity to communicate with his counsel or seek out assistance with transportation after arrival. ICE left E.L.A. at the airport dressed in a uniform issued by the detention center, and deprived him of the identification documents, clothing, shoes, cash, and phones he brought with him from El Salvador

when he entered ICE detention. Being deprived of these basic necessities further compromised E.L.A.'s safety and security. E.L.A. has stated that he wishes to return to the United States and receive an adjudication of his asylum application on the merits from USCIS.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: September 11, 2026

*/s/ Wendy Wylegala*

Wendy Wylegala
Kids in Need of Defense
252 West 37th Street, Suite 1500W
New York, NY 10018
Phone: 646-970-2913
Fax: 202-824-0702
wwylegala@supportkind.org