**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION**

| | |
|---|---|
| J.O.P., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*<br><br>Defendants. | Case No. 8:19-cv-01944-SAG |

**DEFENDANTS' OPPOSITION TO CLASS COUNSEL'S MOTION TO REMEDY DEFENDANTS' CONTEMPT AND ENFORCE THE SETTLEMENT AGREEMENT AS TO CLASS MEMBER E.L.A.**

# TABLE OF AUTHORITIES

Cases

*Consumer Fin. Prot. Bureau v. Klopp*,
957 F.3d 454 (4th Cir. 2020) ........ 13, 14, 20

*Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*,
434 Md. 37 (Md. 2013) ........ 9

*In re Gen. Motors Corp.*,
61 F.3d 256 (4th Cir. 1995) ........ 13, 18

*In re GMC*,
110 F.3d 1003 (4th Cir. 1997) ........ 21

*Johnson v. Robinson*,
987 F.2d 1043 (4th Cir. 1993) ........ 13

*Noem v. Abrego Garcia,*
No. 24-A949, 604 U.S. __, 2025 WL 1077101 (Apr. 10, 2025) ........ 5, 6, 19

*Omega World Travel, Inc. v. Omega Travel & Shipping Agencies, Inc.*,
905 F.2d 1530 (4th Cir. 1990) ........ 18

*Schwartz v. Rent-A-Wreck of America*,
261 F. Supp. 3d 607 (D. Md. 2017) ........ 20, 21

*Silva v. United States*,
866 F.3d 938 (8th Cir. 2017) ........ 22

*Tapestry, Inc. v. Factory Mut. Ins. Co.*,
286 A.3d 1044 (Md. 2022) ........ 8

*United States v. Esposito*,
205 Fed. Appx. 995 (4th Cir. 2006) ........ 20, 21

*United States v. Zannino*,
895 F.2d 1 (1st Cir. 1990) ........ 20, 21

Federal Statutes and Regulations

8 C.F.R. § 103.2 ........ 9, 12-13

8 C.F.R. § 208.10 ........ 9-10, 12

8 C.F.R. §§ 208.10 ........ 13

8 U.S.C. § 1158 ........ 11, 12, 15, 16, 17

8 U.S.C. § 1252 ........ 22

**TABLE OF CONTENTS**


INTRODUCTION .......... 1
BACKGROUND .......... 1
ARGUMENT .......... 4
A. Defendants Are Attempting to Facilitate E.L.A.'s Return .......... 5
B. Dismissal For Failure to Comply With Biometrics Requirements is Consistent with the Settlement Agreement. .......... 7
1. Dismissal for Failure to Comply With Biometrics Requirements Defendants' is a Final Determination Consistent With the Settlement Agreement. .......... 7
2. Ordering Defendants to Provide E.L.A. Another Opportunity to Attend a Biometrics Appointment is Not an Appropriate Remedy for E.L.A.'s Erroneous Removal. .......... 12
3. Dismissal for Failure to Comply with Biometrics Requirements is an Adjudication on the Merits. .......... 15
C. This Court Cannot Order E.L.A.'s Immediate Release Upon Return to the United States. 17
D. Class Counsel's Demands For Paperwork And Advance Notice Stray Beyond The Four Corners of The Settlement Agreement. .......... 19
E. Class Counsel's Claim for Property Loss Compensation is Factually Unsupported, Procedurally Waived, and Beyond this Court's Subject-Matter Jurisdiction. .......... 20
CONCLUSION .......... 22

## INTRODUCTION

Ever since E.L.A.'s removal from the United States on September 1, 2026, Defendants stand ready to facilitate E.L.A.'s physical return to the United States. Multiple ICE ERO employees have reached out to G-28 counsel with respect to facilitating E.L.A.'s return, and undersigned counsel continues to communicate the necessary next steps with Class Counsel to return E.L.A. to the United States. Defendants repeatedly reminded Class Counsel that there are multiple flights a week from El Salvador that are at E.L.A.'s disposal. Despite those efforts, Class Counsel have failed to take any of the necessary steps for E.L.A. to return. Class Counsel's actions do not demonstrate a desire that E.L.A. wishes to return to the United States, and Defendants are in a holding pattern until E.L.A. makes an affirmative move.

Facilitation is the appropriate remedy for E.L.A.'s removal. This Court should deny Class Counsel's Motion to Enforce because Plaintiffs' requests fall far outside any contempt authority of this court, the Court's previous orders on facilitation, and the confines of the Settlement Agreement.

## BACKGROUND

On July 1, 2019, four named Plaintiffs commenced this litigation to challenge United States Citizenship and Immigration Services' ("USCIS") policies on Unaccompanied Alien Children ("UACs") under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Public Law 110-457, 122 Stat. 5044 (Dec. 23, 2008). Complaint, Dkt. No. 1. On

November 25, 2024, this Court granted final approval of a Settlement Agreement. Nov. 25, 2024 Order, Dkt. No. 205.[1]

Relevant to this matter, the Settlement Agreement addresses the agreed-upon Class Member rights for those with final orders of removal:

- Section III.I: With respect to any Class Member with a final removal order, ICE will refrain from executing the Class Member's final removal order until USCIS issues a Final Determination on one properly filed asylum application under the terms of this Agreement. Settlement Agreement, Dkt. No. 199-2, at 9.
- Section II.L: Final Determination means either that: (a) USCIS has made an adjudication on the merits, as defined in Paragraph II.B; or (b) USCIS has provided notice to the applicant that the asylum application has been dismissed, terminated, or returned to immigration court due to an Adverse Jurisdictional Determination as defined in Paragraph II.C, except that no Adverse Jurisdictional Determination shall give rise to a Final Determination: (1) while the Class Member is challenging the Adverse Jurisdictional Determination via the procedure described in Paragraph V.D; (2) if the Adverse Jurisdictional Determination was issued under Paragraph III.C, while the Class Member is still within the time period to file a rebuttal as described in that paragraph and while the Class Member's rebuttal is pending before USCIS; or (3) if the Adverse Jurisdictional Determination must be re-examined under Paragraph III.E and that reexamination is not yet complete. *Id*. at 5–6.

[1] Defendants refer this Court to the Background Section of their Opposition to Class Counsel's Motion to Enforce Section III.H of the Settlement Agreement, Dkt. No. 659, for a thorough discussion of this matter's lengthy procedural history.

- Section II.B: **"Adjudicate on the merits"** means to render a decision on the substance of an asylum claim by either granting an approval or issuing a determination of non-eligibility. *Id*. at 5.

Class Member E.L.A. missed two required biometrics appointments on April 1, 2025, and October 6, 2025. Letter to Court, Declaration of Eldhen O. Fajardo ¶ 4 (Fajardo Decl.), Dkt. No. 668-1; Defs.' Ex. A (filed under seal). On March 14, 2026, ICE executed a final removal order. Pls.' Motion, Declaration of Wendy Wylegela (Wylegala Decl.), ¶ 8. Defendants disclosed Class Member E.L.A.'s removal to Class Counsel on March 30, 2026. *Id.* ¶ 10.

On June 15, 2026, Class Counsel advised Defendants that E.L.A. "wishes to return to the United States for adjudication of his pending asylum application pursuant to section III.B. of the Settlement Agreement." *Id.* ¶ 13, Pls.' Mot., Ex. B at 29 (sealed). On June 18, 2026, Defendants confirmed that they would facilitate return of E.L.A. *Id.* On August 7, 2026, E.L.A. returned to the United States and was detained at the Winnfield Parish, Louisiana ICE facility. *Id.* ¶ 18.

On August 11, 2026, ICE advised USCIS that E.L.A. was a JOP class member being detained at the Winnfield Parish, Louisiana ICE facility. Letter to Court, Declaration of Brandon J. Bennethum, ¶ 4 (Bennethum Decl.), Dkt. No. 668-2. USCIS reviewed E.L.A.'s case and saw E.L.A. missed two biometrics appointments in 2025. Fajardo Decl. ¶ 5. That same day, USCIS informed ICE that E.L.A.'s case "will be closed as soon as possible" and, on August 12, 2026, that "USCIS would proceed with the closure of the asylum claim." Fajardo Decl. ¶¶ 5, 7. This decision was made because "where an applicant for asylum misses his or her required biometrics appointments, USCIS closes the case and provides notice to the applicant of the closure." *Id.* ¶ 6. ICE systems, however, still contained an alert that E.L.A. was identified as a potential JOP Class Member. Bennethum Decl. ¶ 4. Therefore, on August 16, 2026, ERO Supervisory and Detention

Deportation Officer Williams requested the JOP banner be removed by the ICE National Case Management Unit (NCMU). *Id.* On the same day, ICE NCMU removed the JOP banner from EARM. Based on this information, ICE understood there to be no pending asylum application for adjudication on the merits before USCIS at the time of removal. *Id.* USCIS has not yet closed E.L.A.'s asylum claim. Fajardo Decl. ¶ 8.

On September 1, 2026, at approximately 2:21 a.m. E.T., E.L.A. was moved from the Jackson Parish Correction Center, where E.L.A. had been detained since August 8, 2026. *Id*. On September 1, 2026, at approximately 9:45 a.m. ET, the plane carrying E.L.A. took off for San Salvador, El Salvador.[2] *Id.* On September 3, 2026, an ICE ERO attaché in El Salvador responsible for facilitating E.L.A.'s returned reached out to E.L.A.'s G-28 immigration counsel.[3] Joint Status Report, Dkt. No. 682. An additional ICE ERO employee reached out to G-28 immigration counsel on September 14, 2026. *Id.* On September 14, 2026, the Court issued an order directing the parties to confer daily detailing steps taken that day to facilitate E.L.A.'s return to the United States. Dkt. No. 681. Throughout those meetings, Defendants continued to represent that they remain ready to facilitate E.L.A.'s return, that multiple flights depart from El Salvador weekly, and that those flights can accommodate E.L.A.'s return to the United States. *See, e.g.*, Dkt. Nos. 682, 684, 689.

**ARGUMENT**

Defendants do not contest that E.L.A.'s removal from the United States on September 1, 2026, was due to a miscommunication between USCIS and ICE regarding whether the paperwork was sufficient to close the case out in USCIS's systems. Defendants provided notice to the Court

---

[2] Defendants refer this Court to Defendants' Status Report filed on September 3, 2026, Dkt. No. 667, for a full accounting of undersigned counsel's knowledge and action with respect to E.L.A.'s removal.

[3] An attorney may enter his or her appearance before ICE using Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative. This response uses "G-28 immigration counsel" as shorthand for the attorney entered to represent E.L.A. before ICE

of E.L.A.'s removal, Defendants' Notice, Dkt. No. 664, and the next day affirmed that they would facilitate E.L.A.'s return to the United States. Bennethum Decl. ¶ 4(8). Facilitation of return is the appropriate remedy for a violation of Section III.I of the Settlement Agreement resulting in the removal of a Class Member. April 23, 2025, Mem. Op. on Motion to Enforce (April 2025 Mem. Op.), Dkt. No. 253, at 13. Yet E.L.A. does not wish to return—that, is, unless he receives assurances either from Defendants or by way of a Court order that his failure to appear for biometrics appointments will be disregarded and that he will be released upon his return to the United States. These requests go far beyond the appropriate remedy for the violation and should not be granted.

**A. Defendants Are Attempting to Facilitate E.L.A.'s Return.**

In a prior decision involving facilitation of return, this Court held that Maryland contract law required returning the alien to a position "to ensure that his case is handled as it would have been had he not been" removed. April 2025 Mem. Op. at 13–14 (quoting *Noem v. Abrego Garcia*, No. 24-A949, 604 U.S. __, 2025 WL 1077101, at *1 (Apr. 10, 2025)). E.L.A. was removed on September 1, 2026. Bennethum Decl. ¶ 4(3). On September 2, 2026, Defendants confirmed that they would facilitate E.L.A.'s return to the United States. *Id*. at ¶ 4(8). Defendants have subsequently taken all the steps available to them to facilitate E.L.A.'s return to the United States. They contacted E.L.A. through counsel on September 3, 2026, just two days after his removal, to begin the facilitation process. Joint Status Report, Dkt. No. 682. Defendants provided contact information for an ICE ERO attaché in El Salvador on September 3 and 10, 2026. Pls.' Mot., Ex. 3 at 3–4. After Class Counsel failed to reach out to the attaché, Defendants set up an email thread with the attaché, G-28 counsel, Class Counsel, and Defendants' counsel. Joint Status Report, Dkt. No. 684. Defendants confirmed that they would place E.L.A. on a flight from El Salvador to the United States and maintain that there are multiple such flights weekly. *Id*.

But E.L.A. does not presently wish to return to the United States. Joint Status Report, Dkt. No. 689. Indeed, E.L.A.'s counsel has affirmatively declined to reach out to the ICE ERO attaché to discuss his return, and Defendants cannot compel E.L.A. to avail himself of the proffered relief. *Id*.

No further remedy is appropriate for E.L.A.'s removal. While Class Counsel contends that coercive relief is necessary to prevent further removals of other Class Members because "ICE's written guidance is not adequate to ensure that Class Members are not removed," they mischaracterize the nature and timeline of events in E.L.A.'s case. Pls.' Mot. 22. ICE's outreach to USCIS concerning E.L.A. began on August 11, 2026. Fajardo Decl. ¶ 3. USCIS informed ICE that E.L.A.'s case "will be closed as soon as possible" and, on August 12, 2026, that "USCIS would proceed with the closure of the asylum claim." Fajardo Decl. ¶¶ 5, 7. ICE interpreted USCIS's response to mean E.L.A.'s asylum claim was closed. Bennethum Decl. ¶ 4(4) ("ICE understood there to be no pending asylum application for adjudication on the merits pending before USCIS at the time of removal.").

Furthermore, ICE's outreach to USCIS began before the distribution of guidance to all ICE personnel on August 13, 2026, consistent with the Court's July 29, 2026 order. ICE Guidance, Dkt. No. 674-2. That guidance includes a list of USCIS POCs for ICE to contact if they have questions concerning the Settlement Agreement, including to "determine the status of an alien's asylum application." *Id*. at 5. As Defendants noted on September 10, 2026, the USCIS declarant who communicated the impending closure of E.L.A.'s asylum application and E.L.A.'s failure to appear for biometrics to ICE is not one of the USCIS POCs identified in the circulated ICE guidance. Status Report, Dkt. No. 674; *see id.* "Those USCIS POCs have greater familiarity with Defendants' obligations under the *J.O.P.* settlement agreement." *Id*. Defendants are not aware of

any other removals of Class Members that occurred after the distribution of ICE guidance on August 13, 2026. Status Report, Dkt. No. 674-3 (sealed). A single removal due to a miscommunication does not, as Class Counsel argue, establish that "coercive relief" is needed to ensure Defendants' compliance with the Settlement Agreement and Court's July 29, 2026 Order.

**B. Dismissal For Failure to Comply With Biometrics Requirements is Consistent with the Settlement Agreement.**

Class Counsel requests that the Court order "that USCIS promptly return E.L.A. and adjudicate his application on the merits, without regard for any alleged failure to attend a prior biometrics appointment." Pls.' Mot. 15. This request is blatantly inconsistent with both the Settlement Agreement and the Court's prior orders that address contract law interpretation and should not be granted. The Settlement Agreement does not bar closure of Class Member asylum applications who fail to comply with biometrics requirements. A contrary holding would perversely incentivize Class Members' failure to comply with their biometrics and other technical requirements because doing so would make them effectively impossible to remove for the duration of the Settlement Agreement. Indeed, Class Counsel's argument is essentially that E.L.A. should receive a windfall for simply filing his asylum application. Nothing in the Settlement Agreement requires such a remedy and doing so would be highly inequitable.

**1. Dismissal for Failure to Comply With Biometrics Requirements Defendants' is a Final Determination Consistent With the Settlement Agreement.**

Section III.I of the Settlement Agreement states that "ICE will refrain from executing [a] Class Member's final removal order until USCIS issues a *Final Determination* on one properly filed asylum application under the terms of this Agreement." Settlement Agreement 9, § III.I (emphasis added). As defined in Section II.L, Final Determination "means either that: (a) USCIS has made an adjudication on the merits, as defined in Paragraph II.B; or (b) USCIS has provided notice to the applicant that the asylum application has been dismissed, terminated, or returned to

immigration court due to an Adverse Jurisdictional Determination . . ." Settlement Agreement 5, § II.L. Therefore, if a Class Member receives notice from USCIS that his or her asylum application has been dismissed, terminated, or returned to immigration court, that Class Member may be removed from the United States pursuant to a final order of removal under Section III.I without needing to determine whether he or she separately received an adjudication on the merits.[4]

Class Counsel incorrectly contend that the modifier "due to an Adverse Jurisdictional Determination" in Section II.L(b) applies to dismissals and terminations, not just returns to immigration court. Pls.' Mot. 18. Maryland's objective theory of contract law governs interpretation of the Settlement Agreement, meaning that the Court must interpret the language of the Section II.L(b) "based on what a reasonable person in the position of the parties would have understood the language to mean." *Tapestry, Inc. v. Factory Mut. Ins. Co.*, 286 A.3d 1044, 1053 (Md. 2022) (quoting *Credible Behav. Health, Inc. v. Johnson*, 220 A.3d 303, 310 (Md. 2019)). As Defendants explained in May 2026, there are many reasons an asylum application may be dismissed or terminated that have nothing to do with an adverse jurisdictional determination, including but not limited to the applicant becoming a lawful permanent resident, failure to comply with biometric capture requirements, withdrawal of the application, failure to appear for a scheduled asylum interview, failure to list a residence where mail can be delivered, and the applicant being a U.S. citizen. *See* Decl. of Margaret Massey, Dkt. No. 583-1. Under Class Counsel's interpretation of Section II.L(b), none of these would be a Final Determination and Defendants would be barred from removing them under Section III.I. Pls.' Mot. 18. It is

[4] While the Court can decide this issue on the definition of "Final Determination" because that is the standard used in Section III.I, USCIS's dismissal of E.L.A.'s case due to his failure to comply with his biometrics appointment would also satisfy the Settlement Agreement's requirements for an "adjudication on the merits" under Section II.B. *See infra* § B.3.

unreasonable to assume the parties intended for this reading and result, and it would be inequitable to order such changes now.

Following Class Counsel's argument that "Adverse Jurisdictional Determination" modifies not only "returned to immigration court" but also "dismissed" or "terminated" makes little sense when the Settlement Agreement is read as a whole. *See Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 52, 73 A.3d 224, 232–33 (Md. 2013) (holding that in ascertaining the meaning of a contract provision "the contract must be construed in its entirety."). An "Adverse Jurisdictional Determination" relates to USCIS's jurisdiction over the asylum application. Settlement Agreement 7, § III.C(1). Thus, it makes sense for such applications to be returned to the immigration court, which would have jurisdiction over those applications. By contrast, "dismiss" and "terminate" describe a wide range of other decisions by USCIS that may not be directly related to jurisdiction, such as failure to attend a biometrics appointment or where an alien becomes a lawful permanent resident prior to adjudication, and may not result in the alien being referred to the immigration court at all.

As this Court has recognized, Defendants would not have committed "themselves to a wholly infeasible obligation." May 26, 2026 Mem. Op. Granting Motion to Extend Agreement (May 2026 Mem. Op.), Dkt. No. 619, at 18. In many instances, federal regulation mandates closure of the case if an applicant fails to comply with technical and administrative requirements. For example, "if USCIS requires an individual to appear for biometrics capture, an interview, or other required in-person process but the person does not appear, the benefit request *shall be considered abandoned and denied* unless by the appointment time USCIS has received a change of address or rescheduling request that the agency concludes warrants excusing the failure to appear." 8 C.F.R. § 103.2(b)(13)(ii) (emphasis added); *see also* 8 C.F.R. § 208.10 ("Failure to comply with

fingerprint processing requirements without good cause may result in dismissal of the application or waiver of the right to an adjudication by an asylum officer."). Class Counsel's interpretation of the Settlement Agreement would require Defendants not to comply with this federal regulation, which they would not have reasonably agreed to. It is not fully clear how Defendants would then be expected to proceed with such cases—should USCIS proceed to adjudication without biometrics? Give endless opportunities to reschedule? Would these cases end up in some kind of limbo until the termination of the Settlement Agreement where they can be neither denied nor adjudicated? Class Counsel's new-found interpretation would significantly expand the scope of the Settlement Agreement, limit traditional grounds for denying or closing asylum claims, and thus grant Class Members greater rights to asylum than other aliens. It is thus telling that Class Counsel has not proffered this broad interpretation before.

A reasonable person in the position of the parties would read the Settlement Agreement to avoid these absurd results. As Defendants have previously argued, Section III.B is a statement of policy that must be read in accordance with other provisions of the Settlement Agreement, including Sections II.L and III.I. Defs.' Opp. to Mot. to Extend Termination Date of Settlement Agreement, Dkt. No. 568, at 12. The parties would not have included a mechanism for individuals with a Final Determination to be removed under Section III.I if they intended for such removals to be barred by Section III.B. This interpretation is consistent with the parties' joint motion seeking approval of the Settlement Agreement, which summarized the relief provided to Class Members: "under the Settlement Agreement, class members will now have the opportunity for their asylum applications to be decided on the merits by USCIS." Joint Mot. for Prelim. Approval of Class Action Settlement Agreement and to Amend the Class Def., Dkt. No. 199-1, at 18. The use of the word "opportunity" is key. The Court has also referred to Defendants' obligations "to afford

particular process to the pending [Class Member] asylum claims." April 2025 Mem. Op. at 10. The Court has previously declined to find that Section III.B required adjudication on the merits of *all* Class Member applications. May 2026 Mem. Op. at 17. Consistent with these statements about the purpose of the Settlement Agreement, the Court should recognize that the benefit provided to Class Members in Section III.B is, first and foremost, a guarantee that USCIS will exercise "Initial Jurisdiction" over their asylum applications. *See* Settlement Agreement 6, § II.M (defining "Initial Jurisdiction" as "USCIS jurisdiction over an individual's asylum claim pursuant to 8 U.S.C. § 1158(b)(3)(C) despite the individual's being in removal proceedings."). USCIS is acting pursuant to that jurisdiction when it issues a biometrics notice or schedules an interview. But if Class Members fail to appear or comply with required USCIS procedures, they are failing to take the opportunity afforded by their Class membership. The Court should decline to read Sections II.L(b) and III.B to prevent USCIS from complying with federal regulations and closing cases where the Class Member has failed to comply with biometrics requirements.

Defendants' reading of Section II.L(b) to include denials for failure to comply with biometrics requirements and of Section III.B not to bar these denials is consistent with the practice of the parties and the Court up to this point of the litigation. The USCIS guidance issued pursuant to Section III.A of the Settlement Agreement did not provide for USCIS to halt issuing denials for failure to comply with biometrics requirements. *See generally* USCIS Memorandum: Revised Updated Procedures for Determination of Initial Jurisdiction over Asylum Applications Filed by Unaccompanied Alien Children and Implementation of the J.O.P. Settlement Agreement (Oct. 2025).[5] Moreover, Class Counsel had not brought a single Section V.D allegation over an

[5] Available at https://www.uscis.gov/sites/default/files/document/legal-docs/JOP_UAC_Procedures_Memo_10.30.2025.pdf.

administrative denial before the instant motion, and Defendants have been transparent that they are proceeding with administrative denials. Indeed, they reported to the Court in May 2026 on the categories of cases subject to administrative denial and the number of denials issued in each category. Decl. of Margaret Massey ¶¶ 6-12, Dkt. No. 583-1 (noting 1,135 cases where a decision had been served of closure due to failure to comply with biometrics requirements and 224 cases where such decisions had been entered in Global but not yet served). This Court should decline to depart from this established practice and read an entirely new obligation into the Settlement Agreement, one which would require contravening federal regulation for potentially thousands of cases. E.L.A.'s removal (which Defendants are ready and willing to remedy) is not a basis to suddenly reinterpret the scope of the entire Settlement Agreement.

**2. Ordering Defendants to Provide E.L.A. Another Opportunity to Attend a Biometrics Appointment is Not an Appropriate Remedy for E.L.A.'s Erroneous Removal.**

While E.L.A.'s asylum application is still pending, Defendants note that E.L.A.'s asylum application will almost certainly be denied due to his failure to appear for biometrics appointments. *See* Fajardo Decl. ¶ 9 ("My understanding is that, if E.L.A. returns to the United States, USCIS's policy will be to move forward with closing the case due to E.L.A.'s failure to attend his biometrics appointments."). Under federal regulation, asylum applications must be denied if an applicant fails to appear for a biometrics capture. 8 U.S.C. § 1158(d)(1); 8 C.F.R. § 208.10 ("Failure to comply with fingerprint processing requirements without good cause may result in dismissal of the application or waiver of the right to an adjudication by an asylum officer."); 8 C.F.R. § 103.2(b)(13)(ii) ("if USCIS requires an individual to appear for biometrics capture, an interview, or other required in-person process but the person does not appear, the benefit request shall be considered abandoned and denied unless by the appointment time USCIS has received a change of address or rescheduling request that the agency concludes warrants excusing the failure to

appear."). E.L.A. failed to appear for scheduled biometrics capture appointments on April 1, 2025, and October 7, 2025. Fajardo Decl. ¶ 4. Notices of the appointments were sent to both him and his counsel. [6] Defs.' Ex. A (filed under seal). These appointments were scheduled while he was in the United States and not detained. *See* Pls.' Mot. 7. Neither Class Counsel nor E.L.A. has provided any explanation for E.L.A.'s failure to appear at these appointments. Therefore, his case is subject to mandatory denial under 8 C.F.R. §§ 208.10 and 103.2(b)(13)(ii).

The Court should not grant Class Counsel's request to order Defendants to disregard E.L.A.'s failure to comply with biometrics requirements under its enforcement authority. "The district court has the authority to order the performance of duties contained within the four corners of the consent decree." *Johnson v. Robinson*, 987 F.2d 1043, 1049 (4th Cir. 1993) (punctuation and citation omitted); s*ee also Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 454, 463 (4th Cir. 2020) ("The scope of a consent order must be discerned within its four corners, and not by reference to what might satisfy its purposes." (cleaned up)). As discussed in Section II, denial of E.L.A.'s case is required under federal regulation and would not be in contravention of any provision of the Settlement Agreement. There is no "duty" Defendants would fail by issuing this denial. Therefore, this Court cannot grant this purported remedy under its enforcement authority.

This Court should similarly decline to order this relief pursuant to its contempt authority. While courts have "broad discretion" in ordering civil contempt sanctions, *In re Gen. Motors Corp.*, 61 F.3d 256, 259 (4th Cir. 1995), this discretion is not without limit. "Because the sanctions

---

[6] The address E.L.A. provided to USCIS is the same as that of his counsel. Defendants' understanding is that E.L.A. provided the same mailing address for both himself and his attorney. *Cf.* U.S. Citizenship & Immigr. Servs., USCIS Policy Manual, vol. 1, pt. a, ch. 10, available at https://www.uscis.gov/policy-manual/volume-1-part-a-chapter-10 (last updated September 18, 2026) ("All aliens in the United States (except A and G visa holders and visa waiver visitors) have a legal requirement to report a change of address to USCIS within 10 days of moving[.]").

for civil contempt must be causally related to contemptuous conduct, . . . resolution of . . . sanctions arguments depends on the violations found by the district court." *Klopp*, 957 F.3d at 461 (citing *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017)). At issue is a violation of Section III.I of the Settlement Agreement. To the extent that the Court concludes Defendants' actions with respect to E.L.A. constitute "contemptuous conduct," any remedy must still be causally related to the violation. *Klopp*, 957 F.3d at 461. Parties can purge contempt by coming into compliance with the violated court order. As the Court has recognized, the appropriate remedy for violation of Section III.I is facilitation of return. April 2025 Mem. Op. at 14 ("this Court will order Defendants to facilitate Cristian's return to the United States so that he can receive the process he was entitled to under the parties' binding Settlement Agreement."). Defendants' denial of E.L.A.'s asylum application for failure to appear for biometrics appointments would not be a violation of the Settlement Agreement or any order of this Court and therefore cannot form the basis for potential contempt sanctions or remedies. Instead, a contempt order requiring USCIS to ignore E.L.A.'s failures would provide an unwarranted windfall to a single Class Member, not compliance with the Settlement Agreement or a return to the status quo.

Defendants also maintain that there has been no impropriety in the handling of information regarding E.L.A.'s asylum application before USCIS. *See* Pls.' Mot. 21 (alleging that Defendants "misled" E.L.A., Class Counsel, and the Court). Class Counsel acknowledged that E.L.A.'s immigration counsel was aware of E.L.A. missing at least one biometrics appointment. Pls.' Mot. 7. As the Court has noted, there is a large backlog of asylum applications pending before USCIS. May 2026 Mem. Op. 19. E.L.A.'s asylum application has not been noted as closed in Global for his failures to appear for two biometrics appointments. Fajardo Decl. ¶ 8. Defendants strongly object to Class Counsel's suggestion that, either under the Settlement Agreement terms or as part

of facilitation of return, USCIS should be expected to provide details of the ongoing internal processes of USCIS before any decision is even recorded in Global, or that ICE should be expected to have knowledge of that process. This information was disclosed relating to E.L.A. because it contributed to his removal, *see* Fajardo Decl. ¶¶ 4–9, Bennethum Decl. ¶ 4, and was relevant in responding to the Court's questions posed by order at Dkt. No. 666. E.L.A., and other Class Members, must receive a notice of denial once that denial is recorded in Global before such denial constitutes a Final Decision under the Settlement Agreement. Settlement Agreement 5, § II.L. The Court should decline to find any impropriety in declining to preemptively disclose potential decisions not yet finalized by USCIS or recorded in Global.

**3. Dismissal For Failure to Comply With Biometrics Requirements is an Adjudication on the Merits.**

In the alternative, should this court disagree that dismissal for failure to comply with biometrics requirements is a Final Determination, it should find that USCIS's dismissal of an asylum application for failure to comply with biometrics requirements is an adjudication on the merits. As defined in the Settlement Agreement, "'Adjudicate on the merits' means to render a decision on the substance of an asylum claim by either granting an approval or issuing a determination of non-eligibility." Settlement Agreement 4, § II.B. Dismissal for failure to comply with biometrics requirements is a determination of non-eligibility because compliance with biometrics appointments is part of eligibility to be granted asylum. Under 8 U.S.C. § 1158(b)(1)(A), "Conditions for granting asylum: Eligibility," Congress specified that "The Secretary of Homeland Security [] may grant asylum to an alien who has applied for asylum *in accordance with the requirements and procedures* established by the Secretary of Homeland Security or Attorney General under this section . . ." 8 U.S.C. § 1158(b)(1)(A). One of those procedures, also known as biometrics collection, is set forth in § 1158(d)(1): "The Attorney

General may require applicants to submit fingerprints and a photograph at such time and in such manner to be determined by regulation by the Attorney General." § 1158(d)(1). It then follows that an individual who fails to comply with biometrics collection has not applied for asylum in accordance with a procedure established under § 1158, which means they are not eligible for asylum under § 1158(b)(1)(A). Further, biometrics are a key requirement that ensure an applicant for asylum is not subject to one of the mandatory bars to asylum, such as the persecutor bar, serious non-political crime bar, or the particularly serious crime bar, 8 U.S.C. § 1158(b)(2)(A), and that the applicant merits a favorable exercise of discretion, *id.* § 1158(b)(1)(A). The required biometrics collection are one step the alien must take to demonstrate to USCIS that he or she is not barred from asylum for these reasons. Collection of biometrics enables the agency to both verify that the person who appears for any scheduled interview is the same person who filed the application and to run a battery of background and security checks on the alien. These checks are vital to ensure the integrity of the asylum process and may reveal information that directly impacts the applicant's eligibility under the refugee definition. A dismissal for non-compliance with biometrics requirements is a determination of non-eligibility and therefore an adjudication on the merits as defined in the Settlement Agreement. And as Class Counsel identify, "once USCIS provides an adjudication on the merits, Class Membership ends because this core benefit has been accomplished." Pls.' Mot. 18.

Class Counsel's contention that different form names for administrative denials and denials after an interview indicates that administrative denials cannot be a determination of non-eligibility is without merit. Pls.' Mot. 17. There are many reasons for a form not to include the legal significance of the form in its name. The most simple interpretation of the existence of separate forms is that administrative denials are a subset of determinations of non-eligibility which involve

reporting different information. The Court should give little weight to Class Counsel's contention that the form names have any significance to this meaning of "adjudication on the merits," particularly when the statute itself makes clear that a dismissal for non-compliance with biometrics requirements is a determination of non-eligibility.

Class Counsel further contend that "'determination of non-eligibility' specifically denotes that USCIS must have assessed the merits of the application and denied asylum." Pls.' Mot. 17. But Class Counsel fails to explain how biometrics are not part and parcel of the merits of an asylum claim, as they are specified as a necessary process in the statute establishing asylum procedures. § 1158(d)(1). Furthermore, while Class Counsel contends that an interview is required for an "adjudication on the merits" as defined in the Settlement Agreement, this contention is not supported by the plain language of the Settlement Agreement. As Class Counsel points out, the Affirmative Asylum Procedures Manual mentions "interview" 784 times. Pls.' Mot. 19. Yet the Settlement Agreement does not contain it a single time. *See generally* Settlement Agreement. If an asylum interview were truly "a core benefit of the bargain," the Settlement Agreement would say so.

**C. This Court Cannot Order E.L.A.'s Immediate Release Upon Return to the United States.**

E.L.A. seeks immediate release upon his arrival to the United States. Pls.' Mot. 18. At present, E.L.A.'s future detention status is speculative because E.L.A. is not currently in the United States. This Court cannot order prospective relief that would contravene statutory authority governing the detention of aliens, and this request must be denied. Nor, again, is his detention upon return a means of remedying a violation of the Settlement Agreement. Removal of a Class Member prior to a Final Determination is a violation; the remedy is return. Nothing in the Settlement Agreement speaks to detention. Indeed, E.L.A. was lawfully detained prior to his removal. So once

again, Class Counsel ask for a baseless windfall as a remedy. If E.L.A. does not wish to return because of the possibility of detention, that is his prerogative. But that does not allow Class Counsel to expand their request for relief beyond remedying the violation at issue.

While "[t]he appropriate remedy for civil contempt is within the court's broad discretion," *In re Gen. Motors Corp.*, 61 F.3d 256, 259 (4th Cir. 1995), this discretion is not without limitation. *See* Order on Motion for Contempt, Dkt. No. 645 at 47 (citing cases). But this Court may not use its powers of equity, such as its contempt authority, to ignore Congressional directives expressed in legislation. *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497-98 (2001). Plaintiffs cite to *Omega World Travel, Inc. v. Omega Travel & Shipping Agencies, Inc.*, 905 F.2d 1530, 1990 WL 74305, at *3 (4th Cir. 1990), for the proposition that this Court can grant "prospective and corrective punishment" to "coerce future behavior." Pls.' Mot. 18–19. That case—a question of contempt in a trademark infringement settlement—is distinguishable to this case where the Court is constrained in what it may order with respect to non-detention.

Plaintiffs argue that "an order of E.L.A.'s release would restore E.L.A. to the condition he was in prior to his first improper removal." Pls.' Mot. 20. Any argument by Plaintiffs as to E.L.A.'s first removal are waived – Defendants facilitated that return. *See supra* Background. E.L.A. was in detention prior to his removal on September 1, 2026. *See id.* There is no alternative to immigration detention available to him, and even if there were, the Court lacks the authority to compel it here, given its narrow jurisdiction over this matter restricted to enforcing a Settlement Agreement that has no bearing on or terms related to detention. Any subsequent challenge to detention must sound in habeas, which is not the posture of this case. *See* April 2025 Order 5–6 (noting this matter "is not a habeas case."). E.L.A.'s request for this Court to use its contempt authority as a workaround of statutory authority should be denied.

**D. Class Counsel's Demands For Paperwork And Advance Notice Stray Beyond The Four Corners of The Settlement Agreement.**

Class Counsel requests that this Court order Defendants to provide E.L.A., his immigration counsel, and Class Counsel with copies of E.L.A.'s entry and release paperwork; at least three business days' advance notice of the time and location of his planned arrival in the United States; at least three weeks' advance notice of any scheduled asylum interview; and at least five days' notice of any planned removal. Proposed Order, Dkt. No. 676-1. Class Counsel asserts that these extra-contractual remedies will restore E.L.A. to "the position he would have been in prior to the first wrongful removal and prevent future noncompliance with Section III.I of the Agreement and the Court's Orders." *Id*. This assertion is mere *ipse dixit*. Class Counsel offer no controlling authority or evidentiary record establishing that these sweeping measures are needed to restore the pre-removal status quo with regard to his rights under the Settlement Agreement, nor can they identify any provision within the Settlement Agreement authorizing such relief.

In the case of Cristian, this Court recognized that Maryland contract law required "putting him in the position 'to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador.'" April 2025 Order at 13 (citing *Noem v. Abrego Garcia*, No. 24-A949, 604 U.S. __, 2025 WL 1077101, at *1 (Apr. 10, 2025)). The Court's jurisdiction in the case is limited to enforcement of the Settlement Agreement and its own orders; restoring E.L.A. to the status quo can only extend to matters within that limited jurisdiction—essentially, ensuring he receives his rights as a Class Member under the Settlement Agreement. Settlement Agreement 13, ¶ V.A ("This Court shall retain exclusive jurisdiction to supervise the implementation of this Settlement Agreement and to enforce its provisions and terms until the Termination Date[.]"). Restoring E.L.A. to the status quo with respect to his pending asylum application before USCIS requires nothing more than facilitating his return to the United States—an action Defendants have

actively proffered despite E.L.A.'s declining to return without assurances beyond the four corners of the Settlement Agreement. Requiring five days' notice before return or twenty days' notice before any asylum interview is not within the protections afforded to Class Members by the Settlement Agreement. "[T]he scope of a consent [order] must be discerned within its four corners, and not by reference to what might satisfy [its] purposes." *Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 464, 463 (4th Cir. 2020). This fundamental principle of consent decree interpretation is fatal to Class Counsel's claims.

While Class Counsel casually asserts that these remedies are required by procedural due process, they fail to cite a single supporting authority or offer reasoned legal argument to sustain that assertion. Class Counsel has therefore waived this argument. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *United States v. Esposito*, 205 Fed. Appx. 995, 998 n2 (4th Cir. 2006) (citing *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990); *United States v. Pearson*, 221 Fed. Appx. 212, 217 n.1 (4th Cir. 2007) (same). It is unclear why the Constitution requires paperwork and notice for a *remedy*.

**E. Class Counsel's Claim for Property Loss Compensation is Factually Unsupported, Procedurally Waived, and Beyond this Court's Subject-Matter Jurisdiction.**

Class Counsel requests an order directing the return of, or compensation for, E.L.A.'s alleged personal property, including "his El Salvador identity card, three cell phones, clothing, and money." Pls.' Mot. 22. This claim is legally unsupportable and lacks merit.

First, Class Counsel misapplies *Schwartz v. Rent-A-Wreck of America*, 261 F. Supp. 3d 607, 617 (D. Md. 2017), to argue that E.L.A. must be compensated for "losses sustained as a result of contumacy." Pls.' Mot. 26. This reliance is misplaced because E.L.A.'s alleged property losses were not precipitated by "contumacy." Contumacy is defined as "[s]tubborn resistance to authority

specifically: willful contempt of court." *Contumacy*, Merriam-Webster, https://www.merriam-webster.com/dictionary/contumacy (last visited September 18, 2026). The record contains no evidence that Defendants willfully defied any order of this Court. To the contrary, the record reflects that E.L.A.'s removal resulted from a miscommunication between USCIS and ICE regarding whether E.L.A. had received a Final Determination as defined under the Settlement Agreement. Settlement Agreement 5, ¶ II.L. Moreover, Defendants immediately initiated efforts to facilitate E.L.A.'s return to the United States. Status Reports, Dkt. Nos. 667, 668. Defendants' actions do not demonstrate "stubborn resistance" to this Court's authority; therefore, E.L.A. is not entitled to compensation for his losses.

Second, a party seeking compensatory sanctions in civil contempt "bears the burden of proving *both* the fact and the amount of its losses." *Schwartz*, 261 F. Supp. 3d at 617 (emphasis added). Class Counsel's generic, uncorroborated allegations concerning an "El Salvador identity card, three cell phones, clothing, and money" fall far short of satisfying this evidentiary burden. Pls.' Mot. 26. Class Counsel provides no competent proof establishing that E.L.A. failed to receive his personal effects upon arrival in El Salvador, nor do they quantify the valuation of the items requested. Pls.' Mot. 22; Wylegala Decl. ⁋ 33. By offering only perfunctory assertions without supporting evidence, Class Counsel has waived this claim. *In re GMC*, 110 F.3d 1003, 1016–18 (4th Cir. 1997) (explaining that the complaining party "bears the burden of proving both the fact, [and] the amount of its losses . . . ."); *see United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *United States v. Esposito*, 205 Fed. Appx. 995, 998 n2 (4th Cir. 2006) (citing *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990); *United States v. Pearson*, 221 Fed. Appx. 212, 217 n.1 (4th Cir. 2007) (same).

Finally, this Court lacks subject-matter jurisdiction to adjudicate property loss claims arising from the execution of a removal order. Under 8 U.S.C. § 1252(g), "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security] to commence proceedings, adjudicate cases, or execute removal orders against any alien." E.L.A.'s monetary claims arise directly from the decision to execute a removal order. Dkt. No. 668-1. Jurisdiction is therefore statutorily precluded. *Silva v. United States*, 866 F.3d 938, 940 (8th Cir. 2017) ("So long as the claim arises from a decision to execute a removal order, there is no jurisdiction."). Nevertheless, as a matter of good faith, Defendants note that they have engaged in ongoing discussions with Class Counsel to resolve this matter amicably and continue to investigate the whereabouts of E.L.A.'s possessions, without waiving their jurisdictional defenses.

## CONCLUSION

This Court should deny Class Counsel's Motion to Remedy Defendants' Contempt and Enforce the Settlement Agreement as to Class Member E.L.A.

Dated: September 21, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANTHONY NICASTRO
Director

CATHERINE M. RENO
Assistant Director

RUTH ANN MUELLER
Senior Litigation Counsel

EVAN P. SCHULTZ
JAIME A. SCOTT
JEFFREY ALDERETTE
Trial Attorneys

*/s/ Larissa K. Johnson*
LARISSA K. JOHNSON
Trial Attorney (D.C. Bar No. 90034719)
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
Telephone: (202) 598-9126
Fax: (202) 305-7000
Larissa.K.Johnson@usdoj.gov
*Counsel for Defendants*