**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION**

J.O.P., *et al.*,

Plaintiffs,

v.

U.S. Department of Homeland Security, *et al.*,

Defendants.

Civil Action No.
8:19-CV-01944-SAG

Redacted Version

**CLASS COUNSEL'S BRIEF IN SUPPORT OF THEIR MOTION UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(B)**
**TO EXTEND THE TERMINATION DATE OF THE SETTLEMENT AGREEMENT**

# TABLE OF CONTENTS


Page

I. INTRODUCTION .... 1

II. BACKGROUND .... 3

A. The Settlement Agreement and Its Original Termination Dates .... 3

B. The Extension of the Agreement's Termination Date to November 18, 2026 .... 5

C. Class Counsel's First and Third Motions to Enforce and Defendants' Ever-Growing Violations of Section III.I .... 7

D. Class Counsel's Efforts to Locate and Seek Return of Class Members Removed in Violation of Section III.I .... 10

III. CLASS COUNSEL'S PROPOSAL TO EXTEND THE TERMINATION DATE .... 14

IV. LEGAL STANDARDS .... 15

V. ARGUMENT .... 17

A. Extending the Life of the Agreement for the Class to November 27, 2026 Is Suitably Tailored to Defendants' Established Substantial Noncompliance with Section III.B .... 17

B. Extending the Life of the Agreement for Removed Class Members Through February 24, 2028 Is Suitably Tailored to Defendants' Established Substantial Noncompliance with Section III.I .... 18

VI. CONCLUSION .... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Castañon-Nava v. Dep't of Homeland Sec.*,
806 F. Supp. 3d 823 (N.D. Ill. 2025) ....................18, 19

*Consumer Fin. Prot. Bureau v. Klopp*,
957 F.3d 454 (4th Cir. 2020) ....................27

*Dep't of Fair Emp. & Hous. v. L. Sch. Admission Council Inc.*,
No. 12-cv-01830-JCS, 2018 WL 1156605 (N.D. Cal. Mar. 5, 2018)....................19

*Dorcas Int'l Inst. of Rhode Island v. USCIS*,
834 F. Supp. 3d 242 (D.R.I. 2026)....................6

*Duvall v. Hogan*,
No. CV ELH-94-2541, 2021 WL 2042295 (D. Md. May 21, 2021) ....................16

*Duvall v. Moore*,
No. CV MJM-94-2541, 2024 WL 4529261 (D. Md. Oct. 18, 2024)....................16, 19

*Johnson v. Robinson*,
987 F.2d 1043 (4th Cir. 1993) ....................17

*Kelly v. Wengler*,
822 F.3d 1085 (9th Cir. 2016) ....................17

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992)....................16, 21

*Smyth ex rel. Smyth v. Rivero*,
282 F.3d 268 (4th Cir. 2002) ....................15

*Thompson v. U.S. Dep't of Hous. & Urban Dev.*,
404 F.3d 821 (4th Cir. 2005) .................... *passim*

**Statutes**

8 U.S.C. § 1158(a)(2)(E)....................3

8 U.S.C. § 1158(b)(3)(c) ....................3

**Other Authorities**

8 C.F.R. § 1241.1(f) ....................12

Federal Rule of Civil Procedure 60(b) ........................................................................ 2, 15, 27

## I. INTRODUCTION

When the parties to this case entered into the Settlement Agreement, they secured a straightforward bargain for a fixed period of time: in exchange for releasing their claims, thousands of young people who arrived in this country as unaccompanied children would receive a meaningful opportunity to have their asylum applications adjudicated on the merits before being removed from the United States. The Agreement embodied the unremarkable premise that its terms would be honored. What has followed is anything but.

In the roughly 22 months since the Court approved the Agreement and incorporated its terms into an order operating as a consent decree, Defendants have created a record of noncompliance that is as sweeping as it is troubling. Within [redacted] days of the Agreement's Effective Date, Defendants removed the first confirmed Class Member. They did not stop there. To date, Defendants have disclosed [redacted] confirmed and potential Class Members removed in actual or potential violation of the Agreement—including one young man, E.L.A., whom Defendants removed to El Salvador for the second time with nothing but a detention uniform on his back. Most of those removals came after—and in defiance of—this Court's April 23, 2025 Order, and at least [redacted] violated this Court's July 29, 2026 Order. Meanwhile, Defendants froze the adjudication of Class Members' asylum applications through the USCIS No Asylum Adjudications Policy, prompting the Court to find a "dramatic change in circumstances" and to extend the Agreement's Termination Date by 175 days. Notably, this Court also held Defendants in civil contempt for removing individuals identified to ICE as potential Class Members.

Each of these [redacted] individuals is a real person—a young asylum seeker now living in the country from which they fled, stripped of the protections this Court approved and Defendants pledged to uphold. Class Counsel have worked tirelessly to locate these young people and arrange for their return, but the task is immense. Even finding a removed Class Member is an uphill battle.

In many instances, Defendants have actively impeded the process by withholding basic contact information or slow-walking responses to requests for details related to returns. It is impossible for Class Counsel to reach all the affected individuals before the current November 18, 2026 Termination Date, much less to secure their return to the United States so they may access the benefits found in the Agreement.

Class Counsel therefore asks this Court to exercise its well-established equitable authority under Federal Rule of Civil Procedure 60(b) to ensure that Defendants' noncompliance does not become its own reward. Specifically, this motion seeks two extensions of the Agreement's Termination Date. First, for the Class as a whole, it seeks a modest nine-day extension to November 27, 2026 to account for the period between this Court's May 26, 2026 Order and the judicial vacatur of the USCIS No Asylum Adjudications Policy, during which at least some Class Members continued to be deprived of their bargained-for adjudications. Second, for those Class Members removed in violation of the Agreement on or before November 27, 2026, it seeks an extension through February 24, 2028—the date through which the Court already retains authority over the USCIS implementing memorandum—so these individuals may belatedly access the full package of protections they were promised. Both proposals are suitably tailored to the changed circumstances the Court already found. Neither gives the Class something new. Instead, both simply restore what Defendants took away. If the Agreement expires while scores of removed Class Members remain scattered in their countries of feared persecution, unable to exercise their rights, then the violations—not the bargain—will have the final word.

## II. BACKGROUND

### A. The Settlement Agreement and Its Original Termination Dates

On July 1, 2019, Plaintiffs, a group of young asylum seekers who entered the United States as unaccompanied children, brought this action for declaratory and injunctive relief against Defendants the U.S. Department of Homeland Security ("DHS"), U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"). They argued that a May 31, 2019 USCIS memorandum (the "2019 Redetermination Memo"), ECF No. 15-2, unlawfully modified policies governing the treatment of asylum applications of unaccompanied children ("UCs"), in violation of the Administrative Procedure Act ("APA") and the Due Process Clause of the Fifth Amendment, ECF No. 1. A previous USCIS memorandum—issued in May 2013—had implemented a policy that USCIS would accept jurisdiction of all asylum applications filed by individuals previously determined to be UCs. ECF No. 15-6. The 2019 Redetermination Memo revised this policy, requiring asylum officers to make their own determinations of whether the applicant was still a UC at the time they filed their application, and accordingly redetermine whether the applicant was eligible for protections granted to UCs under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (the "TVPRA"). Specifically, the TVPRA provides that USCIS, rather than an immigration judge, has initial jurisdiction over a UC's asylum application despite the young person being in immigration court removal proceedings. 8 U.S.C. § 1158(b)(3)(c). It also exempts UCs' asylum applications from the general requirement that such applications be filed within one year of a person's entering the United States. 8 U.S.C. § 1158(a)(2)(E).

In 2024, the parties reached a final Settlement Agreement providing relief to a certified class of young asylum seekers previously determined to be UCs. ECF No. 199-2. The Court

granted final approval of the Agreement on November 25, 2024. ECF No. 205. The Agreement defines the certified Class as:

> all individuals nationwide who [on or before February 24, 2025]: (1) were determined to be a UAC; and (2) who filed an asylum application that was pending with USCIS; and (3) on the date they filed their asylum application with USCIS, were 18 years of age or older, or had a parent or legal guardian in the United States who is available to provide care and physical custody; and (4) for whom USCIS has not adjudicated the individual's asylum application on the merits.

ECF No. 199-2 at 5 (Section II.E). The Agreement required USCIS to rescind the 2019 Redetermination Memo and issue a superseding memorandum explaining and implementing the Agreement, including its requirement that USCIS would assume initial jurisdiction over Class Members' asylum applications. *Id.* at 7 (Sections III.A, III.B).[1] The Agreement's original Termination Date was May 27, 2026. ECF No. 619 at 4–5.

The Agreement provides for the Court to retain jurisdiction over:

> 1. Claims by any Party in accordance with the provisions laid out in Section V of this Agreement that any other Party has committed a violation of this Agreement;
>
> 2. The express repudiation of any of the terms of this Agreement by any Party; and
>
> 3. Plaintiffs' claims for attorney fees and/or litigation costs.

ECF No. 199-2 at 13 (Section IV.H). The Agreement purports to end that jurisdiction on its Termination Date. *Id.* at 6 (Section II.S), 13 (Section IV.H ("[T]he Court shall retain jurisdiction . . . only until the date the Agreement terminates as described in Section IV.K.")); *id.* (Section V.A ("This Court shall retain exclusive jurisdiction to supervise the implementation of this Settlement Agreement and to enforce its provisions and terms until the Termination Date . . . .")); ECF No. 619 at 1 ("Nearly all of the provisions of that Agreement are set to terminate on May 27, 2026

[1] USCIS issued a memorandum on January 30, 2025, with an effective date of February 24, 2025. After Class Counsel identified aspects of the memorandum that were not consistent with the Agreement, USCIS issued a revised memorandum on October 30, 2025. ECF No. 616 at 1.

(the 'Termination Date'), as will, *ostensibly*, this Court's authority to enforce those expiring terms.") (emphasis added). The Agreement also includes a separate "Termination Date – USCIS Memo" through which Section III.A of the Agreement remains in force for three years from the Effective Date, which is February 24, 2028. ECF No. 199- 2 at 6 (Section II.S.1), 13 (Section IV.K ("[T]he Court shall have jurisdiction to enforce Paragraph III.A of this Agreement until three years after the superseding memorandum'[s effective date.")) (Section V.A ("[T]he Court shall retain jurisdiction over Paragraph III.A (USCIS superseding memorandum) until the Termination Date – USCIS Memorandum.")).

**B. The Extension of the Agreement's Termination Date to November 18, 2026**

Just over a year after the Court's final approval of the Agreement, on December 2, 2025, USCIS issued a policy memorandum that directed USCIS personnel to "[p]lace a hold on all Forms I-589 (Application for Asylum and for Withholding of Removal), regardless of the [non-citizen's] country of nationality, pending a comprehensive review." ECF No. 535-7 (USCIS Policy Memorandum PM-602-0192, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries* (Dec. 2, 2025)) (the "USCIS No Asylum Adjudications Policy") at 2. At a March 2026 evidentiary hearing before the Court, testimony confirmed that USCIS was applying the No Asylum Adjudications Policy to Class Members. ECF No. 619 at 8–9. Moreover, as discussed below, the March 2026 evidentiary hearing revealed that Defendants had removed many confirmed and potential Class Members in actual or potential violation of Section III.I of the Agreement. *Id*. at 6–7.

In April 2026, Class Counsel filed a motion to extend the life of the Agreement, citing Defendants' noncompliance with Sections III.B and III.I of the Agreement as changed circumstances warranting modification. ECF No. 535. Following full briefing and a hearing, the

Court granted the motion on May 26, 2026, finding that "the USCIS Hold Memo constituted a dramatic change in circumstances." ECF No. 619 at 19. The Court rejected Class Counsel's other claims of changed circumstances tied to USCIS, deferred decision on the claims of changed circumstances tied to ICE, and extended the Agreement's Termination Date for 175 days, to November 18, 2026. ECF No. 619 at 14, 17, 20 n.26; ECF No. 620. Importantly for present purposes, the Court reasoned:

> Since the Memo's issuance on December 2, 2025, it has applied to at least some portion of the Class. Thus, for the 175 days between its issuance and the date of this opinion, some portion of the Class has been denied the benefit of the Parties' bargain—a full 548-day window during which Defendants are obligated to adjudicate Class Members' applications on the merits. An extension of the Termination Date equal to the period of deprivation of that benefit is suitably tailored to address the deprivation. *See Castañon-Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823, 862–63 (N.D. Ill. 2025).

ECF 619 at 29. The Court also acknowledged that at least some Class Members would continue to be deprived of the benefit of the bargain and that an additional remedy may be needed:

> Of course, as of today, the adjudicative holds continue to prevent at least some Class Members from enjoying the benefit of their 548-day bargain. The decision about how long those holds will continue is within the purview of Defendants and the Executive Branch. But to the extent the situation persists and deprives some Class Members of the ability to have their applications adjudicated consistent with the Agreement, Class Counsel may again move to modify the Agreement to extend its term.

*Id*.

Nine days after this Court's decision—on June 5, 2026—the U.S. District Court for the District of Rhode Island vacated and set aside the USCIS No Asylum Adjudications Policy, concluding it violated the APA. *See Dorcas Int'l Inst. of Rhode Island v. USCIS*, 834 F. Supp. 3d 242 (D.R.I. 2026). Although Defendants have appealed the decision, they have represented that "th[e] policy is not being implemented" in compliance with that court's order. ECF No. 626 (June 22, 2026 Hr'g Tr.) at 47–48; *see also* ECF No. 634 at 4 ("[T]he adjudications pause has been

vacated by the U.S. District Court for the District of Rhode Island and is no longer being applied by USCIS."), 8 ("Defendants are not currently applying the December 2, 2025 adjudications hold.").

### C. Class Counsel's First and Third Motions to Enforce and Defendants' Ever-Growing Violations of Section III.I

On or about March 15, 2025, Defendants removed Cristian, a Class Member, under the Alien Enemies Act and in violation of Section III.I of the Agreement. In response to Class Counsel's first motion to enforce the Agreement, the Court ordered Defendants to facilitate Cristian's return to the United States and further ordered Defendants "not to remove from the United States members of the certified 'Class,' defined in Section II.E of the Settlement Agreement." ECF No. 254 (the "April 23, 2025 Order").

In January 2026, after the Court denied their second motion to enforce on procedural grounds, Class Counsel filed a third motion to enforce Section III.I of the Agreement. ECF No. 459. The Court held a hearing on February 18, 2026, at which Defendants were directed to be ready to provide additional information regarding the removals of eight potential Class Members. ECF No. 645 at 3. Finding "Defendants' showing at the hearing woefully inadequate," the Court ordered an evidentiary hearing at which Defendants were ordered to produce people with personal knowledge regarding the facts and circumstances surrounding Defendants' removal of nine confirmed and potential Class Members, among other topics. *Id*. at 4. The hearing extended over three days, the parties filed supplemental briefs, and the Court held another hearing on June 22, 2026 to address issues raised for the first time in the supplemental briefing. *Id*. Through this process, it came to light that many more confirmed and potential Class Members had been removed in actual or potential violation of the Settlement Agreement and the Court's April 23, 2025 Order. ECF No. 645 at 12–13. On June 26, 2026, Defendants revealed that they knew of 107 confirmed

(54) and potential (53) Class Members removed pursuant to the execution of final removal orders. ECF No. 629-1 at 1–2; ECF No. 631 at 3–4.

On July 29, 2026, the Court made extensive findings regarding Defendants' removal of confirmed and potential Class Members and granted in part the third motion to enforce. ECF No. 642 (the "July 29, 2026 Order"); ECF No. 645. The Court found that "the degree and nature of Defendants' noncompliance" with Section III.I is "an unanticipated circumstance sufficient to support this Court's exercise of its modification authority." ECF No. 645 at 44-45. Exercising this authority, the Court modified the Agreement to:

> require Defendants to, every two weeks, search their systems to identify removed potential Class Members, using the parameters they have heretofore employed for such searches (i.e., using "Removed UACs" tags), and to report to Class Counsel and this Court on the results of those searches—as well as any other potentially wrongful removals of potential Class Members of which Defendants become aware through any other means—as part of status reports ordered in [the following paragraph].

ECF No. 642 at 2. The Court ordered additional remedies based on its authority to enforce the Agreement, including:

> If any system alerts signifying an individual's potential *J.O.P.* Class membership are present in an individual's records in ICE's systems, or if an individual is identified to ICE as a potential *J.O.P.* Class Member by any other means (including, but not limited to, USCIS's compiled lists of potential Class Members, self-identification, or identification by counsel), ICE must refrain from removing the individual unless and until USCIS adjudicates their asylum application on the merits or the USCIS Asylum Office confirms the individual is not a Class Member.

*Id*. at 1. The Court also held Defendants in civil contempt. *Id*. at 3. The Court was careful to point out "that removals of Class Members executed as a result of alleged deficiencies in identification methods and/or parameters, despite constituting violations" do *not* amount to contempt. ECF No. 645 at 34. Instead:

> where an individual has been identified to ICE as a potential Class Member, Defendants are obligated not to remove that individual until the individual is

> confirmed not to be a Class Member. Any removals of individuals executed in ignorance or disregard of identification of their potential Class membership were and are in contempt of that order.

*Id.* As of today, Class Counsel is unable to discern the full extent of the contumacy. [redacted] Declaration of Rebecca Scholtz ("Scholtz Decl.") ¶ 8. But suffice to say, Defendants acted in contempt of the Court's orders in a substantial number of removals.

Defendants' status reports filed pursuant to the July 29, 2026 Order reveal that removals of confirmed and potential Class Members continue unabated. On August 13, 2026, Defendants filed their first status report. [redacted] ECF 646-3 (sealed). On August 27, 2026, Defendants filed their second status report. [redacted] ECF No. 653-3 (sealed). Finally, on September 10, 2026, Defendants filed their third status report. [redacted] ECF No. 674-3 (sealed). [redacted] Scholtz Decl. ¶ 7.

[redacted] *Id.* ¶ 8. [redacted] *Id.* In addition, on September 1, 2026, Defendants removed Class Member E.L.A. to El Salvador in violation of the Agreement *for the second time*. ECF No. 665. [redacted] Scholtz Decl. ¶ 9. [redacted] *Id.* ¶ 19.

[redacted] *Id.* ¶ 6. After the Court's July 26, 2026 decision holding that Class Members whom ICE physically removes from the United States via voluntary departure are not entitled to return to the United States for an adjudication of their asylum application, ECF No. 645 at 24–25, Defendants ceased reporting on such individuals. ECF No. 642 at 2–3 (requiring status reports on "removed" Class Members).

### D. Class Counsel's Efforts to Locate and Seek Return of Class Members Removed in Violation of Section III.I

Since Class Counsel first learned of the removals of confirmed and potential Class Members in actual or potential violation of Section III.I of the Agreement, they have been working tirelessly to locate them and seek their return. This is a very time- and labor-intensive endeavor—

made even more difficult by Defendants' persistent failure to cooperate in even the most basic ways. Despite their best efforts, it is impossible for Class Counsel to reach all confirmed and potential removed Class Members by November 18, 2026, to say nothing of securing their return to the United States to vindicate their rights under the Agreement.

Each young person expelled from the United States in disregard of Section III.I is a unique individual now living precariously in their country of feared persecution. In many instances, even locating them is an uphill battle. And given the sheer number of these young people, Class Counsel was forced to create a comprehensive outreach and tracking system to organize their efforts. As detailed in the attached declaration, each time Defendants newly identify an individual whom ICE has removed in actual or potential violation of the Agreement, Class Counsel documents the details of the disclosure. Scholtz Decl. ¶ 17. Class Counsel then engages in extensive efforts to contact the removed young person and their counsel of record via multiple avenues, including emails, phone calls, and letters. *Id*. The primary goal of this initial outreach is to assess Class membership and, if the individual is a Class Member, to explore their desire to return to the United States for an asylum adjudication on the merits. *Id*.

[redacted] *Id*. Since the Court's July 29, 2026 decision limiting recourse to those with executed final removal orders, Class Counsel have adjusted their approach. They now focus on determining whether the confirmed or potential Class Member in fact received a removal order because, for example, ICE kept them in immigration detention past the deadline they were given to depart the United States, thus triggering a removal order. *Id*.; *see*

8 C.F.R. § 1241.1(f). These efforts are critical because if indeed such an order exists and the young person is a Class Member, their removal violated Section III.I and they are entitled to relief.

To date, Class Counsel has reached 14 removed Class Members. Scholtz Decl. ¶ 18. In 12 cases, Class Counsel has ruled out Class membership. *Id.* In 57 cases, Class Counsel has exhausted outreach efforts based on the contact information Defendants have provided thus far and has asked Defendants to provide additional contact information in their records with no response yet. *Id.* In 65 cases outreach efforts are ongoing. *Id.*

When Class Counsel are able to connect directly with a Class Member and the Class Member is interested in pursuing return to the United States for a USCIS asylum adjudication, Class Counsel sends a written request to Defendants asking for the Class Member's return and asking Defendants to provide specific information about Defendants' plans for return, including whether and where ICE will detain them and the legal basis for any planned detention. *Id.* ¶ 21. To date, Class Counsel has done so in seven cases. *Id.* If Defendants agree to return a removed Class Member, Class Counsel engages in an extensive process of advising the Class Member, arranging counsel for the Class Member in their individual immigration case where possible, and facilitating contact between the Class Member and Defendants in anticipation of their return. *Id.* ¶ 23. Of course, Class Counsel have no direct control over the pace of Defendants' engagement in a Class Member's return. In the case of E.L.A., Class Counsel emailed Defendants on June 15, 2026 about his desire to return and he arrived in the United States eight weeks later. ECF No. 676-6 ¶¶ 13, 18.

Plainly, the evidence establishes that it is impossible for Class Counsel to reach all the affected confirmed and potential Class Members before the current Termination Date, much less secure Class Members' returns to the United States to restore their bargained-for benefits under

the Agreement. Defendants' conduct has cemented this result, as they slow-walk action while November 18, 2026 looms.

First, Defendants have withheld basic information that could have facilitated earlier identification of and connection with confirmed and potential Class Members. As detailed in the attached declaration, obtaining valuable information—including date of birth, Class Member status, and full contact information for counsel and the confirmed or potential Class Member—is akin to pulling teeth. Scholtz Decl. ¶¶ 10–15. Without this information, Class Counsel's efforts have been slowed and, in some instances, stalled. *Id*. ¶ 14. Defendants cannot claim innocence. For example, on August 7, 2026, ICE picked up the phone and called Class Member R.S.P. about his interest in returning to the United States using a number they had withheld from Class Counsel for four-and-a-half months. *Id*.

Second, Defendants take the position—with which Class Counsel disagrees—that they have 60 days to respond to each request for a wrongfully removed Class Member's return. *Id*. ¶ 22. Though in some cases they have agreed to return a wrongfully removed Class Member sooner, in E.M.P.'s case Defendants took the full 60 days to respond and then refused to return him, prompting a motion to compel return, ECF No. 544, which this Court denied on July 29, ECF No. 642 at 1. The Court took notice of this approach. ECF No. 645 at 18 n.18 ("Defendants repeatedly invoked this 60-day period in their interactions with Class Counsel regarding E.M.P.").

Third, Defendants have not provided Class Counsel with critical information needed to advise Class Members interested in return. Scholtz Decl. ¶ 21. Without details from Defendants on their plans for returning Class Members—and given Defendants' cavalier treatment of E.L.A. after his return, including his unlawful second removal to El Salvador stripped of his belongings—

Class Counsel's efforts to secure Class Members' returns are compromised. Rather than speedily act to remedy their violations, Defendants' actions reflect their will to run out the clock.

## III. CLASS COUNSEL'S PROPOSAL TO EXTEND THE TERMINATION DATE

Against this backdrop, given Defendants' application of the USCIS No Asylum Adjudications Policy to some Class Members until June 5, 2026 and their substantial non-compliance with Section III.I , Class Counsel urges the Court to modify the Settlement Agreement to extend its life in two distinct and tailored ways.

First, the Court should extend the Termination Date of the Settlement Agreement for the entire Class from November 18, 2026 to November 27, 2026. The Class is entitled to an additional nine days of the Agreement because the USCIS No Asylum Adjudications Policy continued to deprive the Class of its bargained-for rights for nine days between the Court's May 26, 2026 order extending the Agreement and a federal district court enjoining the memo on June 5, 2026. As reflected in Class Counsel's concurrently filed proposed order, this modification would involve simple edits to Sections II.S (Termination Date) and IV.K (Termination) to insert November 27, 2026. As the Court has already determined, an extension of this sort is suitably tailored to address the deprivation of Class Members' rights. ECF No. 619 at 29.

Second, the Court should modify the Settlement Agreement to extend the Agreement's life for those confirmed and potential Class Members removed between November 25, 2024 (the Agreement's Effective Date) and November 27, 2026 (the Agreement's proposed Termination Date). Under this proposal, the Agreement would *not* remain in force perpetually for these removed young people. Instead, it would end on February 24, 2028, the current Termination Date – USCIS Memo. ECF No. 199-2 at 6 (Section II.S.1).

As detailed in Class Counsel's proposed order, this modification would involve simple edits to Sections II.S.1 (Termination Date – USCIS Memo), IV.K (Termination), and V.A

(Retention of Jurisdiction). As for Section II.S.1, Class Counsel proposes inserting "& Removed Class Members" to the title of the defined "Termination Date – USCIS Memo[randum]." In Section IV.K, Class Counsel proposes inserting ", as well as the entire Agreement for those Class Members removed between November 25, 2024 and November 27, 2026 in violation of [Section] III.I, ." This supplements the Court's enforcement authority over Section III.A, which *already* extends past the Agreement's standard Termination Date. *Compare* ECF No. 199-2 at 6 (Section II.S) *with id*. (Section II.S.1). Finally, Class Counsel proposes including both these edits in Section V.A for clarity. As discussed below, this approach is suitably tailored to Defendants' noncompliance, remedying the premature deprivation of the entire package of benefits that the removed Class Members were entitled to receive under the Agreement.

## IV. LEGAL STANDARDS

"The court's inherent authority to modify a consent decree or other injunction is now encompassed in Rule 60(b)(5) of the Federal Rules of Civil Procedure." *Thompson v. U.S. Dep't of Hous. & Urban Dev*., 404 F.3d 821, 826 (4th Cir. 2005). Rule 60(b)(5) provides that a court may relieve a party or its legal representative from a final judgment or order if, among other things, "applying it prospectively is no longer equitable."

As the Court recognized when extending the Agreement's Termination Date, "the power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible." ECF No. 619 at 11 (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 381 n.6 (1992)). Class Counsel acknowledges that the Agreement operates as a consent decree and that the rules related to consent decree modification apply to this motion. ECF No. 205 (Nov. 25, 2024 Order granting joint motion for final approval of Settlement Agreement); *Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 281 (4th Cir. 2002) ("A consent decree, because it is entered as an order of the

court, receives court approval and is subject to the oversight attendant to the court's authority to enforce its orders, characteristics not typical of settlement agreements."), *overruled on other grounds*, *Stinnie v. Holcomb*, 77 F.4th 200 (4th Cir. 2023).

Under the Supreme Court's decision in *Rufo*, Class Counsel "bears the burden of establishing that a significant change in circumstances warrants revision of the decree. If [Class Counsel] meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." 502 U.S. at 383. In assessing whether circumstances have changed such that a modification is warranted, the Court must determine whether Class Counsel, when they entered into the agreement, actually anticipated the events now cited as the basis for the modification. If they did actually anticipate these circumstances, a modification ordinarily should not be granted. *Id.* at 385. However, "that the events were theoretically foreseeable does not foreclose a modification"; "the issue is whether the parties *actually* anticipated the events giving rise to the modification request." *Thompson*, 404 F.3d at 828 (emphasis in original).

"In institutional reform litigation, modification of a consent decree to extend the period of enforcement may be justified by a significant and unanticipated degree of noncompliance with its terms." *Duvall v. Moore*, No. CV MJM-94-2541, 2024 WL 4529261, at *6 (D. Md. Oct. 18, 2024) (Maddox, J.) (*Duvall II*) (collecting cases); *see also Duvall v. Hogan*, No. CV ELH-94-2541, 2021 WL 2042295, at *14 (D. Md. May 21, 2021) (Hollander, J.) ("Courts have consistently held that the failure of substantial compliance with the terms of a consent decree can qualify as a significant change in circumstances justifying modification."); *Thompson*, 404 F.3d at 831 (affirming the district court's conclusion that defendants' "lack of compliance with their

obligations under the Consent Decree was an unanticipated and substantial change of circumstance").

Notably, "[a] court's inherent power to modify a consent decree" "is not circumscribed by the language of the decree." *Id.* at 830, 832 n.6 (emphasis removed) (collecting cases); *see also Johnson v. Robinson*, 987 F.2d 1043, 1050 (4th Cir. 1993) ("[A] district court may, of course, modify a consent decree to impose new duties upon a party."). Yet "generally speaking, a district court modifying a consent decree should strive to 'preserve the essence of the parties' bargain.'" *Thompson*, 404 F.3d at 833 (quoting *Pigford v. Veneman*, 292 F.3d 918, 927 (D.C. Cir. 2002); *see also id.* at 831–32 ("[T]he district court modified the decree no more than was necessary to approximate the positions the parties would have occupied had the Local Defendants lived up to their obligations under the Consent Decree.") (citing *Pigford*, 292 F.3d at 927); *Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016) ("[A] modification of a court order is 'suitably tailored to the changed circumstance' when it 'would return both parties as nearly as possible to where they would have been absent' the changed circumstances.") (quoting *Pigford*, 292 F.3d at 927 (emphasis omitted)).

## V. ARGUMENT

### A. Extending the Life of the Agreement for the Class to November 27, 2026 Is Suitably Tailored to Defendants' Established Substantial Noncompliance with Section III.B

The Court has already determined that the USCIS No Asylum Adjudications Policy "constituted a dramatic change in circumstances" sufficient to support the Court's exercise of its modification authority. ECF No. 619 at 19. And it already extended the life of the Agreement by 175 days—which is the number of days the USCIS No Asylum Adjudications Policy had been in place, in substantial noncompliance with Section III.B, as of the date of the Court's order. *Id.* at

29. The question, then, is merely whether Class Counsel's proposed extension of an additional nine days is suitably tailored to the change in circumstances. The answer, plainly, is yes.

Nine is the number of additional days—between May 26, 2026 (the day of the Court's order) and June 5, 2026 (the day the USCIS No Asylum Adjudications Policy was enjoined)—when some portion of the Class continued to be deprived of the full benefit of the parties' bargain. ECF No. 620; ECF No. 645 at 4 n.6. Under the Court's reasoning in its decision to extend the Termination Date by 175 days, it is undeniable that the Class is entitled to an additional nine days of the Agreement. ECF No. 619 at 29 ("An extension of the Termination Date equal to the period of deprivation of that benefit is suitably tailored to address the deprivation. *See Castañon-Nava* [ ], 806 F. Supp. [at] 862–63 . . . ."). Neither facts nor law have changed since May 26, 2026 to support a different result. Indeed, the Court anticipated that this additional modification might be necessary. ECF No. 619 at 29 ("But to the extent the situation persists and deprives some Class Members of the ability to have their applications adjudicated consistent with the Agreement, Class Counsel may again move to modify the Agreement to extend its term."). The Court should therefore extend the Agreement's Termination Date by nine days, to November 27, 2026.

### B. Extending the Life of the Agreement for Removed Class Members Through February 24, 2028 Is Suitably Tailored to Defendants' Established Substantial Noncompliance with Section III.I

The Court has already determined that "the degree and nature of Defendants' noncompliance" with Section III.I (which Class Counsel characterized as "arguably the Agreement's most important term from a harm-reduction angle," ECF No. 594 at 11) is "an unanticipated circumstance sufficient to support this Court's exercise of its modification authority." ECF No. 645 at 44-45. Again, then, the remaining question is whether Class Counsel's

proposed modification extending the life of the Agreement for removed Class Members through February 24, 2028 is suitably tailored to these changed circumstances. The answer here is yes.

As the Court underscored when granting Class Counsel's motion to extend the Agreement earlier this year, "'[m]odification of a court order is suitably tailored to the changed circumstance when it would return both parties as nearly as possible to where they would have been absent the changed circumstances,' and extending the term of a consent decree by the amount of time that a party failed to comply with the decree meets that standard." *Dep't of Fair Emp. & Hous. v. L. Sch. Admission Council Inc.*, No. 12-cv-01830-JCS, 2018 WL 1156605, at *17 (N.D. Cal. Mar. 5, 2018) (quoting *Kelly*, 822 F.3d at 1097–98 (internal quotation marks omitted)); *see also Duvall II*, 2024 WL 4529261, at *6 (collecting cases).

[redacted] Scholtz Decl. ¶ 9. Thus, for the [redacted] days between this initial documented violation and the date of this motion, some portion of the Class has been denied the benefit of the parties' bargain—originally, a full 548-day window during which Defendants are obligated to adjudicate Class Members' applications on the merits before removing them from the United States, which then turned into a 723-day window when the Court extended the Agreement. *Id.* ¶ 19. Presuming Defendants do not completely halt their removals of confirmed and potential Class Members before the proposed Termination Date of November 27, 2026, some portion of the Class will have been denied the benefit of the parties' bargain for [redacted] days. An extension of the Termination Date equal to the period of deprivation of that benefit is suitably tailored to address the deprivation. *See Castañon-Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823, 862–63 (N.D. Ill. 2025). Thus, an extension of the Termination Date of 684 days—through October 11, 2028—can function as a reasonable

benchmark for now. Class Counsel, however, propose a modification even more narrowly tailored in two respects.

First, Class Counsel propose that the Court extend the Termination Date only for removed Class Members, not for the Class as a whole. This choice is rooted in the recognition that Defendants prematurely deprived these Class Members of the entire package of benefits to which they were entitled under the Agreement. For a Class Member who should have remained protected under the Agreement, Defendants' violation effectively accelerated the end of that person's participation in the Settlement. If the Agreement expires for them, Defendants' violation becomes the final word. Class Counsel's proposed modification allows the Court to restore, as nearly as practicable, the position removed Class Members would have occupied if Defendants had complied with Section III.I in the first place. Had Defendants complied, these Class Members would have remained subject to the Agreement and reaped its benefits in the United States. Thus, an extension of the Agreement for this set of Class Members does not give them something new or something they never secured. Instead, the Court would restore the protection that they bargained for and that Defendants wrongly short circuited.

This restoration would not be vast, but it would be meaningful. [redacted] ECF 674-3 (sealed). Though that number may continue to grow—if further violations of Section III.I occur through November 27, 2026, if Class Counsel discover that some Class Members' voluntary departures were in fact executions of final removal orders, or if Defendants uncover earlier violations that are not yet reported to the Court and Class Counsel—it will remain a discrete subset of the entire Class. Restoring the bargain struck for this limited group of affected Class Members and requiring Defendants to adhere to the Agreement for their benefit is thus not an overbroad

approach that would run afoul of *Rufo* and *Thompson*. Indeed, the Fourth Circuit has made clear that the Court holds the power to fashion a modification responsive to the unique facts at hand. *Thompson*, 404 F.3d at 830 ("The essence of a court's equity power lies in its inherent capacity to adjust remedies in a feasible and practical way to eliminate the conditions or redress the injuries caused by unlawful action. Equitable remedies must be flexible if these underlying principles are to be enforced with fairness and precision.") (quoting *Freeman v. Pitts*, 503 U.S. 467, 487 (1992)).

Defendants may attempt to characterize this modification as amounting to unwarranted special treatment of a portion of the Class not envisioned by the Agreement. The Court should flatly reject that characterization. In Class Counsel's bargained-for world, this segmenting of the Class would never have materialized. Instead, Defendants would have held up their end of the bargain and refrained from removing Class Members out of respect for Section III.I. As the Court has observed: "The quantitative metric for evaluating compliance, while not stated expressly, is clear by virtue of it being a prohibition: *zero* such removals are permitted." ECF No. 645 at 45 n.36. In that world, the Agreement would have terminated as planned. Yet Defendants created the category of removed Class Members through their patent disregard of the Agreement. A targeted modification by the Court to address this deprivation is not special treatment. Instead, it is simply a direct response to the changed circumstances for which Defendants bear full responsibility. If anything, the case for modification here is even stronger than in situations where an intervening independent force fundamentally altered the bargain the parties originally struck. *See Thompson*, 404 F.3d at 829–31 (extending the consent decree as to the federal defendants even though they were not responsible for the delays that constituted the substantial noncompliance).

The Court should also reject any entreaty to slice and dice the Agreement so that only particular provisions would outlive the current Termination Date for removed Class Members.

The Agreement's substantive provisions are an interlocking set of protections, all of which are essential components of the bargain the parties struck. ECF No. 199-2 at 7–11 (Section III). Removed Class Members are, of course, entitled to USCIS jurisdiction over their asylum claims—and to a process in the event USCIS disavows that jurisdiction—should they elect to return to the United States to pursue relief. *Id*. at 7–9 (Sections III.B, III.C, III.D, III.G). To make that right meaningful, they require protection against ICE's contrary advocacy in immigration court and re-removal, as well as a mechanism to reopen a removal order should USCIS grant them asylum. *Id*. at 9–10 (Sections III.H, III.I, III.J). Moreover, removed Class Members are entitled to the Agreement's benefits outside of the core substantive protections. These include the ongoing reporting the Court recently added to the Agreement to unearth removed confirmed and potential Class Members' identities, a critical first step to resurrect their benefits under the Agreement. ECF No. 642 at 2. It also includes the Court's retention of jurisdiction over Plaintiffs' claims for attorney fees and/or litigation costs that accrue as Class Counsel work to protect the rights secured in the Agreement. ECF No. 199-2 at 13 (Section IV.H). Extending the Termination Date of the full Agreement for the discrete group of removed Class Members is a remedy carefully designed to reach those impacted by the changed circumstances, and no others.

Second, in addition to narrowing the Termination Date extension to a discrete part of the Class, Class Counsel proposes a discrete temporal extension to render the Court's modification suitably tailored to the substantial noncompliance. Specifically, Class Counsel proposes that the Court align the Termination Date for removed Class Members with the existing Termination Date – USCIS Memo: February 24, 2028. By aligning these two Termination Dates, the Court undoubtedly would be exercising its modification authority in a measured way. The modification would simply mirror the judicial oversight that Defendants affirmatively accepted when entering

into the Agreement. ECF No. 199-2 at 13 (Section V.A) ("This Court shall retain exclusive jurisdiction to supervise the implementation of this Settlement Agreement and to enforce its provisions and terms until the Termination Date, except that the Court shall retain jurisdiction over Paragraph III.A (USCIS superseding memorandum) until the Termination Date – USCIS Memorandum [of February 24, 2028] . . . .").

Defendants thus cannot protest that the proposed length of the extension rewrites the Agreement to expose them to judicial involvement beyond the time agreed upon there. Neither can Defendants claim that this extension would impact their substantive decision making, since USCIS is bound to adjudicate Class Members' asylum applications until at least February 24, 2028 under the Agreement's terms as incorporated into the USCIS Memo. ECF No. 199-2 at 7 (Section III.A). Consequently, Class Counsel's proposal is fully in line with *Thompson*'s admonition that the Court approximate the positions the parties would have occupied had Defendants lived up to their obligations under the Agreement. 404 F.3d at 831–32.

If anything, Defendants should welcome a limitation of the Termination Date to February 24, 2028 for removed Class Members. This is an extension of 454 days, roughly [redacted] fewer months than the period of deprivation these Class Members will have suffered as a group by the time the Agreement otherwise terminates. Of course, Class Counsel would welcome a longer extension of the Termination Date for removed Class Members.[2] This date could be October 11, 2028, an extension of [redacted] days to match the full [redacted] days of current deprivation. Or it could be a point beyond, since removed Class Members will remain deprived of the benefit of their bargain

---

[2] [redacted] Scholtz Decl. ¶ 19.

until they receive what they were due under the Agreement. But in any event, an extension to a date sooner than February 24, 2028 would not be suitably tailored to Defendants' removal of Class Members in violation of Section III.I. In addition to reflecting a crabbed view of the case law governing extensions, a decision to further limit its length would severely impact Class Counsel's ability to locate removed Class Members and effectuate their return to the United States for an adjudication on their asylum application's merits.

As described above and spelled out in more detail in the attached declaration, Class Counsel has expended and will continue to expend substantial time and effort attempting to remedy the harms Defendants created by removing Class Members. *Supra* Section II.D. This requires careful coordination among many, including the removed Class Members themselves and their counsel (if any), presuming, of course, that these Class Members can even be found. And Class Counsel is engaging in these efforts often with little cooperation from Defendants, who at times affirmatively slow down the process of removed Class Member identification and return. The past six months, since the removal of many confirmed and potential Class Members first became known, have proven that significant time is required to ensure that removed Class Members are restored to the position they held prior to their removal in violation of Section III.I. Accordingly, the Court should extend the Agreement for removed Class Members no fewer than 454 days, thereby aligning Defendants' preexisting obligations running to February 24, 2028 with additional time needed to pursue remedies for those removed in defiance of the Agreement's plain terms.

* * *

Class Counsel acknowledges that at an earlier stage of this litigation, the Court stated that it "disagrees that extension of the Termination Date would be a suitably tailored modification to address wrongful removals during the original term." ECF No. 619 at 20 n.26. But the Court

made that statement in the context of Class Counsel's request to extend the Agreement's Termination Date for *all* Class Members. And in that scenario, Section III.I's stay of removal provision would have extended far into the future, opening the door to even more violations in need of remedy. And it would have given *all* Class Members significantly longer protection than originally found in the Agreement—even those never removed. Here, by contrast, Class Counsel has crafted a proposed modification that will apply to a discrete group of Class Members, by Defendants' present count no more than [redacted] although that number may be larger if additional Class Members have been removed. ECF 674-3 (sealed). Each one is harmed personally by the changed circumstances. And the proposed extension for their benefit is modest (an additional 454 days between November 27, 2026 and February 24, 2028). It certainly addresses the Court's concerns.

Should the Court nonetheless conclude that extending the life of the Agreement—even for a limited number of Class Members for a limited amount of time—is not suitably tailored to the wrongful removals, Class Counsel propose that the Court modify the Agreement to retain jurisdiction to remedy Section III.I violations that occurred between November 25, 2024 and November 27, 2026, as well as over related claims for attorney fees and/or litigation costs. Retaining jurisdiction to address substantial noncompliance is well within the Court's authority under *Thompson*. 404 F.3d at 831–33 (affirming the district court's extension of jurisdiction over HUD because of substantial noncompliance). This narrow modification would not immediately restore the bargained-for benefits denied to removed Class Members, but it would make plain the Court's authority to fashion remedies appropriate to individual Class Members and to removed Class Members as a whole. It would thus serve as a suitably tailored vehicle to return both parties to the place they would have occupied had the substantial noncompliance not occurred.

Just as the district court concluded in *Thompson*, so too should this Court conclude that "extending the period of its jurisdiction over [federal defendants] would serve the public interest, by ensuring the most efficient means of enforcing the decree." *Id*. at 831. This modification would leave no doubt that Defendants are subject to this Court's Section III.I remedial orders and related fees and costs even after the Agreement's proposed November 27, 2026 Termination Date, eliminating any need to litigate that fact down the road. That the Agreement contains language attempting to limit that power is not the end of the story, as this Court has signaled. ECF No. 619 at 1 ("Nearly all of the provisions of that Agreement are set to terminate on May 27, 2026 (the 'Termination Date'), as will, *ostensibly*, this Court's authority to enforce those expiring terms.") (emphasis added); *Thompson*, 404 F.3d at 833–34 & n.7 (addressing a court's "inherent power to enforce a consent decree" even absent an extension of jurisdiction).

Indeed, this narrow modification would neatly align with the Court's undisputed authority to remedy violations of its April 23, 2025 Order even after the Agreement ends. Notably, upon direct questioning by the Court, Defendants conceded that the Court will still possess this jurisdiction after the Termination Date. ECF No. 622 (May 19, 2026 Hr'g Tr.) at 26–30.[3] [redacted]

[3] Defendants further conceded that the Court retains jurisdiction to enforce other orders it has or will have issued before the Termination Date:

> The Court: What is defendants' position with respect to what authority I would have after May 27th to remedy all of these violations that are now being uncovered?
>
> Ms. Johnson: So defendants do not contest in any way that this Court has jurisdiction to enforce its own order. So, for example, the April order that was issued in 2025, that order would still be in effect; this Court would have jurisdiction to enforce that order after May 27, 2026. To the extent that this Court issues any orders on the other pending motions before this Court before May 27, 2026, defendants would acknowledge that the Court has continuing jurisdiction to enforce those orders.

[redacted] Scholtz Decl. ¶ 8. The modification would also complement the Court's authority, extending past the Agreement's Termination Date, to issue compensatory orders based on its civil contempt finding against Defendants. *See Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 454, 467 & n.6 (4th Cir. 2020) (leaving intact the district court's reasoning that a consent order's expiration does not shield a non-compliant party from remediation but remanding for a reassessment of the remediation's scope). Again, the modification would not be superfluous because some of the unlawful removals were not contemptuous. *Supra* Section II.C; ECF No. 645 at 34 (limiting the contumacy to removals of individuals identified to ICE as potential Class Members). In sum, if the Court rejects Class Counsel's proposal to further extend the life of the Agreement for removed Class Members, it should nonetheless modify the Agreement to explicitly retain jurisdiction to remedy the wrongful removals and compensate Class Counsel for their work.

## VI. CONCLUSION

For all the reasons discussed above, the Court should exercise its equitable power under Fed. R. Civ. P. 60(b)(5) to extend the life of the Settlement Agreement until November 27, 2026 for the Class and until February 24, 2028 for Class Members removed in violation of Section III.I, permitting these Class Members to access, though belatedly, their bargained-for rights under the Agreement.

---

ECF No. 622 (May 19, 2026 Hr'g Tr.) at 28. This, of course, includes the Court's July 29, 2026 Order.

Dated: September 21, 2026

Respectfully submitted,

/s/ Brian T. Burgess

Brian T. Burgess (Bar No. 19251)
Goodwin Procter LLP
1900 N Street, NW
Washington, DC 20036
Phone: 202-346-4000
Fax: 202-346-4444
BBurgess@goodwinlaw.com

Elaine Herrmann Blais*
Kevin J. DeJong*
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
Phone: 617-570-1000
Fax: 617-523-1231
EBlais@goodwinlaw.com
KDeJong@goodwinlaw.com

Adam J. Horowitz*
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Phone: 212-813-8800
Fax: 212-355-3333
AHorowitz@goodwinlaw.com

Wendy Wylegala*
Kids in Need of Defense
252 West 37th Street, Suite 1500W
New York, NY 10018
Phone: 646-970-2913
Fax: 202-824-0702
WWylegala@supportkind.org

Michelle N. Mendez (Bar No. 20062)
National Immigration Project
1763 Columbia Road NW
Suite 175 #896645
Washington, DC 20009
Phone: 410-929-4720
Fax: 617-227-5495
Michelle@nipnlg.org

Rebecca Scholtz*
National Immigration Project
30 S. 10th Street (c/o University of St. Thomas Legal Services Clinic)
Minneapolis, MN 55403
Phone: 202-742-4423
Fax: 617-227-5495
Rebecca@nipnlg.org

Kristen Jackson*
Public Counsel
610 South Ardmore Avenue
Los Angeles, CA 90005
Phone: 213-385-2977
Fax: 213-201-4727
KJackson@publiccounsel.org

Mary Tanagho Ross*
Bet Tzedek Legal Services
3250 Wilshire Blvd., #1300
Los Angeles, CA 90010
Phone: 323-939-0506
Fax: 213-471-4568
MRoss@betzedek.org

*Attorneys for Plaintiffs*

*Admitted *pro hac vice*